No. 12-57302

_____

**UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

_____

CINDY LEE GARCIA,

Plaintiff-Appellant

v.

GOOGLE, INC., YOUTUBE LLC, et al., Defendants-Appellees

and

NAKOULA BASSELEY NAKOULA, an individual, a.k.a. Sam Bacile, et al.,

Defendants.

_____

On Appeal from the United States District Court

for the Central District of California

D.C. No. 2:12-cv-08315-MWF-VBK

_____

**BRIEF OF APPELLANT CINDY LEE GARCIA**

_____

M. Cris Armenta (State Bar No. 177403)       Credence Sol (State Bar219784)
The Armenta Law Firm APC                     La Garenne
11900 W. Olympic Boulevard Suite 730         86200 Chauvigng, France
Los Angeles, CA 90064                        Tel: 06 74 90 22 08
Tel: (310) 826-2826 cris@crisarmenta.com     email: credence.sol@sol-law.com

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ...................................................... 1

II.   JURISDICTION .............................................................................. 5

III.  ISSUES PRESENTED FOR REVIEW.......................................... 5

IV.  STATEMENT OF THE CASE ....................................................... 5

V.   STATEMENT OF FACTS............................................................... 7

     A.     Plaintiff Agreed to Provide a Dramatic Performance in "Desert Warrior" But Did Not Agree, In Writing or Otherwise, to Relinquish Her Copyright Interests ...............7

     B.     Yousseff Used Plaintiff As a "Puppet" For His Own Prejudiced Views, and YouTube Has Knowingly Published the Infringing, Doctored Version of Plaintiff's Performance Tens of Millions of Times...................................................9

     C.     Defendants Next Published an Arabic Version of the Film That Went Viral, Ultimately Resulting in the Issuance of a Death Sentence and Innumerable Death Threats Against Plaintiff, to Which Defendants are Completely Indifferent ........................................................10

     D.     Yousseff  Has Admitted That He Defrauded and Deceived Plaintiff for the Purpose of Procuring Her copyrighted Performance in "Desert Warrior," And That He Planned All Along to Insert Her Performance Into the Propaganda Film .................................................................11

     E.     In Addition to Becoming the Target of a Fatwa, Ms. Garcia Has Received Numerous Death Threats .............................12

     F.     Plaintiff Has Begged YouTube and Google to Save Her Life and Take Down the Film, But They Prefer to Continue to Profit From the Millions of Pageviews That the

Film Attracts........................................................................14

G.      YouTube and Google Have Specific Knowledge of The
        Infringing Material and Are in Receipt of Direct Financial
        Benefits Attributed to the Rampant Infringement...............16

H.      Defendants Google and YouTube's Response....................17

I.      Defendants Google and YouTube Employed Forgery and the
        Declaration of Convicted Fraudster to Bolster Their Defense
        at the Eleventh Hour Before the Hearing in This Case........18

J.      The District Court's Decision .............................................20

VI.     SUMMARY OF ARGUMENT .....................................................21

VII.    STANDARD OF REVIEW ..........................................................22

VIII.   ARGUMENT .................................................................................23

A.      Plaintiff Is Likely to Succeed on the Merits........................23

        1.      Plaintiff Clearly Owns the Rights to Her Dramatic
                Performance .............................................................23

        2.      Plaintiff Never Assigned Her Copyright Interests, As
                Required by This Court's Decision in Effects
                Associates.................................................................25

        3.      Defendant Yousseff and Plaintiff Garcia Never
                Agreed, in Writing or Otherwise, to Create a "Joint
                Work of Authorship," as Google and YouTube
                Apparently Claim......................................................27

        4.      YouTube Has Stepped Far Outside the DMCA's Safe
                Harbor Provision, Subjecting it To Liability for
                Copyright Infringement............................................29

5.      Even if Defendant Yousseff Had a Joint Copyright
        Interest with Ms. Garcia, None of the Third Parties
        Who Have Posted the Film Have A Right to Do So,
        and Are Infringing on Plaintiff's Copyright With
        YouTube's Full Knowledge and Consent.................30

IX.     APPELLANT CONTINUES TO SUFFER IRREPARABLE HARM
        IN THE ABSENCE OF AN INJUNCTION ...................31

X.      THE BALANCE OF EQUITIES IS IN PLAINTIFF'S FAVOR ...32

XI.     AN INJUNCTION IS DECIDEDLY IN THE PUBLIC
        INTEREST ......................................................................33

XII.    RELIEF REQUESTED ..................................................35

XIII.   CONCLUSION ...............................................................37

# TABLE OF AUTHORITIES

**Federal Statutes**                                                                  **Pages**

17 U.S.C. § 101.................................................................. 28

17 U.S.C. § 107.................................................................. 29

17 U.S.C. § 204(a) ............................................................. 25

17 U.S.C. § 201(b) ............................................................. 25

18 U.S.C. § 2..................................................................... 35

**Cases**                                                                                  **Pages**

A&M Records v Napster, Inc.,
239 F3d 1004 (9th Cir, 2001) ................................................................ 29

Aalmuhammed v. Lee,
202 F.2d 1227, 1233-1234 (9th Cir. 2000) .......................................... 28

Alliance for the Wild Rockies v. Cottrell,
632 F.3d 1127, 1131 (9th Cir. 2011) .................................................... 22

American Geophysical Union v. Texaco, Inc.,
60 F.3d 913, 922 (2d Cir. 1994) ............................................................ 29

Beardslee v. Woodford,
395 F.3d 1064, 1067 (9th Cir. 2005) ..................................................... 34

Brown v. Twentieth Century Fox Film Corp.,
799 F. Supp. 166 (D.D.C. 1992) ........................................................... 25

Caribbean Marine Services Co.., Inc. v. Baldridge,
844 F.2d 668, 674 (9th Cir. 1988) ........................................................ 31

Childress v. Taylor,
945 F.2d 500 (2nd Cir. 1991) ............................................................... 28

Columbia Pictures, Inc. v. Bunnell,
245 F.R.D. 443 (C.D. Cal. 2007) ........................................................... 34

Easter Seal Society v. Playboy Enters.,
815 F. 2d 323, 329 (5th Cir. 1987) ....................................................... 26

Effects Associates, Inc. v. Cohen,
908 F.2d 555 (9th Cir. 1990) ............................................................... 22

Ellison v. Robertson,
357 F.3d 1072, 1076 (9th Cir. 2004) .................................................... 29

Export Establishment etc. v. Columbia Broadcasting Service, Inc.,
503 F. Supp. 1137, 1147 (S.D.N.Y. 1980) ............................................ 29

Fleet v. CBS, Inc.,
50 Cal. App. 4th 1911, 1919-1920 (1996) ............................................ 23

Harper & Row Publishers, Inc. v. Nation Enters.,

471 U.S. 539, 564-65, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985) ........ 29

Harris v. Board of Supervisors,
366 F.3d 754, 766 (9th Cir. 2004) ........................................... 32

Jules Jordan Video, Inc. v. 144942 Canada, Inc.,
617 F.3d 1146 (9th Cir. 2010) ................................................ 23

Lands Council v. McNair,
537 F.3d 981, 986 (9th Cir. 2008) .......................................... 22

Law v. Miller,
2011 U.S. Dist. LEXIS 102527 (E.D. Cal. 2011) ............................ 34

Laws v. Sony Music Entm't, Inc.,
448 F.3d 1134, 1137 (9th Cir. 2006) ...................................... 23

Lenz v. Universal Music Corp.,
572 F. Supp. 2d 1150 (N.D. Cal. 2008) ................................... 29

Los Angeles News Service v. Tullo,
973 F. 2d 791, 798 (9th Cir. 1992) ........................................ 29

Muller v. Walt Disney Productions,
871 F. Supp. 678 (S.D.N.Y. 1994) ........................................ 26

National Meat Ass'n v. Brown,
599 F.3d 1093, 1097 (9th Cir. 2010) ..................................... 34

Oddo v. Ries,
743 F. 2d 630 (9th Cir 1984) ................................................ 27

Oster v. Lightbourne,
2011 U.S. Dist. LEXIS 138191 (N.D. Cal. 2011) ............................ 33

Reinsdorf v. Skechers, U.S.A.,
2011 U.S. Dist. LEXIS 28293, at *9 (C.D. Cal. Mar. 9, 2011) ........ 29

Rooney v. Columbia Pictures, Inc.,
538 F. Supp. 211 (S.D.N.Y. 1982) ...................................... 26

Schenck v. United States,
249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 ........................... 34

7

Siegel v. Time Warner, Inc.,
496 F. Supp. 2d 1111, 1148 (C.D. Cal. 2007) ..................................... 29

TMTV Corp. v Pegasus Broad. of San Juan,
490 F Supp. 2d 228 (D.C. Puerto Rico 2007) ..................................... 25

United States v. Hinkson,
585 F.3d 1247. 1263 (9th Cir. 2009) (en banc) ................................... 22

Universal City Studios, Inc. v. Corley,
273 F.2d 429, 440 (2d Cir. 2001) .......................................................... 29

Viacom, et al. v. YouTube, et al,
(2nd Cir . April 5, 2012) ......................................................................... 30

Winter v. NRDC,
555 U.S. 7, 20 (2008) ............................................................................. 22

Worldwide Church of God v. Philadelphia Church of God,
227 F.3d 1110, 1118 (9th Cir. 2000) ................................................... 29

Yue v. Conseco,
CV 11-9506 AHM, 2012 U.S. Dist. LEXIS 46565, 40-41
(C.D. Cal. Apr. 2, 2012) ........................................................................ 32

I. **PRELIMINARY STATEMENT**

This is an appeal from the denial of a motion for a preliminary injunction. Plaintiff Cindy Lee Garcia ("Plaintiff" or "Ms. Garcia") is an ordained Christian minister and an actress who delivered a dramatic supporting performance in what Defendant Nakoula Basseley Nakoula and his agents told her was a benign, low-budget "Arabian" desert adventure film. The film, Ms. Garcia was told, would be titled "Desert Warrior." Instead, Defendant Nakoula and/or his agents took Ms. Garcia's "Desert Warrior" performance, dubbed it over almost beyond recognition, and inserted it into the trailer for another film entirely, which Defendant Nakoula and/or his agents titled, "The Innocence of Muslims" (hereinafter both the film and its trailer will be referred to as the "Film"). In the trailer for the Film, Ms. Garcia, who had delivered lines for "Desert Warrior" expressing concern for her character's daughter, was instead made to appear, through post-performance dubbing in which she did not participate and to which she did not consent, to accuse Mohammed, the founder of the Islamic religion, of being a child molester. Subsequently, Ms. Garcia's altered performance was translated into Arabic, both through additional dubbing and/or through the use of subtitles; the versions of the Film that were accessible to an Arabic-speaking audience were posted on YouTube on or around September 11, 2012. That day, the U.S. consulate in Benghazi, Libya, was attacked, resulting in the death of four Americans. Initially, both the worldwide media and the U.S. government blamed the Film for inciting the violence in Benghazi, the assassination of Benghazi-based U.S. Ambassador Christopher Stevens, and deadly, worldwide demonstrations against the Film.

Although the ultimate cause of the attacks and demonstrations may never be known for certain, the main issue in this case involves the vicious frenzy against Ms. Garcia that the Film caused among certain radical elements of the Muslim community beginning around the time of the Benghazi attacks. Specifically, ever since Defendants posted the Arabic version of the Film to YouTube, Ms. Garcia has become the subject of an Egyptian fatwa, in which a prominent cleric called upon American Muslim youth to kill her; Ms. Garcia has received and continues to receive numerous, credible death threats. Shortly after she became aware of the existence of the Arabic version of the Film, and the death threats began to arrive, Ms. Garcia immediately sought to enjoin any further publication of her performance in the Film. The basis for the injunction is that the makers of the Film, along with the Film's republishers (which include Defendants Google, Inc. and YouTube, which have refused to remove the Film either as posted by Defendant Nakoula and his agents or by the hundreds of third parties who indisputably own no copyright in the Film), have violated her copyright interest in the dramatic performance that she gave for "Desert Warrior." At the district court, Ms. Garcia pointed out that she never consented to appear in "The Innocence of Muslims" and, in fact, had never released her copyright in "Desert Warrior" to any of the Defendants. Furthermore, Ms. Garcia noted that even if Defendants could argue that she had provided an "implied" license of her work for the Film "Desert Warrior," that consent was limited to the project in which she agreed to appear, and that Defendants had breached any implied license when they used her as a "puppet" who appeared to spout their hatred of Muslims and the Islamic religion. Finally, Ms. Garcia informed the district court that her

life and the lives of her family members (who also have received death and rape threats) are in grave danger as the result of Defendants' actions.

The district court declined to hear the matter on an ex parte basis and converted the application to a motion for a preliminary injunction. After the matter was fully briefed and without leave of court, just three days before the scheduled hearing, Defendants Google and YouTube submitted documents that purported to be a signed release by Plaintiff consenting to use of her performance in anything. On the eve of the hearing, the district denied the motion for preliminary injunction *without even permitting a hearing*, notwithstanding the fact that Plaintiff had already provided the district court with credible evidence (including the opinion of an expert handwriting analyst) that the documents submitted by Google and YouTube were forgeries.

The first legal issue presented by this appeal is whether Plaintiff Garcia established that, in the absence of an injunction, she will suffer irreparable harm. Surely, the official pronouncement of a death sentence on Plaintiff, followed by numerous credible death threats, as a result of her appearance in the Film must constitute irreparable harm. The district court erred when it focused on the fact that Defendant Nakoula and/or his agents quietly posted an English-language version of the Film on YouTube in July of 2012, which received no media attention and no attention from the radicals that currently are threatening Ms. Garcia. The critical timeframe begins at the moment at which Plaintiff's life was placed in danger – and that did not occur until *after* the Benghazi attacks on September 11, 2012, when the Film received worldwide notoriety. Plaintiff, a woman of extremely modest means, acted promptly by seeking court relief within a week in the state court and then by seeking federal court protection within

less than 30 days. The district court's conclusion—that that Plaintiff waited too long and thus that her life was not worth saving—was an abuse of discretion. To the extent that the district court held that numerous and credible death threats against Plaintiff do not constitute irreparable harm, such a conclusion is also an abuse of discretion.

The second issue is whether Ms. Garcia has a legally cognizable copyright claim. The district court held that Ms. Garcia was not the "author" of the Film – i.e., its producer or director – and therefore her performance in "Desert Warrior" was somehow merged into a unitary whole together with Defendants' hateful propaganda film, causing her to lose all of her intellectual property rights in her creative acting performance. This was an incorrect statement of the law, and this Court should review it *de novo*. Contrary to the trial court's conclusion, an actor does, in fact, retain a copyright in his or her performance (once it is fixed in a tangible medium) unless she is an employee, has *signed* a release, or *has agreed in writing* that the performance is a work for hire. None of those copyright exceptions apply in this case. What's more, even if Ms. Garcia did convey an "implied" license to Defendant Nakoula and/or his agents (which she did not), that license extended *only* to the performance that she *actually gave*, which was a benign supporting role in the "Desert Warrior" adventure film. Neither Defendants nor the trial court cited any authority (and Plaintiff believes that no such authority exists) that the "implied license" exception upon which Defendants and the trial court relied extends to entirely unrelated projects and/or willful deception of the actor as to the nature of the project, as occurred in this case. Indeed, it is undisputed that the film "Desert Warrior" contained no references to the Muslim faith or its founder, Mohammed. Plaintiff neither expressly nor impliedly consented that her dramatic

performance could be used, dubbed over with hateful dialogue and inserted into the propaganda Film. Accordingly, the trial court erred when it refused to issue a preliminary injunction, and Plaintiff respectfully requests that this Court reverse the trial court's decision.

## II. JURISDICTION

The district court had jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff brought her claims under federal law, specifically under the United States Copyright Act. 17 U.S.C. § 101, *et seq*. This Court has jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

## III. ISSUES PRESENTED FOR REVIEW

1. Whether Plaintiff will suffer irreparable harm in the absence of a preliminary injunction,

2. Whether an actor retains a copyright interest in her dramatic performance fixed to a tangible medium, particularly in the absence of a signed writing or release, such that she may assert a copyright claim where her performance is taken from one film and inserted into a completely different film, for which she also did not sign a release, even if that actor is found to have granted an implied limited license to use her performance in the first film.

## IV. STATEMENT OF THE CASE

On September 26, 2012, just 15 days after the attacks in Benghazi, Plaintiff Garcia brought suit against "Nakoula Basseley Nakoula," Google, Inc., and YouTube LLC. *Complaint (Excerpts of Record ("ER") 1-62.)* Plaintiff filed a first amended complaint (the "Complaint") on October 4, 2012, which amended Defendant Nakoula's name to Mark Youssef ("Youssef"), after it was revealed in his federal criminal probation revocation proceeding that he had lied to the United States District Court,

the Federal Bureau of Investigation and the United States Probation Department about his true name. *First Amended Complaint ("FAC"); ER 63.* Plaintiff alleges that Defendant Youssef violated Plaintiff's copyright interest in her dramatic performance by taking her performance in the supposedly benign film "Desert Warrior" and dubbing it over with hateful words in English and Arabic, as well as subtitling the hateful words in Arabic, and placing her performance into the Film, a trailer entitled "Innocence of Muslims." *FAC ¶ 4; ER 65.* Initially, the world media reported the Film as having caused havoc in the Middle East and elsewhere. *FAC ¶¶ 1-3; ER 64.* Plaintiff alleged secondary infringement claims against Google and YouTube for republishing the Film, which resulted in gruesome and credible death threats and an Egyptian cleric's issuance of a "fatwa" demanding Plaintiff's death. *FAC ¶ 35; ER 71.*

On October 11, 2012, Plaintiff made a routine *ex parte* application for an order to exceed the page limits of her brief. *Plaintiff's Ex Parte Application to Exceed page Limits Set Forth in Local Rule 11-6; ER 123.* The district court denied the application on October 15, 2012. *ER 133-134.* On October 17, 2012, Plaintiff applied for a temporary restraining order. *ER 135.* The district court denied the application and converted the application to a motion for a preliminary injunction. *ER 601-602.* On October 29, 2012, Defendants Google and YouTube (but not Youssef) opposed the motion. *ER 611-641.* Plaintiff filed a reply on November 5, 2012. *ER 686-783.* The hearing was set for December 3, 2012.

On November 28, 2012, without leave of court to file any additional papers, Defendants Google and YouTube filed purported "releases" that they claim Plaintiff executed, in which Plaintiff transferred all of her intellectual property rights to an unknown entity. *Declarations of Mark Basseley*

*Youseff and Timothy L. Alger; ER 791-806.* Within 48 hours, Plaintiff filed objections to the untimely and improper evidence, *and* obtained the expert opinion of an established, well-respected forensic document examiner, who concluded unequivocally that the documents offered were forgeries. *Plaintiff's Objections to and Request to Strike Declarations of Tim Alger and Mark Basseley Youseff; Declarations of M. Cris Armenta, Gaylord Flynn, Cindy Lee Garcia and Jim Blanco; ER 817-890 and ER 895-945.* That same day, November 30, 2012, the district court abruptly canceled the scheduled hearing, denying Plaintiff both a preliminary injunction and her day in court. *ER 892-849.* This appeal follows.

## V.    STATEMENT OF FACTS

### A.    Plaintiff Agreed to Provide a Dramatic Performance in "Desert Warrior" But Did Not Agree, In Writing or Otherwise, to Relinquish Her Copyright Interests.

Plaintiff is an ordained Christian minister. *Declaration of Cindy Lee Garcia ("Garcia Decl.") ¶ 3; ER 193.* She began acting to supplement her income after her husband became disabled. *Id. ¶ 3; ER 193.* As a minister, Ms. Garcia preaches tolerance and respect for all religions. *Id. ¶ 4; ER 193.* The depiction of Plaintiff Garcia as a person who would participate in a hateful production that blasphemes any religion is devastating to her. *Id. ¶ 4; ER 193.*

In July of 2011, Plaintiff responded to a casting notice for a film entitled "Desert Warrior." *Id. ¶ 5; ER 193.* Plaintiff was cast in a supporting role in which, according to the film's producer, Youseff (who at the time was calling himself "Sam Bacile"), she was to play the mother of a young woman who had been promised in marriage to the movie's protagonist, "Master George." (*Id.*) After Plaintiff was cast, Youseff gave

her "call sheets" that indicated the days she was to be on set, and outlined the scenes to be filmed. *Id. ¶ 6; ER 193-194*. Additionally, Youseff and/or his agents provided Plaintiff with "script sheets" for those scenes in which her character was to appear. *Id*. None of those sheets contained content or language that Plaintiff perceived to be religiously offensive. *Id*. Notably, none of the script sheets referred to a character named "Mohammed." *Id*.

Plaintiff never signed a release of her rights to her dramatic performance (whether with respect to "Desert Warrior" or any other project), nor did she sign a work-for-hire agreement. *Id. ¶ 8; ER 194*. Additionally, she was never an employee of Youseff or any production company associated with "Desert Warrior," nor was she an agent of Youseff or anyone else. *Garcia Decl. ¶ 7; ER 194*. Plaintiff's position in this regard is entirely consistent with the recollections of other actors who appeared in the production: none of them apparently signed releases, nor did they sign work-for-hire agreements. *Declaration of Dan Sutter ¶ 4; Declaration of Gaylord Flynn ¶ 8; ER 194*.

Both prior to accepting the role and while on set, Plaintiff specifically asked Youseff (who was using the alias "Sam Bacile") about the film's content. *Garcia Decl. ¶ 10; ER 194*. Youseff consistently responded that the film was titled "Desert Warrior," and that it was an "adventure" story set in the Arabian Desert 2,000 years ago. *Id*. Significantly, at no time during her presence on the set did Plaintiff hear any mention of Islam. *Id*. Accordingly, Plaintiff delivered her performance (the "Copyrighted Performance") as set forth in the "Desert Warrior" script.

It is now undisputed that, contrary to his stated intentions, Youseff never intended to create an "adventure" film titled "Desert Warrior." Instead, as he later admitted to Plaintiff, his true intention from the

beginning was to use her (copyrighted) performance to create an entirely different work, the propaganda Film titled "Innocence of Muslims." *Id. ¶ 13; ER 196.*

**B.** **Yousseff Used Plaintiff As a "Puppet" For His Own Prejudiced Views, and YouTube Has Knowingly Published the Infringing, Doctored Version of Plaintiff's Performance Tens of Millions of Times.**

In March of 2012, Yousseff requested that Plaintiff participate in a post-production session. *Id. ¶ 11; ER 195.* During that session, Plaintiff only redelivered lines she had delivered previously. *Id.* Sometime after July 2, 2012, Plaintiff telephoned Yousseff to ask whether "Desert Warriors" was ready to be screened. *Id. ¶ 12.* Yousseff then revealed that he had posted a trailer on YouTube. *Id. ¶ 12.*

When Plaintiff accessed the trailer (by then retitled "Innocence of Muslims," and referred to throughout this brief as the "Film") on YouTube she made the horrifying discovery that Yousseff had dubbed bigoted dialogue over her lines, and used her Copyrighted Performance in a manner that was entirely inconsistent with the production in which Yousseff had told Plaintiff she was participating. *Id. ¶ 12; ER 195.* In effect, Yousseff turned her into a walking, talking "puppet" for his opinion that Mohammed, the founder of the Islamic religion, was a "child molester." *Id.*

Here are the lines that Plaintiff Garcia *actually* delivered in "Desert Warrior":

"Is George crazy?  Our daughter is but a child?"

*Id. ¶ 12; ER 195.*

In contrast, in the Film ("Innocence of Muslims"), Yousseff retained Ms. Garcia's *visual* performance but dubbed in the words:

> "***Is your Mohammed a child molester***?"

*See id. ¶ 12, and Ex. B to Declaration of Dave Hardy ("Hardy Decl.") (YouTube video, "The Innocence of Muslims", posted by "Sam Bacile"); ER 195.* Plaintiff has never uttered those words, let alone on the set of "Desert Warrior." *Garcia Decl. ¶ 12; ER 196.*

### C. Defendants Next Published an Arabic Version of the Film That Went Viral, Ultimately Resulting in the Issuance of a Death Sentence and Innumerable Death Threats Against Plaintiff, to which Defendants Are Completely Indifferent.

On September 11, 2012, the U.S. Consulate in Benghazi, Libya, was attacked, resulting in the deaths of four Americans, including Ambassador Christopher Stevens. *Declaration of Abou El Fadl, ¶ 10; ER 248.* Violence has continued to erupt across the world. *Id. ¶ 11; ER 248.* Many experts in geopolitical affairs initially attributed this violence directly to the Film. *Id. ¶ 9*-15; ER 249. News reports indicate that many people worldwide have died in the violence that the Film has sparked. *Id., Ex. D; ER 250.* Whether or not the Film caused the violence, the violence in fact occurred, with many at the time attributing it to the anti-Muslim sentiment in the Film. *Id., ¶ 15; ER 249-250.*

On September 19, 2012, Egyptian cleric Ahmad Fouad Ashoush issued a "fatwa" directed at Plaintiff and every other person appearing in "The Innocence of Muslims":

18

I issue a fatwa and call on the Muslim youth in America and Europe to do this duty, which is to kill the director, the producer and the actors and everyone who helped and promoted the film.

*Id. ¶ 14; ER 249.*

Google Chairman Eric Schmidt's response to the fatwa was astounding, though perhaps not surprising given that the fatwa was not directed at him and, unlike Plaintiff, he likely has the financial means to hire private security. He said: "We believe the answer to bad speech is more speech … It'll stay up." *Declaration of M. Cris Armenta Decl. ¶ 9, & Ex. C; ER 489.* Needless to say, neither Mr. Schmidt, nor Google, nor YouTube offered Plaintiff any security-related assistance, leaving Plaintiff and her family "sitting ducks." Naturally, Plaintiff has no desire to become a martyr for Yousseff and Schmidt's "cause" of attacking Islam while pretending that YouTube and Google are neutral defenders of free speech. Nor has she any interest in helping Defendants to profit from the 30 million-plus "views," and associated ad revenues, from exhibiting the Film and her Copyrighted Performance.

> **D.** **Yousseff Has Admitted That He Defrauded and Deceived Plaintiff for the Purpose of Procuring Her Copyrighted Performance in "Desert Warrior," And That He Planned All Along to Insert Her Performance Into the Propaganda Film.**

Immediately after seeing the news about the attacks in Libya and realizing that the grotesque manipulation of her performance was related to the violence around the world, Plaintiff asked Yousseff why he "did this?" *Garcia Decl. ¶ 13; ER 196.* He replied, "You are not responsible. Tell the world that you are innocent. I did this… I did it because I am tired of the radical Muslims killing innocent people." *Id. ¶ 10; ER 194-195.* In essence,

Yousseff admitted that it was always his secret intention to manipulate the footage so that Plaintiff would appear to have participated in creating a hate film. *Id.* In that conversation, Yousseff, by telling Plaintiff that she was "innocent" and "not responsible," affirmed that the work that became "Innocence of Muslims" was not a "joint work," and that he acted alone. *See Garcia Decl. ¶ 13; ER 196.* Moreover, Mr. Yousseff's statements to Ms. Garcia constitute an admission that she had *not* given him permission to insert her (doctored) Copyrighted Performance in "Desert Warrior" into the hate Film "The Innocence of Muslims."

## E. In Addition to Becoming the Target of a Fatwa, Ms. Garcia Has Received Numerous Death Threats.

Immediately after the Film "went viral" on YouTube, Plaintiff began to receive calls from the media, all of whom apparently were already somehow aware that her Copyrighted Performance was prominently featured in the Film. *Garcia Decl. ¶ 14; ER 196.* Members of the media, none of whom had been given Ms. Garcia's address by Ms. Garcia or her family, camped outside her home. *Id. ¶ 14; ER 196.)* Plaintiff learned about the *fatwa* and began to receive credible and gruesome threats, including death threats and threats to rape her daughter. *Id.* In order to clear her name, to ensure that the world was aware that she was duped into performing for Yousseff, and to clarify that she had never uttered the words attributed to her in the Film, she publicly declared that she does not condone the content or message of the Film, and that her Copyrighted Performance in "Desert Warrior" had been grotesquely mutilated. *Id. ¶ 14; ER 196.* Hoping that the justice system would show more concern for her continued survival than had the Defendants, Plaintiff took legal action in state court, premised on various

theories of tort liability, to have the Film removed from YouTube. *Id. ¶¶ 14, 15; ER 196-197.*)

While in Los Angeles Superior Court on September 20, 2012, for a hearing on her state-law claims, Plaintiff and her counsel were directed by law enforcement to park in a secure location; seven armed Los Angeles County Deputy Sheriffs accompanied them in the courthouse. *Id. ¶ 15; ER 196-197; Armenta Decl. ¶ 2; ER 487.*) Her attorney was approached by the head of security for the Los Angeles Superior Court, who expressed concern for Plaintiff, Ms. Armenta, and both of their families; he advised that those threatening Plaintiff "are very patient," and that everybody connected with this case was in danger. *Id.*; *Garcia Decl. ¶ 15; ER 196-197.* Both were advised to take serious security measures at home, as well as any time at which they may enter or exit the L.A. Superior Court in the future. *Garcia Decl. ¶ 15 ER 196-197; Armenta Decl. ¶ 2; ER 487.*

While in New York during the last week of September 2012, Plaintiff and counsel were accompanied by retired police officers and other security officers. *Garcia Decl. ¶ 16; ER 197.* When they departed New York, the Port Authority Police would not permit Plaintiff even to enter the La Guardia International Airport terminal; Plaintiff was taken directly to her airplane on the tarmac in a squad car, for fear that she would become an "instant target" in the terminal. *Id.* Plaintiff has now moved her home, as well as the location of her church. *Id. ¶ 17; ER 197-198.* The numerous death threats have been reported to the authorities. *Id.* They include, but are not limited to, the following:

> "I am ready to die for MUHAMMAD (PBUH) and I would Like to Kill all Those Who contributed in the Shape of Acting or Financially or any other Kind of Support in Shameless Movie."

"And If You Wanna to save your life and we consider your innocent then Just Kill Sam and Terry Jones."

"Dear the end is near."

"It's all a big joke.  She will be Killed by someone who loves and cares our Prophet Muhammad peace be upon him"

"She will know what she did now she is saying sorry about that"

*Id. ¶ 17 & Ex. B) (grammatical errors in original); ER 197-198.*  Ms. Garcia also received a gruesome set of threats related to raping her daughter.  *Id.* As frightening and disturbing as these threats have been to Plaintiff, according to noted international expert and UCLA Professor Abou El Fadl, it is the threats that are *not* made that are the most dangerous.  *Abou El Fadl ¶ 17; ER 250.*  Thanks to Defendants' refusal to remove the Film that contains her Copyrighted Performance from YouTube, Plaintiff's life has been changed forever.  *Id. ¶ 16; ER 250.*  It is only her public efforts to clear her name that may be keeping her alive and her efforts to remove or disable the Film will certainly help to convince others that she is not a willing puppet of a global conspiracy against Islam.  *Id. ¶ 21; ER 251.*

**F.**  **Plaintiff Has Begged YouTube and Google to Save Her Life and Take Down the Film, But They Prefer to Continue to Profit From the Millions of Pageviews That the Film Attracts.**

In accordance with YouTube's terms of service, Appellant issued the first of many DMCA takedown notices on September 24, 2012, through her takedown agent, DMCA Solutions.  *Hardy Decl., ¶ 5; ER 409.*  Appellant and DMCA Solutions have issued eight takedown notices.   In the

experience of DMCA Solutions, YouTube typically responds to an initial takedown notice in a manner intended to protect itself from liability for contributory copyright infringement pursuant to the "safe harbor" provisions of the DMCA. *Id., ¶ 4; ER 408-409.* First, YouTube typically sends a notice advising that the notice has been received ("Acknowledgement of Takedown Notice"). Next, YouTube typically quickly removes or disables the allegedly infringing content pending the original poster's provision of proof that he or she has the right to post it. *Id.*

YouTube itself, through the Associate General Counsel of Google, Inc. (YouTube's parent company) Zavanah Levine, has issued a sworn statement in which she agrees that YouTube's DMCA procedures are consistent with the observations of DMCA Solutions:

> Once YouTube receives a notification of alleged infringement that substantially complies with the DMCA requirements, we act promptly to remove the identified material from our service or disable access to it. Throughout my tenure at the company, we have removed almost all of the videos identified in DMCA notices within 24 hours; indeed for the vast majority of DMCA notices (about 85%), we remove the identified videos within a few minutes using automated tools.

*Declaration of Zavanah Levine, ¶ 19; ER 294.* This time, contrary to the policy and protocols sworn to by Ms. Levine, and the practices long observed in the industry, YouTube did not remove or disable the content within 24 hours. Instead, it sent multiple, identical form letters denying Ms. Garcia's requests. *Hardy Decl. ¶ 7 & Ex. C ("YouTube's First Substantive Inquiry"); ER 409-410.* In response to YouTube's First Inquiry Response, Appellant's takedown agent sent a detailed response explaining her copyright interests, setting forth the relevant law. *Id. ¶ 8 & Ex. D ("Garcia's First Substantive Response"); ER 410-412.* Ms. Garcia sent the First Substantive Response on September 26, 2012. *Id.* By October 2, 2012,

YouTube still had neither responded nor disabled the content. *Id., ¶ 9; ER 412.* YouTube has breathed life into a work of fiction that is causing violence and death the world over.

On October 2, 2012, counsel for Appellant Garcia spoke directly with counsel for Defendants Google and YouTube. *Armenta Decl. ¶ 4; ER 488.* Defense counsel informed Ms. Armenta that the Film remained posted, that a decision had been made "at the highest levels" to keep it up, and that YouTube was not obligated to respond to Ms. Garcia—even though it was YouTube that had demanded "further information … [in] as much detail as possible"! (*Id.*)

Within two hours of that conversation, Appellant received another inquiry from YouTube, requesting even more information. *Hardy Decl. ¶ 9 ("YouTube's Second Inquiry"); ER 412-416.* Appellant's takedown agent then issued Garcia's Second Substantive Response, citing additional relevant case law and provisions of the United States Copyright Act. *Hardy Decl. ¶ 10 & Ex. E; ER 414.* Finally on October 4, 2012, YouTube set forth its final position – consistent with Chairman Schmidt's public remarks—that Google and YouTube would continue to post all copies of the Film.[1] *Hardy Decl. ¶ 11 ("YouTube's Final Response"); ER 416-417.*

---

[1] Significantly, neither Google nor YouTube has taken any steps to take down postings of the Film that have been put up by third parties entirely unrelated to the Film or any of the persons involved in its production, which third parties indisputably are committing copyright infringement.

### G.     <u>YouTube and Google Have Specific Knowledge of the Infringing Material and Are in Receipt of Direct Financial Benefits Attributed to the Rampant Infringement.</u>

YouTube has long been in possession of actual notice of the URLs that contain the infringing content. YouTube claims to have received more than 30 million "views" of the Film in the English language alone; it has not provided information of which Plaintiffs are aware that would quantify the number of "views". *See generally Hardy Decl. & Exs. appended thereto; ER 408-418.* It is incontrovertible that the trailer is a "draw" for consumers—whose viewings provide YouTube with profit from ad revenues—to visit YouTube. YouTube and Google have the ability to block access to the trailer—in fact, they have already made the editorial judgment to do so in Saudi Arabia, Libya, Indonesia, and Egypt, and may have done so in other countries. *Armenta Decl. ¶ 9 & Ex. C; ER 489.*

### H.     <u>Defendants Google and YouTube's Response.</u>

Defendants Google and YouTube opposed injunctive relief, arguing that Appellant had not identified any irreparable harm, and that Ms. Garcia committed inexcusable delay by because she did not file her complaint until September 19, 2012. Defendants also argued, against the weight both of Ninth Circuit authority and the opinion of the United States Copyright Office as recently set forth at the World Intellectual Property Organization, both that Ms. Garcia *could not* hold a copyright interest in her own performance and that, notwithstanding the absence of a written release, her performance must have been a "work for hire." Defendants finally argued that the equities did not tip in Appellant's favor and that an injunction would be an unlawful prior restraint that would not serve the public interest.

Appellant responded in her reply brief that the ongoing death threats as a result of Google and YouTube's continued publication of the Film certainly constitute irreparable harm. Appellant also demonstrated that under the prevailing authority in the Ninth Circuit, and as acknowledged by the official position of the United States in connection with the World Intellectual Property Organization treaty, an actor's individual performance is, in fact, copyrightable, once that performance is fixed in a tangible medium. Finally, Appellant noted that Google and YouTube submitted no evidence to support their guess that Ms. Garcia must have agreed to work for hire. Further, two well established and indisputably relevant exceptions to the First Amendment apply in this case: (1) restraint against copyright infringement; and (2) restraint against permitting a person to shout "Fire!" in a crowded theater. As to the first point, it is virtually indisputed that Ms. Garcia never agreed to a work-for-hire or any other arrangement that would result in the cession of her intellectual property rights to Yousseff and/or his agents. As to the second point, it is well to remember that YouTube itself erected a crowded theater, and given that Yousseff clearly (and successfully) intended the Film to incite violence, restraining further publication of the trailer does not run afoul of the First Amendment. The public, would, in fact, be served by restraining further publication of the Film, when considering balancing the right to speak versus the violence that has ensued. Nothing stops Yousseff or any other person from insulting Muslims, the Islamic religion, or any Islamic religious figures, including Mohammed. However, what Defendants may ***not*** do is force Ms. Garcia to do their dirty work, in contravention of her own opinions and beliefs.

**I.** **Defendants Google and YouTube Employed Forgery and the Declaration of a Convicted Fraudster to Bolster Their Defense at the Eleventh Hour Before the Hearing in This Case.**

After the motion for preliminary injunction was fully briefed and all that awaited was the December 3, 2012, hearing, on November 28, 2012, Defendants Google and YouTube submitted two declarations without any leave of court to do so. Defendant Yousseff, a convicted fraudster who is currently sitting in a federal prison for various parole violations related to that conviction, executed a declaration (apparently drafted by counsel for Google and YouTube) that attached two documents, a "Cast Deal Memo" and a "Release," both of which Appellant purportedly signed. Appellant questioned the authenticity of the documents, informed defense counsel of their dubious nature, and immediately retained a well-respected forensic document examiner, James Blanco. After reviewing the documents and numerous samples of Plaintiff's handwriting, Mr. Blanco concluded unequivocally that Mr. Yousseff's documents are a forgery. Appellant alerted Defendants and the Court that Mr. Blanco's signed declaration would be forthcoming and made efforts to immediately secure and file it. To her shock, just minutes before she uploaded Mr. Blanco's declaration was uploaded to the court's electronic filing system, the district court issued an order denying the motion for preliminary injunction and vacating the December 3, 2012 hearing.

The district court's decision does not appear on its face to have been dependent on the forged documents submitted by Defendants Google and YouTube. It is significant to note, however, that the assumption that Defendants Google and YouTube offered in their opposition – that

Appellant must have signed a release (because everyone in the film industry signs one) – has been handily refuted. Ms. Garcia never signed any release of her rights, was not an employee of Yousseff or anybody else, and her performance was not documented as a "work for hire."

### J. The District Court's Decision.

As noted above, the district court refused to hear oral argument and denied Appellant's motion apparently without having the benefit of the knowledge that Defendants are now staking their case on forged documents. In its decision, the district court instead concluded that Appellant failed to show irreparable harm.[2] It further concluded that Ms. Garcia holds no copyright interest to her dramatic performance in the Film.

The district court's decision was wrong for many reasons. First, the district court failed to acknowledge that the performance Ms. Garcia delivered was for the "adventure" story "Desert Warrior," not the propaganda Film "Innocence of Muslims." Second, the district court erred and missed the point when it held that because Appellant is not the "author" of "Desert Warrior," unlike a producer, director or scriptwriter, she could not hold a copyright – she does, but only in the part that constitutes her creative performance. Specifically, the court concluded that the "movie was intended by everyone involved with it to be a unitary whole," and therefore the copyright "vests initially in the author or authors of the work," and does no vest in an actor – contrary to the case law, the United States Copyright

---

[2] Under the district court's reasoning, it would be hard to imagine a case in which a Appellant *could* show imminent or irreparable harm. Must Cindy Lee Garcia be murdered as threatened, must her daughter be raped as threatened, must the *fatwa* be carried out as threatened resulting in her murder or the rape of her daughter, in order for her to demonstrate the likelihood of harm?

Act and the position of the United States in recently approving an international treaty on the subject. Third, although the district court acknowledged Appellant's position "that she owns the copyright of her performance," it concluded that Appellant "necessarily (if impliedly) would have granted the Film's author a license to distribute her performance as a contribution incorporated into the indivisible whole of the Film." This conclusion was wrong not only because it conflicts with the law of the Ninth Circuit and the position of the U.S. Copyright Office, but also because even if Ms. Garcia *did* grant some implied, non-written, unspoken "license" to Youseff and/or his agents, the scope of that license would have been limited to the use of her performance in a desert adventure film with the working title "Desert Warrior" – *not* a propaganda Film in which her lines were re-dubbed with the express intention of fomenting worldwide hatred. Having denied the motion on the above grounds, the district court did not reach the issues of balance of equities and the public interest.

## VI.   **SUMMARY OF ARGUMENT**

The primary legal question, which will impact the entire entertainment industry, is whether an actor owns a copyrightable interest in her dramatic performance in a film, where the actor has not made a writing assigning her interest and the film makers later take her performance and insert a doctored version of it into a wholly different property. By way of example, if an actor performed in a benign action film or documentary and the filmmaker later took that benign performance and inserted it into a hard-core pornographic film, does the actor retain a copyrightable interest in his or her original performance such that he or she could avail herself of the remedies of the United States Copyright Act to enjoin publication of the performance in the

later work?  The answer is yes, and is guided quite specifically by this Circuit's decision in Effects Associates, Inc. v. Cohen, 908 F.2d 555 (9th Cir. 1990).   In Effects, this Circuit held that a contributor in a film retains ownership of its copyright interests, but where there is an implied license to use the contribution, if the scope of that license is exceeded, a copyright claim may be launched.

## VII.   STANDARD OF REVIEW

The denial of a preliminary injunction is reviewed for abuse of discretion.  Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir. 2011).  A district court abuses its discretion if it bases its decision "on an erroneous legal standard or clearly erroneous findings of fact."  Id. (quoting Lands Council v. McNair, 537 F.3d 981, 986 (9th Cir. 2008) (en banc).  A district court's legal conclusions are reviewed de novo and its factual findings for clear error.  Id. (quoting Lands Council, 537 F.3d at 986-87).  In doing so, the reviewing court "first look[s]] to whether the trial court identified and applied the correct legal rule to the relief requested.  Second, the court looks to whether the trial court's resolution resulted from a factual finding that was illogical, implausible or without support in inferences that may be drawn from the facts in the record.  United States v. Hinkson, 585 F.3d 1247. 1263 (9th Cir. 2009) (en banc).

To obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  Winter v. NRDC, 555 U.S. 7, 20 (2008).  A preliminary injunction is proper if there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the merits, the balance of hardships tips sharply in favor of the plaintiff; and the

injunction is in the public interest.  Alliance for Wild Rockies, 632 F.3d at
1131-1132.

## VIII.  ARGUMENT

The district court abused its discretion in denying the motion for a
preliminary injunction and was incorrect in its conclusions of law.

### A.    Plaintiff Is Likely to Succeed on the Merits

1.    Plaintiff Clearly Owns the Rights to Her Dramatic
Performance.

Once Ms. Garcia's performance was put in film, it became a
"dramatic work" "fixed in [a] tangible medium of expression" that could be
"perceived, reproduced, or otherwise communicated" through "the aid of a
machine or device." 17 U.S.C. § 102(a); see Fleet v. CBS, Inc., 50 Cal. App.
4th 1911, 1919-1920 (1996) ("their individual performances in the film
White Dragon were copyrightable.  Since their section 3344 claims seek
only to prevent CBS from reproducing and distributing their performances in
the film, their claims must be preempted by federal copyright law"); see also
Jules Jordan Video, Inc. v. 144942 Canada, Inc., 617 F.3d 1146 (9th Cir.
2010) (holding that claim that actor's right of publicity claim, arising from
unauthorized use of performance in DVD's, came within subject of
copyright); Laws v. Sony Music Entm't, Inc., 448 F.3d 1134, 1137 (9th Cir.
2006) (finding voice recordings were plainly original works of authorship
fixed in a tangible medium).  Ms. Garcia's individual performance in the
film "Desert Warrior" is copyrightable.  See id. (actors' individual
performances in film are copyrightable).

The district court apparently was under the impression that an actor's
rights to his or her performance automatically revert to the filmmaker once
they collaborate to create a unitary work.  Not true.  First, if that were the

law, filmmakers would not engage in the universal practice of requiring their actors to release their copyrights as a condition of appearing in films, which did not occur in this case.   Second, <u>Laws v. Sony Music Entm't, Inc.</u>, 448 F.3d 1134, 1137 (9th Cir. 2006), and <u>Jules Jordan Video</u>, 617 F.3d 1146, confirm that in the Ninth Circuit, a performer retains the rights in her performance unless she transfers or assigns them:  (1) by virtue of her status as an *employee* of the filmmaker; (2) by a *written* assignment of the copyright; or (3) by executing a *written* work-for-hire agreement.  In fact, it is clear that the law, not only of the Ninth Circuit, but also as understood by the United States Patent and Trademark Office and the Copyright Office, ***is and always has been*** that the copyright interest in an actor's performance resides with that actor until and unless it is assigned.  (<u>See</u> RJN at 3.)

The United States publicly affirmed this position in connection with the signing of the World Intellectual Property Organization ("WIPO") Audiovisual Dramatic Performance Treaty ("AVP Treaty") signed in Beijing, China in July of 2012.  *<u>See RJN at 4; ER a176-177.</u>*  The United States was instrumental in encouraging other countries to sign the AVP Treaty in order to bring other countries into compliance with the long-standing acknowledgement in the United States that actors, just like musicians, own the rights to their performances unless assigned, unless they are employees, or unless they execute a written instrument indicating their work is a work-for-hire. The formal statement issued by the United States Copyright Office, in connection with the AVP Treaty, states:

**Under U.S. law, actors and musicians are considered to be "authors" of their performances providing them with copyright rights.[3]**

Just as the rights established in the U.S. law already provide the protection for musical performers mandated by the WPPT, U.S. law is already generally compatible with the AVP provisions ("points of attachment" for parties to this treaty under U.S. law).

*See* RJN at 4; ER 177.

Because U.S. law firmly establishes that actors own the copyrights in their performances unless assigned or otherwise relinquished, Plaintiff Garcia retains the copyright to her performance.  See, e.g., TMTV Corp. v Pegasus Broad. of San Juan, 490 F Supp. 2d 228 (D.C. Puerto Rico 2007) (actors' portrayals of characters rendered them "authors").

> 2.  Plaintiff Never Assigned Her Copyright Interests, As Required by This Court's Decision in Effects Associates.

Appellant is aware of no authority requiring *her* to bear the burden to show that she did *not* transfer her rights.  Imposing such a burden on Appellant would be entirely inconsistent with the Copyright Act's well-established requirement that a copyright assignment be made in writing.  See 17 U.S.C. § 204(a) (exclusive copyright assignment must be in writing; 17 U.S.C. § 201(b) (writing required for work-for-hire).  Appellant executed no such writing transferring or assigning her rights. *Garcia Decl. ¶¶ 7-9; ER 194.*

In many cases, an actor or musician relinquishes his or her copyright interests to a studio or filmmaker *in writing* and loses the right to assert a copyright claim in a performance.  See, e.g., Brown v. Twentieth Century

---

[3] In direct contravention to the position of the United States in connection with advancing the AVP Treaty, the district court held that actors are not "authors" of their performances.

Fox Film Corp., 799 F. Supp. 166 (D.D.C. 1992) (James Brown transferred rights to song "Please, Please, Please," and could not object to use of a musical clip captured on film); Rooney v. Columbia Pictures, Inc., 538 F. Supp. 211 (S.D.N.Y. 1982) (actor Mickey Rooney signed contracts broad enough to transfer rights in his performances); Muller v. Walt Disney Productions, 871 F. Supp. 678 (S.D.N.Y. 1994) (conductor made writing in which he gave up rights to his performance).

That did not happen here.

Appellant's recollection coincides with that of other "Desert Warrior" actors, who also did not sign releases. (*Declaration of Dan Sutter ¶ 4 ER 239; Declaration of Gaylord Flynn ¶ 4, ER 241-242.*) Moreover, the Ninth Circuit has resoundingly rejected the argument that moviemakers enjoy some special status under the Copyright Act allowing them to avoid the writing requirement. Effects Associates, Inc. v. Cohen, et al., 908 F.2d 555 (9th Cir. 1990), is instructive. In that case, the plaintiff created special effects for use in a film, and then brought a copyright infringement action against the producer. As in this case, the parties had *no written agreement* regarding transfer of the plaintiff's copyright to the producer. The Ninth Circuit held that, as a matter of law, the plaintiff's rights had not transferred: "Absent an express transfer of ownership, a contributor who is not an employee retains ownership of his copyright." *Id.* at 558 (citing Easter Seal Society v. Playboy Enters., 815 F. 2d 323, 329 (5th Cir. 1987)). The court went on to hold:

> [S]ection 101 specifically addresses the movie and book publishing industries, affording moviemakers a simple, straightforward way of obtaining ownership of the copyright in a creative contribution – namely a written agreement. The Supreme Court and this circuit, while recognizing the custom and practice in the industry, **have refused to permit moviemakers to sidestep section 204's writing requirement**.

> Accordingly, we find unpersuasive Cohen's contention that section 204's writing requirement, which singles out no particular group, somehow doesn't apply to him. As section 204 makes no special allowances for the movie industry, neither do we.

Effects Assoc. at 558 (emphasis added). See also Oddo v. Ries, 743 F. 2d 630 (9th Cir 1984) (publishing of distorted manuscript exceeded scope of initial contributor's work; publisher liable for copyright infringement). Thus, because no writing exists showing either a transfer of rights or a work-for-hire agreement, the copyright in Appellant's performance remains intact.

### 3. Defendant Yousseff and Plaintiff Garcia Never Agreed, in Writing or Otherwise, to Create a "Joint Work of Authorship," as Google and YouTube Apparently Claim.

Appellant anticipated YouTube to oppose, claiming Appellant could not sue Defendant Yousseff for copyright infringement (or, by extension, Google and YouTube for contributory infringement) because Appellant and Defendant Yousseff created a "joint work of authorship." However, Appellant never had a meeting of the minds with Defendant Yousseff, other than perhaps pertaining to "Desert Warrior." "Joint work" defenses should be carefully evaluated on a case-by-case basis to determine whether the "authors" intended to create a "unitary work." Here, Yousseff's fraudulent procurement of Ms. Garcia's performance did not create a joint agreement on anything related to the propaganda Film "The Innocence of Muslims."

Initially, Appellant notes that the burden is on Defendants, *not on her*, to show that both she and Yousseff intended that the doctored propaganda Film "The Innocence of Muslims," which she was tricked into believing was a desert historical adventure called "Desert Warrior," would be a joint work of authorship.

35

> Although the Second and Seventh Circuits do not base their decisions [as to joint authorship] on the word 'authors' in the statute, the practical results they reach are consistent with ours. These circuits have held that a person claiming to be an author of a joint work must prove that **both parties intended each other to be joint authors.**

Aalmuhammed v. Lee, 202 F.2d 1227, 1233-1234 (9th Cir. 2000) (emphasis added). Aalmuhammad is significant in two ways, both of which the district court ignored: First, as noted above, it establishes that the burden is on the *putative joint author*, not the person claiming a sole copyright, to prove the intent to create a jointly authored work. Second, it suggests that in this case, where there is no written joint authorship agreement, a contributory infringer such as Google or YouTube cannot establish a joint authorship defense, because it cannot prove Ms. Garcia's or Yousseff's subjective intentions. Perhaps this second point is academic, because in this case the uncontroverted evidence is that Appellant never intended to be a "joint author" of "The Innocence of Muslims," given that Defendant Yousseff tricked her by assuring her that she was appearing in an innocuous action film called "Desert Warrior."

Even if the burden of proof were not an insurmountable obstacle for Defendants, the law of joint authorship would be. While "joint" authors may not sue each other in copyright, see 17 U.S.C. § 101, a "joint work" exists "only when *both authors intended at the time the work was created, 'that their contributions be merged into separate or interdependent parts of a unitary whole.'*" Id.; Childress v. Taylor, 945 F.2d 500 (2nd Cir. 1991) (emphasis added). "Copyright law best serves the interests of creativity when it carefully draws the bounds of 'joint authorship' so as to protect the legitimate claims of both sole authors and co-authors." Id. "Where the author never intended for his material to be part of a joint work, he retains

the right to that material." <u>Siegel v. Time Warner, Inc.</u>, 496 F. Supp. 2d 1111, 1148 (C.D. Cal. 2007). **If the parties' intentions at the beginning of the creative process are inconsistent**, there is "a lack of intent to form a joint work." <u>See, e.g.</u>, <u>Reinsdorf v. Skechers, U.S.A.</u>, 2011 U.S. Dist. LEXIS 28293, at *9 (C.D. Cal. Mar. 9, 2011) (use of copyrighted photographs was limited to terms of license, not entitling Skechers to use them as it "saw fit").[4]

    4. <u>YouTube Has Stepped Far Outside the DMCA's Safe Harbor Provision, Subjecting it To Liability for Copyright Infringement.</u>

 "The DMCA was enacted in 1998 to implement the World Intellectual Property Organization Copyright Treaty," <u>Universal City Studios, Inc. v. Corley</u>, 273 F.2d 429, 440 (2d Cir. 2001), and to update domestic copyright law. <u>See Ellison v. Robertson</u>, 357 F.3d 1072, 1076 (9th Cir. 2004). Title II of the DMCA, titled separately the Online Copyright Infringement Liability Limitation Act ("OCILLA") was designed to "clarif[y] the liability faced by service providers who transmit potentially infringing material over their networks." S. Rep. 105-190 at 2 (1998).

---

[4]     Google and YouTube did not raise the issue of "fair use," but should they do so improperly on appeal, they would be wrong. 17 U.S.C. § 107. Plaintiff considered the issue of fair use, pursuant to <u>Lenz v. Universal Music Corp.</u>, 572 F. Supp. 2d 1150 (N.D. Cal. 2008). Google and YouTube are enjoying an economic benefit by drawing 30 million "views" using the Film. <u>A&M Records v Napster, Inc.</u>, 239 F3d 1004 (9th Cir, 2001); <u>see also Worldwide Church of God v. Philadelphia Church of God</u>, 227 F.3d 1110, 1118 (9th Cir. 2000) <u>American Geophysical Union v. Texaco, Inc.</u>, 60 F.3d 913, 922 (2d Cir. 1994) (finding that researchers at for-profit laboratory gained indirect economic advantage by photocopying copyrighted scholarly articles); <u>Export Establishment etc. v. Columbia Broadcasting Service, Inc.</u>, 503 F. Supp. 1137, 1147 (S.D.N.Y. 1980) (dramatic ratings boost by using copyrighted Charlie Chaplin clips). The use of Plaintiff's performance goes to the "heart" of the message. <u>Los Angeles News Service v. Tullo</u>, 973 F. 2d 791, 798 (9th Cir. 1992); <u>see Harper & Row Publishers, Inc. v. Nation Enters.</u>, 471 U.S. 539, 564-65, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985)

Congress elected "to create a series of 'safe harbors []' for certain common activities of service providers." Id. at 19. To that end, OCILLA established a serious of four "safe harbors" that allow qualifying service providers to limit their liability for claims of copyright infringement. See Viacom, et al. v. YouTube, et al, (2nd Cir . April 5, 2012), Case No. 10-3270 CV (RJN at 4.) YouTube is such a provider. See generally id.; see also RJN 6 (2nd Circuit opinion on DMCA issues relative to YouTube).

Under 512(c)(1)(A), safe harbor protection is available only if the service provider:

(i)      Does not have actual knowledge that the material or an activity using the material on the system or network is infringing;

(ii)     In the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or

(iii)    upon obtaining such knowledge or awareness, acts expeditiously to remove or disable access to the material.

In short, OCILLA creates a safe harbor for online service providers ("OSPs"), *only if* they adhere to the mandatory safe harbor guidelines and "expeditiously" block access to alleged infringing material, or remove that material from their systems when they receive a notification of an infringement claim from a copyright holder or the copyright holder's agent. OCILLA also includes a counter-notification provision that offers OSPs a safe harbor from liability when users claim that the material in question is not, in fact, infringing.

        5.    <u>Even if Defendant Yousseff Had a Joint Copyright Interest with Ms. Garcia, None of the Third Parties Who Have Posted the Film Have A Right to Do So, and Are</u>

Infringing on Plaintiff's Copyright With YouTube's Full
Knowledge and Consent.

While YouTube and Google may raise the issue of "joint work" and
joint copyright as between Appellant and Yousseff (albeit Appellant
absolutely contests that argument as stated above), there is no such issue
with respect to the hundreds of third parties who have copied the Film and
re-posted it on YouTube, accounting for tens of millions of views for
YouTube. It is undisputed that these third parties have no right to copy and
re-post the Film, and are clearly committing copyright infringement.
Defendants YouTube and Google cannot argue otherwise, and have been on
notice of these massive acts of infringement for quite some time. The eight
DMCA takedown notices delivered by Ms. Garcia's DMCA takedown agent
specifically named and identified these third party YouTube URLs and
requested that YouTube remove or disable them. Defendants YouTube and
Google have refused.

## IX.  APPELLANT CONTINUES TO SUFFER IRREPARABLE HARM IN THE ABSENCE OF AN INJUNCTION

At this point in the proceedings, in light of the district court's disposal
of Ms. Garcia's request for an emergency temporary restraining order
("TRO"), it is the law applicable to temporary injunctions that applies in this
case. That said, even under the far stricter standards that apply to a TRO,
Ms. Garcia was entitled to relief. In order to obtain a TRO, a plaintiff must
be in danger of an irreparable injury that is both likely and immediate.
Winter v. Nat. Res. Defense Council, Inc., 555 U.S. 7, 129 S.Ct. 365, 374-
75, 172 L.Ed.2d 249 (2008); Caribbean Marine Services Co.., Inc. v.
Baldridge, 844 F.2d 668, 674 (9th Cir. 1988) ("a plaintiff must demonstrate
immediate threatened injury as a prerequisite to preliminary injunctive

relief"). ***Risk of death constitutes "irreparable harm."*** See, e.g., <u>Harris v.</u> <u>Board of Supervisors</u>, 366 F.3d 754, 766 (9th Cir. 2004) (affirming preliminary injunction barring Los Angeles County from closing hospital and reducing public hospital beds due to risk of irreparable harm to patients including death); <u>Yue v. Conseco</u>, CV 11-9506 AHM, 2012 U.S. Dist. LEXIS 46565, 40-41 (C.D. Cal. Apr. 2, 2012) (preliminary injunction warranted against increased cost of life insurance because loss of "security" and "peace of mind" constitutes irreparable injury).

Appellant more than met her burden. As set forth above and in the accompanying declarations, she has suffered and will continue to suffer immediate and irreparable harm if the Film is not taken down:

- Ms. Garcia received credible threats of death and harm against both herself and her family (one individual threatened to rape her daughter repeatedly);
- Ms. Garcia has had to move her personal residence due to threats and harassment;
- Appellant has been advised repeatedly and in the strongest terms to take the most stringent security measures possible to protect herself; and
- Every moment the Film remains on YouTube, her copyright continues to be violated.

## X.    THE BALANCE OF EQUITIES IS IN PLAINTIFF'S FAVOR

Under the circumstances of this case – not just the serious intellectual property issues raised by Ms. Garcia's claim, but more importantly, the credible threats of *death* against her, the hardship to Ms. Garcia if the Film is not removed is grave indeed. It is true that the law requires this Court to "balance" the relative hardships to the parties when evaluating a request for

a temporary restraining order.  To this day, Defendants Google and YouTube have provided Ms. Garcia with *no* rationale for their cruel decision to continue to endanger her life by continuing to publish the video:  the only excuses they make for themselves are:  (1) Yousseff's racist belief that "the Muslims" have killed unspecified "innocent" people; and (2) Google Chairman Eric Schmidt's disingenuous claim that the problems experienced by innocent people (such as Ms. Garcia) due to the Film can simply be cured with "more speech."[5]   In reality, the circumstantial evidence is far more damning, particularly to Google and YouTube.  As set forth on the YouTube site, the Film has received more than 30 million page "views" in English alone—and Ms. Garcia expects that number to soar once discovery commences and she obtains page view numbers for Arabic-language versions.  Because YouTube derives income from advertising revenues and "views", it has 30 million reasons to leave the Film where it is, and let Ms. Garcia fend for herself.

The balance of hardships cannot tip to any side other than to Appellant.  "The balance of equities strongly favors [the Plaintiff] because Defendants' only interest is fiscal, whereas the [Plaintiff] faces *life or death consequences*."  See Oster v. Lightbourne,  2011 U.S. Dist. LEXIS 138191 (N.D. Cal. 2011)

## XI.    AN INJUNCTION IS DECIDLY IN THE PUBLIC INTEREST

Finally, Appellant must show that an injunction is in the public interest.  Winter v. Natural Res. Def. Council, Inc., 129 S.Ct. 365, 374, 376

---

[5]     Of course, Mr. Schmidt's encouragement of "more speech" directly contradicts that of his counsel, Tim Alger, who has repeatedly blamed Plaintiff's exercise of her right to free speech – that is, her public stance in distancing herself from the Film – for the peril she is currently experiencing.

(2008); <u>National Meat Ass'n v. Brown</u>, 599 F.3d 1093, 1097 (9th Cir. 2010); <u>see also</u> <u>Beardslee v. Woodford</u>, 395 F.3d 1064, 1067 (9th Cir. 2005). It is. Defendants' actions have not just put the life of Cindy Lee Garcia in danger. They have endangered the lives of every actor and member of the crew subject to the *fatwa*. Media reports have already reported numerous deaths caused by violence related to the Film. The web giant known as Google, a name derived from the number 10 with 100 zeroes, pursues Mammon at the expense of innocents.

Appellant anticipates that Defendants to argue again that the First Amendment trumps the worldwide carnage sparked by the Film. It does not. First, Ms. Garcia is a private individual who is not acting in concert with the state; she therefore is not capable of violating the First Amendment. <u>See, e.g., Law v. Miller</u>, 2011 U.S. Dist. LEXIS 102527 (E.D. Cal. 2011) (rejecting claim that non-governmental parties violated First Amendment where defendants were not state employees and there was no nexus between the defendants and the state such that the defendants' actions might fairly be treated as those of the state). Second, the First Amendment does not protect copyright infringement. <u>Columbia Pictures, Inc. v. Bunnell</u>, 245 F.R.D. 443 (C.D. Cal. 2007) ("To the extent that the users are engaged in copyright infringement, the First Amendment affords them no protection whatsoever.") (citing <u>Harper & Row</u>, 471 U.S. at 559). Third, even if the Film did not violate Ms. Garcia's copyright, by now it is clear that Defendants' actions can be compared to falsely shouting "Fire!" in a theater, creating a "clear and present danger" outside the protections of the First Amendment. <u>Schenck v. United States</u>, 249 U.S. 47, 52, 39 S.Ct. 247, 63

L.Ed. 470. Accordingly, this public interest would be best protected by a takedown order.[6]

Further, Defendant Yousseff violated the terms of his federal criminal probation by posting the Film – he was prohibited from using a computer or accessing the Internet. (See RJN 5 & Ex. B.) As the worldwide events described in this brief unfolded, Defendant Yousseff was arrested on a probation violation and now sits in the Metropolitan Detention Center in Los Angeles. Magistrate Judge Segal found that he may have violated the terms of his probation, used aliases, and is both a flight risk and danger to the community. (See RJN 5 & Ex. B.) The public has an interest in ensuring that criminal defendants do not violate probation terms -- and that Google and YouTube not continue to aid and abet him in doing so[7] – which is exactly what has here been done.

## XII. RELIEF REQUESTED

Based on the above, Appellant requests that the district court's order denying the motion for preliminary injunction be reversed. The specific relief requested by Appellant in the lower Court was an order enjoining Google and YouTube:

---

[6] YouTube's own guidelines prohibit the posting of "hate speech"—a clearer case of hate speech is hard to imagine. YouTube can hardly claim an interest, other than a monetary one, in continuing its unlimited exhibit of the Film.

[7] "Whoever commits an offense against the United States or aids, abets, counsels, commends, induces or procures its commission, is punishable as a principal." 18 U.S.C. § 2. In this case, Defendants Google and YouTube are now *knowingly* aiding and abetting Defendant Yousseff's continued violation of his federal probation by keeping the video posted. Counsel for Plaintiff have provided counsel for YouTube and Google the Judgment and Commitment for Yousseff showing that he was prohibited from using the Internet, computers, or ISPs without the permission of the United States Probation Officer.

1.      From publishing, reproducing, disclosing, or otherwise allowing the Copyrighted Performance (the original, un-dubbed script of which is identified in Exhibit A to Ms. Garcia's Complaint) to be uploaded or shown on YouTube.com and any other Websites operated by Defendants, or any of them, and from copying or allowing the content to be copied into any computer database, information service, storage facility, archives or other computerized network or facility:

2.      From disclosing or displaying, or causing to be disclosed or displayed, any portion of Ms. Garcia's Copyrighted Performance;

3.      From destroying or concealing, or in any way disposing of any reproduction, facsimile, excerpt, or derivative of any work related to the Copyrighted Performance that is in Defendants' possession, custody or control.

Appellant also sought an impoundment order, such that Defendants turn over for impoundment, to remain in the custody of Ms. Garcia's counsel during the pendency of this action, all unauthorized copies of in their custody, possession or control of the copyrighted works of Ms. Garcia, including but not limited to:

4.      All copies of the Copyrighted Performance, whether contained in the Film, whether as titled "Desert Warrior" or "The Innocence of Muslims," in the possession, custody, or control of Defendants.

5.      Any and all media in which the Copyrighted Performance is stored within the possession, custody, or control of Google and YouTube, including but not limited to computers, computer disks, cassette tapes, hard drives, CD-ROMs, DVDs, USB sticks, and other media.

## XII.  **CONCLUSION**

In summary, the district court's conclusion is insupportable:  under controlling legal authority, Ms. Garcia *does* have a property interest in her Copyrighted Performance.  If this Court adopted the trial court's view of copyright law, it would turn the entire media and music industry on their heads.  Further, the trial court relied on no evidence whatsoever to support its findings, whether explicit or implicit, that Garcia was an employee and/or produced a "work for hire."  Indeed, Defendants' late proffer of forged documents purporting to create such a relationship reveals that even Defendants are aware that Ms. Garcia never ceded her copyright interest.  Additionally, the district court erred in faulting Appellant for the timing of her motion:  Plaintiff has shown that she acted immediately once she understood the danger (both to her property and her life) that Defendants had placed her in.

Based on the foregoing, Appellant respectfully requests that this Court REVERSE the trial court's denial of her request for a preliminary injunction.


Dated: January 18, 2013                    Respectfully submitted,


                                           ____s/ M. Cris Armenta_____
                                           Maria Cristina Armenta
                                           Attorney for Petitioner
                                           Cindy Lee Garcia

## <u>STATEMENT OF RELATED CASES</u>

Defendant-Appellant Cindy Lee Garcia is unaware of any related cases in this Court, Pursuant to Ninth Circuit Rule 28-2.6.

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 32(a)(7)(B) and (C) of the Federal Rules of Civil

Procedure, the undersigned hereby certifies that the foregoing brief,

including this certificate, contains no more than 10,186 words.


Dated: January 18, 2013                    Respectfully submitted,


_____s/ M. Cris Armenta_____
Maria Cristina Armenta
Attorney for Petitioner
Cindy Lee Garcia

## PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am employed in the County of Los Angeles, State of California. I am over the age of eighteen years and not a party to the within action. My business address is 11900 Olympic Blvd, Suite 730, Los Angeles, CA 90064.

On January 18, 2013 I served the following document(s) described as:

### BRIEF OF APPELLANT CINDY LEE GARCIA

### EXCERPTS OF RECORDS VOLUMES 1-4

on the interested parties in this action by placing true copies thereof enclosed in sealed envelopes addressed as follows:

**Timothy L. Alger**

**Perkins Coie LLP**

**3150 Porter Drive**

**Palo Alto, CA 94304-1212**

**U.S. Court of Appeals**

**James R. Browning Courthouse**

**Office of the Clerk**

**96 Seventh Street**

**San Francisco, CA 94103**

**x**     BY OVERNIGHT MAIL: I deposited such document(s) in a box or other facility regularly maintained by the overnight service carrier, or delivered such document(s) to a courier or driver authorized by the overnight service carrier to receive documents, in an

envelope or package designated by the overnight service carrier with delivery fees paid or provided for, addressed to the person(s) served hereunder. (C.C.P. §1013 (d)(e))


Executed on January 18, 2013 in Los Angeles, California.


s/ Heather Rowland
**Heather Rowland**