## CASE NO. 12-57302

## UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

CINDY LEE GARCIA,

*Plaintiff-Appellant*,

vs.

GOOGLE INC. and YOUTUBE, LLC,

*Defendants-Appellees.*

## APPELLEES GOOGLE INC. AND YOUTUBE, LLC'S ANSWERING BRIEF

On Appeal from the United States District Court
for the Central District of California
Hon. Michael W. Fitzgerald, District Judge
District Court Case No. CV-12-8315-MWF (VBKx)

PERKINS COIE LLP
Timothy L. Alger, State Bar No. 160303
TAlger@perkinscoie.com
Sunita Bali, State Bar No. 274108
Sbali@perkinscoie.com
3150 Porter Drive
Palo Alto, California 94306
Telephone: (650) 838-4334
Facsimile: (650) 838-4534

Attorneys for Defendants-Appellees
Google Inc. and YouTube, LLC

## CORPORATE DISCLOSURE STATEMENT

Appellee YouTube, LLC is a wholly owned subsidiary of Appellee Google Inc.  Google Inc. has no parent company and no publicly traded company owns more than 10% of its stock.

TABLE OF CONTENTS

PAGE(S)

I. PRELIMINARY STATEMENT ...................................................................1

II. STATEMENT OF JURISDICTION .........................................................4

III. STATEMENT OF ISSUES ......................................................................4

IV. STATEMENT OF THE CASE .................................................................5

V. STATEMENT OF FACTS ........................................................................9

VI. SUMMARY OF ARGUMENT ...............................................................12

VII. STANDARD OF REVIEW .....................................................................14

VIII. LEGAL STANDARD FOR PRELIMINARY INJUNCTIONS .................14

IX. ARGUMENT ..........................................................................................15

    A.    Appellant Failed to Show a Likelihood of Success On the
           Merits of Her Copyright Claims Against YouTube ............................15

          1.    Appellant does not have a cognizable copyright interest .........15

                  a.    Appellant is not an author of the Film or any
                       portion of the Film. ..........................................................16

                  b.    Appellant's reliance on preemption cases is
                       misplaced. .........................................................................18

          2.    Appellant's allegations confirm that Youssef is the
               Film's copyright owner, giving him the right to post the
                Film on Youtube.com. ............................................................20

          3.    Even if Appellant had a cognizable copyright claim, her
                performance was a "Work for Hire" .........................................21

          4.    Appellant signed a release relinquishing any copyright
               interest. ......................................................................................24

5.      Any copyright interest was impliedly assigned when Garcia delivered her performance for use in the Film...............25

B.      Appellant Cannot Show a Likelihood of Irreparable Harm...............26

      1.      Appellant cannot establish a causal connection between the allegedly infringing conduct of YouTube and the injury she alleges........................................................................27

      2.      Appellant has not identified any irreparable harm. ..................30

      3.      Appellant's inexcusable delay undermines her claims of irreparable harm. ........................................................................34

C.      The Equities Do Not Tip In Appellant's Favor....................................35

D.      Appellant's Requested Injunction Would be a Prior Restraint, and Would Not Serve the Public Interest ...............................................36

X.      CONCLUSION.................................................................................................40

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*Aalmuhammed v. Lee,*
  202 F.3d 1227 (9th Cir. 2000) ...................................................passim

*Abend v. MCA,*
  863 F.2d 1465 (9th Cir. 1988) *aff'd on other grounds sub. nom. Stewart
  v. Abend,* 495 U.S. 207 (1990)............................................................31

*Alexander v. United States,*
  509 U.S. 544 (1993)............................................................................36

*Anderson v. United States,*
  612 F.2d 1112 (9th Cir. 1979) ...........................................................14

*Antelope Valley Press v. Poizner,*
  162 Cal. App. 4th 839 (2008) ............................................................22

*Burrow-Giles Lithographic Co. v. Sarony,*
  111 U.S. 53 (1884)..............................................................................16

*Campbell Soup Co. v. ConAgra, Inc.,*
  977 F.2d 86 (3d Cir. 1992) ...........................................................26, 30

*Campbell v. Acuff-Rose Music, Inc.,*
  510 U.S. 569 (1994)............................................................................38

*Caribbean Marine Svcs. Co., Inc. v. Baldrige,*
  844 F.2d 668 (9th Cir. 1988) .............................................................27

*Childress v. Taylor,*
  945 F.2d 500 (2d Cir. 1991) ..............................................................16

*Citibank, N.A. v. Citytrust,*
  756 F.2d 273 (2d Cir. 1985) ..............................................................34

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983)..........................................................................................32

*Cmty. for Creative Non-Violence v. Reid*,
    490 U.S. 730 (1989).................................................................................16, 22

*Dahl v. HEM Pharm. Corp.*,
    7 F.3d 1399 (9th Cir. 1993) ...........................................................................14

*DeNovellis v. Shalala*,
    135 F.3d 58 (1st Cir. 1998).............................................................................31

*Effects Assocs., Inc. v. Cohen*,
    908 F.2d 555 (9th Cir. 1990) ................................................................2, 25, 26

*Ellison v. Robertson*,
    357 F.3d 1072 (9th Cir. 2004) .......................................................................15

*Evans v. Evans*,
    162 Cal. App. 4th 1157 (2008) ......................................................................37

*Fleet v. CBS, Inc.*,
    50 Cal. App. 4th 1911 (1996) ........................................................................18

*Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*,
    654 F.3d 989 (9th Cir. 2011) .............................................................14, 26, 27

*Foad Consulting Group, Inc. v. Azzalino*,
    270 F.3d 821 (9th Cir. 2001) ........................................................................26

*Gaiman v. McFarlane*,
    360 F.3d 644 (7th Cir. 2004) ........................................................................16

*Harris v. Board of Supervisors*,
    366 F.3d 754 (9th Cir. 2004) ...................................................................33, 34

*J.C. ex rel. R.C. v. Beverly Hills Unified Sch. Dist.*,
    711 F. Supp. 2d 1094 (C.D. Cal. 2010) ...........................................................5

*Johnson v. Couturier*,
    572 F.3d 1067 (9th Cir. 2009) .......................................................................14

*Jules Jordan Video, Inc. v. 144942 Canada Inc.*,
    617 F.3d 1146 (9th Cir. 2010) ......................................................................19, 24

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*,
    634 F.2d 1197 (9th Cir. 1980) ............................................................................35

*Law v. Miller*,
    2011 U.S. Dist. LEXIS 102527 (N.D. Cal. Sept. 9, 2011)...........................36, 37

*Laws v. Sony Music Entm't, Inc.*,
    448 F.3d 1134 (9th Cir. 2006) .......................................................................18, 19

*Leigh v. Salazar*,
    677 F.3d 892 (9th Cir. 2012) ..............................................................................24

*Lin-Brook Builders Hardware v. Gertler*,
    352 F.2d 298 (9th Cir. 1965) ..............................................................................23

*Munaf v. Geren*,
    553 U.S. 674 (2008)............................................................................................30

*Nebraska Press Ass'n v. Stuart*,
    427 U.S. 539 (1976)............................................................................................37

*New Era Pubs. Int'l, ApS v. Henry Holt & Co.*,
    695 F. Supp. 1493 (S.D.N.Y. 1988), *aff'd*, 873 F.2d 576 (2d Cir. 1989)...........30

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964)............................................................................................37

*New York Times Co. v. United States*,
    403 U.S. 713 (1971) (per curiam)......................................................................37

*Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.*,
    762 F.2d 1374 (9th Cir. 1985) ............................................................................34

*Perfect 10, Inc. v. Google Inc.*,
    653 F.3d 976 (9th Cir. 2011), *cert. denied*, 132 S.Ct. 1713 (2012) .......28, 29, 31

*Religious Tech. Ctr. v. F.A.C.T.Net*,
    901 F. Supp. 1519 (D. Colo. 1995).....................................................................39

*Religious Tech. Ctr. v. Netcom On-Line Commc'ns Svcs., Inc.*,
   907 F. Supp 1361 (N.D. Cal. 1995) ....................................................40

*Richmond v. Weiner*,
   353 F.2d 41 (9th Cir. 1965) ..............................................................21

*Salinger v. Colting,*
   607 F.3d 68, 81 (2d Cir. 2010) ....................................................28, 39

*Sampson v. Murray*,
   415 U.S. 61 (1974).............................................................................31

*Schenk v. United States*,
   249 U.S. 47 (1919).............................................................................39

*Selby v. New Line Cinema Corp.*,
   96 F. Supp. 2d 1053 (C.D. Cal. 2000) ..............................................20

*Shegog v. Bd. of Ed. of City of Chicago*,
   194 F.3d 836 (7th Cir. 1999) ............................................................31

*Stormans, Inc. v. Selecky*,
   586 F.3d 1109 (9th Cir. 2009) ..........................................................35

*Technology & Intellectual Prop. Strategies Group PC v. Fthenakis*,
   2012 WL 159585 (N.D. Cal. Jan. 17, 2012)......................................27

*Thalheimer v. City of San Diego*,
   645 F.3d 1109 (9th Cir. 2011) ..........................................................14

*Thomson v. Larson*,
   147 F.3d 195 (2nd Cir. 1998) ...........................................................16

*Tough Traveler, Ltd. v. Outbound Prods.*,
   60 F.3d 964 (2d Cir. 1995), *aff'd,* 165 F.3d 15 (2d Cir. 1998) ..........34

*Trenton v. Infinity Broadcasting Corp.*,
   865 F. Supp. 1416 (C.D. Cal. 1994) .................................................24

*Twentieth Century Fox Film Corp. v. Entm't Distrib.*,
   429 F.3d 869 (9th Cir. 2005) ............................................................23

*U.S. Ex Rel. v. Board of Trustees of Univ. of Ala.*,
   104 F.3d 1453 (4th Cir. 1997) ..........................................................20

*Weinberger v. Romero-Barcelo*,
   456 U.S. 305 (1982).................................................................39, 40

*Whitney v. California*,
   274 U.S. 357 (1927)........................................................................36

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)..............................................................14, 26, 35

*Yue v. Conseco Life Ins. Co.*,
   282 F.R.D. 469 (C.D. Cal. 2012).................................................33, 34

**STATUTES**

17 U.S.C. § 101 ...................................................................................22

17 U.S.C. § 102 ...................................................................................15

17 U.S.C. § 102(a) ..............................................................................19

17 U.S.C. § 106..............................................................................21, 30

17 U.S.C. § 106(5) ..............................................................................21

17 U.S.C. § 201(a) .....................................................................16, 20, 21

17 U.S.C. § 201(b) ..............................................................................22

17 U.S.C. § 201(d)(1)...........................................................................24

17 U.S.C. § 204(a) .........................................................................24, 25

17 U.S.C. § 501 ...................................................................................21

17 U.S.C. §512(c) ...............................................................................17

U.S. Const., Art. I, § 8, cl. 8.................................................................38

**OTHER AUTHORITIES**

Lemley & Volokh, *Freedom of Speech and Injunctions in Intellectual Property Cases*, 48 Duke L.J. 147, 192 (1998) ....................................................31

Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 5.03D (2012) ...............................................................................................................23

## I.     PRELIMINARY STATEMENT

Appellant Cindy Lee Garcia ("Appellant"), an actress who appears for about five seconds in a controversial "trailer" for a film called "Innocence of Muslims" (the "Film"), asks this Court for an order removing the Film from Youtube.com, a video sharing site.  Appellant alleges direct and secondary copyright infringement, but Appellant has no cognizable copyright interest given that she acknowledges she had no role in the creative process, she had no role in producing the Film, and she appeared on-screen only briefly, with her voice dubbed in a manner that was inconsistent with the performance that she claims to own.

It is undisputed that the Film was placed on YouTube by defendant Mark Basseley Youssef ("Youssef").  Appellant pleads facts that, if true, establish that Youssef has a protectable copyright interest in the entire Film, which he both wrote and produced—giving Youssef the right to upload and display the Film on Youtube.com.  This precludes Appellant from obtaining a take-down order against Appellees Google Inc. and YouTube, LLC (collectively "YouTube").

Appellant's complaint establishes that she lacks any copyright in the Film or any portion of the Film.  The facts as alleged by Appellant establish Youssef as the author of the Film and the owner of its copyright.  *See Aalmuhammed v. Lee,* 202 F.3d 1227 (9th Cir. 2000).  Appellant acknowledges that she is not a "joint author" with Youssef of the Film, and there is no basis for her contention that she owns a

sliver of the Film that contains a performance that, when fixed, was intended to be, and became, an integral part of a single creative work. Her own allegations confirm that she is not the "author" of even that sliver, let alone of the entire work that she seeks to have removed.

Appellant describes a contribution to the Film that was, at most, *de minimis*. She offers facts that establish she functioned like an employee, reciting words from a script written by others, which was captured on film and later dubbed over by others, all under the complete control of Youssef. Nowhere does Appellant establish that she was, or even understood herself to be, an independent contractor who retained a separate and exclusive copyright in her brief appearance in the Film. Further, as the district court concluded, Appellant impliedly licensed any copyright interests she might conceivably have in her performance to others when it was incorporated into the indivisible whole of the Film. *See Effects Assocs., Inc. v. Cohen,* 908 F.2d 555 (9th Cir. 1990).

Appellant's real grievance here—Youssef's distortion of her brief performance in the Film so as to make her character appear to mock Islam and Mohammed—does not involve copyright law. While Appellant may have claims against Youssef or others under theories of contracts, fraud, and/or right-of-publicity, she has no claim for copyright infringement against YouTube, which merely provides a platform for the sharing of videos on the Internet, and which

2

continues to display a video that was posted by the person whom Appellant's own pleadings establish was the copyright owner.

Further, Appellant inexcusably delayed in moving for injunctive relief, given that the Film has been available for viewing at Youtube.com since early summer 2012 (and Appellant admits she was aware of this), months before Appellant asserted any claims under the Copyright Act. Even after filing her lawsuit in federal court, she waited another three weeks before seeking a temporary restraining order. Any private interest Appellant may have in enjoining the Film's availability, to the extent any such interest exists, is heavily outweighed by the public's interest in having the Film remain accessible.

Irrespective of the Film's artistic or social merits (or the lack thereof), the Film is now part of important public debate, even becoming an issue in the recent presidential campaign and selection of the new Secretary of State.[1] Our laws permit even the vilest criticisms of governments, political leaders, and religious figures as legitimate exercises in free speech. Granting injunctive relief prior to adjudicating whether Appellant holds a copyright interest in the Film, and if she does, whether she is entitled to compel the Film's removal from YouTube, would be an unconstitutional prior restraint.

---

[1] *See* Motion for Judicial Notice, Exhs. A-G.

3

For all of these reasons, the district court's denial of Appellant's Motion for Preliminary Injunction should be affirmed.

## II.  STATEMENT OF JURISDICTION

YouTube agrees with the statement of jurisdiction in Appellant's opening brief.

## III.  STATEMENT OF ISSUES

1.  Whether the district court correctly determined that Appellant, who appeared as an actress for no more than five seconds in a movie trailer, failed to show a likelihood of success on the merits on her claim that Appellant owns a copyright in the trailer (or portion thereof) and YouTube infringed that copyright by declining to remove the trailer on her demand from its video sharing service.

2.  Whether the district court correctly determined that Appellant failed to show a likelihood of irreparable harm where she delayed almost three months before bringing a claim for copyright infringement and where she could not establish that the removal of expressive speech that has become a matter of public debate offers an effective and proper remedy for an alleged harm that is unrelated to her purported copyright interest.

4

## IV.   STATEMENT OF THE CASE

This appeal is Appellant's fourth attempt to obtain a court order removing a 14-minute movie trailer from Youtube.com[2] that has been the subject of widespread news coverage and public debate since the summer of 2012.  Appellant alleges that she was duped into appearing as an actress in the Film.  (Appellant's Excerpts of Record ("AER") 65 (First Amended Complaint ("FAC") ¶ 4).)  The English version of the Film[3] was first posted on YouTube on July 2, 2012 by Youssef, who also goes by the names Sam Bacile and Nakoula Basseley Nakoula.  (AER 64, 69-70 (FAC ¶¶ 1, 29).)  The Film was posted again on YouTube, this time dubbed in Arabic, on September 11, 2012.  (AER 64, 70 (FAC ¶¶ 1, 30).)  The Film's criticism of the prophet Mohammed has sparked civil unrest in some countries.[4]

---

[2] YouTube "is a publicly available website where persons can post video clips for viewing by the general public." *J.C. ex rel. R.C. v. Beverly Hills Unified Sch. Dist.*, 711 F. Supp. 2d 1094, 1098 (C.D. Cal. 2010).

[3] The original posting of the Film is at http://www.youtube.com/watch?v=qmodVun16Q4.  Appellant appears at 9:04-9:05 and 9:08-9:11.

[4] In several countries where the Film appears to violate local laws, YouTube has made the Film inaccessible.  However, YouTube has determined that the Film neither violates United States laws nor YouTube's community standards.  Visitors to YouTube are prompted with the following warning prior to viewing the Film: "The following content has been identified by the YouTube community as being potentially offensive or inappropriate.  Viewer discretion is advised."

Appellant contends the Film harmed her personally and professionally. (AER 65-66, 69, 71 (FAC ¶¶ 4, 8-9, 29, 38-39).)  On September 19, 2012, she filed a complaint in Los Angeles Superior Court against Youssef (named as Nakoula Basseley Nakoula), unidentified producers of the Film (named as "Does"), Google, and YouTube.  (AER 645-661 (Request for Judicial Notice ("RJN"), Exh. A).) Appellant sought declaratory relief, injunctive relief, and damages against all of the defendants under several common law theories, including invasion of privacy, fraud, and slander, and under California's right of publicity and unfair business practices statutes.  (*Id.*)  The bulk of the state court complaint was devoted to allegations against Youssef and the other defendants involved in creating and publishing the Film.  (*Id.*)  Appellant made no claims under the Copyright Act, and did not assert that she held a copyright in the Film or any portion of it.

On September 20, 2012, Superior Court Judge Luis A. Lavin denied Appellant's ex parte application for temporary restraining order requiring the removal of the Film, finding that Appellant failed to show any likelihood of prevailing on her claims.  (AER 662-663 (RJN, Exh. B).)  Judge Lavin also denied Appellant's request for an order to show cause why a preliminary injunction should not be issued.  (*Id.*)

Five days later, Appellant voluntarily dismissed her state court action (AER 664-667 (RJN, Exh. C)), and on September 26, 2012, she filed this action in the

6

Central District of California against Google, YouTube, Youssef (named as Nakoula), and Does 1 through 10, claiming (1) direct copyright infringement, (2) secondary copyright infringement, (3) fraud, (4), unfair business practices, (5) libel, and (6) intentional infliction of emotional distress. (AER 1-62 (Complaint).) Only copyright claims are asserted against Google and YouTube.

On October 4, 2012, Appellant amended her complaint to add Youssef as a named defendant following the public disclosure of his real name during criminal proceedings after he was arrested for violating the terms of his probation. (AER 63-122 (FAC).)

On October 17, 2012, Appellant filed with the district court an Ex Parte Application for a Temporary Restraining Order and Request for an Order to Show Cause Re Preliminary Injunction and Order of Impoundment ("Ex Parte Application"), seeking a mandatory injunction requiring YouTube to remove the Film. (AER 135-170.) The next day, on October 18, 2012, Judge Michael Fitzgerald issued a minute order declining to consider Appellant's request on an ex parte basis, in part because "the alleged infringement seems to have commenced almost three months ago on July 2, 2012." (AER 601-602.) Instead, the district court construed Appellant's ex parte application as a motion for preliminary injunction and set a briefing schedule. (*Id*.)

7

On October 29, 2012, YouTube filed an Opposition to Plaintiff's Motion for Preliminary Injunction and Order of Impoundment (AER 611-641.)  Appellant filed her reply brief on November 5, 2012.  (AER 686-733.)

On November 15, 2012, YouTube obtained from Youssef's criminal attorney a copy of the Personal Release and Cast Deal Memo ("Release") that was completed and signed by Appellant.  (AER 800.)  The Release is dated August 9, 2011, and: (1) grants to "Sam Bessi," a name Mr. Youssef has used in the past, and production company "Matthew Metta," the right to photograph and record Ms. Garcia; (2) releases all claims for invasion of privacy, right of publicity; and (3) assigns to "M.M" "all rights necessary for the development, production, and exploitation of the Motion Picture, whether denominated copyrights, performance rights, or publicity rights . . ."  (AER 791-796, 801.)  On November 27, 2012, Youssef signed a declaration stating that the Release was executed by Appellant in his presence the day before she began work on the Film.  (AER 792.)  The Release and declaration were filed with the district court the next day, November 28, 2012.[5] (AER 791-798.)

---

[5] On November 30, 2012, after Appellant moved for an order allowing her to cross-examine Youssef and YouTube's counsel, the district court issued a minute order stating that it would not consider the Release and related declarations in deciding Appellant's Motion for Preliminary Injunction.  (AER 891.)

On November 30, 2012, the district court denied Appellant's Motion for Preliminary Injunction. (AER 892-894.) The court found that given Appellant's delay in bringing her claim, she "has not demonstrated that the requested preliminary relief would prevent any alleged harm." (AER 893.) The court also found that Appellant failed to establish a likelihood of success on the merits of her copyright claims, recognizing that it is the "person to whom the work owes its origin and who superintended the whole work" that is the author (and copyright owner) of the Film. (AER 894 (quoting *Aalmuhammed*, 202 F.3d at 1233).) The court further stated that even if Appellant's copyright interest were cognizable and proven, Appellant "necessarily (if impliedly) would have granted the Film's author a license to distribute her performance as a contribution incorporated into the indivisible whole of the Film." (*Id*.) Because the court found that Appellant failed to show irreparable harm or a likelihood of success on the merits, it did not reach the issues of balance of equities and the public interest. (*Id*.)

Appellant filed a Notice of Appeal from the district court's order on December 21, 2012. (AER 946-950.)

## V.    STATEMENT OF FACTS

Appellant alleges in her First Amended Complaint that she sought and received an acting role in the Film in July 2011. (AER 69 (FAC ¶ 27).) She claims that the Film was "represented to be an 'historical Arabian Desert adventure

9

film'" (*id.*), but the Film later was "changed horrifically [*sic*] to make it appear that Appellant voluntarily performed in a hateful anti-Islamic production." (AER 69-70 (FAC ¶ 29).) Appellant contends that "the innocuous lines that plaintiff delivered on set were overdubbed so as to give the appearance that she was accusing the Islamic religious figure Mohammed of being a child molester and a sexual deviant." (AER 66 (FAC ¶ 8).) She further alleges that "[t]he words that were put into plaintiff's mouth were so offensive, not only to plaintiff but to millions worldwide, that it sparked [] riots and violence around the globe." (*Id.*)

The FAC makes a number of admissions that are relevant to Appellant's claim of copyright ownership (or lack thereof). Appellant states that she is "an actress who appears in the Film." (AER 65 (FAC ¶ 4).) Appellant "was given only specific pages of a script titled *Desert Warrior*." (AER 69 (FAC ¶ 28).) She alleges no involvement in the writing, directing, filming, editing, or producing of the Film. Her role was merely to read lines from the script, and Appellant concedes that the dubbed words she is depicted as uttering in the Film were never actually spoken by her. (AER 65 (FAC ¶ 4).)

Appellant admits that she received the script from Youssef, who "held himself out as the writer and producer of the Film," and "managed all aspects of the production." (AER 65 (FAC ¶ 5.) She alleges that "Defendant [Youssef] used her as a puppet." (AER 66 (FAC ¶ 8.) She also alleges that the producers

10

"intentionally concealed the purpose and content of the film."  (AER 69 (FAC ¶ 27; *see also* AER 69-70 (FAC ¶ 29) ("the content and overall purpose of the Film was concealed from her")).)

The FAC states that when the Film was released publicly on YouTube, Appellant's depicted performance was "grotesquely different than the performance that [she] actually had delivered."  (AER 66 (FAC ¶ 8).)  She describes her performance in the Film as "distorted and disguised."  (AER 66 (FAC ¶ 10).)  She asserts that the producers "manipulated [her] image to create the false appearance of anti-Muslim bigotry by [her]."  (AER 78 (FAC ¶ 74).)[6]

Appellant believes that she signed a contract to work on the Film, but she has not come forward with it, and she asserts the missing document merely "ensured that she would receive IMDB credit."  (AER 65-66 (FAC ¶ 6).) Appellant also alleges that she is not sure whether she signed a contract, and such a form is "unknown to her at this time, if it exists."  (AER 66 (FAC ¶ 7).)  These inconsistencies do not dissuade her from firmly alleging what is *not* in the contract

---

[6] Although Appellant asserts in Issue 2 in her Opening Brief that she created a copyrighted performance in a movie called *Desert Warrior*, which was then altered and used without her permission in a separate work called *Innocence of Muslims* (Appellant's Opening Brief ("AOB") at 5), she offers no facts (in her complaint or elsewhere) suggesting that any *Desert Warrior* movie was ever created.  Rather, both her state and federal lawsuits—and this appeal—rest on the contention that she participated in the creation of a single work superintended by Youssef that ultimately was named *Innocence of Muslims.*  (AOB at 8-9.)

that she might have signed, but which also might not exist: "She does recall that the contract did ***not*** call for her to transfer any rights, including any copyrights, and that it was not a 'work for hire' agreement." (AER 65-66 (FAC ¶ 6) (original emphasis).)

## VI. SUMMARY OF ARGUMENT

The district court correctly denied Appellant's request for a mandatory preliminary injunction ordering removal of the Film from YouTube.com.

First, Appellant failed to show a likelihood of success on the merits of her copyright claims against YouTube. Appellant is not an author of the Film or any portion thereof. Her five-second appearance in the Film is nothing more than a *de minimis* contribution to a work, which is insufficient to satisfy authorship requirements. As shown by Appellant's own factual allegations, Youssef is the Film's author and copyright owner and had the lawful right to post the Film on YouTube. Even if Appellant has a cognizable copyright interest, which she does not, her performance was a work for hire, as she was hired by Youssef to perform lines at Youssef's direction, which were later overdubbed. Appellant also signed a release relinquishing any copyright interest she may have had in the Film. Finally, any copyright interest was impliedly assigned to Youssef when she delivered her performance with the intent that it be incorporated into the indivisible whole of the Film.

Second, Appellant failed to show that she is likely to suffer irreparable harm in the absence of a preliminary injunction. Removing the Film now, seven months after the Film first appeared on YouTube.com, will not prevent any future harm that may result from Appellant's performance in the Film, even if it is assumed that the Copyright Act provides a remedy for such harm. The Film has already been widely viewed; removing the Film from YouTube will not change the fact that Appellant appeared in the Film, which she has publicly confirmed in television interviews. Moreover, Appellant's three month delay in seeking injunction relief undermines any claim of irreparable harm.

Third, the equities do not tip in Appellant's favor. A court order requiring removal from YouTube of the Film or any portion thereof would impose a substantial burden on free expression, without preventing any future harm to Appellant.

Fourth, the requested injunction would not serve the public interest. Rather, it would constitute an unlawful prior restraint. The Film continues to be a matter of public discussion and removing the Film from YouTube would only make access to the Film more difficult. The order that Appellant seeks would stifle important speech at the core of the First Amendment.

13

## VII.   STANDARD OF REVIEW

This Court reviews a denial of a motion for preliminary injunction for abuse of discretion.  *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1115 (9th Cir. 2011).  The district court "abuses its discretion when it bases its decision on an erroneous legal standard or on clearly erroneous findings of fact."  *Johnson v. Couturier*, 572 F.3d 1067, 1078-79 (9th Cir. 2009).

## VIII.  LEGAL STANDARD FOR PRELIMINARY INJUNCTIONS

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  There must be "a clear showing that the plaintiff is entitled to such relief."  *Id*. at 22.  A plaintiff seeking a preliminary injunction must show:  (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary injunctive relief; (3) that the balance of equities tips in her favor; and (4) that an injunction is in the public interest.  *Id*. at 20; *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 994 (9th Cir. 2011).

A request for a mandatory preliminary injunction that would alter the status quo "is subject to heightened scrutiny and should not be issued unless the facts and law clearly favor the moving party."  *Dahl v. HEM Pharm. Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993); *Anderson v. United States,* 612 F.2d 1112, 1114 (9th Cir. 1979) (noting that a mandatory preliminary injunction is particularly disfavored).

# IX.   ARGUMENT

## A.   Appellant Failed to Show a Likelihood of Success On the Merits of Her Copyright Claims Against YouTube

Copyright protection is afforded to "original works of authorship fixed in any tangible medium of expression."  17 U.S.C. § 102.  To prevail on a claim for copyright infringement, a plaintiff must prove that: (1) the plaintiff owns the copyrighted material; and (2) the defendant violated the plaintiff's *exclusive rights* under the Copyright Act.  *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004).  Appellant cannot establish either element.

### 1.   Appellant does not have a cognizable copyright interest.

Appellant does not claim a copyright interest in the entirety of the Film[7] and admits that the Film is not a "joint work" between Appellant and filmmaker Youssef.  (AER 893 (District Court Order at 3); *see also* AOB at 23, 27-29).)  Appellant also does not allege ownership of any work that exists separate and apart from the Film, as the only alleged fixation of her performance is the Film itself.  (*See* AER 66 (FAC ¶ 10).)  Rather, Appellant asserts that she owns the copyright in her "dramatic performance" in the Film.  (AER 893 (District Court Order at 3); AER 66 (FAC ¶ 10); AOB at 23.)  Appellant's theory of copyright protection, however, is not recognized by law.

---

[7] Although Appellant seeks an order removing her "dramatic performance" from YouTube, she offers no suggestion as to how her performance can be removed from YouTube without impacting the rights of others.

### a. Appellant is not an author of the Film or any portion of the Film.

A copyright "vests initially in the author or authors of the work." 17 U.S.C. § 201(a). The Supreme Court has held that the term "author," as used in the Copyright Act, generally refers to "the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989). This Court has determined that an "author" of a copyrighted work is best defined as "the person to whom the work owes its origin and who superintended the whole work, the 'mastermind.'" *Aalmuhammed*, 202 F.3d at 1233 (quoting *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 58 (1884)). For a movie, this definition "would generally limit authorship to someone at the top of the screen credits, sometimes the producer, sometimes the director, possibly the star, or the screenwriter—*someone who has artistic control*." *Id.* (emphasis added).

As this Court noted in *Aalmuhammed*, a broader construction of authorship would risk extending copyright claims to "many 'overreaching contributors,' . . . and deny sole authors 'exclusive authorship status simply because another person render[ed] some form of assistance." *Aalmuhammed*, 202 F.3d at 1235 (quoting *Thomson v. Larson*, 147 F.3d 195, 200 (2d Cir. 1998), and *Childress v. Taylor*, 945 F.2d 500, 504 (2d Cir. 1991)); *see also Gaiman v. McFarlane*, 360 F.3d 644, 658

16

(7th Cir. 2004) (recognizing that "copyright would explode" if every contributor to a collaborative work was afforded authorship status).

Appellant is not the author of the Film or even the scene containing her performance; instead, she is a mere contributor whose main "contribution" (reading lines from a script provided to her) was dubbed over by others. Indeed, Appellant acknowledges she lacked the artistic control necessary for authorship. (AER 69 (FAC ¶¶ 27-28).) As stated by Appellant, "Defendant [Youssef] used her as a puppet." (AER 66 (FAC ¶ 8).)

The record is devoid of any facts supporting Appellant's claim that she made any independently copyrightable creative contribution to the Film. It was Youssef who controlled the creative direction of the Film, including the manner in which Appellant appeared. *See Aalmuhammed*, 202 F.3d at 1234 ("an author 'superintend[s]' the work . . . 'by putting the persons in position, and arranging the place where people are to be . . .'"). Youssef was "the writer and producer of the Film" and "managed all aspects of the production." (AER 65 (FAC ¶ 5).) Appellant's recitation of lines provided by Youssef, many of which were later overdubbed, simply does not qualify for copyright protection.[8]

---

[8] Appellant devotes an entire section of her Opening Brief discussing the Digital Millennium Copyright Act ("DMCA") and her takedown notices. However, the DMCA "safe harbor" is an affirmative defense, which shields a service provider from monetary damages if it complies with the Act's safe harbor provisions. 17 U.S.C. §512(c). YouTube does not dispute that it has declined to remove the Film

### b.    Appellant's reliance on preemption cases is misplaced.

Appellant does not cite a single case in which a court afforded copyright protection to an actress who delivered a brief performance in a film under the direction and control of another. Instead, Appellant relies primarily on preemption cases, where where courts considered whether claims for misappropriation of name and likeness or right of publicity are preempted by the Copyright Act.

Appellant relies on *Fleet v. CBS, Inc*., 50 Cal. App. 4th 1911 (1996), to argue that her performance in the Film is independently copyrightable. But *Fleet* simply held that plaintiff actors' claims for misappropriation of name or likeness were preempted by the Copyright Act because the images at issue were taken directly from a copyrighted motion picture. *Id*. at 1916. The *Fleet* court did not decide whether the actors had a valid copyright claim; the plaintiffs did not claim a copyright interest in the movie in which they acted, or in their individual performances. *Fleet*, 50 Cal. App. 4th at 1916.

Appellant similarly relies on *Laws v. Sony Music Entm't, Inc.*, 448 F.3d 1134 (9th Cir. 2006), for the proposition that a performer retains the copyright in her performance unless she transfers or assigns the right to another. But *Laws,* like *Fleet*, involved claims for misappropriation of name or voice, not copyright. *Id*. at

at Appellant's demand. DMCA is irrelevant to Appellant's request for a preliminary injunction.

1138.  Moreover, the work at issue in *Laws* was a sound recording, which is expressly protected under the Copyright Act.  *Id.* at 1139; *see also* 17 U.S.C. § 102(a).  The court found that plaintiff's claims were preempted because the entirety of the alleged misappropriated vocal performance was contained within a copyrighted medium.  *Laws*, 448 F.3d at 1141.

Lastly, Appellant cites this Court's decision in *Jules Jordan Video, Inc. v. 144942 Canada Inc.*, 617 F.3d 1146 (9th Cir. 2010), but that also is a preemption case, not an infringement case.  In *Jules Jordan*, an adult movie actor and his company sued an entertainment distributor for copying and selling DVDs featuring the actor's performances.  *Id.* at 1149.  The actor and his company asserted claims for copyright infringement and violation of the actor's right of publicity.  *Id.* at 1149-50.  The actor's right of publicity claim was preempted because unauthorized distribution of copyrighted DVDs falls within the subject matter of copyright.  *Id.* at 1155.  The Court also considered whether the actor or his company was the "author" of the films at issue.  The Court found that the actor operated a "one-man shop"; he was the officer, director, and shareholder of the company, and exercised complete control over the production of the films.  *Id.* at 1156.  "It was all Gasper all the time."  *Id.*  The plaintiff's copyright interest arose from something far greater than a five-second appearance in a film.

19

The determination that a particular state law tort claim is preempted by the Copyright Act does not establish that this Appellant has a viable claim for copyright infringement. *Selby v. New Line Cinema Corp.*, 96 F. Supp. 2d 1053, 1058 (C.D. Cal. 2000) (noting that "[s]cope and protection are not synonymous. . . . the shadow actually cast by the [Copyright] Act's preemption is notably broader than the wing of its protection.") (quoting *U.S. Ex Rel. v. Board of Trustees of Univ. of Ala.*, 104 F.3d 1453, 1463 (4th Cir. 1997)). None of Appellant's cases support her contention that her very limited involvement in the Film created a copyright interest allowing her to demand removal of the Film or any portion of the Film from YouTube.

**2.      Appellant's allegations confirm that Youssef is the Film's copyright owner, giving him the right to post the Film on Youtube.com.**

Appellant's own allegations establish that Youssef controlled the making of the Film. Youssef was "the writer and producer of the Film," "managed all aspects of production," and "was in charge of all aspects of the production." (AER 65 (FAC ¶ 5).) Youssef was the Film's author. *Aalmuhammed*, 202 F.3d at 1234. As the author of the Film, Youssef is also the copyright owner. 17 U.S.C. § 201(a) ("Copyright in a work protected under this title vests initially in the author or authors of the work.").

One cannot infringe his own copyright. *See Richmond v. Weiner*, 353 F.2d 41 (9th Cir. 1965); *see also* 17 U.S.C. § 106(5) (recognizing a copyright owner's exclusive right to publicly display "the individual images of a motion picture or other audiovisual work"). As the copyright owner, Youssef has the *exclusive* right to reproduce the copyrighted work, prepare derivative works, distribute copies of the work to the public, and publicly display the entire work or any of the images contained therein. 17 U.S.C. § 106.

Appellant admits that the Film was posted on the YouTube website by Youssef himself. (AER 64, 69-70 (FAC ¶¶ 1, 29, 30).) Because Youssef was exercising his lawful rights under the Copyright Act when he displayed the Film, such activity was authorized by the copyright owner, and YouTube cannot be liable to Appellant for copyright infringement for failure to remove the Film at her demand.[9]

### 3. Even if Appellant had a cognizable copyright claim, her performance was a "Work for Hire."

In general, copyright in a work "vests initially in the author . . . of the work." 17 U.S.C. § 201(a). But "[i]n the case of a work made for hire, the employer . . . for whom the work was prepared is considered the author . . . , and, unless the

---

[9] Appellant also complains that the Film has been re-posted on YouTube by third party infringers. (AOB at 31.) However, Appellant has no copyright interest in the Film and therefore has no standing to complain about the reposting of the film by others. *See* 17 U.S.C. § 501.

parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." 17 U.S.C. § 201(b). The Copyright Act defines a "work made for hire" to include: "(1) a work prepared by an employee within the scope of his or her employment; or (2) a work specially ordered or commissioned for use as . . . part of a motion picture or other audiovisual work . . . if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." 17 U.S.C. § 101.

Whether an artist is an "employee" for purposes of the "work for hire" doctrine is determined by common law principals of agency. *Cmty. for Creative Non-Violence*, 490 U.S. at 751. One of the most critical factors is the level of control that the employer has over the artist's work. *Id.* ("we consider the hiring party's right to control the manner and means by which the product is accomplished"); *see also Antelope Valley Press v. Poizner*, 162 Cal. App. 4th 839, 852 (2008) ("[T]he right of the person to whom services are rendered to control the manner and means of accomplishing the desired result of those services is a significant factor for determining whether the person performing the work is an employee or an independent contractor.").

Appellant's own allegations establish that she was Youssef's employee. Appellant admits that she was hired merely as an actress for a role in the Film. She responded to a casting call and ultimately "was cast in the part" that she played.

22

(AER 65, 69 (FAC ¶¶ 4, 27).) She was given portions of a script to read and paid $500 for her work. (AER 69 (FAC ¶ 28); AER 193-194 (Garcia Decl. ¶ 6).) Appellant retained no rights to control the Film or her appearance in it. The location and all of the instrumentalities for making the Film were provided by the filmmaker. Appellant alleges that Youssef was the "writer and producer of the Film" and "*managed all aspects of production*." (AER 65 (FAC ¶ 5 (emphasis added)).) She was hired by Youssef to "deliver an acting performance" (AER 66, 69 (FAC ¶ 8, 28)), and then Youssef or others took that performance and later dubbed over her words (AER 66, 69-70 (*id.* ¶¶ 8, 29)). Appellant was an employee, under the law, relating to her work on the Film.

Once it is determined that the work was created by an employee within the scope of her employment, as is the case here, there is a presumption that the employer owns a copyright in the work. *Twentieth Century Fox Film Corp. v. Entm't Distrib.*, 429 F.3d 869, 880 (9th Cir. 2005) (recognizing presumption); *Lin-Brook Builders Hardware v. Gertler*, 352 F.2d 298, 300 (9th Cir. 1965) (when one hires another to make a work "of an artistic nature . . . the presumption arises that the mutual intent of the parties is that the title to the copyright shall be the person at whose instance and expense the work is done."). An employee may only rebut the presumption by presenting evidence of an agreement that the employee would hold a copyright. Melville B. Nimmer & David Nimmer, Nimmer on Copyright §

5.03D (2012); *Trenton v. Infinity Broadcasting Corp.*, 865 F. Supp. 1416, 1426

(C.D. Cal. 1994). Appellant has failed to present any evidence of such an

agreement.

### 4. Appellant signed a release relinquishing any copyright interest.

A copyright can be transferred like any other property right. *See* 17 U.S.C. §

201(d)(1); *Jules Jordan Video*, 617 F.3d at 1156. However "[a] transfer of

copyright ownership, other than by operation of law, is not valid unless an

instrument of conveyance, or a note or memorandum of the transfer, is in writing

and signed by the owner of the rights conveyed of such owner's authorized agent."

17 U.S.C. § 204(a).

Here, Appellant signed an unambiguous release prior to her participation in

the filming, relinquishing any copyright interest she may have had in the Film.

(AER 794-796 (Personal Release and Case Deal Memo).)[10] Even if Appellant had

some cognizable copyright interest in the Film or any portion of the Film, Garcia

released such interest long ago.

---

[10] The district court chose not to consider the release executed by Appellant in deciding her motion for preliminary injunction. (AER 892-894 (November 30, 2012 Order).) If the Court reverses the district court's denial of Appellant's motion for preliminary injunction, YouTube requests that the Court remand for reconsideration of the motion, thereby allowing the district court to determine whether injunctive relief is appropriate given the existence and effect of the release. *See Leigh v. Salazar*, 677 F.3d 892, 900-901 (9th Cir. 2012) (reversing the district court's denial of the preliminary injunction and remanding the case for further proceedings).

**5.** **Any copyright interest was impliedly assigned when Garcia delivered her performance for use in the Film.**

Relying on *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555 (9th Cir. 1990), Appellant claims that she did not relinquish her copyright interest in writing, and therefore "the copyright in her performance remains intact." (AOB at 35.) This Court also held in *Effects Assocs.* that "[a] nonexclusive license may be granted orally, or may even be implied from conduct." *Id.* at 558. Appellant fails to address this issue, maintaining only that she does not have the burden to show she transferred her rights. (AOB at 33.) But the evidence shows that Appellant, at a minimum, impliedly assigned a nonexclusive license to Youssef.

In *Effects Assocs.*, the defendant commissioned the plaintiff to create special effects footage for a horror movie. 908 F.2d at 555-56. It was undisputed that the plaintiff was the copyright owner of the footage and that the defendants "copied, distributed and publicly displayed [the] footage without written authorization." *Id.* The defendant argued a transfer of rights in the footage was possible under 17 U.S.C. § 204(a) without a written authorization, as was customary in the movie industry. *Id.* at 557. The Court rejected this argument but found that an exception exists for nonexclusive licenses implied from conduct. *Id.* at 558. It determined that the plaintiff had relinquished its rights by its conduct, as it "created a work at defendant's request and handed it over, intending that defendant copy and distribute it." *Id.*

25

Here, as in *Effects Assocs.*, no writing was required to transfer Appellant's copyright interest. Appellant was paid $500 for a performance that was fixed as part of the creation of the Film. (AER 69; 193-194 (FAC ¶ 27; Garcia Decl. ¶ 6).) She was given specific pages of a script and read from them. (AER 65, 69 (FAC ¶¶ 5, 28).) Appellant clearly intended that Youssef incorporate her performance into the Film and distribute it. (AER 66 (FAC ¶ 8).) Accordingly, she conveyed to Youssef an implied license to use her footage in the Film.[11]

## B. Appellant Cannot Show a Likelihood of Irreparable Harm

"[E]ven in a copyright infringement case, the plaintiff must demonstrate a likelihood of irreparable harm as a prerequisite for injunctive relief, whether preliminary or permanent." *Flexible*, 654 F.3d at 998. Irreparable harm is that which "cannot be redressed by a legal or an equitable remedy following a trial." *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992). To justify injunctive relief, the alleged harm must be likely. *Winter*, 555 U.S. at 22. It must

---

[11] Appellant seems to suggest that Youssef's use of her performance exceeded the scope of the implied license she gave him. It is undisputed, however, that Appellant agreed to appear in Youssef's Film, and she has not alleged that she contractually retained any rights over how she was presented in the Film. (AER 69 (FAC ¶ 27).) As the creator of the final version of the Film, Youssef was not required to obtain a new license from Appellant each time he made modifications to the Film. This would make his license useless. *See Foad Consulting Group, Inc. v. Azzalino*, 270 F.3d 821, 838 (9th Cir. 2001) (Kozinski, J. concurring) ("To regard each such modification as resulting in a new project for purposes of the license would be to render the implied license useless, once again giving the plan designer, rather than the owner, total control over the development.").

also be imminent. *See Caribbean Marine Svcs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (requiring "immediate threatened injury").

Plaintiffs must make a factual showing that irreparable injury will result in the absence of an injunction. *See Flexible*, 654 F.3d at 998 (plaintiff must make a showing of irreparable injury "on the facts of his case"). Mere assertions of irreparable harm will not suffice. *See, e.g.*, *Baldrige*, 844 F.2d at 674 ("plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief" (original emphasis)); *Technology & Intellectual Prop. Strategies Group PC v. Fthenakis*, 2012 WL 159585, at *4 (N.D. Cal. Jan. 17, 2012) (plaintiff "must demonstrate it will suffer an immediate injury that is not speculative").

### 1. Appellant cannot establish a causal connection between the allegedly infringing conduct of YouTube and the injury she alleges.

Removing the Film now—seven months after it was posted to YouTube and Appellant became aware of this,[12] and five months after it became the subject of public debate—would do nothing to mitigate or prevent the personal injuries she claims to have suffered.

---

[12] Appellant reports that she first viewed the Film after Youssef told her it had been posted on YouTube "sometime after July 2, 2012." (AER 195 (Garcia Declaration ¶ 12).) This was almost three months before Appellant sued under state law and sought an injunction in Superior Court, and more than three months before she sued for copyright infringement in federal court. (AER 64 (FAC ¶ 1).)

As an initial matter, copyright law does not provides a remedy for these types of injuries. *See Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010) ("relevant harm" is that which affects "the parties' legal interests" and "cannot be remedied after a final adjudication" (emphasis added)). The legal interest at issue in this litigation is Appellant's alleged ownership of a copyright and the rights she claims to have pursuant to that copyright, i.e., control of the copying and display of the work. The Copyright Act does not provide a remedy for injury to reputation, emotional harm and psychic and physical injuries.

In any event, the injunctive relief Appellant wants would not solve her problem. Appellant simply cannot establish under the law "a sufficient causal connection" between the allegedly infringing conduct she seeks to enjoin and the injuries she seeks to avoid. *Perfect 10, Inc. v. Google Inc.*, 653 F.3d 976, 982 (9th Cir. 2011), *cert. denied*, 132 S.Ct. 1713 (2012).

This Court's recent decision in *Perfect 10* is instructive. Perfect 10 owned copyrights in "photographic images of nude models" and made those images available for a fee on its website. *Id*. at 977-78. Perfect 10 claimed that Google's search engine and other services infringed Perfect 10's copyrights by making the photos accessible for free. *Id*. at 978. The district court denied Perfect 10's motion for a preliminary injunction and this Court affirmed, agreeing that Perfect 10 had not shown that an injunction would prevent the harm of which it

28

complained. Particularly important to the analysis was the fact that "search engines other than Google contribute to making Perfect 10 images freely available"—meaning an injunction against a single service that facilitates searching the World Wide Web would not have solved plaintiff's alleged problem. *Id*. at 982.

The same reasoning applies here. All of Appellant's purported harms arise from the Film. But an order against the YouTube Defendants will not entirely remove the Film from the Internet or other avenues of distribution, and it will not prevent others from seeing, sharing, and talking about the Film. Since the Film was posted in July 2012, it has been viewed and copied by countless individuals. (AER 64 (FAC ¶ 3).) A takedown order against YouTube will not alleviate Appellant's safety concerns, restore Appellant's "career and reputation" (AER 71 (FAC ¶ 38)), or assuage the anger of those outraged by the Film (AER 70 (FAC ¶ 34)).

Thus, even if we assume that Appellant's alleged personal injuries normally might justify a copyright injunction, Appellant's delay in seeking relief and the broad distribution of the Film in the interim makes it impossible to establish the requisite causal connection necessary to support a takedown order.

## 2. Appellant has not identified any irreparable harm.

Because it is an "extraordinary and drastic remedy," *Munaf v. Geren*,

553 U.S. 674, 689-90 (2008), preliminary injunctive relief is appropriate only if it

is "the *only* way of protecting the plaintiff from harm." *Campbell Soup*, 977 F.2d

at 91 (emphasis in original). If other remedies can protect a plaintiff's legal

interests, then the alleged harms do not warrant preliminary injunctive relief. *Id.*

Here, Appellant claims that she has suffered and will continue to suffer three

principal harms: (1) violation of her copyright (*see, e.g.*, AOB at 40; AER 69-70,

72 (FAC ¶¶ 29, 42)); (2) harm to her career prospects (*see, e.g.,* AER 71, 78, 80

(FAC ¶¶ 38, 76, 86)); and (3) emotional distress arising from alleged threats,

insults, and other indignities (*see, e.g.*, AER 70-71, 79, 81 (FAC ¶¶ 32-35, 81, 93);

*see also* AOB at 40; AER 162-163 (Ex Parte App. at 21-22)).

*First*, Appellant is not entitled to injunctive relief because she fails to allege

any exclusive right to display and distribute the Film. *See* 17 U.S.C. § 106; *New

Era Pubs. Int'l, ApS v. Henry Holt & Co.*, 695 F. Supp. 1493, 1526 (S.D.N.Y.

1988), *aff'd*, 873 F.2d 576 (2d Cir. 1989) (denying request to enjoin publication of

allegedly infringing book; explaining that if "the copyright owner can be

reasonably compensated in damages for injury to this commercial interest, and the

injury to the public interest in free speech resulting from injunction would be great,

that is a powerful reason for limiting the remedy to damages and withholding the

injunctive relief"); *Abend v. MCA*, 863 F.2d 1465, 1479 (9th Cir. 1988) (plaintiff seeking to enjoin movie did not show "irreparable injury which would justify imposing the severe remedy of an injunction;" plaintiff could be "compensated adequately for the infringement by monetary compensation"), *aff'd on other grounds sub. nom. Stewart v. Abend*, 495 U.S. 207 (1990); Lemley & Volokh, *Freedom of Speech and Injunctions in Intellectual Property Cases*, 48 Duke L.J. 147, 192 (1998) ("Copyright law is aimed primarily at ensuring that authors are economically rewarded so that they and others will continue to create new works of authorship—damages can generally reward authors relatively adequately and are often not terribly hard to estimate.").

*Second*, even if the Film has affected Appellant's career prospects, that harm is not irreparable as a matter of law. *See, e.g.*, *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (lost income and damaged reputation do not constitute irreparable injury); *DeNovellis v. Shalala*, 135 F.3d 58, 64 (1st Cir. 1998) (temporary loss of income does not usually constitute irreparable injury); *Shegog v. Bd. of Ed. of City of Chicago*, 194 F.3d 836, 839 (7th Cir. 1999) (temporary deprivation of employment, even combined with financial distress and difficulty finding new job, is not an irreparable injury).[13]

---

[13] Although Appellant identifies harm to her career as one of the irreparable harms she will suffer absent an injunction, she has offered no evidence that the Film has reduced or will reduce her career prospects. *See Perfect 10*, 653 F.3d at 981

**Third**, the insults and threatening statements Appellant identifies, while unfair and upsetting, do not justify injunctive relief. According to Appellant, several individuals have made statements that could be construed as wishing harm against her and/or her family—mostly on Appellant's Facebook profile. (AER 151 (Ex Parte App. at 10)); AER 202-228 (Decl. of Cindy Lee Garcia, Exh. B).) In addition, according to Appellant, an Egyptian cleric has encouraged his followers to harm Appellant and all those who worked on the Film. (AER 149 (Ex Parte App. at 8).)

This is not a showing of likely, imminent, and severe harm. For one, past injuries alone do not justify prospective injunctive relief. *See, e.g.*, *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). The threats appear to be the result of her alleged participation in the Film, and not the Film's continued availability on YouTube, and removal of the Film would do nothing to change the fact that Appellant participated in the Film. (*See* AER 210-212, 215-216, 221-227 (Garcia Decl., Exh. B at 19-21, 24-25, 30-36 (ECF pagination)).) Indeed, litigation and the many public appearances of Appellant (and her lawyer) have made Appellant the

(plaintiff failed to establish irreparable harm in part because it failed to identify a single customer it lost as a result of defendant's conduct).

most visible member of the Film's cast.[14]  Appellant cannot seek extraordinary

relief to prevent something she herself perpetuates by other means.

Appellant relies on *Harris v. Board of Supervisors*, 366 F.3d 754 (9th Cir.

2004), and *Yue v. Conseco Life Ins. Co.*, 282 F.R.D. 469 (C.D. Cal. 2012), to

support her position.  In *Harris*, the irreparable harm to the plaintiffs included

"pain, infection, amputation, medical complications, and death due to delayed

treatment."  366 F.3d at 766.  The problems could be avoided entirely if the

rehabilitation center stayed open and the hospital maintained its current capacity.

*Id*.  In *Yue*, the court found that "without a preliminary injunction, class members

[would] be forced to make a choice [regarding their life insurance] while the

---

[14] *See, e.g.* Russell Goldman, *Actress Says Maker of Anti-Muslim Film Lied to Cast*, ABC News, Sept. 13, 2012, *available at* http://abcnews.go.com/Blotter/actress-maker-anti-muslim-film-lied-cast/story?id=17228157); Anthony McCartney, *'Innocence of Muslims' Actress Cindy Lee Garcia Sues YouTube, Producer*, The Huffington Post, Sept. 19, 2012, *available at* http://www.huffingtonpost.com/2012/09/19/innocence-of-muslims-actress-cindy-lee-garcia-youtube_n_1898577.html; Miguel Marquez and Stan Wilson, *Actress In Anti-Islamic Film Files Lawsuit Against Filmmaker and YouTube*, CNN, Sept. 19, 2012, *available at* http://www.cnn.com/2012/09/19/us/california-anti-islam-film-lawsuit); *Effort to Take Down Anti-Muslim Film Rejected*, available at http://abclocal.go.com/kabc/video?id=8818769), and clips of Appellant's appearances on the television show, "The View" (http://www.youtube.com/watch?v=tKqhLk0agNA) and the "Today Show" (http://today.msnbc.msn.com/id/49146658/ns/today-today_news/t/actress-anti-islam-film-i-was-duped/#.UHS65fkn2Ew).

polices are in a legal limbo. The resulting uncertainty, stress, and inability to plan [were] sufficient to constitute irreparable harm." 282 F.R.D. at 484.

The preliminary injunctions in both *Harris* and *Yue* were capable of preventing future harm. A takedown order against YouTube would not end all distribution of the Film or erase Appellant's television interviews in which she freely discussed her participation in the Film, which are widely available. It also would not dissolve the alleged fatwa, prevent people from contacting her on Facebook, or change people's views about the Film or her participation in it.

### 3. Appellant's inexcusable delay undermines her claims of irreparable harm.

Courts often reject claims of irreparable harm where "the plaintiff has delayed either in bringing suit or in moving for preliminary injunctive relief." *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995), *aff'd*, 165 F.3d 15 (2d Cir. 1998); *see also Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) (10-week delay undercut claim of irreparable harm). A plaintiff's "long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." *Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.*, 762 F.2d 1374, 1377 (9th Cir. 1985).

Appellant unreasonably delayed in seeking injunctive relief against YouTube. According to Appellant, the Film was available on YouTube no later than July 2, 2012—almost three months before Appellant first sought preliminary

relief in Superior Court. (AER 64 (FAC ¶ 1).) Appellant admits she became aware of the Film's posting by Youssef in July, and viewed it at that point at Youtube.com, and the overdubbing (in English) was undoubtedly evident at that time, but Appellant did nothing whatsoever to pursue her claims of copyright infringement until the end of September. (*See* AER 147 (Ex Parte App. at 6).) Even after filing this action, Appellant waited another three weeks before filing this motion.

Appellant offers no explanation for her excessive delay, nor can she, because none of her claims required investigation. On this basis alone, Appellant's motion for preliminary injunction was properly denied.

## C. The Equities Do Not Tip In Appellant's Favor

A plaintiff seeking injunctive relief "must establish that 'the balance of equities tips in [her] favor.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20). This Court must "balance the interests of all parties and weigh the damage to each." *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980). It must also consider whether Appellant's requested relief would adversely affect the rights of nonparties or the public at large. *See Winter*, 555 U.S. at 26 ("In this case, the District Court and the Ninth Circuit significantly understated the burden the preliminary injunction would impose on the Navy's ability to conduct realistic

training exercises, and the injunction's consequent adverse impact on the public interest in national defense.").

### D. Appellant's Requested Injunction Would be a Prior Restraint, and Would Not Serve the Public Interest

Removing the Film at Appellant's behest would impose an unconstitutional prior restraint. It is indisputable that the Film is expressive speech, fully protected under the First Amendment, and it has become the catalyst for even more expressive speech—indeed, it is the subject of heated debate throughout the nation and around the world. This very lawsuit together with Appellant's many public appearances have only added another layer of discourse to an already important public debate.

Nearly century ago, Justice Brandeis wrote: "If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence. Only an emergency can justify repression." *Whitney v. California,* 274 U.S. 357, 377 (1927) (Brandeis, J., concurring).

Appellant's contention that she is a private individual who is "not capable of violating the First Amendment" (AOB at 42) fails because she is using the courts to obtain a prior restraint.[15] *See Alexander v. United States*, 509 U.S. 544, 550

---

[15] *Law v. Miller*, 2011 U.S. Dist. LEXIS 102527 (N.D. Cal. Sept. 9, 2011), the lone case cited by Appellant in support of this argument, did not involve prior restraints.

(1993) ("Temporary restraining orders and permanent injunctions—*i.e.*, court orders that actually forbid speech activities—are classic examples of prior restraints."); *Evans v. Evans*, 162 Cal. App. 4th 1157, 1167 (2008) (prior restraints are "highly disfavored and presumptively violate" the First Amendment). A prior restraint is "the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).

To "establish a valid prior restraint under the federal Constitution, a proponent has a heavy burden to show the countervailing interest is compelling, the prior restraint is necessary and would be effective in promoting this interest, and less extreme measures are unavailable." *Evans*, 162 Cal. App. 4th at 1166 (citing *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 562-568 (1976)). Even concerns about national security have been deemed insufficiently compelling to justify a prior restraint. *See New York Times Co. v. United States*, 403 U.S. 713, 714 (1971) (per curiam) (refusing to enjoin publication of the Pentagon Papers).

---

The plaintiff in that case (a prisoner) alleged that employees of 7-Eleven violated his First Amendment rights by telling a police offer that he had threatened to kill one of the employees, thereby getting him arrested. *Id.* at *1-3. The court found that the plaintiff did not have a First Amendment claim because the 7-Eleven employees were not state actors. *Id.* at *6. Here, Appellant is asking the court, a government entity, to restrain speech. *See New York Times Co. v. Sullivan,* 376 U.S. 254, 265 (1964) (First Amendment applies where private litigant asks a court to restrict speech).

Appellant has not shown and cannot show that this is one of the rare cases justifying a prior restraint.

**First,** Appellant has not identified "compelling interests" justifying a prior restraint; at best, she has identified interests in a five-second appearance in the Film that are commercial, speculative, or both. The personal harms that Appellant contends justify a takedown order are unrelated to the purpose and remedies of the Copyright Act, which is the basis for her claims. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575 (1994) (the purpose of the Copyright Act is "[t]o promote the Progress of Science and useful Arts") (citing U.S. Const., Art. I, § 8, cl. 8).

**Second**, it is beyond dispute that a prior restraint would not "be effective in promoting" Appellant's interests because enjoining YouTube would not actually prevent any of the future harms Appellant alleges (*i.e.* harm to career prospects (AER 71, 78, 80 (FAC ¶¶ 38, 76, 86)) and emotional distress arising from alleged threats and insults (AER 70-71, 79, 81 (FAC ¶¶ 32-35, 81, 93)), especially at this late date.

**Third**, removal of the Film from YouTube would stifle speech at the core of the First Amendment—speech about religion, politics, and the value of free speech itself. (*See* AER 64 (FAC ¶ 3 (alleging that the Film has inspired protests in nearly 50 countries and drawn comment from the President of the United States and the

Secretary of State)); AOB at 42 (stating that there have been 30 million viewings of the Film's English version).

Courts are rightly skeptical when a plaintiff invokes tenuous copyright claims to stifle public debate. *See Religious Tech. Ctr. v. F.A.C.T.Net*, 901 F. Supp. 1519, 1527 (D. Colo. 1995) ("Public interest lies with the free exchange of dialogue on matters of public concern. The injunction sought would silence the Defendants as participants in an ongoing debate involving matters of significant public controversy. Relief of this kind does not serve the public interest."); *Salinger*, 607 F.3d at 82 ("The public's interest in free expression . . . is significant and is distinct from the parties' speech interests.").[16]

Where an injunction "will adversely affect a public interest . . . the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312-13 (1982). That is exactly what should happen here.

---

[16] Appellant contends that the First Amendment simply falls away because "by now it is clear that Defendants' actions can be compared to falsely shouting 'Fire!' in a theater, creating a 'clear and present danger' outside the protections of the First Amendment." (AOB at 42-43 (citing *Schenk v. United States*, 249 U.S. 47, 52 (1919)).) But *Schenk* did not involve a prior restraint. *Schenk* simply held that speech may be punished if, after a trial on the merits, the speech is found to be illegal and not protected by the First Amendment. *See Schenk*, 249 U.S. at 49, 52-53 (upholding conviction, after trial, for violation of a federal statute).

Appellant's alleged interests in the Film simply do not justify a prior restraint of core First Amendment speech. *See id.* at 312 (explaining that courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."); *see also Religious Tech. Ctr. v. Netcom On-Line Commc'ns Svcs., Inc.*, 907 F. Supp 1361, 1383 (N.D. Cal. 1995) (rejecting request for preliminary injunctive relief against providers of an Internet bulletin board in a copyright case, in part because service providers "play[ed] a vital role in the speech of their users").

## X.  CONCLUSION

For all of the foregoing reasons, the order of the district court denying Appellant's Motion for Preliminary Injunction should be affirmed.

DATED:  February 15, 2013                **PERKINS COIE** LLP

By: */s/ Timothy L. Alger* _____
    Timothy L. Alger

Attorneys for Appellees
Google Inc. and YouTube, LLC

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Defendants-Appellees Google Inc.

and YouTube, LLC are not aware of any related cases pending in this Court.

## CERTIFICATE OF COMPLIANCE

The foregoing brief complies with the requirements of Ninth Circuit

Rule 32.  The brief has been prepared in proportionally spaced typeface using

Times New Roman 14-point type.  According to the word processing system used

to prepare the brief, the word count of this brief is 9,626 words, not counting those

items excludable under Rule 32(a)(7)(B)(iii) of the Federal Rules of Appellate

Procedure.


DATED:  February 15, 2013        **PERKINS COIE LLP**

By: */s/ Timothy L. Alger*
     Timothy L. Alger

Attorneys for Appellees
Google Inc. and YouTube, LLC

42

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF System on February 15, 2013.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF System.

DATED:  February 15, 2013

*/s/ Timothy L. Alger*
Timothy L. Alger
Perkins Coie LLP

Attorneys for Appellees
Google Inc. and YouTube, LLC