Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 1 of 266

No. 12-57302

---

**UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

---

CINDY LEE GARCIA,

Plaintiff-Appellant

v.

GOOGLE, INC., YOUTUBE LLC, et al., Defendants-Appellees

and

NAKOULA BASSELEY NAKOULA, an individual, a.k.a. Sam Bacile, et al.,

Defendants.

---

On Appeal from the United States District Court

for the Central District of California

D.C. No. 2:12-cv-08315-MWF-VBK

---

**APPELLANT'S EXCERPTS OF RECORD**

**Volume 3 of 4**

**Pages 485-741**

---

M. Cris Armenta (State Bar No. 177403)
The Armenta Law Firm APC
11900 W. Olympic Boulevard
Suite 730 Los Angeles, CA 90064
Tel: (310) 826-2826
email: cris@crisarmenta.com

Credence Sol (State Bar 219784)
La Garenne
86200 Chauvigny, France
Tel: 06 74 90 22 08
email: credence.sol@sol-law.com

**INDEX**

**APPELLANT'S EXCERTS OF RECORD**

| Docket No. | Date | Description | Volume | Pages |
|:---:|:---:|:---|:---:|:---:|
| 1 | 9/26/2012 | Complaint | 1 | 1-62 |
| 5 | 10/4/2012 | First Amended Complaint | 1 | 63-122 |
| 8 | 10/11/2012 | Plaintiff's *Ex Parte* Application to Exceed Page Limits Set Forth in Local Rule 11-6; Declaration of M. Cris Armenta in Support Thereof | 1 | 123-126 |
| 10 | 10/12/2012 | Declaration of M. Cris Armenta in Support of Plaintiff's Ex Parte Motion to Exceed page Limit Under Local Rule 11-6 | 1 | 127-132 |
| 11 | 10/12/2012 | Order Denying Plaintiff's *Ex Parte* Application to Exceed Page Limit Under Local Rule 11-6 | 1 | 133-134 |
| 12 | 10/17/2012 | *Ex Parte* Application For a | 1 | 135-170 |

| | | | | |
|---|---|---|---|---|
| | | Temporary Restraining Order and an Order of Impoundment; Declarations of Garcia, Sutter, Flynn, Fadl, Levine, hardy and Armenta; Request for Judicial Notice | | |
| 13 | 10/17/2012 | Request For Judicial Notice | 1 | 171-191 |
| 14 | 10/17/2012 | Declaration of Cindy Lee Garcia, Dan Sutter, Gaylord Flynn, Dr. Khaled Abou El Fadl, All in Support of Ex Parte Application | 1&2 <br><br> 2 Begins at ER 238 | 192-285 |
| 14-1 | 10/17/2012 | Declaration of Zahavah Levine in Support of Ex Parte Application | 2 | 286-405 |
| 14-2 | 10/17/2012 | Declaration of David Hardy In Support of Ex Parte Application | 2 | 406-484 |
| 14-3 | 10/17/2012 | Declaration of M. Cris Armenta in Support of Ex | 3 | 485-600 |

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 4 of 266

| | | Parte Application | | |
|---|---|---|---|---|
| 15 | 10/18/2012 | Order Denying Ex Parte Application | 3 | 601-602 |
| 18-1 | 10/22/2012 | [Proposed] Order on Stipulation to Continue Hearing Date on Plaintiff's Motion for Preliminary Injunction | 3 | 603-606 |
| 20 | 10/23/2012 | Order on Stipulation to Continue Hearing Date on Plaintiff's Motion for Preliminary Injunction | 3 | 607-610 |
| 22 | 10/29/2012 | Opposition of Google Inc. and YouTube, LLC to Plaintiff's Motion for Preliminary Injunction and Order of Impoundment | 3 | 611-641 |
| 22-1 | 10/29/2012 | Request for Judicial Notice in Support of Opposition of Google Inc. and YouTube, LLC to Plaintiff's Motion | 3 | 642-667 |

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 5 of 266

| | | | | |
|---|---|---|---|---|
| | | for a Preliminary Injunction and Order of Impoundment | | |
| 23 | 10/29/2012 | Opposition of Google Inc. and YouTube, LLC to Plaintiff's Request for Judicial Notice in Support of Motion for Preliminary Injunction and Order of Impoundment | 3 | 668-675 |
| 24 | 10/29/2012 | Objections By Google Inc. and YouTube, LLC to Evidence Submitted in Support of Plaintiff's Motion for Preliminary Injunction and Order of Impoundment | 3 | 676-685 |
| 27 | 11/5/2012 | (1) Reply Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction and | 3 | 686-733 |

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 6 of 266

| | | Order of Impoundment; Declaration of M. Cris Armenta in Support Thereof; (2) Plaintiff's Response to Objections by Google, Inc. and YouTube LLC to Evidence Submitted in Support of Plaintiff's Motion for Preliminary Injunction and Order of Impoundment;(3) Plaintiff's Objections to Evidence Submitted by Google Inc., and YouTube LLC, in Opposition Brief to Plaintiff's Motion for Preliminary Injunction and Order of Impoundment;(4) [Proposed] Order Sustaining Plaintiff's Objections to | | |

| | | Evidence Submitted by Google, Inc. and YouTube LLC in Opposition Brief to Plaintiff's Motion for Preliminary Injunction and an Order of Impoundment | | |
|---|---|---|---|---|
| 28 | 11/5/2012 | Plaintiff's Objections to Evidence Submitted by Google Inc. and YouTube, LLC in Opposition Brief to Plaintiff's Motion for Preliminary Injunction and Order of Impoundment | 3 | 734-741 |
| 29 | 11/05/2012 | Plaintiff's Responses to Objections by Google Inc. and YouTube LLC to Evidence Submitted in Support of Plaintiff's Motion for Preliminary Injunction and | 4 | 742-790 |

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 8 of 266

| | | Order of Impoundment | | |
|---|---|---|---|---|
| 33 | 11/28/2012 | Declaration of Mark Basseley Youssef | 4 | 791-798 |
| 34 | 11/28/2012 | Declaration of Timothy L. Alger | 4 | 799-806 |
| 35 | 11/29/2012 | Plaintiff's Notice of Request Under Central District Local Rule 7-8 To Cross-Examine Declarants Submitted By defendants Google Inc. and YouTube, LLC | 4 | 807-809 |
| 36 | 11/30/2012 | Objections of Google Inc. and YouTube, LLC to Plaintiff's Notice of Request Under Central District Local Rule 7-8 to Cross-Examine Declarants | 4 | 810-816 |
| 37 | 11/30/2012 | Plaintiff's Objection to and Request to Strike Declarations of Time Alger and Mark Basseley | 4 | 817-890 |

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 9 of 266

| | | Youssef; Declarations of M. Cris Armenta, Galord Flynn, Cindy Lee Garcia and Jim Blanco | | |
|---|---|---|---|---|
| 38 | 11/30/2012 | Order Denying Request to Cross-Examine | 4 | 891 |
| 39 | 11/30/2012 | Order Denying Plaintiff Garcia's Motion for Preliminary Injunction | 4 | 892-894 |
| 40 | 11/30/2012 | Declaration of James A. Blanco in Support of Objection and Request to Strike Declarations of Tim Alger and Mark Basseley Youssef | 4 | 895-945 |
| 42 | 12/21/2012 | Notice of Appeal | 4 | 946-950 |

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 10 of 266

M. Cris Armenta (SBN 177403)
THE ARMENTA LAW FIRM APC
11900 W. Olympic Boulevard, Suite 730
Los Angeles, CA 90064
Tel: (310) 826-2826 x 108
Facsimile: (310) 826-5456
Email: cris@crisarmenta.com

Credence E. Sol (SBN 219784)
La Garenne
86300 Chauvigny
France
Telephone: 06 74 90 22 08
credence.sol@sol-law.com

Attorneys for Plaintiff
Cindy Lee Garcia

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CINDY LEE GARCIA, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>NAKOULA BASSELEY NAKOULA, an individual also known as SAM BACILE, MARK BASSELEY YOUSSEF, ABANOB BASSELEY NAKOULA, MATTHEW NEKOLA, AHMED HAMDY, AMAL NADA, DANIEL K. CARESMAN, KRITBAG DIFRAT, SOBHI BUSHRA, ROBERT BACILY, NICOLA BACILY, THOMAS J. TANAS, ERWIN SALAMEH, YOUSSEFF M. BASSELEY, and/or MALID AHLAWI; GOOGLE, INC., a Delaware Corporation; YOUTUBE, LLC, a California limited liability company, and DOES 1 through 10, inclusive.<br><br>Defendants. | Case No. CV12-8315-MWF-(VBKx)<br><br>**DECLARATION OF M. CRIS ARMENTA IN SUPPORT OF EX PARTE APPLICATION** |

ER485

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 11 of 266

# DECLARATION

ER486

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 12 of 266

## DECLARATION OF M. CRIS ARMENTA

I, M. Cris Armenta, declare:

1.      I am an attorney licensed in the State of California and principal of the Armenta Law Firm, counsel of record for Plaintiff Cindy Lee Garcia in this action. I am a member in good standing before the State Bar of California, and admitted to practice before this Court. I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

2.      While in Los Angeles Superior Court on September 20, 2012, for a hearing on Ms. Garcia's state court lawsuit, I was directed by the officers of the Los Angeles County Sheriff's Department and the Los Angeles Police Department to park in a secure underground location and accompanied to the courthouse by law enforcement. Cindy Lee Garcia and I were escorted to the public hearing by seven armed Los Angeles County Deputy Sheriffs. Before we walked down any halls or into elevators, areas were checked and secured for threats.  We were accompanied to a secure area of the courthouse before permitted into the general public areas of the courthouse. While I was in the courtroom, I was approached by the head of security for the Los Angeles Superior Court and warned that we were in grave danger. He expressed concern for Ms. Garcia, for me personally, and for both of our families, advising that the people who were after Ms. Garcia, and by extension me, "are very patient." We both were advised to take serious security measures entering and exiting the Los Angeles Superior Court, and with respect to our personal lives and residences. I was advised to exercise extreme caution in the Los Angeles Superior Court even if I was to appear there for unrelated matters. I have personally taken security measures and informed my local police department and Sheriff's office and my personal security company of the threats and warnings my client and I have received with respect to our safety.

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 13 of 266

3.      Counsel for YouTube has stated in open court that it is Cindy Lee
Garcia's actions in going public with that have raised her profile and placed her in
danger.  My response to Mr. Alger was to explain that it is likely her public
appearances condemning the film that have kept her out of harm's way so far since
she was originally contacted by the media and identified prior to her voluntarily
going public.    Mr. Alger also asked me if Ms. Garcia had signed an actor release
for participation in filing – I assured him that she did not and that the other actors
with whom I have spoken personally corroborate this non-event in what appears to
be an extremely low-budget film.

4.      On October 2, 2012, I spoke directly with counsel for Defendant
Google and YouTube.  I was told that the, despite the issuance of several takedown
notices pursuant to the Digital Millennium Copyright Act, that the *Innocence of*
*Muslims* video trailer was still on YouTube and that the decision to keep the video
on the site was made "at the highest levels" to keep the content up.  Tim Alger,
counsel for YouTube and Google, further informed me that, despite the fact that
YouTube's takedown agent had specifically asked for legal reasoning as why the
content should be pulled down, that ***YouTube was not obligated to respond to***
***Garcia's First Substantive Response***.  I remarked that the non-response was "highly
unusual" and that it is Cindy Lee Garcia's position that YouTube "has lost any safe
harbor protection."

5.      Indeed, in other, informal conversations with counsel for Google and
YouTube, counsel seems to have been playing "hide the ball" in that until I insisted
on a meet and confer conference pursuant to the Local Rules, in preparation for
filing an application for this temporary restraining order, they refused to advise as to
Google and YouTube's substantive reason for not disabling the infringing content.
In those conversations, counsel indicated to me that they have difficulty believing

2

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 14 of 266

1    that Mr. Nakoula neglected to obtain a release from Ms. Garcia with respect to her

2    copyright claims over her performance.

3         6.    In compliance with the Local Rules, I met and conferred with counsel

4    for YouTube and Google on October 4, 2012 at 4:00 p.m., prior to finalization and

5    filing of this Application.  For the first time, defense counsel revealed their

6    substantive position: that *Innocence of Muslims* is a "joint work" between Cindy Lee

7    Garcia and Defendant Nakoula pursuant to the United States Copyright Act.  A copy

8    of *Innocence of Muslims* posted by Sam Bacile, as well as many others on YouTube,

9    is attached hereto as Exhibit A.

10        7.    I have copied Tim Alger on the communications between Cindy Lee

11   Garcia's DMCA takedown agent, and YouTube's takedown agent, so that counsel

12   would be well informed of the communications and legal discussions.  Efforts to

13   secure the disabling of the content began on September 25, 2012 and ended on

14   October 3, 2012 at 1:23 p.m., when YouTube finally stated unequivoically that it

15   would not disable the content.

16        8.    Attached as Exhibit B are the published guidelines of YouTube with

17   respect to its treatment of hate speech and whether YouTube will continue to host

18   videos that have been identified as hate speech.

19        9.    Attached as Exhibit C are the public comments of Google Chairman

20   Eric Schmidt in which he acknowledged the anti-hate-speech guidelines of

21   YouTube, but stated, in reference to the controversy of YouTube's decision to keep

22   *Innocence of Muslims* on its website: "We believe the answer to bad speech is more

23   speech . . . It'll stay up."  He also discusses the efforts YouTube made to block the

24   film in particular countries.

25        10.   YouTube sold to Google for $1.85 billion.  It is clear from the party

26   admissions of YouTube's management team and founders that's value is derived

27   from generating "views" on YouTube of its content, even if that content is

28

3

DECLARATION OF CINDY LEE GARIA
CV 12 8315 (VBKx)

ER489

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 15 of 266

1  copyrighted.  The founders of YouTube acknowledged that if they removed all
2  copyrighted content from their site, their "views" would drop to 20% of existing
3  views generated.  Attached as Exhibit D are true and correct copies of emails
4  exchanged between the YouTube founders and accompanied with the authentication
5  declaration by Viacom counsel in the <u>Viacom v. Google</u> case decided recently by
6  the Second Circuit Court of Appeals.

7      11.  On October 15, 2012, at approximately 12:30 p.m. pst, I spoke to
8  attorney Steve Seiden, the criminal defense attorney representing Mr. Nakoula.  The
9  purpose of my call was to inquire whether or not Mr. Nakoula had accepted my
10  client's settlement offer in this litigation.  During the call, Mr. Seiden informed me
11  that my client is pursuing the wrong person.  When I asked him who the right person
12  was, he responded, "the one that owns the rights to the film."  I asked him who that
13  was and he responded that is was not Nakoula, but would not tell me who the other
14  person or persons were that own the film.  I immediately set the email to Tim Alger
15  attached hereto as Exhibit E.

16      I declare under penalty of perjury under the laws of the United States of
17  America that the foregoing is true and correct.

18      Executed on this 16th day of October, 2012.

19
20  M. Cris Armenta

21
22
23
24
25
26
27
28

4

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 16 of 266



EXHIBIT A

ER491

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 17 of 266

# EXHIBIT B

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 18 of 266

# **What** is Hateful Content?

Hateful Content is videos, comments or channel information which contain "Hate Speech". "Hate speech" refers to content that promotes hatred against members of a protected group. Protected groups include, but are not limited to, race or ethnic origin, religion, disability, gender, age, veteran status, and sexual orientation/gender identity.

Sometimes there is a fine line between what is and what is not considered hate speech. For instance, it is generally okay to criticize a nation, but not okay to make insulting generalizations about people of a particular nationality.

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 19 of 266

- Report channels and comments through the <u>Help & Safety Tool</u>

Keep in mind that not everything that is mean or insulting is considered hate speech.

### ♀ Help & Safety Tool

**Tips for confronting hate speech on YouTube from the <u>Anti-Defamation League.</u>**

✔️ Flag: Flag the offensive video for review by the YouTube team. Make sure to include why you thought the video was hateful.

✔️ Think: Perspective is crucial. Think before you respond, and try to respond in a thoughtful, careful manner.

✔️ Speak: Post videos or comments that oppose the offensive point of view. Let the YouTube community see a competing perspective.

✔️ Applaud: Don't forget to post positive comments on videos that share positive messages.

✔️ Talk: Talk to your friends, teachers, or family about what you've seen.

✔️ Learn: Many groups publish information about combating particular kinds of prejudice, such as the Anti-Defamation League's resources on <u>anti-Semitism.</u>

✔️ E-mail: Notify groups like the Anti-Defamation League, which keep track of trends in hate speech.

✔️ Act: Take active steps to <u>combat prejudice</u> online and offline.



## FAQ:

**Q: Is it hate speech if they aren't talking about a protected group?**
**A:** No, it is not considered hate speech if a protected group is not involved. So if someone is making insults towards you personally that are not considered hate speech, use the <u>Help & Safety Tool.</u>

**Q: Why wasn't the video or comment I reported to YouTube removed?**
**A:** The YouTube Team reviews all videos flagged and reports made through the <u>Help & Safety Tool</u>. So if a video you have flagged, or comment you have reported hasn't been removed, it's because it doesn't violate our hate speech policies. We encourage free speech and defend everyone's right to express unpopular points of view, and keep in mind that not everything that is mean or insulting is considered hate speech.

⊞ **United Kingdom**

⊞ **Canada**

⊞ _____

**Australia**

Help - About - Copyright - Uploaders & Partners - Advertising - Developers - Safety - Privacy - Terms

© 2012 YouTube, LLC - Change language: English (US)

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 20 of 266

ER495

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 21 of 266



# EXHIBIT C

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 22 of 266

# EXHIBIT D

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 23 of 266

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VIACOM INTERNATIONAL INC., COMEDY PARTNERS, COUNTRY MUSIC TELEVISION, INC., PARAMOUNT PICTURES CORPORATION, and BLACK ENTERTAINMENT TELEVISION LLC, <br><br> Plaintiffs, <br><br> v. <br><br> YOUTUBE INC., YOUTUBE, LLC, and GOOGLE, INC., <br><br> Defendants. | Case No. 1:07-cv-02103 (LLS) <br> (Related Case No. 1:07-cv-03582 (LLS)) <br><br> **DECLARATION OF WILLIAM M. HOHENGARTEN IN SUPPORT OF VIACOM'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |

I, William M. Hohengarten, hereby declare as follows:

1.      I am a partner with the law firm Jenner & Block LLP and represent the plaintiffs in the above-captioned action ("Viacom"). I submit this declaration in support of Viacom's Motion for Partial Summary Judgment on Liability and Inapplicability of the Digital Millennium Copyright Act Safe Harbor Defense. Attached to this declaration are Exhibits referenced in Viacom's Memorandum of Law and Viacom's Statement of Undisputed Facts in Support of Viacom's Motion for Partial Summary Judgment. I make this declaration based on personal knowledge, except where otherwise noted herein.

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 15 of 116   Page ID
#:522
Case 1:07-cv-02103-LLS   Document 191   Filed 03/18/10   Page 2 of 58

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 24 of 266

### *Fung* Slip Opinion

2.     Attached as Exhibit 1 for the Court's convenience is a true and correct copy of the

slip opinion in *Columbia Pictures Industries, Inc. v. Gary Fung*, No. CV 06-5578 SVW (C.D.

Cal. Dec. 21, 2009).

### Solow Declaration

3.     Attached as Exhibit 2 are the Declaration of Warren Solow in Support of

Plaintiffs' Motion for Partial Summary Judgment, dated March 3, 2010, and Exhibits A-G

thereto.

### Sum of YouTube View Count Data for Viacom Clips in Suit

4.     During discovery, Viacom identified to Defendants the infringing video clips of

Viacom's copyrighted works that have appeared on YouTube without authorization and that are

at issue in this lawsuit ("Clips in Suit"). The Clips in Suit are listed in Exhibits F and G to the

Declaration of Warren Solow, which is Exhibit 2 to this Declaration. In response to discovery

requests, Defendants have produced data showing the number of times each Clip in Suit was

viewed on the YouTube website ("YouTube View Count Data"). Pursuant to Fed. R. Evid. §

1006, an employee of Jenner & Block LLP, working at my direction, summed the YouTube

View Count Data for all Clips in Suit and arrived at a figure of over 507 million views.

### Documents Produced by Defendants

5.     The documents listed below in paragraphs 6 through 201 are true and correct

copies of documents produced by Defendants in this action, and accordingly are marked by

Defendants with a Bates number beginning with the prefix "GOO001-".

6.     Attached as Exhibit 3 is a true and correct copy of a document produced by

Defendants marked with the Bates range GOO001-00303096-104.

2

ER499

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 16 of 116   Page ID
#:523
Case 1:07-cv-02103-LLS   Document 191   Filed 03/18/10   Page 3 of 58

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 25 of 266

7.     Attached as Exhibit 4 are a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-00011355, a true and correct copy of an associated email attachment marked with the Bates number GOO001-00011356, and a true and correct copy of an associated email attachment marked with the Bates number GOO001-00011357. These documents were introduced as Exhibit 12 at the Rule 30(b)(6) deposition of David King, Exhibit 18 at the deposition of Chris Maxcy, and Exhibit 30 at the deposition of David Eun.

8.     Attached as Exhibit 5 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-02757578.

9.     Attached as Exhibit 6 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-00660588. This email exchange was introduced as Exhibit 8 at the deposition of Chad Hurley and as Exhibit 15 at the deposition of Zahavah Levine.

10.     Attached as Exhibit 7 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-01907664.

11.     Attached as Exhibit 8 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-01424049-50.

12.     Attached as Exhibit 9 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-05951723-37.

13.     Attached as Exhibit 10 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-02482760. This email exchange was introduced as Exhibit 2 at the deposition of Cuong Do.

ER500

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 17 of 116   Page ID
#:524
Case 1:07-cv-02103-LLS   Document 191   Filed 03/18/10   Page 4 of 58

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 26 of 266

14.    Attached as Exhibit 11 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-00561567-82. This document was introduced as Exhibit 12 at the deposition of Micah Schaffer.

15.    Attached as Exhibit 12 are a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-00744094, and a true and correct associated email attachment produced by Defendants marked with the Bates number range GOO001-00744095-152.

16.    Attached as Exhibit 13 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-00044974-82. This document was introduced as Exhibit 7 at the deposition of Heather Gillette.

17.    Attached as Exhibit 14 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-07167907-08.

18.    Attached as Exhibit 15 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-00504044-45.

19.    Attached as Exhibit 16 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-00629095. This email exchange was introduced as Exhibit 7 at the deposition of Brent Hurley, Exhibit 1 at the deposition of Cuong Do, and Exhibit 8 at the deposition of Zahavah Levine.

20.    Attached as Exhibit 17 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-00629474.

21.    Attached as Exhibit 18 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-00839842-46.

4

ER501

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 27 of 266

22.      Attached as Exhibit 19 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-00007027-29.

23.      Attached as Exhibit 20 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-02403826-27.

24.      Attached as Exhibit 21 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-02824049-52.

25.      Attached as Exhibit 22 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-00762173-198. This document was introduced as Exhibit 13 at the deposition of Brent Hurley.

26.      Attached as Exhibit 23 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-07728393-95.

27.      Attached as Exhibit 24 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-00522244. This email exchange was introduced as Exhibit 5 at the deposition of Micah Schaffer.

28.      Attached as Exhibit 25 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-05172407.

29.      Attached as Exhibit 26 are a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-00630641, and a true and correct copy of an associated email attachment produced by Defendants marked with the Bates number GOO001-00630642. These documents were introduced as Exhibit 20 at the deposition of Brent Hurley.

30.      Attached as Exhibit 27 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-03060898-904.

5

ER502

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 19 of 116   Page ID
#:526
Case 1:07-cv-02103-LLS   Document 191   Filed 03/18/10   Page 6 of 58

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 28 of 266

31.     Attached as Exhibit 28 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-00558783-84.

32.     Attached as Exhibit 29 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-02761607-11.

33.     Attached as Exhibit 30 are a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-00420319, and a true and correct copy of an associated email attachment produced by Defendants marked with the Bates number GOO001-00420320-27.

34.     There is no Exhibit 31 to this Declaration, and that exhibit number is therefore intentionally left blank.

35.     Attached as Exhibit 32 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-03631419.

36.     Attached as Exhibit 33 are a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-03406085, and a true and correct copy of an associated email attachment produced by Defendants marked with the Bates number GOO001-03406086.

37.     Attached as Exhibit 34 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-00988969-72.  This email exchange was introduced as Exhibit 15 at the deposition of Heather Gillette and as Exhibit 18 at the deposition of Kevin Donahue.

38.     Attached as Exhibit 35 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-00953867-69.  This email exchange was introduced as Exhibit 14 at the deposition of Heather Gillette.

6

ER503

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 20 of 116   Page ID
#:527
Case 1:07-cv-02103-LLS   Document 191   Filed 03/18/10   Page 7 of 58

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 29 of 266

39.    There is no Exhibit 36 to this Declaration, and that exhibit number is therefore intentionally left blank.

40.    Attached as Exhibit 37 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-01627276-79. This email exchange was introduced as Exhibit 2 at the Rule 30(b)(6) deposition of Chris Maxcy.

41.    Attached as Exhibit 38 are a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-03045959, and a true and correct copy of an excerpt from an associated email attachment produced by Defendants marked with the Bates number range GOO001-03045960-8245.

42.    Attached as Exhibit 39 are a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-00794737, and a true and correct copy of an associated email attachment marked with the Bates number range GOO001-00794738-58. These documents were introduced as Exhibit 15 at the deposition of David Eun, Exhibit 15 at the deposition of David Drummond, Exhibit 6 at the deposition of Eric Schmidt, Exhibit 4 at the deposition of Bhanu Narasimhan, and Exhibit 3 at the deposition of Peter Chane.

43.    There is no Exhibit 40 to this Declaration, and that exhibit number is therefore intentionally left blank.

44.    Attached as Exhibit 41 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-03114019. This email exchange was introduced as Exhibit 3 at the deposition of Bhanu Narasimhan.

45.    Attached as Exhibit 42 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-00802317.

ER504

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 30 of 266

46.   Attached as Exhibit 43 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-06555098-99.  This email exchange was introduced as Exhibit 8 at the deposition of Bhanu Narasimhan.

47.   Attached as Exhibit 44 are a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-00990640, and a true and correct copy of an associated email attachment marked with the Bates number GOO001-00990641.  These documents were introduced as Exhibit 5 at the deposition of Eric Schmidt, Exhibit 11 at the deposition of Wendy Chang, Exhibit 14 at the deposition of David Drummond, Exhibit 2 at the deposition of Larry Page, and Exhibit 2 at the deposition of Peter Chane.

48.   Attached as Exhibit 45 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-03592968-69.  This email exchange was introduced as Exhibit 4 at the deposition of Peter Chane.

49.   Attached as Exhibit 46 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-03594244.  This email exchange was introduced as Exhibit 8 at the deposition of Peter Chane.

50.   Attached as Exhibit 47 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-05084213.

51.   Attached as Exhibit 48 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-00562962-65.  This email exchange was introduced as Exhibit 12 at the deposition of Patrick Walker.

52.   Attached as Exhibit 49 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-00566289.  This email exchange was introduced as Exhibit 12 at the deposition of Peter Chane.

ER505

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 22 of 116   Page ID
#:529
Case 1:07-cv-02103-LLS   Document 191   Filed 03/18/10   Page 9 of 58

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 31 of 266

53.   Attached as Exhibit 50 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-00495746-57.  This email exchange was introduced as Exhibit 6 at the deposition of David Eun and as Exhibit 9 at the deposition of Peter Chane.

54.   Attached as Exhibit 51 are a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-00496021, and a true and correct copy of an associated email attachment marked with the Bates number range GOO001-00496022-62. These documents were introduced as Exhibit 9 at the deposition of David Eun, Exhibit 9 at the deposition of Omid Kordestani, and Exhibit 13 at the deposition of Peter Chane.  The email attachment was introduced as Exhibit 7 at the deposition of Bhanu Narasimhan.

55.   Attached as Exhibit 52 are a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-00496614, and a true and correct copy of an associated email attachment marked with the Bates number range GOO001-00496615-47. These documents were introduced as Exhibit 8 at the deposition of Eric Schmidt, Exhibit 10 at the deposition of Omid Kordestani, Exhibit 18 at the deposition of David Drummond, Exhibit 7 at the deposition of Sergey Brin, Exhibit 16 at the deposition of Peter Chane, and Exhibit 2 at the deposition of Jonathan Rosenberg.

56.   Attached as Exhibit 53 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-01495915-18.

57.   Attached as Exhibit 54 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-02055019-20.  This email exchange was introduced as Exhibit 35 at the deposition of David Drummond.

ER506

Case 2:12-cv-08315-MWF-VBK Document 14-3 Filed 10/17/12 Page 23 of 116 Page ID
#:530
Case 1:07-cv-02103-LLS Document 191 Filed 03/18/10 Page 10 of 58

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 32 of 266

58.     Attached as Exhibit 55 are a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-02693804, and a true and correct copy of an associated email attachment marked with Bates number range GOO001-02693808-13.

59.     Attached as Exhibit 56 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-05150988.

60.     Attached as Exhibit 57 are a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-04430721, and a true and correct copy of an associated email attachment produced by Defendants marked with the Bates number range GOO001-04430722-722.003. These documents were introduced as Exhibit 10 at the deposition of Peter Chane.

61.     Attached as Exhibit 58 are a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-02361246, and a true and correct copy of an associated email attachment produced by Defendants marked with the Bates number range GOO001-02361247-48.

62.     Attached as Exhibit 59 are a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-00496065, and a true and correct copy of an associated email attachment produced by Defendants marked with the Bates number range GOO001-00496066-94. These documents were introduced as Exhibit 8 at the deposition of David Eun and as Exhibit 13 at the deposition of Wendy Chang.

63.     Attached as Exhibit 60 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-00502665-93. This document was introduced as Exhibit 10 at the deposition of David Eun and as Exhibit 5 at the deposition of Tim Armstrong.

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 24 of 116   Page ID
#:531
Case 1:07-cv-02103-LLS   Document 191   Filed 03/18/10   Page 11 of 58

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 33 of 266

64. Attached as Exhibit 61 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-00482516-18. This email exchange was introduced as Exhibit 13 at the deposition of Patrick Walker.

65. Attached as Exhibit 62 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-00496651-54. This email exchange was introduced as Exhibit 12 at the deposition of David Eun, Exhibit 8 at the deposition of Omid Kordestani, Exhibit 17 at the deposition of David Drummond, Exhibit 7 at the deposition of Eric Schmidt, Exhibit 3 at the deposition of Larry Page, Exhibit 5 at the deposition of Sergey Brin, and Exhibit 3 at the deposition of Jonathan Rosenberg.

66. Attached as Exhibit 63 are a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-00791569, and a true and correct copy of an associated email attachment produced by Defendants marked with the Bates number range GOO001-00791570-611. These documents were introduced as Exhibit 15 at the deposition of Wendy Chang, Exhibit 17 at the deposition of Larry Page, and Exhibit 4 at the deposition of Jonathan Rosenberg.

67. Attached as Exhibit 64 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-00563430-33. This email exchange was introduced as Exhibit 14 at the deposition of David Eun, Exhibit 19 at the deposition of David Drummond, Exhibit 6 at the deposition of Sergey Brin, Exhibit 17 at the deposition of Peter Chane, and Exhibit 5 at the deposition of Jonathan Rosenberg.

68. Attached as Exhibit 65 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-00563469-70. This email exchange was introduced as Exhibit 11 at the deposition of Patrick Walker.

ER508

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 25 of 116   Page ID
#:532
Case 1:07-cv-02103-LLS   Document 191   Filed 03/18/10   Page 12 of 58

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 34 of 266

69.     Attached as Exhibit 66 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-00792297.  According to the metadata produced by Defendants, this email exchange was produced from the files of Google co-founder Larry Page.

70.     Attached as Exhibit 67 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-04736644-47.

71.     Attached as Exhibit 68 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-03548410-12.

72.     Attached as Exhibit 69 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-02021241-44.

73.     Attached as Exhibit 70 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-01395950.  This email exchange was introduced as Exhibit 22 at the deposition of Chad Hurley and as Exhibit 12 at the deposition of Eric Schmidt.

74.     Attached as Exhibit 71 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-01271624-27.  This email exchange was introduced as Exhibit 10 at the deposition of Heather Gillette.

75.     Attached as Exhibit 72 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-03383629.

76.     Attached as Exhibit 73 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-01364485.  This document was introduced as Exhibit 15 at the deposition of Michael Solomon.

ER509

Case 2:12-cv-08315-MWF-VBK   Document 14-3    Filed 10/17/12   Page 26 of 116   Page ID
#:533
Case 1:07-cv-02103-LLS   Document 191    Filed 03/18/10   Page 13 of 58

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 35 of 266

77.     Attached as Exhibit 74 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-07155101.

78.     Attached as Exhibit 75 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-00217336.

79.     Attached as Exhibit 76 are a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-03037036, and a true and correct copy of an associated email attachment produced by Defendants marked with the Bates number range GOO001-03037037-65. These documents were introduced as Exhibit 3 at the deposition of Shashi Seth.

80.     Attached as Exhibit 77 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-05154818.

81.     Attached as Exhibit 78 are a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-05943950, and a true and correct copy of an associated email attachment produced by Defendants marked with the Bates number range GOO001-05943951-59. These documents were introduced as Exhibit 12 at the deposition of Shashi Seth.

82.     Attached as Exhibit 79 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-01016844-45. This email exchange was introduced as Exhibit 4 at the deposition of Shashi Seth.

83.     Attached as Exhibit 80 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-00225766-68. This email exchange was introduced as Exhibit 39 at the deposition of Wendy Chang.

ER510

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 27 of 116   Page ID
#:534
Case 1:07-cv-02103-LLS   Document 191   Filed 03/18/10   Page 14 of 58

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 36 of 266

84.     Attached as Exhibit 81 are a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-02414976-79, and a true and correct copy of an associated email attachment marked with the Bates number GOO001-02414980. These documents were introduced as Exhibit 10 at the deposition of Shashi Seth.

85.     Attached as Exhibit 82 are a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-03241189-90, and a true and correct copy of an associated email attachment marked with the Bates number range GOO001-03241191-92. These documents were introduced as Exhibit 11 at the deposition of Shashi Seth.

86.     Attached as Exhibit 83 are a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-00747816, and a true and correct copy of an associated email attachment marked with the Bates number range GOO001-00747817-989. These documents were introduced as Exhibit 5 at the deposition of Shashi Seth.

87.     Attached as Exhibit 84 are a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-02201131, and true and correct copies of excerpts from an associated email attachment marked with the Bates number range GOO001-02201132-132.0228.

88.     Attached as Exhibit 85 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-00827503-05.

89.     Attached as Exhibit 86 is a true and correct copy of a document produced by Defendants marked with the Bates number range     GOO001-01998134-50.

90.     Attached as Exhibit 87 are a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-00829227-28, and a true and

14

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 28 of 116   Page ID
#:535
Case 1:07-cv-02103-LLS   Document 191   Filed 03/18/10   Page 15 of 58

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 37 of 266

correct copy of an associated email attachment marked with the Bates number range GOO001-00829229-229.007.

91.     Attached as Exhibit 88 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-00797774-77.

92.     Attached as Exhibit 89 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-05942431-32.

93.     Attached as Exhibit 90 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-02057400-02.

94.     Attached as Exhibit 91 are a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-00984825-27, a true and correct copy of an associated email attachment produced by Defendants marked with the Bates number range GOO001-00984828-33, and a true and correct copy of an associated email attachment marked with the Bates number range GOO001-00984834-40.  These documents were introduced as Exhibit 26 at the deposition of Omid Kordestani.

95.     Attached as Exhibit 92 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-00746418.  This email exchange was introduced as Exhibit 27 at the deposition of Chris Maxcy.

96.     Attached as Exhibit 93 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-00751570-71.

97.     Attached as Exhibit 94 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-00869300.

98.     Attached as Exhibit 95 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-02244041-57.

15

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 29 of 116   Page ID
#:536
Case 1:07-cv-02103-LLS   Document 191   Filed 03/18/10   Page 16 of 58

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 38 of 266

99.     There is no Exhibit 96 to this Declaration, and that exhibit number is therefore intentionally left blank.

100.    There is no Exhibit 97 to this Declaration, and that exhibit number is therefore intentionally left blank.

101.    There is no Exhibit 98 to this Declaration, and that exhibit number is therefore intentionally left blank.

102.    There is no Exhibit 99 to this Declaration, and that exhibit number is therefore intentionally left blank.

103.    There is no Exhibit 100 to this Declaration, and that exhibit number is therefore intentionally left blank.

104.    There is no Exhibit 101 to this Declaration, and that exhibit number is therefore intentionally left blank.

105.    There is no Exhibit 102 to this Declaration, and that exhibit number is therefore intentionally left blank.

106.    There is no Exhibit 103 to this Declaration, and that exhibit number is therefore intentionally left blank.

107.    Attached as Exhibit 104 are a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-00330654, and an associated email attachment produced by Defendants marked with the Bates number range GOO001-00330655-59. These documents were introduced as Exhibit 17 at the deposition of Wendy Chang.

108.    Attached as Exhibit 105 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-05164894-927.

16

ER513

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 39 of 266

109.   Attached as Exhibit 106 are a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-00330681, and a true and correct copy of an associated email attachment produced by Defendants marked with the Bates number range GOO001-00330682-84.  These documents were introduced as Exhibit 18 at the deposition of Wendy Chang.

110.   Attached as Exhibit 107 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-00633965-92.

111.   Attached as Exhibit 108 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-05920388-419.

112.   Attached as Exhibit 109 are a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-00763354, a true and correct copy of an associated email attachment produced by Defendants marked with the Bates number range GOO001-00763355-63, and a true and correct copy of an associated email attachment produced by Defendants marked with the Bates number range GOO001-00763364-76.  These documents were introduced as Exhibit 14 at the deposition of Brent Hurley.

113.   Attached as Exhibit 110 are a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-00658376-77, and a true and correct copy of an associated email attachment produced by Defendants marked with the Bates number range GOO001-00658378-84.  These documents were introduced as Exhibit 16 at the deposition of Brent Hurley and as Exhibit 12 at the deposition of David Drummond.

114.   Attached as Exhibit 111 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-02656593-94.  This email exchange was introduced as Exhibit 9 at the deposition of David Drummond.

17

ER514

Case 2:12-cv-08315-MWF-VBK  Document 14-3  Filed 10/17/12  Page 31 of 116  Page ID
#:538
Case 1:07-cv-02103-LLS  Document 191  Filed 03/18/10  Page 18 of 58

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 40 of 266

115.    Attached as Exhibit 112 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-002338150-84.

116.    Attached as Exhibit 113 are a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-02439050-52, and a true and correct copy of an associated email attachment produced by Defendants marked with the Bates number range GOO001-02439053. These documents were introduced as Exhibit 21 at the deposition of Omid Kordestani.

117.    Attached as Exhibit 114 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-00255239-42. This email exchange was introduced as Exhibit 13 at the deposition of Shashi Seth.

118.    Attached as Exhibit 115 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-00237661-63. This email exchange was introduced as Exhibit 22 at the deposition of Omid Kordestani.

119.    Attached as Exhibit 116 are a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-01295801, and a true and correct copy of an associated email attachment produced by Defendants marked with the Bates number range GOO001-01295802. These documents were introduced as Exhibit 20 at the deposition of Omid Kordestani.

120.    Attached as Exhibit 117 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-08030008-10.

121.    Attached as Exhibit 118 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-00421229-34. The metadata produced by Defendants indicate this document was last modified on February 3, 2006.

18

ER515

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 32 of 116   Page ID
#:539
Case 1:07-cv-02103-LLS   Document 191   Filed 03/18/10   Page 19 of 58

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 41 of 266

122.    Attached as Exhibit 119 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-02826891-95. The metadata produced by Defendants indicate this document was last modified on March 14, 2006.

123.    Attached as Exhibit 120 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-00824855-59. The metadata produced by Defendants indicate this document was last modified on July 26, 2006.

124.    Attached as Exhibit 121 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-02829970-74. The metadata produced by Defendants indicate this document was last modified on August 18, 2006.

125.    There is no Exhibit 122 to this Declaration, and that exhibit number is therefore intentionally left blank.

126.    There is no Exhibit 123 to this Declaration, and that exhibit number is therefore intentionally left blank.

127.    Attached as Exhibit 124 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-07056597-603. The metadata produced by Defendants indicate this document was last modified on February 26, 2007.

128.    Attached as Exhibit 125 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-01232697-703. The metadata produced by Defendants indicate this document was last modified on June 19, 2007.

129.    Attached as Exhibit 126 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-02768034-35.

130.    Attached as Exhibit 127 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-01027757-73.

ER516

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 33 of 116   Page ID
#:540
Case 1:07-cv-02103-LLS   Document 191   Filed 03/18/10   Page 20 of 58

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 42 of 266

131.   Attached as Exhibit 128 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-01535521-24.

132.   Attached as Exhibit 129 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-04431787-88.

133.   Attached as Exhibit 130 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-00509640. This email exchange was introduced as Exhibit 48 at the deposition of Chad Hurley and as Exhibit 10 at the deposition of Kevin Donahue.

134.   Attached as Exhibit 131 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-00222797-803.

135.   Attached as Exhibit 132 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-02754251. This email exchange was introduced as Exhibit 3 at the deposition of Franck Chastagnol.

136.   Attached as Exhibit 133 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-02027618-19. This email exchange was introduced as Exhibit 14 at the deposition of Shashi Seth.

137.   Attached as Exhibit 134 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-00561601-21. This document was introduced as Exhibit 27 at the deposition of Zahavah Levine.

138.   Attached as Exhibit 135 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-08643428.

139.   Attached as Exhibit 136 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-02493069-74.

ER517

Case 2:12-cv-08315-MWF-VBK Document 14-3 Filed 10/17/12 Page 34 of 116 Page ID
#:541
Case 1:07-cv-02103-LLS Document 191 Filed 03/18/10 Page 21 of 58

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 43 of 266

140. Attached as Exhibit 137 are a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-02930251-52, and a true and correct copy of an associated email attachment produced by Defendants marked with the Bates number range GOO001-02930253-82.

141. Attached as Exhibit 138 are a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-02604786-87, and a true and correct copy of an associated email attachment produced by Defendants marked with the Bates number range GOO001-02604788-91.

142. Attached as Exhibit 139 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-01950611-18. This document was introduced as Exhibit 8 at the Rule 30(b)(6) deposition of David King.

143. Attached as Exhibit 140 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-09612201.

144. Attached as Exhibit 141 are a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-03427120-21, and a true and correct copy of an associated email attachment produced by Defendants marked with the Bates number range GOO001-03427122-43. These documents were introduced as Exhibit 9 at the deposition of Vance Ikezoye and as Exhibit 24 at the deposition of Chad Hurley.

145. Attached as Exhibit 142 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-02867502-05.

146. Attached as Exhibit 143 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-02493328-37.

ER518

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 35 of 116   Page ID
#:542
Case 1:07-cv-02103-LLS   Document 191   Filed 03/18/10   Page 22 of 58

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 44 of 266

147.   Attached as Exhibit 144 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-01511226-27.  This email exchange was introduced as Exhibit 27 at the deposition of Chad Hurley, Exhibit 31 at the deposition of David Drummond, Exhibit 18 at the deposition of Eric Schmidt, Exhibit 14 at the deposition of Larry Page, and Exhibit 14 at the deposition of Sergey Brin.

148.   Attached as Exhibit 145 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-02506820-28.0006.  Defendants produced this document with apparent errors in the document's images.

149.   Attached as Exhibit 146 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-01202238-43.  This document was introduced as Exhibit 6 at the deposition of Chris Maxcy and as Exhibit 2 at the deposition of Franck Chastagnol.

150.   There is no Exhibit 147 to this Declaration, and that exhibit number is therefore intentionally left blank.

151.   Attached as Exhibit 148 are a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-01870875, a true and correct copy of an associated email attachment produced by Defendants marked with the Bates number range GOO001-01870876-78, a true and correct copy of an associated email attachment produced by Defendants marked with the Bates number range GOO001-01870879-81, and a true and correct copy of an associated email attachment produced by Defendants marked with the Bates number range 01870882-84.

152.   Attached as Exhibit 149 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-02826036-46.  This document was

22

ER519

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 45 of 266

introduced as Exhibit 23 at the deposition of David Drummond, Exhibit 15 at the deposition of Eric Schmidt, Exhibit 11 at the deposition of Larry Page, and Exhibit 8 at the deposition of Jonathan Rosenberg.

153.   There is no Exhibit 150 to this Declaration, and that exhibit number is therefore intentionally left blank.

154.   There is no Exhibit 151 to this Declaration, and that exhibit number is therefore intentionally left blank.

155.   Attached as Exhibit 152 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-02874326-27.

156.   Attached as Exhibit 153 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-02240369-411. This document was introduced as Exhibit 18 at the deposition of Omid Kordestani and as Exhibit 27 at the deposition of David Drummond.

157.   Attached as Exhibit 154 are a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-02524911, a true and correct copy of an associated email attachment produced by Defendants marked with the Bates number range GOO001-02524912-63, and a true and correct copy of an associated email attachment produced by Defendants marked with Bates number range GOO001-02524964-5010. This document was introduced as Exhibit 28 at the deposition of David Drummond. Portions of this document were introduced as Exhibit 19 at the deposition of Omid Kordestani.

158.   Attached as Exhibit 155 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-02241782-835. This document was introduced as Exhibit 5 at the deposition of Zahavah Levine.

ER520

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 37 of 116   Page ID
#:544
Case 1:07-cv-02103-LLS   Document 191   Filed 03/18/10   Page 24 of 58

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 46 of 266

159.    Attached as Exhibit 156 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-02354601-05.

160.    Attached as Exhibit 157 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-09612078-79.

161.    Attached as Exhibit 158 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-05175716-18.

162.    Attached as Exhibit 159 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-00889264-81.

163.    Attached as Exhibit 160 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-09684557-79.

164.    Attached as Exhibit 161 are true and correct copies of excerpts from a document produced by Defendants marked with the Bates number range GOO001-02276277-384.

165.    Attached as Exhibit 162 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-07726987-7009.

166.    Attached as Exhibit 163 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-02243231-53.

167.    There is no Exhibit 164 to this Declaration, and that exhibit number is therefore intentionally left blank.

168.    Attached as Exhibit 165 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-02242506-23.

169.    Attached as Exhibit 166 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-02242907-24.

ER521

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 47 of 266

170.    Attached as Exhibit 167 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-02392607-43. This document was introduced as Exhibit 5 at the deposition of Jim Patterson.

171.    Attached as Exhibit 168 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-06176212-24.

172.    Attached as Exhibit 169 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-06176368-86.

173.    Attached as Exhibit 170 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-02552363-70.

174.    Attached as Exhibit 171 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-00010746. This email exchange was introduced as Exhibit 21 at the deposition of Chris Maxcy and as Exhibit 3 at the deposition of Jim Patterson.

175.    Attached as Exhibit 172 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-00243149-52.

176.    Attached as Exhibit 173 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-09684201-21.

177.    Attached as Exhibit 174 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-02338330-43.

178.    Attached as Exhibit 175 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-01177848.

179.    Attached as Exhibit 176 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-00508644-47. This email

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 48 of 266

exchange was introduced as Exhibit 5 at the deposition of Kevin Donahue and as Exhibit 11 at the deposition of Brent Hurley.

180.     Attached as Exhibit 177 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-09531942-68.

181.     Attached as Exhibit 178 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-06147947-73.

182.     Attached as Exhibit 179 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-02034326-30.

183.     Attached as Exhibit 180 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-06811230-34.

184.     Attached as Exhibit 181 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-00827716-17.

185.     Attached as Exhibit 182 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-02866493-517.

186.     Attached as Exhibit 183 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-00718495-98.

187.     Attached as Exhibit 184 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-06361166-79.  Defendants produced this document in a format that is difficult to read.  Despite Viacom's request that Defendants produce a corrected, readable version of this document, Defendants failed to do so.

188.     Attached as Exhibit 185 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-01949763-65.

ER523

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 40 of 116   Page ID
#:547
Case 1:07-cv-02103-LLS   Document 191   Filed 03/18/10   Page 27 of 58

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 49 of 266

189.   Attached as Exhibit 186 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-09684681-719. Despite repeated requests by Viacom's counsel over many months during discovery, Defendants failed to produce this document until four days before the filing of Viacom's Motion for Partial Summary Judgment.

190.   Attached as Exhibit 187 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-09684647-66. Despite repeated requests by Viacom's counsel over many months during discovery, Defendants failed to produce this document until four days before the filing of Viacom's Motion for Partial Summary Judgment.

191.   Attached as Exhibit 188 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-09684752-818. Despite repeated requests by Viacom's counsel over many months during discovery, Defendants failed to produce this document until four days before the filing of Viacom's Motion for Partial Summary Judgment.

192.   Attached as Exhibit 189 is a true and correct copy of a document produced by Defendants marked with the Bates number GOO001-00746412.

193.   Attached as Exhibit 190 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-06525907-09.

194.   Attached as Exhibit 191 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-00923210-12. This email exchange was introduced as Exhibit 8 at the deposition of Patrick Walker and as Exhibit 1 at the deposition of David Eun.

ER524

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 41 of 116   Page ID
#:548
Case 1:07-cv-02103-LLS   Document 191   Filed 03/18/10   Page 28 of 58

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 50 of 266

195.    Attached as Exhibit 371 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-01529251.

196.    Attached as Exhibit 372 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-02316969-72. This document was introduced as Exhibit 1 at the deposition of Nicole Wong.

197.    Attached as Exhibit 373 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-02502815-19. This document was introduced as Exhibit 16 at the deposition of Eric Schmidt, Exhibit 25 at the deposition of David Drummond, Exhibit 12 at the deposition of Larry Page, and Exhibit 11 at the deposition of Sergey Brin.

198.    Attached as Exhibit 374 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-06010126-31.

199.    Attached as Exhibit 375 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number GOO001-06669529.

200.    Attached as Exhibit 378 is a true and correct copy of a document produced by Defendants marked with the Bates number range GOO001-07181365-67.

201.    Attached as Exhibit 382 is a true and correct copy of an email exchange produced by Defendants marked with the Bates number range GOO001-08050272-75. This email exchange was introduced as Exhibit 6 at the deposition of Kent Walker.

<u>Instant Message Conversation Transcripts Produced by Defendants</u>

202.    In the course of discovery, Defendants produced transcripts of instant message conversations. Like the other documents Defendants produced, these transcripts of instant message conversations are marked with Bates numbers beginning with the prefix "GOO001-".

ER525

Case 2:12-cv-08315-MWF-VBK  Document 14-3  Filed 10/17/12  Page 42 of 116  Page ID
#:549
Case 1:07-cv-02103-LLS  Document 191  Filed 03/18/10  Page 29 of 58

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 51 of 266

203.    Defendants produced these instant message transcripts in HTML format, which is difficult to read. An employee of Jenner & Block LLP, working at my direction, generated more easily readable versions of the instant message conversation transcripts by opening them in an ordinary Internet browser. Those versions reflect the manner in which they would be seen by the participants in the instant message conversation. This readable format does not alter the content of the instant message discussions in any way. For the Court's convenience, each exhibit listed below in paragraphs 204 through 217 that contains the transcript of an instant message conversation includes (a) the readable version of the transcript of the instant message conversation generated by a Jenner & Block LLP employee acting at my direction; and (b) the original transcript of the same instant message conversation as produced by Defendants. In order to ensure the protection of potentially private information of Defendants' employees, Jenner & Block LLP employees, at my direction, have redacted certain personal and irrelevant material from these instant message conversation transcripts.

204.    Attached as Exhibit 192 is a true and correct copy of the instant message conversation transcript produced by Defendants marked with the Bates number range GOO001-00507525-32. The transcript produced by Defendants is preceded by a readable version generated in the manner described in paragraph 203 *supra*. This instant message conversation was introduced as Exhibit 3 and as Exhibit 4 at the deposition of Maryrose Dunton.

205.    Attached as Exhibit 193 is a true and correct copy of the instant message conversation produced by Defendants marked with the Bates number range GOO001-00507535-40. The transcript produced by Defendants is preceded by a readable version generated in the manner described in paragraph 203 *supra*. This instant message conversation was introduced as Exhibit 5 and as Exhibit 15 at the deposition of Maryrose Dunton.

ER526

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 43 of 116   Page ID
#:550
Case 1:07-cv-02103-LLS   Document 191   Filed 03/18/10   Page 30 of 58

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 52 of 266

206.    Attached as Exhibit 194 is a true and correct copy of the instant message conversation produced by Defendants marked with the Bates number range GOO001-00507405-07. The transcript produced by Defendants is preceded by a readable version generated in the manner described in paragraph 203 *supra*.

207.    Attached as Exhibit 195 is a true and correct copy of the instant message conversation produced by Defendants marked with the Bates number range GOO001-01931840-51. The transcript produced by Defendants is preceded by a readable version generated in the manner described in paragraph 203 *supra*.

208.    Attached as Exhibit 196 is a true and correct copy of the instant message conversation produced by Defendants marked with the Bates number range GOO001-07585952-93. The transcript produced by Defendants is preceded by a readable version generated in the manner described in paragraph 203 *supra*.

209.    Attached as Exhibit 197 is a true and correct copy of the instant message conversation produced by Defendants marked with the Bates number range GOO001-00507331-43. The transcript produced by Defendants is preceded by a readable version generated in the manner described in paragraph 203 *supra*.

210.    Attached as Exhibit 198 is a true and correct copy of the instant message conversation produced by Defendants marked with the Bates number range GOO001-01931799-811. The transcript produced by Defendants is preceded by a readable version generated in the manner described in paragraph 203 *supra*.

211.    Attached as Exhibit 199 is a true and correct copy of the instant message conversation produced by Defendants marked with the Bates number range GOO001-02363217-

ER527

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 44 of 116   Page ID
#:551
Case 1:07-cv-02103-LLS   Document 191   Filed 03/18/10   Page 31 of 58

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 53 of 266

19. The transcript produced by Defendants is preceded by a readable version generated in the manner described in paragraph 203 *supra*.

212.    Attached as Exhibit 200 is a true and correct copy of the instant message conversation produced by Defendants marked with the Bates number range GOO001-07738864-65. The transcript produced by Defendants is preceded by a readable version generated in the manner described in paragraph 203 *supra*.

213.    Attached as Exhibit 201 is a true and correct copy of the instant message conversation produced by Defendants marked with the Bates number range GOO001-00829681-94. The transcript produced by Defendants is preceded by a readable version generated in the manner described in paragraph 203 *supra*. This instant message conversation was introduced as Exhibit 19 and as Exhibit 20 at the deposition of Maryrose Dunton.

214.    Attached as Exhibit 202 is a true and correct copy of the instant message conversation produced by Defendants marked with the Bates number range GOO001-00829702-18. The transcript produced by Defendants is preceded by a readable version generated in the manner described in paragraph 203 *supra*. This instant message conversation was introduced as Exhibit 21 and as Exhibit 22 at the deposition of Maryrose Dunton.

215.    Attached as Exhibit 203 is a true and correct copy of the instant message conversation produced by Defendants marked with the Bates number range GOO001-07169720-33. The transcript produced by Defendants is preceded by a readable version generated in the manner described in paragraph 203 *supra*.

216.    Attached as Exhibit 376 is a true and correct copy of the instant message conversation produced by Defendants marked with the Bates number range GOO001-07169708-

ER528

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 45 of 116   Page ID
#:552
Case 1:07-cv-02103-LLS   Document 191   Filed 03/18/10   Page 32 of 58

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 54 of 266

19. The transcript produced by Defendants is preceded by a readable version generated in the manner described in paragraph 203 *supra*.

217.     Attached as Exhibit 377 is a true and correct copy of the instant message conversation produced by Defendants marked with the Bates number range GOO001-07169928-43. The transcript produced by Defendants is preceded by a readable version generated in the manner described in paragraph 203 *supra*.

### Documents Produced by YouTube Co-Founder Jawed Karim

218.     In response to a subpoena issued by Viacom in this action on December 7, 2007, YouTube co-founder Jawed Karim produced documents on May 16 and 21, 2008. The documents that Karim produced are marked with Bates numbers beginning with the prefix "JK".

219.     In his deposition, Mr. Karim testified that the documents marked with the Bates prefix "JK" were "all documents produced as a result of, you know, my involvement with YouTube." He also testified that "the e-mails, you know, any e-mails that -- that I wrote and received, those were all in my e-mail file," and explained that the e-mails came from two accounts: "my personal e-mail kind of early on, before there was a YouTube," and "then there also was the e-mails I used from the YouTube e-mail account." *See* Exhibit 313 hereto (Karim Dep.) at 28:22-29:21.

220.     Mr. Karim also described the process in which his personal emails were collected. As he explained, "There was a collection process at Wilson, Sonsini, I believe. And so I brought in, you know, all of my e-mails. And the person responsible for the collection, I -- I worked with him to extract the YouTube related e-mails from all those e-mails." *See* Exhibit 313 hereto (Karim Dep.) at 30:3-14.

ER529

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 55 of 266

221.   Mr. Karim also described the process by which emails from his YouTube email account were collected.  As he explained, that "procedure·was simply to copy, you know, sent and received e-mails in -- in all other e-mail folders."  Mr. Karim participated in this process by "transfer[ring] the data."  *See* Exhibit 313 hereto (Karim Dep.) at 30:16-31:3.

222.   Attached as Exhibit 204 is a true and correct copy of a document produced by Jawed Karim marked with the Bates number range JK00009887-91.

223.   Attached as Exhibit 205 is a true and correct copy of an email exchange produced by Jawed Karim marked with the Bates number range JK00009137-39.

224.   Attached as Exhibit 206 is a true and correct copy of an email exchange produced by Jawed Karim marked with the Bates number range JK00004704-05.  This email exchange was introduced as Exhibit 29 at the deposition of Chad Hurley and as Exhibit 24 at the deposition of Jawed Karim.

225.   Attached as Exhibit 207 is a true and correct copy of an email exchange produced by Jawed Karim marked with the Bates number JK00005039.  This email exchange was introduced as Exhibit 23 at the deposition of Jawed Karim.

226.   Attached as Exhibit 208 is a true and correct copy of an email exchange produced by Jawed Karim marked with the Bates number JK00005043.  This email exchange was introduced as Exhibit 1 at the deposition of Chad Hurley and as Exhibit 31 at the deposition of Jawed Karim.

227.   Attached as Exhibit 209 is a true and correct copy of an email exchange produced by Jawed Karim marked with the Bates number range JK00009381-82.  This email exchange was introduced as Exhibit 7 at the deposition of Jawed Karim.

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 47 of 116   Page ID
#:554
Case 1:07-cv-02103-LLS   Document 191   Filed 03/18/10   Page 34 of 58

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 56 of 266

228.   Attached as Exhibit 210 is a true and correct copy of an email exchange produced by Jawed Karim marked with the Bates number JK00009383. This email exchange was introduced as Exhibit 8 at the deposition of Jawed Karim.

229.   Attached as Exhibit 211 is a true and correct copy of an email exchange produced by Jawed Karim marked with the Bates number JK00005928. This email exchange was introduced as Exhibit 20 at the deposition of Jawed Karim.

230.   Attached as Exhibit 212 is a true and correct copy of an email exchange produced by Jawed Karim marked with the Bates number JK00005929. This email exchange was introduced as Exhibit 33 at the deposition of Chad Hurley.

231.   Attached as Exhibit 213 is a true and correct copy of an email exchange produced by Jawed Karim marked with the Bates number JK00006057. This email exchange was introduced as Exhibit 4 at the deposition of Chad Hurley and as Exhibit 17 at the deposition of Jawed Karim.

232.   Attached as Exhibit 214 is a true and correct copy of an email exchange produced by Jawed Karim marked with the Bates number JK00000382. This email exchange was introduced as Exhibit 2 at the deposition of Brent Hurley and as Exhibit 45 at the deposition of Chad Hurley.

233.   Attached as Exhibit 215 is a true and correct copy of an email exchange produced by Jawed Karim marked with the Bates number range JK00007416-18. The page marked with Bates number JK00007416 was introduced as Exhibit 41 at the deposition of Chad Hurley.

234.   Attached as Exhibit 216 is a true and correct copy of an email exchange produced by Jawed Karim marked with the Bates number range JK00006055-56. This email exchange was introduced as Exhibit 34 at the deposition of Chad Hurley.

ER531

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 57 of 266

235.    Attached as Exhibit 217 is a true and correct copy of an email exchange produced by Jawed Karim marked with the Bates number range JK00006166-69.  This email exchange was introduced as Exhibit 40 at the deposition of Jawed Karim.

236.    Attached as Exhibit 218 is a true and correct copy of an email exchange produced by Jawed Karim marked with the Bates number range JK00009595-96.

237.    There is no Exhibit 219 to this Declaration, and that exhibit number is therefore intentionally left blank.

238.    There is no Exhibit 220 to this Declaration, and that exhibit number is therefore intentionally left blank.

239.    Attached as Exhibit 221 are a true and correct copy of an email exchange produced by Jawed Karim marked with the Bates number range JK00006259-60, and an associated email attachment produced by Jawed Karim marked with the Bates number range JK00006263-70.  These documents were introduced as Exhibit 45 and Exhibit 46, respectively, at the deposition of Jawed Karim.

240.    Attached as Exhibit 222 is a true and correct copy of an email exchange produced by Jawed Karim marked with the Bates number JK00009668.  This email exchange was introduced as Exhibit 19 at the deposition of Jawed Karim.

241.    Attached as Exhibit 223 is a true and correct copy of an email exchange produced by Jawed Karim marked with the Bates number range JK00006392-93.  This email exchange was introduced as Exhibit 12 at the deposition of Jawed Karim.

242.    Attached as Exhibit 224 is a true and correct copy of an email exchange produced by Jawed Karim marked with the Bates number range JK00006689-90.  This email exchange was introduced as Exhibit 18 at the deposition of Jawed Karim.

ER532

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 49 of 116   Page ID
#:556
Case 1:07-cv-02103-LLS   Document 191   Filed 03/18/10   Page 36 of 58

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 58 of 266

243.    Attached as Exhibit 225 is a true and correct copy of an email exchange produced by Jawed Karim marked with the Bates number range JK00006627-28.

244.    Attached as Exhibit 226 is a true and correct copy of an email exchange produced by Jawed Karim marked with the Bates number range JK00009791-92.

245.    Attached as Exhibit 227 is a true and correct copy of an email exchange produced by Jawed Karim marked with the Bates number range JK00007378-79.

246.    Attached as Exhibit 228 is a true and correct copy of an email exchange produced by Jawed Karim marked with the Bates number range JK00007420-22.  This email exchange was introduced as Exhibit 35 at the deposition of Jawed Karim and as Exhibit 5 at the deposition of Chad Hurley.

247.    Attached as Exhibit 229 is a true and correct copy of an email exchange produced by Jawed Karim marked with the Bates number JK00007423.  This email exchange was introduced as Exhibit 55 at the deposition of Jawed Karim.

248.    Attached as Exhibit 230 is a true and correct copy of an email exchange produced by Jawed Karim marked with the Bates number JK00007479.  This email exchange was introduced as Exhibit 38 at the deposition of Jawed Karim.

249.    There is no Exhibit 231 to this Declaration, and that exhibit number is therefore intentionally left blank.

250.    Attached as Exhibit 232 is a true and correct copy of an email exchange produced by Jawed Karim marked with the Bates number JK00008043.  This email exchange was introduced as Exhibit 11 at the deposition of Chad Hurley and as Exhibit 36 at the deposition of Jawed Karim.

36

ER533

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 50 of 116   Page ID
#:552
Case 1:07-cv-02103-LLS   Document 191   Filed 03/18/10   Page 37 of 58

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 59 of 266

251.    Attached as Exhibit 233 is a true and correct copy of an email exchange produced by Jawed Karim marked with the Bates number JK00008331-35.

252.    Attached as Exhibit 234 is a true and correct copy of an email exchange produced by Jawed Karim marked with the Bates number JK00000824.

253.    Attached as Exhibit 235 is a true and correct copy of an email exchange produced by Jawed Karim marked with the Bates number JK00000836.

254.    Attached as Exhibit 236 are a true and correct copy of an email exchange produced by Jawed Karim marked with the Bates number JK00002261, and a true and correct copy of an associated email attachment produced by Jawed Karim marked with the Bates number JK00002262. These documents were introduced as Exhibits 51 and 52 at the deposition of Jawed Karim.

255.    Attached as Exhibit 237 is a true and correct copy of a document produced by Jawed Karim marked with the Bates number range JK00000173-79. This document was introduced as Exhibit 47 at the deposition of Jawed Karim.

256.    Attached as Exhibit 238 is a true and correct copy of an email exchange produced by Jawed Karim marked with the Bates number range JK00009130-32. This email exchange was introduced as Exhibit 29 at the deposition of Jawed Karim.

257.    Attached as Exhibit 239 is a true and correct copy of an email exchange produced by Jawed Karim marked with the Bates number JK00008859.

258.    Attached as Exhibit 379 is a true and correct copy of an email exchange produced by Jawed Karim marked with the Bates number range JK00004669-70.

ER534

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 51 of 116   Page ID
#:558
Case 1:07-cv-02103-LLS   Document 191   Filed 03/18/10   Page 38 of 58

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 60 of 266

259.   Attached as Exhibit 380 is a true and correct copy of an email exchange produced by Jawed Karim marked with the Bates number JK00005597.  This email exchange was introduced as Exhibit 2 at the deposition of Chad Hurley.

260.   Attached as Exhibit 381 is a true and correct copy of an email exchange produced by Jawed Karim marked with the Bates number range JK00007560-61.  This email exchange was introduced as Exhibit 42 at the deposition of Chad Hurley and as Exhibit 34 at the deposition of Jawed Karim.

261.   Attached as Exhibit 240 is a true and correct copy of an AVI-format video file produced by Jawed Karim and given the Bates number file name JK00010387_MVI_0922.avi.  A portion of this video file was introduced as Exhibit 12 at the deposition of Chad Hurley.

262.   For the Court's convenience, and at my direction, an employee of Jenner & Block LLP created a true and correct transcript of Exhibit 240.  This transcript is attached hereto as Exhibit 241.

### Defendants' Failure to Produce Emails of Top Executives

263.   Virtually none of the Exhibits listed above as produced by Jawed Karim (bearing JK Bates numbers) were produced by Defendants, even though YouTube co-founders Steve Chen and Chad Hurley and other YouTube employees are listed as senders and/or recipients on most of the documents preserved and produced by Mr. Karim and attached as exhibits hereto.

264.   Chad Hurley testified that he "lost all" of his emails from the key time periods in this case.  *See* Exhibit 312 hereto (C. Hurley Dep.) at 187:15-16.  Jenner & Block LLP's review of Defendants' document production indicates that Defendants produced fewer than ten custodial Chad Hurley emails per month for August, September, and October 2005, and fewer than 25 such emails per month for November and December 2005 and January 2006.

38

ER535

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 52 of 116   Page ID
#:559
Case 1:07-cv-02103-LLS   Document 191   Filed 03/18/10   Page 39 of 58

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 61 of 266

265.    Jenner & Block LLP's review of Defendants' document production indicates that Defendants did not produce a single Steve Chen custodial email from March through July 2005, and produced only one Chen custodial email from each of August and September 2005.  From November 2005 through October 2006, Defendants produced fewer than ten custodial Chen emails per month.

266.    At his deposition, Google CEO Eric Schmidt agreed that a search for responsive custodial Schmidt documents from June 2006 through February 2007 yielded only 19 documents.  Mr. Schmidt further testified: "It was my practice to delete or otherwise cause the e-mails that I had read to go away as quickly as possible."  *See* Exhibit 314 hereto (Schmidt Dep.) at 18:24-19:2.  The document attached as Exhibit 242 is chart of Custodial Documents Produced by Eric Schmidt that counsel for Viacom prepared by analyzing Defendants' document production.  This chart was introduced as Exhibit 1 at the deposition of Eric Schmidt.

**Documents Produced by Viacom**

267.    Documents produced by Viacom in this action are marked with Bates numbers beginning with the prefix "VIA."

268.    The documents listed in paragraphs 270 through 273 were retained by the Viacom Plaintiffs' in the course of regularly conducted business activity, collected pursuant to the Viacom Plaintiffs' discovery obligations, and produced to Defendants in this litigation.

269.    There is no Exhibit 243 to this Declaration, and that exhibit number is therefore intentionally left blank.

270.    Attached as Exhibit 244 is a true and correct copy of a letter sent from Viacom General Counsel Michael Fricklas to Google General Counsel Kent Walker at Mr. Walker's business address.  The letter was produced by Viacom marked with the Bates number range

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 53 of 116   Page ID
#:560
Case 1:07-cv-02103-LLS   Document 191   Filed 03/18/10   Page 40 of 58

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 62 of 266

VIA01475465-76 and introduced as Exhibit 4 at the deposition of Kent Walker. Mr. Fricklas sent this letter on February 2, 2007 and Mr. Walker replied as shown in Exhibit 382 hereto, which is an email exchange produced by Defendants.

271.   Attached as Exhibit 245 are a true and correct copy of an email exchange produced by Viacom marked with the Bates number VIA00727695, and a true and correct copy of an associated email attachment produced by Viacom marked with Bates number range VIA00727696-98. These documents were introduced by Defendants as Exhibit 5 at the deposition of Jason Witt.

272.   There is no Exhibit 246 to this Declaration, and that exhibit number is therefore intentionally left blank.

273.   Attached as Exhibit 383 is a true and correct copy of an email exchange produced by Viacom marked with the Bates number range VIA17716283-85.

**Documents Obtained From Publicly Accessible Portions of Defendants' Websites**

274.   The following exhibits are true and correct copies of documents printed from publicly accessible portions of the Google and YouTube websites. Each exhibit referenced in paragraphs 276 through 318 below was printed from the YouTube or Google website by an employee of Jenner & Block LLP acting at my direction.

275.   There is no Exhibit 247 to this Declaration, and that exhibit number is therefore intentionally left blank.

276.   Attached as Exhibit 248 is a true and correct copy of a screenshot of a YouTube watch page produced by Viacom marked with the Bates number range VIA14375471-72.

277.   Attached as Exhibit 249 is a true and correct copy of a screenshot of a YouTube watch page produced by Viacom marked with the Bates number range VIA14375444-45.

ER537

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 63 of 266

278.    Attached as Exhibit 250 is a true and correct copy of a screenshot of a YouTube watch page produced by Viacom marked with the Bates number range VIA14375526-28.

279.    Attached as Exhibit 251 is a true and correct copy of a screenshot of a YouTube watch page produced by Viacom marked with the Bates number range VIA14375557-59.

280.    Attached as Exhibit 252 is a true and correct copy of a screenshot of a YouTube watch page produced by Viacom marked with the Bates number range VIA14375446-47.

281.    Attached as Exhibit 253 is a true and correct copy of a screenshot of a YouTube watch page produced by Viacom marked with the Bates number VIA14375721.

282.    Attached as Exhibit 254 is a true and correct copy of a screenshot of a YouTube watch page produced by Viacom marked with the Bates number VIA14375701.

283.    Attached as Exhibit 255 is a true and correct copy of a screenshot of a YouTube watch page produced by Viacom marked with the Bates number range VIA14375674-75.

284.    Attached as Exhibit 256 is a true and correct copy of a screenshot of a YouTube watch page produced by Viacom marked with the Bates number range VIA14375466-67.  This document was introduced as Exhibit 10 at the deposition of Matthew Liu.

285.    Attached as Exhibit 257 is a true and correct copy of a screenshot of a YouTube watch page produced by Viacom marked with the Bates number range VIA14375535-36.

286.    Attached as Exhibit 258 is a true and correct copy of a screenshot of a YouTube watch page generated by Counsel for Viacom.  This document was introduced as Exhibit 11 at the deposition of Matthew Liu.

287.    Attached as Exhibit 259 is a true and correct copy of a screenshot of a YouTube search results page produced by Viacom marked with the Bates number range VIA14375204-06.

Case 2:12-cv-08315-MWF-VBK Document 14-3 Filed 10/17/12 Page 55 of 116 Page ID
#:562
Case 1:07-cv-02103-LLS Document 191 Filed 03/18/10 Page 42 of 58

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 64 of 266

This screenshot was introduced as Exhibit 12 at the deposition of Matthew Liu and as Exhibit 11 at the Rule 30(b)(6) deposition of Varun Kacholia.

288.     Attached as Exhibit 260 is a true and correct copy of a screenshot of a YouTube search results page produced by Viacom marked with the Bates number range VIA14375664-66.

289.     Attached as Exhibit 261 is a true and correct copy of a screenshot of a YouTube search results page produced by Viacom marked with the Bates number range VIA14375611-13.

290.     Attached as Exhibit 262 is a true and correct copy of a screenshot of a YouTube search results page produced by Viacom marked with the Bates number range VIA14375671-73.

291.     Attached as Exhibit 263 is a true and correct copy of a screenshot of a YouTube search results page produced by Viacom marked with the Bates number range VIA14375620-22.

292.     Attached as Exhibit 264 is a true and correct copy of a screenshot of a YouTube search results page produced by Viacom marked with the Bates number range VIA14375635-37.

293.     Attached as Exhibit 265 is a true and correct copy of a screenshot of a YouTube search results page produced by Viacom marked with the Bates number range VIA14375638-40.

294.     Attached as Exhibit 266 is a true and correct copy of a screenshot of a YouTube page produced by Viacom marked with the Bates number range VIA14375228-29. This screenshot was introduced as Exhibit 13 at the deposition of Matthew Liu.

295.     Attached as Exhibit 267 is a true and correct copy of a screenshot of a YouTube page produced by Viacom marked with the Bates number range VIA14375363-64.

296.     Attached as Exhibit 268 is a true and correct copy of a screenshot of a YouTube page produced by Viacom marked with the Bates number range VIA14375413-14.

297.     Attached as Exhibit 269 is a true and correct copy of a screenshot of a YouTube page produced by Viacom marked with the Bates number range VIA14375207-08.

ER539

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 65 of 266

298.    Attached as Exhibit 270 is a true and correct copy of an "Official YouTube Blog" posting dated September 12, 2005.

299.    Attached as Exhibit 271 is a true and correct copy of a press release from the YouTube website dated December 15, 2005 and titled "YouTube Opens Internet Video to the Masses."

300.    Attached as Exhibit 272 is a true and correct copy of an "Official YouTube Blog" posting dated February 16, 2006.

301.    Attached as Exhibit 273 is a true and correct copy of an "Official YouTube Blog" posting dated October 8, 2006 and titled "How Flagging Works."

302.    Attached as Exhibit 274 is a true and correct copy of an "Official YouTube Blog" posting dated May 16, 2008 and entitled "New Features for Search, Contacts and Inbox."  This document was introduced as Exhibit 8 in the Rule 30(b)(6) deposition of Varun Kacholia.

303.    Attached as Exhibit 275 is a true and correct copy of a page on Google's Investor Relations webpage entitled "Google Announces Fourth Quarter And Fiscal Year 2006 Results."

304.    Attached as Exhibit 276 is a true and correct copy of Google's October 9, 2006 press release announcing Google's acquisition of YouTube.

305.    Attached as Exhibit 277 is a true and correct copy of Google's November 13, 2006 press release announcing the closing of Google's acquisition of YouTube.

306.    Attached as Exhibit 278 is a true and correct copy of a page on "Google finance," a website operated by Defendants showing the closing price of Google stock on November 13, 2006.

307.    Attached as Exhibit 279 is a true and correct copy of a page on the YouTube website entitled "Company History."

ER540

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 57 of 116   Page ID
#:564
Case 1:07-cv-02103-LLS   Document 191   Filed 03/18/10   Page 44 of 58

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 66 of 266

308.    There is no Exhibit 280 to this Declaration, and that exhibit number is therefore intentionally left blank.

309.    Attached as Exhibit 281 is a true and correct copy of a page on the YouTube website entitled "Content Verification Program."

310.    Attached as Exhibit 282 is a true and correct copy of a page on the YouTube website entitled "Copyright Infringement Notification." It is linked to from the word "instructions" in the text that states "[i]ndividual notifications may be submitted by following these instructions" on the "Content Verification Program" page in Exhibit 281 attached hereto.

311.    Attached as Exhibit 283 is a true and correct copy of a page on the YouTube website entitled "Solve a Problem: Video not in search."

312.    Attached as Exhibit 284 is a true and correct copy of a screenshot taken from the YouTube website and introduced as Exhibit 7 at the deposition of Cuong Do.

313.    Attached as Exhibit 285 are true and correct copies of screenshots taken from the YouTube website and introduced as Exhibit 3 at the deposition of Omid Kordestani.

314.    Attached as Exhibit 286 is a true and correct copy of a document printed from the YouTube website by John Browne, Counsel for Plaintiffs in the Premier League Action, and introduced as Exhibit 9 at the deposition of Suzanne Reider. *See* Exhibit 348 hereto (Reider Dep.) at 168:18-173:18 (representation from Class counsel John Browne that he printed this document from the YouTube website, and testimony from Ms. Reider about the substance of the document).

315.    Attached as Exhibit 287 is a true and correct copy of Google's 2007 Annual Report, printed from the Google website.

ER541

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 58 of 116   Page ID
#:565
Case 1:07-cv-02103-LLS   Document 191   Filed 03/18/10   Page 45 of 58

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 67 of 266

316.   Attached as Exhibit 288 is a true and correct copy of a page from Google's website entitled "Ten ways Gmail makes email easy and efficient. And maybe even fun."

317.   Attached as Exhibit 387 is a true and correct copy of a page from Google's website entitled "Google Code of Conduct."

318.   Attached as Exhibit 388 is a true and correct copy of a page on the YouTube website entitled "Content ID System."

## Documents Produced by Third-Party Credit Suisse

319.   Viacom issued a subpoena *duces tecum* in this action to third-party Credit Suisse Securities USA LLC ("Credit Suisse") on December 6, 2007. In response, Credit Suisse produced documents marked with Bates numbers beginning with the prefix "CSSU." Credit Suisse acted as a financial advisor to Defendant Google in connection with Google's acquisition of YouTube. *See* Exhibit 328 hereto (Duncan Dep.) at 60:16-68:25.

320.   Attached as Exhibit 289 are true and correct copies of several documents and handwritten notes produced by Credit Suisse and together introduced as Exhibit 21 at the deposition of Storm Duncan. These documents are marked with Bates number ranges CSSU 001863-66, CSSU 001868-71, and CSSU 001944-57. *See* Exhibit 328 hereto (Duncan Dep.) at 192:2 -192:9, 199:24-200:5, and 207:25-210:13 (authenticating documents).

321.   Attached as Exhibit 290 are a true and correct copy of an email exchange produced by Credit Suisse marked with the Bates number range CSSU 002845-46, and a true and correct copy of an associated email attachment produced by Credit Suisse marked with the Bates number range CSSU 002847-52. These documents were introduced as Exhibit 10 at the deposition of Storm Duncan. *See* Exhibit 328 hereto (Duncan Dep.) at 67:14-68:4 (authenticating documents).

45

ER542

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 59 of 116   Page ID
#:566
Case 1:07-cv-02103-LLS   Document 191   Filed 03/18/10   Page 46 of 58

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 68 of 266

322.    Attached as Exhibit 291 is a true and correct copy of an email exchange produced by Credit Suisse marked with the Bates number CSSU 002686. This email exchange was introduced as Exhibit 13 at the deposition of Storm Duncan and as Exhibit 8 at the deposition of David Drummond. *See* Exhibit 328 hereto (Duncan Dep.) at 96:6-98:24 (authenticating documents).

323.    Attached as Exhibit 292 are a true and correct copy of an email exchange produced by Credit Suisse marked with the Bates number range CSSU 004069-70, and a true and correct copy of an associated email attachment produced by Credit Suisse marked with the Bates number range CSSU 004071-74. These documents were introduced as Exhibit 14 at the deposition of Storm Duncan. *See* Exhibit 328 hereto (Duncan Dep.) at 96:6-98:24 (authenticating documents).

324.    Attached as Exhibit 293 are a true and correct copy of an email exchange produced by Credit Suisse marked with the Bates number CSSU 003560, and a true and correct copy of an associated email attachment produced by Credit Suisse marked with the Bates number range CSSU 003561-86. These documents were introduced as Exhibit 17 at the deposition of Storm Duncan, Exhibit 5 at the deposition of Omid Kordestani, Exhibit 6 at the deposition of David Drummond, Exhibit 2 at the deposition of Eric Schmidt, Exhibit 3 at the deposition of Sergey Brin, Exhibit 7 at the deposition Jonathan Rosenberg, and Exhibit 1 at the deposition of Larry Page. *See* Exhibit 328 hereto (Duncan Dep.) at 113:3-114:4 (authenticating documents).

325.    Attached as Exhibit 294 are a true and correct copy of an email exchange produced by Credit Suisse marked with the Bates number CSSU 003326, and a true and correct copy of an associated email attachment produced by Credit Suisse marked with the Bates number range CSSU 003327-50. These documents were introduced as Exhibit 19 at the deposition of

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 60 of 116   Page ID
#:563
Case 1:07-cv-02103-LLS   Document 991   Filed 03/18/10   Page 47 of 58

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 69 of 266

Storm Duncan. *See* Exhibit 328 hereto (Duncan Dep.) at 124:9-125:1 (authenticating documents).

326.     Attached as Exhibit 295 is a true and correct copy of an email exchange produced by Credit Suisse marked with the Bates number range CSSU 002982-86.

### Documents Produced by Venture Capital Investors in YouTube

327.     Viacom issued subpoenas in this action to third-parties Sequoia Capital Operations LLC ("Sequoia Capital"), Artis Capital Management L.P. ("Artis Capital"), and TriplePoint Capital LLC ("TriplePoint Capital). In response to the subpoenas, Sequoia Capital produced documents marked with Bates numbers beginning with the prefix "SC," Artis Capital produced documents marked with Bates numbers beginning with the prefix "AC," and TriplePoint Capital produced documents marked with Bates numbers beginning with "TP." As the United States District Court for the Northern District of California noted in granting Viacom's motion to compel the production of documents from Sequoia Capital, Artis Capital, and TriplePoint Capital, they "are venture capital firms who were involved with defendant YouTube in its initial rounds of investment and eventual acquisition by defendants Google, which was effective on November 13, 2006. All respondents received significant quantities of Google shares when Google acquired YouTube and also indemnified Google for the outcomes of copyright infringement suits." *Viacom Int'l, Inc. v. YouTube, Inc.*, No. C 08-80129 SI, 2008 U.S. Dist. LEXIS 79777 (N.D. Cal. Aug. 18, 2008).

328.     Attached as Exhibit 296 are true and correct copies of excerpts from the closing documents for YouTube's Series A financing, which were produced by Sequoia Capital marked with the Bates number range SC008403-627. The signatures of YouTube's co-founders appear on the pages marked with Bates numbers SC008415, SC008426, SC008466, and SC008504.

ER544

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 61 of 116   Page ID
#:568
Case 1:07-cv-02103-LLS   Document 191   Filed 03/18/10   Page 48 of 58

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 70 of 266

329.    Attached as Exhibit 297 are true and correct copies of excerpts from the closing documents for YouTube's Series B financing, which were produced by Sequoia Capital marked with the Bates number range SC008711-984. The signatures of YouTube's co-founders appear on the pages marked with Bates numbers SC008721-722, SC008731-733, SC008777, and SC008820-822.

330.    Attached as Exhibit 298 is a true and correct copy of a document produced by Sequoia Capital marked with the Bates number range SC011742-79.

331.    Attached as Exhibit 299 are a true and correct copy of an email exchange produced by Sequoia Capital marked with the Bates number SC010022, and an associated email attachment produced by Seqouia Capital marked with the Bates number range SC010023-28. These documents were introduced as Exhibit 11 at the deposition of David Drummond. *See* Exhibit 327 hereto (Drummond Dep.) at 89:7-89:22 (authenticating document).

332.    Attached as Exhibit 300 is a true and correct copy of a document produced by Artis Capital marked with the Bates number AC005772. This document was introduced as Exhibit 22 at the deposition of David Lamond. *See* Exhibit 384 hereto (D. Lamond Dep.) at 148:14-148:17 (authenticating document).

333.    Attached as Exhibit 301 are true and correct copies of excerpts from a document produced by Artis Capital marked with the Bates number AC007823-905. When sending this document to Counsel for Plaintiffs with redactions on December 17, 2009, Defendants' counsel identified it as the final version of the YouTube, Inc. Disclosure Schedule prepared in connection with the merger between Google and YouTube.

334.    Attached as Exhibit 302 is a true and correct copy of a document produced by TriplePoint Capital marked with the Bates number range TP000479-95.

Case 2:12-cv-08315-MWF-VBK  Document 14-3  Filed 10/17/12  Page 62 of 116  Page ID
#:569
Case 1:07-cv-02103-LLS  Document 191  Filed 03/18/10  Page 49 of 58

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 71 of 266

335.    Attached as Exhibit 303 is a true and correct copy of a document produced by

TriplePoint Capital marked with the Bates number range TP000055-143. This document was

introduced as Exhibit 2 at the deposition of David Drummond and as Exhibit 2 at the deposition

of David Estrada. *See* Exhibit 327 hereto (Drummond Dep.) at 21:23-22:9 (authenticating

document).

### Documents Produced by Third-Party Audible Magic

336.    In response to a subpoena issued by Viacom in this action on April 16, 2008,

third-party Audible Magic produced documents marked with Bates numbers beginning with the

prefix "AM." Audible Magic provided digital fingerprintng services to Defendants. *See* Exhibit

141 hereto (cover email and final agreement between YouTube and Audible Magic).

337.    Attached as Exhibit 304 is a true and correct copy of a document produced by

Audible Magic marked with the Bates number range AM 002090-91. This email exchange was

introduced as Exhibit 6 at the deposition of Vance Ikezoye. *See* Exhibit 336 hereto (Ikezoye

Dep.) at 54:23-55:25 (authenticating document).

338.    Attached as Exhibit 305 is a true and correct copy of an email exchange produced

by Audible Magic marked with the Bates number range AM 001241-44. This email exchange

was introduced as Exhibit 13 at the deposition of Franck Chastagnol. *See* Exhibit 321 hereto

(Chastagnol Dep.) at 180:17-181:22 (authenticating document).

339.    Attached as Exhibit 306 is a true and correct copy of an email exchange produced

by Audible Magic marked with the Bates number range AM 000917-28. This email exchange

was introduced as Exhibit 8 at the deposition of Vance Ikezoye. *See* Exhibit 336 hereto (Ikezoye

Dep.) at 62:12-63:19 (authenticating document).

ER546

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 72 of 266

**Documents Produced by Third-Party Motion Picture Association of America**

340.    In response to a subpoena issued by Defendants on January 18, 2008, third-party Motion Picture Association of America ("MPAA") produced documents marked with Bates numbers beginning with the prefix "MPAA."

341.    Attached as Exhibit 307 is a true and correct copy of a document produced by the MPAA marked with the Bates number range MPAA012777-78. This document was introduced as Exhibit 4 at the deposition of Dean Garfield and as Exhibit 5 at the Rule 30(b)(6) deposition of David King. *See* Exhibit 333 hereto (Garfield Dep.) at 33:24-34:2 (authenticating document).

342.    Attached as Exhibit 308 is a true and correct copy of a document produced by the MPAA marked with the Bates number range MPAA012806-07. This document was introduced as Exhibit 7 at the deposition of Dean Garfield and as Exhibit 12 at the deposition of Jonathan Rosenberg. *See* Exhibit 333 hereto (Garfield Dep.) at 40:25-42:17 (authenticating document).

343.    Attached as Exhibit 309 is a true and correct copy of an email exchange produced by the MPAA marked with the Bates number range MPAA0011721.

344.    There is no Exhibit 310 to this Declaration, and that exhibit number is therefore intentionally left blank.

345.    There is no Exhibit 311 to this Declaration, and that exhibit number is therefore intentionally left blank.

**Deposition Transcripts From This Action**

346.    Attached as Exhibit 312 is a true and correct copy of the transcript of the deposition of Chad Hurley taken on April 22, 2009.

347.    Attached as Exhibit 313 is a true and correct copy of the transcript of the deposition of Jawed Karim taken on June 9, 2009.

ER547

Case 2:12-cv-08315-MWF-VBK  Document 14-3  Filed 10/17/12  Page 64 of 116  Page ID
#:571
Case 1:07-cv-02103-LLS  Document 191  Filed 03/18/10  Page 51 of 58

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 73 of 266

348.    Attached as Exhibit 314 is a true and correct copy of the transcript of the deposition of Eric Schmidt taken on May 6, 2009.

349.    Attached as Exhibit 315 is a true and correct copy of the transcript of the deposition of Larry Page taken on October 1, 2009.

350.    Attached as Exhibit 316 are true and correct copies of excerpts from the transcript of the deposition of Brent Hurley taken on August 26, 2008.

351.    Attached as Exhibit 317 are true and correct copies of excerpts from the transcript of the deposition of Roelof Botha taken on August 5, 2009.

352.    Attached as Exhibit 318 are true and correct copies of excerpts from the transcript of the deposition of Sergey Brin taken on October 15, 2009.

353.    Attached as Exhibit 319 are true and correct copies of excerpts from the transcript of the deposition of Peter Chane taken on December 2, 2009.

354.    Attached as Exhibit 320 are true and correct copies of excerpts from the transcript of the deposition of Wendy Chang taken on July 11, 2008.

355.    Attached as Exhibit 321 are true and correct copies of excerpts from the transcript of the deposition of Franck Chastagnol taken on December 10, 2008.

356.    Attached as Exhibit 322 are true and correct copies of excerpts from the transcript of the deposition of Cuong Do taken on February 13, 2009.

357.    Attached as Exhibit 323 are true and correct copies of excerpts from the transcript of the Rule 30(b)(6) deposition of Cuong Do taken on September 12, 2007.

358.    Attached as Exhibit 324 are true and correct copies of excerpts from the transcript of the Rule 30(b)(6) deposition of Jeremy Doig taken on September 14, 2007.

51

ER548

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 65 of 116   Page ID
#:572
Case 1:07-cv-02103-LLS   Document 191   Filed 03/18/10   Page 52 of 58

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 74 of 266

359.    Attached as Exhibit 325 are true and correct copies of excerpts from the transcript of the deposition of Kevin Donahue taken on October 15, 2008.

360.    There is no Exhibit 326 to this Declaration, and that exhibit number is therefore intentionally left blank.

361.    Attached as Exhibit 327 are true and correct copies of excerpts from the transcript of the deposition of David Drummond taken on February 12, 2009.

362.    Attached as Exhibit 328 are true and correct copies of excerpts from the transcript of the deposition of Storm Duncan taken on July 16, 2008.

363.    Attached as Exhibit 329 are true and correct copies of excerpts from the transcript of the deposition of Maryrose Dunton taken on August 22, 2008.

364.    Attached as Exhibit 330 are true and correct copies of excerpts from the transcript of the deposition of Alex Ellerson taken on May 22, 2009.

365.    Attached as Exhibit 331 are true and correct copies of excerpts from the transcript of the deposition of David Estrada taken on December 8, 2009.

366.    Attached as Exhibit 332 are true and correct copies of excerpts from the transcript of the deposition of David Eun taken on August 7, 2008.

367.    Attached as Exhibit 333 are true and correct copies of excerpts from the transcript of the deposition of Dean Garfield taken on November 2, 2009.

368.    Attached as Exhibit 334 are true and correct copies of excerpts from the transcript of the deposition of Heather Gillette taken on August 12, 2008.

369.    Attached as Exhibit 335 are true and correct copies of excerpts from the transcript of the deposition of Michael Housley taken on October 3, 2008.

ER549

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 75 of 266

370.    Attached as Exhibit 336 are true and correct copies of excerpts from the transcript of the deposition of Vance Ikezoye taken on September 10, 2009.

371.    Attached as Exhibit 337 are true and correct copies of excerpts from the transcript of the deposition of Kent Walker taken on December 17, 2009.

372.    Attached as Exhibit 338 are true and correct copies of excerpts from the transcript of the deposition of the Rule 30(b)(6) deposition of Varun Kacholia taken on January 8, 2010.

373.    Attached as Exhibit 339 are true and correct copies of excerpts from the transcript of the deposition of David King taken on December 12, 2008.

374.    Attached as Exhibit 340 are true and correct copies of excerpts from the transcript of the deposition of the Rule 30(b)(6) deposition of David King taken on January 13, 2010.

375.    Attached as Exhibit 341 are true and correct copies of excerpts from the transcript of the deposition of Omid Kordestani taken on February 12, 2009.

376.    Attached as Exhibit 342 are true and correct copies of excerpts from the transcript of the deposition of Zahavah Levine taken on April 2, 2009.

377.    Attached as Exhibit 343 are true and correct copies of excerpts from the transcript of the deposition of Andrew Lin taken on July 2, 2009.

378.    Attached as Exhibit 344 are true and correct copies of excerpts from the transcript of the deposition of Matthew Liu taken on November 13, 2009.

379.    Attached as Exhibit 345 are true and correct copies of excerpts from the transcript of the deposition of Chris Maxcy taken August 28, 2008.

380.    Attached as Exhibit 346 are true and correct copies of excerpts from the transcript of the deposition of Bhanu Narasimhan taken September 18, 2009.

ER550

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 67 of 116   Page ID
#:574
Case 1:07-cv-02103-LLS   Document 191   Filed 03/18/10   Page 54 of 58

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 76 of 266

381.   Attached as Exhibit 347 are true and correct copies of excerpts from the transcript of the deposition of Patrick Walker taken on July 22, 2008.

382.   Attached as Exhibit 348 are true and correct copies of excerpts from the transcript of the deposition of Suzanne Reider taken on October 3, 2008.

383.   Attached as Exhibit 349 are true and correct copies of excerpts from the transcript of the deposition of Michael Robinson taken on January 15, 2010.

384.   Attached as Exhibit 350 are true and correct copies of excerpts from the transcript of the deposition of Jonathan Rosenberg taken on December 4, 2009.

385.   Attached as Exhibit 351 are true and correct copies of excerpts from the transcript of the deposition of Micah Schaffer taken on July 23, 2008.

386.   Attached as Exhibit 352 are true and correct copies of excerpts from the transcript of the deposition of Nicholas Seet taken November 24, 2009.

387.   Attached as Exhibit 353 are true and correct copies of excerpts from the transcript of the deposition of Shashi Seth taken July 16, 2009.

388.   Attached as Exhibit 354 are true and correct copies of excerpts from the transcript of the deposition of Gideon Yu taken on August 14, 2009.

389.   There is no Exhibit 355 to this Declaration, and that exhibit number is therefore intentionally left blank.

390.   Attached as Exhibit 384 are true and correct copies of excerpts from the transcript of the deposition of David Lamond taken on April 15, 2009.

391.   Attached as Exhibit 385 are true and correct copies of excerpts from the transcript of the deposition of Jim Patterson taken on December 18, 2009.

ER551

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 68 of 116   Page ID
#:5751
Case 1:07-cv-02103-LLS   Document 191   Filed 03/18/10   Page 55 of 58

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 77 of 266

392.   Attached as Exhibit 386 are true and correct copies of excerpts from the deposition of Michael Solomon taken on September 1, 2009.

**Declarations Filed in Other Actions**

393.   Attached as Exhibit 356 is a true and correct copy of the January 5, 2007 Declaration of Steve Chen in Support of Defendants' Motion for Summary Adjudication of Defendant's First Affirmative Defense of DMCA Safe Harbor in *Robert Tur d/b/a Los Angeles News Service v. YouTube, Inc.*, No. CV 06-4436 FMC (C.D. Cal.). Mr. Chen's declaration in the *Tur* case was introduced as Exhibit 16 at the deposition of Micah Schaffer in this case.

394.   Attached as Exhibit 357 is a true and correct copy of the January 5, 2007 Declaration of Zahavah Levine in Support of Defendants' Motion for Summary Adjudication of Defendant's First Affirmative Defense of DMCA Safe Harbor in *Robert Tur d/b/a Los Angeles News Service v. YouTube, Inc.*, No. CV 06-4436 FMC (C.D. Cal.). Ms. Levine's declaration in the *Tur* case was introduced as Exhibit 29 at Ms. Levine's deposition in this case.

395.   Attached as Exhibit 358 is a true and correct copy of the September 10, 2002 Declaration of Vance Ikezoye in Support of Plaintiffs' Proposed Preliminary Injunction Order in *In re Aimster Copyright Litigation*, No. 01 C 8933 (N.D. Ill.). This declaration was introduced as Exhibit 1 at the deposition of Vance Ikezoye in this matter.

396.   Attached as Exhibit 359 is a true and correct copy of the February 2, 2006 Declaration of Vance Ikezoye in Support of Plaintiffs' Motions for Summary Judgment in *Metro-Goldwyn-Mayer Studios, Inc., v. Grokster, Ltd.*, No. 01-08541 SVW (C.D. Cal.). This declaration was introduced as Exhibit 2 at the deposition of Vance Ikezoye in this matter.

ER552

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 69 of 116   Page ID
#:5761
Case 1:07-cv-02103-LLS   Document 761   Filed 03/18/10   Page 56 of 58

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 78 of 266

### Interrogatory Responses

397.    Attached as Exhibit 360 is a true and correct copy of Defendants' responses to Plaintiffs' First Set of Interrogatories.

398.    Attached as Exhibit 361 is a true and correct copy of Defendants' responses to Plaintiffs' Second Set of Interrogatories.

### Hearing Transcript

399.    Attached as Exhibit 362 is a true and correct copy of an excerpt from the transcript of a Rule 16(b) conference in this action that was held on July 27, 2007.

### Other Documents

400.    Attached as Exhibit 363 is a true and correct copy of an S-3 Registration Statement filed by Defendant Google Inc. with the Securities and Exchange Commission on February 7, 2007.  Counsel for Viacom retrieved this Registration Statement from the SEC's "Edgar" online search service.  As of February 27, 2010, the Registration Statement is available at http://www.sec.gov/Archives/edgar/data/1288776/000119312507022578/ds3asr.htm.

401.    Attached as Exhibit 364 is a true and correct copy of a document provided by Defendants' corporate representative Cuong Do and introduced as Exhibit 2 in the 30(b)(6) deposition of Cuong Do.

402.    Attached as Exhibit 365 is a true and correct copy of the resume of YouTube co-founder Jawed Karim.  The resume was introduced as Exhibit 1 in Mr. Karim's deposition, and authenticated by Mr. Karim.  *See* Exhibit 313 hereto (Karim Dep.) at 7:10-8:23.

403.    There is no Exhibit 366 to this Declaration, and that exhibit number is therefore intentionally left blank.

ER553

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 79 of 266

404.    There is no Exhibit 367 to this Declaration, and that exhibit number is therefore intentionally left blank.

405.    There is no Exhibit 368 to this Declaration, and that exhibit number is therefore intentionally left blank.

406.    Attached as Exhibit 369 is a true and correct copy of a June 28, 2007 letter from Donald Verrilli, then-counsel to Viacom, to Mark Ouweleen and David Kramer, counsel for Defendants.

407.    Attached as Exhibit 370 is a true and correct copy of a June 29, 2007 letter from Mark Ouweleen, then-counsel to Defendants, to Donald Verrilli, then-counsel to Viacom.  This letter was emailed to Mr. Verrilli from the email address mark.ouweleen@bartlit-beck.com.

<u>YouTube's Distribution of Copies of Videos Onto YouTube Users' Computers</u>

408.    When I have viewed videos on YouTube using the Internet Explorer web browser, I have found complete copies on my personal computer of the video files I viewed. Specifically, after I viewed several videos on YouTube, complete copies of those videos remained on my computer in my Temporary Internet Files folder, even after I navigated away from the YouTube site on my web browser. The complete copies of the video files left by YouTube remained on my personal computer in the Temporary Internet Files folder for periods of at least several hours (and perhaps indefinitely), even though I shut down and rebooted my personal computer during that period. I was able to play these videos on my personal computer, without returning to the YouTube site, simply by clicking on the copies of the video files left by YouTube in my Temporary Internet Files folder and opening those files in a Flash player. I was also able to move the copies of the videos from the Temporary Internet Files folder of my personal computer to other folders on my hard drive where, in my experience as a consumer

ER554

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 80 of 266

computer user, the copies would remain and be playable permanently, unless I took action to

delete them.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ___ day of
March 2010, at Washington, DC.

William M. Hohengarten

ER555

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 72 of 116   Page ID
#:579
Case 1:07-cv-02103-LLS   Document 214-62   Filed 03/18/10   Page 1 of 10

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 81 of 266

| From: | Steve Chen <steve@youtube.com> |
| Sent: | Friday, July 22, 2005 8:29 AM |
| To: | YouTube Group < ▮ > |
| Subject: | Fwd: introductions - Charles Chariya |
| Attach: | Message Text.txt;YouTube Marketing Analysis - Charles Chariya July 22nd 2005.doc |

Actually, everyone should take a look at this. I originally though introductions was only appropriate for Chad because marketing == content/design but this may be interesting to everyone.

-s

Begin forwarded message:

> From: "Charles Chariya" < ▮ >
> Date: July 22, 2005 8:17:30 AM PDT
> To: "Steve Chen" <steve@youtube.com>, "Hurley Chad" <chad@youtube.com>
> Subject: RE: introductions - Charles Chariya

Steve - thanks for the introduction. Chad, I'd love to meet up with you, Steve and the rest of the team next week. I am available either Tuesday or Wednesday night. Let me know what's best for you.

Steve and I have been discussing YouTube over the past week, and I think we've had some fairly productive discussions. I really think there's huge potential, and I'm excited about the possibilities.

I spent a few hours last night and put together a topline marketing analysis, from my perspective. Forgive me if this is too forward, but the concept really got my creative juices flowing.

Also, I've asked the surfing department here at Yahoo to include YouTube to the directory, and they'll be reviewing it later today. This should increase page rank for both Yahoo and Google, which should result in higher search results placement and hopefully, higher traffic as a result.

Charles

-----Original Message-----
From: Steve Chen [mailto:steve@youtube.com]
Sent: Friday, July 22, 2005 10:51 AM
To: Hurley Chad; ▮
Subject: introductions

hi chad --

this is charles. a friend from imsa. he's the guy that i've spoken to

**Exhibit 2H**

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY
REDESIGNATED CONFIDENTIAL

JK0006258

ER556

you about who has worked at yahoo for the last 5+ years. he's been working in their marketing/sales department in new york city for the last 3 years. he'll be coming out here next week for a visit and we should try to arrange a time to meet up. i think tues/wed nights are **open for you, charles?**

-s

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

JK00006260

ER557

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 83 of 266



**YouTube Marketing Analysis**
July 21st, 2005
Charles Chariya

Overview
YouTube is a online video streaming destination which allows users to
quickly and easily upload, watch, and share video worldwide.

Usage and Growth
Launched in June 2005, YouTube has grown in popularity and usage.
There are currently thousands of videos which users have uploaded to
the site, and tens of thousands of monthly unique visitors.

Technology
YouTube has developed a proprietary video conversion technology that
converts video from standard digital formats (avi, mpg, etc) into a
quick-loading and streaming flash format.

**************************************************************

Site Overview........................................................2
    Finding Content..............................................2
    Sharing Video................................................3
User Analysis (Current and Future) .................................4
    Individuals..................................................4
    Film Producers...............................................4
    Other Professionals..........................................5
Competitive Analysis................................................5
Content Sources.....................................................6
Risk Areas..........................................................6
    Content......................................................6
    Advertisers..................................................6
    Technology...................................................6
Marketing Opportunities.............................................6
Media Advertising Options...........................................7
Advertising Landscape...............................................7
Conclusions and Next Steps..........................................8
Proposed Revenue Models.............................................8

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY
**REDESIGNATED CONFIDENTIAL**

JK00006263

ER558

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 84 of 266

Site Overview
Finding Content
Currently, the site has minimal navigation, and is focused around a
personalized interface for the content.  Finding content can be done
via search, browsing thru links (uploaders, favorites of other users,
random frontpage streams), and via tags.



SUGGESTIONS: YouTube Reviews (hire copywriters), Add Length to the
description of the videos

Also available is finding video via Recent Uploads, Most Popular, Most
Discussed, Most Added to Favorites, and Random.



SUGGESTIONS: Categorize Videos (hire categorizers), User Rating System

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY
REDESIGNATED CONFIDENTIAL

JK00006264

ER559

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 76 of 116   Page ID
#:593
Case 1:07-cv-02103-LLS   Document 214-62   Filed 03/18/10   Page 5 of 10

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 85 of 266

Sharing Video
Uploading is quick and easy and requires registration.



SUGGESTIONS: Require several additional fields (Age/Birth date, Gender,
Occupation, Industry, Zip Code) for future targeting/profiling purposes

Once registered the uploading and sharing of videos is easy and
seamless.



SUGGESTIONS: Application on-desktop to drag/drop video files, and auto-
upload to YouTube.  Pre-checking procedure to reject non-supported file
formats (before upload takes place).  Allow for non-video files to be
uploaded converted and shared (mp3, wav, other audio).

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY
REDESIGNATED CONFIDENTIAL

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 77 of 116   Page ID
#:594
Case 1:07-cv-02103-LLS   Document 244-62   Filed 03/18/10   Page 6 of 10

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 86 of 266

```
******************************************************************
```

User Analysis (Current and Future)

Individuals
 - Individual Uploaders
The majority of the content on YouTube is currently from random users.
These users not only upload their own work, but can potentially upload
publicly available content of viewing.  Risk area here is copyright as
many videos which are uploaded are not the property of the uploader.

 - Video Sharers
Video sharers are individuals that create, edit, and share video for
public or private consumption.  This might include baby videos,
graduation video, or just hanging out with friends.  This may become
the mainstream user for YouTube over time.  To increase usage by this
group, you may want to consider partnering with hardware manufacturers
(Kodak, Sony, Canon) as the video sharing destination of choice for
people who purchase video capable cameras.

 - Video Resume
Video Resumes is a fairly specific subset of the individual group.
These may include people who want to share their work sample, such as
actors, but this can also become mainstream if YouTube were to partner
with Monster.com or Hotjobs.yahoo.com.

 - Vloggers
Vloggers are people who keep regular diaries or reports using video on
the network.  YouTube could be an easy way to help Vloggers focus on
content, rather than the myriad hosting, streaming, bandwidth issues
that they currently may face.

Film Producers
Film producers are really broken out into two different types, those
that are made, and those that have not made it.  For producers and
directors that are seeking to break into the industry, YouTube could be
a very quick and easy business card to showcase their work.  Allowing
for vanity URLs and customization of the showcase page would be a
premium offering, and would provide an extremely valuable service.

Business Users
 - Training Video
On a corporate basis, video is used sparsely for business purposes.
The main issue relates to delivery, and YouTube can provide a means to
quickly and easily solve this issue.  Not only corporate video, but
partnering with instructional video companies to make the current
libraries accessible may be a good investment.

 - Video Site Operators (Pay per content sites)
Another source of potential revenue is creating an Enterprise version
of YouTube.  This may require some engineering to allow for secure 3rd
party referrals to content which is hosted and served by YouTube.  Some
consideration here would be increased resolution, disk space, private
entry, reporting, and security precautions.  Pricing to such site
operators would likely be fixed monthly fee + streams/bandwidth/usage
fee.  Secure viewing might require a domain key authentication to

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY
REDESIGNATED CONFIDENTIAL

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 78 of 116   Page ID
#:595
Case 1:07-cv-02103-LLS   Document 241-62   Filed 03/18/10   Page 7 of 10

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 87 of 266

validate that the user requesting the stream is a valid user of the 3rd
party site.

Other Professionals
 - Musicians (Music Videos)
Music Video distribution may be an opportunity.  Launch (Yahoo Music)
was built upon the Music Video and Audio Streaming, had great support
in the music community, and there may be some room to build off of this
type of success.

 - Athletes
Scouting Reports, sample video, etc.  This is a fairly specialized
marketplace, however sports is a highly monetized and competitive space.

*****************************************************************

Competitive Analysis
        http://www.archive.org/stream - Internet Movie Archive allows for
        users to upload and stream video in any format.  This site still
        suffers from the delay time in buffering which YouTube avoids by
        converting files to flash video.  Many VLoggers currently use
        archive.org to host their media files, and use other sources to
        host the creative/copy for the vlog.

        Itunes - Apple's site which allows for video sharing/streaming.
        This site is limited as most files are in Apple QuickTime format,
        which does require additional installation for normal PC users,
        before being able to view.  YouTube also requires Flash, but the
        penetration of Flash is currently higher than the penetration of
        QuickTime.

        Vlog.com - Video Blogging site which sells software to create and
        upload video blogs for streaming.  Software sells for $99 and the
        current employees provide vlogs which exemplify how the software
        and streams work.

        http://blip.tv/ - Turnkey Vlog site, uses Archive.org to
        host/stream video.  Requires Creative Commons license or release
        to the public domain.

        Directories
        http://videoblogging-universe.com/vlogs/
        http://www.mefeedia.com/feeds/

        Newsgroups
        http://groups.yahoo.com/group/videoblogging/

Audio Competitive Analysis
        http://www.ourmedia.org/ provides "free storage and free
        bandwidth for your videos, audio files, photos, text or software.
        Forever. No catches."

        http://podlot.com/ is a "cheap place to park your podcast."
        Accounts cost only $5.

        http://www.audioblog.com/ offers podcast hosting and recording
        tools for $50 per year.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY
**REDESIGNATED CONFIDENTIAL**

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 79 of 116   Page ID
#:586
Case 1:07-cv-02103-LLS   Document 249-62   Filed 03/18/10   Page 8 of 10

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 88 of 266

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Content Sources
Content is king.  The current content on the site consists of random
snippets which have been uploaded from various sources.  Some are legit,
others may be infringing on standard copyright (made by others, shared
on the net, and then uploaded by unrelated party to YouTube).

As YouTube grows, a content strategy must be in place to allow for
growth in the right directions.  Licensed content thru partnerships,
requesting content from original sources, sponsoring and producing
original content are all good ways of building the right type of
content going forward.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Risk Areas
Content
One major risk area is video which is not intended to be shown to a
large audience.  This could include copyrighted materials, but could
also include personal videos which may show people in a negative light.
Although the policy when uploading states that the video must be legit,
YouTube may be liable for any damages which copyright holders may press.

Advertisers
Another major risk area is for advertisers and partners.  Most quality
advertisers are very specific and particular as to how their brand is
portrayed.  Any association to shady topics (sex, drugs, gambling, and
to a lesser degree, alcohol) may make advertiser shy away from a
partnership.

Technology
There may be a risk from other sites and companies to develop products
and services that make YouTube obsolete.  This may come from direct
competitors (iFilm, Apple Quicktime, etc) or from technology companies
(Google, Microsoft, Yahoo).  Additionally, the ability for users to
bypass the site to view video content thru embedded video may also be a
technology risk, since it stops YouTube to fully monetize a users
consuming the video.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Marketing Opportunities
Although over the next few months, there will be tremendous growth in
usage from word of mouth; there are many ways to accelerate the pace of
trial and usage of the site.  Some standard methods of marketing
include:
   1. Hiring a Publicist
   2. Issuing Press Releases
   3. Join public forums for related areas
      a. Advertising in film schools
      b. Assisting/Sponsoring vlog groups and events
      c. Assisting/Sponsoring in film festivals
      d. Partnership with relevant advertisers (hardware/software
         companies)
      e. General seminars and talks with schools, businesses, etc

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY
REDESIGNATED CONFIDENTIAL

JK00006268

ER563

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 80 of 116   Page ID
#:584
Case 1:07-cv-02103-LLS   Document 214-62   Filed 03/18/10   Page 9 of 10

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 89 of 266

   4. Advertising
        a. Listed in directories of companies such as Yahoo!
        b. Text-based advertising for related terms
        c. Advertising in public areas for awareness building (Times
           Square, Central Park, other public areas)
   5. Promotions and Contests
        a. Video Contest w/ a Prize
        b. Tie-in w/ vendors that will be doing such events

*****************************************************************

Media Advertising Options
Although it's obvious YouTube will have video ads in the stream, I see
the monetization opportunity in a few key areas:

(a) the front door - which should have the most traffic - could be
exposed to advertisers for take-overs for massive one-day events.

(b) content areas - although you do use tags, I think that a human
categorizer would help people navigate more easily thru the massive
amounts of available video.  Again, takeovers of "Autos" or "College"
or even the existing "Most Popular" areas could be easy wins with
advertisers.

(c) video area - so obviously, a video ad before the video, but
consider breaking up videos (by a professional editor) into 4-5 minute
segments to insert additional video ads.  Obviously a take on what's
done in network.  Also, on the right hand side, I'd suggest using an
industry standard Ad Position.
** Note: there will be some issues w/ this type of advertising if
YouTube allows users to stream using the Embed method (which simply
streams the video).  Advertisers may not want their video ads running
in un-controlled areas, however this is a hurdle which can be overcome.

(d) sponsored search results - this may be an easy fall-back, but
should be considered, especially if users are doing a lot of search
activity.

*****************************************************************

Advertising Landscape
In 2006, $125 billion will be spent in advertising in the US, $114
billion will be spent in offline media outlets, while only $10.7
billion will be spent online, according to Jupiter Research.  For the
foreseeable future, online media spending will continue to grow at a
18-20% rate, while offline spending will only grow at a 4% rate.

Rich Media (which Video Ads is a sub-set) has grown relatively quickly
in the last year, however they are not a large part of the overall
online media spend.  This is mostly due to the restrictions that many
sites have (size limitations, uninitiated audio rules, etc).  In 2003,
Rich media made up $200 million of the $3.3 billion spent online for
marketing, or less than 1%.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY
REDESIGNATED CONFIDENTIAL

JK00006268

ER564

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 90 of 266

************************************************************************

Conclusions and Next Steps
   1. Determine the short-term goals
      a. Exponential Growth in User Base over next 3-6 months
      b. Increase the amount and quality of video streams which are
        available to consumers

   2. Determine the long-term priorities
      a. Increase awareness in the Producer area (Contests or
        Promotions)
      b. Begin partnership discussions with advertisers and content
        producers
      c. Create solution for enterprise video streaming
      d. Create solution for video site operator streaming
      e. Create solution for vlogger video streaming

************************************************************************

Proposed Revenue Models

  A. Advertising (See Media Advertising Options above)

  B. Subscription / Premium Services for Individuals
      a. Video Resumes, Music Videos, Sports Scouting Reports

  B. Enterprise YouTube for Businesses
      a. Backend for businesses to host and stream video
      b. Secure streaming partner for video site operators (pay per
        view or premium video seller)

  C. Video Ad Streaming Provider
      a. Self-service video ad serving platform for advertisers and
        agencies
      b. Competitors include:
         i. EyeWonder
http://www.eyewonder.com/ews/ews_FormatInstantPlayAd.cfm?id=1
         ii. EyeBlaster
http://www.eyeblaster.com/products/rich_media_formats/streaming_v
ideo.asp
         iii. PointRoll
http://www.pointroll.com/products/overview.asp
         iv. Unicast
http://www.viewpoint.com/pub/advertising/

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY
**REDESIGNATED CONFIDENTIAL**

JK00006270

ER565

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 82 of 116   Page ID
#:589
Case 1:07-cv-02103-LLS   Document 244-62   Filed 03/18/10   Page 1 of 10

Δ π EXHIBIT *46*
Deponent

| | |
|---|---|
| **From:** | Steve Chen <steve@youtube.com> |
| **Sent:** | Friday, July 22, 2005 8:29 AM |
| **To:** | YouTube Group <▮▮▮▮▮> |
| **Subject:** | Fwd: introductions - Charles Chariya |
| **Attach:** | Message Text.txt; YouTube Marketing Analysis - Charles Chariya July 22nd 2005.doc |

Actually, everyone should take a look at this. I originally though introductions was only appropriate for Chad because marketing == content/design but this may be interesting to everyone.

-s

Begin forwarded message:

> **From:** "Charles Chariya" <▮▮▮▮▮>
> **Date:** July 22, 2005 9:17:30 AM PDT
> **To:** "Steve Chen" <steve@youtube.com>, "Hurley Chad" <chad@youtube.com>
> **Subject:** RE: Introductions - Charles Chariya

Steve - thanks for the introduction. Chad, I'd love to meet up with you, Steve and the rest of the team next week. I am available either Tuesday or Wednesday night. Let me know what's best for you.

Steve and I have been discussing YouTube over the past week, and I think we've had some fairly productive discussions. I really think there's huge potential, and I'm excited about the possibilities.

I spent a few hours last night and put together a topline marketing analysis, from my perspective. Forgive me if this is too forward, but the concept really got my creative juices flowing.

Also, I've asked the surfing department here at Yahoo to include YouTube to the directory, and they'll be reviewing it later today. This should increase page rank for both Yahoo and Google, which should result in higher search results placement and hopefully, higher traffic as a result.

Charles

-----Original Message-----
From: Steve Chen [mailto:steve@youtube.com]
Sent: Friday, July 22, 2005 10:51 AM
To: Hurley Chad; ▮▮▮▮▮
Subject: introductions

hi chad –

this is charles. a friend from imsa. he's the guy that i've spoken to

*Exhibit 221*

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY
REDESIGNATED CONFIDENTIAL

JK00006259

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 91 of 266

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 83 of 116   Page ID
#:590
Case 1:07-cv-02103-LLS   Document 244-62   Filed 03/18/10   Page 2 of 10

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 92 of 266

you about who has worked at yahoo for the last 5+ years.  he's been
working in their marketing/sales department in new york city for the
last 3 years.  he'll be coming out here next week for a visit and we
should try to arrange a time to meet up.  i think tues/wed nights are
**open for you, charles?**

-s

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

JK00006260

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 84 of 116   Page ID
#:594
Case 1:07-cv-02103-LLS   Document 214-62   Filed 03/18/10   Page 3 of 10



**YouTube Marketing Analysis**
July 21st, 2005
Charles Chariya

**Overview**
YouTube is a online video streaming destination which allows users to
quickly and easily upload, watch, and share video worldwide.

**Usage and Growth**
Launched in June 2005, YouTube has grown in popularity and usage.
There are currently thousands of videos which users have uploaded to
the site, and tens of thousands of monthly unique visitors.

**Technology**
YouTube has developed a proprietary video conversion technology that
converts video from standard digital formats (avi, mpg, etc) into a
quick-loading and streaming flash format.

*********************************************************************

Site Overview.........................................................2
   Finding Content....................................................2
   Sharing Video......................................................3
User Analysis (Current and Future) ...................................4
   Individuals........................................................4
   Film Producers.....................................................4
   Other Professionals................................................5
Competitive Analysis..................................................5
Content Sources.......................................................6
Risk Areas............................................................6
   Content............................................................6
   Advertisers........................................................6
   Technology.........................................................6
Marketing Opportunities...............................................6
Media Advertising Options.............................................7
Advertising Landscape ................................................7
Conclusions and Next Steps............................................8
Proposed Revenue Models...............................................8

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY
REDESIGNATED CONFIDENTIAL

JK00006283

ER568

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 85 of 116   Page ID
#:592
Case 1:07-cv-02103-LLS   Document 214-62   Filed 03/18/10   Page 4 of 10

Site Overview
Finding Content
Currently, the site has minimal navigation, and is focused around a
personalized interface for the content.  Finding content can be done
via search, browsing thru links (uploaders, favorites of other users,
random frontpage streams), and via tags.



SUGGESTIONS: YouTube Reviews (hire copywriters), Add Length to the
description of the videos

Also available is finding video via Recent Uploads, Most Popular, Most
Discussed, Most Added to Favorites, and Random.



SUGGESTIONS: Categorize Videos (hire categorizers), User Rating System

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY
REDESIGNATED CONFIDENTIAL

JK00006264

ER569

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 94 of 266

Sharing Video
Uploading is quick and easy and requires registration.



SUGGESTIONS: Require several additional fields (Age/Birth date, Gender, Occupation, Industry, Zip Code) for future targeting/profiling purposes

Once registered the uploading and sharing of videos is easy and seamless.

SUGGESTIONS: Application on-desktop to drag/drop video files, and auto-upload to YouTube. Pre-checking procedure to reject non-supported file formats (before upload takes place). Allow for non-video files to be uploaded converted and shared (mp3, wav, other audio).

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY
REDESIGNATED CONFIDENTIAL

JK00008265

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 95 of 266

ER570

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 87 of 116   Page ID
#:594
Case 1:07-cv-02103-LLS   Document 214-62   Filed 03/18/10   Page 6 of 10

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 96 of 266

**********************************************************************

User Analysis (Current and Future)

Individuals
   - Individual Uploaders
The majority of the content on YouTube is currently from random users.
These users not only upload their own work, but can potentially upload
publicly available content of viewing.   Risk area here is copyright as
many videos which are uploaded are not the property of the uploader.

   - Video Sharers
Video sharers are individuals that create, edit, and share video for
public or private consumption.   This might include baby videos,
graduation video, or just hanging out with friends.   This may become
the mainstream user for YouTube over time.   To increase usage by this
group, you may want to consider partnering with hardware manufacturers
(Kodak, Sony, Canon) as the video sharing destination of choice for
people who purchase video capable cameras.

   - Video Resume
Video Resumes is a fairly specific subset of the individual group.
These may include people who want to share their work sample, such as
actors, but this can also become mainstream if YouTube were to partner
with Monster.com or Hotjobs.yahoo.com.

   - Vloggers
Vloggers are people who keep regular diaries or reports using video on
the network.   YouTube could be an easy way to help Vloggers focus on
content, rather than the myriad hosting, streaming, bandwidth issues
that they currently may face.

Film Producers
Film producers are really broken out into two different types, those
that are made, and those that have not made it.   For producers and
directors that are seeking to break into the industry, YouTube could be
a very quick and easy business card to showcase their work.   Allowing
for vanity URLs and customization of the showcase page would be a
premium offering, and would provide an extremely valuable service.

Business Users
   - Training Video
On a corporate basis, video is used sparsely for business purposes.
The main issue relates to delivery, and YouTube can provide a means to
quickly and easily solve this issue.   Not only corporate video, but
partnering with instructional video companies to make the current
libraries accessible may be a good investment.

   - Video Site Operators (Pay per content sites)
Another source of potential revenue is creating an Enterprise version
of YouTube.   This may require some engineering to allow for secure 3rd
party referrals to content which is hosted and served by YouTube.   Some
consideration here would be increased resolution, disk space, private
entry, reporting, and security precautions.   Pricing to such site
operators would likely be fixed monthly fee + streams/bandwidth/usage
fee.   Secure viewing might require a domain key authentication to

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY
REDESIGNATED CONFIDENTIAL

JK00006266

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 88 of 116   Page ID
#:595
Case 1:07-cv-02103-LLS   Document 293-62   Filed 03/18/10   Page 7 of 10

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 97 of 266

validate that the user requesting the stream is a valid user of the 3rd
party site.

Other Professionals
 - Musicians (Music Videos)
Music Video distribution may be an opportunity.  Launch (Yahoo Music)
was built upon the Music Video and Audio Streaming, had great support
in the music community, and there may be some room to build off of this
type of success.

 - Athletes
Scouting Reports, sample video, etc.  This is a fairly specialized
marketplace, however sports is a highly monetized and competitive space.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Competitive Analysis
     http://www.archive.org/stream – Internet Movie Archive allows for
     users to upload and stream video in any format.  This site still
     suffers from the delay time in buffering which YouTube avoids by
     converting files to flash video.  Many VLoggers currently use
     archive.org to host their media files, and use other sources to
     host the creative/copy for the vlog.

     Itunes – Apple's site which allows for video sharing/streaming.
     This site is limited as most files are in Apple QuickTime format,
     which does require additional installation for normal PC users,
     before being able to view.  YouTube also requires Flash, but the
     penetration of Flash is currently higher than the penetration of
     QuickTime.

     Vlog.com – Video Blogging site which sells software to create and
     upload video blogs for streaming.  Software sells for $99 and the
     current employees provide vlogs which exemplify how the software
     and streams work.

     http://blip.tv/ – Turnkey Vlog site, uses Archive.org to
     host/stream video.  Requires Creative Commons license or release
     to the public domain.

     Directories
     http://videoblogging-universe.com/vlogs/
     http://www.mefeedia.com/feeds/

     Newsgroups
     http://groups.yahoo.com/group/videoblogging/

Audio Competitive Analysis
     http://www.ourmedia.org/ provides "free storage and free
     bandwidth for your videos, audio files, photos, text or software.
     Forever. No catches."

     http://podlot.com/ is a "cheap place to park your podcast."
     Accounts cost only $5.

     http://www.audioblog.com/ offers podcast hosting and recording
     tools for $50 per year.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY
**REDESIGNATED CONFIDENTIAL**

JK00006267

Case 2:12-cv-08315-MWF-VBK  Document 14-3  Filed 10/17/12  Page 89 of 116  Page ID
#:596
Case 1:07-cv-02103-LLS  Document 299-62  Filed 03/18/10  Page 8 of 10

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 98 of 266

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Content Sources
Content is king.  The current content on the site consists of random
snippets which have been uploaded from various sources.  Some are legit,
others may be infringing on standard copyright (made by others, shared
on the net, and then uploaded by unrelated party to YouTube).

As YouTube grows, a content strategy must be in place to allow for
growth in the right directions.  Licensed content thru partnerships,
requesting content from original sources, sponsoring and producing
original content are all good ways of building the right type of
content going forward.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Risk Areas
Content
One major risk area is video which is not intended to be shown to a
large audience.  This could include copyrighted materials, but could
also include personal videos which may show people in a negative light.
Although the policy when uploading states that the video must be legit,
YouTube may be liable for any damages which copyright holders may press.

Advertisers
Another major risk area is for advertisers and partners.  Most quality
advertisers are very specific and particular as to how their brand is
portrayed.  Any association to shady topics (sex, drugs, gambling, and
to a lesser degree, alcohol) may make advertiser shy away from a
partnership.

Technology
There may be a risk from other sites and companies to develop products
and services that make YouTube obsolete.  This may come from direct
competitors (iFilm, Apple Quicktime, etc) or from technology companies
(Google, Microsoft, Yahoo).  Additionally, the ability for users to
bypass the site to view video content thru embedded video may also be a
technology risk, since it stops YouTube to fully monetize a users
consuming the video.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Marketing Opportunities
Although over the next few months, there will be tremendous growth in
usage from word of mouth; there are many ways to accelerate the pace of
trial and usage of the site.  Some standard methods of marketing
include:
  1. Hiring a Publicist
  2. Issuing Press Releases
  3. Join public forums for related areas
      a. Advertising in film schools
      b. Assisting/Sponsoring vlog groups and events
      c. Assisting/Sponsoring in film festivals
      d. Partnership with relevant advertisers (hardware/software
         companies)
      e. General seminars and talks with schools, businesses, etc

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY
REDESIGNATED CONFIDENTIAL

JK00006268

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 90 of 116   Page ID
#:594
Case 1:07-cv-02103-LLS   Document 214-62   Filed 03/18/10   Page 9 of 10

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 99 of 266

4. Advertising
    a. Listed in directories of companies such as Yahoo!
    b. Text-based advertising for related terms
    c. Advertising in public areas for awareness building (Times
       Square, Central Park, other public areas)
5. Promotions and Contests
    a. Video Contest w/ a Prize
    b. Tie-in w/ vendors that will be doing such events

*****************************************************************

Media Advertising Options
Although it's obvious YouTube will have video ads in the stream, I see
the monetization opportunity in a few key areas:

(a) the front door - which should have the most traffic - could be
exposed to advertisers for take-overs for massive one-day events.

(b) content areas - although you do use tags, I think that a human
categorizer would help people navigate more easily thru the massive
amounts of available video.  Again, takeovers of "Autos" or "College"
or even the existing "Most Popular" areas could be easy wins with
advertisers.

(c) video area - so obviously, a video ad before the video, but
consider breaking up videos (by a professional editor) into 4-5 minute
segments to insert additional video ads.  Obviously a take on what's
done in network.  Also, on the right hand side, I'd suggest using an
industry standard Ad Position.
** Note: there will be some issues w/ this type of advertising if
YouTube allows users to stream using the Embed method (which simply
streams the video).  Advertisers may not want their video ads running
in un-controlled areas, however this is a hurdle which can be overcome.

(d) sponsored search results - this may be an easy fall-back, but
should be considered, especially if users are doing a lot of search
activity.

*****************************************************************

Advertising Landscape
In 2006, $125 billion will be spent in advertising in the US, $114
billion will be spent in offline media outlets, while only $10.7
billion will be spent online, according to Jupiter Research.  For the
foreseeable future, online media spending will continue to grow at a
18-20% rate, while offline spending will only grow at a 4% rate.

Rich Media (which Video Ads is a sub-set) has grown relatively quickly
in the last year, however they are not a large part of the overall
online media spend.  This is mostly due to the restrictions that many
sites have (size limitations, uninitiated audio rules, etc).  In 2003,
Rich media made up $200 million of the $3.3 billion spent online for
marketing, or less than 1%.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY
REDESIGNATED CONFIDENTIAL

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 100 of 266

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Conclusions and Next Steps
1. Determine the short-term goals
   a. Exponential Growth in User Base over next 3-6 months
   b. Increase the amount and quality of video streams which are available to consumers

2. Determine the long-term priorities
   a. Increase awareness in the Producer area (Contests or Promotions)
   b. Begin partnership discussions with advertisers and content producers
   c. Create solution for enterprise video streaming
   d. Create solution for video site operator streaming
   e. Create solution for vlogger video streaming

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Proposed Revenue Models

A. Advertising (See Media Advertising Options above)

B. Subscription / Premium Services for Individuals
   a. Video Resumes, Music Videos, Sports Scouting Reports

B. Enterprise YouTube for Businesses
   a. Backend for businesses to host and stream video
   b. Secure streaming partner for video site operators (pay per view or premium video seller)

C. Video Ad Streaming Provider
   a. Self-service video ad serving platform for advertisers and agencies
   b. Competitors include:
      i. EyeWonder
   http://www.eyewonder.com/ews/ews FormatInstantPlayAd.cfm?id=1
      ii. EyeBlaster
   http://www.eyeblaster.com/products/rich media formats/streaming v ideo.asp
      iii. PointRoll
   http://www.pointroll.com/products/overview.asp
      iv. Unicast
   http://www.viewpoint.com/pub/advertising/

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY
REDESIGNATED CONFIDENTIAL

JK00006270

ER575

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 101 of 266



| | |
|---|---|
| **From:** | Jawed <​███████> |
| **Sent:** | Saturday, July 23, 2005 10:36 AM |
| **To:** | Chad Hurley <chad@youtube.com> |
| **Cc:** | YouTube Group ████ |
| **Subject:** | Re: reject? |

I say we reject this one, but not the other ones. This one is totally blatant.

Jawed

http://www.jawed.com/

On Sat, 23 Jul 2005, Chad Hurley wrote:

> if we reject this, we need to reject all the other copyrighted
> ones.... should we just develop a flagging system for a future push?
>
> -chad
>
>
>
> On Jul 23, 2005, at 11:26 AM, Jawed wrote:
>
>> http://www.youtube.com/watch.php?v=JibSAAF8zO4
>>
>> Jawed
>>
>> _____
>> http://www.jawed.com/
>>
>>
>>
>>
>
>
>

*Exhibit 222*

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

JK00009668

Case 2:12-cv-08315-MWF-VBK  Document 14-3  Filed 10/17/12  Page 93 of 116  Page ID
#:690
Case 1:07-cv-02103-LLS  Document 274-64  Filed 03/18/10  Page 1 of 2

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 102 of 266

| From: | Steve Chen <steve@youtube.com> |
|---|---|
| Sent: | Friday, July 29, 2005 6:51 AM |
| To: | Chad Hurley <chad@youtube.com> |
| Cc: | YouTube Group < > |
| Subject: | Re: http://www.filecabi.net/ |



Δ π EXHIBIT 12
Deponent
Date
WWW.DEPOBOOK.COM

right, i understand those goals but, at the same time, we have to
keep in mind that we need to attract traffic. how much traffic will
we get from the personal videos? remember, the only reason why our
traffic surged was due to a video of this type.

i'm not really disagreeing with you but i also think we shouldn't be
so high & mighty and think we're better than these guys. viral
videos will tend to be THOSE type of videos.

-s

On Jul 29, 2005, at 7:45 AM, Chad Hurley wrote:

> hmm, i know they are getting a lot of traffic... but its because
> they are a stupidvideos.com-type of site. they might make enough
> money to pay hosing bills, but sites like this and big-boys.com
> will never go public. I would really like to build something more
> valuable and more useful... actually build something that people
> will talk about and changes they way people use video on the internet.
>
>
>
> On Jul 29, 2005, at 1:33 AM, Steve Chen wrote:
>
>
>> haha ya.
>>
>> or something.
>>
>> just something to watch out for. check out their alexa ranking.
>>
>> -s
>>
>> On Jul 29, 2005, at 1:25 AM, Chad Hurley wrote:
>>
>>
>>
>>> hmm, steal the movies?
>>>
>>>
>>>
>>> On Jul 29, 2005, at 1:05 AM, Steve Chen wrote:
>>>
>>>
>>>
>>>
>>>> steal it|
>>>>
>>>>
>>>>
>>>>

Exhibit 223

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY
REDESIGNATED CONFIDENTIAL

JK00006392

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 94 of 116   Page ID
#:691
Case 1:07-cv-02103-LLS   Document 214-64   Filed 03/18/10   Page 2 of 2

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 103 of 266

```
>>>>
>>>>
>>>
>>>
>>>
>>>
>>
>>
>>
>>
>
>
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

JK00006393

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 95 of 116   Page ID
#:692
Case 1:07-cv-02103-LLS   Document 274-65   Filed 03/18/10   Page 1 of 2

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 104 of 266

| From: | Steve Chen < ▓▓▓▓▓ > |
|---|---|
| Sent: | Wednesday, August 10, 2005 12:27 AM |
| To: | Jawed < ▓▓▓▓ > |
| Cc: | Chad Hurley <chad@youtube.com>; YouTube Group < ▓▓▓▓▓▓ > |
| Subject: | Re: monitoring videos |

sounds good.

-s

On 8/9/05, Jawed ▓▓▓▓▓▓ wrote:
> lets remove stuff like movies/tv shows.
>
> lets keep short news clips for now. we can become stricter over time, just
> not overnight.
>
> like the CNN space shuttle clip, I like. we can remove it once we're
> bigger and better known, but for now that clip is fine.
>
> Jawed
>
> _____
> http://www.jawed.com/
>
>
>
> On Tue, 9 Aug 2005, Chad Hurley wrote:
>
> > i just don't want to create a bad vibe... and perhaps give the users
> > or the press something bad to write about, sort of like that last
> > blog posting ... http://clintsharp.com/archives/2005/08/09/youtube-
> > stealing-your-content/
> >
> >
> >
> >
> > On Aug 9, 2005, at 3:16 PM, Steve Chen wrote:
> >
> > > but we should just keep that stuff on the site. i really don't see
> > > what will happen.
> > >
> > > what?  someone from cnn sees it?  he happens to be someone with
> > > power?  he happens to want to take it down right away.  he gets in
> > > touch with cnn legal.  2 weeks later, we get a cease & desist
> > > letter.  we take the video down.
> > >
> > > -s
> > >
> > > On Aug 9, 2005, at 2:40 PM, Jawed wrote:
> > >
> > >
> > > >> Steve is changing the most-recent on browse.php to only include
> > >> videos
> > >> that have been reviewed.
> > >>
> > >> Jawed
> > >>

*Exhibit 224*

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY
REDESIGNATED CONFIDENTIAL

JK00006689

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 105 of 266

```
>>>>  _____
>>>> http://www.jawed.com/
>>>>
>>>>
>>>>
>>>> On Tue, 9 Aug 2005, Chad Hurley wrote:
>>>>
>>>>
>>>>
>>>>> we need to start being diligent about rejecting copyrighted /
>>>>> inappropriate content.
>>>>>
>>>>> we are getting serious traffic and attention now, I don't want this
>>>>> to be killed by a potentially bad experience of a network exec or
>>>>> someone visiting us.
>>>>>
>>>>> like there is a cnn clip of the shuttle clip on the site today, if
>>>>> the boys from Turner would come to the site, they might be pissed?
>>>>> these guys are the ones that will buy us for big money, so lets make
>>>>> them happy.
>>>>>
>>>>> we can then roll a lot of this work into a flagging system soon.
>>>>>
>>>>> -chad
>>>>>
>>>>>
>>>>>
>>>>
>>>>
>>>
>>>
>>>
>>
>>
>>
>
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

JK00006690

ER580

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 106 of 266

| | |
|---|---|
| **From:** | Steve Chen <steve@youtube.com> |
| **Sent:** | Friday, September 2, 2005 1:47 AM |
| **To:** | Chad Hurley <chad@youtube.com> |
| **Cc:** | YouTube Group <▮▮▮▮▮▮▮> |
| **Subject:** | Re: YouTube Message: hey dude |
| **Attach:** | Message Text.txt |



i just went through the admin stuff to review the videos we have on the site now. one thing that struck me, you know how sites like meetro, mph online, and gamefly are actually using our site as the platform for serving up their video ads/content? well, over time, more established places will start using us.

should we just assume that a user uploading content really owns the content and is agreeing to all the terms of use? so we don't take down anything other than obscene stuff?

-s

On Sep 1, 2005, at 12:01 PM, Chad Hurley wrote:

> I emailed this guy in the morning to remove the videos... if he doesn't act soon, I'll remove them.
>
> -Chad                        _____
>
> On Sep 1, 2005, at 11:54 AM, Steve Chen wrote:
>
>> what do we do here?
>>
>> -s
>>
>> Begin forwarded message:
>>
>> From: YouTube Service <service@youtube.com>
>> Date: September 1, 2005 10:27:17 AM PDT
>> To: ▮▮▮▮▮
>> Subject: YouTube Message: hey dude
>>
>> 
>>
>> **YouTube Message: hey dude**
>>
>> koolkeith500 has sent you this message at YouTube:
>>
>> **so I take it that you guys are going to have that UCbearcats guy take down all of those family uploaded?**

Exhibit 227

JK00007378

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY
**REDESIGNATED CONFIDENTIAL**

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 98 of 116   Page ID
Case 1:07-cv-02103-LLS   Document 214-68   Filed 03/18/10   Page 2 of 2
#:695

If not, I might as well upload mine back on here :O}

steve wrote:

> hey dude, do you mind taking down the family guy videos? i'm afraid we're going to get in t
it's copyrighted content...


To respond, click here.
Thank you for using YouTube,
YouTube Team.

---

Copyright © 2005 YouTube, LLC™

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 107 of 266

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

JK00007379

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 99 of 116   Page ID
#:606
Case 1:07-cv-02103-LLS   Document 214-69   Filed 03/18/10   Page 1 of 3

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 108 of 266

**From:** Chad Hurley <chad@youtube.com>
**Sent:** Saturday, September 3, 2005 11:09 PM
**To:** Steve Chen <steve@youtube.com>
**Cc:** Jawed <███████████>
**Subject:** Re: copyrighted material!!!

lets just work in that flagging feature soon... then we won't be liable.

On Sep 3, 2005, at 2:02 AM, Steve Chen wrote:

> yes, then i agree with you. take down whole movies. take down
> entire TV shows. take down XXX stuff.
>
> everything else keep including sports, commercials, news, etc.
>
> keeping it, we improve video uploads, videos viewed, and user
> registrations. by removing it, we may taint our reputation, but,
> where else are these people going to go to upload personal videos?
>
> -s
>
> On Sep 3, 2005, at 2:00 AM, Jawed wrote:
>
>
>> my suggested policy is really lax though. all I'm saying is: take
>> down
>> whole movies. we dont get many of those. and we SHOULD take down
>> entire TV
>> shows, like an entire family guy episode.
>>
>> we've also been taking down clips of TV shows, like family guy... we
>> should probably continue doing that, otherwise youtube will just
>> look like
>> a dumping ground for copyrighted stuff. if we keep that policy, I
>> don't
>> think our views will decrease at all.
>>
>> XXX stuff we should never allow. at least, not until we have a way to
>> separate it via tagging as "R-rated".
>>
>> Jawed
>>
>> _____
>>
>> http://www.jawed.com/
>>
>>
>>
>> On Sat, 3 Sep 2005, Steve Chen wrote:
>>
>>
>>> ya, i know that if remove all that content. we go from 100,000
>>> views
>>> a day down to about 20,000 views or maybe even lower.
>>>
>>> the copyright infringement stuff. i mean, we can presumably claim

DATE: 4-22-09          EXHIBIT# 5
DEPONENT: HURLEY, C.

CASE:  Viacom, et al., v. YouTube, et al., The Football
Association Premier League, et al., v. YouTube, et al.,
Case Nos. 07-CV-2203 and 07-CV-3582
A. Ignacio Howard, CLR, RPR, CSR No. 9830

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

JK00007420



Exhibit 228
ER583

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 109 of 266

>>> that we don't know who owns the rights to that video and by
>>> uploading, the user is claiming they own that video. we're
>>> protected
>>> by DMCA for that. we'll take it down if we get a "cease and
>>> desist".
>>>
>>> what i mean is, potentially, any of this content could be the user's
>>> videos. maybe it's david sacks uploading a clip/preview of some
>>> movie.
>>>
>>> why don't we just remove the XXX stuff for now?
>>>
>>> -s
>>>
>>> On Sep 3, 2005, at 1:53 AM, Jawed wrote:
>>>
>>>
>>>
>>>> well I'd just remove the obviously copyright infringing stuff.
>>>>
>>>> movies and tv shows, I'd get rid of. we are not a glorified
>>>> putfile,
>>>> right?
>>>>
>>>> none of the most favorite videos are movies or tv shows. we're ok
>>>> cracking
>>>> down on this content. we'll leave music videos, news clips, and
>>>> clips of
>>>> comdey shows for now.
>>>>
>>>> I think thats a pretty good policy for now, no?
>>>>
>>>> Jawed
>>>>
>>>> _____
>>>> http://www.jawed.com/
>>>>
>>>>
>>>>
>>>> On Sat, 3 Sep 2005, Steve Chen wrote:
>>>>
>>>>
>>>>
>>>>
>>>>> i'm thinking it's still okay.
>>>>>
>>>>> what's the difference between big-boys/stupidvideos vs youtube?
>>>>> isn't it the community and user aspect?
>>>>>
>>>>> if you look at the top videos on the site, it's all from this
>>>>> type of
>>>>> content. in a way, if you remove the potential copyright
>>>>> infringements, wouldn't you still say these are still "personal"
>>>>> videos?
>>>>>
>>>>> if you define "personal" videos to be videos on your personal hard
>>>>> drive that you want to upload and share with people?
>>>>>
>>>>> anyway, if we do remove that stuff, site traffic and virality will
>>>>> drop to maybe 20% of what it is. i think, as people hear about
>>>>> the

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

JK00007421

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 110 of 266

>>>>> site, a good amount of the materials on the site is still
>>>>> personal —
>>>>> they'll start recognizing that it's a place to share their own
>>>>> personal videos.
>>>>>
>>>>> i'd hate to prematurely attack a problem and end up just losing
>>>>> growth due to it.
>>>>>
>>>>> also, doesn't the DMCA cover us from a lot of this, as the guy
>>>>> said?
>>>>>
>>>>> -s
>>>>>
>>>>> On Sep 3, 2005, at 12:22 AM, Chad Hurley wrote:
>>>>>
>>>>>
>>>>>
>>>>>
>>>>>> aaahhhhh, the site is starting to get out of control with
>>>>>> copyrighted material... we are becoming another big-boys or
>>>>>> stupidvideos. if you came to the site now, that is what you would
>>>>>> think the site is all about.... just look at the recent videos in
>>>>>> the admin tool.
>>>>>>
>>>>>> i think we may need to start enforcing the restrictions soon and
>>>>>> implement the flagging feature.
>>>>>>
>>>>>> -chad
>>>>>>
>>>>>>
>>>>>>
>>>>>>
>>>>>>
>>>>>>
>>>>>
>>>>>
>>>>>
>>>>>
>>>>>
>>>>
>>>>
>>>>
>>>
>>>
>>>
>>>
>>
>>
>
>
>

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

JK00007422

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 102 of 116   Page ID
#:609
Case 1:07-cv-02103-LLS   Document 274-71   Filed 03/18/10   Page 1 of 1

Δ π EXHIBIT 58
Deponent Karim
6/6/07
www.DEPOBOOK.COM

| | |
|---|---|
| **From:** | Steve Chen <steve@youtube.com> |
| **Sent:** | Wednesday, September 7, 2005 12:28 AM |
| **To:** | Roelof Botha <Botha@sequoiacap.com> |
| **Cc:** | Chad Hurley <chad@youtube.com>; Jawed <▮▮▮▮▮▮▮> |
| **Subject:** | Re: Racy content |
| **Attach:** | Message Text.txt |

Roelof:

On the dev environment, the first phase of solving this problem is implemented.

I think it's an accepted that in an environment such as YouTube, relying on user-generated content, copyrighted and inappropriate content will find its way onto the site. On the dev environment, we've implemented a flagging system so you can flag videos as being inappropriate or copyrighted. That way, the perception is that we are concerned about this type of material and we're actively monitoring it.

The actual removal of this content will be in varying degrees. We may want to keep some of the borderline content on the site but just remove it from the browse/search pages. That way, you can't find the content easily. Again, similar to Flickr, if you search for the right tags on Flickr, you can find truckloads of adult and copyrighted content. It's just that you can't stumble upon it, you have to be actively searching for it.

-s

On Sep 6, 2005, at 11:18 PM, Roelof Botha wrote:

> Hi guys,
>
> I've noticed that are a few recent 'racy' videos (e.g., http://www.youtube.com/?v=TTFPt_Jpks0).
> Should we create a 'mature' section for this content? Or should we put in the equivalent of a
> 'safe search' function (just like Google has) so we don't alienate the moms that are uploading
> videos on the site?
>
> Best,
> Roelof

Exhibit 230

**HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY**
**REDESIGNATED CONFIDENTIAL**

JK00007479

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 111 of 266

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 103 of 116   Page ID
#:610
Case 1:07-cv-02103-LLS   Document 214-73   Filed 03/18/10   Page 1 of 1

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 112 of 266

| From: | Chad Hurley <chad@youtube.com> |
|---|---|
| Sent: | Friday, September 23, 2005 10:27 AM |
| To: | Chen Steve <steve@youtube.com>; Karim Jawed < ███████ > |
| Subject: | flagging change |

hey guys,

can we remove the flagging link for "copyrighted" today? we are
starting to see some complains for this and basically if we don't
remove them we could be held liable for being served a notice. it's
actually better if we don't have the link there at all because then
the copyright holder is responsible for serving us notice of the
material and not the users.

anyways, it would be good if we could remove this asap.

thanks, chad

DATE: 4-22-09
DEPONENT: HURLEY, C,      EXHIBIT# 11

CASE: Viacom, et al., v. YouTube, et al., The Football
Association Premier League, et al., v. YouTube, et al.,
Case Nos. 07-CV-2203 and 07-CV-3582
A. Ignacio Howard, CLR, RPR, CSR No. 9830

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY
**REDESIGNATED CONFIDENTIAL**

JK00008043

Exhibit 232
ER587

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 113 of 266

YouTube Ideas                                                                3/22/06
Jawed Karim

Topics:

- **Copyrighted content**
- **3-strikes policy**
- **Bringing back tags**
- **Historical Most Viewed**
- **Connecting local users**
- **Personal video portal**
- **Google Video**
- **YouTube 1-click video uploading application**
- **Apple Movie Trailers**

### Copyrighted content

Although the new 10-minute length restriction serves well to reinforce the official line
that YouTube is not in the business of hosting full-length television shows, it probably
won't cut down the actual amount of illegal content uploaded since standard 22-minute
episodes can still easily be uploaded in parts, and users will continue to upload the
"juiciest" bits of television shows. Not all copyrighted content on YouTube should be
treated the same:

- As of today episodes and clips of the following well-known shows can still be
  found: Family Guy, South Park, MTV Cribs, Daily Show, Reno 911, Dave
  Chapelle. This content is an easy target for critics who claim that copyrighted
  content is entirely responsible for YouTube's popularity. Although YouTube is
  not legally required to monitor content (as we have explained in the press) and
  complies with DMCA takedown requests, we would benefit from *preemptively*
  removing content that is blatantly illegal and likely to attract criticism. This will
  help to dispel YouTube's association with Napster (Newsweek: "Is YouTube the
  Napster of Video?", "Showbiz unsure if YouTube a friend or foe"). Although a
  more thorough analysis is required, much of this content does not even seem to
  attract many views.

- Obscure/international copyrighted content (Korean soaps, Anime, …): Since this
  "subculture" material is only popular among a small but dedicated group of
  viewers, it is less likely to result in legal problems in the short run, and keeping it
  will continue to attract people and demonstrates that YouTube is the best place
  online to find rare ("long tail") content. Therefore it's best to remove this material
  following DMCA notices, but not preemptively.

Highly Confidential - Attorneys' Eyes Only                        JK00000173

REDESIGNATED CONFIDENTIAL

Exhibit 237
ER588

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 105 of 116   Page ID
#:612
Case 1:07-cv-02103-LLS   Document 214-78   Filed 03/18/10   Page 2 of 7

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 114 of 266

- Copyrighted content that goes viral and obtains far more views on YouTube than it possibly could have at the original source. Examples: Lazy Sunday, Natalie Portman rapping, Autistic basketball player, Tom Cruise on Oprah. Despite the higher legal risk it may be best to let these clips run their course on YouTube until the DMCA notice arrives, because their forced removals have been highly publicized in the media. For many people these events call into question whether the traditional media really "gets it" and this may ignite discussions that could eventually convince traditional media to see YouTube as a distribution partner and not as an enemy.

### 3-strikes policy

Although users are told in two emails that their accounts will be closed after the third violation, the policy appears to have caught some valuable users (users who attract many other users) by surprise and may have alienated them against YouTube. Some have launched campaigns against YouTube. I think the 3-strikes policy should remain, but we should make it more clear by displaying large warnings on the *website* to the users in question upon login. They don't seem to pay much attention to warnings in emails.

### Bringing back tags

Form's usability study found that search is the predominant way users find videos on YouTube. It's fair to assume that users would also use tags (which are very similar to search) if they were more prominently featured and if they were more accurate. From a UI-perspective, tags have remained in the background since our launch. Another problem is that many users enter useless tags during video upload.

The accuracy of the Related Videos window drives the number of videos viewed on the site. Because the Related Videos results depend entirely on the tags that the (often clueless) video uploader entered, we should A) make video owners aware of the relationship between their tags and Related Videos and B) offer them tools to pick better tags.

Two features that can help users tweak the Related Videos window that is displayed on their own videos:

- Display an initially empty Related Videos window on the video upload page (my_videos_upload) and on the video edit page (my_videos_edit). As the user types tags into the "Tags:" HTML form, the Related Videos page is automatically updated in real-time and filled with the related videos that would be displayed for the tags that the user has entered so far. This is similar to Google Suggest ("As you type, Google will offer suggestions."). See http://www.google.com/webhp?complete=1

- Sometimes videos only make sense in the context in which they relate to a previous video. Examples: commentary or follow-up videos about another video,

Highly Confidential - Attorneys' Eyes Only

REDESIGNATED CONFIDENTIAL

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 115 of 266

or spoofs/parodies of an original video. In those cases the original video should definitely appear in the Related Videos window, or otherwise the video being viewed does not make sense. However, due to poorly chosen tags the original video often does not appear there. The video author should be able to pick another specific video on YouTube that will then be "forced" to appear as the first video in the Related Videos window. (This could be hacked on top of current functionality with a hidden randomly generated unique tag.)

The "Recent Tags:" field (which has existed since launch) may not be an optimal use of front-page real estate. It would be more relevant and interesting to have a "**Top Tags**" field instead that only shows the tags of the most popular videos from the previous 24 hours.

We could also store searches entered by users and feature the most popular recent searches, after filtering out the dirty ones.

**Historical Most Viewed**

Many users use the Most Viewed (Today) page to quickly find the newest most entertaining clips. The page only shows videos uploaded in the last two days to keep the content fresh.

The most popular videos of all time can always be found on the Most Viewed (All Time) page, but the videos that were only popular for a few days are lost in a sea of millions of videos once they drop off the Today list. Examples: Scary Maze, Four-legged robotic mule, Breakup.

<u>User activity is the best metric for finding good content</u>. The "best" videos are those with the most views/comments. One way to increase views is to help users find the best videos. Users should be able to browse the "Most Viewed (Today)" page as it appeared on any previous day in the past. (The same applies to "This Week" for any previous week, etc). Note that these pages are static: Once a page is generated for a given time period it will never have to be re-generated, so this feature does not put additional strain on the database.

**Connecting local users**

Like MySpace and other social networking sites have done, YouTube should let people find other local users to strengthen the sense of community. Since we now collect location information during signup, we can add user search functionality:

Highly Confidential - Attorneys' Eyes Only

REDESIGNATED CONFIDENTIAL

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 107 of 116   Page ID
#:621
Case 1:07-cv-02103-LLS   Document 214-78   Filed 03/18/10   Page 4 of 7

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 116 of 266



MySpace's user search

Also interesting:

- Search for videos recorded within X miles of a location. ("Show me all videos recorded in Palo Alto")
- See most popular videos by location. ("Show me videos that are popular among users in Los Angeles")

**Personal video portal**

Much of MySpace's success is due to its members' ability to customize profiles. Although YouTube Profiles are now somewhat customizable, this ability is missing from the user's Video page (profile_videos). Video owners should have more control over this page, so that they can create a "personal video portal". This includes the ability to:

- Change the order of videos shown
- Change layout and color scheme
- Directly embed some videos into the page (using embeddable player)
- Organize videos into albums (may be able to use Playlists)

In the future YouTube could provide video owners with detailed viewing statistics about each video, such as breakdown of viewers by country, gender, and age. These metrics would be especially interesting and valuable to paying commercial content providers who use YouTube as a distribution platform.

**Google Video**

Google's sparse interface lacks community features and is optimized for purchasing music videos, TV shows, and full-length movies. The checkout process is fairly smooth, going from a 30-second preview to payment and download:

Highly Confidential - Attorneys' Eyes Only

REDESIGNATED CONFIDENTIAL

JK00000176

ER591

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 117 of 266



## Google Video Player notable features

The Google Video Player can be used to watch any video on Google Video, and must be used to watch paid content. Every video watched is automatically downloaded and saved for future access to `My Documents\My Videos\Google Videos`.

- Resizable video, can watch at any size including full screen mode
- Paid video content encoding: 480x360, 800 kbps video, 128 kbps audio
- Quick navigation through scene selection thumbnails:



Highly Confidential - Attorneys' Eyes Only

JK00000177

REDESIGNATED CONFIDENTIAL

ER592

Case 2:12-cv-08315-MWF-VBK   Document 14-3   Filed 10/17/12   Page 109 of 116   Page ID
#:616
Case 1:07-cv-02103-LLS   Document 214-78   Filed 03/18/10   Page 6 of 7

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 118 of 266

Google Results Page notable features



- Can play all search result videos back-to-back with one click
- Can play search result videos within thumbnail view (each thumbnail is actually a small embedded player)

Search result sort/display methods

- Sort by Price: For Sale / Free
- Sort by Length: Long / Medium / Short
- Display mode: Matrix / Detailed list

Google Watch Page notable features

Flash player

- Google Flash stream: 320x240, 430 kbps video, 64 kbps audio (YouTube Flash stream: 320x240, 300 kbps video, 64 kbps audio)
- User can skip video beyond what is buffered
- User can switch from windowed to full screen mode and back while playing without interrupting video position

Most videos are downloadable in formats:

- MPEG-4
- Google Video Player (.gpv) This is a pointer file that simply contains the full video content's URL. Upon opening this file in Google Video Player, the corresponding .gpi file (the video data) is shown while being downloaded and saved in the background.

Highly Confidential - Attorneys' Eyes Only

REDESIGNATED CONFIDENTIAL

JK00000178

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 119 of 266

Google Video upload process

The upload process is cumbersome at best and is optimized for very large uploads, not casual user-generated content. After uploading, it can take several days for the content to be reviewed, before it appears on the site.

Uploading videos requires using the Google Video Uploader application. Possible advantages of using an application instead of a web interface are:

- There is no maximum upload file size. HTTP uploads are limited by the maximum POST content-length specified in the web server.
- Uploads of large files can be resumed if interrupted in the middle.
- User sees reliable feedback of upload progress.

**YouTube 1-click video uploading application**

Most of the above advantages of using the Google Video Uploader currently do not apply to YouTube. However, I have noticed that more people are using YouTube videos as a messaging medium. That is, the purpose of their videos is to talk to other YouTube members. For such videos the current upload process is cumbersome and has a high overhead because it requires many steps. Especially for non-tech-savvy members there would be advantages to having an application that integrates video capture and uploading all into a one-click process. Since building such a product internally is a development headache it would be worthwhile to investigate whether we could contract out the development of such an application if it is deemed useful.

**Apple Movie Trailers**

Apple Movie Trailers is pushing the envelope for freely available online video clips. They are encoded at 1920x1080, H.264 10 mbps, and the average 2 min trailer is 150 MB. This is too large to stream in real-time on most broadband connections, but it will be possible soon, with Comcast already offering 6 mbps connections.

Highly Confidential - Attorneys' Eyes Only                                                    JK00000179

**REDESIGNATED CONFIDENTIAL**

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 120 of 266

# EXHIBIT E

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 121 of 266

**Heather Rowland**

| | |
|---|---|
| **From:** | Cris Armenta |
| **Sent:** | Monday, October 15, 2012 12:52 PM |
| **To:** | talger@perkinscoie.com |
| **Cc:** | Sol, Credence (credence.sol@sol-law.com); Jason Armstrong (armstronglaw@me.com); David Hardy (David.Hardy@DMCASolutions.com); Andy Schapiro (AndrewSchapiro@quinnemanuel.com); Heather Rowland; sbali@perkinscoie.com |
| **Subject:** | Innocence of Muslims |

We are filing our papers tomorrow out of respect for your schedule.

I have just been informed by Nakoula's attorney that Nakoula (aka Sam Bacile or Sam Basel) DOES NOT OWN the rights to the film and will not claim copyright ownership or the rights to the film. We believe it is YouTube's burden to identify the correct copyright owner, in light of Garcia's allegation that she owns the rights to her dramatic performance. In light of your comments during our meet and confer that YouTube's position that the work is joint between Nakoula and Garcia. This party admission will be in our papers. In light of this admission, we believe you should revisit YouTube's refusal to take down the content because Nakoula is not a copyright owner, pursuant to his attorney's admission of a few minutes ago. We do not believe that YouTube can identify any copyright owner other than Garcia – therefore she has the right to stop third party infringers, including Nakoula, YouTube and all the other posters. Feel free to call him to verify – Steve Seiden in Hawthorne.
Please advise us if your position.

Cris

1

ER596

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 122 of 266

# PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen years and not a party to the within action.  My business address is 11900 Olympic Boulevard, Suite 730, Los Angeles, California 90064.

On October 17, 2012 I served the following document(s) described as:

**(1) *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND AN ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION, AND ORDER OF IMPOUNDMENT**

**(2)  REQUEST FOR JUDICIAL NOTICE**

**(3) DECLARATIONS OF CINDY LEE GARCIA, DAN SUTTER, GAYLORD FLYNN, DR. KHALED ABOU EL FADL, ALL IN SUPPORT OF EX PARTE APPLICATION**

**(4) DECLARATION OF DAVID HARDY IN SUPPORT OF EX PARTE APPLICATION**

**(5) DECLARATION OF M. CRIS ARMENTA IN SUPPORT OF EX PARTE APPLICATION**

**(6) DECLARATION OF ZAHAVAH LEVINE IN SUPPORT OF EX PARTE APPLICATION**

**(7) [PROPOSED] ORDER GRANTING PLAINTIFF'S *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER, ISSUANCE OF ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION, AND ORDER OF IMPOUNDMENT**

1

ER597

1   on the interested parties in this action by placing true copies thereof addressed as follows:

2   **Timothy L. Alger**
    **Sunita Bali**
3   **Perkins Coie LLP**
    **3150 Porter Drive**
4   **Palo Alto, CA 94304-1212**
    **TAlger@perkinscoie.com**
5   **sbali@perkinscoie.com**

6

7   ☑   BY ELECTRONIC MAIL, pursuant to the consent of the above counsel

8   I declare under penalty of perjury under the law of the State of California that the above is true and
9   correct and that I am employed in the office of a member of the Bar of this Court at whose
10  direction the service was made.

11  Executed on  October 17, 2012 in Los Angeles, California.

12
13                                                                Heather Rowland
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2
NOTICE OF RELATED CASES

ER598

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 124 of 266

# PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen years and not a party to the within action.  My business address is 1511 West Beverly Blvd, Los Angeles, California 90026.

On _____ I served the following document(s) described as:

**(1) *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND AN ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION, AND ORDER OF IMPOUNDMENT**

**(2) REQUEST FOR JUDICIAL NOTICE**

**(3) DECLARATIONS OF CINDY LEE GARCIA, DAN SUTTER, GAYLORD FLYNN, DR. KHALED ABOU EL FADL, ALL IN SUPPORT OF EX PARTE APPLICATION**

**(4) DECLARATION OF DAVID HARDY IN SUPPORT OF EX PARTE APPLICATION**

**(5) DECLARATION OF M. CRIS ARMENTA IN SUPPORT OF EX PARTE APPLICATION**

**(6) DECLARATION OF ZAHAVAH LEVINE IN SUPPORT OF EX PARTE APPLICATION**

**(7) [PROPOSED] ORDER GRANTING PLAINTIFF'S *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER, ISSUANCE OF ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION, AND ORDER OF IMPOUNDMENT**

on the interested parties in this action by placing true copies thereof enclosed in sealed envelopes addressed as follows:

ER599

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 125 of 266

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Nakoula B. Nakoula*
*c/o*
*Los Angeles County Sheriff's Department*
*Stanley Mosk Courthouse*
*110 North Grand Avenue Room 525*
*Los Angeles, 90012*

☐   PERSONAL SERVICE: On _____ I served the foregoing documents listed above by personally handing them to

_____

*I declare under penalty of perjury under the law of the United States of America that the above is true and correct and that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.*

Executed on _____ in Los Angeles, California.

_____

**PROOF OF SERVICE**

2

ER600

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 126 of 266

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

<u>CIVIL MINUTES -- GENERAL</u>

Case No.   **CV 12-08315-MWF (VBKx)**                    Date:  **October 18, 2012**

Title:      Cindy Lee Garcia -v- Nakoula Basseley Nakoula, et al.

---

PRESENT:  HON. MICHAEL W. FITZGERALD, U.S. DISTRICT JUDGE

    Rita Sanchez                                      None Present
    Courtroom Deputy                          Court Reporter

ATTORNEYS PRESENT FOR APPELLANTS:        ATTORNEYS PRESENT FOR APPELLEE:

    None Present                                      None Present

PROCEEDINGS (IN CHAMBERS):  ORDER DENYING EX PARTE
                                     APPLICATION [12]

      On October 17, 2012, Plaintiff Cindy Lee Garcia filed an Ex Parte
Application for a Temporary Restraining Order and an Order to Show Cause Re
Preliminary Injunction, and Order of Impoundment (the "Application").  (Docket
No. 12).  The Application is DENIED.

      Ex parte applications solely for extraordinary relief are rarely granted.  *See
Mission Power Eng'g Co. v. Cont'l Casualty Co.*, 883 F. Supp. 488, 490-91 (C.D.
Cal. 1995).  In addition, under both the Local Rules and the Procedures of this
Court, ex parte applications that fail to include a statement of opposing counsel's
position will not be considered.  *See* Local Rule 19-1.

      Garcia has not advised the Court as to whether Defendants oppose the
Application, nor is it clear that the Application has been served on all Defendants.
The Court also notes that Garcia's mirror Ex Parte Application for Temporary
Restraining Order and For an Order to Show Cause Re Preliminary Injunction was
denied in the California Superior Court for the County of Los Angeles on
September 20, 2012.  *See Cindy Lee Garcia -v- Nakoula Basseley Nakoula, et al.*,
BC492358, Civil Minutes (Cal. Sup. Ct. Sept. 20, 2012).

      The Court presumes that Defendants oppose the Application.  While
Defendants had no position on Garcia's request to exceed the page limits set forth
in Local Rule 11-6 (*see* Docket No. 8 at 2 n.1), which the Court previously denied

---

ER601

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 127 of 266

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES -- GENERAL

Case No.   **CV 12-08315-MWF (VBKx)**                    Date:  **October 18, 2012**

Title:      Cindy Lee Garcia -*v*- Nakoula Basseley Nakoula, et al.

---

(Docket No. 11), it was clear that Defendants oppose the relief sought in the Application.

For the reasons stated above and given that the alleged infringement seems to have commenced almost three months ago on July 2, 2012 (*see* Application at 2), the Court declines to consider this Application on an ex parte basis. Instead, the Court construes the Application as a motion for a preliminary injunction.

Accordingly, the Court ORDERS the following:

Defendants shall file any opposition brief on or before **October 29, 2012**.

Garcia shall file any reply brief on or before **November 5, 2012**.

The hearing on Garcia's motion for preliminary injunction is hereby scheduled for **November 19, 2012 at 10:00 a.m.**

IT IS SO ORDERED.

ER602

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 128 of 266



1   Timothy L. Alger (SBN 160303)
    TAlger@perkinscoie.com
2   PERKINS COIE LLP
    3150 Porter Drive
3   Palo Alto, CA  94304-1212
    Telephone:  650.838.4300
4   Facsimile:  650.838.4350

5   Sunita Bali (SBN 274108)
    SBali@perkinscoie.com
6   PERKINS COIE LLP
    1888 Century Park E., Suite 1700
7   Los Angeles, CA  90067-1721
    Telephone:  310.788.9900
8   Facsimile:  310.788-3399

9
    Attorneys for Defendants
10  Google Inc. and YouTube, LLC

11                  UNITED STATES DISTRICT COURT

12                  CENTRAL DISTRICT OF CALIFORNIA

13

14

15  CINDY LEE GARCIA, an individual,     Case No. CV-12-8315-MWF (VBKx)

16              Plaintiff,               Assigned to the Honorable Michael W.
                                         Fitzgerald
17       v.
                                         **[PROPOSED] ORDER ON
18  NAKOULA BASSELEY NAKOULA,            STIPULATION TO CONTINUE
    an individual also known as SAM      HEARING DATE ON PLAINTIFF'S
19  BACILE, MARK BASSELEY                MOTION FOR PRELIMINARY
    YOUSSEF, ABANOB BASSELEY             INJUNCTION**
20  NAKOULA, MATTHEW NEKOLA,
    AHMED HAMDY, AMAL NADA,
21  DANIEL K. CARESMAN, KRITBAG
    DIFRAT, SOBHI BUSHRA, ROBERT
22  BACILY, NICOLA BACILY,
    THOMAS J. TANAS, ERWIN
23  SALAMEH, YOUSSEFF M.
    BASSELEY, and/or MALID
24  AHLAWI; GOOGLE, INC., a
    Delaware Corporation; YOUTUBE,
25  LLC, a California limited liability
    company, and DOES 1 through 10,
26  inclusive,

27              Defendants.

28

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 129 of 266

1                    **[PROPOSED] ORDER**

2        Pursuant to the stipulation of the parties dated October 22, 2012, and good

3  cause appearing, the Court hereby orders that the hearing on Plaintiff's motion for

4  preliminary injunction shall be continued to December 3, 2012, at 10:00 a.m.

5

6        IT IS SO ORDERED.

7  DATED: _____, 2012

8                            Hon. Michael W. Fitzgerald
                                   U.S. District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                            1        [PROPOSED] ORDER ON STIPULATION
                                     TO CONTINUE HEARING DATE

                                    Case No. CV-12-8315-MWF (VBKx)

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 130 of 266

# PROOF OF SERVICE

I, Pamela Villeral, declare,

I am employed in the City of Los Angeles, County of Los Angeles, State of California. I am over the age of 18 years and not a party to the within action. My business address is 1888 Century Park East, Suite 1700, Los Angeles, California 90067-1721. On the date signed below, I served the documents named below on the parties in this action as follows:

**[PROPOSED] ORDER ON STIPULATION TO CONTINUE HEARING DATE ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Upon the parties named below as follows: (See attached service list.)

☒ **(BY MAIL)** I caused the above referenced document(s) to be placed in an envelope, with postage thereon fully prepaid, and placed in the United States mail at Los Angeles, California. I am readily familiar with the practice of the firm for collection and processing of correspondence for mailing, said practice being that in the ordinary course of business, mail is deposited in the United States Postal Service the same day as it is placed for collection. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☒ (FEDERAL) I declare under penalty of perjury under the laws of the United States of America the above it true and correct.

Executed on **October 22, 2012**, at Los Angeles, California.

Pamela Villeral

2     PROOF OF SERVICE
Case No. CV-12-8315-MWF (VBKx)

ER605

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 131 of 266

1

2 **<u>SERVICE LIST</u>**

3

4 **<u>Defendant</u>**

5 Nakoula B. Nakoula aka Mark Basseley Youssef
c/o Los Angeles County Sherriff's Department

6 Stanley Mosk Courthouse

7 110 North Grand Avenue, Room 525
Los Angeles, CA  90012

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3                                    PROOF OF SERVICE

Case No. CV-12-8315-MWF (VBKx)

**ER606**

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 132 of 266

1   Timothy L. Alger (SBN 160303)
    TAlger@perkinscoie.com
2   PERKINS COIE LLP
    3150 Porter Drive
3   Palo Alto, CA  94304-1212
    Telephone:  650.838.4300
4   Facsimile:  650.838.4350

5   Sunita Bali (SBN 274108)
    SBali@perkinscoie.com
6   PERKINS COIE LLP
    1888 Century Park E., Suite 1700
7   Los Angeles, CA  90067-1721
    Telephone:  310.788.9900
8   Facsimile:  310.788-3399

9
    Attorneys for Defendants
10  Google Inc. and YouTube, LLC

11              UNITED STATES DISTRICT COURT
12            CENTRAL DISTRICT OF CALIFORNIA
13

14
15  CINDY LEE GARCIA, an individual,     Case No. CV-12-8315-MWF (VBKx)

        Plaintiff,                        Assigned to the Honorable Michael W.
16                                        Fitzgerald
        v.
17                                        **ORDER ON STIPULATION TO
    NAKOULA BASSELEY NAKOULA,             CONTINUE HEARING DATE ON
18  an individual also known as SAM       PLAINTIFF'S MOTION FOR
    BACILE, MARK BASSELEY                 PRELIMINARY INJUNCTION**
19  YOUSSEF, ABANOB BASSELEY
    NAKOULA, MATTHEW NEKOLA,
20  AHMED HAMDY, AMAL NADA,
    DANIEL K. CARESMAN, KRITBAG
21  DIFRAT, SOBHI BUSHRA, ROBERT
    BACILY, NICOLA BACILY,
22  THOMAS J. TANAS, ERWIN
    SALAMEH, YOUSSEFF M.
23  BASSELEY, and/or MALID
    AHLAWI; GOOGLE, INC., a
24  Delaware Corporation; YOUTUBE,
    LLC, a California limited liability
25  company, and DOES 1 through 10,
    inclusive,
26
        Defendants.
27

28

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 133 of 266

## ORDER

Pursuant to the stipulation of the parties dated October 22, 2012, and good cause appearing, the Court hereby orders that the hearing on Plaintiff's motion for preliminary injunction shall be continued to December 3, 2012, at 10:00 a.m.

IT IS SO ORDERED.

DATED:  October 23, 2012

_____
Hon. Michael W. Fitzgerald
U.S. District Judge

1

[PROPOSED] ORDER ON STIPULATION
TO CONTINUE HEARING DATE

Case No. CV-12-8315-MWF (VBKx)

ER608

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 134 of 266

## PROOF OF SERVICE

I, Pamela Villeral, declare,

    I am employed in the City of Los Angeles, County of Los Angeles, State of California. I am over the age of 18 years and not a party to the within action. My business address is 1888 Century Park East, Suite 1700, Los Angeles, California 90067-1721. On the date signed below, I served the documents named below on the parties in this action as follows:

**[PROPOSED] ORDER ON STIPULATION TO CONTINUE HEARING DATE ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Upon the parties named below as follows:  (See attached service list.)

☒ **(BY MAIL)** I caused the above referenced document(s) to be placed in an envelope, with postage thereon fully prepaid, and placed in the United States mail at Los Angeles, California. I am readily familiar with the practice of the firm for collection and processing of correspondence for mailing, said practice being that in the ordinary course of business, mail is deposited in the United States Postal Service the same day as it is placed for collection. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☒ (FEDERAL) I declare under penalty of perjury under the laws of the United States of America the above it true and correct.

Executed on **October 24, 2012**, at Los Angeles, California.

 

_____
                    Pamela Villeral

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 135 of 266

1

2                                **SERVICE LIST**

3

4       **Defendant**

5       Nakoula B. Nakoula aka Mark Basseley Youssef

        c/o Los Angeles County Sherriff's Department

6       Stanley Mosk Courthouse

7       110 North Grand Avenue, Room 525

        Los Angeles, CA  90012

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                    3                    PROOF OF SERVICE

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 136 of 266

1   Timothy L. Alger (SBN 160303)
    TAlger@perkinscoie.com
2   PERKINS COIE LLP
    3150 Porter Drive
3   Palo Alto, CA  94304-1212
    Telephone:  650.838.4300
4   Facsimile:  650.838.4350

5   Sunita Bali (SBN 274108)
    SBali@perkinscoie.com
6   PERKINS COIE LLP
    1888 Century Park E., Suite 1700
7   Los Angeles, CA  90067-1721
    Telephone:  310.788.9900
8   Facsimile:  310.788.3399

9   Attorneys for Defendants
    Google Inc. and YouTube, LLC
10

11              UNITED STATES DISTRICT COURT

12              CENTRAL DISTRICT OF CALIFORNIA

13

| | |
|---|---|
| 14   CINDY LEE GARCIA, an individual, | Case No.  CV-12-8315-MWF (VBKx) |
| 15                     Plaintiff, | OPPOSITION OF GOOGLE INC. AND YOUTUBE, LLC TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND ORDER OF IMPOUNDMENT |
| 16        v. | |
| 17   NAKOULA BASSELEY NAKOULA, an individual also known as SAM | |
| 18   BACILE, MARK BASSELEY YOUSSEF, ABANOB BASSELEY | Date:         December 3, 2012 |
| 19   NAKOULA, MATTHEW NEKOLA, AHMED HAMDY, AMAL NADA, | Time:         10:00 a.m. |
| 20   DANIEL K. CARESMAN, KRITBAG DIFRAT, SOBHI BUSHRA, ROBERT | Courtroom:  1600 |
| 21   BACILY, NICOLA BACILY, THOMAS J. TANAS, ERWIN | Honorable Michael W. Fitzgerald |
| 22   SALAMEH, YOUSSEFF M. BASSELEY, and/or MALID AHLAWI; | |
| 23   GOOGLE, INC., a Delaware Corporation; YOUTUBE, LLC, a | |
| 24   California limited liability company, and DOES 1 through 10, inclusive, | |
| 25                     Defendants. | |
| 26 | |
| 27 | |
| 28 | |

Opposition to Motion for Preliminary
Injunction and Order of Impoundment
CV-12-8315-MWF (VBKx)

ER611

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 137 of 266

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ...................................................................................1

II.  BACKGROUND ...................................................................................3

III. LEGAL STANDARDS ........................................................................6

IV.  ARGUMENT.........................................................................................7

    A.   Plaintiff Cannot Show a Likelihood of Irreparable Harm ..................7

        1.   Plaintiff cannot establish a causal connection between the allegedly infringing conduct of the YouTube Defendants and the injury she alleges.......................................................7

        2.   Plaintiff has not identified any irreparable harm .....................9

        3.   Plaintiff's inexcusable delay undermines her claims of irreparable harm .................................................................12

    B.   Plaintiff Cannot Show a Likelihood of Success On the Merits of Her Copyright Infringement Claims Against the YouTube Defendants.......................................................................................13

        1.   Plaintiff does not own a copyright in the Film .......................13

        2.   Plaintiff cannot hold a copyright in only those portions of the Film containing her dramatic performance........................14

        3.   Plaintiff identifies Youssef as the Film's exclusive copyright owner, giving him the right to post the Film on YouTube ................................................................................16

        4.   Plaintiff's dramatic performance was a "work for hire." .........17

        5.   Plaintiff is not even a joint author..........................................19

    C.   Plaintiff Cannot Show that the Equities Tip In Her Favor. ...............20

    D.   Plaintiff's Requested Injunction Would be a Prior Restraint, and Would Not Serve the Public Interest..............................................21

V.   CONCLUSION ...................................................................................24

-i-

Opposition to Motion for Preliminary
Injunction and Order of Impoundment
CV-12-8315-MWF (VBKx)

ER612

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 138 of 266

# TABLE OF AUTHORITIES

**Page**

CASES

*Aalmuhammed v. Lee,*
    202 F.3d 1227 (9th Cir. 2000) ................................................13, 15, 20

*Abend v. MCA,*
    863 F.2d 1465 (9th Cir. 1988), *aff'd on other grounds sub. nom. Stewart*
    *v. Abend,* 495 U.S. 207 (1990) ......................................................... 10

*Alexander v. United States,*
    509 U.S. 544 (1993).............................................................................21

*Anderson v. United States,*
    612 F.2d 1112 (9th Cir. 1980) ........................................................... 6

*Antelope Valley Press v. Poizner,*
    162 Cal. App. 4th 839 (2008)......................................................18, 19

*Balboa Island Village Inn, Inc. v. Lemen,*
    40 Cal. 4th 1141 (2007)....................................................................23

*Booth v. Colgate-Palmolive Co.,*
    362 F. Supp. 343 (S.D.N.Y. 1973) ................................................ 15

*Campbell Soup Co. v. ConAgra, Inc.,*
    977 F.2d 86 (3d Cir. 1992) ............................................................7, 9

*Caribbean Marine Svcs. Co., Inc. v. Baldrige,*
    844 F.2d 668 (9th Cir. 1988) ............................................................ 7

*Citibank, N.A. v. Citytrust,*
    756 F.2d 273 (2d Cir. 1985) ...........................................................12

*City of Los Angeles v. County of Kern,*
    462 F. Supp. 2d 1105 (C.D. Cal. 2006) ......................................... 6

*City of Los Angeles v. Lyons,*
    461 U.S. 95 (1983)............................................................................11

*Cmty. for Creative Non-Violence v. Reid,*
    490 U.S. 730 (1989).....................................................................13, 18

-ii-

Opposition to Motion for Preliminary
Injunction and Order of Impoundment
CV-12-8315-MWF (VBKx)

ER613

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 139 of 266

**TABLE OF AUTHORITIES**
(continued)

Page

*Dahl v. HEM Pharmaceuticals Corp.,*
    7 F.3d 1399 (9th Cir. 1993) ...................................................... 6

*DeNovellis v. Shalala,*
    135 F.3d 58 (1st Cir. 1998) ..................................................... 10

*Ellison v. Robertson,*
    357 F.3d 1072 (9th Cir. 2004) ................................................ 13

*Evans v. Evans,*
    162 Cal. App. 4th 1157 (2008) ............................................... 21

*Fleet v. CBS, Inc.,*
    50 Cal. App. 4th 1911 (1996) ................................................. 15

*Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.,*
    654 F.3d 989 (9th Cir. 2011) ............................................... 6, 7

*Goldie's Bookstore, Inc. v. Sup. Ct.,*
    739 F.2d 466 (9th Cir. 1984) ................................................. 12

*J.C. ex rel. R.C. v. Beverly Hills Unified Sch. Dist.,*
    711 F. Supp. 2d 1094 (C.D. Cal. 2010) .................................... 3

*Jules Jordan Video v. 144942 Canada,*
    617 F.3d 1146 (9th Cir. 2010) ................................................ 16

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League,*
    634 F.2d 1197 (9th Cir. 1980) ............................................... 20

*Laws v. Sony Music Entertainment, Inc.,*
    448 F.3d 1134 (2006) .......................................................... 15

*Lin-Brook Builders Hardware v. Gertler,*
    352 F.2d 298 (9th Cir. 1965) ................................................ 19

*Munaf v. Geren,*
    553 U.S. 674 (2008) .............................................................. 9

*Nebraska Press Ass'n v. Stuart,*
    427 U.S. 539 (1976) ............................................................. 21

-iii-

Opposition to Motion for Preliminary
Injunction and Order of Impoundment
CV-12-8315-MWF (VBKx)

ER614

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 140 of 266

**TABLE OF AUTHORITIES**
(continued)

Page

*New Era Pubs. Int'l, APS v. Henry Holt & Co.,*
  695 F. Supp. 1493 (S.D.N.Y. 1988), *aff'd*, 873 F.2d 576 (2d Cir. 1989).......9, 10

*New York Times Co. v. Sullivan,*
  403 U.S. 713 (1971) (per curiam)..................................................................21

*Oakland Tribune, Inc. v. Chronicle Pub. Co.,*
  762 F.2d 1374 (9th Cir. 1985) ........................................................................12

*Oddo v. Ries,*
  743 F.2d 630 (9th Cir. 1984) ..........................................................................19

*Perfect 10, Inc. v. Google Inc.,*
  653 F.3d 976 (9th Cir. 2011), *cert. denied*, 132 S.Ct. 1713 (2012) ...............8, 11

*Religious Tech. Ctr. v. F.A.C.T.Net,*
  901 F. Supp. 1519 (D. Colo. 1995) .................................................................23

*Religious Tech. Ctr. v. Netcom On-Line Commc'ns Svcs., Inc.,*
  907 F. Supp 1361 (N.D. Cal. 1995)................................................................23

*Richlin v. Metro-Goldyn-Mayer Pictures, Inc.,*
  531 F.3d 962 (9th Cir. 2008), *cert. denied*, 555 U.S. 1137 (2009) ...................19

*Richmond v. Weiner,*
  353 F.2d 41 (9th Cir. 1965) ......................................................................16, 19

*Rivera-Vega v. ConAgra, Inc.,*
  70 F.3d 153 (1st Cir. 1995).............................................................................7

*Salinger v. Colting,*
  607 F.3d 68 (2d Cir. 2010) ....................................................................8, 9, 23

*Sampson v. Murray,*
  415 U.S. 61 (1974)..........................................................................................10

*Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.,*
  997 F.2d 484 (8th Cir. 1993) ...........................................................................6

*Schenk v. United States,*
  249 U.S. 47 (1919)..........................................................................................23

Opposition to Motion for Preliminary
Injunction and Order of Impoundment
CV-12-8315-MWF (VBKx)

ER615

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 141 of 266

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Selby v. New Line Cinema Corp.,*
    96 F. Supp. 2d 1053 (C.D. Cal. 2000) .................................................. 15

*Shegog v. Bd. of Ed. of City of Chicago,*
    194 F.3d 836 (7th Cir. 1999) ................................................................ 10

*Stormans, Inc. v. Selecky,*
    586 F.3d 1109 (9th Cir. 2009) .............................................................. 20

*Technology & Intellectual Prop. Strategies Group PC v. Fthenakis,*
    2012 WL 159585 (N.D. Cal. Jan. 17, 2012) .......................................... 7

*Tough Traveler, Ltd. v. Outbound Prods.,*
    60 F.3d 964 (2d Cir. 1995) .................................................................. 12

*Trenton v. Infinity Broadcasting Corp.,*
    865 F. Supp. 1416 (C.D. Cal. 1994) .................................................... 19

*Twentieth Century Fox Film Corp. v. Entm't Distrib.,*
    429 F.3d 869 (9th Cir.2005) ................................................................ 19

*U.S. ex rel. v. Board of Trustees of Univ. of Ala.,*
    104 F.3d 1453 (4th Cir. 1997) ............................................................. 16

*Weinberger v. Romero-Barcelo,*
    456 U.S. 305 (1982) ............................................................................ 23

*Whitney v. California,*
    274 U.S. 357 (1927) ............................................................................ 21

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ...................................................................... 6, 7, 20

STATUTES

17 U.S.C. § 101 .................................................................................. 17, 19

17 U.S.C. § 102 ........................................................................................ 13

17 U.S.C. § 106 ........................................................................ 10, 14, 16

17 U.S.C. § 201(a) ........................................................... 13, 16, 17, 19

-v-

Opposition to Motion for Preliminary
Injunction and Order of Impoundment
CV-12-8315-MWF (VBKx)

ER616

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 142 of 266

1
2

## TABLE OF AUTHORITIES
### (continued)

Page

3   17 U.S.C. § 201(b) ................................................................................17

4   17 U.S.C. §512(c) ................................................................................14

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

-vi-

Opposition to Motion for Preliminary
Injunction and Order of Impoundment
CV-12-8315-MWF (VBKx)

ER617

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 143 of 266

1    Defendants Google Inc. ("Google") and YouTube, LLC ("YouTube")

2    (collectively the "YouTube Defendants") oppose plaintiff Cindy Lee Garcia's

3    Motion for a Preliminary Injunction and Order of Impoundment.

## I.    INTRODUCTION

5    Plaintiff Cindy Lee Garcia ("Plaintiff"), an actress who appears for about five

6    seconds in a controversial "trailer" for a film called "Innocence of Muslims" (the

7    "Film"), asks this Court to order the YouTube Defendants to remove all copies of

8    the Film from Youtube.com, a video sharing site.  Plaintiff alleges direct and

9    secondary copyright infringement, but these baseless copyright claims are really

10   nothing more than a pretext to seek removal from YouTube of material that she

11   considers offensive.

12   Under copyright law, Plaintiff's allegations establish that defendant Mark

13   Basseley Youssef ("Youssef") has a protectable copyright interest in the Film he

14   both wrote and produced, giving Youssef the right to upload and display the Film

15   on Youtube.com.  Plaintiff's complaint also establishes that she lacks any copyright

16   interest in the Film.  Plaintiff admits that she did not author the Film and that her

17   contribution to the Film is nothing more than a "work for hire."  She concedes that

18   she functioned as an employee, performing a script which was captured on film and

19   dubbed over by others, all under the complete control of Youssef.  Nowhere does

20   Plaintiff establish that she was, or even understood herself to be, an independent

21   contractor with a separate and exclusive copyright in her brief appearance in the

22   Film.

23   Plaintiff's real grievance here—Youssef's distortion of her brief performance

24   in the Film so as to make her character appear to mock Islam and Mohammed—

25   does not involve copyright law.  Rather, the "injury" for which she seeks redress

26   involves the law of contracts, fraud, and/or right-of-publicity, all against Youssef or

27   others. But her manufactured copyright claims against the YouTube Defendants,

28   who merely provide a platform for the sharing of videos on the Internet, clearly fail

-1-                Opposition to Motion for Preliminary
Injunction and Order of Impoundment
CV-12-8315-MWF (VBKx)

ER618

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 144 of 266

1   on these pleadings.  Lacking any viable copyright claim against the YouTube

2   Defendants, plaintiff is not entitled to the takedown order she seeks from this Court.

3        Broader social policy also supports denial of plaintiff's application.  She

4   seeks to use copyright law as a means of stifling speech about a matter of public

5   concern simply because she objects to that speech.  Irrespective of the Film's

6   artistic or social merits, Plaintiff's own allegations demonstrate that the Film is now

7   part of important public debate, even becoming an issue in this year's presidential

8   campaign.  Granting injunctive relief prior to first adjudicating whether plaintiff

9   does actually hold a legitimate copyright interest in the Film, and if she does,

10   whether she is entitled to compel the Film's editing and removal from YouTube,

11   would be an unconstitutional prior restraint.

12       It is well established that United States law protects and encourages speech,

13   including discourse about matters that are the subject of strong disagreement.  In

14   this country, our laws permit even the vilest criticisms of governments, political

15   leaders, and religious figures as legitimate exercises in free speech.  The First

16   Amendment, the Digital Millennium Copyright Act, the Communications Decency

17   Act, and other laws drastically limit efforts by parties wishing to restrict and punish

18   speech on the Internet and elsewhere.  No matter one's views about the merits of

19   the Film, it is beyond dispute that the Film's existence and impact are a matter of

20   widespread public concern.  Indeed, Plaintiff's involvement with the Film (which

21   she herself has aggressively publicized on television) is newsworthy in itself.

22       Nor is Plaintiff entitled to the injunctive relief she seeks under settled legal

23   standards.  She has inexcusably delayed in moving for injunctive relief, given that

24   the Film has been available for viewing on YouTube (and plaintiff admits she was

25   aware of this) since early summer.  Even after filing this action, she waited another

26   three weeks before seeking a temporary restraining order.  And any limited private

27   interest Plaintiff might possess, to the extent any exists at all, in enjoining the

28   Film's availability is heavily outweighed by the public's interest in having the Film

Opposition to Motion for Preliminary
Injunction and Order of Impoundment
CV-12-8315-MWF (VBKx)

ER619

1   remain accessible, given the great debate that has developed over the Film's

2   contents, its fallout, and statements made about it by the U.S. Administration.[1] For

3   all of these reasons, Plaintiff's motion should be denied.

## II.   BACKGROUND

5          This motion is Plaintiff's third attempt to obtain an order removing the Film,

6   a 14-minute movie trailer, from YouTube.[2]  Plaintiff alleges that she was duped

7   into appearing as an actress in the Film. (First Amended Complaint ("FAC") ¶ 4

8   [Dkt. No. 5].) The English version of the Film[3] was first posted onto YouTube on

9   July 2, 2012 by Youssef, who also goes by the names Sam Bacile and Nakoula

10  Basseley Nakoula. (*Id.* ¶¶ 1, 29.) The Film was posted again on YouTube, this

11  time dubbed in Arabic, on September 11, 2012. (*Id.* ¶¶ 1, 30.)  The Film's criticism

12  of Mohammed has sparked public debate, and in some countries, civil unrest.[4]

13         Plaintiff contends the Film harmed her personally and professionally. (*Id.* ¶¶

14  4, 8-9, 29, 38-39.)  On September 19, 2012, she filed a complaint in Los Angeles

15  Superior Court against Youssef (named as Nakoula Basseley Nakoula), unidentified

16  producers of the Film (named as "Does"), Google, and YouTube. (Request for

17  Judicial Notice ("RJN"), Exh. A.)  Plaintiff sought declaratory relief, injunctive

18  relief, and damages against all of the defendants under several common law

19  _____

20  [1] The Film's actual impact is in genuine dispute to this day.  On October 9, 2012, on the eve of
21  congressional hearings, the U.S. State Department contradicted earlier assertions by the U.S. Ambassador
    to the United Nations that the attack on the U.S. consulate in Libya was part of rioting over the Film, and
22  acknowledged that the attack – which resulted in the death of Ambassador J. Christopher Stevens – was a
    planned terrorist attack unconnected with the Film. *See US officials: We Didn't Link Libya Attack to*
23  *Video,* available at http://www.google.com/hostednews/ap/article/ALeqM5grvFY_sIOXSwZCx
    GSAa6gZS-0_TA?docId=0eb49c9e195f4df0b1080e8b9d065fa0; *State Department Admits It Knew Libya*
24  *Attack was Terrorism,* available at http://www.csmonitor.com/World/Latest-News-Wires/2012/1009/State-
    Department-admits-it-knew-Libya-attack-was-terrorism.
25      [2] YouTube "is a publicly available website where persons can post video clips for viewing by the
    general public." *J.C. ex rel. R.C. v. Beverly Hills Unified Sch. Dist.,* 711 F. Supp. 2d 1094, 1098 (C.D.
26  Cal. 2010).
        [3] The original posting of the Film is at http://www.youtube.com/watch?v=qmodVun16Q4.
27  Plaintiff appears at 9:04-9:05 and 9:08-9:11.
        [4] In several countries where the Film appears to violate local laws, YouTube has made the Film
28  inaccessible. However, the YouTube Defendants have determined that the Film neither violates United
    States laws or YouTube's community standards.

Opposition to Motion for Preliminary
Injunction and Order of Impoundment
CV-12-8315-MWF (VBKx)

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 145 of 266

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 146 of 266

1    theories, including invasion of privacy, fraud, and slander, and under California's

2    right of publicity and unfair business practices statutes. (*Id.*)  The bulk of the state

3    court complaint was devoted to allegations against Youssef and the other

4    defendants involved in creating and publishing the Film.  (*Id.*)  Plaintiff made no

5    claims under the Copyright Act, and did not assert that she held a copyright in the

6    Film or any portion of it.

7         On September 20, 2012, Judge Luis A. Lavin denied plaintiff's *ex parte*

8    application for temporary restraining order requiring the removal of the Film,

9    holding that Plaintiff failed to show any likelihood of prevailing on her claims.

10   (RJN, Exh. B.)  Judge Lavin also denied Plaintiff's request for an order to show

11   cause why a preliminary injunction should not be issued.  (*Id.*)

12        Five days later, Plaintiff voluntarily dismissed her state court action (RJN,

13   Exh. C); and on September 26, 2012, she initiated this action against the YouTube

14   Defendants, Youssef (named as Nakoula), and Does 1 through 10, claiming (1)

15   direct copyright infringement, (2) secondary copyright infringement, (3) fraud, (4),

16   unfair business practices, (5) libel, and (6) intentional infliction of emotional

17   distress. [Dkt. No. 1.]  Only copyright claims are asserted against the YouTube

18   Defendants.

19        On October 4, 2012, Plaintiff amended her complaint to add Youssef as a

20   named Defendant following the public disclosure of his real name during criminal

21   proceedings after he was arrested for violating the terms of his probation.[5]  [Dkt.

22   No. 5.]  On October 17, 2012, Plaintiff filed an *ex parte* application for temporary

23   restraining order, which was denied on October 18, 2012, and the Court set a

24   briefing schedule and a hearing date for Plaintiff's Motion for Preliminary

25   Injunction.  [Dkt. No. 15.]

26

27   _____

28        [5] *See* http://news.yahoo.com/calif-man-behind-anti-muslim-film-ordered-jailed-012117266.html

-4-                    Opposition to Motion for Preliminary
Injunction and Order of Impoundment
CV-12-8315-MWF (VBKx)

ER621

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 147 of 266

1    Plaintiff alleges that she sought and received an acting role in the Film in

2    July 2011. (FAC ¶ 27.) Plaintiff maintains that the Film was "represented to be an

3    'historical Arabian Desert adventure film'" (*id.*), but the Film later was "changed

4    horrifically to make it appear that Ms. Garcia voluntarily performed in a hateful

5    anti-Islamic production." (*Id.* ¶ 29) Plaintiff contends that "the innocuous lines that

6    plaintiff delivered on set were overdubbed so as to give the appearance that she was

7    accusing the Islamic religious figure Mohammed of being a child molester and a

8    sexual deviant." (*Id.* ¶ 8.) She further alleges that "[t]he words that were put into

9    plaintiff's mouth were so offensive, not only to plaintiff but to millions worldwide,

10   that it sparked [] riots and violence around the globe." (*Id.*)

11   The FAC makes a number of admissions that are relevant to Plaintiff's claim

12   of copyright ownership (or lack thereof). Plaintiff states that she is "an actress who

13   appears in the Film." (*Id.* ¶ 4.) Plaintiff "was given only specific pages of a script

14   titled *Desert Warrior*." (*Id.* ¶ 28.) She alleges no involvement in the writing,

15   directing, filming, editing, or producing of the Film. Her role was merely to read

16   lines from the script, and Plaintiff concedes that the dubbed words she is depicted

17   as uttering in the Film were never actually spoken by her. (*Id.* ¶ 4.) In other words,

18   those words were not part of her alleged performance.

19   Plaintiff admits that she received the script from Youssef, who "held himself

20   out as the writer and producer of the Film," and "managed all aspects of the

21   production." (*Id.* ¶ 5.) Plaintiff alleges that "Defendant [Youssef] used her as a

22   puppet." (*Id.* ¶ 8.) She also alleges that the producers "intentionally concealed the

23   purpose and content of the film." (*Id.* ¶ 27; *see also id.* ¶ 29 ("the content and

24   overall purpose of the Film was concealed from her").)

25   The FAC states that when the Film was released publicly on YouTube,

26   Plaintiff's depicted performance was "grotesquely different than the performance

27   that plaintiff actually had delivered." (*Id.* ¶ 8.) She describes her performance in

28   the Film as "distorted and disguised." (*Id.* ¶ 10.) Plaintiff asserts that the producers

-5-

Opposition to Motion for Preliminary
Injunction and Order of Impoundment
CV-12-8315-MWF (VBKx)

1   "manipulated plaintiff's image to create the false appearance of anti-Muslim

2   bigotry by plaintiff." (*Id.* ¶ 74.)

3       Plaintiff believes that she signed a contract to work on the Film, but she has

4   not come forward with it, and she asserts the missing document merely "ensured

5   that she would receive IMDB credit." (*Id.* ¶ 6.) Plaintiff also alleges that she

6   actually is not sure whether she signed a contract, and such a form is "unknown to

7   her at this time, if it exists." (*Id* ¶ 7.) These inconsistencies do not dissuade her

8   from firmly alleging what is *not* in the contract that she might have signed, but

9   which also might not exist: "She does recall that the contract did *not* call for her to

10  transfer any rights, including any copyrights, and that it was not a 'work for hire'

11  agreement." (*Id.* ¶ 6 (original emphasis).)

### III.   LEGAL STANDARDS

13      "A preliminary injunction is an extraordinary remedy never awarded as of

14  right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). There

15  must be "a clear showing that the plaintiff is entitled to such relief." *Id.* at 22. A

16  plaintiff seeking a preliminary injunction must show: (1) a likelihood of success on

17  the merits; (2) a likelihood of irreparable harm in the absence of preliminary

18  injunctive relief; (3) that the balance of equities tips in her favor; and (4) that an

19  injunction is in the public interest. *Id.* at 20; *Flexible Lifeline Sys., Inc. v. Precision*

20  *Lift, Inc.*, 654 F.3d 989, 994 (9th Cir. 2011).

21      A request for a mandatory preliminary injunction that would alter the status

22  quo "is subject to heightened scrutiny and should not be issued unless the facts and

23  law clearly favor the moving party." *Dahl v. HEM Pharmaceuticals Corp.*, 7 F.3d

24  1399, 1403 (9th Cir. 1993); *Anderson v. United States,* 612 F.2d 1112, 1114 (9th

25  Cir. 1980) (noting that a mandatory preliminary injunction is particularly

26  disfavored). Also, "the burden on the moving party is particularly heavy where, as

27  here, granting the preliminary injunction would give the movant substantially the

28  same relief it would obtain after a trial on the merits." *City of Los Angeles v.*

Opposition to Motion for Preliminary
Injunction and Order of Impoundment
CV-12-8315-MWF (VBKx)

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 148 of 266

ER623

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 149 of 266

1   *County of Kern*, 462 F. Supp. 2d 1105, 1111 (C.D. Cal. 2006); *see also Sanborn*

2   *Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 486 (8th Cir.

3   1993); *Rivera-Vega v. ConAgra, Inc.*, 70 F.3d 153, 164 (1st Cir. 1995).

### IV.   ARGUMENT

#### A.   Plaintiff Cannot Show a Likelihood of Irreparable Harm.

6          "[E]ven in a copyright infringement case, the plaintiff must demonstrate a

7   likelihood of irreparable harm as a prerequisite for injunctive relief, whether

8   preliminary or permanent." *Flexible*, 654 F.3d at 998.  Irreparable harm is harm

9   that "cannot be redressed by a legal or an equitable remedy following a trial."

10  *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992).  To justify

11  injunctive relief, the alleged harm must be likely.  *Winter*, 555 U.S. at 22.  It must

12  also be imminent.  *See Caribbean Marine Svcs. Co., Inc. v. Baldrige*, 844 F.2d 668,

13  674 (9th Cir. 1988) (requiring "immediate threatened injury").

14         Plaintiffs must make a *factual* showing that irreparable injury will result in

15  the absence of an injunction.  *See Flexible*, 654 F.3d at 998 (plaintiff must make a

16  showing of irreparable injury "on the facts of his case").  Mere assertions of

17  irreparable harm will not suffice.  *See, e.g., Baldrige*, 844 F.2d at 674 ("plaintiff

18  must *demonstrate* immediate threatened injury as a prerequisite to preliminary

19  injunctive relief" (original emphasis)); *Technology & Intellectual Prop. Strategies*

20  *Group PC v. Fthenakis*, 2012 WL 159585, at *4 (N.D. Cal. Jan. 17, 2012) (plaintiff

21  "must demonstrate it will suffer an immediate injury that is not speculative").

#### 1.   Plaintiff cannot establish a causal connection between the allegedly infringing conduct of the YouTube Defendants and the injury she alleges.

24         Removing the Film now—more than three months after it was posted to

25  YouTube and Plaintiff became aware of the same,[6] and more than one month after

26  it became the subject of widespread debate—would not prevent any of the personal,

---

[6] Plaintiff reports that she first viewed the Film after Youssef told her it had been posted on YouTube "sometime after July 2, 2012."  (See Garcia Declaration at ¶ 12 )

Opposition to Motion for Preliminary
Injunction and Order of Impoundment
CV-12-8315-MWF (VBKx)

ER624

1    reputational and emotional harms Plaintiff alleges.  Even if copyright law provides

2    a remedy for these types of injuries—which is doubtful[7]—the injunctive relief she

3    wants would not solve her problem.  Plaintiff simply cannot establish under the law

4    "a sufficient causal connection" between the allegedly infringing conduct she seeks

5    to enjoin and the injuries she seeks to avoid.  *Perfect 10, Inc. v. Google Inc.*, 653

6    F.3d 976, 982 (9th Cir. 2011), *cert. denied*, 132 S.Ct. 1713 (2012).

7           The Ninth Circuit's recent decision in *Perfect 10* is instructive.  Perfect 10

8    owned copyrights in "photographic images of nude models" and made those images

9    available for a fee on its website.  *Id.* at 977-78.  Perfect 10 sued Google, claiming

10   that Google's search engine and other services infringed Perfect 10's copyrights

11   (and allegedly threatened to bankrupt Perfect 10) by making them accessible for

12   free.  *Id.* at 978.  The district court denied Perfect 10's motion for a preliminary

13   injunction and the Ninth Circuit affirmed, agreeing that Perfect 10 had not shown

14   that an injunction would prevent the harm of which it complained.  Particularly

15   important to the Ninth Circuit's analysis was the fact that "search engines other

16   than Google contribute to making Perfect 10 images freely available"—meaning an

17   injunction against Google would have been futile.  *Id.* at 982.

18          The same reasoning applies here.  All of Plaintiff's purported harms arise

19   from the Film.  But an order against the YouTube Defendants will not entirely

20   remove the Film from the Internet or other avenues of distribution, and it will not

21   prevent others from seeing, sharing, and talking about the Film.  Since the Film was

22   posted three months ago, it has been viewed and copied by countless individuals.

23   (*See* FAC ¶ 3.)  A takedown order against the YouTube Defendants will not

24   alleviate Plaintiff's safety concerns, restore plaintiff's "career and reputation" (*see*

25   *id.* ¶ 38), or assuage the anger of those outraged by the Film (*see id.* ¶ 34).

26

27   _____

28        [7] *See Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010) ("relevant harm" is that which affects
     "the parties' *legal interests*" and "cannot be remedied after a final adjudication" (emphasis added)).

-8-                              Opposition to Motion for Preliminary
                                  Injunction and Order of Impoundment
                                  CV-12-8315-MWF (VBKx)

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 150 of 266

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 151 of 266

1      Thus, even if we assume that these feared personal harms normally might

2 justify a copyright injunction, Plaintiff's three-month delay in seeking relief and the

3 broad distribution of the Film in the interim makes it impossible to establish the

4 requisite causal connection necessary to support a takedown order.

5        **2.**    **Plaintiff has not identified any irreparable harm.**

6      Because it is an "extraordinary and drastic remedy," *Munaf v. Geren*,

7 553 U.S. 674, 689-90 (2008), preliminary injunctive relief is appropriate only if it is

8 "the *only* way of protecting the plaintiff from harm." *Campbell Soup*, 977 F.2d at

9 91 (emphasis in original). If other remedies can protect a plaintiff's legal interests,

10 then the alleged harms do not warrant preliminary injunctive relief. *Id.*

11      Here, Plaintiff claims—albeit sketchily—that she has suffered and will

12 continue to suffer three principal harms: (1) violation of her copyright (*see, e.g.*,

13 FAC ¶¶ 29, 42); (2) harm to her career prospects (*see, e.g., id.* ¶¶ 38, 76, 86); and

14 (3) emotional distress arising from alleged threats, insults, and other indignities

15 (*see, e.g., id.* ¶¶ 32-35, 81, 93; see also Ex Parte App. at 21-22).[8] None of those

16 purported harms justifies preliminary injunctive relief.

17      *First*, Plaintiff has, at most, "a property interest in the copyrighted material."

18 *Salinger*, 607 F.3d at 81; *see also New Era Pubs. Int'l, APS v. Henry Holt & Co.*,

19

20     [8] Plaintiff's questionable claims and public appearances also continue to stir the pot of controversy. Plaintiff has appeared in a number of television interviews (*see, e.g.* Russell Goldman,

21 *Actress Says Maker of Anti-Muslim Film Lied to Cast*, ABC News, Sept. 13, 2012, *available at* http://abcnews.go.com/Blotter/actress-maker-anti-muslim-film-lied-cast/story?id=17228157), and her

22 complaint was the subject of news reports immediately after its filing (*see e.g.* Anthony McCartney, *'Innocence of Muslims' Actress Cindy Lee Garcia Sues YouTube, Producer*, The Huffington Post, Sept.

23 19, 2012, *available at* http://www.huffingtonpost.com/2012/09/19/innocence-of-muslims-actress-cindy-lee-garcia-youtube_n_1898577.html; Miguel Marquez and Stan Wilson, *Actress In Anti-Islamic Film Files*

24 *Lawsuit Against Filmmaker and YouTube*, CNN, Sept. 19, 2012, *available at* http://www.cnn.com/2012/09/19/us/california-anti-islam-film-lawsuit). Although plaintiff asserted in the

25 state court proceedings that she participated in media interviews to correct the record regarding her involvement in the Film, she continued to make public appearances (often with her lawyer) – long after

26 plaintiff's disavowal of the Film was well-established. This included recent press conferences on the sidewalk outside Los Angeles Superior Court (*see, e.g., Effort to Take Down Anti-Muslim Film Rejected*,

27 available at http://abclocal.go.com/kabc/video?id=8818769), and appearances on the television show, "The View" (http://www.youtube.com/watch?v=tKqhLk0agNA) and the "Today Show"

28 (http://today.msnbc.msn.com/id/49146658/ns/today-today_news/t/actress-anti-islam-film-i-was-duped/#.UHS65fkn2Ew).

Opposition to Motion for Preliminary
Injunction and Order of Impoundment
CV-12-8315-MWF (VBKx)

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 152 of 266

1  695 F. Supp. 1493, 1526 (S.D.N.Y. 1988), *aff'd*, 873 F.2d 576 (2d Cir. 1989)

2  ("[T]he justification of the copyright law is the protection of the *commercial*

3  interest of the artist/author.") (emphasis in original).  As discussed below, Plaintiff

4  is not the author of the Film and does not hold her own copyright that would give

5  her the exclusive right to display and distribute the work. *See* 17 U.S.C. § 106.

6      Damages are the typical remedy for commercial injuries.[9] *See New Era*, 695

7  F. Supp. at 1526 (denying request to enjoin publication of allegedly infringing

8  book; explaining that if "the copyright owner can be reasonably compensated in

9  damages for injury to this commercial interest, and the injury to the public interest

10  in free speech resulting from injunction would be great, that is a powerful reason

11  for limiting the remedy to damages and withholding the injunctive relief"); *Abend*

12  *v. MCA*, 863 F.2d 1465, 1479 (9th Cir. 1988) (plaintiff seeking to enjoin movie did

13  not show "irreparable injury which would justify imposing the severe remedy of an

14  injunction;" plaintiff could be "compensated adequately for the infringement by

15  monetary compensation"), *aff'd on other grounds sub. nom. Stewart v. Abend*, 495

16  U.S. 207 (1990); Lemley & Volokh, *Freedom of Speech and Injunctions in*

17  *Intellectual Property Cases*, 48 Duke L.J. 147, 192 (1998) ("Copyright law is

18  aimed primarily at ensuring that authors are economically rewarded so that they and

19  others will continue to create new works of authorship—damages can generally

20  reward authors relatively adequately and are often not terribly hard to estimate.").

21      ***Second***, even if the Film has affected Plaintiff's career prospects, that harm is

22  not irreparable as a matter of law. *See, e.g., Sampson v. Murray*, 415 U.S. 61, 90

23  (1974) (lost income and damaged reputation do not constitute irreparable injury);

24  *DeNovellis v. Shalala*, 135 F.3d 58, 64 (1st Cir. 1998) (temporary loss of income

25  does not usually constitute irreparable injury); *Shegog v. Bd. of Ed. of City of*

26

27      [9] Plaintiff has not shown that damages would be difficult to calculate or award in this case.
Indeed, she expressly seeks damages under the Copyright Act, including "advertising revenues resulting
28  from the placement of embedded advertisements in the Film" (FAC ¶ 48), and statutory damages (*id.* ¶
49).

Opposition to Motion for Preliminary
Injunction and Order of Impoundment
CV-12-8315-MWF (VBKx)

ER627

1   *Chicago*, 194 F.3d 836, 839 (7th Cir. 1999) (temporary deprivation of employment,

2   even combined with financial distress and difficulty finding new job, is not an

3   irreparable injury).[10]

4      ***Third***, the insults and threatening statements Plaintiff identifies, while unfair

5   and upsetting, do not justify injunctive relief.  According to Plaintiff, several

6   individuals have made statements that could be construed as wishing harm against

7   her and/or her family—mostly on Plaintiff's Facebook profile.  (*See* Ex Parte App.

8   at 10; Decl. of Cindy Lee Garcia, Exh. B.)  In addition, according to Plaintiff, an

9   Egyptian cleric has encouraged his followers to harm Plaintiff and all those who

10  worked on the Film.  (*See* Ex Parte App. at 8.)

11     This is not a showing of likely, imminent, and severe harm.  For one thing,

12  past injuries alone do not justify prospective injunctive relief.  *See, e.g.*, *City of Los*

13  *Angeles v. Lyons*, 461 U.S. 95, 111 (1983).  Plaintiff asserts that the "threats" she

14  identifies are "credible."  (Ex Parte App. at 10.)  But merely saying that does not

15  make it so.  Plaintiff—who freely disclosed her hometown of Bakersfield when she

16  was first interviewed on television—points to no facts showing that she is in actual

17  danger because the Film is posted on YouTube.  Plaintiff continues to travel around

18  the country appearing on national television shows.[11]  It appears that Plaintiff has

19  successfully explained her version of the story and engaged in productive

20  conversations with many of the people who were at first angry with her.  The

21  threats appear to be the result of her alleged participation in the Film, and not the

22  Film's availability on YouTube, and removal of the Film would do nothing to

23  change the fact that she indeed participated in the Film.  (*See* Garcia Decl., Exh. B

24  at 19-21, 24-25, 30-36 (ECF pagination).)  Plaintiff's fear of harm is wholly

25  ———————————

26   [10] Although plaintiff identifies harm to her career as one of the irreparable harms she will suffer

27  absent an injunction, she has offered no evidence that the Film has reduced or will reduce her career prospects.  *See Perfect 10*, 653 F.3d at 981 (plaintiff failed to establish irreparable harm in part because it

28  failed to identify a single customer it lost as a result of defendant's conduct).
 [11] A sampling of plaintiff's television appearances are identified in footnote 1.

Opposition to Motion for Preliminary
Injunction and Order of Impoundment
CV-12-8315-MWF (VBKx)

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 153 of 266

ER628

1    speculative, and "[s]peculative injury does not constitute irreparable injury."

2    *Goldie's Bookstore, Inc. v. Sup. Ct.*, 739 F.2d 466, 472 (9th Cir. 1984).

3        Lastly, and perhaps most importantly, Plaintiff offers no evidence that an

4    injunction would prevent *future* insults and threats.  A takedown order against the

5    YouTube Defendants would not end all distribution of the Film or erase Plaintiff's

6    television interviews discussing her participation in the Film, which are widely

7    available.  It also would not dissolve the alleged fatwa, prevent people from

8    contacting her on Facebook, or change people's views about the Film.

9                **3.    Plaintiff's inexcusable delay undermines her claims of**
                  **irreparable harm.**
10

11       Courts often reject claims of irreparable harm where "the plaintiff has

12    delayed either in bringing suit or in moving for preliminary injunctive relief."

13    *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995); *see also*

14    *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) (10-week delay

15    undercut claim of irreparable harm).  A plaintiff's "long delay before seeking a

16    preliminary injunction implies a lack of urgency and irreparable harm." *Oakland*

17    *Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985).

18       Plaintiff unreasonably delayed in seeking injunctive relief against the

19    YouTube Defendants.  According to plaintiff, the Film was available on YouTube

20    no later than July 2, 2012—almost three months before plaintiff first sought

21    preliminary relief in Superior Court.  (*See* FAC ¶ 1.)  Plaintiff admits she became

22    aware of the Film's posting by Youssef in July, and viewed it at that point on

23    YouTube, but she did nothing whatsoever to pursue her claims of copyright

24    infringement until the end of September.  (*See* Ex Parte App. at 6.)  Even after

25    filing this action, Plaintiff waited another three weeks before filing this motion.

26       Plaintiff offers no explanation for her excessive delay, nor can she, because

27    none of her claims required investigation.  On this basis alone, this Court should

28

Opposition to Motion for Preliminary
Injunction and Order of Impoundment
CV-12-8315-MWF (VBKx)

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 154 of 266

ER629

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 155 of 266

1   conclude that Plaintiff's allegations of irreparable harm under the Copyright Act are

2   defeated by her unreasonable delay in seeking relief.

**B.   Plaintiff Cannot Show a Likelihood of Success On the Merits of Her Copyright Infringement Claims Against the YouTube Defendants.**

5       Copyright protection is afforded to "original works of authorship fixed in any

6   tangible medium of expression." 17 U.S.C. § 102. To prevail on a claim for

7   copyright infringement, a plaintiff must prove that: (1) the plaintiff owns the

8   copyrighted material; and (2) that the defendant violated the plaintiff's *exclusive*

9   *rights* under the Copyright Act. *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir.

10   2004). Plaintiff cannot establish either element.

**1.   Plaintiff does not own a copyright in the Film.**

12       A copyright "vests initially in the author or authors of the work." 17 U.S.C.

13   § 201(a). Although the Copyright Act does not define the term "author," the

14   Supreme Court has stated that the term generally refers to "the party who actually

15   creates the work, that is, the person who translates an idea into a fixed, tangible

16   expression entitled to copyright protection." *Cmty. for Creative Non-Violence v.*

17   *Reid*, 490 U.S. 730, 737 (1989). The Ninth Circuit has stated that an "author" of a

18   copyrighted work is best defined as "the person to whom the work owes its origin

19   and who superintended the whole work, the 'mastermind.'" *Aalmuhammed v. Lee*,

20   202 F.3d 1227, 1233 (9th Cir. 2000) (quoting *Burrow-Giles Lithographic Co. v.*

21   *Sarony*, 111 U.S. 53, 58 (1884)). For a movie, this definition "would generally

22   limit authorship to someone at the top of the screen credits, sometimes the

23   producer, sometimes the director, possibly the star, or the screenwriter—*someone*

24   *who has artistic control*." *Id.* (emphasis added).

25       Plaintiff's brief appearance in the Film is not enough to establish authorship.

26   Plaintiff appeared in the Film for no more than five seconds, and most of the lines

27   attributed to Plaintiff's character were "words that Plaintiff **never spoke**." (FAC ¶ 4

28   (original emphasis).) In fact, she thought that she was appearing in a "historical

Opposition to Motion for Preliminary
Injunction and Order of Impoundment
CV-12-8315-MWF (VBKx)

ER630

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 156 of 266

1   Arabian Desert adventure film." (FAC ¶¶ 27, 29.)  Plaintiff merely responded to a

2   casting call and read lines that were given to her by Youssef, which were later

3   overdubbed. (FAC ¶¶ 27-28.)

4        Plaintiff did not produce the Film, direct the Film, or write the script.  (FAC

5   ¶ 5.)  She was not even a leading character.  Plaintiff's contribution is a far cry from

6   the "artistic control" necessary to support a finding of authorship.[12]

7              **2.    Plaintiff cannot hold a copyright in only those portions**
            **of the Film containing her dramatic performance.**
8

9        Because Plaintiff cannot both publicly disavow the Film and claim to be its

10  author, she attempts to isolate her acting performance from the rest of the Film by

11  claiming to have a copyright "in the dramatic performance she delivered and which

12  was fixed in tangible form when it was filmed during the production of 'Desert

13  Warrior.'" (FAC ¶ 10.)  The entirety of the Film is one work for copyright

14  purposes, however.[13]  The individual images that collectively comprise the Film fall

15  within the scope of the copyright held by the Film's author.  *See* 17 U.S.C. § 106

16  (recognizing a copyright owner's exclusive right to publicly display "the individual

17  images of a motion picture").

18       One can imagine the impenetrable thicket of conflicting rights that would

19  arise if each creative contributor (*i.e.*, actors, director, producer, cameraman,

20       [12] Plaintiff invests a great deal of ink discussing the Digital Millennium Copyright Act ("DMCA")
21  and her takedown notices, and even burdens the record with a declaration from other litigation describing
    YouTube's policy of compliance with the DMCA, which is entirely irrelevant to this case. (*See*
22  Defendants' Objections to Evidence at p.2.)  The DMCA "safe harbor" is an affirmative defense, which
    shields a service provider from monetary damages if it complies with the Act's safe harbor provisions. 17
23  U.S.C. §512(c).  The DMCA is irrelevant to plaintiff's request for a preliminary injunction.
         [13] The YouTube Defendants have found no authority supporting plaintiff's proposition that a
24  motion picture can be parsed into multiple works under the Copyright Act based on claims by actors that
    they were not employees and retained copyrights in their performances.  Creative contributors' lack of
25  rights under copyright law allowed movie distributors to "colorize" black-and-white films in the 1980s,
    even over the objection of famous directors and their heirs. *See* Kohs, *Paint Your Wagon—Please!:*
26  *Colorization, Copyright, and the Search for Moral Rights,* 40 Fed. Comm. L.J. 1 (1988), 9-10 ("copyright
    vests in the 'employer' and not the individual creative participants in the film making process"), 18-19
27  ("In the context of film making, copyright in this country will not normally vest in the director, or any
    other creative participant for that matter."); Cook, *Colorization of Black and White Films:  An Example of*
28  *the Lack of Substantive Protection for Art in the United States,* 63 Notre Dame L. Rev. 309 (1988), 325
    (accord).

-14-                                   Opposition to Motion for Preliminary
                                       Injunction and Order of Impoundment
                                       CV-12-8315-MWF (VBKx)

ER631

1   cinematographer, costume designer, make-up artist, etc.) could hold an independent

2   and exclusive copyright interest in his or her contribution to a movie.  The

3   copyright held by the film's author would be rendered meaningless, as he or she

4   could not possibly exercise the exclusive rights afforded under the Copyright Act

5   without trampling on the rights of other contributors.  *See Booth v. Colgate-*

6   *Palmolive Co.*, 362 F. Supp. 343, 347 (S.D.N.Y. 1973) ("[T]he recognition of a

7   performer's right in a copyrighted work would impose undue restraints on the

8   potential market of the copyright proprietor since a prospective licensee would have

9   to gain permission from each of possibly many performers who might have rights

10  in the underlying work before he could safely use it.").  Accordingly, contribution

11  to a film alone does not establish a copyright unless the requirements for

12  "authorship" are met.  *See Aalmuhammed*, 202 F.3d at 1233-35 (finding that

13  significant creative contributions to a film failed to rise to the level of

14  "authorship").

15      Plaintiff relies on *Fleet v. CBS, Inc.*, 50 Cal. App. 4th 1911 (1996), to argue

16  that an actor's performance in a film is independently copyrightable.  But *Fleet* is a

17  preemption case, not an infringement case.  In *Fleet*, the court considered whether

18  actors' claims for misappropriation of name or likeness were preempted by the

19  Copyright Act.  The court concluded that the actors' claims were preempted

20  because the images of the actors' at issue in the case were taken directly from a

21  copyrighted motion picture and therefore fell within the scope of copyright

22  protection.  *Id.* at 1916; *see also Laws v. Sony Music Entertainment, Inc.*, 448 F.3d

23  1134 (2006) (affirming summary judgment against singer, finding that her voice

24  misappropriation claim was preempted by the Copyright Act).  The Court did not

25  analyze, as it must here, whether the actors could state a claim for copyright

26  infringement because the actors did not claim a copyright interest in the film or in

27  their individual performances.  *Fleet*, 50 Cal. App. 4th at 1916.  Merely, finding

28  something within the scope of copyright law is not the same as finding it subject to

Opposition to Motion for Préliminary
Injunction and Order of Impoundment
CV-12-8315-MWF (VBKx)

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 157 of 266

1   copyright protection. *Selby v. New Line Cinema Corp.*, 96 F. Supp. 2d 1053 (C.D.

2   Cal. 2000) (noting that "scope and protection are not synonymous...the shadow

3   actually cast by the [Copyright] Act's preemption is notably broader than the wing

4   of its protection.") (quoting *U.S. ex rel. v. Board of Trustees of Univ. of Ala.*, 104

5   F.3d 1453, 1463 (4th Cir. 1997).

6          Plaintiff also cites *Jules Jordan Video v. 144942 Canada*, 617 F.3d 1146 (9th

7   Cir. 2010), for the proposition that a performer retains the copyright in her

8   performance unless she transfers or assigns the right to another. (Ex Parte App. at

9   15.) But in *Jules Jordan*, the actor also produced, directed, wrote the script, and

10  filmed the movies in which he claimed a copyright interest. *Id.* at 1150. He

11  operated a "one-man shop." *Id.* Here, the Film was produced, directed, and

12  controlled in all other respects by Youseff, not Plaintiff, as Plaintiff herself

13  expressly concedes.

14          **3.   Plaintiff identifies Youssef as the Film's exclusive copyright
                   owner, giving him the right to post the Film on YouTube.**

15          Plaintiff's own allegations establish that Youssef controlled the making of

16  the Film. Plaintiff alleges that Youssef was "the writer and producer of the Film,"

17  "managed all aspects of production," and "was in charge of all aspects of the

18  production." (FAC ¶ 5.) By plaintiff's own admission, Youssef was the Film's

19  "mastermind"—and, necessarily then, the Film's author. As the author of the Film,

20  Youssef is also the copyright owner. 17 U.S.C. § 201(a) ("Copyright in a work

21  protected under this title vests initially in the author or authors of the work.").

22          It is a basic tenant of copyright law that one cannot infringe his own

23  copyright. *See Richmond v. Weiner*, 353 F.2d 41 (9th Cir. 1965). As the copyright

24  owner, Youssef has the *exclusive* right to reproduce the copyrighted work, prepare

25  derivative works, distribute copies of the work to the public, and publicly display

26  the entire work. 17 U.S.C. § 106.

27

28

Opposition to Motion for Preliminary
Injunction and Order of Impoundment
CV-12-8315-MWF (VBKx)

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 158 of 266

ER633

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 159 of 266

1      Plaintiff admits that the Film was posted on the YouTube website by Youssef

2 himself. (FAC ¶¶ 1, 29, 30.) Because Youssef was exercising his lawful rights

3 under the Copyright Act when he displayed the Film, such activity was authorized

4 by the copyright owner, and the YouTube Defendants cannot be liable to Plaintiff

5 for copyright infringement for failure to remove the Film at Plaintiff's demand.

6         **4.**     **Plaintiff's dramatic performance was a "work for hire."**

7      In general, copyright in a work "vests initially in the author . . . of the work."

8 17 U.S.C. § 201(a). But "[i]n the case of a work made for hire, *the employer . . . for*

9 *whom the work was prepared is considered the author* . . . , and, unless the parties

10 have expressly agreed otherwise in a written instrument signed by them, owns all of

11 the rights comprised in the copyright." 17 U.S.C. § 201(b) (emphasis added). The

12 Copyright Act defines a "work made for hire" to include: "(1) a work prepared by

13 an employee within the scope of his or her employment; or (2) a work specially

14 ordered or commissioned for use as . . . part of a motion picture or other audiovisual

15 work . . . if the parties expressly agree in a written instrument signed by them that

16 the work shall be considered a work made for hire." 17 U.S.C. § 101.

17      Plaintiff alleges that she might have signed a contract for Youssef, but she

18 claims to be "unable to locate a copy of any such contract." (FAC ¶ 6.) She does,

19 however, "recall that the contract did not call for her to transfer any rights,

20 including any copyrights, and that it was not a 'work for hire' agreement." (*Id.*;

21 Garcia Decl. ¶ 8.)[14]

22      Even if Plaintiff's contract does not include the typical "work for hire"

23 language, which is highly doubtful,[15] Plaintiff was clearly an "employee" under the

24

25     [14] Plaintiff has also offered declarations from other actors in the Film who claim that they did not sign releases or work-for-hire agreements. (Declarations of Gaylord Flynn ¶ 4 and Dan Sutter ¶ 4.) Such declarations are irrelevant to what was included in *plaintiff's* contract.

26     [15] Most contracts between actors and filmmakers contain "work for hire" language. *See* Nimmer,

27 § 23.06[A] ("All services rendered for the production company will typically be rendered on a 'work for hire' basis, so that the production company is clearly the owner of the results and proceeds of those services, including the copyright."). It is difficult to understand how an individual who claims to be a

28 professional actress would work on a film without the kind of agreement that is part-and-parcel of the

Opposition to Motion for Preliminary
Injunction and Order of Impoundment
CV-12-8315-MWF (VBKx)

ER634

1   law and her performance was squarely within the scope of her employment.

2   Whether an artist is an "employee" for purposes of the "work for hire" doctrine is

3   determined by common law principals of agency. *Community for Creative Non-*

4   *Violence*, 490 U.S. at 751. The Supreme Court has identified a number of factors to

5   consider:

6              [1] the skill required; [2] the source of the
               instrumentalities and tools; [3] the location of the work;
7              [4] the duration of the relationship between the parties;
               [5] whether the hiring party has the right to assign
8              additional projects to the hired party; [6] the extent of the
               hired party's discretion over when and how long to work;
9              [7] the method of payment; [8] the hired party's role in
               hiring and paying assistants; [9] whether the work is part
10             of the regular business of the hiring party; [10] whether
               the hiring party is in business; the provision of employee
11             benefits; and [11] the tax treatment of the hired party.

12   *Id.* at 751.

13          One of the most critical factors is the level of control that the employer has

14   over the artist's work. *Id.* ("we consider the hiring party's right to control the

15   manner and means by which the product is accomplished"); *see also Antelope*

16   *Valley Press v. Poizner*, 162 Cal. App. 4th 839, 852 (2008) ("[T]he right of the

17   person to whom services are rendered to control the manner and means of

18   accomplishing the desired result of those services is a significant factor for

19   determining whether the person performing the work is an employee or an

20   independent contractor.").

21          The FAC establishes that Plaintiff was Youssef's employee. Plaintiff admits

22   that she was hired merely as an actress for a role in the Film. She responded to a

23   casting call and ultimately "was cast in the part" that she played. (FAC ¶¶ 4, 27.)

24   She was given portions of a script to read and paid $500 for her work. (FAC ¶ 28;

25   Garcia Decl. ¶ 6.) Plaintiff further alleges that Youssef was the "writer and

26

27   industry. On the other hand, it is also difficult to see how, if the individual is *not* a professional, and not
     an attorney, that individual would be able to competently describe the legal effect or limitations of a
28   contract. The Court need not accept plaintiff's self-serving recollection as evidence of the contract's
     terms, especially when it runs contrary to common practice in the movie industry.

-18-

Opposition to Motion for Preliminary
Injunction and Order of Impoundment
CV-12-8315-MWF (VBKx)

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 160 of 266

1    producer of the Film" and *"managed all aspects of production."* (FAC ¶ 5

2    (emphasis added).) She was hired by Youssef to "deliver an acting performance"

3    (FAC ¶ 8, 28), and then Youssef or others took that performance and later dubbed

4    over her words (*id.* ¶¶ 8, 29). Plaintiff was an employee, under the law, relating to

5    her work on the Film.

6          Once it is determined that the work was created by an employee within the

7    scope of her employment, there is a presumption that the employer owns a

8    copyright in the work. *Twentieth Century Fox Film Corp. v. Entm't Distrib.*, 429

9    F.3d 869, 880 (9th Cir.2005) (recognizing presumption); *Lin-Brook Builders*

10   *Hardware v. Gertler*, 352 F.2d 298, 300 (9th Cir. 1965) (when one hires another to

11   make a work "of an artistic nature . . . the presumption arises that the mutual intent

12   of the parties is that the title to the copyright shall be the person at whose instance

13   and expense the work is done."). An employee may only rebut the presumption by

14   presenting evidence of an agreement that the employee would hold a copyright.

15   Nimmer, § 5.03D; *Trenton v. Infinity Broadcasting Corp.*, 865 F. Supp. 1416, 1426

16   (C.D. Cal. 1994). Plaintiff has failed to present any evidence of such an agreement.

17          **5.    Plaintiff is not even a joint author.**

18          Although an author of a work is generally entitled to exclusive ownership of

19   his or her creation, there is an exception when multiple authors contribute to a

20   "joint work." In the case of a "joint work," each contributing author shares a non-

21   exclusive right in his or her creation with the other contributing authors. 17 U.S.C.

22   § 201(a). Each joint author has free reign to exploit the work without the consent of

23   the other co-authors. *Richmond v. Weiner*, 353 F.2d 41, 46 (9th Cir. 1965); *Oddo v.*

24   *Ries*, 743 F.2d 630, 632-33 (9th Cir. 1984) ("A co-owner of a copyright cannot be

25   liable to another co-owner for infringement of the copyright. Rather, each co-

26   owner has an independent right to use or license the use of the copyright.").

27          A "joint work" is defined as "a work prepared by two or more authors with

28   the intention that their contributions be merged into inseparable or interdependent

Opposition to Motion for Preliminary
Injunction and Order of Impoundment
CV-12-8315-MWF (VBKx)

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 161 of 266

ER636

1  parts of a unitary whole." 17 U.S.C. § 101; *see also Richlin v. Metro-Goldyn-*

2  *Mayer Pictures, Inc.*, 531 F.3d 962, 968 (9th Cir. 2008), *cert. denied*, 555 U.S.

3  1137 (2009). The Ninth Circuit has held that for a work to qualify as a "joint

4  work," there must be: "(1) a copyrightable work, (2) two or more 'authors,' and (3)

5  the authors must intend their contributions be merged into inseparable or

6  interdependent parts of a unitary whole." *Almuhammed*, 202 F.3d at 1231. A "joint

7  work" also requires "each author to make an independently copyrightable

8  contribution." *Id.* (quoting *Ashton-Tate Corp. v. Ross*, 916 F.2d 516, 521 (9th Cir.

9  1990)).

10       Plaintiff admits she cannot be a joint author in the Film because "Plaintiff

11  never had a meeting of the minds with Defendant [Youssef]" that they would be

12  joint authors in the Film. (Ex Parte App. at 17-18.) Plaintiff also is not a "joint

13  author" because she is not an author at all. *See Almuhammed*, 202 F.3d at 1233-35

14  (finding that person who consulted on a film and even wrote portions of the script

15  was not a "joint author"). According to Plaintiff, it was Youssef who "managed . . .

16  [and] was in charge of all aspects of the production," and therefore authored the

17  Film. (FAC ¶ 5.) *See id. at* 1234 ("an author 'superintend[s]' the work . . . 'by

18  putting the persons in position, and arranging the place where people are to

19  be . . .'").

20       C.    **Plaintiff Cannot Show that the Equities Tip In Her Favor.**

21       To qualify for injunctive relief, a plaintiff "must establish that 'the balance of

22  equities tips in [her] favor.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th

23  Cir. 2009) (quoting *Winter*, 555 U.S. at 20). This Court must therefore "balance the

24  interests of all parties and weigh the damage to each." *L.A. Mem'l Coliseum*

25  *Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980). It must

26  also consider whether plaintiff's requested relief would adversely affect the rights

27  of nonparties or the public at large. *See Winter*, 555 U.S. at 26 ("In this case, the

28  District Court and the Ninth Circuit significantly understated the burden the

Opposition to Motion for Preliminary
Injunction and Order of Impoundment
CV-12-8315-MWF (VBKx)

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 162 of 266

ER637

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 163 of 266

1  preliminary injunction would impose on the Navy's ability to conduct realistic

2  training exercises, and the injunction's consequent adverse impact on the public

3  interest in national defense.").

4     Granting the relief she requests would violate the free speech rights of

5  Youssef and others (including those who have used the Film as a basis for

6  commentary) and burden the public's interest in free expression.  In contrast,

7  Plaintiff's alleged injuries would not be addressed by enjoining the YouTube

8  Defendants because an injunction would do nothing to prevent such injuries, which

9  are are purely commercial and entirely speculative.  The balance of equities does

10  not tip in Plaintiff's favor.

11     **D.    Plaintiff's Requested Injunction Would be a Prior Restraint, and**

12     **Would Not Serve the Public Interest.**

13     Nearly century ago, Justice Brandeis wrote, in a concurrence

14  in *Whitney v. California,* 274 U.S. 357 (1927):  "If there be time to expose through

15  discussion the falsehood and fallacies, to avert the evil by the processes of

16  education, the remedy to be applied is more speech, not enforced silence.  Only an

17  emergency can justify repression." *Id.* at 377.

18     The injunction Plaintiff seeks is an unconstitutional prior restraint.  *See*

19  *Alexander v. United States,* 509 U.S. 544, 550 (1993) ("Temporary restraining

20  orders and permanent injunctions—*i.e.*, court orders that actually forbid speech

21  activities—are classic examples of prior restraints."); *Evans v. Evans,* 162 Cal.

22  App. 4th 1157, 1166 (2008) (prior restraints are "highly disfavored and

23  presumptively violate" the First Amendment).  A prior restraint is "the most serious

24  and the least tolerable infringement on First Amendment rights." *Nebraska Press*

25  *Ass'n v. Stuart,* 427 U.S. 539, 559 (1976).

26     To "establish a valid prior restraint under the federal Constitution, a

27  proponent has a heavy burden to show the countervailing interest is compelling, the

28  prior restraint is necessary and would be effective in promoting this interest, and

Opposition to Motion for Preliminary
Injunction and Order of Impoundment
CV-12-8315-MWF (VBKx)

ER638

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 164 of 266

1  less extreme measures are unavailable." *Evans*, 162 Cal. App. 4th at 1166 (citing

2  *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 562-568 (1976)). Even concerns

3  about national security have been deemed insufficiently compelling to justify a

4  prior restraint. *See New York Times Co. v. Sullivan*, 403 U.S. 713, 714 (1971) (per

5  curiam) (refusing to enjoin publication of the Pentagon Papers). Plaintiff has not

6  shown and cannot show that this is one of the rare cases justifying a prior restraint.

7    ***First,*** Plaintiff has not identified "compelling interests" justifying a prior

8  restraint; at best, she has identified highly personal interests in very short segments

9  of the Film that are commercial, speculative, or both. The personal harms that

10  Plaintiff contends justify a takedown order are unrelated to the purpose and

11  remedies of the Copyright Act, which is the basis for her claims.

12    ***Second***, it is beyond dispute that a prior restraint would not "be effective in

13  promoting" Plaintiff's interests because enjoining the YouTube Defendants would

14  not actually prevent any of the future harms plaintiff alleges (*i.e.* harm to career

15  prospects (FAC ¶¶ 38, 76, 86) and emotional distress arising from alleged threats

16  and insults (FAC ¶¶ 32-35, 81, 93)), especially at this late date.

17    ***Third***, and perhaps most importantly, by seeking to remove the Film from

18  YouTube, Plaintiff seeks to stifle speech at the core of the First Amendment—

19  speech about religion, politics, and the value of free speech itself. (*See, e.g.*, FAC ¶

20  3 (alleging that the Film has inspired protests in nearly 50 countries and drawn

21  comment from the President of the United States and the Secretary of State);

22  Motion at 22 (stating that there have been 30 million viewings of the Film's English

23  version); *see also* Editorial, *The United States and the Muslim World*, N.Y. Times

24  at A26 (Sept. 19, 2012) (discussing the Film, its effect on the Muslim world, and

25  effects on U.S. foreign policy). In fact, the Film has become a point of discussion

26  in the current campaign for president of the United States.[16]

27

28  [16] *See The Mystery of Benghazi*, available at
http://www.nytimes.com/2012/10/14/opinion/sunday/douthat-the-mystery-of-

Opposition to Motion for Preliminary
Injunction and Order of Impoundment
CV-12-8315-MWF (VBKx)

ER639

1        Courts are rightly skeptical when a plaintiff invokes tenuous copyright claims

2   to stifle public debate. *See Religious Tech. Ctr. v. F.A.C.T.Net*, 901 F. Supp. 1519,

3   1527 (D. Colo. 1995) ("Public interest lies with the free exchange of dialogue on

4   matters of public concern. The injunction sought would silence the Defendants as

5   participants in an ongoing debate involving matters of significant public

6   controversy. Relief of this kind does not serve the public interest.").[17]

7        Thus, rather than serving the public interest, enjoining the YouTube

8   Defendants would only harm the public's interest in free speech and the free

9   exchange of ideas about matters of public concern. *See Salinger*, 607 F.3d at 82

10  ("The public's interest in free expression . . . is significant and is distinct from the

11  parties' speech interests."). Where an injunction "will adversely affect a public

12  interest . . . the court may in the public interest withhold relief until a final

13  determination of the rights of the parties, though the postponement may be

14  burdensome to the plaintiff." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312-

15  13 (1982). That is exactly what should happen here.

16       Plaintiff's alleged interests in the Film simply do not justify a prior restraint

17  of core First Amendment speech. *See id.* at 312 (explaining that courts "should pay

19  benghazi.html?ref=rossdouthat&_r=0; CIA Documents Supported Susan Rice's Description of Benghazi
Attacks, available at http://www.washingtonpost.com/opinions/benghazi-attack-becomes-political-
20  ammunition/2012/10/19/e1ad82ae-1a2d-11e2-bd10-5ff056538b7c_story.html?wprss=rss_homepage;
Bneghazi and Arab Spring Rear Up in U.S. Campaign, available at
21  http://www.nytimes.com/2012/10/22/us/politics/benghazi-and-arab-spring-rear-up-in-us-
campaign.html?hp&_r=0.

22       [17] Plaintiff contends that the First Amendment simply falls away because "by now it is clear that
Defendants' actions can be compared to falsely shouting 'Fire!' in a theater, creating a 'clear and present
23  danger' outside the protections of the First Amendment." (Ex Parte App. at 23 (citing *Schenk v. United
States*, 249 U.S. 47, 52 (1919)).) But *Schenk* did not involve a prior restraint. *Schenk* simply held that
24  speech may be punished if, after a trial on the merits, the speech is found to be illegal and not protected by
the First Amendment. *See Schenk*, 249 U.S. at 49, 52-53 (upholding conviction, after trial, for violation of
25  a federal statute). *Schenk* does not stand for the proposition that potentially controversial or offensive
speech should be cut off at the source before it is determined to be unlawful. *See, e.g., Balboa Island
26  Village Inn, Inc. v. Lemen*, 40 Cal. 4th 1141, 1155-1156 (2007) ("[W]e hold that, following a trial at which
it is determined that the defendant defamed the plaintiff, the court may issue an injunction . . . . prohibiting
27  the defendant from repeating the statements determined to be defamatory. . . . Such an injunction, *issued
only following a determination at trial that the enjoined statements are defamatory*, does not constitute a
28  prohibited prior restraint of expression.") (emphasis added);

Opposition to Motion for Preliminary
Injunction and Order of Impoundment
CV-12-8315-MWF (VBKx)

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 165 of 266

ER640

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 166 of 266

1  particular regard for the public consequences in employing the extraordinary

2  remedy of injunction."); *see also Religious Tech. Ctr. v. Netcom On-Line*

3  *Commc'ns Svcs., Inc.*, 907 F. Supp 1361, 1383 (N.D. Cal. 1995) (rejecting request

4  for preliminary injunctive relief against providers of an Internet bulletin board in a

5  copyright case, in part because service providers "play[ed] a vital role in the speech

6  of their users").

7  **V.   CONCLUSION**

8  For the foregoing reasons, Plaintiff's Motion for a Preliminary Injunction and

9  Order of Impoundment should be denied in its entirety.

10

11  DATED:  October 29, 2012                    **PERKINS COIE** LLP

12

13                                              By: */s/ Timothy L. Alger*
                                                    Timothy L. Alger

14
                                                Attorneys for Defendant
15                                              Google Inc. and YouTube, LLC

16

17

18

19

20

21

22

23

24

25

26

27

28

Opposition to Motion for Preliminary
Injunction and Order of Impoundment
CV-12-8315-MWF (VBKx)

**ER641**

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 167 of 266

1  Timothy L. Alger (SBN 160303)
   TAlger@perkinscoie.com
2  PERKINS COIE LLP
   3150 Porter Drive
3  Palo Alto, CA  94304-1212
   Telephone:  650.838.4300
4  Facsimile:  650.838.4350

5  Sunita Bali (SBN 274108)
   SBali@perkinscoie.com
6  PERKINS COIE LLP
   1888 Century Park E., Suite 1700
7  Los Angeles, CA  90067-1721
   Telephone:  310.788.9900
8  Facsimile:  310.788.3399

9  Attorneys for Defendant
   Google Inc. and YouTube, LLC
10

11              UNITED STATES DISTRICT COURT

12             CENTRAL DISTRICT OF CALIFORNIA

13

| | |
|---|---|
| 14  CINDY LEE GARCIA, an individual, | Case No. CV-12-8315-MWF (VBKx) |
| 15              Plaintiff, | Assigned to the Honorable Michael W. Fitzgerald |
| 16       v. | REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF OPPOSITION OF GOOGLE INC. AND YOUTUBE, LLC TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND ORDER OF IMPOUNDMENT |
| 17  NAKOULA BASSELEY NAKOULA, an individual also known as SAM BACILE, MARK BASSELEY YOUSSEF, ABANOB BASSELEY NAKOULA, MATTHEW NEKOLA, AHMED HAMDY, AMAL NADA, DANIEL K. CARESMAN, KRITBAG DIFRAT, SOBHI BUSHRA, ROBERT BACILY, NICOLA BACILY, THOMAS J. TANAS, ERWIN SALAMEH, YOUSSEFF M. BASSELEY, and/or MALID AHLAWI; GOOGLE, INC., a Delaware Corporation; YOUTUBE, LLC, a California limited liability company, and DOES 1 through 10, inclusive, | Date:        December 3, 2012 Time:        10:00 a.m. Courtroom: 1600 |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26              Defendants. | |
| 27 | |
| 28 | |

Request for Judicial Notice in Support of Opp.
of Google and Youtube to Motion for PI
CV-12-8315-MWF (VBKx
ER642

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 168 of 266

1       Pursuant to Federal Rule of Evidence 201, defendants Google Inc. and

2   YouTube, LLC (collectively, the "YouTube Defendants") hereby request that the

3   Court take judicial notice of the following documents filed in *Garcia v. Nakoula, et*

4   *al.*, Los Angeles Superior Court Case No. BC492358 ("State Court Action").  The

5   YouTube Defendants submit these documents in support of their Opposition to

6   Plaintiff's Motion for Preliminary Injunction and Order of Impoundment.

7       Federal Rule of Evidence 201 provides that the Court may take judicial

8   notice of a fact that is not subject to reasonable dispute because it "can be

9   accurately and readily determined from sources whose accuracy cannot reasonably

10  be questioned." Fed. R. Evid. 201(b)(2).  "Courts have consistently held that courts

11  may take judicial notice of documents filed in other court proceedings." *NuCal*

12  *Foods, Inc. v. Quality Egg LLC*, 2012 WL 3528162, at * 2 (E.D. Cal. Aug. 15,

13  2012); *see also United States v. Black*, 482 F.3d 1035, 1041 (9th Cir. 2007) ("A

14  federal court may 'take notice of proceedings in other courts, both within and

15  without the federal judicial system, if those proceedings have direct relation to the

16  matters at issue'") (citations omitted); *Molus v. Swan*, 2007 WL 2326132, at *6

17  (S.D. Cal. Aug. 13, 2007) (taking judicial notice of pleadings filed by the plaintiff

18  in an earlier state court action).

19      Plaintiff unsuccessfully sought the same relief in the State Court Action as

20  she now seeks from this Court:  an injunction ordering the removal from

21  Youtube.com of a trailer for a film called "Innocence of Muslims."  The YouTube

22  Defendants respectfully request that the Court take judicial notice of the following

23  documents filed in the State Court Action, as they are not subject to reasonable

24  dispute and are directly relevant to this case:

25      1.     Complaint filed by Plaintiff against the YouTube Defendants in the

26  State Court Action on September 19, 2012, a true and correct copy of which is

27  attached as **Exhibit A.**

28                                              -2-     Request for Judicial Notice in Support of Opp.
                                                        of Google and Youtube to Motion for PI

                                                        CV-12-8315-MWF (VBKx)

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 169 of 266

1        2.     Minute Order entered on September 20, 2012, denying Plaintiff's

2    Application for a Temporary Restraining Order and Order to Show Cause re

3    Preliminary Injunction, because Plaintiff failed to show a likelihood of success on

4    the merits, a true and correct copy of which is attached hereto as **Exhibit B**.

5        3.     Request for Dismissal entered in the State Court Action on September

6    25, 2012, a true and correct copy of which is attached hereto as **Exhibit C**.

7

8    DATED:  October 29, 2012            PERKINS COIE LLP

9

10                                  By: */s/ Timothy L. Alger*
                                     Timothy L. Alger

11

12                                  Attorneys for Defendants
                               Google Inc. and YouTube, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                   -3-            Request for Judicial Notice in Support of Opp.
of Google and Youtube to Motion for PI

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 170 of 266

# EXHIBIT

## "A"

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 171 of 266

1    M. Cris Armenta (SBN 177403)
     THE ARMENTA LAW FIRM APC
2    11900 W. Olympic Boulevard, Suite 730
     Los Angeles, CA 90064
3    Tel: (310) 826-2826 x 108
     Facsimile: (310) 826-5456
4    Email: cris@crisarmenta.com

5    Credence E. Sol (SBN 219784)
     La Garenne
6    86300 Chauvigny
     France
7    Telephone: 06 74 90 22 08
     credence.sol@sol-law.com
8
     Attorneys for Plaintiff
9    Cindy Lee Garcia

                              CONFORMED COPY
                              ORIGINAL FILED
                         SUPERIOR COURT OF CALIFORNIA
                            COUNTY OF LOS ANGELES

                              SEP 19 2012

                    John A. Clarke, Executive Officer/Clerk
                    BY _____, Deputy
                            Mary Flores

10                SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                      FOR THE COUNTY OF LOS ANGELES

12   CINDY LEE GARCIA, an individual,      Case No.    BC 4 9 2 3 5 8

13                   Plaintiffs,           COMPLAINT FOR:

14   vs.                                   1.   Declaratory Relief
                                           2.   Invasion of Privacy
15   NAKOULA BASSELEY NAKOULA,             3.   False Light Invasion of Privacy
     an individual also known as SAM       4.   Right of Publicity;
16   BACILE; GOOGLE, INC., a Delaware      5.   Fraud;
     Corporation; YOUTUBE, a California    6.   Unfair Business Practices
17   limited liability company, and DOES 1 7.   Slander;
     through 200, inclusive.               8.   Intentional Infliction of
18                                              Emotional Distress

19                   Defendants.           [Demand For Jury Trial]

20                                         [Ex Parte Application for a
                                           Temporary Restraining Order and a
21                                         Preliminary Injunction Requested]

22

23

24

25

26

27

28

Exhibit A - Page 005

ER646

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 172 of 266

1      For her verified Complaint against Defendants Nakoula Basseley Nakoula, also known as

2   Sam Bacile, Google, Inc. and YouTube LLC, Plaintiff Cindy Lee Garcia alleges as follows:

3                                    **GENERAL ALLEGATIONS**

4          **A.     The Parties**

5          1.      Plaintiff Cindy Lee Garcia is an individual and at all relevant times herein was a

6   resident of Kern County, California.

7          2.      Defendant Nakoula Basseley Nakoula, also known as Sam Bacile ("Defendant

8   Nakoula" or "Bacile") is an individual and at all relevant times herein as a resident of Los Angeles

9   County, California.

10         3.      Defendant Google, Inc., is a corporation incorporated in Delaware with its principal

11  place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043.  Google

12  conducts business throughout California, the nation, and the world.

13         4.      Defendant YouTube, LLC, is a California limited liability company.  YouTube

14  conducts business throughout California, the nation, and the world.

15         5.      Plaintiff lacks knowledge of the true names and capacities of the defendants sued

16  herein as DOES 1 through 200, inclusive, and therefore sues these defendants by such fictitious

17  names.  DOES 1-150 are unidentified posters of the film, as further described below.  Plaintiff will

18  amend this complaint to allege their true names and capacities when they have been ascertained.

19         6.      Plaintiff is informed and believes that each of the defendants designated herein as a

20  Doe is responsible in some manner for the events and happenings herein alleged, as well as for the

21  damages alleged.

22         7.      Plaintiff is informed and believes that each of the defendants was the agent or

23  employee of each of the remaining defendants and, at all relevant times herein, acted within the

24  course and scope of such agency and/or employment.

25                                    **FACTUAL BACKGROUND**

26         8.      Plaintiff Garcia is an actress.  Garcia works in film, television and theatre.

27         9.      In July of 2011, Plaintiff Garcia responded to a casting call posted on Backstage for

28  a film titled "Desert Warrior," which was represented to be an "historical Arabian Desert

2

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 173 of 266

1  adventure film."  She was cast in the film.  The producers of the film, including DOES 151-200,

2  and Defendant Bacile, intentionally concealed the purpose and content of the film.

3        10.      Ms. Garcia was given pages of the script "Desert Warrior."  There was no mention

4  of "Mohammed" during filming or on the set.  There were no references made to religion nor was

5  there any sexual content of which Ms. Garcia was aware.  Mr. Bacile represented to her that the

6  Film was indeed an adventure film and about ancient Egyptians.  Based on those specific

7  representations made and the script and the manner in which the Film was shot, she agreed to

8  deliver an acting performance for "Desert Warriors."

9        11.      On July 2, 2012, Defendant Bacile published a video entitled "The Innocence of

10  Muslims" (the "Film") to the Internet site www.youtube.com, making the Film available publicly

11  and globally.  The Film includes Plaintiff's acting work from "Desert Warriors" and has been

12  changed grotesquely to make it appear that Ms. Garcia voluntarily performed in a hateful anti-

13  Islamic production.  The Film is vile and reprehensible.  Plaintiff was unaware of the vile content

14  contained in the Film, as the content and overall purpose of the Film was concealed from them at

15  all times by Defendant Bacile and DOES 151 through 200.  This lawsuit is not an attack on the

16  First Amendment nor on the right for Americans to say what they think, but does request that the

17  offending content be removed from the Internet.

18        12.      Based on information and belief, in around September of 2012, Defendant Bacile

19  published the Film, with the voices of Plaintiffs and her castmates dubbed into Arabic, on

20  YouTube.  The availability of the Film in Arabic has set off protests and violence in the Middle

21  East.  That violence resulted in the assassination of four embassy officials in Libya, including

22  United States Ambassador Christopher Stevens.

23        13.      After the Film was published on YouTube, Plaintiff received death threats.

24        14.      After the Film was published on YouTube, Plaintiff's family, fearing for their own

25  safety, informed her that she was no longer permitted to see her grandchildren, whom she

26  previously babysat regularly.

27

28

3

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 174 of 266

15.     After the Film was published on YouTube, Plaintiff was fired from her job as a direct result of the Film, in as much as she is now considered a target and the safety of those in her presence cannot be guaranteed.

16.     Plaintiff requested that Google remove the Film from the YouTube Website.  Her request was purportedly passed on to the "YouTube team."   The "YouTube team" has informed her in writing that it has declined to remove the content, despite her privacy concerns.

17.     As a result of Mr. Bacile's falsification of her words in the Film, and Google's refusal to remove the video from the Internet, Plaintiff has suffered severe emotional distress, the destruction of her career and reputation, the loss of her family and her livelihood, and other financial and non-pecuniary damage.  She has been subjected to credible death threats and is in fear for her life and the life and safety of anyone associated with her.

## FIRST CAUSE OF ACTION

### Declaratory Relief

### Against All Defendants

18.     Plaintiff repeats and realleges paragraphs 1 through 17 of this Complaint as though set forth in full.

19.     Plaintiff contends that Defendants have invaded her right to privacy, defrauded her, acted negligently towards her, committed unfair business practices, slandered her, and intentionally inflicted emotional distress upon her.  Plaintiff contends that Defendants' actions have put her life in serious, imminent danger, as evidenced by the death threats she has received since the Film was posted on YouTube, and continuing to the present following the refusal of her request to remove the Film from the YouTube Website.

20.     There is an actual controversy between Plaintiff and Defendants concerning whether the Film may remain posted on the YouTube Website.

4

Exhibit A - Page 008

ER649

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 175 of 266

## SECOND CAUSE OF ACTION

### Invasion of Privacy

### Against All Defendants

21.  Plaintiff repeats and realleges paragraphs 1 through 20 of this Complaint as though set forth in full.

22.  The right of privacy is protected by the California Constitution, Article I, Section 1.

23.  At all times herein mentioned and up to and including the present, Plaintiff had a legally protected interest in her privacy and the right to be free from having hateful words put in her mouth or being depicted as a bigot.  The right to privacy is a fundamental right, long respected in the California courts.

24.  At all times herein mentioned and up to and including the present, Plaintiff had a reasonable expectation of privacy, and at no time expected that Defendants would use her image as a virtual "puppet" for Defendant Bacile's bigoted views (which Plaintiff does not share and rejects), or that Defendant YouTube and its parent company, Google, would refuse to remove the Film after it was alerted of the wrongdoing.

25.  On or about September of 2011, Plaintiff became aware for the first time that another voice had been dubbed over her image, making it appear that she had made outrageously bigoted statements that she never said and does not endorse.

26.  The conduct of Defendants, and each of them, in disseminating this false depiction of Plaintiff as described herein constituted a serious invasion of Plaintiff's right to privacy, and was an egregious breach of social norms that subjected Plaintiff to death threats and extreme emotional distress.

27.  As a proximate cause of the conduct of Defendants, and each of them, Plaintiff has suffered emotional distress, mental suffering, and invasion of her Constitutional right to privacy in a sum that is presently unascertainable.  Plaintiff will seek leave of court to amend this Complaint to set forth the full amount of said damage when ascertained.

28.  The acts of Defendants, and each of them, were willful, wanton, malicious, and oppressive, and justify an award of exemplary and punitive damages.

5

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 176 of 266

## THIRD CAUSE OF ACTION

### False Light Invasion of Privacy

### Against All Defendants

29.  The allegations set forth in paragraphs 1 through 28 are realleged and incorporated herein by reference

30.  Defendants, through the above-described Film and their actions in publishing it, including the content that falsely purported to depict Plaintiff saying bigoted things that she did not say, gave publicity to matters concerning Plaintiff that unreasonably places her in a false light and violates her right of privacy.

31.  The false light in which Plaintiff was placed would be highly offensive to a reasonable person.

32.  Defendants knew of the falsity of the publicized matter and the false light in which Plaintiff would be placed and/or acted with reckless disregard for the truth or falsity of the publicized matter and the false light in which Plaintiff would be placed.

33.  As a direct and proximate result of the above-described depiction, Plaintiff has suffered and will suffer emotional distress, and has been, and continues to be, embarrassed and humiliated by the false statements and implications, terrorized by the death threats that she has received as a result of the false light in which she has been placed, and reasonably fears that she will be shunned, avoided, and subjected to ridicule.

34.  Additionally, as a direct and proximate result of the above-described statements and depictions, Plaintiff has suffered, and may continue to suffer, significant damage to her reputation and to her livelihood, particularly among those who do not know Plaintiff personally or professionally. Further, as a direct and proximate result of the above-described statements and depictions, Plaintiff has suffered, and may continue to suffer, significant damage to her personal reputation in the community. As a result of this potential damage to her reputation, Plaintiff's business and personal relationships have been, and may continue to be, adversely affected.

6

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 177 of 266

35.     All of these above-described damages are in an amount that cannot presently be ascertained but which Plaintiff is informed and believes are in excess of the jurisdictional minimum of this Court, according to proof at trial.

36.     Defendants, and each of them, have acted with knowledge that the depiction of Plaintiff was false and with a reckless disregard of truth or falsity.  Defendants' conduct was intended by them to cause injury to Plaintiffs, and was despicable conduct carried on with a willful and conscious disregard of the rights, reputation, and safety of Plaintiff.  As such, Plaintiff is entitled to recover punitive and exemplary damages in an amount sufficient to punish Defendants and deter them from such conduct in the future.

## FOURTH CAUSE OF ACTION

### Right of Publicity

### Against All Defendants

37.     The allegations set forth in paragraphs 1 through 36 are realleged and incorporated herein by reference.

38.     California's Right of Publicity Statute, California Civil Code § 3344 *et seq.*, protects persons from the unauthorized appropriation of the person's identity by another for commercial gain.

39.     Defendants Bacile, Google, and the Does 1-150 and 151-200 knowingly used Plaintiff's name, photograph, or likeness for commercial gain or otherwise.

40.     None of the Defendants had Plaintiff's consent to do so.

41.     Other than payment for acting in "Desert Warriors," Plaintiff received no compensation or other consideration for Defendants' use of her name, photograph, or likeness.

42.     Plaintiff was harmed by Defendants' actions.

43.     The use of Plaintiff's name, photograph, or likeness was directly connected to Defendants' commercial or other use.

44.     Defendants' actions were a substantial factor in Plaintiff's harms.

45.     The Film was not used in conjunction with news, public affairs, a sports broadcast or account, or a political campaign.

7

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 178 of 266

46.     Plaintiff therefore seeks injunctive relief, and other such preliminary and other equitable or declaratory relief as may be appropriate.

47.     Plaintiff also seeks a remedy as provided for by California Civil Code Section 3344(a) in the amount equal to the greater of $750 per incident, or actual damages, any profits attributable to Defendants' illegal action, before taking into account any actual damages, punitive damages, attorneys fees and costs, and any other relief as may be appropriate.

## FIFTH CAUSE OF ACTION

### Fraud

### Against Defendant Bacile and DOES 1 through 10

48.     The allegations set forth in paragraphs 1 through 47 are realleged and incorporated herein by reference.

49.     Defendant Bacile represented to Plaintiff that the Film was an "adventure" film, and that she would be depicted as a benign historical character.

50.     Defendant Bacile's representations that he intended to make an "adventure" film, and that Plaintiff would be depicted as a concerned mother, were false. Instead, Defendant Bacile made an anti-Islam propaganda film, in which Plaintiff is falsely made to appear to accuse the founder of the Islamic religion of being a sexual deviant and child molester.

51.     When Defendant Bacile represented to Plaintiff that he intended to make an "adventure" film, and that her character was merely to express concern for her child, he knew that the representations were false, or he made the representations with reckless disregard as to their falsity.

52.     Defendant Bacile made the misrepresentations with the intent to defraud Plaintiff. In making the misrepresentations, Defendant Bacile intended to induce Plaintiff to rely upon the misrepresentations and to act upon them by agreeing to appear in his "adventure" film.

53.     At the time Defendant Bacile made the misrepresentations, Plaintiff was unaware of the falsity of the misrepresentations. Plaintiff acted in reliance on the truth of the misrepresentations, in that the misrepresentations substantially influenced her actions, and Plaintiff was justified in relying on the misrepresentations.

8

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 179 of 266

54.     As a direct and proximate result of Defendant Bacile's intentional misrepresentations, Plaintiff has incurred and will incur substantial damages, in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION

**Unfair Business Practices Under Cal. Bus. Prof. Code 17200**

**Against Defendants Nakoula, Google, YouTube, and DOES 1-50**

55.     The allegations set forth in paragraphs 1 through 54 are realleged and incorporated herein by reference.

56.     The aforementioned acts of Defendants constitute unfair, fraudulent and/or illegal business practices within the meaning of California's Unfair Competition Law ("UCL"), embodied in Section 17200, et seq. of the California Business and Professions Code.

57.     Defendants' actions, including fraudulently enticing Plaintiff into appearing in an anti-Islam propaganda film, manipulating the soundtrack of the Film to make it appear that Plaintiff was slandering Islam and Muslim beliefs, and refusing to remove the Film from YouTube after Plaintiff's request, were unfair in that they made Plaintiff a target of the anti-Film violence that has already claimed the lives of four Americans, caused Plaintiff to lose her jobs, and caused Plaintiff to be separated from her family.

58.     Defendant Bacile's actions were fraudulent in that they deceived Plaintiff as to the true nature of the film project in which she participated, and in that they manipulated Plaintiff's image to create the false appearance of anti-Muslim bigotry by Plaintiff.

59.     Defendants' actions were illegal in that they violated Plaintiff's right under California and federal law to protect the use of her image "and violated Section 16600 of the California Business and Professions Code" in that the conduct has made it impossible to practice her trade, profession or occupation.

60.     Defendants' unfair, deceptive, and fraudulent practices originated from and/or occurred primarily in California. The decision to dub Plaintiff's voice to make it appear as though she was spouting inflammatory material about Islam was made in California. The decision to refuse to remove the Film from YouTube was made in California.

9

Exhibit A - Page 013

ER654

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 180 of 266

1     61.    Pursuant to California Business & Professions Code Section 17203, Plaintiff seeks

2 an order of this Court permanently enjoining Defendants from continuing to engage in the

3 unlawful, unfair, and fraudulent conduct described herein.  Plaintiff seeks an order requiring

4 Defendants to:  (1) immediately cease the unlawful, unfair, and fraudulent practices stated in this

5 Complaint; and (2) award Plaintiff reasonable costs and attorneys' fees pursuant to California

6 Code of Civil Procedure Section 1021.5.

7     62.    By reason of the alleged acts and conduct of Defendants, Plaintiff has suffered and

8 will suffer further harm, including the loss of employment, the loss of her family, and the fear of

9 violent retribution.  Plaintiffs are fully entitled to their remedies allowed under the UCL, including

10 restitution for their lost wages and the cost of security protection for themselves and their families.

11     **<u>SEVENTH CAUSE OF ACTION</u>**

12     **Against All Defendants Nakoula and DOES 1 - 50**

13     **Slander**

14     63.    The allegations set forth in paragraphs 1 through 62 are realleged and incorporated

15 herein by reference.

16     64.    By making and republishing the Film, Defendants made a statement of and

17 concerning Plaintiff or words that suggest that Plaintiff approved the finished product and message

18 of the Film.

19     65.    The statements are false as they pertain to Plaintiff.  In making these statements,

20 Defendants knew or should have known that Plaintiff has never called the founder of Islam a child

21 molester.

22     66.    Furthermore, these statements are defamatory because they carry the meaning that

23 Plaintiff is a religious bigot.

24     67.    The statements have been understood by those who saw and heard them on

25 YouTube to mean that Plaintiff it a religious bigot.

26     68.    Plaintiff is informed and believes and thereon alleges that the statements that

27 Defendant Bacile literally "put in her mouth," which Google refuses to remove from YouTube,

28

10

Exhibit A - Page 014

ER655

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 181 of 266

1   have been seen and heard by millions of individuals throughout the world, whose names are not

2   presently known to Plaintiff.

3       69.   These words were slanderous because they tend to injure Plaintiff in her profession,

4   trade and business by imputing to her a general disqualification for working with the public,

5   something that the occupation and duties of her profession peculiarly require, and the profitability

6   of which is naturally lessened if she is believed to be a religious bigot.

7       70.   These words published by Defendants were stated not as a matter of opinion, but as

8   a matter of fact, and therefore were not protected or privileged in any way.

9       71.   The words published by Defendants also were slanderous because Plaintiff never

10  called the founder of Islam a child molester, either on the set of the Film or at any other place or

11  time.

12      72.   At no relevant time did Plaintiff ratify or consent to the dissemination of the

13  statements, on YouTube or anywhere else.  In fact, Plaintiff subsequently contacted Defendant

14  Bacile to ask him to remove the Film from YouTube and also contacted Google and YouTube to

15  request the same thing.

16      73.   Plaintiff is informed and believes and thereon alleges that Defendants repeated the

17  false statements to others, including a worldwide audience on YouTube.

18      74.   The words that Defendants put, and kept, in Plaintiff's mouth carried a defamatory

19  meaning by their very terms and were understood by those who saw and heard them in a way that

20  defamed Plaintiff.

21      75.   Defendants further published such statements deliberately and with knowledge and

22  intention that such words would be heard by a worldwide YouTube.com audience.

23      76.   As a proximate result of Defendants' publication of the false statements, Plaintiff

24  has suffered loss of her reputation, shame, mortification, and hurt feelings all to her general

25  damages in a sum to be proven at trial.

26      77.   As a further result of Defendants' publication of the false statements, Plaintiff has

27  suffered special damages according to proof.

28

1       78.   As the above-described statements were published with malice and oppression and

2    fraud, an award of exemplary and punitive damages is necessary and appropriate.

3

4    **EIGHTH CAUSE OF ACTION**

5    **Against All Defendants**

6    **Intentional Infliction of Emotional Distress**

7       79.   The allegations set forth in paragraphs 1 through 78 are realleged and incorporated

8    herein by reference.

9       80.   The conduct set forth hereinabove was extreme and outrageous and an abuse of the

10   authority and position of Defendants, and each of them.  Said conduct was intended to cause

11   severe emotional distress, or was done in conscious disregard of the probability of causing such

12   distress. Said conduct exceeded the inherent risks of Plaintiff's work as an actress and was not the

13   sort of conduct normally expected to occur in the production of a Film, or in the posting of a film

14   to YouTube. Defendants, and each of them, abused their positions of authority toward Plaintiff,

15   and engaged in conduct intended to make Plaintiff a target of extremist violence. Defendant

16   Google abused its authority over removal of videos from YouTube, and directly injured Plaintiff

17   by their ratification of Defendant Bacile's acts.

18      81.   The foregoing conduct did in fact cause Plaintiff to suffer extreme emotional

19   distress. As a proximate result of said conduct, Plaintiff suffered embarrassment, anxiety,

20   humiliation and emotional distress, and will continue to suffer said emotional distress in the future

21   in an amount according to proof.

22   **PRAYER**

23   Plaintiff Garcia prays for judgment against Defendants as follows:

24   1.   For temporary and permanent injunctive relief;

25   2.   For general damages according to proof at trial, exceeding the jurisdictional

26   minimum of this Court;

27   3.   For special damages arising from the loss of business and business opportunities,

28   according to proof at trial;

12

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 182 of 266

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 183 of 266

4.    For restitution;

5.    For exemplary and punitive damages;

6.    For attorney fees and costs of suit incurred herein; and

7.    For such other and further relief as the Court deems just and proper.

THE ARMENTA LAW FIRM, A.P.C.

Dated: September 18, 2012

By: _____
                    M. Cris Armenta
                    Attorneys for Plaintiff
                    Cindy Lee Garcia

13

Exhibit A - Page 017

ER658

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 184 of 266

1
2          **REQUEST FOR JURY TRIAL**
3          Plaintiff hereby requests a trial for jury.
4   Dated: September 18, 2012          THE ARMENTA LAW FIRM, A.P.C.
5
6                              By:  _____
7                                        M. Cris Armenta
                                        Attorneys for Plaintiff
8                                       Cindy Lee Garcia
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

14

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 185 of 266

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## VERIFICATION

I, Cindy Lee Garcia, a Plaintiff in this proceeding, have read the documents:

### COMPLAINT FOR:

**Declaratory Relief**
**Invasion of Privacy**
**False Light Invasion of Privacy**
**Right of Publicity;**
**Fraud;**
**Unfair Business Practices**
**Slander;**
**Intentional Infliction of Emotional Distress**

**[Demand For Jury Trial]**

**[Ex Parte Application for a Temporary Restraining Order and a Preliminary Injunction Requested]**

The information contained therein are true of my own knowledge, except as to those matters that are alleged on information and belief, and, as to those matters, I believe it to be true.  I declare under penalty of perjury that the foregoing is true and correct.  Executed this 18th day of September, 2012 in Los Angeles, California.          See attached faxed signature

_____

Cindy Lee Garcia

**PLAINTIFF CINDY LEE GARCIA VERIFICATION**  Exhibit A - Page 019

ER660

**VERIFICATION**

I, Cindy Lee Garcia, a Plaintiff in this proceeding, have read the documents:

**COMPLAINT FOR:**

**Declaratory Relief
Invasion of Privacy
False Light Invasion of Privacy
Right of Publicity;
Fraud;
Unfair Business Practices
Slander;
Intentional Infliction of Emotional Distress**

**[Demand For Jury Trial]**

**[Ex Parte Application for a Temporary Restraining Order and a Preliminary Injunction Requested]**

The information contained therein are true of my own knowledge, except as to those matters that are alleged on information and belief, and, as to those matters, I believe it to be true. I declare under penalty of perjury that the foregoing is true and correct. Executed this 18th day of September, 2012 in Los Angeles, California.

*Cindy Lee Garcia*

Cindy Lee Garcia

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 186 of 266

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 187 of 266

# EXHIBIT

## "B"

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| | |
|---|---|
| DATE: 09/20/12 | DEPT. 82 |
| HONORABLE LUIA A. LAVIN          JUDGE | N DIGIAMBATTISTA          DEPUTY CLERK |
| HONORABLE          JUDGE PRO TEM | ELECTRONIC RECORDING MONITOR |
| NONE          Deputy Sheriff | NONE          Reporter |

| | | |
|---|---|---|
| 8:30 am | BC492358 | Plaintiff Counsel    M. CRIS ARMENTA (X) |
| | CINDY LEE GARCIA VS NAKOULA BASSELEY NAKOULA ET AL | Defendant Counsel    TIMOTHY L. ALGER (X) |

**NATURE OF PROCEEDINGS:**

EX PARTE APPLICATION OF PLAINTIFF, CINDY LEE GARCIA, FOR TEMPORARY RESTRAINING ORDER AND FOR AN ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

Matter comes on for hearing.

The court denies all requests from media organiza-tions.

Counsel for plaintiff advises the court that defendant Nakoula was not served.

The request for judicial notice is denied.

The matter is argued and denied.  Plaintiff has not shown a likelihood of success on the merits.

Plaintiff is to give notice.

Page    1 of  1    DEPT. 82

MINUTES ENTERED
09/20/12
COUNTY CLERK

09/21/12

Exhibit B - Page 022

ER663

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 189 of 266

# EXHIBIT

## "C"

Exhibit C - Page 023

ER664

CIV-110

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| M. Cris Armenta, SBN 177403<br>The Armenta Law Firm, APC<br>11900 Olympic Blvd, Suite 790<br>Los Angeles, CA 90064<br>TELEPHONE NO.: 310-826-2826   FAX NO. *(Optional)*: 310-826-5456<br>E-MAIL ADDRESS *(Optional)*: cris@crisarmenta.com<br>ATTORNEY FOR *(Name)*: Cindy Lee Garcia | **FILED**<br>LOS ANGELES SUPERIOR COURT |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS: Same
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Stanley Mosk, Central

PLAINTIFF/PETITIONER: Cindy Lee Garcia

DEFENDANT/RESPONDENT: Nakoula Basseley Nakoula, et al.

SEP 25 2012

JOHN A. CLARKE, CLERK
*Araceli Rodriguez*   Received
BY ARACELI RODRIGUEZ, DEPUTY

SEP 24 2012

| REQUEST FOR DISMISSAL | CASE NUMBER: | Filing Window |
|---|---|---|
| ☐ **Personal Injury, Property Damage, or Wrongful Death**<br> ☐ Motor Vehicle ☐ Other<br>☐ **Family Law** ☐ **Eminent Domain**<br>☑ **Other** *(specify)* : Fraud | BC492358 | |

**- A conformed copy will not be returned by the clerk unless a method of return is provided with the document. -**

1. TO THE CLERK: Please dismiss this action as follows:
   a. (1) ☐ With prejudice   (2) ☑ Without prejudice
   b. (1) ☑ Complaint   (2) ☐ Petition
      (3) ☐ Cross-complaint filed by *(name)*:                          on *(date)*:
      (4) ☐ Cross-complaint filed by *(name)*:                          on *(date)*:
      (5) ☐ Entire action of all parties and all causes of action
      (6) ☐ Other *(specify)*:*

2. *(Complete in all cases except family law cases.)*
   ☐ Court fees and costs were waived for a party in this case. *(This information may be obtained from the clerk. If this box is checked, the declaration on the back of this form must be completed).*

Date: September 24, 2012

M. Cris Armenta
.....................................................   ▶ _____
(TYPE OR PRINT NAME OF ☑ ATTORNEY ☐ PARTY WITHOUT ATTORNEY)                        (SIGNATURE)

*If dismissal requested is of specified parties only or specified causes of action only, or of specified cross-complaints only, so state and identify the parties, causes of action, or cross-complaints to be dismissed.

Attorney or party without attorney for:
☑ Plaintiff/Petitioner   ☐ Defendant/Respondent
☐ Cross-Complainant

3. TO THE CLERK: Consent to the above dismissal is hereby given.**
   Date:
                                                                ▶ _____
_____                                  (SIGNATURE)
(TYPE OR PRINT NAME OF ☐ ATTORNEY ☐ PARTY WITHOUT ATTORNEY)

** If a cross-complaint – or Response (Family Law) seeking affirmative relief – is on file, the attorney for cross-complainant (respondent) must sign this consent if required by Code of Civil Procedure section 581 (i) or (j).

Attorney or party without attorney for:
☐ Plaintiff/Petitioner   ☐ Defendant/Respondent
☐ Cross-Complainant

*(To be completed by clerk.)*
4. ☑ Dismissal entered as requested on *(date)*: SEP 25 2012
5. ☐ Dismissal entered on *(date)*:                    as to only *(name)*:
6. ☐ Dismissal not entered as requested for the following reasons *(specify)*:

7. a. ☐ Attorney or party without attorney notified on *(date)*:
   b. ☐ Attorney or party without attorney not notified. Filing party failed to provide
      ☐ a copy to be conformed ☐ means to return conformed copy

Date: SEP 25   JOHN A. CLARKE, Clerk   By   *Araceli Rodriguez*, Deputy

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CIV-110 [Rev. July 1, 2009]                    **REQUEST FOR DISMISSAL**            Code of Civil Procedure, § 581 et seq.;
                                                                           Gov. Code, § 68637(c); Cal. Rules of Court, rule 3.1390
                                                                                              www.courtinfo.ca.gov

Exhibit C - Page 024

ER665

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 190 of 266

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 191 of 266

CIV-110

| PLAINTIFF/PETITIONER: Cindy Lee Garcia | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: Nakoula Basseley Nakoula, et al. | BC492358 |

## Declaration Concerning Waived Court Fees

The court has a statutory lien for waived fees and costs on any recovery of $10,000 or more in value by settlement, compromise, arbitration award, mediation settlement, or other recovery. The court's lien must be paid before the court will dismiss the case.

1. The court waived fees and costs in this action for *(name):*

2. The person in item 1 *(check one):*
   a. ☐ is not recovering anything of value by this action.
   b. ☐ is recovering less than $10,000 in value by this action.
   c. ☐ is recovering $10,000 or more in value by this action. *(If item 2c is checked, item 3 must be completed.)*

3. ☐ All court fees and costs that were waived in this action have been paid to the court *(check one):* ☐ Yes ☐ No

I declare under penalty of perjury under the laws of the State of California that the information above is true and correct.

Date: _____

_____                    ▶ _____
(TYPE OR PRINT NAME OF ☐ ATTORNEY ☐ PARTY MAKING DECLARATION)              (SIGNATURE)

Exhibit C - Page 025

ER666

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 192 of 266

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

    I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen years and not a party to the within action.  My business address is 11900 Olympic Boulevard, Suite 730, Los Angeles, California 90064.

    On September 24, 2012 I served the following document(s) described as:

**CLOSING BRIEF AFTER ORDER TO SHOW CAUSE TO MODIFY SUPPORT**

on the interested parties in this action by placing true copies thereof enclosed in sealed envelopes addressed as follows:

**Timothy L. Alger**
**Perkins Coie LLP**
**3150 Porter Drive**
**Palo Alto, CA 94304-1212**

**Nakoula Basseley Nakoula**
**12608 Park Street**
**Cerritos, California  90703**

☑  *BY MAIL:*  I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing with the United States Postal Service.  Under that practice, it would be deposited with the United States Postal Service that same day in the ordinary course of business.  Such envelope(s) were placed for collection and mailing with postage thereon fully prepaid at Los Angeles, California, on that same day following ordinary business practices.  (C.C.P. § 1013 (a) and 1013a(3))

    Executed on September 24, 2012 in Los Angeles, California.

                                        _Heather Rowland_

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 193 of 266

1   Timothy L. Alger (SBN 160303)
    TAlger@perkinscoie.com
2   PERKINS COIE LLP
    3150 Porter Drive
3   Palo Alto, CA  94304-1212
    Telephone:  650.838.4300
4   Facsimile:  650.838.4350

5   Sunita Bali (SBN 274108)
    SBali@perkinscoie.com
6   PERKINS COIE LLP
    1888 Century Park E., Suite 1700
7   Los Angeles, CA  90067-1721
    Telephone:  310.788.9900
8   Facsimile:  310.788.3399

9   Attorneys for Defendants
    Google Inc. and YouTube, LLC
10

11              UNITED STATES DISTRICT COURT

12              CENTRAL DISTRICT OF CALIFORNIA

13

| 14 | CINDY LEE GARCIA, an individual, | Case No. CV-12-8315-MWF (VBKx) |
|----|----------------------------------|--------------------------------|
| 15 | Plaintiff, | Assigned to the Honorable Michael W. Fitzgerald |
| 16 | v. | |
| 17 | NAKOULA BASSELEY NAKOULA, an individual also known as SAM BACILE, MARK BASSELEY YOUSSEF, ABANOB BASSELEY NAKOULA, MATTHEW NEKOLA, AHMED HAMDY, AMAL NADA, DANIEL K. CARESMAN, KRITBAG DIFRAT, SOBHI BUSHRA, ROBERT BACILY, NICOLA BACILY, THOMAS J. TANAS, ERWIN SALAMEH, YOUSSEFF M. BASSELEY, and/or MALID AHLAWI; GOOGLE, INC., a Delaware Corporation; YOUTUBE, LLC, a California limited liability company, and DOES 1 through 10, inclusive, | OPPOSITION OF GOOGLE INC. AND YOUTUBE, LLC TO PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND ORDER OF IMPOUNDMENT |
| 18 | | |
| 19 | | Date:        December 3, 2012 |
| 20 | | Time:        10:00 a.m. |
| 21 | | Courtroom: 1600 |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | Defendants. | |

27

28

-1-

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 194 of 266

Defendants Google Inc. and YouTube, LLC (collectively the "YouTube Defendants") oppose plaintiff Cindy Lee Garcia's ("Plaintiff") Request for Judicial Notice in support of her Motion for Preliminary Injunction.[1]

## I.   INTRODUCTION

The YouTube Defendants oppose Plaintiff's request for judicial notice because she fails to meet the requirements of Federal Rule of Evidence 201. First, Plaintiff requests judicial notice of various purported "facts" contained in news reports, but the "facts" set forth are impermissibly vague. Plaintiff fails to offer the actual news reports that might support her factual assertions. Instead, Plaintiff offers her own version of the facts and the views of her purported expert, Khaled Abdou El Fadl, which are not judicially noticeable. The causes of the attack on the United States Embassy in Benghazi, Libya, and other acts of violence, have been widely debated and are not the type of facts that are "generally known" or "readily determined."

Plaintiff also requests that this Court take judicial notice of facts that have no relevance to her Motion for Preliminary Injunction against the YouTube Defendants. She requests judicial notice of statements made by the United States Patent and Trademark Office regarding the WIPO Audiovisual Dramatic Performance Treaty, which has nothing to do with this copyright lawsuit. She also requests judicial notice of the "public file" in Defendant Youssef's criminal proceeding, which brings nothing to bear on the question of whether Plaintiff is entitled to injunctive relief under the Copyright Act against the YouTube Defendants.

Plaintiff's attempt to muddle the record with irrelevant matters that are not subject to judicial notice should not be permitted. Her Request for Judicial Notice should be denied.

---

[1] Plaintiff's Request for Judicial Notice [Dkt. No. 13] was initially submitted in support of her ex parte application for a temporary restraining order, which was denied on October 18, 2012 [Dkt. No. 15].

Defendants Google And Youtube's Opposition
To Plaintiff's RJN

CV-12-8315-MWF (VBKx)

ER669

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 195 of 266

## II.   PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE

Plaintiff has requested that the Court take judicial notice of the following facts in support of her Motion for Preliminary Injunction:

(1) *Facts set forth in news reports.*  Plaintiff asks this Court to take judicial notice of alleged facts set forth in news reports regarding (a) the September 11, 2012, attack on the U.S. Consulate in Benghazi, Libya, (b) violence that has erupted around the world, (c) "expert" opinions attributing this violence directly to the Film, (d) deaths resulting from the violence, (e) a "fatwa" that has been issued by an Egyptian cleric targeting people involved in the Film, and (f) Google's response to requests that the Film be removed from the YouTube website. [Dkt. No. 13, ¶ 2.] Plaintiff, however, has failed to present any news reports to the Court, instead expecting this Court to rely solely on her recitation of the facts and the recitation offered in a declaration by purported expert Khaled Abou El Fadl. [*Id.*]

(2) *The Background and Summary of the WIPO Audiovisual Performances Treaty.*  Plaintiff asks this Court to take judicial notice of various statements made by the United States Patent and Trademark Office regarding the 2012 WIPO Audiovisual Performances Treaty.  Specifically, she requests that the Court accept as true various statements regarding United States copyright law, which reveal "the long-standing acknowledgment in the United States that actors, just like musicians, own the rights to their performances unless assigned, unless they are employees, or unless they execute a written instrument indicating their work is a work-for-hire." [Dkt. No. 13, ¶ 3.] Instead of relying on statutes or case law that are binding on this Court, Plaintiff is seeking to establish copyright law by requesting judicial notice of statements allegedly made by United States officials regarding an international treaty.  That is not the purpose of judicial notice.

(3) *The "public case file" in United States of America v. Nakoula, et al. United States District Court Case No. CR-09-617-CAS.*  Specifically, Plaintiff requests judicial notice of two documents filed in that case: (i) Order of Detention

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 196 of 266

After Hearing and (ii) Judgment and Probation/Commitment Order, as well as the court's findings of fact as stated in those documents. These documents, however, are wholly irrelevant to Plaintiff's Motion for Preliminary Injunction against the YouTube Defendants.

### III.   ARGUMENT

The Federal Rules of Evidence provide that "[a] court may judicially notice a fact that is not subject to reasonable dispute because it:  (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably questioned." Fed. R. Evid. 201(b).  The purpose of judicial notice is to "obviate the need for formal fact-finding as to certain facts that are undisputed and easily verified." *Walker v. Woodford*, 454 F.Supp.2d 1007, 1022 (S.D. Cal. 2006) (noting that an "almanac, dictionary, calendar, or similar source" are the types of sources whose accuracy cannot be reasonable questioned).

"Because the effect of judicial notice is to deprive a party of an opportunity to use rebuttal evidence, cross-examination, and argument to attack contrary evidence, caution must be used in determining that a fact is beyond controversy under Rule 201(b)." *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1151 (9th Cir. 2005) (internal quotations and citations omitted).

### A.   Plaintiff's Request for Judicial Notice of "Facts" From News Reports that Are Not Before the Court Should Be Denied.

Plaintiff asks this Court to take judicial notice of "[t]he specific facts set forth in the news reports," and offers vague descriptions of broad categories of "facts" without providing any news reports.  "Although a Court may take judicial notice of a newspaper article, petitioner must meet the burden of demonstrating that the facts of the article are either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned as required under Rule 201(b) of

the Federal Rules of Evidence." *In re American Apparel, Inc. Shareholder Litigation*, 855 F. Supp. 2d 1043, 1063 (C.D. Cal. 2012) (quoting *Hardison v. Newland*, 2003 WL 23025432, *5 (N.D. Cal. Dec. 17, 2003) (internal quotations omitted).

Plaintiff has failed to meet her burden.

First, the "facts" identified by Plaintiff are too vague to be to be judicially noticed. For example, Plaintiff requests judicial notice of the fact "that violence has continued to erupt across the world" and that "the violence in fact occurred with many at the time attributing it to the anti-Muslim sentiment in the Film." [Dkt. No. 13, ¶ 2.] Such a vague reference to "violence" without reference to specific events cannot be judicially noticed.

Second, Plaintiff has not presented the news reports on which she relies. Instead, she expects the Court to take judicial notice of her recitation of facts, and the recitation offered in the declaration of purported expert Khaled Abou El Fadl, both of whom lack personal knowledge. [Dkt. No. 13, ¶ 2.] Without having the opportunity to review the relevant news reports, the Court cannot determine whether the facts contained in those articles are subject to judicial notice. *See Castaneda v. Saxon Mort. Servs. Inc.*, 687 F. Supp. 2d 1191, 1196 (E.D. Cal. 2009) (denying a request for judicial notice of an article "which expresse[d] opinions of the author that may reasonably be questioned"); *see also Brodsky v. Yahoo! Inc.*, 630 F.Supp.2d 1104, 111 (N.D. Cal. 2009) (taking judicial notice of the existence of press releases, news articles, analyst reports, and third party press releases, but not for the truth of their contents).

Finally, the "facts" offered by Plaintiff are not generally known or capable of accurate or ready determination. Fed. R. Evid. 201. When an alleged fact is subject to reasonable dispute, judicial notice is improper. *Rodgers v. Horsely*, 123 Fed.Appx. 281, 284-85 (9th Cir. 2005); *In re Immune Resp. Sec. Litig.*, 375 F.

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 197 of 266

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 198 of 266

1   Supp. 2d 983, 995 (S.D. Cal. 2005) (citing *Lee v. City of L.A.*, 250 F.3d 668, 688-89

2   (9th Cir. 2001); *In re Easysaver Rewards Litig.*, 737 F. Supp. 2d 1159, 1166 (S.D.

3   Cal. 2010) ("A district court cannot take judicial notice of a fact that is subject to

4   'reasonable dispute' simply because it is contained within the public record.").

5   Many of the facts that Plaintiff seeks judicial notice of are the subject of widespread

6   debate.  For example, Plaintiff seeks judicial notice of the fact that many people

7   have attributed the September 11, 2012, attack on the U.S. Consulate in Benghazi,

8   Libya, and other acts of violence, directly to the Film.  But the U.S. Administration

9   has now acknowledged that the attack in Libya was a terrorist attack unrelated to

10  the Film.[2]

11      In sum, the Court should deny Plaintiff's request for judicial notice of

12  various facts from news reports because they are not set forth with sufficient

13  specificity, Plaintiff failed to provide the news reports on which she relies, and the

14  alleged "facts" are indeed subject to reasonable dispute.

15  **B.     Facts Regarding the WIPO Audiovisual Dramatic Performance**

16  **Treaty are Irrelevant and Should Not Be Judicially Noticed.**

17      Plaintiff asks this Court to take judicial notice of various facts surrounding

18  the negotiation of the WIPO Audiovisual Dramatic Performance Treaty ("AVP

19  Treaty") and related statements made by the United States Patent & Trademark

20  Office ("USPTO").  [Dkt. No. 13, ¶ 3, Exh. A.]  Plaintiff points to various

21  statements made by the USPTO to establish that "actors, just like musicians, own

22  the rights to their performances unless assigned, unless they are employees, or

23

24

25  [2] *See The Mystery of Benghazi*, available at
    http://www.nytimes.com/2012/10/14/opinion/sunday/douthat-the-mystery-of-

26  benghazi.html?ref=rossdouthat&_r=0; *CIA Documents Supported Susan Rice's Description of Benghazi
    Attacks*, available at http://www.washingtonpost.com/opinions/benghazi-attack-becomes-political-

27  ammunition/2012/10/19/e1ad82ae-1a2d-11e2-bd10-5ff056538b7c_story.html?wprss=rss_homepage;
    *Benghazi and Arab Spring Rear Up in U.S. Campaign*, available at

28  http://www.nytimes.com/2012/10/22/us/politics/benghazi-and-arab-spring-rear-up-in-us-
    campaign.html?hp&_r=0.

-6-     Defendants Google And Youtube's Opposition
        To Plaintiff's RJN

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 199 of 266

unless they execute a written instrument indicating their work is a work-for-hire." [*Id.* at ¶ 3.]

Plaintiff essentially seeks to establish a point of copyright law by reference to the USPTO's statements about an international treaty. That is an improper use if the judicial notice rule. First, statements made by the USPTO regarding an international treaty are entirely irrelevant to whether Plaintiff is entitled to a preliminary injunction against the YouTube Defendants. *United States v. Black*, 482 F.3d 1035, 1041 (9th Cir.), *cert. denied*, 552 U.S. 1023 (2007) (requiring that matters judicially noticed have a "direct relation to the matters at issue.") Second, the USPTO merely stated that "[u]nder U.S. law, actors and musicians are considered to be 'authors' of their performances providing them with copyright rights." [Dkt. No. 13, ¶ 3, Exh. A.] Whether a particular actor has a copyright in his or her performance requires an analysis of the specific facts of the case, including but not limited to whether the actor was working as an employee. The purpose of the judicial notice doctrine is not to establish rules of law that are more properly established by binding statues and case law.

## C. Irrelevant Factual Findings Made by Another Court Should Not Be Judicially Noticed.

Finally, Plaintiff requests judicial notice of "the public case file" in *United States v. Nakoula*, United States District Court Case No. CR09-617-CAS, including (i) the Order of Detention After Hearing and (2) the Judgment/Probation Commitment Order. [Dkt. No. 13, ¶ 4, Exh. B.] In addition to the existence of the documents, Plaintiff requests judicial notice of findings of fact contained in those documents; specifically, that "Magistrate Judge Segal found that [Defendant Youssef, also known as Nakoula] may have violated the terms of his probation, used aliases, and is both a flight risk and danger to the community." [*Id.*]

Court proceedings may be subject to judicial notice, but only when they "have direct relation to the matters at issue." *Black*, 482 F.3d at 1041. The status

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 200 of 266

of Youssef's criminal proceedings, including the terms of his probation, have no relevance to the issue of whether Plaintiff is entitled to a preliminary injunction against the YouTube Defendants under the Copyright Act.

Further, "a court may not take judicial notice of findings of facts from another case." *Walker*, 454 F. Supp. 2d at 1022. Therefore Magistrate Judge Segal's factual findings regarding defendant Youssef's possible violation of his probation, use of aliases, and so forth, are not properly subject to judicial notice.

### IV.   CONCLUSION

For the foregoing reasons, Plaintiff's Request for Judicial Notice should be denied in its entirety.

DATED:  October 29, 2012

PERKINS COIE LLP

By: */s/ Timothy L. Alger*
    Timothy L. Alger

Attorneys for Defendants Google Inc. and YouTube, LLC

Defendants Google And Youtube's Opposition
To Plaintiff's RJN
CV-12-8315-MWF (VBKx)

ER675

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 201 of 266

1   Timothy L. Alger (SBN 160303)
    TAlger@perkinscoie.com
2   PERKINS COIE LLP
    3150 Porter Drive
3   Palo Alto, CA  94304-1212
    Telephone:  650.838.4300
4   Facsimile:  650.838.4350

5   Sunita Bali (SBN 274108)
    SBali@perkinscoie.com
6   PERKINS COIE LLP
    1888 Century Park E., Suite 1700
7   Los Angeles, CA  90067-1721
    Telephone:  310.788.9900
8   Facsimile:  310.788.3399

9   Attorneys for Defendant
    Google Inc. and YouTube, LLC
10

11              UNITED STATES DISTRICT COURT

12              CENTRAL DISTRICT OF CALIFORNIA

13

14   CINDY LEE GARCIA, an individual,      Case No. CV-12-8315-MWF (VBKx)

15              Plaintiff,                 Assigned to the Honorable Michael W.
                                           Fitzgerald
16       v.
                                           OBJECTIONS BY GOOGLE INC.
17   NAKOULA BASSELEY NAKOULA,             AND YOUTUBE, LLC TO
     an individual also known as SAM       EVIDENCE SUBMITTED IN
18   BACILE, MARK BASSELEY                 SUPPORT OF PLAINTIFF'S MOTION
     YOUSSEF, ABANOB BASSELEY              FOR PRELIMINARY INJUNCTION
19   NAKOULA, MATTHEW NEKOLA,              AND ORDER OF IMPOUNDMENT
     AHMED HAMDY, AMAL NADA,
20   DANIEL K. CARESMAN, KRITBAG           Date:       December 3, 2012
     DIFRAT, SOBHI BUSHRA, ROBERT          Time:       10:00 a.m.
21   BACILY, NICOLA BACILY,                Courtroom:  1600
     THOMAS J. TANAS, ERWIN
22   SALAMEH, YOUSSEFF M.
     BASSELEY, and/or MALID
23   AHLAWI; GOOGLE, INC., a
     Delaware Corporation; YOUTUBE,
24   LLC, a California limited liability
     company, and DOES 1 through 10,
25   inclusive,

26              Defendants.

27

28

                                    -1-        Defendants' Objection to Evidence Submitted
                                               by Plaintiff ISO Mtn for Preliminary Injunction

                                                     CV-12-8315-MWF (VBKx)

ER676

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 202 of 266

1      Defendants Google Inc. and YouTube, LLC (collectively the "YouTube

2  Defendants") submit the following objections to the evidence submitted by Plaintiff

3  Cindy Lee Garcia in support of her Motion for Preliminary Injunction.[1]

4  **I.     Objections to the Declaration of Zahavah Levine[2]**

5      The YouTube Defendants object to the declaration in its entirety, including

6  all exhibits, on the ground that it is irrelevant.  The Digital Millennium Copyright

7  Act ("DMCA") works as an affirmative defense to a claim for copyright

8  infringement against a service provider.  It eliminates monetary relief if a service

9  provider expeditiously removes copyrighted matter upon request of the copyright

10  owner or upon obtaining actual or constructive knowledge that specific material is

11  infringing.  17 U.S.C. § 512(c).  Plaintiff is seeking injunctive relief, not monetary

12  relief.  Therefore, testimony regarding YouTube's practices under the DMCA is not

13  relevant to Plaintiff's motion.

14      The YouTube Defendants further object to the declaration in its entirety,

15  including all exhibits, on the ground that it consists entirely of inadmissible hearsay

16  that is not subject to any exception.  Accordingly, it should be excluded.

17  **II.    Objections to Declaration of Cindy Lee Garcia[3]**

| No. | Material Objected To | Ground(s) for Objection |
|---|---|---|
| 1. | Paragraph 5, fifth sentence. | Hearsay not subject to any exception. |
| 2. | Paragraph 7, in its entirety. | Improper legal conclusion. |
| 3. | Paragraph 8, first sentence. | Improper legal conclusion. |
| 4. | Paragraph 8, second sentence. | Speculation; lacks foundation. |
| 5. | Paragraph 9, second sentence. | Improper legal conclusion. |
| 6. | Paragraph 10, third and fourth sentences. | Hearsay not subject to any exception. |

[1] The Evidence addressed here was initially submitted in support of Plaintiff's ex parte application for a temporary restraining order, which was denied on October 18, 2012. [Dkt. No. 15.]

[2] *See* Dkt. No. 14-1.

[3] *See* Dkt. No. 14.

Defendants' Objection to Evidence Submitted
by Plaintiff ISO Mtn for Preliminary Injunction

CV-12-8315-MWF (VBKx)

ER677

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 203 of 266

| No. | Material Objected To | Ground(s) for Objection |
|---|---|---|
| 7. | Paragraph 10, seventh sentence. | Speculation. |
| 8. | Paragraph 12, sentence two. | Hearsay not subject to any exception. |
| 9. | Paragraph 13, first sentence. | Speculation; lacks foundation; improper opinion testimony as to the impact of the film. |
| 10. | Paragraph 13, fourth sentence. | Hearsay not subject to any exception. |
| 11. | Paragraph 13, sixth sentence. | Speculation. |
| 12. | Paragraph 14, first sentence. | Speculation; lacks foundation; hearsay not subject to any exception. |
| 13. | Paragraph 14, third sentence. | Hearsay not subject to any exception. |
| 14. | Paragraph 15, second, third and fourth sentences. | Hearsay not subject to any exception; probative value outweighed by unfair prejudice (Fed. R. Evid. 403). |
| 15. | Paragraph 16, fourth sentence. | Hearsay not subject to any exception; probative value outweighed by unfair prejudice (Fed. R. Evid. 403). |
| 16. | Paragraph 17, first, third, fourth, fifth sentences and Exhibit B. | Hearsay not subject to any exception; probative value outweighed by unfair prejudice (Fed. R. Evid. 403). |

## III. Objections to Declaration of Dan Sutter[4]

The YouTube Defendants object to the declaration in its entirety on the ground that the matters stated by the declarant are irrelevant.

| No. | Material Objected To | Ground(s) for Objection |
|---|---|---|
| 1. | Paragraph 2, second sentence. | Hearsay not subject to any exception. |
| 2. | Paragraph 4, in its entirety. | Improper legal conclusion. |
| 3. | Paragraph 5, third sentence. | Speculation; lacks foundation. |

## IV. Objections to Declaration of John Doe No. 1[5]

[4] See Dkt. No. 14.

Defendants' Objection to Evidence Submitted
by Plaintiff ISO Mtn for Preliminary Injunction

CV-12-8315-MWF (VBKx)

ER678

1    The YouTube Defendants object to the declaration in its entirety on the

2  ground that the matters stated by the declarant are irrelevant.

3

| No. | Material Objected To | Ground(s) for Objection |
|-----|----------------------|-------------------------|
| 1.  | Paragraph 2, third sentence. | Hearsay not subject to any exception. |
| 2.  | Paragraph 2, sixth sentence. | Hearsay not subject to any exception; speculation; lacks foundation; improper opinion testimony as to the impact of the Film. |
| 3.  | Paragraph 4, in its entirety. | Improper legal conclusion. |
| 4.  | Paragraph 5, first sentence. | Lacks foundation; hearsay not subject to any exception. |
| 5.  | Paragraph 6, third sentence. | Speculation; lacks foundation. |
| 6.  | Paragraph 6, fifth sentence. | Speculation; vague; ambiguous. |
| 7.  | Paragraph 6, sixth sentence. | Relevance; improper opinion testimony regarding the inflammatory nature of the lines. |
| 8.  | Exhibit A. | Hearsay not subject to any exception; exhibit not attached. |
| 9.  | Exhibit B. | Hearsay not subject to any exception; exhibit not attached. |

## V.   Objections to Declaration of Khaled Abou El Fadl[6]

| No. | Material Objected To | Ground(s) for Objection |
|-----|----------------------|-------------------------|
| 1.  | Paragraph 7, second sentence. | Speculation; lacks foundation; improper expert opinion as to the safety of all actors in the film; probative value outweighed by unfair prejudice (Fed. R. Evid. 403). |

---

[5] *See* Dkt. No. 14.  Although the Declaration of John Doe No. 1 states that he was told that an unredacted version of his declaration containing his true name would be filed under seal, his unredacted declaration, revealing his true name, was filed by Plaintiff's counsel through the Court's ECF system.
[6] *See* Dkt. No. 14.

-4-

Defendants' Objection to Evidence Submitted
by Plaintiff ISO Mtn for Preliminary Injunction

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 204 of 266

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 205 of 266

| No. | Material Objected To | Ground(s) for Objection |
|-----|---------------------|------------------------|
| 2. | Paragraph 8, second, third, fourth, fifth, sixth, seventh, eighth, ninth, tenth, eleventh and twelfth sentences. | Speculation; lacks foundation; lacks personal knowledge; hearsay not subject to any exception; probative value outweighed by unfair prejudice (Fed. R. Evid. 403). |
| 3. | Paragraph 8, fifth sentence. | Speculation; lacks foundation; lacks personal knowledge; improper expert opinion regarding the cause of protests in Cairo, Egypt |
| 4. | Paragraph 9, in its entirety. | Speculation; lacks foundation; lacks personal knowledge; hearsay not subject to any exception; best evidence rule; probative value outweighed by unfair prejudice (Fed. R. Evid. 403). |
| 5. | Paragraph 10, in its entirety. | Lacks foundation; lacks personal knowledge; hearsay not subject to any exception; probative value outweighed by unfair prejudice (Fed. R. Evid. 403). |
| 6. | Paragraph 11, in its entirety. | Lacks foundation; hearsay not subject to any exception; lacks personal knowledge; vague and ambiguous as to the terms "violence" and "dramatic events"; probative value outweighed by unfair prejudice (Fed. R. Evid. 403). |
| 7. | Paragraph 12, in its entirety, and Exhibit B. | Lacks foundation; hearsay not subject to any exception; lacks personal knowledge; probative value outweighed by unfair prejudice (Fed. R. Evid. 403). |
| 8. | Paragraph 13, in its entirety, and Exhibit C. | Lacks foundation; hearsay not subject to any exception; lacks personal knowledge; probative value outweighed by unfair prejudice (Fed. R. Evid. 403). |
| 9. | Paragraph 14, in its entirety. | Speculation; lacks foundation; lacks personal knowledge; hearsay not subject to any exception; best evidence rule; probative value outweighed by unfair prejudice (Fed. R. Evid. 403). |
| 10. | Paragraph 15, in its entirety. | Speculation; lacks foundation; lacks |

Defendants' Objection to Evidence Submitted
by Plaintiff ISO Mtn for Preliminary Injunction

CV-12-8315-MWF (VBKx)

ER680

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 206 of 266

| No. | Material Objected To | Ground(s) for Objection |
|---|---|---|
|  |  | personal knowledge; probative value outweighed by unfair prejudice (Fed. R. Evid. 403). |
| 11. | Paragraph 15, third sentence and Exhibit D. | Hearsay not subject to any exception; exhibit not attached. |
| 12. | Paragraph 15, fourth sentence. | Speculation; lacks foundation; improper expert opinion regarding whether violence occurred. |
| 13. | Paragraph 16, first and third sentences. | Hearsay not subject to any exception; lacks personal knowledge; probative value outweighed by unfair prejudice (Fed. R. Evid. 403). |
| 14. | Paragraph 16, second sentence. | Speculation; lacks foundation; improper expert opinion regarding the fatwa allegedly issued on the life of the actors in the film. |
| 15. | Paragraph 16, third sentence. | Hearsay not subject to any exception; speculation; exhibit not attached. |
| 16. | Paragraph 16, fourth and fifth sentences. | Speculation; lacks foundation; lacks personal knowledge; improper legal conclusion; vague and ambiguous. |
| 17. | Paragraph 17, fourth sentence. | Speculation; lacks foundation; vague and ambiguous. |
| 18. | Paragraph 17, fifth sentence. | Speculation; lacks foundation; improper legal conclusion; improper expert testimony regarding the danger to Plaintiff; probative value outweighed by unfair prejudice (Fed. R. Evid. 403). |
| 19. | Paragraph 17, sixth sentence. | Speculation; lacks foundation; improper expert testimony regarding unannounced or secretive calls by extremist or fanatic groups; probative value outweighed by unfair prejudice (Fed. R. Evid. 403). |
| 20. | Paragraph 18, second sentence. | Speculation; lacks foundation; vague and ambiguous. |
| 21. | Paragraph 18, fourth sentence. | Lacks personal knowledge; speculation; lacks foundation; probative value outweighed by unfair prejudice (Fed. R. Evid. 403). |

-6-

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 207 of 266

| No. | Material Objected To | Ground(s) for Objection |
|---|---|---|
| 22. | Paragraph 19, in its entirety. | Hearsay not subject to any exception; lacks foundation; best evidence rule; probative value outweighed by unfair prejudice (Fed. R. Evid. 403). |
| 23. | Paragraph 20, in its entirety. | Hearsay not subject to any exception; probative value outweighed by unfair prejudice (Fed. R. Evid. 403). |
| 24. | Paragraph 21, first sentence. | Speculation; lacks personal knowledge; lacks foundation; probative value outweighed by unfair prejudice (Fed. R. Evid. 403). |
| 25. | Paragraph 21, second sentence. | Speculation; lacks personal knowledge; lacks foundation; improper legal conclusion; improper expert opinion regarding Plaintiff's ability to travel; probative value outweighed by unfair prejudice (Fed. R. Evid. 403). |
| 26. | Paragraph 21, third sentence. | Speculation; lacks personal knowledge; lacks foundation; improper expert opinion regarding the world's view of Plaintiff; probative value outweighed by unfair prejudice (Fed. R. Evid. 403). |
| 27. | Paragraph 21, fourth, fifth and sixth sentences. | Speculation; lacks personal knowledge; lacks foundation; hearsay not subject to any exception; improper expert opinion regarding how the film and Plaintiff are universally viewed; probative value outweighed by unfair prejudice (Fed. R. Evid. 403). |
| 28. | Paragraph 21, seventh, eighth and ninth sentences. | Speculation; lacks personal knowledge; lacks foundation; improper legal conclusion; improper expert testimony regarding the danger to Plaintiff; probative value outweighed by unfair prejudice (Fed. R. Evid. 403). |
| 29. | Paragraph 22, in its entirety. | Relevance; lacks personal knowledge; speculation; improper expert testimony regarding personal opinion of film; probative value outweighed by unfair prejudice (Fed. R. Evid. 403). |

Defendants' Objection to Evidence Submitted
by Plaintiff ISO Mtn for Preliminary Injunction

CV-12-8315-MWF (VBKx)

ER682

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 208 of 266

| No. | Material Objected To | Ground(s) for Objection |
|---|---|---|
| 30. | Paragraph 22, third, fifth, seventh, eighth and ninth sentences. | Speculation; lacks foundation; improper legal conclusion; improper expert testimony regarding personal opinion of film; probative value outweighed by unfair prejudice (Fed. R. Evid. 403). |
| 31. | Paragraph 22, sixth sentence. | Hearsay not subject to any exception; lacks foundation; lacks personal knowledge; probative value outweighed by unfair prejudice (Fed. R. Evid. 403). |
| 32. | Paragraph 23, in its entirety. | Speculation; lacks foundation; vague and ambiguous; probative value outweighed by unfair prejudice (Fed. R. Evid. 403). |
| 33. | Paragraph 23, fifth sentence. | Improper legal conclusion. |
| 34. | Paragraph 24, in its entirety. | Relevance; speculation; lacks foundation; improper expert opinion regarding how the film and Plaintiff are universally viewed; vague and ambiguous; probative value outweighed by unfair prejudice (Fed. R. Evid. 403). |
| 35. | Paragraph 24, third and fourth sentences. | Speculation; lacks foundation; improper legal conclusion; probative value outweighed by unfair prejudice (Fed. R. Evid. 403). |
| 36. | Paragraph 25, second and third sentences. | Speculation; lacks foundation; improper expert testimony regarding the "heart" of the work and the cause of outrage in the world; probative value outweighed by unfair prejudice (Fed. R. Evid. 403). |

## VI.  Objections to Declaration of M. Cris Armenta[7]

| No. | Material Objected To | Ground(s) for Objection |
|---|---|---|
| 1. | Paragraph 2, in its entirety. | Relevance; probative value outweighed by unfair prejudice (Fed. R. Evid. 403). |

---

[7] *See* Dkt. No. 14-3.

Defendants' Objection to Evidence Submitted
by Plaintiff ISO Mtn for Preliminary Injunction

CV-12-8315-MWF (VBKx)

ER683

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 209 of 266

| No. | Material Objected To | Ground(s) for Objection |
|-----|----------------------|-------------------------|
| 2. | Paragraph 2, fifth, sixth, seventh and eighth sentences. | Hearsay not subject to any exception. |
| 3. | Paragraph 3, in its entirety. | Relevance; hearsay not subject to any exception. |
| 4. | Paragraph 3, second and third sentences. | Speculation; lacks foundation. |
| 5. | Paragraph 4, in its entirety. | Relevance; hearsay not subject to any exception; misrepresents Defendants' position. |
| 6. | Paragraph 5, in its entirety. | Relevance; probative value outweighed by unfair prejudice (Fed. R. Evid. 403); misrepresents Defendants' position. |
| 7. | Paragraph 6, second sentence. | Relevance; hearsay not subject to any exception; misrepresents Defendants' position. |
| 8. | Paragraph 8, in its entirety, and Exhibit B. | Relevance. |
| 9. | Paragraph 9, in its entirety, and Exhibit C. | Hearsay not subject to any exception. |
| 10. | Paragraph 10, in its entirety. | Speculation; lacks foundation; relevance; probative value outweighed by unfair prejudice (Fed. R. Evid. 403). |
| 11. | Paragraph 10, second, third, fourth sentences and Exhibit D. | Relevance; hearsay not subject to any exception; probative value outweighed by unfair prejudice (Fed. R. Evid. 403). |
| 12. | Paragraph 11, in its entirety. | Relevance. |
| 13. | Paragraph 11, third, fourth and fifth sentences. | Hearsay not subject to any exception. |

## VII.   Objections to the Declaration of David Hardy[8]

The YouTube Defendants object to the declaration in its entirety, including all exhibits, on the ground that it is irrelevant. The DMCA works as an affirmative

[8] See Dkt. No. 14-2.

Defendants' Objection to Evidence Submitted
by Plaintiff ISO Mtn for Preliminary Injunction

CV-12-8315-MWF (VBKx)

ER684

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 210 of 266

1   defense to a claim for copyright infringement against a service provider.  It

2   eliminates monetary relief if a service provider expeditiously removes copyrighted

3   matter upon request of the copyright owner or upon obtaining actual or constructive

4   knowledge that specific material is infringing.  17 U.S.C. § 512(c).  Plaintiff seeks

5   injunctive relief, not monetary relief, in her ex parte application.  Therefore,

6   testimony regarding YouTube's practices under the DMCA is not relevant to

7   Plaintiff's motion.

8        The YouTube Defendants further object to the declaration in its entirety,

9   including all exhibits, on the ground that it consists almost entirely of inadmissible

10   hearsay that is not subject to any exception.  Accordingly, it should be excluded.

11   DATED:  October 29, 2012            **PERKINS COIE LLP**

12

13                        By: */s/ Timothy L. Alger*

14                            Timothy L. Alger

15                       Attorneys for Defendants
                            Google Inc. and YouTube, LLC

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendants' Objection to Evidence Submitted
by Plaintiff ISO Mtn for Preliminary Injunction

CV-12-8315-MWF (VBKx)

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 211 of 266

1  M. Cris Armenta (SBN 177403)
   THE ARMENTA LAW FIRM APC
2  11900 W. Olympic Boulevard, Suite 730
   Los Angeles, CA 90064
3  Tel: (310) 826-2826 x 108
   Facsimile: (310) 826-5456
4  Email: cris@crisarmenta.com

5  Credence E. Sol (SBN 219784)
   La Garenne
6  86300 Chauvigny
   France
7  Telephone: 06 74 90 22 08
   Email: credence.sol@sol-law.com
8
   Attorneys for Plaintiff
9  Cindy Lee Garcia

10           **UNITED STATES DISTRICT COURT**

11        **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

12
   CINDY LEE GARCIA, an           Case No. CV12-8315 MWF (VBKx)
13 individual,
                                  **(1) REPLY MEMORANDUM OF**
14              Plaintiff,            **POINTS AND AUTHORITIES IN**
                                     **SUPPORT OF MOTION FOR**
15 vs.                               **PRELIMINARY INJUNCTION**
                                     **AND ORDER OF**
16 NAKOULA BASSELEY                  **IMPOUNDMENT;**
   NAKOULA, an individual also       **DECLARATION OF M. CRIS**
17 known as SAM BACILE, MARK         **ARMENTA IN SUPPORT**
   BASSELEY YOUSSEF,                 **THEREOF (filed separately);**
18 ABANOB BASSELEY
   NAKOULA, MATTHEW               **(2) PLAINTIFF'S RESPONSE TO**
19 NEKOLA, AHMED HAMDY,             **OBJECTIONS BY GOOGLE,**
   AMAL NADA, DANIEL K.             **INC. AND YOUTUBE LLC TO**
20 CARESMAN, KRITBAG                **EVIDENCE SUBMITTED IN**
   DIFRAT, SOBHI BUSHRA,            **SUPPORT OF PLAINTIFF'S**
21 ROBERT BACILY, NICOLA            **MOTION FOR PRELIMINARY**
   BACILY, THOMAS J. TANAS,         **INUNCTION AND ORDER OF**
22 ERWIN SALAMEH, YOUSSEFF          **IMPOUNDMENT (filed**
   M. BASSELEY, and/or MALID        **separately);**
23 AHLAWI; GOOGLE, INC., a
   Delaware Corporation;
24 YOUTUBE, LLC, a California
   limited liability company, and
25 DOES 1 through 10, inclusive.

26              Defendants.

27

28
                                        EX PARTE APPLICATION AND NOTICE
                                        CV12-8315 MWF (VBKx)

**ER686**

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 212 of 266

1    CINDY LEE GARCIA, an
individual,

2

3                Plaintiff,

4    vs.

5    NAKOULA BASSELEY
NAKOULA, an individual also

6    known as SAM BACILE, MARK
BASSELEY YOUSSEF,

7    ABANOB BASSELEY
NAKOULA, MATTHEW

8    NEKOLA, AHMED HAMDY,
AMAL NADA, DANIEL K.

9    CARESMAN, KRITBAG
DIFRAT, SOBHI BUSHRA,

10   ROBERT BACILY, NICOLA
BACILY, THOMAS J. TANAS,

11   ERWIN SALAMEH, YOUSSEFF
M. BASSELEY, and/or MALID

12   AHLAWI; GOOGLE, INC., a
Delaware Corporation;

13   YOUTUBE, LLC, a California
limited liability company, and

14   DOES 1 through 10, inclusive.

15               Defendants.

Case No. CV12-8315 MWF (VBKx)

**(3) PLAINTIFF'S OBJECTIONS TO EVIDENCE SUBMITTED BY GOOGLE INC., AND YOUTUBE, LLC. IN OPPOSITION BRIEF TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND ORDER OF IMPOUNDMENT (filed separately);**

**(4) [PROPOSED] ORDER SUSTAINING PLAINTIFF'S OBJECTIONS TO EVIDENCE SUBMITTED BY GOOGLE, INC., AND YOUTUBE LLC IN OPPOSITION BRIEF TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND AN ORDER OF IMPOUNDMENT (lodged separately)**

16

17

18

19

20

21

22

23

24

25

26

27

28

EX PARTE APPLICATION AND NOTICE
CV12-8315 MWF (VBKx)

ER687

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 213 of 266

# TABLE OF CONTENTS

TABLE OF CONTENTS… ...................................................................... .i

TABLE OF AUTHORITIES ............................................................. iii

REPLY MEMORANDUM OF POINTS AND AUTHORITIES........................... 1

I.   PRELIMINARY STATEMENT.................................................. 1

II.   ARGUMENT ........................................................................ 3

A.   Plaintiff, Like Any Other Performer, Owns the Rights to Her Dramatic Work;Defendants' Suggestion That No Actor Who Is Not a"Star" Enjoys Copyright Protection Is Entirely Unmeritous……………………………………………………..………3

1.   Almuhammad in inapposite, and to the extent that it is on point at all, it supports Plaintiff's position…………………..4

2.   An actor's rights do not depend on the length of time that that she appears in the film, and those rights are not reduced because she recited lines written by others…………7

B.   Defendants' Argument That Plaintiff Cannot Claim a Copyright In Those Portions of the Film Containing Her Dramatic Performance Is, Simply, Wrong…………………………………………8

C.   This Court Should Not Be Misled By Defendants' False Assertion That Plaintiff Claims That Defendant Youssef Is The Film's "Exclusive Copyright Owner."…………………… ……………11

D.   Ms. Garcia Did Not Provide A "Work-for-Hir………………………12

E.   Defendants Apparently Concede That All of the Third Parties Who Have Uploaded the Film Are Infringers………………………17

F.   Plaintiff Has Shown Irreparable Harm……………………………....17

G.   Plaintiff Has Not Delayed in Seeking Relief…………………………19

H.   The First Amendment Does Not Prohibit the Relief Sought And the Balance of Equities Tip Sharply in Plaintiff's Favor………22

III.   CONCLUSION ................................................................... …24

SUPPLEMENTAL DECLARATION OF M. CRIS ARMENTA........................ att.

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 214 of 266

# TABLE OF AUTHORITIES

**Federal Statutes**

17 U.S.C. § 107…………………………………………………........…7

17 U.S.C. § 201 (b) …………………………………………………16

**U.S. Constitution**

Art. I, § 8, cl. 8…………..…………………………………………1

**State Statutes**

Cal. Civ. Proc. § 527.6…………………………………………18

**Cases**

Aalmuhammed v. Lee,
202 F.2d 1227, 1233-1234 (9th Cir. 2000) ………………… 5,6,8

Antelope Valley Press v. Poizner
162 Cal.App.4th 839 (2008) (*cited in* Oppo. Br. at 18), ……… 14

Aymes *v.* Bonelli,
980 F.2d 857 (2d Cir. 1992)……………………………… 15

Booth v. Colgate-Palmolive Co.,
362 F.Supp. 343, 347 (S.D.N.Y. 1973)
(*cited in* Opp. Br. at 15),…………………………………… 8

Brown v. Twentieth Century Fox Film Corp.,
799 F. Supp. 166 (D.D.C. 1992) ……………………………… 13

Cantwell v. Connecticut,
310 U. S. 296 (1940),…………………………………………… 23

Community for Creative Non-Violence v. Reid,
490 U.S. 730, 109 S.Ct2166, 104 L.Ed.2d 811
(1989),. ………………………………………………… 4,14,15,16

Cybermedia Inc v. Symantec Corp.,
19 F. Supp. 2d 1070 (1998)……………………………… 21

DeNovellis v. Shalala,
135 F.3d 58, 64 (1st Cir. 1998),……………………… 22,23

Effects Associates, Inc. v. Cohen, et al.,
908 F.2d 555 (9th Cir. 1990), ……………………………… 6,8

Ellison v. Robertson,
357 F.3d 1072, 1076 (9th Cir. 2004). ………………………… 3

ii

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 215 of 266

Enyart v. Nat'l Conf. of Bar Examiners, Inc.,
630 F.3d 1153, 1165 (9th Cir. 2011) .......................................... 23

Feiner v. NewYork,
340 U.S. 315, 321 (1951). ...................................................... 23

Fleet v. CBS, Inc.,
50 Cal. App. 4th 1911, 1919-1920 (1996) ............................. 4,10

Jules Jordan Video v. 144942 Canada,
617 F.3d 1146 (9th Cir. 2010), ................................. 4,7 ,10,11,15

Laws v. Sony Music Entm't, Inc.,
448 F.3d 1134, 1137 (9th Cir. 2006), ................................. 4,7,9,10

Lin-Brook Builders Hardware v. Gertler
352 F.2d 298, 300 (9th Cir. 1965) ............................................. 17

Muller v. Walt Disney Productions,
871 F. Supp. 678 (S.D.N.Y. 1994) ........................................... 13

NRDC v. Winter,
530 F. Supp. 2d 1110 (C. D. Cal. 2007) ................................... 17

Oster v. Lightbourne,
2011 U.S. Dist. LEXIS 138191 (N.D. Cal. 2011) ................... 17

Perfect 10 v. Google, Inc.,
653 F.3d 976, 982 (9th Cir. 2011) ............................................. 21

Richmond v. Weiner,
353 F.2d 41 (9th Cir. 1965) (cited in Opp. Br. at 16), .............. 12

Rooney v. Columbia Pictures, Inc.,
538 F. Supp. 211 (S.D.N.Y. 1982) ........................................... 13

Sampson v. Murray,
415 U.S. 61, 90 (1974), ............................................................ 22

Schenck v. United States,
249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919) ................ 23

Selby v. New Line Cinema Corp.,
96 F.Supp.2d 1053 (C.D. Cal. 2000) .................................... 11,12

Shegog v. Board of Ed. Of City of Chicago,
94 F. 3d 836 (9th Cir. 1999) ..................................................... 22

TMTV Corp. v Pegasus Broad. of San Juan,
490 F Supp. 2d 228 (D.C. Puerto Rico 2007) ......................... 4,7

Trenton v. Infinity Broadcasting Corp.
865 F.Supp. 1416, 1426. ........................................................... 17

iii



Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 216 of 266

1

2      Turner v. Gibson,
       2011 U.S. Dist. LEXIS 123324 (C. D. Cal. Oct. 25, 2011),.... 17
3
       Twentieth Century Fox Film Corp. v. Entm't. Distrib.,
4      429 F.3d 869, 880 (9th Cir. 2005)............................................... 17

5      Waits v. Frito-Lay,
       978 F.2d 1093, 1099 (9th Cir. Aug. 5, 1992) ............................... 9
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TABLE OF CONTENTS
CV12-8315 MWF(VBKx)

ER691

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 217 of 266

**REPLY MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   PRELIMINARY STATEMENT

In the Opposition ("Opp. Br.") of Google Inc. ("Google") and YouTube LLC ("YouTube") (collectively, "Defendants") to Plaintiff's Motion for a Preliminary Injunction and Order of Impoundment,[1] Defendants urge this Court to find that actors' performances on film are not protected by copyright law, unless the actor was the star or was also the script writer or director. Such a finding would turn the entire film industry upside down, and is also in direct contravention to the law in this Circuit and the United States Copyright Act which has its genesis in United States Constitution. U.S. Const., Art. I, § 8, cl. 8. As Defendants note, the "custom and practice" in the industry is that producers obtain releases from actors, which transfer the actor's copyright interests in their performances to the producers. It is because the law is so well settled that actors own a copyright interest in their performances the second they are affixed to a tangible medium (i.e., film) that this very custom and practice of obtaining releases exists. Defendants' argument – that minor actors simply do not make creative contributions because they are reading a script or do not have marquee billing– denigrates the work of actors and ignores the Copyright Act.

Defendants argue that Plaintiff suffers no irreparable harm because the infringing film was first posted on July 2, 2012. While the posting of the Film then represented copyright infringement, no grave irreparable harm presented itself to Plaintiff until after the Film was seen worldwide, Plaintiff received death threats,

---

[1]   Plaintiff objects to the entire Opposition Memorandum submitted by Defendants as exceeding the page limits contained in Local Rule 11-6. The Defendants' 24 page brief contains 17 footnotes, each of which violates Local Rule 11-3.1, requiring all typeface within the brief to be in 14-point type. By violating Rule 11-3.1, Plaintiff has violated the page limit rule contained in Rule 11-6. Moreover, many of the footnotes contain World Wide Web URLs without providing the Court with the documentation cited or claimed to exist. At a minimum, all 17 footnotes should be disregarded in their entirety.

1

CV 12 8315 (VBKx)

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 218 of 266

1    and a bounty was placed on head through a call by an Egyptian religious figure to

2    "all Muslim youth in America" to kill her.  Plaintiff acted promptly.  (See Defs.

3    RJN.)  She attempted to block the Film, through a state court action, within six

4    days of the attacks in Benghazi and the ensuing worldwide attention to the Film.

5    Blocked by the Communications Decency Act and the inability to find

6    Nakoula/Youssef, who was then in hiding, Plaintiff filed this copyright action in

7    federal court on September 25, 2012.  Defendants accepted service on October 4,

8    2012.  Defense counsel claimed unavailability to handle anything in this case from

9    October 11-16.  The Motion was filed on October 18.  At best, the "delay" in

10   seeking relief was *four* business days.  Defendants' claim of delay is disingenuous

11   given their own delays and the well established timeline of events in this case.

12          Defendants pooh-pooh the explicit and written death threats and worldwide

13   pronouncement of death on Plaintiff, calling them mere "insults."  As Justice Scalia

14   so eloquently put it, however, "Death is different."  Much like the threatened victim

15   in a domestic violence or stalking case, must we wait until Cindy Lee Garcia is

16   murdered for the actual, written, explicit threats of death to have any impact?

17   Additionally, the Court has before it credible evidence from a world-renowned

18   counter-terrorism expert, UCLA law professor and renowned Muslim scholar Abou

19   El Fadl, that Garcia's public efforts in distancing herself from the Film and her

20   ability to take down the Film may ameliorate the threats to her life.  The White

21   House has requested that Defendants review removing the Film, but Defendants

22   refused, and Google's Chairman has steadfastly declared to the world that "the film

23   will stay up."[2]  It is only the actors, with protectable and unassigned interests, who

24   have proper standing to challenge Defendants' continued publication of the Film.

25   Without submitting any admissible evidence, Defendants claim that taking down

26

27   [2]    Given that it is the Chairman of Google who made the executive decision to
       keep the Film up, it will be interesting to hear Google's anticipated Motion to
28   Dismiss, which is anticipated to argue that Google exerts no control over YouTube.

                                                    2

                                                                    CV 12 8315 (VBKx)

ER693

1   the Film will have no impact because third parties also have posted the Film.

2   Defendants ignore the fact that the DMCA takedown notices address all third-party

3   posters on YouTube, none of whom have any rights to post or disseminate the

4   Film. There is no admissible evidence before the Court that the Film exists or is

5   being published anywhere else except on YouTube. If the Court agrees with the

6   well settled rule, as acknowledged by WIPO and the United States Trademark

7   Office, that actors do, in fact, own the rights to their performances unless

8   transferred, then Plaintiff can then address any other posters (if they even exist) or

9   publishers, after this Court's ruling.

10         This is *not* a First Amendment Case. No state action is involved.

11   Defendants' argument, that an injunction would constitute an illegal prior restraint,

12   ignores the entire body of copyright law – copyright law is an *exception* to the First

13   Amendment. Both are embodied in the United States Constitution. If Defendants

14   were correct, the First Amendment would prevent courts from *ever* enjoining

15   copyright infringement. Defendants' own arguments conflict: on the one hand,

16   they argue that the Film has had no real effect or causation of harm of any kind,

17   and on the other hand, they claim that it is a matter of great public concern and

18   debate. Further, it is evident that the Film's incendiary message, propagadated

19   with digital speed, and resultant effect, constitutes shouting "fire" in our modern,

20   global theater.

21         Plaintiff therefore respectfully requests that the court GRANT the Motion for

22   Preliminary Injunction and Order of Impoundment.

23   II.   **ARGUMENT**

24         A.   **Plaintiff, Like Any Performer, Owns the Rights to Her Dramatic
              Work; Defendants' Suggestion That No Actor Who Is Not a**
25            **"Star" Enjoys Copyright Protection Is Entirely Unmeritorious.**

26         Plaintiff initially notes that she does not disagree with Defendants'

27   unremarkable observation that copyright infringement requires the plaintiff to have

28

3

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 219 of 266

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 220 of 266

1   owned a copyright and the defendant to have violated it. See Opp. Br. at 13, citing

2   Ellison v. Robertson, 357 F.3d 1072, 1076 (9th Cir. 2004). The main disagreement

3   between the parties is that Plaintiff takes the position, consistent with the Ninth

4   Circuit and other federal courts, the California state courts, the U.S. Patent and

5   Trademark Office, the U.S. Copyright Office, and the U.S. Government as a whole,

6   that the copyright interest in an actor's performance resides with that actor until

7   and unless it is assigned. See Opening Br. at 14-16, citing Fleet v. CBS, Inc., 50

8   Cal.App.4th 1911, 1919-1920 (1996); Laws v. Sony Music Entm't., Inc., 448 F.3d

9   1134, 1137 (9th Cir. 2006); Jules Jordan Video v. 144942 Canada, 617 F.3d 1146

10  (9th Cir. 2010); TMTV Corp. v. Pegasus Broad. Of San Juan, 490 F.Supp.2d 228

11  (D.C. P.R. 2007); Statements of U.S. Patent and Trademark Office and U.S.

12  Copyright Office; WIPO Audiovisual Dramatic Performance Treaty (July 2012).[3]

13       Defendants, on the other hand, argue alternatively that an actor's

14  contribution to a motion picture is not sufficiently "creative" to justify copyright

15  protection, or that this particular actor is a "little person" who does not enjoy the

16  same legal protections as would a "star." See Opp. Br. at 13 (arguing that author is

17  required to be "the" "mastermind" of the work, generally excluding every actor

18  involved in the creation of a film except "possibly the star"). Defendants'

19  argument is not only legally incorrect, it is dangerous, as it would turn both

20  copyright law and the entire entertainment industries on their heads.

21              1.      Almuhammad is inapposite, and to the extent that it is on point
22                      at all, it supports Plaintiff's position.

23       To the extent that Defendants argue that the only person entitled to copyright

24  protection is "the" "mastermind," they are incorrect.[4] The case that they cite for

25  _____
    [3]      In their opposition brief, Defendants ignore both the position of the United
26  States Government in connection with its accession to the WIPO Treaty, and
    TMTV Corp. v. Pegasus Broad. Of San Juan, 490 F.Supp.2d 228 (D.C. P.R. 2007)
27  (actors' portrayals of characters rendered them "authors"). See Opp. Br., passim.
    [4]      Community for Creative Non-Violence v. Reid, 490 U.S. 730, 109 S.Ct.
28  2166, 104 L.Ed.2d 811 (1989), the case Defendants cite for the proposition that the.

                                        4

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 221 of 266

1   this proposition, <u>Aalmuhammed v. Lee</u>, 202 F.3d 1227, 1233 (9th Cir. 2000) (<u>cited</u>

2   <u>in</u> Opp. Br. at 13), is not on point at all.  That case involved a dispute between

3   director Spike Lee and many major production companies and studios involved in

4   the making of the film *Malcolm X*, on the one hand, and Jefri Almuhammad, a

5   devout Muslim documentarian whom *Malcolm X* star Denzel Washington asked for

6   assistance in preparation for Mr. Washington's role, on the other.  <u>Aalmuhammed</u>,

7   202 F.3d at 1229.  The district court dismissed Mr. Almuhammad's copyright,

8   quantum meruit, and other claims under Rule 12(b)(6) and on summary judgment.

9   <u>Id.</u>  According to the Ninth Circuit, Mr. Almuhammad submitted evidence that he

10  reviewed the script and suggested revisions that would make the script more

11  historically and religiously accurate, provided translation services, participated in

12  post-production, and met with Islamic organizations to persuade them of the

13  accuracy of the completed film.  <u>Id.</u> at 1229-1230.  Mr. Almuhammad sued the

14  defendants when they credited him as an "Islamic Technical Consultant" rather

15  than as a writer; he claimed that *Malcolm X* was a "joint work" and that he

16  therefore co-owned the copyright.  <u>Id.</u> at 1230.  In contrast, as Defendants

17  themselves admit (<u>see</u> Opp. Br. at 19-20), this case does not involve a "joint work."

18      Even if <u>Almuhammed</u> were on point, it would support Plaintiff's case, not

19  Defendants'.  The Ninth Circuit in <u>Almuhammed</u> reviewed the plaintiff's

20  contributions and noted that the plaintiff "rewrote several specific passages" and an

21  unspecified number of "scenes" that appeared in the finished work, and that those

22  items "would have been independently copyrightable." *Id.* at 1231. *That work was*

23  _____

24  "author" of a creative work is "the" (singular) "person who translates an idea into a
    fixed, tangible expression entitled to copyright protection" is not even a case that is

25  about defining whether a film actor can claim a copyright in her performance.
    Rather, that case took up the issue of whether a sculptor who created a statute on an

26  oral commission from a nonprofit unincorporated association was the association's
    "employee" for the purposes of determining whether the sculpture was a "work for

27  hire." <u>Id.</u> The Supreme Court held that the sculptor was not an employee, and
    remanded the case to the district court to determine whether the parties had

28  intended to be joint authors who would co-own the copyright. <u>Id.</u>

5

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 222 of 266

1  *a full-length feature film: in other words, in* <u>*Almuhammad*</u> *the Ninth Circuit*
2  *expressly stated that a person who makes even a relatively small creative*
3  *contribution may assert a copyright interest in that contribution.* <u>See</u> <u>also</u> <u>id</u>. at
4  1232 ("We recognize that a contributor of an expression may be deemed to be the
5  'author' of that expression for purposes of determining whether it is independently
6  copyrightable."). To the extent that <u>Aalmuhammad</u> asserts to the contrary, it is
7  clear that that court could not come to a decision as to which of the many people
8  involved in the making of a film is the "author" under the Copyright Act – while
9  the court suggested producers, directors, "star[s]," and screenwriters, it never
10 actually made a decision on that issue. <u>Id.</u> at 1233. Defendants' heavy emphasis
11 on Ms. Garcia's standing as a supporting actor unworthy of equal protection under
12 the copyright laws overstates <u>Almuhammad's</u> holding. Moreover, in light of the
13 *fatwa* that has been put on her head as the result of having been made to appear to
14 recite the incendiary lines at the heart of the Film's message, it is grossly offensive.

15      Finally, Defendants completely ignore the on-point controlling Ninth Circuit
16 case, <u>Effects Associates, Inc. v. Cohen, et al.</u>, 908 F.2d 555 (9th Cir. 1990) (cited in
17 Opening Br. at 17), which eviscerates their argument that only individuals with
18 marquee billing may copyright their creative contributions. As set forth in
19 Plaintiff's opening brief, in <u>Effects Associates</u> the Ninth Circuit held that an
20 individual who created *special effects* for a film, but (like Plaintiff) had signed no
21 written agreement transferring copyright, retained ownership of his copyright. <u>See</u>
22 Opening Br. at 16, citing <u>Effects Associates</u>, 908 F.2d at 558. Quite simply, it is
23 the law of the land, as the Ninth Circuit has recognized, that "[t]he Supreme Court
24 and this circuit … have refused to permit moviemakers to sidestep" the Copyright
25 Act's requirement that a copyright be transferred in writing – whether the creator is
26 Tom Cruise or Cindy Lee Garcia.[5] <u>See id</u>.

27

28  [5]    Perhaps one of the reasons that the Ninth Circuit has hewn so closely to the

6

2.   An actor's rights do not depend on the length of time that she appears in the film, and those rights are not reduced because she recited lines written by others.

Defendants also argue that Plaintiff has no rights in her performance because her appearance was "brief." See Opp. Br. at 13. Defendants cite no authority for this proposition, and Plaintiff is not aware that any such authority exists. Brevity of performance does not affect the copyright interests of the performer. Rather, it is one of the four factors to be considered in a fair use analysis, a defense which the Defendants do not assert in this case. See 17 U.S.C. § 107.

Additionally, Defendants claim that Plaintiff has no rights in her dramatic performance because she (like all actors) "responded to a casting call" and performed lines that were provided to her. Defendants cite no authority for this proposition either. Indeed, that position cannot be true in light of case law holding that performers, virtually all of whom perform lines written by others, *do* enjoy a protectable copyright interest. See Laws v. Sony Music Entm't., Inc., 448 F.3d 1134, 1137 (9th Cir. 2006), Jules Jordan Video v. 144942 Canada, 617 F.3d 1146 (9th Cir. 2010), and TMTV Corp. v. Pegasus Broad. of San Juan, 490 F.Supp.2d 228 (D.C. P.R. 2007). It is offensive to conclude that actors, stars and not, do not make any "creative contributions," because they are merely readers of a script.

Defendants' assertion in footnote 12 that the Digital Millennium Copyright Act (the "DMCA") is "irrelevant" to the injunctive relief being sought by plaintiff is both obtuse and incorrect.[6] While Defendants correctly identify the DMCA's "safe harbor" provision as defensive in nature (which safe harbor they have by their

---

Copyright Act's writing requirement is the burden on the courts that would result from stretching the requirements of the Act to evaluate creative contributions to movies on a case-by-case basis where there is no writing transferring copyright.

[6]     This is particularly so, since Defendants stated in open court in Los Angeles Superior Court that their conduct is protected by the "safe harbor" provisions of the DMCA, *compelling* Plaintiff to spend days and days sending takedown notices and responding to Defendants' takedown agent, until her receipt of Defendants' final decision to refuse the takedown. (See Supplemental Declaration of M. Cris Armenta at ¶2.)

7

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 223 of 266

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 224 of 266

1    own admission made a calculated decision to forsake), the fact that Plaintiff
2    diligently sought compliance by Defendants with the DMCA's streamlined
3    takedown provisions pursuant to Defendants' own published rules and policy lays,
4    in part, the critical foundation for Plaintiff's right to seek injunctive relief.  Given
5    that the DMCA's takedown provisions and procedure are routinely followed by
6    copyright holders and complied with by third party online service providers such as
7    Defendants as the front-line, definitive method in the United States for seeking and
8    obtaining the immediate takedown of infringing content online, for Plaintiff *not* to
9    have diligently sought Defendants' compliance with the DMCA's takedown
10   provisions would have been to deny the immediacy and seriousness of the harm she
11   faces from the Film's continued appearance, copying, and reposting on YouTube.
12   Defendants' almost flippant dismissal in these circumstances of the DMCA and
13   Plaintiff's efforts to obtain Defendants' compliance is disingenuous given
14   Defendants' own prior testimony (*see* Levine Declaration) attesting to the import
15   Defendants emphasize they put on their own swift and impartial compliance with
16   properly filed DMCA takedown requests.

17       **B.    Defendants' Argument That Plaintiff Cannot Claim a Copyright
18              In Those Portions of the Film Containing Her Dramatic
              Performance Is, Simply, Wrong.**

19       Next, Defendants argue that Plaintiff cannot hold a copyright in those
20   portions of the Film that contain her performance.  See Opp. Br. at 14-16.  That
21   claim is incorrect.  As set forth above, the Ninth Circuit has held that individual
22   creative contributions to a film *are*, in fact, independently copyrightable, regardless
23   of the "impenetrable thicket of conflicting rights" of which Defendants worry.[7]
24   See, e.g., Aalmuhammed, 202 F.3d at 1231, and Effects Associates, 908 F.2d at

25   _____

26   [7]    Avoiding this thicket is, no doubt, the primary reason that competent
     filmmakers require releases from virtually everybody involved in a film
27   production.  Notably, Defendants offer no evidence that the producers of the film at
     hand were competent, had any prior film experience, or, most significantly, that
28   any releases were signed by the actors.  The evidence is to the contrary.

                                    8

                                                        CV 12 8315 (VBKx)

ER699

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 225 of 266

558.  Moreover, Plaintiff has reviewed Section 106 of the Copyright Act, on which Defendants purport to rely, see Opp. Br. at 14, and nothing in its language supports Defendants' position.[8]

    Booth v. Colgate-Palmolive Co., 362 F.Supp. 343, 347 (S.D.N.Y. 1973) (cited in Opp. Br. at 15), a nearly 40-year-old out-of-jurisdiction case, does not aid Defendants' cause.  In that case the plaintiff, actress Shirley Booth, played the title role in the 1960s hit television series *Hazel*, which was based on a copyrighted cartoon character.  Ms. Booth did not own the copyright.  She sued Colgate-Palmolive after the latter broadcast commercials that used the name and likeness of the *cartoon character* that Ms. Booth had originally based her performance on. Colgate-Palmolive produced the commercials pursuant to a written license agreement with the creator and copyright holder of the cartoon character, and in the commercials, another actress performed the cartoon character's voice.  The Southern District of New York granted summary judgment because the commercials did not name or otherwise identify the plaintiff.  Booth is not on point because that case involved state-law and Lanham Act claims, *not* a claim under the Copyright Act.  Second, the offending performance in Booth did not involve an actual depiction of the plaintiff actress or the use of her performance as a "puppet" with a dubbed-in message, as occurred here.  Third, there apparently was no claim in *Booth*, as there is here, that the actress had not signed a release.  Fourth, the *Ninth Circuit has explicitly rejected the Booth case as a correct statement of federal copyright law as it applies to performers' claims.*  See Waits v. Frito-Lay, 978 F.2d 1093, 1099 (9th Cir. Aug. 5, 1992) (rejecting defendants' argument that Booth,

---

[8]    Without providing the Court or the Plaintiff with the cited law review articles, Defendants attempt to make much of articles describing the denial of actors' protests to colorization of black and white films.  See Opp. Br. at 14 n. 13. Those articles deal with the actors who *held no copyright interests*, but asserted "moral rights" to keeping their performance in the manner in which it was initially captured.  By contrast, Plaintiff asserts she has a valid copyright interest.

9

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 226 of 266

1   among other cases "that rejected entertainers' challenges to imitations of their

2   performances based on federal copyright preemption, were correctly decided …

3   [t]his reasoning suffers from a number of flaws"), amended on other grounds, 978

4   F.2d 1093 (9th Cir. Oct. 6, 1992), amended on other grounds 1992 U.S. App.

5   LEXIS 27031, cert den. 506 U.S. 1080, 113 S.Ct. 1047, 122 L.Ed.2d 355 (1993).

6         Defendants attempts to distinguish Fleet v. CBS, Inc., 50 Cal.App.4th 1911

7   (1996), Laws v. Sony Music Ent'mt., Inc., 448 F.3d 1134 (9th Cir. 2006), and Jules

8   Jordan Video v. 144942 Canada, 617 F.3d 1146 (9th Cir. 2010) (see Opp. Br. at 15-

9   16), are similarly unavailing.  Defendants pooh-pooh Fleet on the grounds that the

10  California appellate court's primary task in that case was to determine whether the

11  Copyright Act preempted the plaintiff actors' state-law misappropriation claims.

12  See Opp. Br. at 15.  What Defendants fail to acknowledge is that in order to

13  determine whether the preemption doctrine applies, a court necessarily *must*

14  conduct a copyright analysis.  See Fleet, 50 Cal.App.4th at 1918-1919 (for

15  preemption to occur, the subject of the claim must be "within the subject matter or

16  scope of copyright protection"); see also Laws, 448 F.3d at 1137-38 (same).  If the

17  actors' performances were not copyrightable, in other words, their state-law claims

18  would not have been preempted, and the California court's decision to affirm

19  summary judgment against those actors would have been different.  Accordingly,

20  Defendants' claim that the analysis set forth in Fleet (and Laws) has no value is

21  simply erroneous.

22        Defendants' insistence that Jules Jordan, 617 F.3d 1146, is inapplicable is

23  similarly misguided.  As Defendants admit, Plaintiff cited Jules Jordan for the

24  unremarkable proposition that a performer retains the copyright interest in her

25  performance unless she transfers or assigns the right to somebody else.  See Opp.

26  Br. at 16.  Then, however, Defendants argue that Jules Jordan does not apply

27  because in that case, the plaintiff pornographic film entrepreneur Ashley Gasper

28

10

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 227 of 266

1  directed, produced, and performed in his own films, and therefore had more artistic
2  control than did the Plaintiff in this case. Id. What Defendants fail to mention is
3  that the very narrow reason that Ninth Circuit found the plaintiff's many roles
4  legally significant. The trial court in that case held that Mr. Gasper was an
5  employee of his solely owned company, Jules Jordan Video, and therefore Jules
6  Jordan Video was the "author" of the films and Mr. Gasper lacked standing to
7  bring his case.  However, Mr. Gasper had registered the copyrights in his own
8  name, leading to what the Ninth Circuit characterized as the trial court's implicit
9  holding that Jules Jordan Video also "lacked standing because the registration was
10 invalid." Jules Jordan, 617 F.3d at 1155. The only reason that the Ninth Circuit
11 found that Mr. Gasper's positions as actor, performer, and director were legally
12 significant was because it found that "JJV was Gasper, [and therefore] JJV
13 intended whatever Gasper intended," that there therefore was no dispute between
14 Mr. Gasper and Jules Jordan as to the ownership of the copyright. Id. at 1156.
15 Obviously, the only legally significant similarity between Jules Jordan and this case
16 (save for its rote recitation of fundamental principles of copyright law) is that in
17 this case, too, there apparently is now no claim by Nakoula/Youssef that he has a
18 copyright interest as against Plaintiff.[9] (See Declaration of M. Cris Armenta ¶ 11,
19 and Ex. E thereto.) Accordingly, Jules Jordan does not help Defendants – it
20 supports Plaintiff. And as in Jules Jordan, this Court should decline to "permit a
21 third-party infringer" to avoid copyright liability where Nakoula/Yousseff is not
22 claiming a copyright interest in Ms. Garcia's performance.
23      Next, Defendants attempt to escape liability by quickly citing mechanical
24 language from Selby v. New Line Cinema Corp., 96 F.Supp.2d 1053 (C.D. Cal.
25 2000) for the proposition that in copyright cases, "scope and protection are not
26
27 [9]    If Nakoula/Youssef quitclaims his putative interest to Ms. Garcia, and/or
   causes his and the other postings of the Film to be removed from YouTube, this
28 case may indeed quickly resolve itself as to Nakoula/Youssef

11

ER702

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 228 of 266

1  synonymous." See Opp. Br. at 15. It is unclear, however, how Selby applies to

2  this case, other than to reiterate without analysis that Defendants believe Ms.

3  Garcia is not entitled to protect her performance. Plaintiff is particularly confused

4  as to the reasons for Defendants' reliance on Selby in light of the fact that the

5  plaintiff in that case alleged copyright infringement, a Lanham Act violation, and

6  breach of implied-in-fact contract – *and in the very first paragraph of the opinion,*

7  *the Court notes that the defendants challenged only the Lanham Act and contract*

8  *claims, not the claim for copyright infringement.* Selby, 96 F.Supp.2d at 1054.

9  **C.   Defendants' Assertion That Nakoula/Youssef Is The "Exclusive**
   **Copyright Owner" Is False.**

10

11  Defendants next claim, "By plaintiff's own admission, Youssef was the

12  Film's 'mastermind.'" See Opp. Br. at 16, citing First Amended Complaint.

13  Plaintiff made no such claim. Accordingly, Plaintiff certainly has *not* identified

14  Defendant Youssef as an individual who had any rights in her dramatic

15  performance. Indeed, even Nakoula/Youssef has indicated that he does not believe

16  that he has any rights in Ms. Garcia's dramatic performance. (Armenta Decl. ¶ 11,

17  and Ex. E thereto.) And, tellingly, Defendants make *no* excuse for their refusal to

18  take down the postings on YouTube by third party publishers who are

19  completely unrelated to the Film and cannot assert copyright interests.

20  Nevertheless, and despite receipt of numerous takedown notices as to those posters,

21  Defendants steadfastly refuse to remove even those postings of the Film.[10]

22  **D.   Ms. Garcia Did Not Provide A "Work-for-Hire."**

23  Finally,[11] Defendants argue that notwithstanding the lack of *any* evidence of

24  _____

[10]  That is just one reason that Defendants' citation to Richmond v. Weiner, 353
25  F.2d 41 (9th Cir. 1965) (cited in Opp. Br. at 16), for a "basic tenant [sic] of
    copyright law" is baffling. The other is that the only issue before the court in
26  Richmond was whether the parties were joint owners of a copyright. Because the
    Ninth Circuit agreed with the trial court's conclusion that the parties were joint
27  owners, it held that the defendant could not have infringed. By contrast, in this
    case all parties seem to agree that Plaintiff and Youssef are not joint owners.
28       Because the parties apparently do not disagree on the issue of joint

12

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 229 of 266

1   a release, Plaintiff's performance was a "work for hire" owned by

2   Nakoula/Youssef.  This argument contravenes the clear statutory language both of

3   Section 201(b) of the Copyright Act (writing required to establish work-for-hire),

4   as well as Section 204(a) of the Act (exclusive copyright assignment must be in

5   writing).  Even more oddly, Defendants fail to acknowledge even that Section

6   204(a)'s writing requirement even exists.  See Opp. Br., passim.  Defendants also

7   ignore the plethora of authority cited in Plaintiff's opening brief in which courts

8   have noted that it is through *writing* that a performer may lose her rights.  *See*

9   Opening Br. at 16, citing Brown v. Twentieth Century Fox Film Corp., 799 F.Supp.

10  166 (D. D.C. 1992); Rooney v. Columbia Pictures, Inc., 538 F. Supp. 211

11  (S.D.N.Y. 1982); Muller v. Walt Disney Prods., 871 F.Supp. 678 (S.D.N.Y. 1994).

12       Essentially, Defendant asks this Court to make the following logical leaps:

13     (1) Neither Ms. Garcia nor her fellow actors signed work-for-hire

14     agreements.  Defendants have submitted no evidence to the contrary;

15     (2) Because Cindy Garcia "claims to be a professional actress," she

16     *should* have signed "the kind of agreement [i.e., work-for-hire] that is

17     part-and-parcel of the industry";

18     (3) Because Cindy Garcia may not be "a professional, and not an

19     attorney," she wouldn't be able "to competently describe the legal

20     effect or limitations of a contract" regardless of the recollections of her

21     and her fellow actors; ***and therefore***

22     (4) Cindy Lee Garcia "was clearly an 'employee' under the law."

23  See Opp. Br. at 17-18, and n.15 therein.  This argument *makes absolutely no sense*

24  under copyright law, which requires an agreement in writing in order for a

25  performer to transfer her rights under a work-for-hire agreement.  See 17 U.S.C.

26  _____

27  ownership/authorship, Plaintiff will not waste this Court's time responding to
    Defendants' argument on that issue.  See Opening Br. at 17-19, and Opp. Br. at 19-

28  20 (both arguing that Plaintiff and Nakoula/Youssef are not joint owners).

CV 12 8315 (VBKx)

ER704

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 230 of 266

1   201(b). Nor does it make any sense to fault Plaintiff for *not giving up her rights*.

2   Nor has Defendant provided *any* authority for the proposition that it is Plaintiff's

3   burden to prove a negative: that is, that she did not sign a work-for-hire agreement.

4   Defendants' failure to provide such authority is odd in light of the fact that Plaintiff

5   invited them to do so on page 16 of her opening brief. Nor have Defendants

6   offered any evidence that Plaintiff agreed to a work-for-hire arrangement.[12]

7        All that notwithstanding, even if it was theoretically possible for Plaintiff to

8   have become an employee providing a work-for-hire performance without knowing

9   it, Defendants have failed to show that she did. Defendants cite eleven factors set

10  forth in Community for Creative Non-Violence, 490 U.S. at 751, to wit:

11       [1] the skill required; [2] the source of the instrumentalities and tools;
         [3] the location of the work; [4] the duration of the relationship
12       between the parties; [5] Whether the hiring party has the right to
         assign additional projects to the hired party; [6] the extent of the hired
13       party s discretion over when and how long to work; [7] the method of
         payment; [8] the hired party's role in hiring and paying assistants;[9]
14       whether the work is part of the regular business of the hiring party;
         [10] whether the hiring party is in business; the provision of employee
15       benefits; and [11] the tax treatment of the hired party.

16  See Opp. Br. at 18. Notwithstanding their citation of eleven factors, Defendants

17  focus on only one, arguing that it is the most important: the level of control factor.

18  See Opp. Br. at 18-19. However, the case they cite for this proposition, Antelope

19  Valley Press v. Poizner, 162 Cal.App.4th 839 (2008) (cited in Opp. Br. at 18), is not

20  a case involving issues of work-for-hire versus employee status under federal

21

22  [12]    Plaintiff notes that Defendants object to the submission of two declarations
    by Ms. Garcia's fellow actors in the Film, Gaylord Flynn and Dan Sutter, whose
23  recollection of not having signed releases is identical to Ms. Garcia's recollection.
    Defendants' objection is spurious. Messrs. Flynn and Sutter's declarations were
24  not offered for the purpose of proving what was in Ms. Garcia's contract; rather,
    they were offered because the fact that their own contracts did not include releases
25  tends to show that Ms. Garcia's more likely than not failed to include such
    language either when *working on the same film*. Significantly, despite Defendants'
26  vast resources (infinitely more vast than Plaintiff's), they apparently have failed to
    turn up a single member of the cast or crew to controvert Ms. Garcia or her fellow
27  declarants' account of their contracts. At any rate, it is manifestly unfair for
    Defendants to imply that Ms. Garcia is not to be trusted, yet then turn around and
28  argue that her fellow actors' similar recollections should not be heard.

                                            14

                                                          CV 12 8315 (VBKx)

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 231 of 266

1   copyright law: it is a California state law case in which the court had to decide
2   whether workers were employees or independent contractors under the California
3   Labor Code.  Interestingly, cases that *were* decided in the context of the copyright
4   laws tend to consider a broader range of factors than that urged by the Defendants.
5   See, e.g., Aymes v. Bonelli, 980 F.2d 857 (2d Cir. 1992) (ordering district court to
6   weigh all employment factors "with special emphasis given to tax and benefit
7   treatment of programmer as independent contractor").

8        Jules Jordan Video is not dispositive on this issue due to the unique factual
9   circumstances of that case, on whether an actor is an "employee."  An individual
10  analysis of the Community for Creative Non-Violence factors, though, shows that
11  in this case, Ms. Garcia was *not* an employee:

12        (1) While, as the old saying goes, "everybody's a critic," Defendants
13            do not contest that Ms. Garcia's performance required her to use her
14            own acting ability (much like any actor who practices this craft) and
15            this factor weighs in favor of her not having been an employee.
16        (2) The "source of the instrumentalities and tools" factor likely weighs
17            in favor of Nakoula/ Youssef, as Plaintiff does not dispute that she did
18            not provide the filming equipment or sets, unless one considers the
19            actor's voice, likeness, character, abilities, as the "instrumentalities."
20        (3) The "location of the work" factor likely is a neutral factor:
21            although the work was not performed at Ms. Garcia's place of
22            business, neither was it performed, on information and belief, at any
23            place of business habitually used by Mr. Youssef.
24        (4) The "duration of the relationship" factor weighs decidedly in Ms.
25            Garcia's favor.  As Defendants point out time and again, she played a
26            supporting role in the movie.  Moreover, it is undisputed that Ms.
27            Garcia's professional relationship with Nakoula/Youssef was quite

28                                      15

1   short—she was only on the set for a few days.

2      (5) The "right to assign additional projects to the hired party" likely

3   weighs in favor of Ms. Garcia, who agreed to play her role only.

4      (6) The "when and how long to work" factor weighs in

5   Nakoula/Youssef's favor, as he determined the hours on-set for the

6   few days Ms. Garcia was there.

7      (7) The "method of payment" factor weighs in Ms. Garcia's favor.

8   She received a one-time flat fee, with no deductions for taxes,

9   insurance, or other benefits.

10      (8) The "hiring assistants" factor is neutral; neither party asserts that

11   Ms. Garcia required assistants in connection with her role.

12      (9) The "part of the regular business of the hiring party" factor weighs

13   in Ms. Garcia's favor.  There is no evidence in the record to indicate

14   that Mr. Youssef ever made a film prior to the one at issue here.

15      (10) Likewise, the "in business" and "provision of employee benefits"

16   also weigh in Ms. Garcia's favor:  there is no evidence that

17   Nakoula/Youssef is habitually in the moviemaking business and no

18   evidence that he provided employee benefits of any sort.

19      (11) Finally, the "tax treatment of the hired party" factor is either

20   neutral or weighs in favor of Ms. Garcia.  As noted above, there is no

21   evidence in the record that Mr. Youssef deducted any taxes from Ms.

22   Garcia's flat-fee payment.  Although the deadline to send tax

23   documents for 2012 has not yet arrived, it seems unlikely that Mr.

24   Nakoula/Youssef will be sending W-2s from federal prison.

25   As this Court can see, the vast majority of the Community for Creative Non-

26   Violence factors favor Ms. Garcia; that is, weigh in favor of her *not* having been an

27   employee of Nakoula/Youssef or anyone else during the few days she was on the

28                                    16

CV 12 8315 (VBKx)

ER707

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 232 of 266

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 233 of 266

1    set of the Film.  Accordingly, the presumption that Defendants so ardently seek this

2    Court to apply – that is, that Ms. Garcia provided a work-for-hire, no writing

3    needed to transfer the copyright[13]—would be highly inappropriate under both the

4    law and the facts of this case.

5    **E.    Defendants Apparently Concede That All of the Third Parties Who Have Uploaded the Film Are Infringers.**

6    In Plaintiff's Opening Brief at pages 20-21, she argued that "hundreds of

7    third parties have copied the Film and re-posted it on YouTube ... and are clearly

8    infringing," as set forth in eight DMCA takedown notices that "specifically named

9    and identified" the third parties and URLs involved.  Significantly, Defendants do

10   not even attempt to rebut this argument; Plaintiff assumes they concede the point.

11   **F.    Plaintiff Has Shown Irreparable Harm**

12   The threat of injury or death unquestionably constitutes irreparable harm.

13   See, e.g., Mr. R. Dreyfus, 2012 U.S. App. LEXIS 12427 (June 9, 2012) (injunction

14   appropriate upon showing that reduction of health services would likely cause pain,

15   injuries or death); Oster v. Lightbourne, 2011 U.S Dist. LEXIS 138191 at *7 (N.D.

16   Cal. Dec. 1, 2011) (distinguishing mere economic harm to defendants with threat of

17   death or imminent injury to Plaintiff and enjoining reduction of medical services

18   because balance of "hardships tips strongly" when faced with threat of death or

19   injury); NRDC v. Winter, 530 F. Supp. 2d 1110 (C. D. Cal. 2007) (threat of death to

20   whales warranted injunction).  Although conclusory statements about death threats

21   are insufficient to support an injunction, Turner v. Gibson, 2011 U.S. Dist. LEXIS

22   123324 (C. D. Cal. Oct. 25, 2011), in this case, Plaintiff has submitted to the Court

23   actual written threats of death and threats to rape her daughter and to kill Plaintiff.

24   As Professor El Fadl put it, it is only Plaintiff's "filing of this lawsuit, public

25

26   _____

[13]    See Opp. Br. at 19, citing Twentieth Century Fox Film Corp. v. Entm't.

27   Distrib., 429 F.3d 869, 880 (9th Cir. 2005); Lin-Brook Builders Hardware v. Gertler, 352 F.2d 298, 300 (9th Cir. 1965); Trenton v. Infinity Broadcasting Corp.,

28   865 F.Supp. 1416, 1426.

17

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 234 of 266

1    attempts to clear her name and condemn the Film, and the possibility of disabling
2    the content, are acts of extraordinary courage that may be keeping her alive."
3        Defendants characterize the threats Plaintiff received as mere "insults," and
4    "unfair and upsetting," which do not justify injunctive relief.  Even an ordinary
5    stalking victim in California need only show a "credible threat of violence" to
6    obtain a restraining order.  Cal. Civ. Proc. § 527.6.  The following threats,
7    submitted as evidence in this case, can hardly be described as merely "insults":

9        "I am ready to die for MUHAMMAD [PBAH] and I would Like to
10        Kill all those Who contributed to in the Shape of Acting or Financial
11        or any other Kind of Support in Shameless Movie."

13        "And If You Wanna to save your life and we consider your innocent
14        then Just Kill Sam and Terry Jones."

16        "Dear the end is near. "

18        "cindy lee I want to kill you . . why you make the Innocence of
19        Muslims . . .If I reached to you than I finished you to kill u . If I find
20        u anywhere I will fuck you deep bitch"

22        "I kill who ever hand in insulting my prophet"

24        "Hey u bitch who u make the movie innocence of muslim.  Delete
25        this movie otherwise I am the mafia don"

28                        18

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 235 of 266

1   Despite the clarity of the direct threats on Garcia's life because of the Film,
2   Defendants claim blithely that no "causal connection" exists between the Film's
3   continued posting on YouTube and the threats lodged at Plaintiff.   Defendants
4   provide the Court with *no admissible evidence* whatsoever that the clear threats are
5   to be understood in other than at face value.  They provide the Court with no
6   expert declaration and no evidence of any kind that would support Defendants'
7   conclusions that the written, explicit death threats are simply "unfair."  In short,
8   Defendants have provided the Court with nothing to undermine the evidence
9   before the Court that the threats are real, actual, credible, and are directly
10  connected to the continued posting of the Film on YouTube.

11       Defendants also make widespread and incorrect statements of fact in the
12  opposition brief, which are nowhere supported by any admissible evidence.  For
13  instance, Defendants claim that Plaintiff disclosed her hometown of Bakersfield
14  when interviewed on television.  (Opp. Br. at 11:15-16).  That alleged interview is
15  nowhere in the record – to the contrary, Plaintiff states in her declaration that news
16  reporters were camped out at her house *before* she gave any interviews.  (Garcia
17  Decl. ¶ 14.)  And it was only *after* then that she publicly denounced the Film. (Id.)
18  Defendants also assert incorrectly and without any supporting evidence that the
19  people who were first "angry" with Plaintiff are no longer angry with her, without
20  citing any evidence for that outlandish proposition.  (Opp. Br. at 11:17-19).   In
21  fact, a *fatwa* is still in place and there is no evidence that the bounty on Plaintiff's
22  head has been rescinded. (See Garcia Decl. ¶ 14, El Fadl Decl. ¶¶ 14-15.)

23       **G.   Plaintiff Has Not Delayed in Seeking Relief**
24       Defendants claim that Plaintiff is not entitled to an injunction because she
25  unreasonably delayed in seeking relief.  First, although the initial posting of the
26  Film on July 2, 2012, constituted copyright infringement, there did not exist any
27  exigency or physical threat to Plaintiff until September 11, 2012, after the Film
28

19

CV 12 8315 (VBKx)

ER710

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 236 of 266

1   went "viral" and the media revealed Plaintiff's identity.  In July 2012, the Film

2   garnered no attention and it is fair to infer that Plaintiff took no action then because

3   the Film was simply one of millions of unseen videos on YouTube.  Second, it is

4   reasonable that Plaintiff would wait to act until learning on September 15, 2012,

5   that Google had rejected the White House's request that the Film be taken down.

6   Third, once Plaintiff became aware of the Film's worldwide dissemination and

7   Defendants' refusal to remove it, she sought relief on September 19, 2012.  So,

8   *within four business days*, she sought relief in state court.   The state court denied

9   her ex parte application, on the grounds that the Communications Decency Act

10   barred tort causes of action against Google and YouTube and because

11   Nakoula/Youssef could not be found to be served.  Plaintiff dismissed the state case

12   and immediately filed a copyright registration and this case in in this Court on

13   September 25, 2012.  Fourth, it was not until September 27, 2012, that Google

14   stated publicly, through its Chairman Eric Schmidt, that the "video will stay up."

15   Then, Google and YouTube did not accept service until October 4, 2012.  Fifth,

16   within one business day, Plaintiff insisted that the meet and confer on the motion

17   take place; it was held on October 5, 2012.  In that conference, defense counsel

18   argued that the claim failed because it was a "joint work" between

19   Nakoula/Youssef and Garcia or the other actors.  Plaintiff's counsel immediately

20   consulted with pre-eminent copyright experts on the subject of "joint works."

21   Sixth, defense counsel informed Plaintiff's counsel that he would be unavailable

22   from October 11-16 and therefore, would not claim any delay caused by that

23   agreed-upon freeze period.  Seventh, only two days after defense counsel became

24   available, on October 18, 2012, Plaintiff filed the Application, which was

25   converted into this Motion.  Plaintiff has been extraordinarily diligent in seeking

26   relief, investigating her claims and also waiting for pivotal events to unfold so as to

27   not waste the Court's time or resources unnecessarily.  Eighth, Plaintiff diligently

28

CV 12 8315 (VBKx)

ER711

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 237 of 266

1   worked through the DMCA takedown process, sending numerous takedown notices
2   to the Google representative identified as YouTube's takedown agent.  It was not
3   until October 4, 2012, that Google responded with its final position.  See
4   Cybermedia Inc v. Symantec Corp., 19 F. Supp. 2d 1070 (noting that six month
5   delay in investigating claims not unreasonable, especially where plaintiff was a
6   small company and it was prudent to proceed with caution against Symantec, a
7   company with considerable size and resources).   Plaintiff proceeded with all
8   deliberate speed, while exercising appropriate caution when suing two behemoths
9   such as YouTube and Google.

10        Defendants cite Perfect 10 v. Google, Inc., 653 F.3d 976, 982 (9th Cir. 2011,
11   for the proposition that Plaintiff cannot establish a "causal connection" between the
12   posting of the Film and her injuries. (Opp. at 8:1-6.)  Perfect 10 is not applicable
13   for that proposition.  In Perfect 10, the copyright claimant alleged that refusing the
14   injunction would push Perfect 10 into bankruptcy.  However, Perfect 10 failed to
15   show that it was on a solid financial position otherwise.  653 F.3d at 981-82.
16   "Perfect 10 has not shown that an injunction would forestall that fate
17   [bankruptcy]."  Id.  By contrast, here, Plaintiff *has* submitted competent evidence
18   of a renowned expert that the removal of the Film has a high likelihood of saving
19   her life, her ability to travel, and her career.  Defendants have submitted no
20   contrary evidence.

21        Defendants also use Perfect 10 to argue that an injunction against the
22   YouTube posting would do nothing because the Film is freely available elsewhere.
23   First, in the Perfect 10, case Perfect 10 "freely acknowledged" that other search
24   engines were likewise infringing.  See id. at 982.  In this case, there is *no evidence*
25   that other websites have posted the Film or that it is available elsewhere.  And,
26   Defendants (once again) make this broad and false statement without any
27   evidentiary support.  For the unsupported proposition that the Film was "viewed

28                                21

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 238 of 266

1   and copied by countless individuals," Defendants cite to Paragraph 3 of the First

2   Amended Complaint.  Paragraph 3 contains no such allegation or admission.  The

3   only pertinent allegation is that other posters have posted the Film *on YouTube* and

4   that Defendants refuse to remove it.

5       Defendants also conclude that "even if the Film has affected Plaintiff's

6   career prospects, that harm is not irreparable as a matter of law." (Opp. at 10:21-22

7   citing Sampson v. Murray, 415 U.S. 61, 90 (1974), DeNovellis v. Shalala, 135 F.3d

8   58, 64 (1st Cir. 1998), Shegog v. Board of Ed. Of City of Chicago, 94 F. 3d 836 (9th

9   Cir. 1999).  Defendants are incorrect.  The Ninth Circuit has acknowledged that the

10  loss of an opportunity for a party to pursue her chosen profession is irreparable

11  harm.  Enyart v. Nat'l Conf. of Bar Examiners, Inc., 630 F.3d 1153, 1165 (9th Cir.

12  2011).  The cases cited by Defendants are inapplicable.

13      In Sampson, the United States Supreme Court held that "a loss of

14  employment can amount to irreparable harm," but concluded in that case that a

15  federal temporary employee who was still entitled to administrative hearings could

16  not base an injunction on the possibility of temporary income loss, where the

17  administrative panel had the right to pay income retroactively.  In DeNovellis, the

18  denial of the injunction resulted because the Plaintiff could allege only a decrease

19  in her pay if she accepted a transfer.  And in Shegog, the First Circuit decided that

20  a temporary loss of specific income by teachers after a lay-off was compensable

21  without an injunction.  In other words, the cases cited by Defendants involve only

22  temporary and easily compensable losses.  The closest case factually to the

23  predicament now faced by Ms. Garcia is Enyart – that because of Defendants'

24  actions, Plaintiff is entirely foreclosed from pursuing her profession.

25  **H.   The First Amendment Does Not Prohibit the Relief Sought And**
26  **the Balance of Equities Tip Sharply in Plaintiff's Favor.**

    Defendants claim that Plaintiff seeks to "stifle" public debate that has

27  erupted about the Film.  Not true.  Debate pertaining to Islam is likely to continue

28                                        22

                                                    CV 12 8315 (VBKx)

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 239 of 266

1   on long after this case is decided. The issue in this case, however, is the takedown

2   of the Film itself under the Copyright Act. Plaintiff does not wish to stifle debate

3   or opinion. For that reason, the cases cited by Defendants are inapplicable. <u>See</u>

4   Opp. Br. at 23. Taking the Film would in no way "stifle" any other lawful speech,

5   news reports, or opinions about its content. But, if the First Amendment is

6   implicated, it is significant that Defendants have no standing to assert the free

7   speech rights of Nakoula/Youssef. <u>See</u> Opp. Br. at 21:5. Moreover, limits *do exist*

8   to the First Amendment. Just as shouting fire in a crowded theatre can be punished

9   and restrained, <u>see</u> <u>Schenck v. United States</u>, 249 U.S. 47, 52 (1919), speech in

10  today's global theater can likewise be restrained when it rises to the "incitement"

11  level. The Supreme Court has observed that, in certain circumstances, it may be

12  appropriate to restrict speech in order to prevent a potentially violent audience from

13  causing imminent harm to the speaker. <u>Feiner v. New York</u>, 340 U.S. 315, 321

14  (1951). As Chief Justice Vinson quoted aptly in that case:

> The language of <u>Cantwell v. Connecticut</u>, 310 U. S. 296 (1940), is appropriate here. "The offense known as breach of the peace embraces a great variety of conduct destroying or menacing public order and tranquility. It includes not only violent acts but acts and words likely to produce violence in others. No one would have the hardihood to suggest that the principle of freedom of speech sanctions incitement to riot or that religious liberty connotes the privilege to exhort others to physical attack upon those belonging to another sect. When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the State to prevent or punish is obvious." 310 U. S. at 308.

In this digitized age, issues of proximity are much more immediate than merely the

inside of a crowded movie theater or a street corner. With the touch of a button, a

domestic speaker (such as Nakoula/Youssef) can incite riots and violence across

the world, inciting violence both against U.S. embassies and within our borders

against Plaintiff. If there ever was a case that should set proper limits on inciteful

speech within the contours of our new, digitized, global theater, this is the one.

23

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 240 of 266

III.   **CONCLUSION**

In summary, Defendants' argument that Garcia owns no copyright in her dramatic performance is insupportable. If this Court adopted Defendants' view of copyright law, it would turn the entire media and music industry on their heads. Further, Defendants offer this Court no evidence whatsoever for their invitation to the Court to find that Garcia either was an employee or signed a "work-for-hire" agreement.   Plaintiff has shown that immediately upon understanding the harm she was faced with as a result of the infringing postings by YouTube and Google, she acted immediately. Finally, careful review should be given to the cases cited by Defendants, which are wholly inapplicable or distorted to suit Defendants' views.

Based on the foregoing, Plaintiff respectfully requests that the Court GRANT the Motion in its entirety.

Dated: November 5, 2012          THE ARMENTA LAW FIRM, A.P.C.

                                 By: _____
                                     M. Cris Armenta
                                     Attorneys for Cindy Lee Garcia

24

CV 12 8315 (VBKx)

ER715

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 241 of 266

**DECLARATION OF M. CRIS ARMENTA**

I, M. Cris Armenta, declare:

1.     I am an attorney licensed in the State of California and principal of the Armenta Law Firm, counsel of record for Plaintiff Cindy Lee Garcia in this action. I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

Timeline of Events

2.     My firm was retained by Plaintiff on September 14, 2012.  By September 19, 2012, my firm prepared and filed a Complaint in Los Angeles Superior Court, and sought a restraining order on September 20, 2012.  At the hearing, attorney Tim Alger argued successfully that the state law tort claims against Google and YouTube were barred by the Communications Decency Act.  He also mentioned a "safe harbor" provision.

3.     On September 24, 2012, Plaintiff requested dismissal of the state court complaint.

4.     On September 26, 2012, Plaintiff filed this federal complaint.

5.     On September 27, 2012, Plaintiff offered Defendants' counsel the service papers and asked if they would accept service.  Tim Alger responded that he would and the papers were provided to him immediately and electronically. Attached is as Exhibit A is a true and correct copy of email transmissions between Tim Alger and me on the dates and times indicated.

6.     On October 3, 2012, Tim Alger wrote and suggested that he had not yet been served with the Complaint.  Attached as Exhibit B is a true and correct copy of his mail dated October 3, 2012.  Mr. Alger also suggested that the complaint be amended to re-name Nakoula as Mark Youssef.

7.     On October 4, 2012, Plaintiff amended the Complaint to rename Nakoula as Youssef and served counsel for Defendants Google and YouTube.

1

ER716

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 242 of 266

8.    On Friday, October 5, 2012, Plaintiff telephoned Tim Alger and requested a telephonic meet and confer in advance of filing an application for a TRO or a Motion for Preliminary Injunction. The conference was held that afternoon. During that conversation, Plaintiff's counsel heard YouTube and Google's legal position for the very first time – Alger purported that the work was a joint one between Garcia and the other actors and the producers or Nakoula. Mr. Alger also informed Plaintiff's counsel that he would not be available from October 11 through October 16 to respond to any Application or Motions. Enclosed as Exhibit C is a true and correct copy of an email that I sent to Mr. Alger on Tuesday, October 9, 2012, indicating that Plaintiff was looking at the issues raised by Mr. Alger during counsel's conference. During that time period, I also contacted a pre-eminent expert in the area of "joint works" in the copyright context to obtain expert views on whether Google and YouTube's position had any merit. I also engaged Plaintiff's team of lawyer s—four lawyers – to research diligently the issues of joint works and to call the actors on the Film or their representatives with whom we are in touch.

9.    On October 15, 2012, I spoke with Nakoula/Youssef's criminal defense attorney who indicated to me for the first time that Nakoula/Youssef is not the copyright owner. I immediately provided this information to Tim Alger. Attached as Exhibit D is a true and correct copy of that email dated October 15. I also informed Mr. Alger that we were delaying the filing "out of respect for your schedule" as Mr. Alger had indicated he was not available to receive any papers until after he returned from his trip.

10.    On October 17, 2012, the Application was filed. It was denied on October 18, 2012, and I immediately provided this Notice to Mr. Alger. A true and correct copy of my email transmission is attached hereto as Exhibit E.

11.    Mr. Flynn signed his declaration on October 12, 2012. Between October 12, 2012, and the time that the Application was filed, I had a conversation

2

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 243 of 266

1   with Mr. Flynn in which he consented to the filing of the entire declaration without

2   redacting his name or seeking a sealing order.  For that reason, the declaration was

3   filed in its entirety.  If there is any error in citing the declaration or explaining this

4   last-minute change, it is mine alone.

5

6        I declare under the penalty of perjury under the laws of the United States of

7   America and that I executed this declaration on November 5, 2012.

8

9   Dated: November 5, 2012       THE ARMENTA LAW FIRM, A.P.C.

10

11                     By: _____

12                            M. Cris Armenta

13                         Attorneys for Plaintiff

14                         Cindy Lee Garcia

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 244 of 266

EXHIBIT A

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 245 of 266

## Cris Armenta

| | |
|---|---|
| **From:** | Cris Armenta |
| **Sent:** | Thursday, September 27, 2012 9:33 AM |
| **To:** | 'Alger, Timothy L. (Perkins Coie)' |
| **Cc:** | Heather Rowland |
| **Subject:** | RE: Filed Complaint |

Heather – please email tim all the papers, including the ancillary papers and prepare a proof of service dated today per his email.  thanks

**From:** Alger, Timothy L. (Perkins Coie) [mailto:TAlger@perkinscoie.com]
**Sent:** Thursday, September 27, 2012 9:32 AM
**To:** Cris Armenta
**Subject:** RE: Filed Complaint

Hi Cris, I'll accept service of the complaint and related papers.  Tim


Timothy L. Alger | Perkins Coie LLP
PARTNER
3150 Porter Drive  •  Palo Alto, California  94304
Four Embarcadero Center, Suite 2400  •  San Francisco, California  94111
PHONE: 650.838.4334  •  MOBILE: 650.223.3791  •  FAX: 650.838.4534
E-MAIL: TAlger@perkinscoie.com

**From:** Cris Armenta [mailto:cris@crisarmenta.com]
**Sent:** Thursday, September 27, 2012 9:21 AM
**To:** Alger, Timothy L. (Perkins Coie)
**Subject:** FW: Filed Complaint

If you accept service, we will provide all the ancillary papers.  If I do not hear from you by noon, we will serve the registered agent.


M. Cris Armenta
The Armenta Law Firm, APC
11900 W. Olympic Boulevard, Suite 730
Los Angeles, California 90064
Telephone: (310) 826-2826
Facsimile: (310) 826-5456
www.crisarmenta.com


**From:** Heather Rowland
**Sent:** Wednesday, September 26, 2012 8:07 PM
**To:** Cris Armenta
**Cc:** Heather Rowland; Sol, Credence (credence.sol@sol-law.com)
**Subject:** Filed Complaint

1

ER720

IRS CIRCULAR 230 DISCLOSURE: To ensure compliance with Treasury Department and IRS regulations, we inform you that, unless expressly indicated otherwise, any federal tax advice contained in this communication (including any attachments) is not intended or written by Perkins Coie LLP to be used, and cannot be used by the taxpayer, for the purpose of (i) avoiding penalties that may be imposed on the taxpayer under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein (or any attachments).

* * * * * * * * * *

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 246 of 266

ER721

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 247 of 266

# EXHIBIT B

**Cris Armenta**

| | |
|---|---|
| **From:** | Cris Armenta |
| **Sent:** | Wednesday, October 03, 2012 11:07 AM |
| **To:** | 'Alger, Timothy L. (Perkins Coie)' |
| **Cc:** | Sol, Credence (credence.sol@sol-law.com); David Hardy (David.Hardy@DMCASolutions.com); Hassell, Johnette (jhassell@electronicevidenceretrieval.com) |
| **Subject:** | RE: Service of summons |

I had you down as already having accepted service.  Nevertheless, I will discuss with my team.  Seems like we might amend the complaint, given the Court's order in the criminal case, and serve on you tomorrow.  We plan to serve Nakoula as well, with his new name.

-----Original Message-----
From: Alger, Timothy L. (Perkins Coie) [mailto:TAlger@perkinscoie.com]
Sent: Wednesday, October 03, 2012 11:04 AM
To: Cris Armenta
Subject: Service of summons

Hi Cris --

We spoke last Thursday about acceptance of service of the summons and complaint, but no process server has come by my office and I haven't yet received a notice and waiver pursuant to FRCP 4(d).  Can you let me know what you are planning to do in that regard?  Perhaps, if you are going to amend the complaint (and that might be the simplest way to solve the problem of getting Nakoula's name corrected), you should serve (or request waiver for) the amended complaint.  If you still haven't served Nakoula, maybe that makes the most sense, so there is a single, served, operative pleading and there is no dispute about the response date.

Please shoot me an email or call if you want to discuss further.

Tim


Timothy L. Alger | Perkins Coie LLP
PARTNER
3150 Porter Drive  *  Palo Alto, California  94304
Four Embarcadero Center, Suite 2400  *  San Francisco, California  94111
PHONE: 650.838.4334  *  MOBILE: 650.223.3791  *  FAX: 650.838.4534
E-MAIL: TAlger@perkinscoie.com


IRS CIRCULAR 230 DISCLOSURE:  To ensure compliance with Treasury Department and IRS regulations, we inform you that, unless expressly indicated otherwise, any federal tax advice contained in this communication (including any attachments) is not intended or written by Perkins Coie LLP to be used, and cannot be used by the taxpayer, for the purpose of (i) avoiding penalties that may be imposed on the taxpayer under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein (or any attachments).

1

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 248 of 266

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 249 of 266

* * * * * * * * * *

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

ER724

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 250 of 266

# EXHIBIT C

**Cris Armenta**

| | |
|---|---|
| **From:** | Cris Armenta |
| **Sent:** | Tuesday, October 09, 2012 1:26 PM |
| **To:** | 'Alger, Timothy L. (Perkins Coie)' |
| **Cc:** | Sol, Credence (credence.sol@sol-law.com); Jason Armstrong (armstronglaw@me.com); David Hardy (David.Hardy@DMCASolutions.com) |
| **Subject:** | RE: Garcia v. Nakoula |

We are working on the papers now. Since we only first understood your position on Thursday evening, we are working to address the issues you raised. First, we do not believe the work was joint, because it is clear that Nakoula never intended to vest the rights jointly and since intention is the cornerstone of that analysis, we have serious doubts with your position, or even that Google or YouTube should be undertaking such an analysis in any event under the DMCA. Further, as to the issue you raised previously – whether Garcia transferred her rights – it is clear to us now that she did not.

I raise one additional point with you. Doesn't YouTube's terms of service make the poster warrant that they are acting within the law? Nakoula's conditions of probation prohibited him from using the internet or computers. You indicated trhat you had not seen the conditions of probation. They are publicly available on pacer. YouTube an Google appear to be ignoring the fact that the poster is PROHIBITED BY LAW from using a computer, and hence, posting the content in violation of the law. WE are considering whether it is appropriate to include this in our papers, and will let you know once the papers are ready.

That said, our intention is to file this week, likely Friday. If you need us to delay until Monday, although we are well aware of the size and resources of both your firm and clients, please let us know and we will do what we can to accommodate you, provided that it is clear that the delay is due to your personal schedule and not because emergency relief is not warranted or necessary.

Cris

**From:** Alger, Timothy L. (Perkins Coie) [mailto:TAlger@perkinscoie.com]
**Sent:** Tuesday, October 09, 2012 1:12 PM
**To:** Cris Armenta
**Subject:** Garcia v. Nakoula

Hi Cris --

We met and conferred by telephone last Friday about your planned ex parte application for TRO and OSC re preliminary injunction. During that conference, I raised with you our view that Nakoula, as copyright owner of the entire film, was entitled to post the film on YouTube notwithstanding any claimed co-ownership of your client to portions of the film. I also suggested that if you had any authority to the contrary, we would appreciate seeing it, and would seriously consider it. Also during that conference, you said you were unsure when you would be filing the ex parte application. Having not heard further from you, are you reconsidering whether to proceed with the ex parte application (or, perhaps, with the action in its entirety)? If you are proceeding with an ex parte application, will you please let me know when you intend to file your application? You first told me of plans to seek a TRO and/or PI almost two weeks ago, and I have been trying to keep my calendar clear, given the short turnaround for filing an opposition, but this is becoming increasingly difficult as days pass. I am traveling on Thursday (Oct. 11) and will be outside the country from Friday through Monday (Oct. 12-15), and Google/YT will need adequate time to prepare and file an opposition to your application. If your application is filed while I am traveling or out of the country, I will let the Court know of my communications with you on this point. My hope, of course, is that if plaintiff still intends to proceed by ex parte application rather than noticed motion (which we believe is more appropriate), the parties will cooperate regarding scheduling and will not need to burden the Court with a dispute.

1

ER726

Also, I would like to meet and confer with you regarding our intention to file a motion to dismiss, pursuant to Local Rule 7-3. I propose that we do this next Wednesday, October 17, at a time convenient to you. Please let me know.

Tim

**Timothy L. Alger | Perkins Coie LLP**
PARTNER
3150 Porter Drive  •  Palo Alto, California  94304
Four Embarcadero Center, Suite 2400  •  San Francisco, California  94111
PHONE: 650.838.4334  •  MOBILE: 650.223.3791  •  FAX: 650.838.4534
E-MAIL: TAlger@perkinscoie.com

IRS CIRCULAR 230 DISCLOSURE: To ensure compliance with Treasury Department and IRS regulations, we inform you that, unless expressly indicated otherwise, any federal tax advice contained in this communication (including any attachments) is not intended or written by Perkins Coie LLP to be used, and cannot be used by the taxpayer, for the purpose of (i) avoiding penalties that may be imposed on the taxpayer under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein (or any attachments).

* * * * * * * * * *

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 252 of 266

ER727

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 253 of 266

# EXHIBIT D

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 254 of 266

**Cris Armenta**

| | |
|---|---|
| **From:** | Cris Armenta |
| **Sent:** | Monday, October 15, 2012 12:52 PM |
| **To:** | talger@perkinscoie.com |
| **Cc:** | Sol, Credence (credence.sol@sol-law.com); Jason Armstrong (armstronglaw@me.com); David Hardy (David.Hardy@DMCASolutions.com); Andy Schapiro (AndrewSchapiro@quinnemuel.com); Heather Rowland; 'sbali@perkinscoie.com' |
| **Subject:** | Innocence of Muslims |

We are filing our papers tomorrow out of respect for your schedule.

I have just been informed by Nakoula's attorney that Nakoula (aka Sam Bacile or Sam Basel) DOES NOT OWN the rights to the film and will not claim copyright ownership or the rights to the film. We believe it is YouTube's burden to identify the correct copyright owner, in light of Garcia's allegation that she owns the rights to her dramatic performance. In light of your comments during our meet and confer that YouTube's position that the work is joint between Nakoula and Garcia. This party admission will be in our papers. In light of this admission, we believe you should revisit YouTube's refusal to take down the content because Nakoula is not a copyright owner, pursuant to his attorney's admission of a few minutes ago. We do not believe that YouTube can identify any copyright owner other than Garcia – therefore she has the right to stop third party infringers, including Nakoula, YouTube and all the other posters. Feel free to call him to verify – Steve Seiden in Hawthorne.
Please advise us if your position.

Cris

1

ER729

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 255 of 266

# EXHIBIT E

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 256 of 266

## Cris Armenta

| | |
|---|---|
| **From:** | Cris Armenta |
| **Sent:** | Thursday, October 18, 2012 12:11 PM |
| **To:** | 'Alger, Timothy L. (Perkins Coie)' |
| **Cc:** | sbali@perkinscoie.com; Heather Rowland; Sol, Credence (credence.sol@sol-law.com); Jason Armstrong (armstronglaw@me.com); David Hardy (David.Hardy@DMCASolutions.com) |
| **Subject:** | RE: Activity in Case 2:12-cv-08315-MWF-VBK Garcia et al v. Google Inc et al Order on Ex Parte Application for TRO |

You are welcome.

You should probably sign up for the electronic alert system in the case.

I will be applying for an order to serve Nakoula with this order as well.  Do you want me to include that your opposition may be served via USM to Nakoula or not mention it at all?  Your call.

---

**From:** Alger, Timothy L. (Perkins Coie) [mailto:TAlger@perkinscoie.com]
**Sent:** Thursday, October 18, 2012 12:09 PM
**To:** Cris Armenta
**Subject:** RE: Activity in Case 2:12-cv-08315-MWF-VBK Garcia et al v. Google Inc et al Order on Ex Parte Application for TRO

Cris, thanks for forwarding this.  Tim

**Timothy L. Alger | Perkins Coie LLP**
PARTNER
3150 Porter Drive  •  Palo Alto, California 94304
Four Embarcadero Center, Suite 2400  •  San Francisco, California 94111
PHONE: 650.838.4334  •  MOBILE: 650.223.3791  •  FAX: 650.838.4534
E-MAIL: TAlger@perkinscoie.com

**From:** Cris Armenta [mailto:cris@crisarmenta.com]
**Sent:** Thursday, October 18, 2012 12:00 PM
**To:** Alger, Timothy L. (Perkins Coie)
**Subject:** FW: Activity in Case 2:12-cv-08315-MWF-VBK Garcia et al v. Google Inc et al Order on Ex Parte Application for TRO

**From:** cacd_ecfmail@cacd.uscourts.gov [mailto:cacd_ecfmail@cacd.uscourts.gov]
**Sent:** Thursday, October 18, 2012 11:58 AM
**To:** ecfnef@cacd.uscourts.gov
**Subject:** Activity in Case 2:12-cv-08315-MWF-VBK Garcia et al v. Google Inc et al Order on Ex Parte Application for TRO

This is an automatic e-mail message generated by the CM/ECF system. Please **DO NOT RESPOND** to this e-mail because the mail box is unattended.
***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits

1

ER731

attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

### UNITED STATES DISTRICT COURT for the CENTRAL DISTRICT OF CALIFORNIA

**Notice of Electronic Filing**

The following transaction was entered on 10/18/2012 at 11:57 AM PDT and filed on 10/18/2012
**Case Name:**     Garcia et al v. Google Inc et al
**Case Number:**   2:12-cv-08315-MWF-VBK
**Filer:**
**Document Number:** 15

**Docket Text:**
**MINUTES (IN CHAMBERS) by Judge Michael W Fitzgerald: On 10/17/2012, Plaintiff filed an Ex Parte Application for a Temporary Restraining Order and an Order to Show Cause Re Preliminary Injunction, and Order of Impoundment [12]. The Application is DENIED. For the reasons stated above and given that the alleged infringement seems to have commenced almost three months ago on 7/2/2012 (see Application at 2), the Court declines to consider this Application on an ex parte basis. Instead, the Court CONSTRUES the Application as a MOTION for a Preliminary Injunction. Accordingly, the Court ORDERS the following: Defendants shall file any opposition brief on or before 10/29/2012. Garcia shall file any reply brief on or before 11/5/2012. The hearing on Garcia's motion for preliminary injunction is hereby scheduled for 11/19/2012 at 10:00 AM. (jp)**

**2:12-cv-08315-MWF-VBK Notice has been electronically mailed to:**

M Cris Armenta     heather@crisarmenta.com, cris@crisarmenta.com

Credence E Sol     credence.sol@sol-law.com

**2:12-cv-08315-MWF-VBK Notice has been delivered by First Class U. S. Mail or by other means BY THE FILER to :**

IRS CIRCULAR 230 DISCLOSURE: To ensure compliance with Treasury Department and IRS regulations, we inform you that, unless expressly indicated otherwise, any federal tax advice contained in this communication (including any attachments) is not intended or written by Perkins Coie LLP to be used, and cannot be used by the taxpayer, for the purpose of (i) avoiding penalties that may be imposed on the taxpayer under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein (or any attachments).

* * * * * * * * *

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 257 of 266

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 258 of 266

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am employed in the County of Los Angeles, State of California. I am over the age of eighteen years and not a party to the within action. My business address is 11900 Olympic Boulevard, Suite 730, Los Angeles, California 90064.

On November 5, 2012 I served the following document(s) described as:

(1) **REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND ORDER OF IMPOUNDMENT; DECLARATION OF M. CRIS ARMENTA IN SUPPORT THEREOF (filed separately);**

(2) **PLAINTIFF'S RESPONSE TO OBJECTIONS BY GOOGLE, INC. AND YOUTUBE LLC TO EVIDENCE SUBMITTED IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INUNCTION AND ORDER OF IMPOUNDMENT (filed separately);**

(3) **PLAINTIFF'S OBJECTIONS TO EVIDENCE SUBMITTED BY GOOGLE INC., AND YOUTUBE, LLC. IN OPPOSITION BRIEF TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND ORDER OF IMPOUNDMENT (filed separately);**

(4) **[PROPOSED] ORDER SUSTAINING PLAINTIFF'S OBECTIONS TO EVIDENCE SUBMITTED BY GOOGLE, INC., AND YOUTUBE LLC IN OPPOSITION BRIEF TO PLAINTIFF'S MOTION FOR PRELIMINARY INUNCTION AND AN ORDER OF IMPOUNDMENT (lodged separately)**

on the interested parties in this action by placing true copies thereof enclosed in sealed envelopes addressed as follows:

**Timothy L. Alger**
**Perkins Coie LLP**
**3150 Porter Drive**
**Palo Alto, CA 94304-1212**

*BY MAIL:* I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing with the United States Postal Service. Under that practice, it would be deposited with the United States Postal Service that same day in the ordinary course of business. Such envelope(s) were placed for collection and mailing with postage thereon fully prepaid at Los Angeles, California, on that same day following ordinary business practices. (C.C.P. § 1013 (a) and 1013a(3))

Executed on November 5, 2012 in Los Angeles, California.

Heather Rowland

1
**PROOF OF SERVICE**

ER733

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 259 of 266

1   M. Cris Armenta (SBN 177403)
    THE ARMENTA LAW FIRM APC
2   11900 W. Olympic Boulevard, Suite 730
    Los Angeles, CA 90064
3   Tel: (310) 826-2826 x 108
    Facsimile: (310) 826-5456
4   Email: cris@crisarmenta.com

5   Credence E. Sol (SBN 219784)
    La Garenne
6   86300 Chauvigny
    France
7   Telephone: 06 74 90 22 08
    Email:  credence.sol@sol-law.com
8
    Attorneys for Plaintiff
9   Cindy Lee Garcia

10              UNITED STATES DISTRICT COURT

11          FOR THE CENTRAL DISTRICT OF CALIFORNIA

12   CINDY LEE GARCIA, an          Case No. CV12-8315 MWF (VBKx)
     individual,
13                                 **PLAINTIFF'S OBJECTIONS TO**
                                   **EVIDENCE SUBMITTED BY**
14              Plaintiff,         **GOOGLE INC. AND YOUTUBE,**
                                   **LLC IN OPPOSITION BRIEF TO**
15   vs.                          **PLAINTIFF'S MOTION FOR**
                                   **PRELIMINARY INJUNCTION AND**
16   NAKOULA BASSELEY             **ORDER OF IMPOUNDMENT**
     NAKOULA, an individual also
17   known as SAM BACILE, MARK
     BASSELEY YOUSSEF,
18   ABANOB BASSELEY
     NAKOULA, MATTHEW
19   NEKOLA, AHMED HAMDY,
     AMAL NADA, DANIEL K.
20   CARESMAN, KRITBAG
     DIFRAT, SOBHI BUSHRA,
21   ROBERT BACILY, NICOLA
     BACILY, THOMAS J. TANAS,
22   ERWIN SALAMEH, YOUSSEFF
     M. BASSELEY, and/or MALID
23   AHLAWI; GOOGLE, INC., a
     Delaware Corporation;
24   YOUTUBE, LLC, a California
     limited liability company, and
25   DOES 1 through 10, inclusive.

26              Defendants.

27
                              1   PLAINTIFF'S OBJECTIONS TO EVIDENCE SUBMITTED BY
28                                GOOGLE INC. AND YOUTUBE, LLC IN OPPOSITION BRIEF
                                  TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
                                  AND ORDER OF IMPOUNDMENT
                                  CV12-8315 MWF (VBKx)

ER734

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 260 of 266

1   Plaintiff Cindy Lee Garcia ("Plaintiff") submits the following objections to
2   evidence Defendants have submitted in support of their opposition to her Motion for
3   Preliminary Injunction.  All of Plaintiff's objections relate to "evidence," provided
4   in the form of URLs in the (10-point typeface) footnotes in Defendants' opposition
5   brief.

6

| No. | Material Objected To | Ground(s) for Objection |
|-----|----------------------|-------------------------|
| 1. | Page 3, footnote 1: *US officials: We Didn't Link Libya Attack to Video,* available at http://www.google.com!hostednews/ap/articl e/ALegM5grvFY slQXSwZCxGSAa6gZS-0 TA?docId=Oeb49 cge195f4dfOb1080e8b9d065faO; | Lack of foundation. (FED. R. EVID. 602.) <br><br> Lack of authentication. (FED. R. EVID. 901(a); *Wady v. Provident Life and Accident Ins. Co. of America,* 216 F. Supp. 2d 1060, 1064-1065) (C.D. Cal. 2002) (unauthenticated website materials inadmissible)). <br><br> Hearsay.  (FED. R. EVID. 802.) <br><br> Failure to comply with 14-point-type rule. L.R. 11-3.1.1 |
| 2. | Page 3, footnote 1: *State Department Admits It Knew Libya Attack was Terrorism,* available at http://www.csmonitor.com!W orldiLatest-News-Wires/20 1211 009/StateDepartment-admits-it-knew-Libya-attack -was-terrorism. | Lack of foundation. (FED. R. EVID. 602.) <br><br> Lack of authentication. (FED. R. EVID. 901(a); *Wady v. Provident Life and Accident Ins. Co. of America,* 216 F. |

PLAINTIFF'S OBJECTIONS TO EVIDENCE SUBMITTED BY
GOOGLE INC. AND YOUTUBE, LLC IN OPPOSITION BRIEF
TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
AND ORDER OF IMPOUNDMENT
CV12-8315 MWF (VBKx)

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 261 of 266

| | | |
|---|---|---|
| 1<br>2<br>3<br>4<br>5<br>6<br>7 | | Supp. 2d 1060, 1064-1065) (C.D. Cal. 2002) (unauthenticated website materials inadmissible)).<br><br>Hearsay. (FED. R. EVID. 802.)<br><br>Failure to comply with 14-point-type rule. L.R. 11-3.1.1 |
| 8<br>9<br>10<br>11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19 | 3. | Page 9, footnote 8: Russell Goldman, *Actress Says Maker of Anti-Muslim Film Lied to Cast,* ABC News, Sept. 13,2012, *available at* http://abcnews.go.comIBlotter/actress-maker-anti-muslim-film-lied-cast/story?id=17228157 | Lack of foundation. (FED. R. EVID. 602.)<br><br>Lack of authentication. (FED. R. EVID. 901(a); *Wady v. Provident Life and Accident Ins. Co. of America,* 216 F. Supp. 2d 1060, 1064-1065) (C.D. Cal. 2002) (unauthenticated website materials inadmissible)).<br><br>Hearsay. (FED. R. EVID. 802.)<br><br>Failure to comply with 14-point-type rule. L.R. 11-3.1.1 |
| 20<br>21<br>22<br>23<br>24<br>25<br>26<br>27 | 4. | Page 9, footnote 8: Anthony McCartney, *'Innocence of Muslims' Actress Cindy Lee Garcia Sues YouTube, Producer,* The Huffington Post, Sept. 19, 2012, *available at* http://www.huffingtonpost.com/20 12/09/19/innocence-of-muslims-actress-cindylee-garcia-youtube _ n 1898577 .html. | Lack of foundation. (FED. R. EVID. 602.)<br><br>Lack of authentication. (FED. R. EVID. 901(a); *Wady v. Provident Life and Accident Ins. Co. of America,* 216 F. Supp. 2d 1060, 1064-1065) (C.D. Cal. 2002) |

**PLAINTIFF'S OBJECTIONS TO EVIDENCE SUBMITTED BY GOOGLE INC. AND YOUTUBE, LLC IN OPPOSITION BRIEF TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND ORDER OF IMPOUNDMENT**<br>CV12-8315 MWF (VBKx)

ER736

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 262 of 266

| | | |
|---|---|---|
| | | (unauthenticated website materials inadmissible)). |
| | | Hearsay. (FED. R. EVID. 802.) |
| | | Failure to comply with 14-point-type rule. L.R. 11-3.1.1 |
| 5. | Page 9, footnote 8: Miguel Marquez and Stan Wilson, *Actress In Anti-Islamic Film Files Lawsuit Against Filmmaker and YouTube*, CNN, Sept. 19,2012, *available at http://www.cnn.com/20 12/09/19/us/califomia-anti-islam-film-lawsuit* | Lack of foundation. (FED. R. EVID. 602.)<br><br>Lack of authentication. (FED. R. EVID. 901(a); *Wady v. Provident Life and Accident Ins. Co. of America*, 216 F. Supp. 2d 1060, 1064-1065) (C.D. Cal. 2002) (unauthenticated website materials inadmissible)).<br><br>Hearsay. (FED. R. EVID. 802.)<br><br>Failure to comply with 14-point-type rule. L.R. 11-3.1.1 |
| 6. | Page 9, footnote 8: *Effort to Take Down Anti-Muslim Film Rejected*, available at http://abcloca1.go.com/kabc/video?id=88187 69 | Lack of foundation. (FED. R. EVID. 602.)<br><br>Lack of authentication. (FED. R. EVID. 901(a); *Wady v. Provident Life and Accident Ins. Co. of America*, 216 F. Supp. 2d 1060, 1064-1065) (C.D. Cal. 2002) (unauthenticated website materials |

PLAINTIFF'S OBJECTIONS TO EVIDENCE SUBMITTED BY
GOOGLE INC. AND YOUTUBE, LLC IN OPPOSITION BRIEF
TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
AND ORDER OF IMPOUNDMENT
CV12-8315 MWF (VBKx)

ER737

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 263 of 266

| | | | |
|---|---|---|---|
| 1 | | | inadmissible)). |
| 2 | | | Hearsay. (FED. R. EVID. 802.) |
| 3 | | | Failure to comply with 14-point-type rule. L.R. 11-3.1.1 |
| 4 | | | |
| 5 | 7. | Page 9, footnote 8: "The View" (http://www.youtube.com/watch?v=tKghLkOagNA) | Lack of foundation. (FED. R. EVID. 602.) |
| 6 | | | |
| 7 | | | Lack of authentication. (FED. R. EVID. 901(a); *Wady v. Provident Life and Accident Ins. Co. of America,* 216 F. Supp. 2d 1060, 1064-1065) (C.D. Cal. 2002) (unauthenticated website materials inadmissible)). |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | Hearsay. (FED. R. EVID. 802.) |
| 15 | | | |
| 16 | | | Failure to comply with 14-point-type rule. L.R. 11-3.1.1 |
| 17 | | | |
| 18 | 8. | Page 9, footnote 8: "Today Show" (http://today.msnbc.msn.com/idl4914665 8/ns/today-today news/t/actress-anti-islam-film-i - wasdupedl#.UHS65fkn2Ew). | Lack of foundation. (FED. R. EVID. 602.) |
| 19 | | | |
| 20 | | | Lack of authentication. (FED. R. EVID. 901(a); *Wady v. Provident Life and Accident Ins. Co. of America,* 216 F. Supp. 2d 1060, 1064-1065) (C.D. Cal. 2002) (unauthenticated website materials inadmissible)). |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |
| 26 | | | Hearsay. (FED. R. |
| 27 | | | |
| 28 | | | |

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 264 of 266

| | | | EVID. 802.) |
|---|---|---|---|
| 1 2 3 | | | Failure to comply with 14-point-type rule. L.R. 11-3.1.1 |
| 4 5 6 7 8 9 10 11 12 13 14 15 | 9. | Pages 22-23, footnote 16: *See The Mystery a/Benghazi,* available at http://www.nytimes. coml20 *12/1 01141* opinionlsundayldouthat - the-mystery-of- benghazi.html?ref=ross douthat& FO | Lack of foundation. (FED. R. EVID. 602.)<br><br>Lack of authentication. (FED. R. EVID. 901(a); *Wady v. Provident Life and Accident Ins. Co. of America*, 216 F. Supp. 2d 1060, 1064-1065) (C.D. Cal. 2002) (unauthenticated website materials inadmissible)).<br><br>Hearsay. (FED. R. EVID. 802.)<br><br>Failure to comply with 14-point-type rule. L.R. 11-3.1.1 |
| 16 17 18 19 20 21 22 23 24 25 26 27 | 10. | Page 23, footnote 16: CIA Documents Supported Susan Rice's Description of Benghazi Attacks, available at http://www. washingtonpost.comlopinionslbenghazi-attack-becomes-politica1-ammunitionl20 *12/1 0/19/el* ad82ae-l a2d-ll e2-bd1 0-5ffD56538b7 c story.html ?wprss=rss homepage | Lack of foundation. (FED. R. EVID. 602.)<br><br>Lack of authentication. (FED. R. EVID. 901(a); *Wady v. Provident Life and Accident Ins. Co. of America*, 216 F. Supp. 2d 1060, 1064-1065) (C.D. Cal. 2002) (unauthenticated website materials inadmissible)).<br><br>Hearsay. (FED. R. EVID. 802.)<br><br>Failure to comply |

6

PLAINTIFF'S OBJECTIONS TO EVIDENCE SUBMITTED BY GOOGLE INC. AND YOUTUBE, LLC IN OPPOSITION BRIEF TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND ORDER OF IMPOUNDMENT CV12-8315 MWF (VBKx)

ER739

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 265 of 266

| | | | with 14-point-type rule. L.R. 11-3.1.1 |
|---|---|---|---|
| 11. | Page 23, footnote 16: Bneghazi [sic] and Arab Spring Rear Up in U.S. Campaign, available at *http://www.nytimes.coml20* 12/1 0/22/us/politicslbenghazi -and-arab-spring-rear-up-in-uscampaign. html?hp& FO | | Lack of foundation. (FED. R. EVID. 602.)<br><br>Lack of authentication. (FED. R. EVID. 901(a); *Wady v. Provident Life and Accident Ins. Co. of America*, 216 F. Supp. 2d 1060, 1064-1065) (C.D. Cal. 2002) (unauthenticated website materials inadmissible)).<br><br>Hearsay. (FED. R. EVID. 802.)<br><br>Failure to comply with 14-point-type rule. L.R. 11-3.1.1 |

Dated: November 5, 2012

THE ARMENTA LAW FIRM, A.P.C.

By: _____
M. Cris Armenta
Attorneys for Cindy Lee Garcia

7   PLAINTIFF'S OBJECTIONS TO EVIDENCE SUBMITTED BY GOOGLE INC. AND YOUTUBE, LLC IN OPPOSITION BRIEF TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND ORDER OF IMPOUNDMENT CV12-8315 MWF (VBKx)

ER740

Case: 12-57302, 03/21/2013, ID: 8559948, DktEntry: 21-3, Page 266 of 266

**PROOF OF SERVICE**

1

2  STATE OF CALIFORNIA, COUNTY OF LOS ANGELES
      I am employed in the County of Los Angeles, State of California.  I am over

3  the age of eighteen years and not a party to the within action.  My business address

4  is 11900 Olympic Boulevard, Suite 730, Los Angeles, California 90064.

5        On November 5, 2012 I served the following document(s) described as:

6  **(1) REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
7      OF MOTION FOR PRELIMINARY INJUNCTION AND ORDER OF
       IMPOUNDMENT;  DECLARATION OF M. CRIS ARMENTA IN
8      SUPPORT THEREOF (filed separately);**

9  **(2) PLAINTIFF'S RESPONSE TO OBJECTIONS BY GOOGLE, INC. AND
       YOUTUBE LLC TO EVIDENCE SUBMITTED IN SUPPORT OF
10     PLAINTIFF'S MOTION FOR PRELIMINARY INUNCTION AND
       ORDER OF IMPOUNDMENT (filed separately);**

11 **(3) PLAINTIFF'S OBJECTIONS TO EVIDENCE SUBMITTED BY
       GOOGLE INC., AND YOUTUBE, LLC. IN OPPOSITION BRIEF TO
12     PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND
13     ORDER OF IMPOUNDMENT (filed separately);**

14 **(4) [PROPOSED] ORDER SUSTAINING PLAINTIFF'S OBECTIONS TO
       EVIDENCE SUBMITTED BY GOOGLE, INC., AND YOUTUBE LLC
15     IN OPPOSITION BRIEF TO PLAINTIFF'S MOTION FOR
       PRELIMINARY INUNCTION AND AN ORDER OF IMPOUNDMENT
16     (lodged separately)**

17 on the interested parties in this action by placing true copies thereof enclosed in sealed envelopes
18 addressed as follows:

19                     **Timothy L. Alger**
                      **Perkins Coie LLP**
20                    **3150 Porter Drive**
                   **Palo Alto, CA 94304-1212**

21
         *BY MAIL:* I am "readily familiar" with the firm's practice of collection and processing
22       correspondence for mailing with the United States Postal Service.  Under that practice, it
         would be deposited with the United States Postal Service that same day in the ordinary
23       course of business.  Such envelope(s) were placed for collection and mailing with postage
         thereon fully prepaid at Los Angeles, California, on that same day following ordinary
24       business practices.  (C.C.P. § 1013 (a) and 1013a(3))

25       Executed on November 5, 2012 in Los Angeles, California.

26

27

28                                              Heather Rowland

                                    1
                            **PROOF OF SERVICE**