No. 12-57302

IN THE

# United States Court of Appeals for the Ninth Circuit

CINDY LEE GARCIA,

Plaintiff-Appellant,

v.

GOOGLE INC. AND YOUTUBE, LLC,

Defendants-Appellees,

On Appeal from the United States District Court
for the Central District of California, CV-12-8315-MWF (VBKx)
District Judge Michael W. Fitzgerald

**GOOGLE INC. AND YOUTUBE, LLC'S EMERGENCY MOTION UNDER CIRCUIT RULE 27-3 FOR A STAY PENDING DISPOSITION OF PETITION FOR REHEARING EN BANC**

TIMOTHY L. ALGER
SUNITA BALI
PERKINS COIE LLP
1305 Porter Drive
Palo Alto, California 94306
(650) 838-4334
TAlger@perkinscoie.com
Sbali@perkinscoie.com

February 27, 2014

NEAL KUMAR KATYAL
CHRISTOPHER T. HANDMAN
DOMINIC F. PERELLA
SEAN MAROTTA
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
neal.katyal@hoganlovells.com

*Counsel for Defendants-Appellees
Google Inc. and YouTube, LLC*

**CIRCUIT RULE 27-3 CERTIFICATE**

Pursuant to Ninth Circuit Rule 27-3, counsel for movants state:

1.     The telephone numbers, e-mail addresses, and office addresses of the

attorneys for the parties are:

NEAL KUMAR KATYAL
CHRISTOPHER T. HANDMAN
DOMINIC F. PERELLA
SEAN MAROTTA
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Tel: (202) 637-5600
neal.katyal@hoganlovells.com

TIMOTHY L. ALGER
SUNITA BALI
PERKINS COIE LLP
1305 Porter Drive
Palo Alto, California 94306
Tel: (650) 838-4334
TAlger@perkinscoie.com
Sbali@perkinscoie.com

*Counsel for Appellees Google Inc. and YouTube, LLC*

M. CRIS ARMENTA
THE ARMENTA LAW FIRM APC
11900 W. Olympic Boulevard
Suite 730
Los Angeles, California 90064
Tel: (310) 826-2826
cris@crisarmenta.com

CREDENCE SOL
LA GARENNE
86200 Chauvigny, France
Tel: 06 74 90 22 08
credence.sol@sol-law.com

*Counsel for Appellant Cindy Lee Garcia*

2.     The Court last Wednesday issued a sealed order directing that

Defendant-Appellee Google Inc. take down "all copies" of the video " 'Innocence

of Muslims' from YouTube.com and from any other platforms under Google's

control" and that Google "take all reasonable steps to prevent further uploads of

'Innocence of Muslims' to those platforms."

Google has complied with the Court's order, but in light of the intense public interest in and debate surrounding the video, the video should remain accessible while Google seeks further review. As explained below, Google, YouTube, and the public will suffer irreparable harm to their First Amendment and other constitutional freedoms if Google is not immediately granted a stay pending the disposition of its petition for rehearing en banc.

3. On February 27, 2014, I e-mailed Cris Armenta, counsel for Garcia, to inform her of this motion and to seek her views. She has said Garcia opposes this motion. I am serving this motion on Ms. Armenta by CM/ECF at the same time I file it with the Court.

<u>/s/ Neal Kumar Katyal</u>

# TABLE OF CONTENTS

Page

CIRCUIT RULE 27-3 CERTIFICATE ................................................................ i

TABLE OF AUTHORITIES ....................................................................... iv

INTRODUCTION ........................................................................... 1

BACKGROUND ............................................................................. 1

ARGUMENT ............................................................................... 5

THE COURT SHOULD STAY THE PANEL'S TAKEDOWN
ORDER PENDING DISPOSITION OF A PETITION FOR
REHEARING EN BANC ....................................................................... 5

A.    Legal Standard .................................................................... 5

B.    It Is Reasonably Likely That Google And YouTube Will
Obtain Rehearing En Banc And That The Injunction Will Be
Vacated ............................................................................ 6

      1.    The Panel's Mandatory Injunction Flouts Circuit Law ....................... 6

      2.    The Panel's Analysis Is Wrong On The Merits And
Creates An Intra-Circuit Split On Fundamental Issues Of
Copyright Law ................................................................ 10

      3.    The Panel's Novel View Of Copyright Law Is
Unworkable .................................................................. 15

C.    Google And YouTube Will Suffer Irreparable Harm Unless
The Panel's Order Is Stayed ........................................................ 18

D.    Garcia Will Not Be Harmed If The Panel's Injunction Is
Stayed Until The Mandate Issues .................................................... 18

E.    The Public Interest Favors A Stay ................................................... 19

CONCLUSION ............................................................................ 20

## TABLE OF AUTHORITIES

Page

CASES:

*Aalmuhammed* v. *Lee*,
    202 F.3d 1227 (9th Cir. 2000) ......................................................5, 12, 13, 14, 15

*Alliance for the Wild Rockies* v. *Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ...........................................................................7

*Associated Press* v. *Otter*,
    682 F.3d 821 (9th Cir. 2012) ............................................................................19

*Batjac Prods. Inc.* v. *GoodTimes Home Video Corp.*,
    160 F.3d 1223 (9th Cir. 1998) ...........................................................................11

*Burrow-Giles Lithographic Co.* v. *Sarony*,
    111 U.S. 53 (1884)...........................................................................................12

*Chappell & Co.* v. *Fields*,
    210 F. 864 (2d Cir. 1914) .................................................................................11

*Dahl* v. *HEM Pharms. Corp.*,
    7 F.3d 1399 (9th Cir. 1993) ..............................................................................7

*Elrod* v. *Burns*,
    427 U.S. 347 (1976)..........................................................................................18

*Lair* v. *Bullock*,
    697 F.3d 1200 (9th Cir. 2012) ...........................................................................5

*Leiva-Perez* v. *Holder*,
    640 F.3d 962 (9th Cir. 2011) .............................................................................5

*Monteiro* v. *Temple Union High Sch. Dist.*,
    158 F.3d 1022 (9th Cir. 1998) ...........................................................................20

*Overstreet* v. *United Broth. of Carpenters & Joiners of Am.*,
    409 F.3d 1199 (9th Cir. 2005) ........................................................................9, 10

iv

## TABLE OF AUTHORITIES—Continued

Page

*Park Village Apartment Tenants Ass'n* v. *Mortimer Howard Trust*,
    636 F.3d 1150 (9th Cir. 2011) ...................................................................7, 8, 10

*Sammartano* v. *First Judicial Dist. Court*,
    303 F.3d 959 (9th Cir. 2002) .........................................................................9, 20

*San Antonio Cmty. Hosp.* v. *S. Calif. Dist. Council of Carpenters*,
    125 F.3d 1230 (9th Cir. 1997) ...........................................................................10

*Stanley* v. *University of S. Cal.*,
    13 F.3d 1313 (9th Cir. 1994) ..............................................................6, 7, 8, 20

*Transwestern Pipeline Co.* v. *17.19 Acres of Property Located in
Maricopa Cty.*, 550 F.3d 770 (9th Cir. 2008).................................................7, 8

*Univ. Pictures, Co.* v. *Harold Lloyd Corp.*,
    162 F.2d 354 (9th Cir. 1947) .............................................................................11

*Valle Del Sol Inc.* v. *Whiting*,
    709 F.3d 808 (9th Cir. 2013) .............................................................................18

*Video Software Dealers Ass'n* v. *Schwarzenegger*,
    556 F.3d 950 (9th Cir. 2009) .............................................................................18

*Winter* v. *NRDC*,
    555 U.S. 7 (2008).................................................................................................6

**STATUTES:**

17 U.S.C. § 101 ........................................................................................8, 11, 14

17 U.S.C. § 102(a) .............................................................................................10

17 U.S.C. § 302 ..................................................................................................17

17 U.S.C. § 512 ..................................................................................................16

# TABLE OF AUTHORITIES—Continued

Page

**RULE:**

Fed. R. App. P. 41(d)(1) ........................................................................6, 18

**OTHER AUTHORITIES:**

Eriq Gardner, *Secret 'Innocence of Muslims' Order Caused Google to
Go Ballistic*, The Hollywood Reporter, Feb. 26, 2014......................................17

Lee, *Entertainment and Intellectual Property Law* § 12.7 .....................................15

Register of Copyrights, *Compendium of Copyright Practices II* § 461 .................12

## INTRODUCTION

The merits panel in this case has issued an unprecedented, sweeping injunction directing Google and YouTube to take down a film—"Innocence of Muslims"—across all their platforms and prevent it from being uploaded again. That injunction is wrong on the merits and will cause Google, YouTube, and the public irreparable harm. The Court should stay the panel's takedown order pending disposition of the movants' upcoming petition for rehearing en banc.

The panel majority's takedown order contravenes Circuit law by imposing a mandatory injunction—an injunction gagging speech, no less—even though the majority found the merits "fairly debatable." Op. 10. The majority's novel copyright analysis is wrong on several fronts, creates splits in the Ninth Circuit, and will produce devastating effects: Under the panel's rule, minor players in everything from Hollywood films to home videos can wrest control of those works from their creators, and service providers like YouTube will lack the ability to determine who has a valid copyright claim. And absent a stay, Google, YouTube, and the public face irreparable harm because the panel's order will gag their speech and limit access to newsworthy documents—categorically irreparable injuries.

## BACKGROUND

**The Video.** YouTube is a video-sharing website on which individual users upload, share, and view videos. In July 2012, one user, defendant Mark Basseley

Youssef, uploaded a 13-minute-and-51-second video entitled "Innocence of Muslims" to YouTube.com.  ER64, ER 893.  The video portrays the Prophet Mohammed, the founder of Islam, as a barbarian and child molester.  ER64.  The video was shot in English and later dubbed into Arabic.  *Id.*  That Arabic version of the video went viral in the Muslim world after it was broadcast on Egyptian television, sparking protests and violence.  *Id.*; ER247.

"Innocence of Muslims" attracted international media attention when the Obama Administration cited it as the flashpoint for the 2012 attack on the U.S. consulate in Benghazi, Libya.  ER64.  Former U.S. Ambassador Susan Rice's statements defending that claim are considered to have played a role in her decision to withdraw her name from consideration for Secretary of State.  Congress also questioned then-Secretary of State Hillary Clinton about the film at hearings on the Benghazi attacks.  Appellees' Motion for Judicial Notice ¶¶ 1-3.  Even YouTube's role in hosting the video has been in the public eye.  *See* ER64.

**The Lawsuit.**  Plaintiff Cindy Lee Garcia is a part-time actress who appears in "Innocence of Muslims" for five seconds.  ER69, 193.  Garcia says she believed she was participating in a shoot for an action film called "Desert Warrior."  ER69.  She claims, however, that Youssef overdubbed her lines during post-production to make it look as if Garcia's character referred to Mohammed as a child molester.

2

*Id.* Garcia asserts that, following the international outcry surrounding the film, she received death threats from outraged Muslims. ER197.

Three months after the video was uploaded to YouTube, Garcia commenced this action, alleging in relevant part copyright claims against Google and YouTube. ER1-62. The District Court denied Garcia's motion for a preliminary injunction, finding that she had proven neither irreparable harm nor a likelihood of success on the merits. ER892-94. Because the video had been available on YouTube for months, had been widely disseminated elsewhere on the web, and had received relentless media coverage, the court found that Garcia had not shown how a preliminary injunction "would prevent any alleged harm." ER893. In addition, the court concluded that Garcia was unlikely to succeed on the merits for two reasons: She had not shown that she was the "author" of her performance, as the Copyright Act requires; and even if she were, she had granted the film's author an implied license to integrate her performance into the film. *Id.* Garcia appealed.

On February 19, 2014, nearly eight months after the argument on the appeal, the panel issued a sweeping mandatory injunction. It ordered Google to take down "all copies" of the video "from YouTube.com and from any other platforms under Google's control" and to "take all reasonable steps to prevent further uploads of 'Innocence of Muslims' to those platforms." Order at 1. The panel also imposed an unprecedented gag order; it prohibited Google from publicly disclosing the

3

order until the merits opinion issued.  *Id.*  Google sought an emergency stay of the panel's order; it was denied.

**The Panel Opinion.**  Seven days after the panel issued its order, it handed down its opinion.  Over an 18-page dissent from Judge Smith, the majority (Kozinski, C.J., and Gould, J.) held that the District Court abused its discretion.

The majority suggested that—based on her five-second appearance in a film—Garcia "may have a copyright."  Op. 10.  From that equivocal premise, the panel held that she was likely to succeed, even though it conceded that the question whether an actor in a film ever acquires a copyright is "fairly debatable" and "rarely litigated."  Op. 7-10.  The majority also held that, absent an injunction, Garcia likely will suffer irreparable harm.  Op. 15-17.  In response to YouTube's assertion that the film is already so widespread that removing it from YouTube will not prevent Garcia's harm, the majority concluded that it was good enough if the relief could "curb the harms" at issue.  Op. 17.

Judge Smith dissented.  Emphasizing that mandatory injunctions should be denied unless " 'the facts and law *clearly favor* the moving party,' " Judge Smith found the outcome insufficiently clear to grant an injunction that bans speech—much less to conclude that the District Court had abused its discretion.  Op. 20 (citation omitted).  He also rejected the majority's copyright analysis, concluding that Garcia's acting performance was not a "work" and that, even if it were, she

4

was not its "author." He wrote that the majority's contrary holding "decline[d] to apply the most relevant precedent in this circuit on the question before it"—*Aalmuhammed* v. *Lee*, 202 F.3d 1227 (9th Cir. 2000)—and "read[] the authorship requirement out of the Copyright Act and the Constitution." Op. 26.

## ARGUMENT

## THE COURT SHOULD STAY THE PANEL'S TAKEDOWN ORDER PENDING DISPOSITION OF A PETITION FOR REHEARING EN BANC.

### A.    Legal Standard

On a motion for a stay pending appeal, this Court considers " '(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.' " *Lair* v. *Bullock*, 697 F.3d 1200, 1203 (9th Cir. 2012) (citation omitted). However, a party seeking a stay pending further discretionary review only need show that it is " 'reasonably likely' " review will be granted and that, if it is, there is a " 'reasonable probability' " the order will be reversed. *Leiva-Perez* v. *Holder*, 640 F.3d 962, 967 (9th Cir. 2011) (citations omitted).[1] All these requirements are readily met.

---

[1] We analogize to the standard for stays pending a petition for certiorari because this Court does not appear to have developed a standard for stays pending a

**B.     It Is Reasonably Likely That Google And YouTube Will Obtain Rehearing En Banc And That The Injunction Will Be Vacated.**

The stay should issue first and foremost because Google and YouTube are likely to succeed in challenging the panel's opinion and order.  First, the panel issued a mandatory injunction gagging speech in a case where it admitted the merits are merely "debatable."  That does not come close to cutting it under this Circuit's law.  Second, the panel has adopted a novel interpretation of copyright law that will invite uncertainty and chaos for the entertainment industry, documentary filmmakers, amateur content creators, and for online hosting services like YouTube, allowing bit players in movies, videos, and other media to control how and when creative works are publicly displayed.

1.     <u>The Panel's Mandatory Injunction Flouts Circuit Law.</u>

a.  The majority's decision would radically reshape this Court's rules for issuing mandatory preliminary injunctions.  This Court has emphasized that mandatory injunctions are "particularly disfavored under the law of this Circuit." *Stanley* v. *University of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994).  That is because a mandatory injunction compels parties to act in ways that alter the status quo.  Of course, even a prohibitive injunction is "an extraordinary remedy" that should not be lightly granted.  *Winter* v. *NRDC*, 555 U.S. 7, 14 (2008).   So to

---

petition for rehearing en banc.  That is because a timely petition for rehearing en banc normally stays the Court's mandate.  Fed. R. App. P. 41(d)(1).

ensure that mandatory injunctions remain the exception, this Court has insisted that they should be "denied unless the facts and law *clearly favor* the moving party." *Stanley*, 13 F.3d at 1320 (emphasis added); *accord Transwestern Pipeline Co. v. 17.19 Acres of Property Located in Maricopa Cty.*, 550 F.3d 770, 776 (9th Cir. 2008); *Dahl* v. *HEM Pharms. Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993).

This Court has therefore held that mandatory injunctions cannot issue in "doubtful cases." *Park Village Apartment Tenants Ass'n* v. *Mortimer Howard Trust*, 636 F.3d 1150, 1160 (9th Cir. 2011). But the panel majority's decision did just that. On a key merits question—whether Garcia has a copyright in her performance—the majority conceded that the theory is "*fairly debatable*." Op. 10 (emphasis added). By definition, when the law supporting a claim is only "fairly debatable," it does not "clearly favor" that claim. But the problems with the majority's opinion do not stop there. After all, the standard here is even higher— abuse of discretion. *Alliance for the Wild Rockies* v. *Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). To hold that the district court *abused its discretion* by not concluding that the law and facts clearly favor Garcia is irreconcilable with the majority's own view that a key legal question at issue is "fairly debatable."

Nor was the majority's "fairly debatable" concession a glancing misstatement. Throughout its opinion, the majority forthrightly acknowledged that some dispositive issues are close, that others are open questions, and that still

7

others have not yet been litigated. The majority recognized, for example, that the question whether an actor obtains a copyright is "rarely litigated," and it cited zero cases resolving the question on the merits as it did. Op. 7. It recognized that a key factual question—whether Garcia signed away any rights she had in the film—is contested and unresolved. Op. 12 n.6. And it recognized that a potentially dispositive *legal* question—whether Garcia can meet the requirement that the performance be "fixed * * * by or under the authority of the author," 17 U.S.C. § 101—likewise remains unresolved.[2] Op. 7 n.4. And yet the divided panel imposed a speech-restraining injunction without settling any of these matters.

None of this can be squared with this Circuit's settled rule that "the facts and law [must] clearly favor the moving party" before awarding a mandatory injunction. *Transwestern Pipeline*, 550 F.3d at 776. With all the legal and factual indeterminacy surrounding Garcia's claim, this is the paradigmatic "doubtful case." *Park Village*, 636 F.3d at 1160. Judge Smith got it exactly right when he explained that the "*Stanley* standard counseling extreme caution when considering granting a mandatory preliminary injunction is premised on principles of judicial restraint," and the majority "abandon[ed] restraint" in this case. Op. 37.

---

[2] The panel majority claimed that "neither party raised" this issue, but that is not so. Google and YouTube argued in their merits brief that to qualify as an "author" entitled to protection under the Copyright Act, one must be "the person who translates an idea into a fixed, tangible expression." Br. 16 (citation omitted).

b. The diluted mandatory-injunction standard embraced by the majority is particularly indefensible here because the injunction gags speech. This Court has held that "where * * * there is at least some risk that constitutionally protected speech will be enjoined, only a particularly strong showing of likely success, and of harm to the defendant as well, could suffice" to justify an injunction. *Overstreet* v. *United Bhd. of Carpenters & Joiners of Am.*, 409 F.3d 1199, 1208 n.13 (9th Cir. 2005); *accord Sammartano* v. *First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002). Here there is more than "some" risk: Protected speech on a matter of broad public interest is undoubtedly being gagged, because the panel has suppressed the entire trailer, even though Garcia only claims to hold a copyright in the five seconds where she appeared. The panel accordingly should have ratcheted up the preliminary-injunction standard twice over—once because the injunction is mandatory, and again because of the "significant public interest in upholding First Amendment principles." *Sammartano*, 303 F.3d at 974. It did not do so.

The majority discounted these concerns, stating that "the First Amendment doesn't protect copyright infringement." Op. 18. But that does not resolve the issue here. As the dissent recognized—and the majority acknowledged—"the case at bar does not present copyright infringement *per se*," but instead a mere possibility of infringement. Op. 37; *id.* at 10. That matters. In the related First Amendment field of defamation, Judge Kozinski himself has recognized that "an

9

interlocutory injunction based on a 'reasonable probability' of malice, * * * is, by hypothesis, not based on 'actual malice.' " *San Antonio Cmty. Hosp.* v. *S. Calif. Dist. Council of Carpenters*, 125 F.3d 1230, 1240 (9th Cir. 1997) (Kozinski, J., dissenting).  Needless to say, an interlocutory injunction based on "a fairly debatable" theory of infringement is not based on a finding of actual infringement.

Giving courts the power to enjoin the *possibility* of a copyright violation is a dangerous game.  Because there remains "at least some risk that constitutionally protected speech will be enjoined," *Overstreet*, 409 F.3d at 1208 n.13, the panel should have required "a particularly strong showing of likely success." *Id.*

c.    The injunction is also inappropriate for a third reason:  Its scope vastly exceeds what Garcia requested.  Garcia sought only to enjoin the "posting of her own performance."  Reply Br. 5.  Yet the majority, despite finding that Garcia had a copyright only in her own performance (less the words and actions in the script), ordered Google and YouTube to remove *the entire video*.  That is improper.  With copyright injunctions, as all others, the relief "must be tailored to remedy the specific harm alleged."  *Park Village*, 636 F.3d at 1160.  And where an injunction can't be narrowly tailored to address the harm at issue, there can be no injunction.

2.    <u>The Panel's Analysis Is Wrong On The Merits And Creates An Intra-Circuit Split On Fundamental Issues Of Copyright Law.</u>

a.    Under the Copyright Act, only "original works of authorship" may be copyrighted.  17 U.S.C. § 102(a).  The Act goes on to explain that "[w]orks of

10

authorship" include certain enumerated types of works, such as dramatic works, pantomimes, motion pictures, and sound recordings. *Id.* An acting performance— such as Garcia's—is not among that list. To be sure, when Garcia acts out Youssef's script, she is no doubt "perform[ing] a work"—in this case, "Innocence of Muslims." But the Act draws a crisp distinction between that performance and the copyrightable work itself. *See id.* § 101.

The majority ignored that important distinction. As Judge Smith explained, the majority's holding that Garcia's performance of the work "Innocence of Muslims" is itself a copyrightable work "blurs" the Copyright Act's "line" between works and performances of them. Op. 22. And that is a line this Court has respected for decades. It has held that "the voice, motions, and postures of actors and mere stage business * * * cannot be copyrighted." *Univ. Pictures Co.* v. *Harold Lloyd Corp.*, 162 F.2d 354, 363 (9th Cir. 1947). Nor does the Court stand alone. *See*, *e.g.*, *Chappell & Co.* v. *Fields*, 210 F. 864, 865 (2d Cir. 1914) (same).

The panel, however, suggested that Garcia's five seconds of emoting were copyrightable by analogy to pantomime and choreography. Op. 8. But the protection afforded those works cuts against Garcia. Under the Copyright Office's internal practice guide, which is "entitled to judicial deference if reasonable,"[3] a

---

[3] *Batjac Prods. Inc.* v. *GoodTimes Home Video Corp.*, 160 F.3d 1223, 1230 (9th Cir. 1998).

pantomime is protectable only if there is "a significant amount of copyrightable matter in the form of specific gestures."  Register of Copyrights, *Compendium of Copyright Practices II* § 461.  "A few stock gestures," such as Garcia's tilt of the head during her fleeting screen time, are too insubstantial.  *Id.*

Any other approach would lead to absurd results.  Under the majority's analysis—absent contractual shifting—movie extras could register copyrights in their reaction shots, facial expressions, and mimed chatter.  Background singers on a record could register their "oohs" and "ahhs."  The list goes on. The majority never explains how the Register of Copyrights could administer such a fractured copyright system or why Congress would have wanted to invite that chaos.

b.  To the extent that Garcia's performance in "Innocence of Muslims" was a "work" at all, the majority contravened circuit precedent in holding that Garcia was the "author" of that work.  In *Aalmuhammed* v. *Lee*, this Court articulated the test for determining who is an author when the work is made up of copyrightable contributions from two or more people.  It explained that under Supreme Court precedent, an author of a work is "the person to whom the work owes its origin and who superintended the whole work, the 'master mind.' "  202 F.3d at 1233 (quoting *Burrow-Giles Lithographic Co.* v. *Sarony*, 111 U.S. 53, 61 (1884)).

As the Court explained, deeming the "master mind" of a work its author was necessary because otherwise a work made up of the contributions of many would

be awash in authors. In a movie, for instance, "[e]veryone from the producer and director to casting director, costumer, hairstylist, and 'best boy' gets listed in the movie credits because all of their creative contributions really do matter." *Id.* at 1233. Yet no one would refer to the best boy as an author of the film. The "master mind" test, requiring the author to have "artistic control" over the work, strikes that necessary balance. *Id.* It leaves the copyright with "someone at the top of the screen credits," "sometimes the producer, sometimes the director, possibly the star, or the screen writer," depending on the nature of the film. *Id.*

Garcia had no such role in this film. Instead, her contributions look like the "non-authorship" hallmarks this Court identified in *Aalmuhammed*. This Court explained that a non-author does "not at any time have superintendence of the work"; is "not the person 'who * * * actually formed the [work] by putting the persons in position, and arranging the place'"; cannot "benefit" the work "in the slightest unless [the director] cho[oses] to accept" his or her recommendations; and may make a "valuable contribution to the movie," but that, in and of itself, is not enough to make an author. *Id.* at 1235.

As Judge Smith recognized, Garcia's part in her own performance hit all these marks. Op. 25. Garcia did not have creative control over her performance; she said what others told her to say and used the expressions and inflections others

13

chose for her. *Id.*[4] Under *Aalmuhammed,* that means Garcia is not the "author" of her performance. *See id.*

The *Almuahmmed* authorship test draws yet more textual support from surrounding provisions in the Act. Although the Act does not define the term "author," it states that a work is "fixed" when it is placed in a tangible medium of expression "by or under the authority of the author." 17 U.S.C. § 101. In other words, the "author" is the one who has control over how the work is fixed. That is the control wielded by the "master mind" of the work or the one who has "artistic control" over it, not a mere actress like Garcia. *Aalmuhammed*, 202 F.3d at 1232.

The majority dismissed *Aalmuhammed* as limited to "what is required for a contributor to a work to assert joint ownership over the *entire* work." Op. 8. Not so. As Judge Smith correctly recognized, the *Aalmuhammed* panel "articulated general principles of authorship that assist in analyzing Garcia's interest in her performance." Op. 23. Those general principles were decisive; the decision turned not on the intent of Aalmuhammed, but on the *nature* of his contribution to the film—that is, whether he was an "author" of it. 202 F.3d at 1231-32.

---

[4] The majority quibbles over Youssef's precise role in the film, claiming that he only wrote the screenplay. Op. 12. In fact, Youssef also produced "Innocence of Muslims," making the very creative choices that rendered the end product so offensive to so many. ER65-66. Anyway, as is relevant here, Youssef's script provided the stage direction—that Garcia's character was to "seem[] concerned"— that dictated the content of her supposedly copyrighted performance. ER24. And while Youssef was not the director, neither was Garcia. ER241.

Besides, as Judge Smith emphasized, Garcia's interest in her performance "may best be analyzed as a joint work with Youssef, considering she relied on Youssef's script, equipment, and direction." Op. 23 n.3. The majority disagreed because it read *Aalmuhammed* as providing an answer to a narrow question: whether contributors intended to jointly own a work. Op. 7 n.4. But *Aalmuhammed* does much more. It resolves whether contributors "intend[ed] their contributions be merged into inseparable or interdependent parts of a unitary whole." 202 F.3d at 1231. Here, Garcia intended her performance to be merged as an inseparable part of the motion-picture work she was acting in. Thus, Garcia could only have a copyright interest if she was an "author" of that work. Under *Aalmuhammed*, she was not. *Supra* at 13. In deviating from *Aalmuhammed*'s clear guidance, the majority upset " 'a standard that promotes clarity in the motion picture industry," Op. 27 (quoting Lee, *Entertainment and Intellectual Property Law* § 12.7), and forged an intra-circuit split. That this case arises in the geographic circuit where much of the nation's technology and entertainment industries are located makes the panel's order particularly intolerable.

### 3.    The Panel's Novel View Of Copyright Law Is Unworkable.

Even setting aside the intra-circuit confusion sown by the majority's decision, its novel view of copyright warrants en banc review and reversal because it is unworkable and will invite all sorts of mischief. Under the panel's view, an

15

actor who appears in a video for five seconds has her own copyright in that work—a copyright that empowers her to demand that the *entire video* be scrubbed from the public sphere. But that rule would wreak havoc on movie studios, documentary filmmakers, and creative enterprises of all types by giving their most minor contributors control over their products. And it would severely burden platforms like YouTube, which regularly receive copyright infringement notices under the Digital Millennium Copyright Act, 17 U.S.C. § 512, requiring them either to defer to a bit performer's copyright claim or attempt to untangle the licensing structure behind a third party's video.

The majority tried to skirt this problem by asserting that "copyright interests in the vast majority of films are covered by contract, the work for hire doctrine or implied licenses." Op. 11. But that is an anachronistic view of the world. In an age of digital video cameras and instant uploads, "every schmuck with a video camera" really *is* "a movie mogul." Op. 13. Most of the millions of amateur filmmakers who upload their videos and other creative works to YouTube presumably do not have written agreements with those who appear in their videos. That means anyone who appears in those videos—even for five seconds—will now have independent authority to contact YouTube and demand their removal.

But even when it comes to larger scale professional filmmakers, the majority's soothing assurances are cold comfort. To be sure, many professional

16

filmmakers try to obtain releases from participants. But how long have they done so? And how long do they keep them? And do they obtain them from *everyone* with even the smallest role? The majority's approach opens the door to an extra in even *Gone With the Wind*[5] contacting Netflix and demanding that it purge every copy of the film from its inventory. Nor would the implied-license doctrine solve the problem. YouTube, after all, could not meaningfully adjudicate a takedown dispute if a bit player asserted that he had been misled about what his role in the film would be. Implied contract claims are intensely factual and subject to defenses—such as the fraud-in-the-inducement defense the majority identified, Op. 14—that third-parties like YouTube are ill-equipped to adjudicate. Its only choice would be to roll the dice with an infringement suit or remove the video. As one commentator has already recognized, the majority's rule will ensure that online service providers like Google and YouTube "will have tough days ahead of them in determining how to respond to copyright takedown notices from individuals who, before today, might not have been presumed to hold any interest in copyrighted material." Eriq Gardner, *Secret 'Innocence of Muslims' Order Caused Google to Go Ballistic*, The Hollywood Reporter, Feb. 26, 2014.[6]

---

[5] Copyright protection lasts for the author's life plus 70 years. 17 U.S.C. § 302.

[6] *Available at* http://www.hollywoodreporter.com/thr-esq/secret-innocence-muslims-order-caused-683895.

17

### C. Google And YouTube Will Suffer Irreparable Harm Unless The Panel's Order Is Stayed.

Google and YouTube will suffer irreparable harm if the panel's unprecedented injunction is not stayed. The Supreme Court has "long held" that movies—even movies others find objectionable—"are protected expression." *Video Software Dealers Ass'n* v. *Schwarzenegger*, 556 F.3d 950, 958 n.11 (9th Cir. 2009). The panel's order forces Google and YouTube to remove that protected expression from public view. And " '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.' " *Valle Del Sol Inc.* v. *Whiting*, 709 F.3d 808, 828 (9th Cir. 2013) (quoting *Elrod* v. *Burns*, 427 U.S. 347, 373 (1976)). Although copyright violations are not protected by the First Amendment, when a case concerns whether something truly is a violation in the first place, the values underlying the First Amendment counsel strongly in favor of a stay to decide the underlying copyright question.

### D. Garcia Will Not Be Harmed If The Panel's Injunction Is Stayed Until The Mandate Issues.

At the same time, Garcia will suffer no harm if the panel's injunction is stayed pending disposition of the impending petition for rehearing. Indeed, the federal rules already presume that there will be no harm in preserving the status quo. They provide that a panel's mandate is stayed by the timely filing of a petition for rehearing absent an order to the contrary. Fed. R. App. P. 41(d)(1).

18

Here, after considering the appeal for 18 months, the panel ordered relief immediately to "prevent a rush to copy and proliferate the film." Feb. 21 Order at 2. But the panel misapprehended how widely the video is already available outside of Google's platforms. Removing the video from YouTube and other Google platforms will not eliminate it from the Internet. If anything, the controversial order may generate yet more proliferation on non-Google sites across the globe.

In any event, Garcia will not suffer any harm from delaying the video's removal from YouTube and other Google platforms while the Court considers the case en banc. Garcia has given many media interviews discussing her role in the film. *See* ER196 (Garcia "went public" to speak out against the film). Rushing now to remove "Innocence of Muslims" will not shroud Garcia from the public eye. The Court should follow its usual course and prevent the panel's injunction from going into effect while the full Court considers a rehearing petition.

### E.    The Public Interest Favors A Stay.

Finally, the public interest favors a stay. As even Garcia concedes, "Innocence of Muslims" has been a subject of tremendous public debate and public interest. *See* Garcia Reply Br. 4. Yet the panel's order would remove all access to it via Google-controlled platforms. " 'Courts considering requests for [stays] have consistently recognized the public interest in upholding First Amendment principles.' " *Associated Press* v. *Otter*, 682 F.3d 821, 826 (9th Cir. 2012)

(citation omitted). Moreover, it is " 'always in the public interest to prevent the violation of a party's constitutional rights.' " *Sammartano*, 303 F.3d at 974.

These considerations are particularly weighty here, where the public itself has an interest in continued access to the video while Google and YouTube seek further review. The First Amendment protects not just the right to express information, but to receive it. *See Stanley* v. *Georgia*, 394 U.S. 557, 564 (1969). That is particularly true when the information bears on issues of public concern; " 'the right to receive ideas is a necessary predicate to the recipient's meaningful exercise of his own rights of speech, press, and political freedom.' " *Monteiro* v. *Temple Union High Sch. Dist.*, 158 F.3d 1022, 1027 n.5 (9th Cir. 1998) (citation omitted). If the public cannot access raw material at the center of public debate, citizens cannot make up their own minds about the pressing issues of the day.

That principle is never more true than here. "Innocence of Muslims" has been the focus of wide debate since it was first posted. *Supra* at 2. The panel's opinion will no doubt rekindle that controversy. But due to the panel's sweeping takedown order, the public will be unable to use YouTube to view the video at the center of the public discussion. The public interest favors a stay.

## CONCLUSION

For the foregoing reasons, the Court should stay the panel's February 19 and 26 orders pending the disposition of a timely petition for rehearing en banc.

Respectfully submitted,

/s/ Neal Kumar Katyal

TIMOTHY L. ALGER
SUNITA BALI
PERKINS COIE LLP
1305 Porter Drive
Palo Alto, California 94306
(650) 838-4334
TAlger@perkinscoie.com
Sbali@perkinscoie.com

NEAL KUMAR KATYAL
CHRISTOPHER T. HANDMAN
DOMINIC F. PERELLA
SEAN MAROTTA
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
neal.katyal@hoganlovells.com

February 27, 2014

*Counsel for Defendants-Appellees
Google Inc. and YouTube, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on February 27, 2014.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Neal Kumar Katyal
Neal Kumar Katyal