

**Davis Wright
Tremaine LLP**

Suite 2400
865 South Figueroa Street
Los Angeles, CA 90017-2566

Kelli L. Sager
213.633.6821 tel
213.633.6899 fax

kellisager@dwt.com

March 13, 2014

Ms. Molly Dwyer
Clerk of the Court
United States Court of Appeals for the Ninth Circuit
95 Seventh Street
San Francisco, CA 94103

Re: Letter Brief of Amicus Curiae In Support Of Rehearing En Banc of February 28, 2014 Order Denying Emergency Stay Request of Google, Inc. and YouTube, LLC
Garcia v. Google, Inc. et al., Case No. 12-57302

Dear Ms. Dwyer:

Pursuant to Circuit Rule 29-2, Los Angeles Times Communications LLC, The New York Times Company, The E.W. Scripps Company, The Washington Post, the California Newspaper Publishers Association, the Reporters Committee for Freedom of the Press, the First Amendment Coalition, the California Broadcasters Association, and National Public Radio, Inc. (collectively "Media Amici"), request permission to submit this letter brief addressing the important procedural and substantive issues raised by this Court's March 6 order, which have ramifications for news organizations that extend far beyond the particular facts of this case.

Media Amici urge this Court to grant en banc review of the panel majority's Stay Orders,[1] which summarily rejected requests by defendants-appellees Google, Inc. and YouTube, LLC ("Google") for a stay of an order that required Google to immediately suppress a controversial video, notwithstanding the fact that the video and this lawsuit have been the subject of widespread discussion and debate over the last two years.[2] Under well-established constitutional authority, an order that operates as a direct restraint on the exercise of First Amendment rights must be subject to rigorous scrutiny. By rejecting Google's stay requests without addressing the substantial First Amendment interests at stake, the panel majority acted in contravention of these important principles.

---

[1] To distinguish the panel's orders denying an emergency stay from its order on the merits of plaintiff-appellant's preliminary injunction, the February 19 and 28, 2014 panel orders will be referred to as the "Stay Orders," and the panel's February 26, 2014 Order reversing the trial court's denial of a preliminary injunction motion will be referred to as the "Merits Order."

[2] The lawsuit was filed September 26, 2012.

The Appellant argues that this immediate and direct restraint on speech is justified because she framed her claim as one for alleged copyright infringement, for which injunctive relief is constitutionally permitted. See, e.g., Appellant's Brief In Response To Sua Sponte Briefing Order Re Stay at 16-20. The panel majority adopted this view in its Merits Order, stating simply that "the First Amendment doesn't protect copyright infringement." Merits Order at 18. But this is not a lawsuit involving pirated copies of a DVD. As the majority recognizes, this case presents complex and unusual issues that do not fit neatly into the traditional framework for copyright claims; indeed, the "fair use" aspects of including five seconds of an allegedly copyrighted "performance" in a film was not addressed, even though that doctrine is one of the means by which First Amendment rights and copyright interests are harmonized. For these reasons – and given the fact that this case is only at the preliminary stage – the justification for a stay is even more pronounced.[3]

Compounding Media Amici's concerns, the panel initially issued its ruling under seal, forbidding Google from disclosing the restraining order for an entire week. This highly unusual restriction not only creates a dangerous precedent with respect to the rights of a media company to exercise its own First Amendment rights, but also disregarded the public's constitutional rights of access to court records and proceedings.

This Court should address these serious issues by rehearing the panel's February 28, 2014 Order en banc, and should stay the panel majority's rulings pending the disposition of Google's petition for en banc review of the Merits Order.

I.  **Request For Permission To File Amici Letter Brief.**

Amici Curiae are journalists, publishers, and trade associations whose members regularly gather and disseminate news and information on matters of public interest, using both traditional methods of distribution and the internet. Consequently, these Amici have a strong interest in the

---

[3] Some scholars have argued that given the lower standards for a preliminary injunction than for a final determination on the merits, injunctions for copyright claims should be analyzed more like classic prior restraint cases involving tort claims, like defamation. See Mark A. Lemley & Eugene Volokh, "Freedom of Speech and Injunctions in Intellectual Property Cases," 48 Duke L.J. 147, 169 (1998) ("injunctions against distributing a supposedly infringing work are injunctions restraining speech; and preliminary injunctions restraining speech are generally considered unconstitutional 'prior restraints.'"). See also Balboa Island Village Inn, Inc. v. Lemen, 40 Cal. 4th 1141, 1158 (2007) (explaining in context of request for injunction to prevent defamatory statements, "it is crucial to distinguish requests for preventive relief prior to trial and posttrial remedies to prevent repetition of statements judicially determined to be defamatory").

March 13, 2014
Page 3

interpretation and application of the law governing attempts to restrain the exercise of free speech and press rights.[4]

Media Amici request permission to submit this letter brief to discuss the procedural and substantive requirements for orders that operate as direct restraints on First Amendment rights, and to address the implications that the panel's Stay Orders have for news organizations, whose content often includes sensitive and controversial topics.[5]

### II. The Panel Majority's Order Imposes A Direct Restraint On Speech Without Meeting The High Standard Required To Justify Such An Order.

On February 19, 2014, the panel majority ordered Google to immediately "take down all copies of 'Innocence of Muslims' from YouTube.com and from any other platforms under Google's control," and to "take all reasonable steps to prevent further uploads of 'Innocence of Muslims' to those platforms."[6] The order was extraordinary in several respects: Although this lawsuit has been pending since September 2012, it required Google to act within twenty-four hours, worldwide, even though it did not include any accompanying opinion explaining its rationale. It also was issued as a preliminary injunction, since there has not been any final determination of the merits (and, indeed, the panel pointed to a number of issues related to the merits that the district court has not considered at this point in the proceedings). Perhaps most extraordinarily, the order was issued under seal, and Google was prohibited from disclosing it to explain the sudden disappearance of material from its sites.

Notwithstanding the extraordinary nature of the injunction, the panel majority summarily denied Google's request for a stay, even during the pendency of its petition for rehearing en banc. In so doing, the majority decision failed to take into account the important competing constitutional interests, particularly given the unusual nature of this case. En banc review is essential to ensure that the strict constitutional requirements for restraints on speech are satisfied, particularly where, as here, the restraint is issued on an emergency basis concerning a publication that has been available worldwide for many months.

### A. The Merits Order Is A Direct Restraint On Speech.

The United States Supreme Court has reminded us that "[o]ur liberty depends on the freedom of the press, and that cannot be limited without being lost." Nebraska Press Ass'n v.

---

[4] A description of the individual Amici, including their corporate disclosure information, is attached as Exhibit A.

[5] Google has consented to the filing of this Amicus Letter. Counsel for the Media Amici communicated with counsel for plaintiff-appellant Cindy Lee Garcia, but as of the filing of this Letter, Ms. Garcia's counsel did not respond to the inquiry about her position.

[6] A subsequent order modified the mandatory injunction to permit a redacted version of the film to remain online.

March 13, 2014
Page 4

Stuart, 427 U.S. 539, 548 (1976) (quoting 9 Papers of Thomas Jefferson 239 (J. Boyd ed. 1943)). Thus, "[r]egardless of how beneficent-sounding the purposes of controlling the press might be," the Court has "remain[ed] intensely skeptical about those measures that would allow government to insinuate itself into the editorial rooms of this Nation's press." Id. at 560-61 (quoting Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 259 (1974) (White, J., concurring)). The Supreme Court's long-standing hostility towards direct restraints on speech is the most important manifestation of that skepticism.

When a branch of government, including the judiciary, restrains the publication of information that has been obtained lawfully by the press, it undermines the "main purpose" of the First Amendment, which is "to prevent all such previous restraints upon publications as [have] been practiced by other governments." Nebraska Press, 427 U.S. at 557 (quoting Patterson v. Colorado ex rel. Attorney General, 205 U.S. 454, 462 (1907)). "Both the history and language of the First Amendment support the view that the press must be left free to publish news, whatever the source, without censorship, injunctions, or prior restraints." Nebraska Press Ass'n, 427 U.S. at 717 (Black, J., concurring).

By ordering Google to remove a video from its website and prevent the video from being uploaded again in the future, the Merits Order directly restrains speech. See, e.g., See Marceaux v. Lafayette City-Parish Consol. Gov't, 731 F.3d 488, 493-94 (5th Cir. 2013) (applying prior restraint doctrine to vacate an order taking down a website in order to avoid prejudicing litigants); see also Organization for a Better Austin v. Keefe, 402 U.S. 415, 417-18 (1971) (order enjoining continued distribution of literature was unconstitutional prior restraint); Lemley & Volokh, 48 Duke L.J. at 169.

The circumstances where such restraints are permitted historically have been – and must be – very narrowly cabined.[7] Typically, even the risk of harm to the proponent of the restraining order has been found to be insufficient, even when serious competing interests are at issue. See,

---

[7] The Supreme Court's modern prior restraint jurisprudence dates back to 1931, when the Court vacated a prior restraint against a virulently anti-Semitic publication that disturbed the "public peace" and provoked "assaults and the commission of crime." Near v. Minnesota, 283 U.S. 697, 716 (1931). After discussing the Framers' abhorrence of prior restraints, Chief Justice Hughes suggested that such restraints might be granted only in "exceptional" circumstances, such as to block the threatened publication of the sailing dates of troop transports or information about the movement of soldiers during wartime. Id. Forty years later, the Supreme Court reaffirmed the high constitutional bar against prior restraints, unanimously rejecting the government's request for an order barring two newspapers from publishing information from the "Pentagon Papers," even though the government alleged the materials were stolen and contained highly sensitive national security information. New York Times, 403 U.S. at 714. Prior restraints are "presumptively unconstitutional," id., and "may be considered only where the evil that would result from the reportage is both great and certain and cannot be militated by less intrusive measures." CBS, Inc. v. Davis, 510 U.S. 1315, 1317 (1994) (Blackmun, J., in chambers).

e.g., Near, 283 U.S. at 716-718 (defamatory and racist statements that allegedly disturbed the "public peace"); Nebraska Press, 427 U.S. at 556-561 (publication of defendant's confession in small-town murder case that allegedly would have jeopardized his fair trial rights); New York Times, 403 U.S. at 714 (publication of Pentagon Papers, despite claim that disclosure posed "grave and immediate danger" to national security). See also Burch v. Barker, 861 F.2d 1149, 1155 (9th Cir. 1988) ("[p]rior restraints are permissible in only the rarest of circumstances, such as imminent threat to national security").

The Stay Orders do not address these precedents, evidently relying on the notion espoused by the Appellant that a court considering a "copyright" claim and injunction need not consider the First Amendment concerns as it would if the case sounded in tort. Yet the justifications offered for an injunction here – and, in particular, for the immediate, sweeping, emergency order issued by the panel majority and its rejection of Google's stay requests – are much more akin to the arguments made in prior restraint cases than in traditional copyright cases: the threat of harm to the Appellant personally. Under these circumstances, and given the highly unusual nature of the copyright claim, the well-established principles constraining governments from enjoining speech cannot be so easily dismissed.

Moreover, given the rationale for the panel majority's order, consideration should have been given to cases where direct restraints on speech have been rejected where "there is evidence in the record that 'the cat is out of the bag' and the issuance of an injunction would therefore be ineffective...." Bank Julius Baer & Co. v. Wikileaks, 535 F. Supp. 2d 980, 985 (N.D. Cal. 2008); In re Charlotte Observer, 882 F.2d 850, 854-855 (4th Cir. 1989) (prior restraint never can be justified when the "genie is out of the bottle"); United States v. Smith, 123 F. 3d 140, 154 n.16, 155 n.17 (3d Cir. 1997) ("under prior restraint law, orders prohibiting the media from publishing information already in its possession [and publicly known] are strongly disfavored"). Here, it is undisputed that the video at issue had been publicly available since July 2012, even before the lawsuit was filed in September 2012; moreover, there is no dispute that the video has been the subject of widespread public discussion and debate for the last eighteen months.

By summarily denying Google's stay request without any consideration of these circumstances, or any discussion explaining how this case satisfies the strict requirements that must be met before abrogation of important First Amendment interests is permitted, the panel majority has injected substantial uncertainty into the law governing the viability of direct restraints on speech. Rehearing en banc is essential to ensure that the proper constitutional tests are applied, and that clear guidance is provided to district courts facing similar requests for injunctive relief from individuals who are the subject of news reports.

March 13, 2014
Page 6

### B. Traditional Equitable Principles Favor A Stay Pending En Banc Review.

In addition to the core First Amendment considerations described above, the Supreme Court has emphasized that a "plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. NRDC, Inc., 555 U.S. 7, 20 (2008). The plaintiff must satisfy all four prongs, and even in the copyright context, a mere showing of likely – or even actual – infringement is insufficient to justify injunctive relief. See eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 392-93 (2006) ("this Court has consistently rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed."); Flexible Lifeline Sys. v. Precision Lift, Inc., 654 F.3d 989, 998 (9th Cir. 2011) (applying the injunction standard from Winter and eBay in a copyright infringement action).

These equitable factors provide independent safeguards against the issuance of injunctions that amount to governmental censorship. For example, in Abend v. MCA, Inc., 863 F.2d 1465 (9th Cir. 1988), this Court held that a movie studio infringed the plaintiff's copyright in the original story on which the film "Rear Window" was based. Id. at 1478. But despite its finding of infringement, the Court declined to enjoin distribution of the film, explaining that "an injunction could cause public injury by denying the public the opportunity to view a classic film for many years to come." Id. at 1479. See also Campbell v. Acuff-Rose Music, 510 U.S. 569, 578 n.10 (1994) (noting that even where courts find copyright infringement, in cases that do not involve "simple piracy," injunctions may be inappropriate where there is "a strong public interest in the publication of the secondary work [and] the copyright owner's interest may be adequately protected by an award of damages for whatever infringement is found").

In addition to the "public interest" factor, courts have emphasized that free speech concerns must be taken into account in weighing the "irreparable harm" and "balance of equities" factors as well. In particular, the Supreme Court has emphasized that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976); see also CBS, Inc. v. District Court, 729 F.2d 1174, 1177 (9th Cir. 1984) ("[t]he first amendment informs us that the damage resulting from a prior restraint – even a prior restraint of the shortest duration – is extraordinarily grave"). Google "unquestionably" is suffering "irreparable injury" with each passing day that it must abide by the injunction, but in balancing the hardships the panel majority virtually ignored this constitutional injury. Nor did the majority give sufficient consideration to the fact discussed above, that the video – and Appellant's role in it – already has been widely disseminated and publicly discussed, making the effectiveness of the injunction highly questionable. En banc

rehearing is needed to ensure that these constitutional and equitable principles are considered and properly applied, and Google's constitutional rights should be protected in the interim.[8]

### III. The Order Creates A Dangerous Precedent For Newsgathering Organizations.

Media Amici have serious concerns about the impact of the Stay Orders and Merits Order for newsgathering organizations.

First, by ordering a media company to take affirmative steps to remove content, without a clear discussion and application of the First Amendment requirements for such extraordinary relief, the panel majority's actions could encourage subjects of critical or unflattering news coverage to seek similar relief, using copyright law to secure removal of the objectionable content while trying to evade the constitutional protections against prior restraints. It is not uncommon for media organizations to face copyright claims where the goal is transparently aimed at suppressing news reporting, rather than furthering any economic or creative interest on the part of a copyright holder, whether the reporting involves pop culture or serious issues of national and world affairs. E.g., Four Navy Seals & Jane Doe v. AP, 413 F. Supp. 2d 1136, 1142 (S.D. Cal. 2005) (plaintiffs brought copyright infringement claim in lawsuit against AP over articles about abuse of Iraqi prisoners and sought injunction against publication of photos); see also Monge v. Maya Magazines, Inc., 688 F.3d 1164 (9th Cir. 2012) (celebrities brought copyright infringement claim based on magazine's publication of wedding photos).

Courts traditionally have rejected such efforts by emphasizing that copyright is intended to promote "the commercial interest of the artist/author" and not "to protect secrecy." Bollea v. Gawker Media, LLC, 913 F. Supp. 2d 1325, 1329 (M. D. Fla. 2012) (denying Hulk Hogan's request for copyright injunction barring news website from publishing sex tape excerpts). But the Merits Order threatens to dramatically expand the scope of copyright injunctions by requiring the removal of a video based not on any commercial or creative interest, but rather on the sort of security concern that has consistently been deemed insufficient to support a direct restraint on speech in other contexts. E.g., New York Times, 403 U.S. at 714 (refusing to enjoin publication

---

[8] Media Amici intend to request permission to submit a separate brief in support of Google's Petition for En Banc Rehearing of the Opinion, which will address the intersection of the First Amendment and copyright in more detail. Because this issue also relates to the justification for a stay, however, this Court's en banc review of the stay order should also make clear that Eldred v. Ashcroft, 537 U.S. 186, 219-220 (2003), which the panel majority cited (Merits Order at 18), does not foreclose First Amendment analysis of injunctions that suppress speech. The Eldred Court held simply that the Copyright Act's idea/expression distinction and fair use provision provided built-in safeguards that sufficiently protected the particular speech interests at issue. 537 U.S. at 219-21. The Court did not address injunctive relief, and it specifically rejected the notion that copyright is a First Amendment-free zone. Id. at 221 (recognizing that another court "spoke too broadly when it declared copyrights categorically immune from challenges under the First Amendment") (quotation omitted).

of Pentagon Papers, despite claim that disclosure posed "grave and immediate danger" to national security). This could encourage copyright suits from a wide variety of putative plaintiffs, from politicians caught in a social media scandal (whose "sexts" are arguably copyrighted), to a source claiming a "modicum of creativity" in an interview, potentially giving them veto power over an entire news article or broadcast.

Second, the Order puts news outlets at risk with respect to their ongoing coverage of this particular controversy. The "Innocence of Muslims" video is unquestionably a matter of tremendous public interest; it has been discussed, debated, and denounced across the world, and high level officials even have addressed its potential role in the attack on the U.S. consulate in Benghazi, Libya. Appellant's role in the video is similarly newsworthy, as her claim to have been defrauded into participating sheds important light on how the video was created. The five-second clip in which she appears is vital to illustrating this point, as it apparently shows that her performance was overdubbed with dialogue disparaging Mohammed. Decades of First Amendment and fair use law suggest that news organizations should be free to include such a brief excerpt in their coverage of the controversy surrounding the video. See, e.g., Harper & Row, Publrs. v. Nation Enters., 471 U.S. 539, 563 (1985) (recognizing that publication of "briefer quotes from the memoirs are arguably necessary adequately to convey the facts" in article about book's publication); Sofa Entm't, Inc. v. Dodger Prods., 709 F.3d 1273, 1276 (9th Cir. 2013) (theatrical production's use of seven-second clip from television show "to mark a historical point" was protected fair use). But by ordering removal of this five-second clip, the panel majority leaves Media Amici and other news organizations in a difficult position as they determine how to cover the ongoing controversy over the video.

Third, the Court's procedure in issuing the Order underscores the extraordinary nature of the ruling and the need for en banc rehearing. On February 19, 2014, a week before the panel issued its Opinion, it issued an order under seal directing Google to remove the "Innocence of Muslims" video while directing that "[n]either the parties nor counsel shall disclose this order, except as necessary to the takedown process, until the opinion in this case issues." Dkt. # 40. On February 21, 2014, the panel summarily denied Google's first emergency stay motion, once again directing that "[n]either the parties nor counsel shall disclose this order or the order of February 19 until the opinion is actually published." Dkt. # 43. The parties and their counsel remained gagged, and the Court's orders remained under seal, until the panel decision was issued on February 26, 2014.

This highly unusual order is inconsistent with constitutional and common law rights of access to judicial proceedings. See, e.g., Associated Press v. District Court, 705 F.3d 1143, 1147 (9th Cir. 1983) (rejecting sealing even for 48 hours; "[t]he effect of the order is a total restraint on the public's first amendment right of access even though the restraint is limited in time"); Kamakana v. City & County of Honolulu, 447 F.3d 1172, 1179 (9th Cir. 2006) (sealing order in civil case required "compelling reasons sufficient to outweigh the public's interest in disclosure"). The ramifications of such secret judicial decision-making is especially disturbing. As Judge Easterbrook of the Seventh Circuit explained, in opining about the danger to public confidence that results from secret decision-making:

March 13, 2014
Page 9

> The political branches of government claim legitimacy by election, judges by reason. Any step that withdraws an element of the judicial process from public view makes the ensuing decision look more like fiat and requires rigorous justification. The Supreme Court issues public opinions in all cases, even those said to involve state secrets. … A district court issued public opinions in a case dealing with construction plans for hydrogen bombs. … We issued a public opinion in a case whose subject was attorney-client confidences that required the parties' names and many details to be withheld. … It is impossible to see any justification for issuing off-the-record opinions in a dispute about drawings of transmission testing equipment. … The Clerk of this court will place the district court's opinions in the public record. We hope never to encounter another sealed opinion.

Hicklin Engineering, L.C. v. Bartell, 439 F.3d 346, 348-349 (7th Cir. 2006) (citations omitted). The same rationale applies here: there is no compelling explanation for the secrecy order. The panel's statement that it was acting to prevent a rush to proliferate the video before its removal from YouTube overlooks the fact that the video had been available online since July 2012, and that it remains available on other websites unaffected by the injunction. The sudden need for secrecy is all the more puzzling given that the appeal had been pending in this Court since December 2012. These sealed rulings and gag orders therefore only further demonstrate the novelty of this unprecedented Order, while underscoring the need for en banc review.

## IV. Conclusion

For all of the foregoing reasons, Media Amici respectfully urge this Court to rehear the February 28, 2014 Order en banc, and stay the injunction pending the disposition of Google's petition for en banc review of the panel's Opinion.

Respectfully submitted,

*Kelli L. Sager* /DL

Kelli L. Sager
DAVIS WRIGHT TREMAINE LLP
Attorneys for Amici Curiae

## EXHIBIT A

Pursuant to Federal Rules of Appellate Procedure 29(c) and 26.1, Amici Curiae provide the following:

Los Angeles Times Communications LLC (The Times), is the publisher of the Los Angeles Times, the largest metropolitan daily newspaper circulated in California. The Times also publishes through Times Community News, a division of the Los Angeles Times, the Daily Pilot, Coastline Pilot, Glendale News-Press, The Burbank Leader, Huntington Beach Independent, and the La Cañada Valley Sun, and maintains the website www.latimes.com, a leading source of national and international news. The Times is a wholly owned subsidiary of Tribune Publishing Company, LLC, which in turn is a wholly owned subsidiary of Tribune Company (which is publicly traded). Tribune also publishes the Chicago Tribune, Baltimore Sun, Sun Sentinel (South Florida), Orlando Sentinel, Hartford Courant, The Morning Call, and Daily Press.

The New York Times Company is a publicly traded company and has no affiliates or subsidiaries that are publicly owned. No publicly held company owns 10% or more of its stock. It is a leading global multimedia media news and information company, which publishes The New York Times and the International New York Times, and operates NYTimes.com and related properties.

The California Newspaper Publishers Association (CNPA) is a non-profit trade association representing more than 800 daily, weekly and student newspapers in California. For well over a century, CNPA has defended the First Amendment rights of publishers to gather and disseminate -- and the public to receive – news and information.

The Reporters Committee for Freedom of the Press (RCFP) is an unincorporated association of reporters and editors with no parent corporation and no stock. RCFP works to defend the First Amendment rights and freedom of information interests of the news media. The Reporters Committee has provided representation, guidance and research in First Amendment and Freedom of Information Act litigation since 1970.

The First Amendment Coalition (FAC) is a non-profit advocacy organization based in San Rafael, California, which is dedicated to freedom of speech and government transparency and accountability. FAC's members include news media outlets, both national and California-based, traditional media and digital, together with law firms, journalists, community activists and ordinary citizens.

The California Broadcasters Association (CBA) is a non-profit trade association representing more than 1000 radio and television stations in California. Founded in 1947, the CBA promotes the customs and practices of the industry in the best interests of broadcasters and the communities they serve.

March 13, 2014
Page 11

The E.W. Scripps Company is a publicly traded corporation. It has no parent corporation, and no publicly owned company owns 10% or more of its stock. It is a diverse, 131-year-old media enterprise with interests in television stations, newspapers, and local news and information web sites. The company's portfolio of locally focused media properties includes: 19 TV stations (10 ABC affiliates, three NBC affiliates, one independent and five Azteca Spanish language stations); daily and community newspapers in 13 markets; and the Washington, D.C.-based Scripps Media Center, home of the Scripps Howard News Service.

National Public Radio, Inc. (NPR) is a privately supported, not-for-profit membership organization that has no parent company and issues no stock. It produces and distributes its radio programming through, and provides trade association services to, nearly 800 public radio member stations located throughout the United States and in many U.S. territories. NPR's award-winning programs include Morning Edition, and All Things Considered, and serve a growing broadcast audience of over 23 million Americans weekly. NPR also distributes its broadcast programming online, in foreign countries, through satellite, and to U.S. Military installations via the American Forces Radio and Television Service.

WP Company LLC (d/b/a The Washington Post) is a wholly owned subsidiary of Nash Holdings LLC. Nash Holdings LLC is privately held and does not have any outstanding securities in the hands of the public. WP Company LLC publishes The Washington Post, one of the nation's leading daily newspapers, as well as a website (www.washingtonpost.com) that reaches a monthly audience of more than 20 million readers.

Counsel for the parties did not author this brief. The parties have not contributed money intended to fund preparing or submitting the brief. No person – other than amicus curiae, its members, or its counsel – contributed money that was intended to fund preparing or submitting this brief.

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 29(c) and 32(a)(7)(C), and Circuit Rule 29-2(c), according to the word processing system used to prepare this letter brief, the word count is 4,136 words, not including Exhibit A, the address block, and this certificate of compliance.

RESPECTFULLY SUBMITTED this 13th day of March, 2014.

DAVIS WRIGHT TREMAINE LLP
KELLI L. SAGER
DAN LAIDMAN
BRENDAN N. CHARNEY

By _____
Dan Laidman

Attorneys for Amici Curiae