No. 12-57302

IN THE

# United States Court of Appeals

FOR THE NINTH CIRCUIT

CINDY LEE GARCIA,

*Plaintiff-Appellant,*

v.

GOOGLE INC. AND YOUTUBE, INC.,

*Defendants-Appellees,*

and

NAKOULA BASSELEY NAKOULA AKA SAM BACILE, MARK BASSELEY YOUSSEF, ABANOB BASSELEY NAKOULA, MATTHEW NEKOLA, AHMED HAMDY, AMAL NADA, DANIEL K. CARESMAN, KRITBAG DIFRAT, SOBHI BUSHRA, ROBERT BACILY, NICOLA BACILY, THOMAS J. TANAS, ERWIN SALAMEH, YOUSSEFF M. BASSELEY, AND MALID AHLAWI

*Defendants.*

On Appeal from the United States District Court for the Central District of California

**BRIEF OF AMICUS CURIAE NETFLIX, INC.**

Michael H. Page
Joseph C. Gratz
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, CA 94111
415-362-6666

*Attorneys for Amicus Curiae Netflix, Inc.*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for Amici Curiae certifies that Netflix has no parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

## TABLE OF CONTENTS

PAGE NO.

INTEREST OF NETFLIX ................................................................................1

ARGUMENT .................................................................................................2

    I.    The Decision of the Panel, If Left Undisturbed, Will Create Uncertainty For Established Business Models ...............................................................2

        A.    The panel opinion creates a new species of copyright. ............................................................... 2

        B.    The panel opinion's suggested solutions are evanescent at best and illusory at worst................. 5

        C.    The panel opinion risks requiring third-party distributors to grant an effective veto right to any performer. ............................................ 9

    II.    The Court Should Return Copyright Law to its Proper State ...................................................................10

CONCLUSION .............................................................................................12

CERTIFICATE OF COMPLIANCE ....................................................................14

CERTIFICATE OF SERVICE...........................................................................15

# TABLE OF AUTHORITIES

PAGE NO.

**Cases**

*Aalmuhammed v. Lee*,
  202 F.3d 1227 (9th Cir. 2000) ............................................................. 12

*Clean Flicks of Colorado LLC v. Soderbergh*,
  433 F. Supp. 2d 1236 (D. Colo. 2006) .................................................... 7

*Nat'l Basketball Ass'n v. Motorola, Inc.*,
  105 F.3d 841 (2d Cir. 1997) .................................................................. 3

*Rossi v. Motion Picture Ass'n of Am. Inc.*,
  391 F.3d 1000 (9th Cir. 2004) ............................................................. 10

*Thomson v. Larson*,
  147 F.3d 195, 199 (2d Cir. 1998) ....................................................... 4, 9

**Statutes**

17 U.S.C. § 101 ............................................................................................ 4

17 U.S.C. § 102 ............................................................................................ 3

17 U.S.C. § 106A ........................................................................................ 8

17 U.S.C. § 203 ............................................................................................ 8

17 U.S.C. § 203(a)(4) .................................................................................. 9

17 U.S.C. § 512 ............................................................................................ 9

47 U.S.C. § 230 .......................................................................................... 11

Pursuant to Federal Rule of Appellate Procedure 29(a), this Court granted leave for the filing of amicus curiae briefs in its March 13, 2014 Order, ECF No. 61.

## INTEREST OF NETFLIX[1]

Netflix is a pioneer in the Internet delivery of movies and TV shows. Since launching in 2007, Netflix's streaming business has become one of the primary means by which American consumers watch movies and television shows. Netflix now has over 44 million subscribers worldwide who watch more than one billion hours of content each month. Netflix licenses its content from a wide variety of distributors—while some are major studios, many others are smaller, independent producers—and depends on those distributors to have in turn licensed any underlying rights.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(c)(5), Netflix hereby certifies that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund preparing or submitting the brief; and no person other than Netflix contributed money intended to fund preparing or submitting the brief.

# ARGUMENT

## I. The Decision of the Panel, If Left Undisturbed, Will Create Uncertainty For Established Business Models

Appellees and numerous *amici* have ably briefed the doctrinal and statutory problems with the panel opinion. Netflix joins in that analysis, and will not repeat it herein, but instead focuses on the practical (or rather impractical) effects of the panel opinion if left to stand. By creating a new species of copyright, and empowering essentially any performer in a motion picture or television program to both sue downstream distributors and enjoin any use of her performance of which she does not approve, the panel majority risks wreaking havoc with established copyright and business rules on which all third party distributors, including Netflix, depend. While Netflix has no doubt that Ms. Garcia was mistreated by the filmmakers here, bad facts should not be allowed to make bad law: this Court should not upend copyright law in its search for a remedy.

### A. The panel opinion creates a new species of copyright.

The majority opinion has created a new species of exclusive right, untethered to the Copyright Act, by recognizing an amorphous form of copyright without first identifying the copyrighted work at issue. A

work of authorship is not eligible for copyright protection until it is "fixed in any tangible medium of expression." 17 U.S.C. § 102. But Appellant has expressly disclaimed joint authorship of *The Innocence of Muslims* as a whole, and the only other fixation anyone has identified is the script, to which Appellant makes no claim. As a result, and as the Copyright Office has since confirmed, Appellant is not the author of any copyrighted work to begin with. The analysis should have ended there.

The cases Garcia cites regarding the supposed copyrightability of actors' performances are not to the contrary. None of them holds that an actor holds copyright in his performance; instead, each discusses whether a performer's state-law claims for misappropriation of his performance are preempted by operation of 17 U.S.C. § 301. They thus tell us nothing about whether an actor's performance is separately copyrightable, because "Section 301 preemption bars state law misappropriation claims with respect to uncopyrightable as well as copyrightable elements." *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 849 (2d Cir. 1997).

There are, to be sure, situations where individual works of authorship can be fixed "by or under the authority of the author," 17

U.S.C. § 101, and thus subject to copyright, and then later assembled into a separately copyrightable compilation. But this is not such a case: a typical motion picture, if there is more than one author, is a joint work, "prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." *Id.* One is either a *joint* author of a motion picture, or one is not an author *at all*. The majority opinion, by creating a non-joint-author, unfixed species of copyright, has turned copyright law on its head.

Moreover, while a joint author has no power to prevent another joint author from licensing their work but instead is entitled only to an accounting of his share of the proceeds, *Thomson v. Larson*, 147 F.3d 195, 199 (2d Cir. 1998), under the majority opinion, an actor with only one line of dialogue might have far greater power than a full joint author. If the panel opinion stands, an actor can both sue downstream, licensed distributors such as Netflix and seek an injunction preventing those legitimate distributors from exhibiting films and television shows to millions of consumers.

### B. The panel opinion's suggested solutions are evanescent at best and illusory at worst.

The majority opinion places third-party content distributors such as Netflix in an untenable position: where under established copyright law Netflix was able to rely on licenses granted by a film's producer, it is now potentially subject to suit and injunction at the hands of almost any actor in a film or television program. Netflix makes available for streaming thousands of works, of every stripe, from approximately 200 suppliers in the United States alone. For virtually all of those works, Netflix has no role in their creation, and no independent knowledge of the licenses and contracts between the copyright holder and each actor in each work. Under the majority opinion, however, Netflix may now be at risk of a suit for injunction at the hands of any of those actors.

The majority opinion suggests that the changes it makes to copyright law are unlikely to have more than occasional effects at the margins, based on what the majority assumes (without any apparent record) are near-universal practices of contractual agreement in Hollywood, combined with the likelihood a copyright holder has, in any event, an implied license to an actor's performance. Neither solution,

5

however, cures the potentially serious problems caused by the majority's holding.

The majority first suggests that the problem is easily solved by the filmmaker obtaining written licenses or work-for-hire agreements from each performer. But while major studios may now be diligent in doing so, as the majority opinion characterized it, "every schmuck with a videocamera," Slip Op. at 13, is indeed a filmmaker, and popular works are created by all sorts of artists. Copyright is not just for Hollywood. As technology makes it easier for even small-scale productions to garner audiences in the millions, copyright rules that work across the board are more important than ever. Like all other licensees of film and television shows not of its own creation, Netflix has no ability to determine whether licensing niceties have been observed for each of the tens of thousands of works it distributes, and no easy way to assess or defend against a claim they have not.

Nor do contractual indemnities from content suppliers solve this problem. Even an indemnity from a well-heeled studio would not prevent a suit against a distributor like Netflix, or shield Netflix from the trouble and distraction of litigating such a claim to conclusion and

6

the harm that would come from an injunction requiring the removal of content enjoyed by millions of subscribers. Because these claims are often fact-intensive, they are expensive and unlikely to be resolved short of a trial in many cases. The financial and logistical burdens imposed are not cured by indemnities, no matter how broad.

Nor can distributors like Netflix protect their right to distribute popular films by bowdlerizing them to remove a claimant's performance when a dispute arises; to do so might be found to infringe the producer's own copyright. *See Clean Flicks of Colorado LLC v. Soderbergh*, 433 F. Supp. 2d 1236 (D. Colo. 2006) (enjoining a video rental service from making available edited versions of movies on copyright grounds).

The panel majority's next suggestion, that the implied license inherent in the act of performing will protect most filmmakers and distributors, is at best optimistic. The panel correctly recognizes the existence of that license, but then limits it in a way inconsistent with the Copyright Act by suggesting that a use of which the actor does not approve is beyond its scope. In so doing, the panel adopts a type of "moral rights"—rights not to enjoy the economic fruits of one's creation, but to ensure the artistic integrity of the presentation of one's creation.

7

The United States does not recognize moral rights for movies and television programs. *Cf.* 17 U.S.C. § 106A (establishing limited moral rights for works of visual art). And yet the panel majority creates such rights here: it limits the scope of the implied license to uses Ms. Garcia expected or approved of, giving her an effective veto right over edits to which she objects. Where are the limits to that doctrine, and how can such a claim be determined short of discovery and trial? Can a bit-part actor in *Gone With the Wind* now seek an injunction (laches problems aside) because he does not approve of the use of his performance in a piece of "Yankee propaganda"? What about his heirs? And even if he signed some agreement in 1939 defining the scope of the license, what are the chances that the studio (to say nothing of Netflix) can lay its hands on it?

    The implied license solution fails, at least in certain situations, for yet another reason: Under 17 U.S.C. § 203, any copyright license (written or implied) may be terminated by the author or her heirs after 35 years. Thus even if the implied license were sufficient protection, it is evanescent. And once again, Netflix and other downstream distributors have no way of knowing whether—for any of the tens of

8

thousands of works in their catalogs—an actor has exercised her right of termination. *See* 17 U.S.C. § 203(a)(4) (requiring that notice of termination be served on the "grantee" of the license but not on any downstream sublicensees, such as distributors).

### C. The panel opinion risks requiring third-party distributors to grant an effective veto right to any performer.

In the face of the majority opinion, Netflix and other third-party distributors are left with increasingly constrained choices. Under the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512, there is already a strong bias towards removal of content. In order to take advantage of DMCA safe harbors, a third party must take down content upon receipt of a takedown notice. For service providers such as YouTube, the safer course in close calls thus is already to take down rather than risk liability. But—until this opinion—a third party such as Netflix, with an express license from the registered copyright holder, could confidently decline to remove content from its service: Even if the sender of the DMCA notice was herself a coauthor, no copyright claim would lie against the third party, since her remedy would lie against her coauthor for an accounting. *Thomson*, 147 F.3d at 199.

9

This opinion works a profound change, skewing the balance for online distributors even further towards a default rule where almost any takedown notice is best treated as fiat.  If the panel opinion stands, one DMCA-compliant email notification from the actor who played Juror Number Four could be enough to justify removal of *My Cousin Vinny* from Netflix—and Netflix would be unlikely to recover its litigation costs from that actor even if it prevailed in a resulting lawsuit.  *Rossi v. Motion Picture Ass'n of Am. Inc.*, 391 F.3d 1000, 1004 (9th Cir. 2004) (senders of DMCA notices are not liable for damages resulting even from objectively baseless notices if they subjectively acted in good faith).  Placing an effective veto right in the hands of every actor is a recipe for endless litigation, and for uncertainty about the availability of popular movies and television shows.

## II. The Court Should Return Copyright Law to its Proper State

There is no doubt that Ms. Garcia was ill used by Mr. Youssef, and no doubt that the resulting work is an odious piece of racist invective.  Nor is there doubt that Ms. Garcia has suffered real harm as a result.  But copyright law is not the correct remedy, and YouTube is not the correct target.  If—as it appears from the allegations of the complaint—

10

Mr. Youssef defrauded Ms. Garcia into performing, or violated her right of publicity, or placed her in a false light, existing non-copyright laws can address those wrongs.

But those claims lie against the person who committed the alleged torts, not against any and all Internet sites where the resulting work was posted. Congress enacted 47 U.S.C. § 230 for good reason: to protect innocent third-party service providers from state-law claims that should be brought against the tortfeasor instead, lest the spectre of unlimited liability for acts beyond the knowledge or control of those providers deter or cripple the growth of online commerce. Ms. Garcia should not be able to circumvent that Congressional intent by artfully pleading a tort claim against Mr. Youssef as a copyright claim against YouTube.

It is true in the modern Internet age that content, once disseminated, is difficult if not impossible to erase. It is also true that, in many cases, remedies against the actual tortfeasor may seem hollow. But the proper course remains an action against the true tortfeasor, even if he cannot pay a judgment. An injunction against the true tortfeasor can still achieve the desired effect, since third parties will

generally take down material that has been adjudicated unlawful. The instinct to distort the Copyright Act beyond recognition, in order to reach third party defendants who had nothing to do with the actual torts alleged, should be resisted.

## CONCLUSION

The correct decision here, which the District Court reached and the Copyright Office has recently affirmed, is that Ms. Garcia has no copyright to assert, and thus her claims lie against Youssef, not YouTube. She has no copyright in her individual performance, because it was never fixed in a copy, separate from *The Innocence of Muslims*, at her direction. Neither does she have a copyright in the film as a whole, because under this Circuit's controlling precedent of *Aalmuhammed v. Lee*, 202 F.3d 1227 (9th Cir. 2000), Ms. Garcia is simply not "the person to whom the work owes its origin and who superintended the whole work, the 'master mind.'"

Ms. Garcia's claim thus rests on air: she has no underlying copyright to assert. But rather than accept the result of that analysis—that Mr. Youssef's protected speech, odious as it may be, cannot be vetoed by Ms. Garcia suing YouTube—the majority opinion bends

copyright to the breaking point to achieve rough justice, and then optimistically suggests that the damage it does will be limited to edge cases. Netflix does not share that optimism.

Accordingly, Netflix joins Appellants in urging rehearing *en banc*, and affirmance of the District Court's finding that Ms. Garcia has no copyright to assert.

DATED: April 14, 2014                    Respectfully submitted,

                                         */s/ Michael H. Page*
                                         Michael H. Page
                                         Joseph C. Gratz
                                         DURIE TANGRI LLP
                                         *Attorneys for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and Ninth Circuit Rule 32-1, I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A), because it is written in 14-point Century Schoolbook font, and with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) and this Court's Order of March 13, 2014 Order, ECF No. 61, because it contains 2,485 words, excluding the portions excluded under Fed. R. App. P. 32(a)(7)(B)(iii). This count is based on the word-count feature of Microsoft Word.


DATED:  April 14, 2014              */s/ Michael H. Page*
                                                                            Michael H. Page
                                                                            Joseph C. Gratz
                                                                            DURIE TANGRI LLP
                                                                            *Attorneys for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system on April 14, 2014.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that, for any participants in the case who are not registered CM/ECF users, I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days.

DATED: April 14, 2014      */s/ Michael H. Page*
Michael H. Page
Joseph C. Gratz
DURIE TANGRI LLP
*Attorneys for Amici Curiae*