# No. 12-57302

# IN THE UNITED STATE COURT OF APPEALS FOR THE NINTH CIRCUIT

_____

CINDY LEE GARCIA,
        *PLAINTIFF-APPELLANT,*

v.

GOOGLE INC. AND YOUTUBE, LLC,
        *DEFENDANTS-APPELLEES.*

_____

**On Appeal from the United States District Court
For the Central District of California
Case No. CV-12-8315-MWF (VBKx)
Honorable Michael W. Fitzgerald, District Court Judge**

_____

**BRIEF OF *AMICUS CURIAE* INTERNATIONAL DOCUMENTARY ASSOCIATION, FILM INDEPENDENT, FREDRIK GERTTEN, AND MORGAN SPURLOCK IN SUPPORT OF GOOGLE, INC. AND YOUTUBE, LLC'S PETITION FOR REHEARING EN BANC OR, ALTERNATIVELY, REHEARING**

| **GARY L. BOSTWICK** | **JACK LERNER** | **MICHAEL C. DONALDSON** |
|---|---|---|
| BOSTWICK LAW | USC INTELL. PROP. & TECH. LAW CLINIC | DONALDSON + CALLIF, LLP |
| 12400 WILSHIRE BLVD., SUITE 400 | 699 EXPOSITION BLVD. | 400 S. BEVERLY DRIVE, SUITE 400 |
| LOS ANGELES, CA 90025 | LOS ANGELES, CA 90089 | BEVERLY HILLS, CA 90212 |
| (310) 979-6059 | (213) 740-9013 | (310) 277-8394 |
| gbostwick@B1Law.com | jlerner@law.usc.edu | michael@donaldsoncallif.com |

| **LINCOLN D. BANDLOW** | **ROM BAR-NISSIM** |
|---|---|
| LATHROP & GAGE LLP | 826 1/2 N. CORONADO ST. |
| 1888 CENTURY PARK EAST, SUITE 1000 | LOS ANGELES, CA 90026 |
| LOS ANGELES, CA 90067 | (773) 420-7330 |
| (310) 789-4600 | rbarnissim@gmail.com |
| lbandlow@lathropgage.com | |

*Counsel for Amici Curiae*

## IDENTITY OF AMICI

This brief of amici curiae is submitted on behalf of the following persons or entities: International Documentary Association, Film Independent, Fredrik Gertten, and Morgan Spurlock.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned states that none of the amici is a corporation that issues stock or has a parent corporation that issues stock.

Dated: April 14, 2014

        LINCOLN D. BANDLOW
        ROM BAR-NISSIM
        GARY L. BOSTWICK
        MICHAEL C. DONALDSON
        JACK LERNER

        By: ___s/ Gary L. Bostwick_____
        Attorneys for Amici Curiae

## STATEMENT OF COMPLIANCE WITH RULE 29(c)(5)

This brief is submitted pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure with the leave of the Court, pursuant to the Court's Order dated March 13, 2014, Docket No. 61.

No party's counsel authored the brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief and no person or entity – other than the amicus curiae, its members, or its counsel – contributed money that was intended to fund preparing or submitting the brief.

Dated: April 14, 2014

LINCOLN D. BANDLOW
ROM BAR-NISSIM
GARY L. BOSTWICK
MICHAEL C. DONALDSON
JACK LERNER


By:  s/ Gary L. Bostwick
Attorneys for Amici Curiae

# TABLE OF CONTENTS

**IDENTITY OF AMICI** .................................................................................. i

**CORPORATE DISCLOSURE STATEMENT** ....................................................... i

**STATEMENT OF COMPLIANCE WITH RULE 29(c)(5)** ............................ ii

**INTEREST OF AMICI CURIAE** ................................................................. 1

**ARGUMENT** ............................................................................................. 2

    **A. Chaos Caused by the Ruling Will Deter Honest Filmmaking** ................................................................................. 2

        1. When does a person appearing on screen create a "copyrightable contribution"? ............................................. 3

        2. When is the filmmaker an "employer"? ........................................... 5

        3. How do post-filming changes in the work alter the scope of implied licenses? ...........................................................7

    **B. Risk of Legal Threat to a Filmmaker is Now So Difficult to Calculate That a Chilling Effect on Creative Works Is Certain; All but Well-Established and Well-Heeled Production Enterprises Will Be Discouraged from Filmmaking** ............................................................................... 10

    **C. Copyright Interests Often Are Not Addressed for Actors Appearing in Film and Rarely for Interviewees Appearing in Documentaries, Even When a Written Agreement Exists** ........... 11

    **D. At the Least, the Injunction Should Be Reconsidered** ..................... 12

**CERTIFICATE OF COMPLIANCE** ................................................................. 13

**CERTIFICATE OF SERVICE** ........................................................................ 14

# TABLE OF AUTHORITIES

Cases

*Childress v. Taylor*, 945 F.2d 500 (2nd Cir. 1991) ....................................................4

*Einhorn v. Mergatroyd Productions,*
    426 F.Supp.2d 189 (S.D.N.Y. 2006) ..............................................................4

*Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061 (7th Cir. 1994) ...............................4

*Garcia v. Google, Inc.*, 743 F.3d 1258 (9th Cir. 2014) ...................................*passim*

*McKinney v. Morris*, B240830,
    2013 WL 5617125 (Cal. Ct. App. Oct. 15, 2013) ...........................................9

*Storey v. Comm'r of Internal Revenue*,
    103 T.C.M. (CCH) 1631 (T.C. 2012) .............................................................7

*World-Wide Volkswagen Corp. v. Woodson*,
    444 U.S. S.Ct. 559 (1980) ................................................................................3


Statutes

17 U.S.C. § 203 .........................................................................................................11


Other Authorities

Andrew C. Revkin, *'Gasland' Filmmaker Takes on Cuomo and
    'Dot.FlatEarth'*, N.Y. TIMES, June 28, 2012 ...................................................7

EASY RIDER: SHAKING THE CAGE (Columbia TriStar Home Video
    1999) ..............................................................................................................5,8

JONATHAN ROSENBAUM, JIM JARMUSCH: INTERVIEWS (Ludvig
    Hertzberg 2001) ..............................................................................................6

Library of Congress, National Film Registry Titles 1989-2013 ..........................8, 9

MARK LITWAK, CONTRACTS FOR THE FILM & TELEVISION INDUSTRY
    (3rd ed. 2012) ................................................................................................11

Mark Litwak, *Do Your Actors Own Your Film?* IFP RESOURCES
    (March 3, 2014) ........................................................................................2

MICHAEL C. DONALDSON, CLEARANCE AND COPYRIGHT: EVERYTHING
    YOU NEED TO KNOW FOR FILM AND TELEVISION (3rd ed. 2008) ...................11

SAG-AFTRA, Day Performer Contract Low Budget ..............................................11

SAG-AFTRA, Performer Contract Student Film .......................................................11

SAG-AFTRA, Performer Contract Ultra Low Budget .............................................11

Slamdance, CHRISTOPHER NOLAN INTERVIEW, VIMEO ..............................................6

THE ROBERT RODRIGUEZ TEN-MINUTE FILM SCHOOL (Los Hooligans
    Productions 1998) ......................................................................................6

**INTEREST OF AMICI CURIAE**

The International Documentary Association is a nonprofit §501(c)(3) organization that supports nonfiction filmmaking and the documentary genre. Film Independent is a §501(c)(3) nonprofit organization, likewise incorporated and tax exempt, that champions the cause of independent film and a community of artists who embody diversity, innovation and uniqueness of vision. Morgan Spurlock is an Academy Award-nominated documentary filmmaker, television producer and screenwriter best known for the documentary film "Super Size Me" and the currently-airing CNN documentary series "Inside Man." Fredrik Gertten is a Swedish documentary filmmaker and journalist who has produced and/or directed over twenty documentary films, including the Academy Award-nominated "Burma VJ: Reporting from a Closed Country".

Amici and their members are filmmakers who are alarmed the Court's decision in this appeal will create significant uncertainty and additional burden, so much so that it may prevent future meritorious projects important to our culture and advancement.

# ARGUMENT

How Amici will be affected by the issues raised in the present dispute has not yet been available for the Court's consideration. They now provide descriptions of their actual experiences to illustrate how new rules established by this Court's decision would have hindered their past filmmaking efforts and will chill future activities.

Amici acknowledge Ms. Garcia's serious concerns. But, in providing her unprecedented remedies, the Court has created uncertainty as to several fundamental concepts that are essential to modern filmmaking.[1] This uncertainty threatens not just filmmakers like Amici, but may prevent worldwide audiences in the millions from experiencing new works that advance understanding, insight and development.

### A.     Chaos Caused by the Ruling Will Deter Honest Filmmaking.

The Court's decision creates uncertainty for amici filmmakers. Amici cannot now predict with sufficient certainty: (1) when a "copyrightable contribution" arises; (2) when a filmmaker qualifies as an "employer"; and (3) the scope of licenses when not expressed in writing.

---

[1] *See* Mark Litwak, *Do Your Actors Own Your Film?* IFP RESOURCES (March 3, 2014), http://www.ifp.org/resources/do-your-actors-own-your-film/#.U0lnMJ6wWZ ("This single decision is remarkable by changing a number of basic principles on which the movie industry operates.").

**1.     When does a person appearing on screen create a "copyrightable contribution"?**

A filmmaker, tyro or veteran, now faces new and uncertain formulae to determine whether a contribution by a person appearing on screen is copyrightable. The new ambiguity will plague all films, not just scripted works. Filmmakers using interviews in a documentary must be sure those on screen, even if their embodiment of recollections are creative, do not have a copyright interest that could halt release of the project – or even threaten to do so. One need only consider reality TV of the unscripted variety. Before releasing 14 episodes to be aired, the producer must now agonize about whether the contribution of anyone appearing on the show supports legal threats, even an injunction.

A producer now does not know with the predictability the law strives to achieve how much "contribution" creates a "copyrightable interest." Predictability in the legal system "allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). Today, a producer has no objective parameters to assess this issue; neither the lines spoken or screen time will be of aid. If producers receive counsel on this question applied in other contexts, they will be confused and mystified by cases rejecting a "copyrightable interest" of

actors in other media. *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061 (7th Cir. 1994), *Childress v. Taylor*, 945 F.2d 500 (2nd Cir. 1991), *Einhorn v. Mergatroyd Productions,* 426 F.Supp.2d 189 (S.D.N.Y. 2006)

As just one example, consider the simple case of amateurs filming the next viral video on Venice Beach skateboarding ramps. If only a "minimal degree of creativity" is required "no matter how crude, humble or obvious," (*Garcia v. Google, Inc.*, 743 F.3d 1258, 1263 (9th Cir. 2014)) fears will rise in a filmmaker that complaints and injunctions, not just from the skater-performers, but from every extra sitting at a table or a counter in a long-shot, every onlooker watching the chainsaw juggler, will doom the project. A gesticulation from afar, unique and creative but silent, may establish a "copyrightable contribution."

Consider the groundbreaking and influential film "Easy Rider" which allegorizes the death of the hippie movement, is in the National Film Registry, and is considered an important contribution to American culture. Persons appearing in the film included professional actors, locals who were not actors, and street performers. Many scenes were scripted; many were improvised. After *Garcia,* a producer must question who had a copyrightable interest in some scenes; some occurred while the actors were on drugs, making it debatable whether any creative embodiment occurred at all, while others showed innumerable street performers

filmed without permission or direction.[2] Today, would those persons have a copyrightable interest?

### 2. When is the filmmaker an "employer"?

"But if shooting a single amateur film amounts to the regular business of filmmaking, every schmuck with a videocamera becomes a movie mogul." *Id*. at 1266. Filmmakers have always needed to secure all the proper rights to exploit their films. Distributors, exhibitors and insurers will not expose themselves to liability if there is a defect in the chain of title. Where the filmmaker cannot secure a release of a "copyrightable interest", "employer" status has for decades served as a safety net. Without it, first-time filmmakers will face expensive procedures to determine chain of title, if they can do so at all.

This Court appears to hold that first-time and burgeoning filmmakers cannot be "employers" for "work made for hire" purposes, because these filmmakers are not in the "regular business of filmmaking." *Id.* A filmmaker on his first film now will be deterred even from embarking on a project unless he is convinced he can distinguish himself from Garcia's adversary, Youssef, and achieve "employer" status. The opinion's holding appears to turn on Youssef having not worked in the film industry before and that he had no union contracts, relationships with prop houses or other film suppliers, leases of studio space or distribution agreements.

---

[2] EASY RIDER: SHAKING THE CAGE (Columbia TriStar Home Video 1999).

*Id.* at 1266. Many great filmmakers started with equal deficiencies but made great films. But even after a successful film, a filmmaker now cannot help fearing that if his next project is low-budget and without the industrial trappings cited by this Court, he may still be unworthy of "employer" status.

Christopher Nolan made his first film, "Following", for an estimated $6,000;[3] he went on to produce the "Batman" trilogy. Robert Rodriguez made "El Mariachi" for an estimated $7,000[4]; later he produced the "Spy Kids" franchise and "Sin City." Jim Jarmusch made "Permanent Vacation" for an estimated $12,000[5] and now is considered to have blazed a trail of creativity for filmmakers like Spike Lee and Quentin Tarantino.

Josh Fox (Writer/Producer/Director of Oscar-nominated documentary film "GasLand") ran a small theater and film production company in New York when he started investigating fracking. He had not made a feature-length documentary before, had no union contracts and had no distribution agreements. He still had none when he wrote, produced, and directed the Academy Award-nominated documentary "GasLand" it was accepted at the Sundance Film Festival in 2010

---

[3] Slamdance, CHRISTOPHER NOLAN INTERVIEW, VIMEO, 0:25-0:40, http://vimeo.com/28828816.
[4] THE ROBERT RODRIGUEZ TEN-MINUTE FILM SCHOOL 0:10-0:15 (Los Hooligans Productions 1998)
[5] JONATHAN ROSENBAUM, JIM JARMUSCH: INTERVIEWS 113 (Ludvig Hertzberg 2001).

where it won the Special Jury Prize.[6] Later the film aired on HBO and is credited with raising international public awareness about the issues surrounding fracking.[7]

Lee Storey is a law firm partner who took six years to make her film, "Smile 'Til it Hurts: The Up With People Story", while working full-time as an attorney. The United States Tax Court held she was engaged "in the trade or business of film production" for tax purposes.[8] Now how can she or any of the filmmakers cited above know with reliable predictability when they metamorphose into "employers" in the "regular business of filmmaking"?

The uncertainties created by trying to distinguish themselves from Youssef will cause most filmmakers to consider engaging counsel. Doing so will entail costs that could kill the film before a single frame is shot. The specter of delays inevitably caused by specious claims could do the same.

### 3. How do post-filming changes in the work alter the scope of an implied license?

"The film differs so radically from anything Garcia could have imagined when she was cast that it can't possibly be authorized by any implied license she granted Youssef." *Id.* at 1267. Absent a writing addressing the scope of consent, a

---

[6] Statement authorized by Mr. Fox.
[7] Andrew C. Revkin, *'Gasland' Filmmaker Takes on Cuomo and 'Dot.FlatEarth',* N.Y. TIMES, June 28, 2012*, available at* http://dotearth.blogs.nytimes.com/2012/06/28/gasland-filmmaker-takes-on-cuomo-and-dot-earth/.
[8] *Storey v. Comm'r of Internal Revenue*, 103 T.C.M. (CCH) 1631 (T.C. 2012).

filmmaker must now attempt to determine in advance what alterations "exceed the bounds of any implied license." Otherwise, as this Court notes: "If the scope of an implied license was exceeded merely because a film didn't meet the ex ante expectation of an actor, that license would be virtually meaningless." *Id.* at 1266. In "Easy Rider",[9] Dennis Hopper filmed locals already sitting in a diner when the crew arrived to shoot the scene. On camera, they spouted lines like, "You name it – I'll throw rocks at it Sheriff" and "Look like a bunch of refugees from a gorilla love in." Dennis Hopper told them before filming that his character, along with Peter Fonda's and Jack Nicholson's characters "had just raped a little girl outside of town." That was not in the script.[10] After reading this Court's holding, someone like Hopper might worry that the diners could halt the movie based on copyright infringement because, using the Court's phrasing, he "exceeded the bounds of any implied license" to secure their participation, and they agreed "to perform in reliance" on a lie.

Often, particularly with documentaries, the narrative does not fully materialize until the filmmaker is in the editing room. Filmmakers regularly need to "radically" alter the narrative to tell the most truthful or compelling story.

Academy Award winning documentarian Errol Morris, whose film "The Fog of War" won an Oscar and whose "Thin Blue Line" is part of the National Film

---

[9] Library of Congress, National Film Registry Titles 1989-2013, http://www.loc.gov/film/registry_titles.php.
[10] EASY RIDER: SHAKING THE CAGE (Columbia TriStar Home Video 1999).

Registry,[11] suffered experiences illustrating this point. He set out to make a film about tabloid journalism and celebrity. *McKinney v. Morris*, B240830, 2013 WL 5617125 (Cal. Ct. App. Oct. 15, 2013) (unpublished opinion cited not for precedential value, but for factual summary of aid to this Court). Joyce McKinney and the "Manacled Mormon" scandal received widespread tabloid coverage in the 1970s and allegations of kidnapping and rape were bandied about. Morris interviewed McKinney for the film. She signed a standard release form. She testified later that she agreed to the interview because Morris promised her an opportunity to clear her name and that he would not use the tabloid articles about her. After the interview, Morris changed the focus of his film to McKinney and the scandal. McKinney sought an injunction under state law theories.

"Tabloid" illustrates the difficulty determining when the use of a person's contribution exceeds the bounds of any implied license. Morris stated McKinney was a "natural, animated storyteller who used interesting turns of phrase and allusions." *Id.* Assuming no conditions for the interview were given, did "Tabloid" differ so radically from anything McKinney could have imagined, because it was critical of McKinney instead of positive or an academic piece about tabloid journalism? Can subjects like Joyce McKinney block release or win damages? Can someone like McKinney create a factual dispute about what was promised such

---

[11] Library of Congress, National Film Registry Titles 1989-2013, http://www.loc.gov/film/registry_titles.php.

that distribution can be blocked? This Court's opinion makes it harder than ever for amici to answer these questions. If they cannot be answered, the film will not be made.

**B.     Risk of Legal Threat to a Filmmaker is Now So Difficult to Calculate That a Chilling Effect on Creative Works Is Certain; All but Well-Established and Well-Heeled Production Enterprises Will Be Discouraged from Filmmaking.**

This Court's decision will inevitably chill filmmaking, particularly those of amateur, non-profit and student filmmakers. Future films – the next "Easy Rider" or "Tabloid" – may not materialize if their makers fear they have failed to secure the proper rights. First-time filmmakers who cannot determine what rights to secure or who now cannot secure such rights, will opt to abandon projects instead of risking an injunction or damages. Filmmakers with paltry budgets will be burdened with legal costs associated with the uncertainties caused by the decision. It may now be safer not to make a film, if potential claimants, even those honestly treated, can make claims when disgruntled by an editorial decision. Insurers will not underwrite a film unless all "necessary releases" have been secured – filmmakers will be uncertain what those are, and how to get them. Only filmmakers with great resources, well-established studios and production

companies that already enjoy certifiable "employer" status will make movies. Even they will hesitate when the cost-benefit balance slides downward.

**C.** **Copyright Interests Often Are Not Addressed for Actors Appearing in Film and Rarely for Interviewees Appearing in Documentaries, Even If a Written Agreement Exists.**

Sample contracts provided by the leading performers' union for low budget and student filmmakers omit reference to license, transfer of interest in the performance[12] or release of any kind.[13] Leading practitioners who have authored books with contract forms for filmmakers include forms that only refer to name and likeness in documentary releases and low-budget actor agreements, not covering "copyrightable interest."[14] Any filmmaker who relies on these contracts – or has relied on them up to now – will be thrust into the "impenetrable thicket of copyright law", contrary to the Court's view that "it will rarely come to that." *Garcia, supra*, 743 F.3d at 1265.

---

[12] No matter how it is accomplished, transfer of a license is cold comfort because it can be terminated after 35 years. 17 U.S.C. § 203.

[13] *See* SAG-AFTRA, Day Performer Contract Low Budget, http://www.sagaftra.org/files/sag/day_performer_contract_low_budget_6_28.pdf, SAG-AFTRA, Performer Contract Student Film, http://www.sagaftra.org/files/sag/performer_contract_student_film_6_34.pdf, SAG- AFTRA, Performer Contract Ultra Low Budget, http://www.sagaftra.org/files/sag/performer_contract_ultra_low_budget_6_32.pdf

[14] MICHAEL C. DONALDSON, CLEARANCE AND COPYRIGHT: EVERYTHING YOU NEED TO KNOW FOR FILM AND TELEVISION 257 & 342 (3rd ed. 2008); MARK LITWAK, CONTRACTS FOR THE FILM & TELEVISION INDUSTRY 28 & 86-87 (3rd ed. 2012).

Scott Hamilton Kennedy, Academy Award-nominated director of several documentaries, including "The Garden", incorporated performing arts elements into two of his films. After considering this Court's opinion, he fears complications if a performer he captures dancing claims copyright/ownership of that footage. He believes it is implicitly understood by all parties in the industry that these performers are being captured for a film he is creating, not a film by or for them.[15]

### D. At the Least, the Injunction Should Be Reconsidered.

Even if the Court disagrees with these and other amici regarding other elements of its decision, it is urgent that the injunction be reconsidered. Amici respectfully request this Court reconsider the effect on the public its order of injunction will have. The damage to these amici, and to the world's cultural advancement through film, far outweighs prospective damage on the other side of the equation.

Dated: April 14, 2014
LINCOLN D. BANDLOW
ROM BAR-NISSIM
GARY L. BOSTWICK
MICHAEL C. DONALDSON
JACK LERNER

By: __s/ Gary L. Bostwick__
Attorneys for Amici Curiae

---

[15] Statement authorized by Mr. Kennedy.

## CERTIFICATE OF COMPLIANCE

I certify that this brief has been prepared in a proportionally spaced typeface using MS-Word in 14-point Times New Roman font and contains 2,421words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and the Interest of the Amici section.

Dated: April 14, 2014

LINCOLN D. BANDLOW
ROM BAR-NISSIM
GARY L. BOSTWICK
MICHAEL C. DONALDSON
JACK LERNER


By: ___s/ Gary L. Bostwick___
Attorneys for Amici Curiae

## CERTIFICATE OF SERVICE

I hereby certify that on April 14, 2014, I electronically filed the foregoing brief of amicus curiae with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: April 14, 2014          LINCOLN D. BANDLOW
ROM BAR-NISSIM
GARY L. BOSTWICK
MICHAEL C. DONALDSON
JACK LERNER


By:   s/ Gary L. Bostwick
Attorneys for Amici Curiae