**No. 12-57302**
(Oral Argument Scheduled for December 15, 2014)

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**
_____

CINDY LEE GARCIA,

*Plaintiff-Appellant-Respondent*,

v.

GOOGLE INC. AND YOUTUBE, LLC,

*Defendants-Appellees-Petitioners*.

_____

On Appeal from the United States District Court for the Central District of
California, Case No. 2:12-cv-8315-MWF (VBKx), Hon. Michael W. Fitzgerald

_____

**BRIEF *AMICUS CURIAE* OF THE
COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION
IN SUPPORT OF GOOGLE AND YOUTUBE
URGING REVERSAL *EN BANC***

_____

Matt Schruers
Computer & Communications
 Industry Association
900 17th Street NW, Suite 1100
Washington, D.C. 20006
(202) 783-0070
mschruers@ccianet.org

*Counsel for Amicus Curiae*

November 25, 2014

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* the Computer & Communications Industry Association states that it does not have a parent corporation and that no publicly held corporation has an ownership stake of 10% or more in it.

/s/ Matt Schruers
Matt Schruers
Computer & Communications
  Industry Association
900 17th Street NW, Suite 1100
Washington, D.C. 20006
(202) 783-0070
mschruers@ccianet.org

*Counsel for Amicus Curiae*

November 25, 2014

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ....................................................ii

TABLE OF AUTHORITIES ...........................................................................iv

INTEREST OF *AMICUS*...............................................................................1

SUMMARY OF ARGUMENT .........................................................................2

ARGUMENT ..................................................................................................3

I.     Without Question, Congress Intended to Provide Robust Protection for Online Commerce and Speech Via the DMCA Safe Harbor..............3

    A. The DMCA safe harbor enables essential communications and commerce ............................................................................................4

    B. Granting independent rights to performers in their performances would invite frivolous DMCA takedowns and undermine the safe harbor ...................................................................................................7

    C. Service providers hosting user-generated content would find it particularly difficult to administer such a rule ...................................10

II.    The Proposed Injunction Compels Proactive Monitoring, Which Online Services Cannot Achieve, and Which Congress Has Rejected As Unreasonable..........................................................................................11

CONCLUSION................................................................................................12

CERTIFICATE OF COMPLIANCE...............................................................14

CERTIFICATE OF SERVICE ........................................................................15

## TABLE OF AUTHORITIES

*Cases*

*Aalmuhammed v. Lee*, 202 F.3d 1227 (9th Cir. 2000).........................................2

*Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008).........5

*Conrad v. AM Community Credit Union*, 750 F.3d 634 (7th Cir. 2014).............7

*Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003)...........8

*Eldred v. Ashcroft*, 537 U.S. 186 (2003) .............................................................2

*Ellison v. Robertson*, 357 F.3d 1072 (9th Cir. 2004).........................................5

*Flynn v. Nakoula*, No. 14-cv-01901 (C.D. Cal. filed Sept. 11, 2014) ................8

*Golan v. Holder*, 132 S. Ct. 873 (2012)..............................................................2

*Midler v. Ford Motor Co.*, 849 F.2d 460 (9th Cir. 1988) ...................................2

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) ..............11

*Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102 (9th Cir. 2007)....................2, 11

*Perfect 10, Inc. v. Google, Inc.*, 416 F. Supp. 2d 828 (C.D. Cal. 2006).............6

*Perfect 10, Inc. v. Google, Inc.*, 508 F.3d 1146 (9th Cir. 2007).........................6

*Reno v. American Civil Liberties Union*, 521 U.S. 844 (1997) ........................10

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*,
    718 F.3d 1006 (9th Cir. 2013) ........................................................................4

*White v. Samsung Electronics America, Inc.*, 989 F.2d 1512 (9th Cir. 1993).....9

iv

*Statutes and Legislative Materials*

17 U.S.C. § 102(a) ........................................................................ 7

17 U.S.C. § 301 ............................................................................ 2

17 U.S.C. § 512 ............................................................................ 4

17 U.S.C. § 512(c)(3)(A)(ii)-(iii) ................................................. 8

17 U.S.C. § 512(f) ........................................................................ 9

17 U.S.C. § 512(m)(1) ............................................................... 12

47 U.S.C. § 230 ...................................................................... 2, 6

H. REP. NO. 105-551, pt. 2 (1998) ............................................. 5

S. REP. NO. 105-190 (1998) ....................................................... 5

*Other Authorities*

BOOZ & CO., *The Impact of U.S. Internet Copyright Regulations on Early-Stage Investment: A Quantitative Study* (2011) ............................... 4

Center for Democracy & Tech., *Campaign Takedown Troubles: How Meritless Copyright Claims Threaten Online Political Speech* (2010), *available at* https://cdt.org/files/pdfs/copyright_takedowns.pdf ................... 9

Andrew Chung, *Second actor sues Google over 'Innocence of Muslims' movie trailer*, REUTERS, Sept. 15, 2014, *available at* http://www.reuters.com/article/2014/09/15/usa-google-movie-idUSL1N0RG1C120140915 .......................................................... 8

Facebook, *Facebook Company Info* (last accessed Nov. 24, 2014) ................... 5

Saul Hansell, *McCain Fights for Right to Remix on YouTube*, N.Y. TIMES, Oct. 14, 2008, *available at* http://bits.blogs.nytimes.com/2008/10/14/mccain-fights-for-right-to-remix-on-youtube .................................................. 9

v

Josh Lerner *et al.*, ANALYSIS GROUP, *The Impact of Copyright Policy Changes on Venture Capital Investment in Cloud Computing Companies* (2011) .......................................................................... 6

Josh Lerner *et al.*, ANALYSIS GROUP, *The Impact of Copyright Policy Changes in France and Germany on Venture Capital Investment in Cloud Computing Companies* (2012) ........................................... 6

Lawrence Lessig, *Copyright and Politics Don't Mix*, N.Y. TIMES, Oct. 20, 2008, *at* http://www.nytimes.com/2008/10/21/opinion/21lessig.html ........... 9

Lydia Pallas Loren, *Deterring Abuse of the Copyright Takedown Regime by Taking Misrepresentation Claims Seriously*, 46 WAKE FOREST L. REV. 745 (2011).................................................................................. 9

MCKINSEY & CO., *Internet Matters: The Net's sweeping impact on growth, jobs and prosperity* (2011) ............................................................ 7

MCKINSEY & CO., *Measuring the value of search* (2011).................................. 6

Catherine Rampell, *Standing Up To Takedown Notices*, WASH. POST, Oct. 19, 2007, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2007/10/18/AR2007101802453_2.html ........................ 9

Wendy Seltzer, *Free Speech Unmoored in Copyright's Safe Harbor: Chilling Effects of the DMCA on the First Amendment*, 24 HARV. J.L. & TECH. 171 (2011)................................................................................ 9

Twitter, *About Twitter* (last accessed Nov. 24, 2014) ........................................ 5

U.S. Copyright Office, Directory of OSP Designated Agents ........................... 6

YouTube, *YouTube Statistics* (last accessed Nov. 24, 2014) ............................. 5

# INTEREST OF *AMICUS*[1]

The Computer & Communications Industry Association ("CCIA") represents more than twenty large, medium-sized, and small companies in the high technology products and services sectors, including computer hardware and software, electronic commerce, telecommunications, and Internet products and services—companies that collectively generate more than $465 billion in annual revenues.[2]

CCIA members depend upon balanced and predictable copyright regulations. Many offer services allowing users to submit content of all types, and require certainty regarding what is copyrightable, particularly when administering the "notice and takedown" provisions of the Digital Millennium Copyright Act ("DMCA") safe harbor. The prospect that an online intermediary could face liability or injunctive relief based upon brief, not separately fixed performances contained in audiovisual works would increase frivolous takedowns and lead to over-enforcement and unnecessary suppression of commerce and speech.

---

[1] No counsel for any party authored this brief in whole or part; no such party or counsel made a monetary contribution intended to fund its preparation or submission; and no person other than *amicus*, its members, and counsel made such a contribution. All parties have consented to the filing of this brief. Defendant-appellee-petitioner Google is a member of CCIA, but took no part in the preparation of this brief.

[2] A complete list of CCIA members is available at https://www.ccianet.org/members.

## SUMMARY OF ARGUMENT

The case before the court is a fraud claim dressed in copyright clothing.[3] As the panel decision displays, the attire of copyright fits poorly here, but the plaintiff-respondent Garcia is determined to wear it, because (a) other claims would be barred by Section 230 of the Communications Decency Act; (b) a copyright claim affords a plaintiff access to, and injunctive relief against, third-party defendants; and (c) a copyright claim brings the extraordinary relief of compelling those third parties to "disappear" online content. That defendant Mark Basseley Youssef made fraudulent representations here, as a result of which Garcia has suffered great hardship, is not in question. The question is whether the proper remedy for such a wrong lies in *copyright*, to be levied against a third-party intermediary, rather than Youssef himself.

By granting Garcia's request for a sweeping mandatory injunction, the panel contravenes Congress's intent in enacting the Digital Millennium Copyright Act

---

[3] *See* Internet Law Profs. *Amicus* Br. at 7, Dkt. Entry 103 (filed Apr. 14, 2014) (noting that Garcia's original complaint did not allege a copyright claim). It is unclear whether the panel believed Garcia was likely to succeed on a state or federal IP claim. Although the panel cites federal copyright opinions, its conclusion of authorship relies upon *Aalmuhammed v. Lee*, 202 F.3d 1227 (9th Cir. 2000), and *Midler v. Ford Motor Co.*, 849 F.2d 460 (9th Cir. 1988), both of which involved plaintiffs prevailing on *state* law claims. If Garcia's claim is viewed as arising under state law, it must be barred by 47 U.S.C. § 230, *see Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1119 (9th Cir. 2007), if not preempted by 17 U.S.C. § 301, and not void as an affront to the First Amendment, for so substantially altering the "traditional contours" of copyright. *See Eldred v. Ashcroft*, 537 U.S. 186, 221 (2003); *Golan v. Holder*, 132 S. Ct. 873, 890 (2012).

safe harbor, a cornerstone of the digital economy. The panel's proposed injunction portends an unmanageable situation in which intermediaries ill-equipped to parse the individual artistic contributions of different performers are expected to selectively edit and ensure that third party content disappears from the online environment.

This brief first discusses the economic importance of the DMCA safe harbor, and how the panel's decision imperils that value. It then explains why the panel's decision to allow a performer to claim a copyright in her performance, independent of the copyright in the work in which that performance is fixed, creates an unmanageable situation for online intermediaries. Finally, the brief explains that a "stay down" injunction constitutes a form of proactive monitoring or filtering that is not technically feasible for online services, and which Congress has explicitly rejected.

## ARGUMENT

### I. Without Question, Congress Intended to Provide Robust Protection for Online Commerce and Speech Via the DMCA Safe Harbor.

The panel's conclusion that YouTube infringed Garcia's copyright by hosting an audiovisual work that "Garcia doesn't claim a copyright interest in", Order and Amended Opinion, at 6, Dkt. Entry 127 (July 11, 2014) (hereinafter "op."), undermines the predictability of the DMCA safe harbor, upon which a large

and growing segment of the U.S. economy relies. Congress intended this protection, codified at 17 U.S.C. § 512,[4] to promote Internet commerce and communication by reducing costs of liability and injunctive relief associated with third party content, including cases such as this.

### A. The DMCA safe harbor enables essential communications and commerce.

The safe harbor makes manageable an otherwise potentially unmanageable liability risk. Congress was well aware that federal copyright law extended copyright protection to all types and forms of fixed works, and that proactively monitoring for those works was impossible. In the investment-capital dependent technology industry, even minor changes in liability risk deter investment; a broad new liability threat, such as copyright exposure to unfixed and unregistered performances, would substantially inhibit technology innovation.[5]

Being "loath to permit the specter of liability to chill innovation that could also serve substantial socially beneficial functions," *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1014 (9th Cir. 2013), Congress enacted Section 512 to guarantee "greater certainty to service providers concerning

---

[4] Section 512 originally comprised Title II of the Digital Millennium Copyright Act, Pub. L. 105-304, Title II, Oct. 27, 1998, 112 Stat. 2860.

[5] Booz & Co., *The Impact of U.S. Internet Copyright Regulations on Early-Stage Investment: A Quantitative Study* (2011), at 5-6, *available at* http://www.strategyand.pwc.com/media/uploads/Strategyand-Impact-US-Internet-Copyright-Regulations-Early-Stage-Investment.pdf.

their legal exposure for infringements that may occur in the course of their activities." *See Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004) (quoting S. REP. NO. 105-190, at 20 (1998)). "[B]y limiting the liability of service providers, the DMCA ensures that the efficiency of the Internet will continue to improve and that the variety and quality of services on the Internet will continue to expand." S. REP. NO. 105-190, at 8 (1998).

The variety and quality did indeed expand in the wake of the DMCA. Whereas Congress worried that Yahoo's then-index of only 800,000 web pages could not reasonably be monitored, *see* H. REP. NO. 105-551, pt. 2, at 558 (1998), today YouTube users upload 100 hours of video *per minute*, Twitter users generate 500 million tweets per day, and Facebook hosts more than 1 billion monthly active users, on a Web containing tens of billions of search-indexable pages.[6] The volume of communications and content that compelled Congress to legislate in 1998 is today one drop in an ocean of information.

The DMCA thus successfully spurred "the necessary investment in the expansion" of the Internet, *see* S. REP. NO. 105-190, at 8 (1998),[7] enabling services

---

[6] *See* Twitter, *About Twitter*, *available at* https://about.twitter.com/company (last accessed Nov. 24, 2014); YouTube, *YouTube Statistics*, *available at* https://www.youtube.com/yt/press/statistics.html (last accessed Nov. 24, 2014); Facebook, *Facebook Company Info*, *available at* http://newsroom.fb.com/company-info/ (last accessed Nov. 24, 2014).

[7] For example, the Second Circuit's 2008 holding in *Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008), also known as "*Cablevision*," was

such as search engines, which today "have become essential sources of vital

information for individuals, governments, non-profits, and businesses,"[8] and

generate an annual $780 billion in value worldwide.[9] These protections also offer

legal certainty for tens of thousands of other, similarly situated businesses across

the U.S. economy.[10] Along with the Communications Decency Act safe harbor, 47

U.S.C. § 230, and the First Amendment of the U.S. Constitution, the DMCA safe

---

estimated to have inspired up to $1.3 billion in investment in U.S. cloud computing firms in the 30 months following the decision. Josh Lerner *et al.*, ANALYSIS GROUP, *The Impact of Copyright Policy Changes on Venture Capital Investment in Cloud Computing Companies* (2011), *available at* http://www.analysisgroup.com/uploadedFiles/Publishing/Articles/Lerner_Fall2011_Copyright_Policy_VC_Investments.pdf. By contrast, European decisions around at that time involving French and German cloud companies had the adverse effect, leading to a total decrease in French and German VC investment of $87 million over an approximately three year period. Josh Lerner *et al.*, ANALYSIS GROUP, *The Impact of Copyright Policy Changes in France and Germany on Venture Capital Investment in Cloud Computing Companies* (2012), *available at* http://www.analysisgroup.com/uploadedfiles/news_and_events/news/2012_eu_cloudcomputing_lerner.pdf.

[8] "It is by now a truism that search engines such as Google Image Search provide great value to the public. Indeed, given the exponentially increasing amounts of data on the web, search engines have become essential sources of vital information for individuals, governments, non-profits, and businesses who seek to locate information." *Perfect 10, Inc. v. Google, Inc.*, 416 F. Supp. 2d 828, 848-49 (C.D. Cal. 2006), *aff'd*, 508 F.3d 1146 (9th Cir. 2007).

[9] MCKINSEY & CO., *Measuring the value of search,* at 38 (2011), *available at* http://www.mckinsey.com/insights/marketing_sales/measuring_the_value_of_search.

[10] Over 66,000 services have complied with U.S. Copyright Office formalities to receive the protections of the DMCA. *See* U.S. Copyright Office, Directory of OSP Designated Agents, *at* http://www.copyright.gov/onlinesp/list/a_agents.html.

harbor comprises the unique legal foundation of the Internet, which enables almost $8 trillion in commerce each year.[11]

### B. Granting independent rights to performers in their performances would invite frivolous DMCA takedowns and undermine the safe harbor.

Recognizing Garcia's novel claim in this case would undermine the DMCA by inviting frivolous or abusive takedown claims against works that the claimant has neither authored nor fixed.

The Copyright Office spoke to the question of authorship in twice refusing Garcia's request to register her performance, explaining that an "actress' performance is either joint authorship or is a contribution under a work made for hire agreement," Appellee's Mot. for Judicial Notice at 8, Dkt. Entry 55 (filed Mar. 12, 2014); op. at 11, and yet Garcia "expressly disclaims" such an agreement, *see* op. at 7, thereby disavowing authorship in *the only fixed work* at issue. Fixing one's work, of course, is a requirement of copyrightability. 17 U.S.C. § 102(a).

Similar claims have failed in other federal appellate courts; the Seventh recently Circuit dismissed claims by a singing telegram performer who alleged infringement of an otherwise unfixed performance based on unauthorized social media postings. *See Conrad v. AM Community Credit Union*, 750 F.3d 634, 636

---

[11] MCKINSEY & CO., *Internet Matters: The Net's sweeping impact on growth, jobs and prosperity*, at 9 (2011), *available at* http://www.mckinsey.com/insights/high_tech_telecoms_internet/internet_matters.

(7th Cir. 2014) (performance not fixed by performer was "not copyrighted or even copyrightable"). Because Garcia has disclaimed joint authorship in the only fixed work before the court – the film – her case is no different.

If a plaintiff may obtain an injunction despite the Copyright Office having ruled she had authored nothing independently copyrightable, and despite her having disavowed an authorial role in the only fixed work before the court, intermediaries face the prospect of litigation from innumerable self-styled "authors." This concern is not speculative; in the wake of the panel's decision, another actor appearing in the same film has already brought suit. *See Flynn v. Nakoula*, No. 14-cv-01901 (C.D. Cal. filed Sept. 11, 2014).[12]

The DMCA avoids these problems by requiring takedown claimants to identify to service providers both the copyrighted work they own and, separately, the material they allege to be infringing. *See* 17 U.S.C. § 512(c)(3)(A)(ii)-(iii). To hold otherwise – to permit a performer to allege that a single work is at once both the original infringed work and the infringing work – would create "a species of mutant copyright", *see Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 34 (2003), more akin to a federal publicity right. Every actor, interview subject, and casual passerby captured in a video may contend to have offered some

---

[12] Andrew Chung, *Second actor sues Google over 'Innocence of Muslims' movie trailer*, REUTERS, Sept. 15, 2014, *available at* http://www.reuters.com/article/2014/09/15/usa-google-movie-idUSL1N0RG1C120140915.

minor creative contribution. This would invite frivolous and abusive claims, which service providers presently have no means to prevent or address. Already, the DMCA can be used to suppress and "disappear" content that one dislikes or disagrees with, due to the fact that individuals have limited recourse when they are the victim of a false takedown notice. *See* 17 U.S.C. § 512(f).[13] Misuse even affects political speech.[14] Expanding the scope of what may be the subject of a takedown request would open the floodgates to such misconduct.

In order to effectively administer the DMCA, an intermediary must be able to expect that the right to reproduce, distribute, and perform a given work "belongs either to the public at large or to the copyright holder, not to someone who happens to appear in the copyrighted work." *See White v. Samsung Electronics America, Inc.*, 989 F.2d 1512, 1517 n.24 (9th Cir. 1993) (Kozinski, J., dissenting) (discussing alleged infringement by claimed parody).

---

[13] Lydia Pallas Loren, *Deterring Abuse of the Copyright Takedown Regime by Taking Misrepresentation Claims Seriously*, 46 WAKE FOREST L. REV. 745 n.169 (2011); Catherine Rampell, *Standing Up To Takedown Notices*, WASH. POST, Oct. 19, 2007, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2007/10/18/AR2007101802453_2.html.

[14] Lawrence Lessig, *Copyright and Politics Don't Mix*, N.Y. TIMES, Oct. 20, 2008, *available at* http://www.nytimes.com/2008/10/21/opinion/21lessig.html; Saul Hansell, *McCain Fights for Right to Remix on YouTube*, N.Y. TIMES, Oct. 14, 2008, *available at* http://bits.blogs.nytimes.com/2008/10/14/mccain-fights-for-right-to-remix-on-youtube; Wendy Seltzer, *Free Speech Unmoored in Copyright's Safe Harbor: Chilling Effects of the DMCA on the First Amendment*, 24 HARV. J.L. & TECH. 171, 172-75 (2011); Center for Democracy & Tech., *Campaign Takedown Troubles: How Meritless Copyright Claims Threaten Online Political Speech* (2010), *available at* https://cdt.org/files/pdfs/copyright_takedowns.pdf.

**C.  Service providers hosting user-generated content would find it particularly difficult to administer such a rule.**

As the International Documentary Film Association (IDFA) points out, filmmakers will face numerous uncertainties if the panel's decision stands, including when a person appearing has made a copyrightable (but not otherwise fixed) contribution, and when post-filming editing might exceed the bounds of that person's implied license.  IDFA *Amicus* Br. at 3-7, Dkt. Entry 88 (filed Apr. 14, 2014).  Whatever uncertainties the filmmaker faces, the online intermediaries upon whose platforms the filmmakers work may be hosted know even less.  Even if a filmmaker has secured a release, or has consulted with those appearing in his or her film, the platform hosting the content has no way of knowing this.  In short, the challenges that filmmakers face similarly confront the online intermediary who might distribute or perform that filmmaker's work, who possesses even less information than the filmmaker.  These intermediaries are essential means for both commercial and non-commercial speech, comprising the "vast platform from which to address and hear from a worldwide audience of millions of readers, viewers, researchers, and buyers." *Reno v. American Civil Liberties Union*, 521 U.S. 844, 853 (1997).  To burden them with such liability risks would undermine the important function they serve in modern society.  These service providers have transformed and democratized domestic and international commerce, culture, and

politics, in large part because the safe harbors in the Communications Decency Act and the DMCA have afforded the industry predictability.

## II. The Proposed Injunction Compels Proactive Monitoring, Which Online Services Cannot Achieve, and Which Congress Has Rejected As Unreasonable.

The panel's injunction to "take down all copies" of the film from YouTube and all "platforms under Google's control" and to prevent further uploads of the same appears to impose an obligation upon Google to monitor all of its properties for any reproduction of the segment of the film containing Garcia's brief appearance. In the DMCA, Congress placed that burden "squarely on the owners of the copyright", *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1113 (9th Cir. 2007), recognizing that only rights-holders know what they own, and what uses they have authorized, and by which users.[15] The injunction disagrees with this choice, and instead appears to impose across *all Google platforms* the unprecedented requirement that the enjoined content be taken down and *stay* offline – including, one might conclude, Google's email service.

Even the most sophisticated online platforms would struggle to proactively parse works for unregistered performances within them, when months' worth of

---

[15] To the extent the DMCA safe harbor permits injunctive relief against service providers, it ensures that they "may be subject only to the narrow injunctive relief set forth in section 512(j)." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1158 (9th Cir. 2007).

video are being uploaded every hour. Any injunction compelling affirmative monitoring or filtration of this magnitude of content would be technically impossible and thus overbroad *per se*. Even a narrower injunction that might be technically feasible would nevertheless undermine the economic and social value of user-generated content and social media. It is for these reasons that Congress made clear in the DMCA safe harbor that service providers were not expected to be "monitoring [their] service[s]". 17 U.S.C. § 512(m)(1).

The brief of *amici* Adobe Systems *et al.*, at 4-10, Dkt. Entry 101 (filed Apr. 14, 2014), discusses at greater length the unmanageability of injunctions to monitor and suppress content prospectively; *amicus* CCIA endorses these arguments.

## CONCLUSION

The plaintiff Garcia makes a compelling case that she was wronged by the publication of the film. However, the panel's attempt to provide a remedy for this wrong in *copyright* and against *third party intermediaries* has dramatically expanded the scope of what may be the subject of a DMCA takedown notice, and has also led to an unnecessarily overbroad injunction.

For the foregoing reasons, the Court should vacate the injunction and affirm the district court's decision.

Respectfully submitted,

/s/ Matt Schruers
Matt Schruers
Computer & Communications
   Industry Association
900 17th Street NW, Suite 1100
Washington, D.C. 20006
(202) 783-0070
mschruers@ccianet.org

*Counsel for Amicus Curiae*

November 25, 2014

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitations of Fed. R. App. P.

32(a)(7)(B) because it contains 2,899 words, excluding the parts of the brief

exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the types style requirements of Fed. R. App. P. 32(a)(6) because it has

been prepared in a proportionally spaced typeface using Microsoft Word in 14

point Times New Roman.

/s/ Matt Schruers
Matt Schruers
Computer & Communications
  Industry Association
900 17th Street NW, Suite 1100
Washington, D.C. 20006
(202) 783-0070
mschruers@ccianet.org

*Counsel for Amicus Curiae*

November 25, 2014

## CERTIFICATE OF SERVICE

I hereby certify that on November 25, 2014, I electronically filed the foregoing Brief *Amicus Curiae* of the Computer & Communications Industry Association in Support of Defendants-Appellees, with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Matt Schruers
Matt Schruers
Computer & Communications
  Industry Association
900 17th Street NW, Suite 1100
Washington, D.C. 20006
(202) 783-0070
mschruers@ccianet.org

*Counsel for Amicus Curiae*

November 25, 2014