NO. 12-57302

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

CINDY LEE GARCIA,

PLAINTIFF-APPELLANT,

V.

GOOGLE, INC., YOUTUBE LLC, et al.,

DEFENDANTS-APPELLEES,

AND

NAKOULA BASSELEY NAKOULA, an individual, a.k.a. Sam Bacile, et al.,

DEFENDANTS.

On Appeal from the United States District Court
for the Central District of California
D.C. No. 2:12-cv-08315-MWF-VBK

The Honorable Michael W. Fitzgerald, District Court Judge

**BRIEF OF *AMICI CURIAE* ELECTRONIC FRONTIER FOUNDATION,
AMERICAN CIVIL LIBERTIES UNION, PUBLIC KNOWLEDGE,
CENTER FOR DEMOCRACY AND TECHNOLOGY, NEW MEDIA
RIGHTS, AMERICAN LIBRARY ASSOCIATION, ASSOCIATION OF
COLLEGE AND RESEARCH LIBRARIES, AND ASSOCIATION OF
RESEARCH LIBRARIES IN SUPPORT OF DEFENDANTS-APPELLEES**

Corynne McSherry
Vera Ranieri
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Email: corynne@eff.org
Telephone: (415) 436-9333

*Counsel for Amici Curiae*

Lee Rowland
Brian Hauss
AMERICAN CIVIL LIBERTIES
UNION
125 Broad St, 18th Floor
New York, NY 10004
Email: lrowland@aclu.org
Telephone: (212) 549-2500

*On the Brief:*

Sherwin Siy
John Bergmayer
PUBLIC KNOWLEDGE
1818 N Street NW, Suite 410
Washington, DC 20036
(202) 861-0020
*Counsel for Public Knowledge*

Art Neill
Teri Karobonik
NEW MEDIA RIGHTS
4685 Convoy St. Suite 210
San Diego, CA 92111
(619) 665-9297
teri@newmediarights.org

*Counsel for New Media Rights*

Erik Stallman
CENTER FOR DEMOCRACY &
TECHNOLOGY
1634 I Street NW, 11th Floor
Washington, DC 20008
(202) 637-9800
dsohn@cdt.org

*Counsel for Center for Democracy
and Technology*

Jonathan Band
JONATHAN BAND PLLC
21 Dupont Circle, NW
Washington, D.C. 20036
(202) 296-5675
jband@policybandwidth.com

*Counsel for American Library Association,
Association of College and Research Libraries,
and Association of Research Libraries*

## DISCLOSURE OF CORPORATE AFFILIATIONS AND
## OTHER ENTITIES WITH A DIRECT FINANCIAL INTEREST IN
## LITIGATION

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Amici Curiae Electronic Frontier Foundation, American Civil Liberties Union, Public Knowledge, New Media Rights, Center for Democracy and Technology, American Library Association, Association of College and Research Libraries, and Association of Research Libraries (collectively, "Amici") state that none of them has a parent corporation and that no publicly held corporation owns 10% or more of the stock of any of them.

# TABLE OF CONTENTS

DISCLOSURE OF CORPORATE AFFILIATIONS ............................................ i

STATEMENTS OF INTEREST ........................................................... 1

INTRODUCTION ..................................................................... 3

ARGUMENT ......................................................................... 4

I.  *INNOCENCE OF MUSLIMS* IS CENTRAL TO A GLOBAL DEBATE ....... 4

II.  BLACK-LETTER LAW SUPPORTS REJECTION OF THE PANEL
DECISION AND AFFIRMANCE OF THE DISTRICT COURT ................. 6

     A.  The District Court Identified and Applied the Correct Rigorous
Injunction Standard ................................................. 6

         1.  Copyright law disfavors Garcia's copyright claim. ...................... 8

         2.  The balance of harms does not favor Ms. Garcia. ...................... 10

         3.  The panel majority improperly discounted the public interest
against censoring speech of public concern. .............................. 14

             i.  The panel majority improperly assumed that a likelihood of
success negates the balancing of equities and careful
assessment of the public interest. ......................................... 15

             ii.  The panel majority gave insufficient weight to the public
interest, which tilts sharply against censoring political
speech. ................................................................ 17

             iii.  The panel opinion assumed a copyright exception to the First
Amendment that does not exist. .......................................... 20

     B.  Reversal of the District Court Will Inevitably Lead to Collateral
Damage ............................................................ 23

         1.  Requiring an intermediary to monitor "blacklisted" content sets a
dangerous precedent for online speech. ................................... 23

2.   A finding of a separate copyright interest in this case would upset settled expectations of content creators everywhere. ...................25

3.   Recognition of a separate copyright interest in this case creates an increased risk of orphan works.......................................27

4.   The injunction improperly extends beyond this Court's jurisdiction.......................................................28

III.  CONCLUSION ...............................................29

CERTIFICATE OF COMPLIANCE...................................32

CERTIFICATE OF SERVICE ........................................33

# TABLE OF AUTHORITIES

## Federal Cases

*A & M Records* v. *Napster, Inc.*,
  239 F.3d 1004 (9th Cir. 2001)............................................................. 13

*Aalmuhammed v. Lee*,
  202 F.3d 1227 (9th Cir. 2000).................................................... 8, 9, 26

*Acierno v. New Castle County*,
  40 F.3d 645 (3d Cir. 1994)..................................................................... 7

*Allen v. Wright*,
  468 U.S. 737 (1984) ............................................................................. 11

*Am. Hosp. Supply Corp. v. Hosp. Prods., Ltd.*,
  780 F.2d 589 (7th Cir. 1986)............................................................... 13

*Ashcroft v. Am. Civil Liberties Union*,
  542 U.S. 656 (2004) ............................................................................. 18

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*,
  729 F.3d 937 (9th Cir. 2013)............................................................... 14

*Bantam Books, Inc. v. Sullivan*,
  372 U.S. 58 (1963) ............................................................................... 18

*Bartnicki v. Vopper*,
  532 U.S. 514 (2001) ............................................................................. 19

*Burrow-Giles Lithographic Co. v. Sarony*,
  111 U.S. 53 (1884) ................................................................................. 8

*Cacchillo v. Insmed, Inc.*,
  638 F.3d 401 (2d Cir. 2011)................................................................... 7

*Christopher Phelps & Assocs., LLC v. Galloway*,
  492 F.3d 532 (4th Cir. 2007)......................................................... 10, 12

*Community for Creative Non-Violence v. Reid*,
  490 U.S. 730 (1989) ............................................................................... 9

iv

*Dahl v. HEM Pharms. Corp.,*
   7 F.3d 1399 (9th Cir. 1993) ........................................................................ 6

*Dish Network Corp. v. F.C.C.,*
   653 F.3d 771 (9th Cir. 2011) ..................................................................... 15

*Earth Island Inst. v. Carlton,*
   626 F.3d 462 (9th Cir. 2010) ..................................................................... 12

*eBay Inc. v. Mercexchange, LLC,*
   547 U.S. 388 (2006) ...................................................................... 16, 20, 22

*Eldred v. Ashcroft,*
   537 U.S. 186 (2003) .............................................................................. 20, 22

*Elrod v. Burns,*
   427 U.S. 347 (1976) ..................................................................................... 18

*Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.,*
   654 F.3d 989 (9th Cir. 2011) ......................................................... 14, 16, 22

*Flynn v. Nakoula, et al.,*
   Case No. 14-cv-01901-MMM (KKx) (C.D. Cal. Filed Sept. 11, 2014) ............. 24

*Kirtsaeng v. John Wiley & Sons,*
   568 U.S. __, 133 S. Ct. 1351 (2013) ....................................................... 28

*Landmark Commc'ns, Inc. v. Virginia,*
   435 U.S. 829 (1978) ..................................................................................... 19

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
   572 U.S. __, 134 S. Ct. 1377 (2014) ....................................................... 11

*Marlyn Neutraceuticals, Inc. v. Mucos Pharma GmbH & Co.,*
   571 F.3d 873 (9th Cir. 2009) ......................................................................... 6

*Mattel, Inc. v. MCA Records, Inc.,*
   296 F.3d 894 (9th Cir. 2002) ....................................................................... 20

*Mills v. Alabama,*
   384 U.S. 214 (1966) ..................................................................................... 17

*New Era Publications Int'l, ApS v. Henry Holt & Co.*,
  695 F. Supp. 1493 (S.D.N.Y. 1988) .................................................. 11

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*,
  475 U.S. 1 (1986) ............................................................... 17, 21

*Perfect 10, Inc. v. Amazon.com, Inc.*,
  508 F.3d 1146 (9th Cir. 2007) ....................................................... 16

*Perfect 10, Inc. v. Google, Inc.*,
  653 F.3d 976 (9th Cir. 2011) ......................................................... 16

*Religious Techn. Ctr. v. Netcom*,
  907 F. Supp 1361 (N.D. Cal. 1985) ................................................... 21

*Reno v. American Civil Liberties Union*,
  521 U.S. 844 (1997) ................................................................. 17

*Roda Drilling Co. v. Siegal*,
  552 F.3d 1203 (10th Cir. 2009) ........................................................ 7

*Salinger v. Colting*,
  607 F.3d 68 (2d Cir. 2010) ....................................................... 11, 21

*Sammartano v. First Judicial Dist. Court*,
  303 F.3d 959 (9th Cir. 2002) ......................................................... 20

*Stanley v. Georgia*,
  394 U.S. 557 (1969) ................................................................. 17

*Stanley v. Univ. of Southern Cal.*,
  13 F.3d 1313 (9th Cir. 1994) .......................................................... 6

*Thomson v. Larson*,
  147 F.3d 195 (2d Cir. 1998) ........................................................... 9

*United States v. Playboy Entm't Grp., Inc.*,
  529 U.S. 803 (2000) ................................................................. 21

*Weinberger v. Romero–Barcelo*,
  456 U.S. 305 (1982) ................................................................. 14

*Winter v. Natural Res. Def. Council, Inc.*,
 555 U.S. 7 (2008) ..................................................................................... 15, 16


**Federal Statutes**

17 U.S.C. § 102(a) ........................................................................................... 8

17 U.S.C. § 411(a) ......................................................................................... 20


**Constitutional Provisions**

U.S. Const. Article I, Section 8 ...................................................................... 8


**Other Authorities**

4 Melville Nimmer & David Nimmer, *Nimmer on Copyright* § 14.06(A)(5)
 (1997) .......................................................................................................... 14

Giuseppina D'Agostino, *Healing Fair Dealing? A Comparative Copyright
 Analysis of Canada's Fair Dealing to U.K. Fair Dealing and U.S. Fair Use*,
 53 McGill L.J. 309 (2008) ......................................................................... 29

Patricia Aufderheide & Peter Jaszi, *Untold Stories: Creative Consequence of the
 Rights Clearance Culture for Documentary Filmmakers*, Center for Social
 Media, American University, Nov. 2004 ................................................... 25

The Law Library of Congress, *The Impact of Foreign Law on Domestic
 Judgments*, March 2010 ........................................................................... 29

*YouTube Press Statistics* ............................................................................ 25

## STATEMENTS OF INTEREST

This brief is filed pursuant to Fed. R. App. Proc. 29(a) with the consent of all parties.

The Electronic Frontier Foundation is a member-supported, non-profit public interest organization dedicated to protecting digital civil liberties and free expression.

The American Civil Liberties Union is a nationwide, non-profit, non-partisan organization with more than 500,000 members dedicated to the principles embodied in the Constitution and Bill of Rights.

Public Knowledge is a not-for-profit public-interest advocacy and research organization that seeks to ensure that the public has access to knowledge and the ability to freely communicate and innovate in the digital age.

New Media Rights is an independently funded non-profit program of California Western School of Law supporting independent creators and Internet users though direct legal services, education, and advocacy on media and Internet law.

The Center for Democracy & Technology is a non-profit public-interest organization promoting human rights and technological innovation on the Internet, including balanced policies that protect creators without inhibiting innovators.

The American Library Association, the Association of College and Research Libraries, and the Association of Research Libraries collectively represent over 100,000 libraries in the United States, employing over 350,000 librarians and other personnel.

# INTRODUCTION

Based on a copyright claim that the Copyright Office firmly rejected, that has struck scholars and practitioners as dubious at best, and that even the original panel opinion described as "fairly debatable," Cindy Lee Garcia asks this Court to reverse the district court and uphold an extraordinary injunction requiring a service provider to censor the historical record. The injunction contradicts clear Supreme Court and circuit court precedent on both copyrightability and the mandatory preliminary injunction standard. The district court properly declined Ms. Garcia's request, and this Court should do the same.

It is a truism that bad facts make bad law, and that is clearly what happened when this case was reviewed by the original panel. The hoodwinking of Ms. Garcia was deplorable, as were the threats that followed publication of the video. The producer of "Innocence of Muslims" should be held to account for his deception, and Ms. Garcia has legal options for doing so. Anyone engaging in criminal acts related to Ms. Garcia can be prosecuted.

What should not occur, however, is a repetition of the panel opinion's expansive and erroneous notion of copyrightability, or its impoverished notion of the injunction standard and the public interest, all in the hope that forcing Google to make a video that has already been widely disseminated a little harder to find will cause a group of religious fanatics to stop harassing Ms. Garcia. That hope is

3

unlikely to be realized. Instead, the certain outcome is that the panel opinion's novel copyright theory will prompt abuse of the copyright system and chill protected speech. Indeed, it has already begun to do so.

Creators of all stripes, their audiences, and the service providers who help them to find each other all rely on a careful balance between copyright and free speech, informed by a robust and multifaceted understanding of the public interest. The district court's denial of injunctive relief upheld that balance and should be affirmed.

## ARGUMENT

## I. *INNOCENCE OF MUSLIMS* IS CENTRAL TO A GLOBAL DEBATE

To understand the stakes of this litigation, it is important to understand the nature of the speech at issue. Uploaded to YouTube in July 2012, "Innocence of Muslims" went largely unnoticed until September, when its director uploaded an excerpt dubbed into Arabic.[1] Florida pastor Terry Jones promoted the video as part of "International Judge Muhammad Day," scheduled for September 11, 2012.[2] Within days, over ten million people had viewed the video.[3]

---

[1] http://thelede.blogs.nytimes.com/2012/09/11/obscure-film-mocking-muslim-prophet-sparks-anti-u-s-protests-in-egypt-and-libya. Unless otherwise noted, all websites were last visited Nov. 24, 2014.

[2] http://www.nytimes.com/2012/09/12/world/middleeast/anger-over-film-fuels-anti-american-attacks-in-libya-and-egypt.html.

[3] http://www.forbes.com/sites/jjcolao/2012/09/14/innocence-of-muslims-now-with-10-million-views-worldwide.

Reactions were intense. In London, 10,000 people gathered outside Google's headquarters to demand the video's removal.[4] In Cairo, home city of the film's creator, protestors besieged the U.S. embassy.[5] The film was even blamed for a violent attack on an American diplomatic compound in Benghazi, Libya.[6]

Here in the United States, the publication of "Innocence of Muslims," and the reactions to it around the world, spurred debate about the appropriate limits of a free press and state regulation of "hate speech." The White House took the extraordinary measure of asking Google to "review" the video.[7] Google refused to take it down, but did block access to the video from Egypt and Libya, "in response to the delicacy of the situation." *Id*. President Obama, speaking at the United Nations just days after his office had hinted that Google should take the video down, delivered an impassioned defense of Google's constitutional right to publish that same video:

> We [protect speech critical of religion not] because we support hateful speech, but because our founders understood that without such protections, the capacity of each individual to express their own views and practice their own faith may be threatened. We do so because in a diverse society, efforts to restrict speech can quickly become a tool to

---

[4] http://www.telegraph.co.uk/news/9607763/Muslims-protest-age-of-mockery-as-thousands-descend-on-Google-HQ.html.

[5] http://www.reuters.com/article/2012/09/14/us-film-protests-idUSBRE88D0O320120914.

[6] http://www.nytimes.com/2012/09/12/world/middleeast/anger-over-film-fuels-anti-american-attacks-in-libya-and-egypt.html.

[7] http://www.nytimes.com/2012/09/15/world/middleeast/google-wont-rethink-anti-islam-videos-status.html.

silence critics and oppress minorities.  We do so because given the power of faith in our lives, and the passion that religious differences can inflame, the strongest weapon against hateful speech is not repression; it is more speech.[8]

Whatever may be said about the merits of "Innocence of Muslims," it has unquestionably been of exceptional interest around the world for more than two years.  For good or ill, it has become part of the historical record on freedom of the press, freedom of religion, and international policy.

## II.  BLACK-LETTER LAW SUPPORTS REJECTION OF THE PANEL DECISION AND AFFIRMANCE OF THE DISTRICT COURT

### A.  The District Court Identified and Applied the Correct Rigorous Injunction Standard

As the district court recognized, mandatory preliminary injunctions are "subject to heightened scrutiny and should not be issued unless the facts and law clearly favor" the request.  AER at 893 (citing *Dahl v. HEM Pharms. Corp.,* 7 F.3d 1399, 1403 (9th Cir. 1993) (requiring defendant to provide drug to patients))).  The Ninth Circuit has repeatedly affirmed that such injunctions "are not issued in doubtful cases."  *Marlyn Neutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (internal quotation marks omitted); *see also Stanley v. Univ. of Southern Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994) ("When a mandatory preliminary injunction is requested, the district court should deny such

---

[8] Barack Obama, Remarks by the President to the UN General Assembly, September 25, 2012, *available at* http://www.whitehouse.gov/the-press-office/2012/09/25/remarks-president-un-general-assembly.

relief unless the facts and law clearly favor the moving party.") (internal quotation marks omitted)); *see also Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011); *Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir. 1994); *Roda Drilling Co. v. Siegal*, 552 F.3d 1203, 1208–09 (10th Cir. 2009).

There is good reason for this caution. Where an injunction alters rather than preserves the status quo, the risk of harm to the parties and the public interest is at its height. The public may be deprived of valuable services. An innovative business may be forced to close its doors forever, even though its business could ultimately prove lawful. And in many legal contexts, including copyright cases, a mandatory injunction may impose a prior restraint on speech that is later determined to be lawful.

The panel opinion notwithstanding, Ms. Garcia cannot meet the required standard.[9] First, the law and facts do not clearly favor Garcia's novel copyright claim; far from it. Second, Garcia asks the Court to give undue consideration to harms unrelated to copyright. Third, Garcia asks the court to discount the harm to

---

[9] Doubtless aware that she cannot meet the mandatory injunction standard, Ms. Garcia has suggested that the injunction she obtained was merely prohibitory, i.e., it maintained an existing status quo, rather than altering it. This claim defies reason. Until this Court's February Order, Google had been hosting the video at the heart of this dispute for well over a year. Ms. Garcia sought, and obtained, an order forcing the company to take aggressive steps to take the video offline and prevent future uploads: i.e., to change the status quo.

the public interest caused by the compelled removal of a video at the center of a global debate.

### 1. Copyright law disfavors Garcia's copyright claim.

Several other amici will address fundamental flaws in the panel opinion's copyrightability analysis, as has Google. We will not belabor the point here, except to stress that the merits do not "clearly favor" Ms. Garcia and therefore do not meet the mandatory preliminary injunction standard. If anything, the overwhelming weight of constitutional, statutory, and judicial authority *dis*favors Ms. Garcia's claim.

The central problem with Ms. Garcia's theory is that it assumes one could have a copyright interest in creative expression in the abstract. U.S. law does not recognize any such interest. Article I, Section 8 of the Constitution authorizes Congress to "secur[e] for limited Times to *Authors* . . . the exclusive Right to their respective *Writings"* (emphasis added). The Copyright Act reflects that mandate, extending copyright protection only to "works of authorship" that are "fixed in a tangible means of expression" (i.e., "writings"). 17 U.S.C. § 102(a). "Author" and "work" cannot be divorced. As this court observed, an "author" is a "person to whom [a] work owes its origin and who superintended the whole work." *See Aalmuhammed v. Lee*, 202 F.3d 1227, 1233 (9th Cir. 2000) (citing *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 61 (1884)); *see also Community for*

*Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989) (the "author" of a work is the person "who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection."). A work may have joint authors, of course, but only if those authors (1) intended their contributions be merged into inseparable or interdependent parts of a unitary whole; and (2) exercised meaningful creative control over the work. *See Aalmuhammed*, 202 F.3d at 1234 (*citing Thomson v. Larson*, 147 F.3d 195, 197 (2d Cir. 1998)).

As the district court correctly noted, Ms. Garcia concedes that she cannot meet any of these requirements for authorship. AER at 894. The only copyrightable work at issue in this case is the video. Ms. Garcia contributed a brief performance to that work, but she manifestly did not exercise creative control over the work as a whole. Ms. Garcia's own concession should have ended the matter.

Unfortunately, the district made the mistake of gilding the lily by discussing additional theories under which Ms. Garcia waived any copyright interest she might have had. That discussion implicitly (and likely unintentionally) gave undue credence to Ms. Garcia's initial copyright theory, and the panel opinion compounded that error. The Intellectual Property Law Professors put it well:

> The issue is not whether "a copyright interest in a creative contribution to a work simply disappears," but whether any copyright in the "creative contribution" is ever acquired in the first place. An

9

artist who never exercises authorial control over a writing in which
her contribution is fixed never acquires copyright in it.

Brief for Professors of Intellectual Property Law as Amici Curiae Supporting

Petitioner, *Garcia v. Google*, No. 12-8315, Dkt. No. 102, at 6 n.3 (9th Cir. filed

Apr. 14, 2014) (internal citation omitted).

A party cannot license a right she does not have.  Thus, there was no need

for either the district court or the panel opinion to reach the questions of implied

license or the work-for hire doctrine.  Moreover, doing so led the panel majority to

draw a series of additional conclusions implying that "every schmuck with a

videocamera" might have to seek a license from every schmuck she happened to

capture on video doing anything mildly creative (see Section II.B, *infra*).  Amici

urge this Court to avoid the same dangerous path.

### 2.  The balance of harms does not favor Ms. Garcia.

The district court correctly found that "Garcia has not demonstrated that the

requested preliminary relief would prevent any alleged harm."  AER 893**.**  As the

dissent to the panel opinion notes, that conclusion was not "illogical or

implausible," Am. Op. at 22 (Smith, J., dissenting), and is supported by other facts

in the record.  It was certainly not an abuse of discretion.

Even considered *de novo*, Garcia cannot demonstrate irreparable *copyright*

harms.  *See Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 544

(4th Cir. 2007) ("Irreparable injury often derives from the nature of copyright

violations, which deprive the copyright holder of intangible exclusive rights."). By their nature, irreparable harms are those that cannot be remedied with damages; Ms. Garcia's alleged harms qualify in at least that sense. But in a copyright case, remedies must still be tethered to the purpose of copyright law. *See Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010) ("The relevant harm is the harm that . . . occurs to the parties' legal interests."). Garcia must show how her interests *as an author* would be protected by an injunction, since "the justification of the copyright law is the protection of the commercial interest of the artist/author . . . [and] to stimulate creation by protecting its rewards." *Id*. at 81 n.9 (quoting *New Era Publications Int'l, ApS v. Henry Holt & Co.*, 695 F. Supp. 1493, 1526 (S.D.N.Y. 1988)).

Ms. Garcia must also show a "line of causation between the illegal conduct and the injury [that is not] too attenuated," *Allen v. Wright*, 468 U.S. 737, 752 (1984), *abrogated on other grounds, Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. __, 134 S. Ct. 1377 (2014) (considering injuries in the context of standing) and that "the prospect of obtaining relief from the injury as a result of a favorable ruling [cannot be] too speculative." *Id*.

Ms. Garcia cannot make this showing. First, because the harms she alleges are not harms to her copyright interests (assuming arguendo that she has any such interest), the line of causation between them and the alleged infringement is too

attenuated. Second, she cannot show that an injunction would prevent any *additional* irreparable harm to her purported copyright interests. In *Christopher Phelps*, the court noted that an injunction would not "undo the prior infringement, nor diminish the chances of future copying," 492 F.3d at 544, and declined to impose a "draconian burden" on a defendant on such a flimsy basis. *Id.* Similarly, here, an injunction would neither erase Ms. Garcia's association with the film nor prevent the unedited film's continued dissemination on other platforms. Given these facts, Ms. Garcia has failed to meet the high burden for a pre-trial injunction preventing the distribution of a film.

The panel decision erroneously concluded otherwise. The panel states that Ms. Garcia has shown that she is being threatened, and concludes that "To the extent the irreparable harm inquiry is at all a close question, we think it best to err on the side of life." Am. Op. at 18**.** That is a worthy sentiment, but not one that relieves Ms. Garcia of the burden of demonstrating that injunctive relief would remedy the harm. She failed to do this to the district court's satisfaction, and the panel opinion does not explain how the court's conclusion on this point amounted to an abuse of discretion. *See Earth Island Inst. v. Carlton*, 626 F.3d 462, 475–76 (9th Cir. 2010). Indeed, one can comb through the panel opinion in vain looking for any evidence that the injunction requested will do anything to *stop* those threats. Instead, the panel majority shifted the burden to *Google* to prove the

injunctive relief wouldn't remedy the harms Ms. Garcia has alleged. Am. Op. at 18. It is Ms. Garcia's job to prove the connection, not Google's job to disprove it.

What is more, Ms. Garcia's attempt to use copyright law to solve non-copyright harms smacks of copyright misuse. "The misuse defense prevents copyright holders from leveraging their limited monopoly to allow them to control areas outside the monopoly." *A & M Records* v. *Napster, Inc.*, 239 F.3d 1004, 1026 (9th Cir. 2001). Ms. Garcia's civil complaint properly sounds in defamation, fraud and/or intentional infliction of emotional distress. Her desire to remove the clips from YouTube led her to reach instead for copyright law, simply because it offers a convenient and powerful weapon to remove online content. But the harms of which she complains do not involve infringement, and the Court should not bless her efforts to pretend otherwise.

The panel opinion also failed to actually *balance* the harms of its injunction. The preliminary injunction factors exist to give a district court the opportunity to minimize the costs of its being mistaken. *Am. Hosp. Supply Corp. v. Hosp. Prods., Ltd.*, 780 F.2d 589, 593–94 (7th Cir. 1986). Thus, it must balance the harms of failing to issue an injunction should a plaintiff be correct on the merits against the harms of issuing an injunction should a plaintiff's claims fail. *Id.* However, the panel opinion seems to do neither of these things, instead merely reciting the harms that Ms. Garcia has already suffered. Am. Op. at 17-18.

Ms. Garcia may deserve redress for the harms that have come to her, but copyright is the wrong tool for the job.

3. The panel majority improperly discounted the public interest against censoring speech of public concern.

This Court warned against a categorical application of the injunction standard in *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 999–1000 (9th Cir. 2011) ("No longer applicable is the presumption of irreparable harm, which allowed the collapse of factors that plaintiff must prove down to one.") (*citing* 4 Melville Nimmer & David Nimmer, *Nimmer on Copyright* § 14.06(A)(5) at 14-149 (1997)). If a likelihood of success is present, courts must consider every other factor, every time. Moreover, courts must give particular consideration to the fourth factor: the impact on the public interest. *See Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312 (1982) ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.").

The district court expressly declined to reach the balance of equities and the public interest because it did not believe Ms. Garcia was remotely likely to succeed on the merits. This was proper. *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 944 (9th Cir. 2013) (when a plaintiff has failed to show the likelihood of success on the merits, a court need "need not consider the

remaining [*Winter*[10] elements]") (citing *Dish Network Corp. v. F.C.C.*, 653 F.3d 771, 776–77 (9th Cir. 2011))).

Having erroneously concluded that Ms. Garcia *was* likely to succeed on the merits, however, the panel opinion did reach the equities, and made two discrete errors. Am. Op. at 16, 19. First, the panel found that Garcia's likelihood of success on copyright claims *de facto* deprives Defendants of any recognizable equities and satisfies the public interest test. It does neither. Second, the panel totally failed to consider the free speech interests of both Defendants and the public. Both are clear errors of law.

### i. The panel majority improperly assumed that a likelihood of success negates the balancing of equities and careful assessment of the public interest.

The panel majority dismissed Google's arguments that free speech interests tilt the equities and public interest in their favor, holding that both prongs automatically favor Garcia because she "demonstrated a likelihood of success on her [copyright] claim," and "the First Amendment doesn't protect copyright infringement." Am. Op. at 19. In other words, once it (improperly) took the impact on free speech rights off the table, the panel opinion collapsed the entire

---

[10] *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

injunction inquiry into the initial question of the plaintiff's success on the merits, which is precisely what *eBay*[11] and *Winter* forbid.

Just as courts may not assume irreparable harm in copyright cases, see *Flexible Lifeline,* neither may they presume that a copyright-based injunction *de facto* serves the public interest. *See Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 980-81 (9th Cir. 2011) ("cases arising under the Copyright Act must be evaluated on a case-by-case basis in accord with traditional equitable principles and without the aid of presumptions or a 'thumb on the scale' in favor of issuing such relief") (citation omitted).

If the injunction balancing test is not to be rendered meaningless, it must enable a court to find that the overall balance of hardships counsels against an injunction *even where* a plaintiff has a likelihood of success on the merits. Here, by contrast, the panel effectively presumed that the equities and public interest prongs were met automatically once it found that Garcia had a likelihood of success on her claims. It therefore failed to "expressly consider whether this [public interest] value outweighed" the copyright interests at stake. *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1166 (9th Cir. 2007).

---

[11] *eBay Inc. v. Mercexchange, LLC*, 547 U.S. 388 (2006).

ii.  **The panel majority gave insufficient weight to the public interest, which tilts sharply against censoring political speech.**

The panel majority discounted the harm to the public interest occasioned by the compelled removal of a video at the center of a global debate on a matter of significant public concern. Had the panel properly considered the public interest as a distinct factor, the balance of equities would have shifted in favor of the appellees.

Beyond the immediate impact on the parties, "[t]he constitutional guarantee of free speech 'serves significant societal interests' wholly apart from the speaker's interest in self-expression." *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 8 (1986) (citation omitted). This case involves weighty First Amendment implications: the public's right to access and view a video at the center of a roiling political debate. The public's right to "receive information and ideas, regardless of their social worth . . . is fundamental to our free society." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (internal citations omitted). The Supreme Court has stated that "there is practically universal agreement that a major purpose of that [First] Amendment was to protect the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966). The protections of the First Amendment, of course, apply fully to content on the Internet. *Reno v. American Civil Liberties Union,* 521 U.S. 844, 870 (1997). And

"[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"—here, to the public. *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

Where a plaintiff seeks a preliminary injunction to alter the status quo by removing speech from the public eye, the scales are tipped even more sharply in favor of judicial restraint because the court's assessment of likely success may ultimately prove incorrect. The Supreme Court has warned of the "extraordinary harm and a serious chill upon protected speech" that can result from the censorship of an improperly-granted preliminary injunction. *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 670–71 (2004). When reversing the status quo results in a restriction on speech, the dangers to the public's right in free speech "outweigh those" of permitting additional speech "by mistake." *Id.* Where a party seeks to enjoin the publication of speech, that injunction may result in a prior restraint should the court later find that the public had a right to access it. And "[a]ny system of prior restraints . . . [bears] a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963).

Even more troubling, the panel majority's decision included no discussion of the public's right to see and share a video causing political furor. The panel majority's Order requires Defendants both to take offline videos containing Ms. Garcia's five-second performance *and* to ensure that no one uploads any others.

18

As a practical matter, such a broad injunction chills not only Google's speech, but that of its users. It puts Google in the role of copyright cop, affirmatively monitoring user speech for signs of alleged infringement. Worse, it means that the panel majority's Order extends to non-infringers—that is, users who lawfully post or display the video in discussing the global controversy it has created.

The Supreme Court has acknowledged that "a stranger's illegal conduct does not suffice to remove the First Amendment shield from speech about a matter of public concern." *Bartnicki v. Vopper*, 532 U.S. 514, 535 (2001). That is, even if the panel majority had properly concluded that Defendants had engaged in wrongdoing by hosting the video, the extension of the injunction to the public's speech on a newsworthy video demanded a more searching First Amendment inquiry.

Finally, the broad gag order that accompanied the panel majority's Order exacerbated the harm to the public interest. "The operations of the courts and the judicial conduct of judges are matters of utmost public concern." *Landmark Commc'ns, Inc. v. Virginia,* 435 U.S. 829, 839 (1978). By entering the preliminary injunction in secrecy, the Court prevented third parties, most notably the press and public, from even learning about a court order reducing the availability of newsworthy speech. This order also impeded the Copyright Office's ability to join and challenge the panel majority's orders before they were implemented.

19

17 U.S.C. § 411(a). This additional violence to the public's free speech rights makes the panel opinion's failure to consider the public interest all the more disturbing.

### iii. The panel opinion assumed a copyright exception to the First Amendment that does not exist.

The panel attempted to sidestep meaningful consideration of the foregoing speech-related harms to the public interest with the observation that "the First Amendment doesn't protect copyright infringement." Op. at 18 (citing *Eldred v. Ashcroft*, 537 U.S. 186, 219-20 (2003)). [12] It affirmed that position in the amended opinion, suggesting that because Google had failed to raise a fair use defense, the panel had no obligation to consider the speech implications of its order. Am. Op. at 19.

That suggestion was wrong. The assertion of a copyright claim does not relieve a court of the obligation to give full consideration to the public interest,

---

[12] Notably, *Eldred* is not a case about weighing the factors related to an injunction. *Eldred* analyzed whether the First Amendment requires a heightened standard of review in evaluating an extension of the existing copyright regime; the Court held that it does not. Nothing in *Eldred* contradicts the rule in *eBay* and progeny that in weighing the merits of an injunction, the public interest is a separate and distinct inquiry. And the public interest undoubtedly includes the protection of free speech rights. *See, e.g.*, *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002) (collecting cases); *cf. Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 900 (9th Cir. 2002) (traditional tests may "fail[] to account for the full weight of the public's interest in free expression" when a trademark becomes integral to public discussion).

including the speech implications of issuing injunctive relief. Indeed, such a rule would be unconstitutional. As the Second Circuit Court of Appeals observed in a 2010 copyright case: "By protecting those who wish to enter the marketplace of ideas from government attack, the First Amendment protects the public's interest in receiving information . . . . Every injunction issued before a final adjudication on the merits risks enjoining speech protected by the First Amendment." *Salinger*, 607 F.3d at 82 (*citing Pac. Gas & Elec. Co.*, 475 U.S. at 8); *see also Religious Tech. Ctr. v. Netcom*, 907 F. Supp 1361, 1383 (N.D. Cal. 1985) (noting that where plaintiffs sought injunctive relief that is broader than necessary to prevent internet bulletin board user from committing copyright infringement, "there is a valid First Amendment question raised" and denying request for preliminary injunction against bulletin board because "requiring them to prescreen postings for possible infringement would chill their users' speech.").

Moreover, the panel's confidence that the likelihood of success controlled the overall preliminary injunction analysis was not only incorrect as a matter of law, but also failed to account for any possibility of error. And where liability lies on the line between copyright and free speech, an "[e]rror in marking that line exacts an extraordinary cost." *United States v. Playboy Entm't Grp., Inc.,* 529 U.S. 803, 817 (2000).

21

Finally, special care was particularly necessary here, where the plaintiff has manufactured a copyright claim not to promote creative expression, but to shut it down. The Supreme Court has repeatedly stressed that one of the core reasons that the Copyright Clause can be reconciled with the First Amendment is that both are ultimately dedicated to fostering creative expression. *See Eldred*, 537 U.S. at 219 ("copyright's purpose is to promote the creation and publication of free expression. As *Harper & Row* [*Publishers, Inc., v. Nation Enterprises,* 471 U.S. 539, 558 (1985)] observed: '[T]he Framers intended copyright itself to be the engine of free expression. By establishing a marketable right to the use of one's expression, copyright supplies the economic incentive to create and disseminate ideas.'"). In this case, however, it is abundantly clear that the only reason Ms. Garcia is asserting a copyright claim at all is to use it to inhibit expression—the video itself, and also commentary on the video.

In sum, the panel majority's circular analysis applied the wrong injunction standard and largely collapsed the injunction inquiry into an assessment of success on the merits, an approach the Supreme Court has expressly rejected. *See eBay Inc.*, 547 U.S. at 394; *Flexible Lifeline Sys.*, 654 F.3d at 990. It then gave too much weight to a dubious copyright claim, manufactured a copyright harm where none exists, and drastically discounted the countervailing public interest in an unedited historical record.

On rehearing, this Court has an opportunity to correct these errors and take the more rigorous approach mandated by the overwhelming weight of precedent. If it does so, amici submits it must affirm the district court's denial of a preliminary injunction, and lift the injunction order under which Google continues to labor. In addition, the Court should expressly reject the panel opinion's improper suggestion that courts need not consider the speech implications of injunctive relief in copyright cases unless the Defendant has raised a fair use defense.

**B.** **Reversal of the District Court Will Inevitably Lead to Collateral Damage**

The Court should reject Ms. Garcia's copyright theory and decline to extend injunctive relief purely as a matter of law. But her theory and the relief she has obtained are also bad policy, with a host of unintended consequences for online creativity.

1. Requiring an intermediary to monitor "blacklisted" content sets a dangerous precedent for online speech.

Ms. Garcia sought, and received, a "takedown and staydown" order, one that sets a dangerous precedent for all online platforms and the users that depend on those platforms to share creative works.

Emboldened by the majority opinion, other performers are likely to start asserting their own claims, resulting in the removal of a wide swath of speech.[13] Moreover, because the cost of investigating each allegation of infringement will almost always be greater than the cost of simply removing the content, intermediaries who fear liability will have little incentive to engage in exacting reviews. Alternatively, intermediaries facing a host of novel takedown requests may simply decide to cease offering certain services, even where those services are used predominantly for lawful purposes. For example, platforms faced with the risk of crippling liability and/or burdensome "stay-down" orders may shut down platforms for user-generated content in favor of hosting only content that has been expressly cleared by every conceivable copyright claimant.

In sharp contrast to today's largely free-flowing online political and cultural exchange, the result may be an Internet permeated by the same bureaucratic "clearance culture" that characterizes television, radio, and other mass media outlets—wherein creators who make fair uses of copyrighted content cannot find an audience without first satisfying a gauntlet of lawyers and insurers. *See* Patricia Aufderheide & Peter Jaszi, *Untold Stories: Creative Consequence of the Rights*

---

[13] Indeed, another actor from "Innocence of Muslims" has already brought a similar suit, alleging copyright infringement in his performance. *See Flynn v. Nakoula, et al.*, Case No. 14-cv-01901-MMM (KKx) (C.D. Cal. Filed Sept. 11, 2014).

*Clearance Culture for Documentary Filmmakers*, Center for Social Media, American University, Nov. 2004.[14]

> 2. A finding of a separate copyright interest in this case would upset settled expectations of content creators everywhere.

A ruling endorsing Ms. Garcia's copyright theory and the upholding injunctive relief (as opposed to the district court's more sensible approach) is likely to have unfortunate consequences for the traditional filmmaking community. But the risk is significantly worse for the growing number of amateur video makers who are taking advantage of new and inexpensive tools to create their own independent works, for commercial or noncommercial purposes.

Despite the derisive tone of the panel opinion, "every schmuck with a videocamera" is indeed a potential movie mogul. Am. Op. at 13–14. One need not look much further than the success of YouTube itself as proof of the enormous amount of creative content being produced by amateurs. *See YouTube Press Statistics*[15] (over 100 hours of video uploaded to YouTube every minute).

Thanks to platforms like YouTube, and new digital technologies, a filmmaker no longer needs expensive equipment, resources, and networks to create and distribute her work. But the panel's decision, if endorsed by the full Court, would introduce a new and unexpected cost, stifling this new creativity just as it is

---

[14] http://www.cmsimpact.org/sites/default/files/UntoldStories_Report.pdf.
[15] https://www.youtube.com/yt/press/statistics.html.

exploding. A creator with knowledge of the panel opinion will feel compelled to engage in time-consuming and expensive contracting to ensure she has the ability to use her creation as she wishes. The result would be a barrier that could deter the vast majority of such creators from generating works in the first place.

But of course it will never occur to the vast majority of creators that a 5 second performance might give someone else a copyright interest in their work— until such a person shows up to demand a cut, or worse, to demand that it be taken down. Indeed, manufacturing legal interests, as Ms. Garcia (and the panel opinion) has done, is particularly dangerous in the copyright context because copyright is such a powerful tool. Faced with strict liability, the threat of statutory damages and the risk of having to pay attorneys' fees if they guess wrong about success, many legitimate creators will not want to risk a legal battle, no matter how specious the claim, and will feel compelled to settle. Others, hit with a takedown notice under the DMCA's notice and takedown scheme, will hesitate to counter-notice, for the same reason.

Moreover, in holding that an individual "creative contribution" is *sufficient* to find a separate copyright, the panel decision either upends or hopelessly complicates every future case of joint authorship. The very standard it employs to find Garcia's separate copyright is a *prerequisite* to a finding of joint authorship. *Aalmuhammed*, 202 F.3d at 1231. If this is the case, every joint author now has, in

addition, a separate copyright interest embedded within the joint work, giving each of them veto power over the distribution of the finished joint work.

### 3. Recognition of a separate copyright interest in this case creates an increased risk of orphan works

Finally, recognizing an "authorial interest" in fleeting performances will have yet another unintended consequence: exacerbating the "orphan work" problem. An orphan work is a work as to which the owner is virtually impossible to identify or locate. Consequently, those who would like to use and share these works may hesitate to do so out of fear that they could later be found liable for copyright infringement because they failed to obtain a license for that use.

The persistent problem of orphan works is due mostly to three dangerous and sadly persistent aspects of U.S. copyright law: extremely long terms, high statutory damages, and a lack of formalities for copyright protection. But at least one only had to worry about locating the identifiable authors of actual "works." Ms. Garcia asks this Court to add a fourth, powerful deterrent to sharing orphan works: a potentially limitless number of potential copyright holders. Potential users would now have to worry about tracking down every participant in the film (or other work)—even those with as scant a contribution as five seconds—as a potential copyright holder. Sadly, such an outcome would discourage documentarians, libraries, archives and others from sharing works central to our common culture, even where in truth no author objected to its use.

4. <u>The injunction improperly extends beyond this Court's jurisdiction</u>

By default, copyright law is territorially limited. *See Kirtsaeng v. John Wiley & Sons*, 568 U.S. __, 133 S. Ct. 1351, 1359 (2013) ("The [Copyright] Act does not instantly protect an American copyright holder from unauthorized piracy taking place abroad.") (original emphasis omitted). Despite this limit on the Copyright Act, the injunction granted by the panel prohibits Google and its worldwide affiliates from "publishing, reproducing, disclosing, or otherwise allowing [the work] to be uploaded or shown" regardless of where the acts are taking place in the world. Garcia Op. Br. at 44; Order, Feb. 19, 2014 ("Google, Inc. shall take down all copies of 'Innocence of Muslims' from YouTube.com and from any other platforms under Google's control"); *see* Order, Mar. 6, 2014 (recognizing the worldwide effect of the Court's Feb. 19 order).

That is, despite the fact that no determination has been made as to the extent of Garcia's purported copyright in her performance under any law but American law, the injunction forces Google to act on a worldwide basis to prevent users in any country from uploading and viewing the video via any Google platform. For example, a Google subsidiary in an Ireland will be forced to prevent an Irish citizen from uploading the video in order to comment on it for the benefit of other Irish citizens, even if the subsidiary's servers are based in Ireland.

This kind of broad injunction is likely to be cited as precedent for allowing *other* jurisdictions to order the censorship of Internet content in America directed at Americans, based on laws that are inconsistent with the First Amendment and American due process.[16]  For example, our fair use doctrine, a crucial free-speech safeguard, operates very differently from its closest corollary in the United Kingdom, "fair dealing."  *See* Giuseppina D'Agostino, *Healing Fair Dealing? A Comparative Copyright Analysis of Canada's Fair Dealing to U.K. Fair Dealing and U.S. Fair Use*, 53 McGill L.J. 309 (2008).  If injunctions on Internet content from a single jurisdiction can be enforced on a worldwide scale, a copyright holder that objects to content that is protected by the U.S. fair use doctrine, but not the U.K.  Fair dealing provisions, can simply use an English court to impede the ability of American Internet users to access that content.[17]

## III.  CONCLUSION

Ms. Garcia's desire to obscure her relationship to the video in question is entirely understandable.  But copyright is simply not the right means for it, and suggesting otherwise will lead, and has already led, to a host of unintended

---

[16] Unlike American courts, courts in other jurisdictions often consider foreign law, including American law, when determining domestic policy.  *See, e.g.*, The Law Library of Congress, *The Impact of Foreign Law on Domestic Judgments*, March 2010, *available at* http://www.loc.gov/law/help/domestic-judgment/impact-of-foreign-law.pdf.

[17] The copyright holder would have to satisfy other jurisdictional requirements, but those are hardly insurmountable if the owner is, for example, a large corporation.

consequences. The panel decision was wrong as a matter of law and policy. The Court should affirm the district court's denial of injunctive relief and lift the current injunction immediately.

Dated: November 25, 2014

By:   /s/ Corynne McSherry__
Corynne McSherry
Vera Ranieri
ELECTRONIC FRONTIER
FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Telephone:  (415) 436-9333
corynne@eff.org

*Counsel for Electronic Frontier Foundation*

*On the brief:*

Lee Rowland
Brian Hauss
AMERICAN CIVIL LIBERTIES
UNION
125 Broad St, 18th Floor
New York, NY 10004
lrowland@aclu.org
(212) 549-2500

*Counsel for American Civil Liberties Union*

Sherwin Siy
John Bergmayer
PUBLIC KNOWLEDGE
1818 N Street NW, Suite 410
Washington, DC 20036
(202) 861-0020

*Counsel for Public Knowledge*

Art Neill
Teri Karobonik
NEW MEDIA RIGHTS
4685 Convoy St. Suite 210
San Diego, CA 92111
(619) 665-9297
teri@newmediarights.org

*Counsel for New Media Rights*

Erik Stallman
CENTER FOR DEMOCRACY &
TECHNOLOGY
1634 I Street NW, 11th Floor
Washington, DC 20008
(202) 637-9800
dsohn@cdt.org

*Counsel for Center for Democracy
and Technology*

Jonathan Band
Krista Cox
JONATHAN BAND PLLC
21 Dupont Circle, NW
Washington, D.C. 20036
(202) 296-5675
jband@policybandwidth.com

*Counsel for American Library
Association, Association of College
and Research Libraries, and
Association of Research Libraries*

31

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION,
## TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS
## PURSUANT TO FED. R. APP. P. 32(a)(7)(C)

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify as follows:

1.     This Brief of Amici Curiae Electronic Frontier Foundation, American Civil Liberties Union, Public Knowledge, New Media Rights, Center for Democracy and Technology, American Library Association, Association of College and Research Libraries, and Association of Research Libraries In Support of Defendants-Appellees complies with the type-volume limitation, because this brief contains 6,629 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2011, the word processing system used to prepare the brief, in 14 point font in Times New Roman font.

Dated: November 25, 2014                    By:   /s/ Corynne McSherry__

                                            Corynne McSherry

                                            *Counsel for Amici Curiae*
                                            *Electronic Frontier Foundation*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on November 25, 2014.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: November 25, 2014             By:   /s/ Corynne McSherry__

Corynne McSherry

*Counsel for Amici Curiae*
*Electronic Frontier Foundation*