NO. 12-57302

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

CINDY LEE GARCIA,

PLAINTIFF-APPELLANT,

v.

GOOGLE INC. AND YOUTUBE, LLC,

DEFENDANTS-APPELLEES.

_____

On Appeal from the United States District Court
for the Central District of California
Case No. CV-12-8315-MWF (VBKx)
Honorable Michael W. Fitzgerald, District Court Judge

_____

BRIEF OF AMICI CURIAE PROFESSORS SHYAMKRISHNA BALGANESH,
JUSTIN HUGHES, PETER MENELL, AND DAVID NIMMER IN SUPPORT
OF NEITHER PARTY

_____

JUSTIN HUGHES
WILLIAM H. HANNON PROFESSOR OF LAW
LOYOLA LAW SCHOOL
919 Albany Street
Los Angeles, California 90015
(213) 736-8108
Justin.hughes@lls.edu

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned states that none of the amici are a corporation.

Dated: November 25, 2014

By: /s/ *Justin Hughes*
*Counsel for Amici Curiae*

STATEMENT OF COMPLIANCE WITH RULE 29(C)(5)

This brief is submitted pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure with the consent of the parties. No party's counsel authored the brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person other than the amici curiae or their counsel, contributed money that was intended to fund preparing or submitting the brief.

Dated: November 25, 2014      By: */s/ Justin Hughes*
                                        *Counsel for Amici Curiae*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT………………………………………………...ii

INTERESTS OF AMICI CURIAE……………..………………………………………....……..1

SUMMARY OF ARGUMENT…………………………………………………………...2

ARGUMENT………………………………………………………………………………...4

I.     UNDER AMERICAN COPYRIGHT AN ACTOR'S DRAMATIC PERFORMANCE CAN CONSTITUTE ORIGINAL EXPRESSION THAT IS A COMPONENT OF A PROTECTABLE WORK OF AUTHORSHIP; NONETHELESS, GARCIA'S PERFORMANCE MAY BE TOO SHORT TO MERIT SUCH PROTECTION. ............................................................................... 6

II.     IN THE RARE CASE WHEN A DRAMATIC PERFORMANCE IS NEITHER A WORK MADE FOR HIRE NOR LICENSED (EXPRESSLY OR IMPLIEDLY) TO THE FILM PRODUCER, THE DRAMATIC PERFORMER MAY BE A CO-AUTHOR ............................ 9

   A.     The Control Test Developed in Aalmuhammed v. Lee Misconstrues the Copyright Act ………………………………………………………………………………………….12

   B.     Joint Authorship Does Not Require Equal Ownership .................................................. 17

   C.     Existing Copyright Law Is Structured to Accommodate Works of Joint Authorship ... 22

III.     PROOF OF FRAUD IS NOT AN ISSUE IN THIS CASE, AS IT EXERTS NO EFFECT ON GOOGLE'S DEFENSE OF IMPLIED LICENSE. ............................................................. 23

CONCLUSION……………………………………………………………………………......26

TABLE OF AUTHORITIES

**Cases**

*Aalmuhammed v. Lee*, 202 F.3d 1227 (9th Cir. 2000)……1, 2, 4, 11, 12, 13, 14, 15, 17, 20, 21

*Abend v. M.C.A.*, 863 F.2d 1465 (9th Cir. 1988), *aff'd on other grounds*, 493 U.S. 990 (1989)……………………………………………...…………..14

*Anderson v. Broadwell*, 6 P.2d 267 (Cal. Ct. App. 1931)…………...……19

*Ashton-Tate Corp. v. Ross*, 916 F.2d 516 (9th Cir. 1990)…………………16

*Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239 (1903)…………..8

*Brod v. Gen. Pub. Grp., Inc.*, 32 F. App'x 231 (9th Cir. 2002)…..……17-18

*Brown v. McCormick*, 87 F. Supp. 2d 467 (D. Md. 2000), *aff'd*, 1 F. App'x 215 (4th Cir. 2001)…………………………..………..…………....…11, 20

*Brownstein v. Lindsay*, 742 F.3d 55 (3d Cir. 2014)………...……………….12

*Childress v. Taylor*, 945 F.2d 500 (2d Cir. 1991)……………………12, 18

*Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989)..14, 20

*Cudmore v. Cudmore*, 311 N.W.2d 47 (S.D. 1981)..……………………..19

*Cummings v. Anderson*, 614 P.2d 1283 (Wash. 1980)…..………………19

*Effects Assocs., Inc. v. Cohen*, 908 F.2d 555 (9th Cir. 1990)………5, 11, 23

*Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061(7th Cir. 1994)……………12

*Feist Publications v. Rural Telephone Service Co, Inc.*, 499 U.S. 340 (1991)

………………………………………………………………………….8

*Gaiman v. McFarlane*, 360 F.3d 644 (7th Cir. 2004)…..………………..16

*Garcia v. Google, Inc.*, 743 F.3d 1258 (9th Cir. 2014), *opinion amended and superseded*, 766 F.3d 929 (9th Cir. 2014), *reh'g granted*, No. 12-57302, 2014 WL 5840553 (9th Cir. Nov. 12, 2014)…………...……………..11

*Gardner v. Nike, Inc*., 279 F.3d 774 (9th Cir. 2002)………...………..…5, 24

*ITOFCA, Inc. v. MegaTrans Logistics, Inc*., 322 F.3d 928 (7th Cir. 2003)..25

*Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351, 1363 (2013)….…..19

*Kyjen Co., Inc. v. Vo-Toys, Inc.,* 223 F. Supp. 2d 1065 (C.D. Cal. 2002)….6

*Richlin v. Metro-Goldwyn-Mayer*, 531 F.3d 962 (9ᵗʰ Cir. 2007)………...…7

*Samantar v. Yousuf*, 560 U.S. 305 (2010)…………...…………………….19

*Thomson v. Larson*, 147 F.3d 195 (2d Cir. 1998)..................................17, 18

*Winter v. Natural Res. Def. Council*, 555 U.S. 7 (2008)……………………6

## Statutes

17 U.S.C. § 101…………………………………………………12, 13, 17

17 U.S.C. §201(a)………………………………………...…………….18

17 U.S.C. § 512……………………………………………..………….22

## Legislative History

H.R. Rᴇᴘ. 94-1476, 1976 U.S.C.C.A.N. 5659 (1976)……13, 15, 16, 18, 21

## Other Authorities

Shyamkrishna Balganesh, *Unplanned Coauthorship*, 100 Vᴀ. L. Rᴇᴠ. 1683, (2014)…………………………………………………………………….13

Cᴏᴍᴘᴇɴᴅɪᴜᴍ ᴏғ U.S. Cᴏᴘʏʀɪɢʜᴛ Oғғɪᴄᴇ Pʀᴀᴄᴛɪᴄᴇ (2d ed. 1984)…………………………………………………………7-8, 9, 15

F. Jay Dougherty, *Not a Spike Lee Joint? Issues in the Authorship of Motion Pictures under U.S. Copyright Law*, 49 UCLA L. Rᴇᴠ. 225 (2001)….14, 15

Justin Hughes, *Size Matters (or Should) in Copyright Law*, 75 Fᴏʀᴅʜᴀᴍ L. Rᴇᴠ. 575 (2005)……………………………………………………9

Nɪᴍᴍᴇʀ & Nɪᴍᴍᴇʀ, Nɪᴍᴍᴇʀ ᴏɴ Cᴏᴘʏʀɪɢʜᴛ (2014)………………………...………………………..…..……10, 22, 23, 25

POWELL ON REAL PROPERTY (Michael Allan Wolf, ed., 2009)………….19

HERBERT TIFFANY, TIFFANY REAL PROPERTY (3d ed. 1939)…………….18

## INTERESTS OF AMICI CURIAE

The authors of this brief are law professors who study and teach intellectual property law.

We submit this brief to assist the court in resolving the highly unusual circumstances posed by this case. It is often said that "hard cases make bad law." Arguments that have been put forward run the risk of distorting a wide range of cases. Furthermore, the court's prior decision in *Aalmuhammed v. Lee*, 202 F.3d 1227 (9th Cir. 2000), another hard case, unduly limits the range of authorship modes. This case provides the court an opportunity to clarify and rationalize the interpretation of authorship while providing a sound framework for resolving the dispute presented.

## SUMMARY OF ARGUMENT

This case presents a highly unusual and highly charged controversy, leading litigants and amici to put forward extreme solutions that risk distorting the copyright system. Not taking a position on the ultimate resolution of the controversy, we seek to clarify the legal principles under which the current dispute should be resolved.

The district court's brief order denying a preliminary injunction suffers from two critical errors: (1) its principal stated rationale—that Garcia lacks any cognizable copyright interest—rests on the flawed interpretation of copyright law's joint authorship doctrine set forth by a panel of this court in *Aalmuhammed v. Lee*, 202 F.3d 1227 (9th Cir. 2000); and (2) the district court's order does not address the balance of the equities or the public interest factors, making it impossible to evaluate the basis for its conclusion.

Many of the briefs submitted in this proceeding suggest that recognition of copyrightable interests in performances would produce a parade of horribles for internet service providers (ISPs) and the copyright system. While sympathetic to the concerns raised by ISPs, we do not believe these dire predictions are warranted. This case presents an exceedingly rare if not unprecedented scenario; there is little reason to believe that faithful interpretation of the Copyright Act and application of

fundamental copyright principles would produce unreasonable burdens on ISPs.

And if they did, those concerns are more properly directed toward Congress.

ARGUMENT

The posture of this appeal—reviewing a district court's denial of a preliminary injunction motion—has resulted in an inchoate record. Several elements, however, are not disputed by the parties (such as the duration of Garcia's performance) or are matters of public record (such as the Copyright Office's denial of registration). Based on that record, this court's limited role is to evaluate whether the district court abused its discretion in denying Garcia's requested relief.

In this brief, we question a key legal premise underlying the district court's decision. That decision turned principally on *Aalmuhammed v. Lee*, 202 F.3d 1227 (9th Cir. 2000), a precedent that we believe misconstrues copyright law's joint authorship doctrine in two critical ways: (1) by limiting ownership of jointly authored works to the person or persons who "masterminded" or "superintended" creation of the work; and (2) by holding that, absent contractual agreements to the contrary, jointly owned works, as tenancies in common, are owned co-equally. As to the first of these errors, the district court believed that Garcia's concession that she did not "superintend" the work defeats her copyright claim. Order Den. Pl. Garcia's Mot. for Prelim. Inj. 3 (Nov. 30, 2012) (hereinafter District Court Order).

We believe that the root of the problem rests with the 2000 *Aalmuhammed v. Lee* precedent. While we share that panel's view that Mr. Aalmuhammed's claim to a coequal share of the motion picture rights to the film *Malcolm X* was

4

preposterous, that panel's analysis misapprehended the Copyright Act and the

common law principles that it invokes. The *en banc* panel should take this

opportunity to clarify joint authorship doctrine.

Separately, the district court reinforced its opinion against Garcia with the

statement that "by operation of law Garcia necessarily (if impliedly) would have

granted the Film's author a license to distribute her performance as a contribution

incorporated into the indivisible whole of the Film," District Court Order 3 (citing

*Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 558-59 (9th Cir. 1990)), and noting

that "Garcia has introduced no evidence to the contrary." *Id.* While it appears that

Garcia alleged and offered evidence (which the district court rejected) that she was

duped into the performance, the extent to which she was defrauded may be

irrelevant to this case. To the extent that this case turns on an implied, non-

exclusive license being granted from Garcia to Youssef, it is black letter law that

such a non-exclusive license could not be transferred to YouTube. *Gardner v.*

*Nike, Inc.*, 279 F.3d 774, 778 (9th Cir. 2002).

Before reaching the question of joint authorship or an implied license to use

copyrighted material, it is necessary to consider whether Garcia's performance,

fixed in a tangible medium of expression, attracts copyright protection. In their

zeal to limit the exposure of ISPs to takedown notices by actors, Google and

various amici have suggested that performances are not eligible for copyright

protection. Section I addresses this faulty assertion and sets forth the foundational principles under which performances attract copyright protection.

With such a limited record, we cannot say whether the district court's ultimate decision to deny the preliminary injunction was an abuse of discretion. Although dramatic performances constitute original expression protectable by copyright, it may well be that Garcia's short performance on the film in question does not attract copyright protection at all because it does not attain even copyright law's low threshold of originality. Moreover, the balance of equities, including both the public interest and Ms. Garcia's interests, could well tip the balance in one direction or the other. *See Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008).

Our concern lies with the faulty legal standard that forms the basis for the district court's order.

I.    UNDER AMERICAN COPYRIGHT AN ACTOR'S DRAMATIC PERFORMANCE CAN CONSTITUTE ORIGINAL EXPRESSION THAT IS A COMPONENT OF A PROTECTABLE WORK OF AUTHORSHIP; NONETHELESS, GARCIA'S PERFORMANCE MAY BE TOO SHORT TO MERIT SUCH PROTECTION.

In 1998 Judi Dench won the Oscar for Best Supporting Actress for an eight minute performance in *Shakespeare in Love.* Twenty-two years earlier, Beatrice Straight won the Oscar for Best Supporting Actress for her six minute performance in *Network.* Under one of the theories Google advances in this case, neither of

6

these performances could rise to the level of authorship because each actress worked under a film director and "the creator of a work at another's direction, without contributing intellectual modification, is not an author." Google and YouTube, LLC's Petition for Rehearing *en banc*, March 12, 2014, at 14 (quoting *Kyjen Co., Inc. v. Vo-Toys, Inc.,* 223 F. Supp. 2d 1065, 1068 (C.D. Cal. 2002)). Google argues expressly that Ms. Garcia cannot be an author because she "had no creative control over the script or her performance," *id.* at 16—in other words, that dramatic performers are puppets on strings.

Neither courts nor the Copyright Office take such a narrow view of protectable original expression under U.S. copyright law. The fact that actors routinely consent to their work being owned *ab initio* as works made for hire in no way undermines the general principle that actors' performances constitute original expressions that, when embodied in a work fixed in a tangible medium, attract copyright protection for that work. In *Richlin v. Metro-Goldwyn-Mayer*, 531 F.3d 962, 970 (9th Cir. 2007), this court gave as examples of potential bases for co-authorship in the *Pink Panther* film: "Peter Sellers's legendary comedic performance, Henry Mancini's memorable score, or Blake Edwards's award-winning direction." Similarly, the Compendium of U.S. Copyright Office Practice unequivocally recognizes the dramatic performance of actors as a basis for authorship in an audiovisual work. Section 808.4 of the Compendium identifies

ten (10) "*Elements of Motion Picture Authorship*" in the following order: Production, Direction, Cinematography, **Performance**, Animation, Screenplay or Script, Works that Precede a Screenplay or Script, Editing, Musical Score, and Soundtrack. The Compendium further states, "Performance refers to the acting, speaking, singing, or dancing in a motion picture." COMPENDIUM OF U.S. COPYRIGHT OFFICE PRACTICE § 808.4(D) (2d ed. 1984) (hereinafter Compendium). In short, dramatic performances are protectable expression within a work of authorship, *e.g.* an audiovisual work or a sound recording.

All of this comports with an established feature of our copyright system: that the requisite level of creativity for original expression is "extremely low; even a slight amount will suffice." *Feist Publications v. Rural Telephone Service Co, Inc.*, 499 U.S. 340, 345 (1991). Justice Holmes' description of the originality standard law is as true today as it was a century ago: "Personality always contains something unique. It expresses its singularity even in handwriting, and a very modest grade of art has in it something irreducible, which is one man's alone. That something he may copyright unless there is a restriction in the words of the act." *Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 250 (1903). One does not need an Oscar-winning performance to have original expression protectable by copyright—a very modest grade of dramatic art will do.

That said, we recognize that it is possible that Garcia's five second performance falls short, quantitatively and qualitatively, of the low threshold of originality required for copyright protection. American copyright law has long recognized the principle that a contribution that is too short or too small may fail to cross the "modicum of creativity" threshold. As Benjamin Kaplan wrote in his classic exposition on copyright, "to make the copyright turnstile revolve, the author should have to deposit more than a penny in the box." BENJAMIN KAPLAN, AN UNHURRIED VIEW OF COPYRIGHT 46 (1967); *see* Compendium § 313.4(C) (single words and short textual phrases are not copyrightable), § 802.5(B) ("short musical phrases are not copyrightable because they lack a sufficient amount of authorship"), § 803.5(B) ("Short sound recordings may lack a sufficient amount of authorship to be copyrightable."); *see also* Justin Hughes, *Size Matters (or Should) in Copyright Law*, 75 FORDHAM L. REV. 575 (2005).

II. IN THE RARE CASE WHEN A DRAMATIC PERFORMANCE IS NEITHER A WORK MADE FOR HIRE NOR LICENSED (EXPRESSLY OR IMPLIEDLY) TO THE FILM PRODUCER, THE DRAMATIC PERFORMER MAY BE A CO-AUTHOR

Ms. Garcia's copyright authorship claim has elicited a wide spectrum of reactions. At one extreme is the claim that her performance qualifies as a stand-alone work subject to copyright protection. At the other end is the claim that an actor's performance contributes nothing in the way of copyrightable expression. We believe that the truth lies in the middle.

A helpful jumping-off point in this investigation emerges from Garcia's efforts to register her work. When "the question as to copyrightabilty forms the core of the dispute between the parties, . . . input from the Copyright Office—the governmental agency that possesses special expertise in determining the bounds of copyright protection—[can] be of great value." 2 NIMMER ON COPYRIGHT § 7.16[B][b][vi]. This case bears out that proposition. Guidance through this thicket comes from the Copyright Office's response to Ms. Garcia's registration effort. Associate Register of Copyrights Robert Kasunic accurately encapsulates governing law: "an actor or actress in a motion picture is either a joint author in the entire work or, as most often is the case, is not an author at all by virtue of a work made for hire agreement." Letter to Mr. M. Cris Armenta, Counsel to Ms. Garcia, from Robert J. Kasunic, Associate Register of Copyrights and Director of Registration Policy and Practices, U.S. Copyright Office (Mar. 6, 2014).

Under the unusual facts of this case, Ms. Garcia evidently did not render her services as either an employee in the scope of her employment or as a specially commissioned party who signed the requisite documentation, and did not validly transfer her copyright interests . On that basis, the initial operative question becomes whether she qualifies as a joint author of the resulting film.

In that context, the district court's decision grounds its denial of the preliminary injunction motion on Garcia's concession that she did not

"superintend" the work, defeating her copyright claim. District Court Order 3. This conclusion rests on the panel decision in *Aalmuhammed v. Lee*, 202 F.3d 1227 (9th Cir. 2000). We believe that this precedent misconstrues the Copyright Act.

In the absence of a work made for hire or express licensing arrangement, courts dealing with claims by contributors to a motion picture have adopted one of four divergent solutions. They have (i) denied the Islamic consultant who contributed of lines of dialog to the movie *Malcolm X* any protection owing to a lack of "control over the work," *Aalmuhammed v. Lee*, 202 F.3d 1227, 1235 (9th Cir. 2000); (ii) found the contributor of special effects for the horror film *The Stuff* to have granted the moviemaker an implied "non-exclusive license[]" to use and incorporate expression owned by the contributor, *Effects Assocs., Inc.*, 908 F.2d at 559; (iii) found the contributor to own her performance as a stand-alone work separate and apart from *Innocence of Muslims* and granted her equitable relief against the film producer, *Garcia v. Google, Inc.*, 743 F.3d 1258, 1263, 1269 (9th Cir. 2014), *opinion amended and superseded*, 766 F.3d 929 (9th Cir. 2014), *reh'g granted*, No. 12-57302, 2014 WL 5840553 (9th Cir. Nov. 12, 2014); or (iv) found the film producer to have mistakenly incorporated one quilt block owned by the contributor and used in the movie *How to Make an American Quilt*, but limited relief to the precise value of that incorporation, *Brown v. McCormick*, 87 F. Supp. 2d 467, 482-83 (D. Md. 2000), *aff'd*, 1 F. App'x 215 (4th Cir. 2001). The lack of

11

uniformity in the foregoing cases compromises the predictability of copyright protection.

### A. The Control Test Developed in *Aalmuhammed v. Lee* Misconstrues the Copyright Act

The Copyright Act defines a joint work as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101 (2012). Most courts have understood this definition to involve two requirements: (i) that each joint author make a copyrightable contribution to the work, and (ii) that both parties manifest an intention to be joint authors when making this contribution. *See, e.g.*, *Brownstein v. Lindsay*, 742 F.3d 55, 64 (3d Cir. 2014); *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1068-71 (7th Cir. 1994); *Childress v. Taylor*, 945 F.2d 500, 505-09 (2d Cir. 1991). In *Aalmuhammed*, however, the Ninth Circuit developed its own interpretation of the elements needed for joint authorship, focusing on the element of control. *Aalmuhammed*, 202 F.3d at 1234. The court there observed:

> [S]everal factors suggest themselves as among the criteria for joint authorship, in the absence of contract. First, an author "superintend[s]" the work by exercising control. This will likely be a person "who has actually formed the picture by putting the persons in position, and arranging the place where the people are to be-the man who is the effective cause of that," or "the inventive or master mind" who "creates, or gives effect to the idea." Second, putative coauthors make objective manifestations of a shared intent to be coauthors. . . . We say objective manifestations because, were the mutual intent to be determined by subjective intent, it could become an instrument of fraud, were one coauthor to hide from the other an intention to take sole credit for the work. Third, the audience appeal of the work turns

on both contributions and "the share of each in its success cannot be appraised." *Control in many cases will be the most important factor.*

*Id.* (emphasis supplied) (citations omitted).

The *Aalmuhammed* court's emphasis on "control" as the most important factor in the joint authorship analysis is inconsistent with the plain meaning, legislative history, and transparent logic of the Copyright Act's ownership regime. The Section 101 definition of "joint work" recognizes a wide range of collaborative working arrangements by requiring only that "the authors collaborated with each other, or if each of the authors prepared his or her contribution with the knowledge and intention that it would be merged with the contributions of other authors as 'inseparable or interdependent parts of a unitary whole.'" *See* H.R. REP. 94-1476, 120, 1976 U.S.C.C.A.N. 5659, 5736 (1976). The master-mind concept narrows the range of joint authors down to one or a few individuals for administrative convenience or to avoid unjustified windfalls, not out of fidelity to legislative intent.

Such an interpretation misses the broad and open-ended recognition of collaborative creativity that Congress intended. Undue emphasis on singular control ("*the* . . . mastermind") is antithetical to the very nature of *joint* authorship, which is an intrinsically collaborative exercise. The nature of a collaborative enterprise is such that at times different authors will exercise more control than the others over the work. *See* Shyamkrishna Balganesh, *Unplanned Coauthorship*,

13

100 VA. L. REV. 1683, 1738 (2014). To require a contributor to exercise equal "inventive" control in order to be a joint author is therefore unrealistic.

Second, under the control standard, it is impossible for contributing authors to know in advance whether they are exercising sufficient control over the unitary work while making their individual contributions. The joint authorship doctrine thereby becomes unpredictable, defeating the "paramount goal" of the 1976 Act. *See Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 749 (1989) (describing "enhancing predictability and certainty of copyright ownership" as Congress' "paramount goal" in the 1976 Act); F. Jay Dougherty, *Not a Spike Lee Joint? Issues in the Authorship of Motion Pictures under U.S. Copyright Law*, 49 UCLA L. REV. 225, 279 (2001). Third, in many cases the control test may directly conflict with the *Aalmuhammed* court's own proposed "audience appeal of the work" test: it is not difficult to think of motion pictures whose principal "audience appeal" is owed to a lead actor or a special effects team that would not qualify under the court's "the inventive or master mind" test. Indeed as this court has reasoned previously, "the tremendous success" of a film was likely "attributable in significant measure to, *inter alia*, the outstanding performances of its stars—Grace Kelly and James Stewart" even though they performed under "the brilliant directing of Alfred Hitchcock." *Abend v. M.C.A.*, 863 F.2d 1465, 1478 (9th Cir. 1988), *aff'd on other grounds*, 493 U.S. 990 (1989).

14

Finally and perhaps most importantly, thoughtful application of the control test raises the absurd possibility that, in some situations, none of the contributors to the work will qualify as an author. This possibility is especially likely with motion pictures, where the person exercising control over the final work (*e.g.*, the producer) often makes little copyrightable contribution to it, whereas the individual contributors of expression exercise no *ultimate* control over the movie as a whole. Under *Aalmuhammed*, then, "motion pictures can rarely be held to be joint works." Dougherty, *supra*, at 280.

Congress unambiguously intended for motion pictures to qualify as joint works when industry custom and practice, dependent on work made for hire, does not govern. *See* H.R. REP. 94-1476, 120 ("a motion picture would normally be a joint rather than a collective work with respect to those authors who actually work on the film."). Again, Copyright Office practices also support this view. Section 808.10(A)(3) of the Copyright Office Compendium states, "Under the Copyright Act, most motion pictures that are not works made for hire are considered joint works." Compendium § 808.10(A)(3).

Because *Aalmuhammed*'s reasoning draws the joint authorship circle too narrowly and undermines establishment of joint authorship in audiovisual works on predictable terms, the *en banc* panel should jettison emphasis on "control" and adopt in its place a test that focuses on two elements: (1) sufficient contribution by

15

each author;[1] and (2) mutual intent among the collaborators that they be joint authors. The first prong turns on the originality inquiry. The second prong focuses on mutual intent to collaborate in the development of a creative work. We note that this inquiry arises only in those circumstances in which the parties have not expressly contracted ownership, typically through the work made for hire doctrine.

Under such an approach, in the absence of contractual agreements, all principal creative collaborators in the production of a motion picture, sound recording, or other collaborative work would qualify as joint owners. This does not mean that every contributor to a collaborative project—such as a movie bit player or a background vocalist—automatically obtains joint authorship status. The joint authorship doctrine, as contemplated by Congress, requires mutual intent at the time that the work is produced that the creative contributors collaborate in a meaningful way. *See* H.R. REP. 94-1476, 120.

---

[1] Another clouded aspect of copyright law's joint works doctrine concerns the quantum required to make someone a joint author. Previously, a panel of this circuit held that, to qualify as a joint author, an individual's contribution had to be independently copyrightable. *See Ashton-Tate Corp. v. Ross*, 916 F.2d 516, 521 (9th Cir. 1990). Other circuits have reasoned that a joint author can be someone who contributes non-copyrightable ideas to a work that itself contains protectable expression from fellow joint authors. *See Gaiman v. McFarlane*, 360 F.3d 644, 659 (7th Cir. 2004) (Posner, J.). The dispute mirrors a dispute in the scholarly commentary, as discussed in those decisions. As this court has never confronted the issue *en banc*, it remains open here. Nonetheless, the issue does not squarely arise in the current case, inasmuch as Ms. Garcia's contribution consisted of expression rather than ideas.

16

The fact that some members of the creative enterprise have more power or control than others does not categorically exclude less powerful creative collaborators from joint authorship. When actors are cast for particularly significant roles, there is every reason to believe that they are not merely puppets. Congress could have declared that all motion pictures (or collaborative works generally) would be owned through contract or work made for hire status, but instead opted for a more flexible default regime; to assign all authorship to a master-mind reduces Congress's handiwork to a façade. Interpreting the statute so narrowly ignores the careful study and negotiation that went into crafting the Section 101 definitions and the Section 201 ownership default.

Part of the reason that the *Aalmuhammed* panel may have opted for its narrow conception of joint authorship was a mistaken concern that all joint owners are necessarily entitled to coequal sharing of the fruits of the collaborative enterprise. As the next section explains, neither Congressional intent nor the common law supports such a result.

### B. Joint Authorship Does Not Require Equal Ownership

*Aalmuhammed* and other prior decisions have denied contributors the status of joint authors out of concern that the result would encourage contributors to "overreach," thereby endangering sole authorship. *Aalmuhammed*, 202 F.3d at 1235; *Thomson v. Larson*, 147 F.3d 195, 200 (2d Cir. 1998). Central to this

17

concern is the belief that a finding of joint authorship requires giving each joint author a co-equal ownership stake in the work. *Brod v. Gen. Pub. Grp., Inc.*, 32 F. App'x 231, 234 (9th Cir. 2002) ("Under the Copyright Act of 1976, a copyright vests *equally* in its author or authors.") (emphasis supplied); *Thomson*, 147 F.3d at 199; *Childress*, 945 F.2d at 508. Neither the legislative history nor the background common law principles that Congress incorporated into its understanding of joint works, however, requires this result.

On the question of ownership of joint works, the Copyright Act provides that the "authors of a joint work are coowners of copyright in the work," and makes no mention of their ownership shares. 17 U.S.C. §201(a) (2012). The House Report accompanying the Act also contains no direct discussion of this point, and further elaborates, "[u]nder the bill, as under the present law, coowners of a copyright would be treated generally as tenants in common." H.R. REP. 94-1476, 121. The Act therefore intended to perpetuate the existing rule that joint authors were to be treated as tenants in common in their ownership of the joint work.

It is well recognized that tenants in common "need not have equal shares in the property." 2 HERBERT TIFFANY, TIFFANY REAL PROPERTY § 426 (3d ed. 1939). Tenants in common are presumed to have equal coownership shares only in the absence of a contrary intention or of circumstances suggesting otherwise. *Id.* at § 426 (noting how tenants in common are "presumed to take equal shares in the

absence of evidence of a contrary intention"); 7 POWELL ON REAL PROPERTY § 50.02[5] (Michael Allan Wolf, ed., 2009), ("The undivided fractional shares held by tenants in common are usually equal and are presumed to be equal unless circumstances indicate otherwise.").

Evidence of such contrary intention may be obtained from circumstances surrounding the creation of the coownership interest, such as unequal contributions to the purchase price. *See, e.g.*, *Anderson v. Broadwell*, 6 P.2d 267 (Cal. Ct. App. 1931) ("In the absence of other controlling facts, the respective interests must be determined by the relative proportion of the purchase price paid by each"); *Cudmore v. Cudmore*, 311 N.W.2d 47, 49 (S.D. 1981) ("This presumption is rebuttable, however, by a showing of unequal contribution…[and] raises a new presumption that the grantees intended to share in proportion to their contribution." (citation omitted)); *Cummings v. Anderson*, 614 P.2d 1283, 1287 (Wash. 1980) ("[W]hen in rebuttal it is shown that they contributed unequally to the purchase price, a presumption arises that they intended to share the property proportionately to the purchase price." (citation omitted)).

As the Supreme Court has reiterated, in interpreting the Copyright Act courts should presume that Congress intended copyright law to conform to prior common law rules and principles. *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351, 1363 (2013) ("'[W]hen a statute covers an issue previously governed by the

common law,' we must presume that 'Congress intended to retain the substance of the common law.'" (quoting *Samantar v. Yousuf*, 560 U.S. 305, 321 n.13 (2010))); *Cmty. for Creative Non-Violence*, 490 U.S. at 740. It follows that when Congress chose to impose the structure of a tenancy in common on joint authors, Congress should be presumed to have intended to perpetuate the common law's rules for determining the tenants' relative ownership shares for joint authors. While joint authorship thus creates a tenancy in common it does not mandate equal ownership shares, especially when parties have made unequal contributions to the work.

A court may therefore presume equal ownership shares in a joint work only when each author has made an equal contribution. In cases where the authors have each made disparate copyrightable contributions to the work, the authors' ownership shares should be determined in relative proportion to their individual contributions, as dictated by the common law.

To illustrate, if the maker of the Marriage Block quilt that was incorporated into the *American Quilt* film without permission were deemed a joint author, then it is plausible that her share of the film's value was properly limited to ".0001176% of the total value of the Movie." *Brown*, 87 F. Supp. 2d at 483 (awarding $2.35 from $2 million earned by Steven Spielberg's Amblin' Entertainment). And if Mr. Aalmuhammed were deemed a joint author, then his contribution of a few lines of dialog used without permission might reasonably have entitled him to a similar

20

tiny fraction of the proceeds of *Malcolm X*, rather than the massive share that his overreaching complaint demanded or the 0% that this court actually awarded him. By the same token, the special effects artists whose handiwork was used without permission in *The Stuff* could have recovered the fractional value that its contribution added to the film as a whole.

* * * * *

For these reasons, the district court was led astray by the *Aalmuhammed* precedent. Under a faithful interpretation of the joint authorship doctrine, the Court should evaluate two issues: (1) Did Ms. Garcia contribute copyrightable expression to the film in question? and (2) Was there mutual intent that she be a joint author? Given the rather limited role that she played in the work, there is good reason to be skeptical that she qualifies as a joint author.[2] Nonetheless, given the inchoate state of the record, it may be appropriate for this court to remand the matter for reconsideration under the proper joint authorship test.

---

[2] We note that the House Report accompanying the 1976 Act suggests that Congress did not intend to altogether foreclose the possibility that in exceptional circumstances, actors might obtain protection otherwise than as joint authors. *See* H.R. Rep. 94-1476, 120 ("It is true that a motion picture would normally be a joint rather than a collective work with respect to those authors who actually work on the film, although their usual status as employees for hire would keep the question of co-ownership from coming employees for hire would keep the question of co-ownership from coming up.").

### C. Existing Copyright Law Is Structured to Accommodate Works of Joint Authorship

This Court is warned that a parade of horribles will inevitably ensue should actors be recognized as potential contributors of copyrightable expression to motion pictures. We believe that those dire predictions are unfounded.

As set forth above, the notion that a qualifying performer has contributed copyrightable expression to a sound recording or motion picture is anything but new. In the normal course of affairs, all rights to the contributions of those performers are consolidated with the producers, by virtue either of the work made for hire doctrine or by assignment. Such performers themselves have no independent copyright interest to vindicate. But, even in the unusual case in which the performer retains her right as a joint owner, copyright doctrine already accommodates the results without disruption.

First, it is common ground in the various submissions to this court that one joint owner may license the resulting product without permission from a fellow joint owner, and that no joint owner can be liable to its fellow joint owners for copyright infringement. As a result, to the extent that Garcia were found to be a co-owner and her fellow co-owner Youssef uploaded *Innocence of Muslims* to YouTube, he did not infringe any right belonging to Garcia.

Second, the Digital Millennium Copyright Act balances the implicated interests by immunizing online service providers from liability for material

uploaded to their service when they follow the prescribed procedures. 17 U.S.C. § 512 (2012). When the producer of a film uploads it to an online service, the statute itself sets forth the governing procedures. 4 NIMMER ON COPYRIGHT § 12B.07[B][3]. In brief, any joint owner may serve a takedown notice on the online service; the service must inform the producer who uploaded the work about the takedown notice and give him an opportunity to file a counter-notification; if only a takedown notice is served, the online service must disable the contested material; if it receives both a takedown notice and a counter-notification, then it should put that material back and have the parties take their dispute to a competent court, which can resolve the matter. *Id.*

In the aberrant facts of this case, evidently Youssef has been incarcerated since uploading *Innocence of Muslims* and nobody has filed the requisite counter-notification to Garcia's takedown notices. Those highly idiosyncratic circumstances do not call forth the need for any deforming interpretation of the law.

III.  PROOF OF FRAUD IS NOT AN ISSUE IN THIS CASE, AS IT EXERTS NO EFFECT ON GOOGLE'S DEFENSE OF IMPLIED LICENSE.

A large part of Garcia's complaint details the alleged misrepresentations that she suffered at the hands of the filmmaker whom she labels a "convicted fraudster" Br. of Appellant Cindy Lee Garcia, Dkt. No. 5, at 27 (Jan. 18, 2013). Although those charges certainly paint a distinctive color to her case, it is important to focus

23

here on their effect on copyright doctrine: They purportedly vitiate an implied license; but that implied license actually plays no operative role in this case. Those allegations can therefore drop out of further consideration.

Based on the analysis of non-exclusive licenses implied from conduct in *Effects Associates, Inc. v. Cohen*, the panel opinion agreed "with Google that Garcia granted Youssef an implied license." The panel then concluded that "Youssef exceeded the bounds of any license [when] he lied to Garcia and held that "Youssef's fraud alone is likely enough to void any agreement he had with Garcia." Were the current appeal from a fictive ruling in *Garcia v. Youssef*, those considerations might be apropos.

But the current case is *Garcia v. Google*. To the extent that an implied license from Garcia can play any role in this litigation, the syllogism encapsulating the parties' logic must run as follows:

(a)     By acting in *Innocence of Muslims*, Garcia conveyed a non-exclusive license to Youssef by her conduct;

(b)     By uploading *Innocence of Muslims* to YouTube, Youssef transferred to Google the right to exploit the film in all regards, including his non-exclusive license from Garcia;

(c)     Therefore, Google has a non-exclusive license from Garcia that defeats her copyright infringement claim.

24

In response to this argument, Garcia replies that she was defrauded, vitiating any implied license.

But there is a more basic flaw in the syllogism:  it is the bedrock proposition that copyright non-exclusive licenses are non-transferable as a matter of law.  *See Gardner*, 279 F.3d at 778 ("Unlike an assignee, a licensee 'had no right to resell or sublicense the rights acquired unless he had been expressly authorized so to do so.'" (quoting 3 NIMMER ON COPYRIGHT § 10.01[C][4])); *ITOFCA, Inc. v. MegaTrans Logistics, Inc*., 322 F.3d 928, 941 (7th Cir. 2003) (Ripple, J., concurring) ("a nonexclusive license cannot be transferred without permission of the copyright owner" (citing 3 NIMMER ON COPYRIGHT § 10.02[C][4])). Accordingly, premise (b) of the foregoing syllogism is wrong as a matter of law. Google cannot be the beneficiary of an implied nonexclusive license granted to a third party.

Given the black letter law, there is no reason to reach the alleged fraud. Whether Garcia was drugged, duped, or defrauded has no bearing on Google, which lacks any direct license from her and cannot rely derivatively on any third party's non-exclusive license (such as the one purportedly granted to Youssef).

If the operative theory in this case against Google were that it was vicariously or contributorily responsible for the direct copyright infringement committed by Youssef, then it could be relevant to determine whether Youssef

himself possessed an implied license that negated his own liability (and, derivatively, Google's). But the First Amended Complaint asserts no such theory. Instead, its First Cause of Action alleges that Google committed direct copyright infringement, setting forth lengthy allegations regarding YouTube's direct conduct. First Am. Compl. ¶ 44. Its Second Cause of Action alleges that users of YouTube have committed direct copyright infringement and that the service is indirectly responsible for their conduct on a variety of theories. *Id.* at ¶¶ 53-56. No one alleges that Garcia gave an implied license to those YouTube users that might negate their direct liability (and, derivatively, Google's). For these reasons, the alleged fraud perpetrated on Ms. Garcia remains of no moment to the issues presented in this case.

## CONCLUSION

By realigning Ninth Circuit law with Congressional intent in crafting the 1976 Act, the court can provide a sound basis for resolution of this present case along with future disputes involving joint authorship.

25 November 2014

Respectfully submitted,
/s/ *Justin Hughes*
JUSTIN HUGHES
*Counsel for Amici Curiae*
WILLIAM H. HANNON PROFESSOR OF LAW
LOYOLA LAW SCHOOL
919 Albany Street
Los Angeles, California 90015
(213) 736-8108

26

Justin.hughes@lls.edu

SHYAMKRISHNA BALGANESH
PROFESSOR OF LAW
UNIVERSITY OF PENNSYLVANIA LAW SCHOOL
3501 Sansom Street
Philadelphia, PA 19104
(215) 573-7780
sbalganesh@law.upenn.edu

PETER MENELL
KORET PROFESSOR OF LAW AND DIRECTOR
BERKELEY CENTER FOR LAW
&TECHNOLOGY
UC BERKELEY SCHOOL OF LAW
Boalt Hall
Berkeley, CA 94720
(510) 642-5489
pmenell@law.berkeley.edu

DAVID NIMMER
PROFESSOR FROM PRACTICE
UCLA SCHOOL OF LAW
385 Charles E. Young Drive East
1242 Law Building
Los Angeles, CA 90095
nimmer@law.ucla.edu

CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and Ninth Circuit Rule 32-1, I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A), because it is written in 14-point Times New Roman font, and with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) and this Court's Order of March 13, 2014 Order, ECF No. 61, because it contains 5,989 words, excluding the portions excluded under Fed. R. App. P. 32(a)(7)(B)(iii). This count is based on the word-count feature of Microsoft Word.

DATED: November 25, 2014

*/s/ Justin Hughes*
*Counsel for Amici Curiae*

CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on November 25, 2014.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that, for any participants in the case who are not registered CM/ECF users, I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days.

DATED: November 25, 2014          */s/ Justin Hughes*
                                  *Counsel for Amici Curiae*