NOS. 12-57302

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

CINDY LEE GARCIA,

PLAINTIFF-APPELLANT,

V.

GOOGLE, INC., YOUTUBE LLC, et al.,

DEFENDANTS-APPELLEES,

AND

NAKOULA BASSELEY NAKOULA, an individual, a.k.a. Sam Bacile, et al.,

DEFENDANTS.

On Appeal From The United States District Court
for the Central District of California
D.C. No. 2:12-cv-08315-MWF-VBK

The Honorable Michael W. Fitzgerald, District Court Judge

**BRIEF OF AMICI CURIAE FLOOR64 INC. AND ORGANIZATION FOR
TRANSFORMATIVE WORKS IN SUPPORT OF DEFENDANTS-
APPELLEES**

Catherine R. Gellis, Esq.
P.O. Box #2477
Sausalito, CA 94966
Telephone: 202-642-2849
Email: cathy@cgcounsel.com

*Counsel for Amici Curiae*

## DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER ENTITIES WITH A DIRECT FINANCIAL INTEREST IN LITIGATION

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, both *amicus curiae* Floor64 Inc. and *amicus curiae* Organization for Transformative Works state that they do not have a parent corporation, and that no publicly held corporation owns 10% or more of the stock of either *amicus*.

# TABLE OF CONTENTS

STATEMENT OF INTEREST ................................................................. 1

INTRODUCTION .............................................................................. 2

ARGUMENT .................................................................................... 3

I.     CONGRESS FORECLOSED THE PANEL'S ORDER. ................................... 3

A.     SECTION 230 PRECLUDED THE INJUNCTION ........................................... 4

B.     THE DMCA ALSO PRECLUDED THIS INJUNCTION. ................................. 7

II.    ENJOINING GOOGLE FRUSTRATES CONGRESS'S INTENT TO PROMOTE ONLINE FREE SPEECH BY PROTECTING INTERMEDIARIES. ............................... 9

A.     WHEN INTERMEDIARIES HAVE TO FEAR LIABILITY FOR USER-GENERATED CONTENT, IT HARMS PUBLIC DISCOURSE. ............................................. 9

B.     THE INJUNCTION AGAINST GOOGLE SIGNALS THAT INTERMEDIARIES NOW NEED TO FEAR LIABILITY FOR HOSTING USER-GENERATED CONTENT. ...... 16

CONCLUSION ................................................................................. 17

# TABLE OF AUTHORITIES

**Cases**

*Barnes v. Yahoo, Inc.* 570 F.3d 1096 (9th Cir. 2009)..............................................10

*Blockowicz v. Williams*, 630 F. 3d 563 (7th Cir. 2010) .............................................4

*Delfino v. Agilent Techs., Inc.*, 52 Cal. Rptr. 3d 376 (Ct. App. 2006) ....................10

*Fair Housing Council of San Fernando Valley v. Roommate.com*, 521 F. 3d 1157

  (9th Cir. 2008) ....................................................................................................5, 6

*Klinger v. Conan Doyle Estate*, 761 F.3d 789 (7th Cir. 2014)................................12

*Perfect 10, Inc. v. CCBill LLC*, 488 F. 3d 1102 (9th Cir. 2007) ........................8, 11

*Scott v. WorldStarHipHop, Inc.,* 102 U.S.P.Q.2d 1725 (S.D.N.Y. 2012)........ 11, 15

*UMG Recordings, Inc. v. Shelter Capital Partners*, 718 F. 3d 1006 (9th Cir. 2013)

  ...........................................................................................................................8, 9

*Zeran v. America Online, Inc.*, 129 F.3d 327, 330-31 (4th Cir.1997)....................10

**Statutes**

17 U.S.C. § 107.........................................................................................................9

17 U.S.C. § 512......................................................................................................2, 7

17 U.S.C. § 512(c)(1).................................................................................................7

17 U.S.C. § 512(c)(3)(A)(v) ......................................................................................8

17 U.S.C. § 512(g)(3)...............................................................................................13

17 U.S.C. § 512(j)(1)(A)(i) ........................................................................................8

17 U.S.C. § 512(j)(1)(A)(ii) .......................................................................................8

iii

17 U.S.C. § 512(j)(1)(A)(iii) ....................................................................8

17 U.S.C. § 512(m)(1) ..............................................................................8

47 U.S.C. § 230 .........................................................................................2

47 U.S.C. § 230(a)(1) ................................................................................3

47 U.S.C. § 230(a)(3) ................................................................................3

47 U.S.C. § 230(b)(1) ..............................................................................10

47 U.S.C. § 230(b)(2) ..............................................................................10

47 U.S.C. § 230(c)(1) ................................................................................4

47 U.S.C. § 230(c)(2)(a) ...........................................................................5

47 U.S.C. § 230(e)(3) ..............................................................................10

## Other Authorities

Alex Hern, *WordPress pulls interview with anti-gay group Straight Pride UK*, The Guardian (Aug. 13, 2013) http://www.theguardian.com/technology/2013/aug/13/wordpress-straight-pride-uk ...............................................................................................15

Center for Democracy & Technology, *Campaign Takedown Troubles: How Meritless Copyright Claims Threaten Online Political Speech* (Sept. 2010), http://www.cdt.org/files/pdfs/copyright_takedowns.pdf ....................................12

Paul Sieminski, *Striking Back Against Censorship*, (Nov. 21, 2013) http://en.blog.wordpress.com/2013/11/21/striking-back-against-censorship/ .....13

S.Rep. No. 105-190 (1998) .......................................................................7

iv

## STATEMENT OF INTEREST

*Amicus* Floor64 Inc. is a corporation that regularly advises and educates innovative technology startups on a variety of issues, including intermediary liability and the important free speech aspects of safe harbors. Floor64's online publication, Techdirt.com, includes over 50,000 discussions on similar topics, totaling more than one million third party comments, and regularly receives over 3 million monthly impressions. The site depends on the statutory protection for intermediaries to enable the robust public discourse found on its pages.

*Amicus* Organization for Transformative Works ("OTW") is a 501(c)(3) nonprofit dedicated to protecting and preserving noncommercial works created by fans based on existing works, including popular television shows, books, and movies. OTW's nonprofit website hosting transformative noncommercial works, the Archive of Our Own ("AO3"), has over 400,000 registered users and receives upwards of 60 million page views per week. OTW submits this brief to make the Court aware of the impact of its decision upon nonprofit intermediaries that facilitate transformative speech and the users whose speech they facilitate.

Pursuant to Federal Rule of Appellate Procedure 29(c)(5), no one, except for undersigned counsel, has authored the brief in whole or in part, or contributed money towards the preparation of this brief. Pursuant to Federal Rule of Appellate Procedure 29(a), all parties have consented to the filing of this brief.

1

## INTRODUCTION

There is no dispute that Plaintiff Garcia has been victimized by Defendant Nakoula, first by being fraudulently coerced into enabling his inflammatory cinematic project without her awareness or consent, and then by wrongfully being held accountable by people who construe religious insult as a justification for violence. Ms. Garcia appealed to the courts to remediate her injury, including by forcing Google to remove from the world all evidence of it.

But courts can only provide remedies the law allows, and here the law explicitly restricted those remedies that could be imposed on intermediaries like Google, for good reason. Congress deliberately insulated them from both monetary and equitable remedies with respect to content others put on their systems when it enacted 47 U.S.C. § 230 ("Section 230") and the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512, as part of a conscious effort to protect and advance online public discourse. By nonetheless providing Ms. Garcia the remedy she sought, just though contravening these statutes may have seemed under these circumstances, the Panel undermined Congress's goal of fostering online speech by effectively stripping intermediaries of the statutory protection they depend on to deliver content others create. As a result the Panel has made all user-created content, no matter how valuable, vulnerable to the censorious whims of others, no matter how illegitimate.

This Court should therefore rescind the order requiring Google to "take down all copies" and "take all reasonable steps to prevent further uploads" of the offending content in light of Congress's express prohibition against such a command and the deleterious effect of this order on the public discourse Congress endeavored to protect.

## ARGUMENT

**I.    Congress statutorily foreclosed the Panel's order.**

The Internet would be nothing without its intermediaries.  Intermediaries are what carry, store, and serve every speck of information that makes up the Internet. From the banal to the erudite, every single thing the world relies on the Internet to provide exists only because some site, server, or system has intermediated that content so the world can have access to it.

Congress understood this value, finding that "[t]he rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens," § 230(a)(1), and that "[t]he Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity."  § 230(a)(3).

To ensure that intermediaries could continue to provide this benefit Congress enacted two statutes, Section 230 and the DMCA, each of which furthers the specific bargain struck by Congress to foster online discourse by shielding intermediaries from liability arising in content others use their systems to disseminate. Although they work in different ways – Section 230 by default and the DMCA more conditionally – they both preclude the injunctive relief the Panel imposed.

### A. Section 230 precluded the injunction.

Section 230 is unequivocal in the immunity it provides intermediaries, standing for the proposition that they are only responsible for what they themselves communicate through their systems, not what others use them for. § 230(c)(1) ("No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."). This immunity not only relieves intermediaries for monetary damages claims arising from the content appearing on their systems, but it also prevents them from being compelled to modify or delete that content (provided it had been supplied by others, as is the case here). *Blockowicz v. Williams*, 630 F. 3d 563, 568 (7th Cir. 2010) (finding Federal Rule of Civil Procedure 65 precludes "an injunction so broad as to make punishable the conduct of persons who act independently and whose rights have not been adjudged according to law.").

While Section 230's bright-line rule may sometimes mean that unsavory content can linger online when the intermediary opts not to delete it, it reflects a conscious choice by Congress. While it desired to have intermediaries assist in keeping less desirable content off the Internet, it deliberately pursued a more-carrot-than-stick approach to achieving this end, allowing them to exercise discretion over the content others posted to them rather than requiring them to. In addition to immunizing intermediaries for the content they host or transmit, thereby freeing them to expend their scarce resources policing only the content that most needed it, Section 230 also immunized them from liability for removing content, thus further reducing the costs of policing it. § 230(c)(2)(a) ("No provider or user of an interactive computer service shall be held liable on account of any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected…"); *see also Fair Housing Council of San Fernando Valley v. Roommate.com*, 521 F. 3d 1157, 1163-64 (9th Cir. 2008).

Although this statute is by design, not an impervious shield preventing undesirable content from remaining online, it reflects the specific policy choice necessary to ensure that the greatest amount of less-desirable content could still be deleted without also risking the prospective removal of legitimate content too. The

Panel's decision, however, upends this balance and raises the costs of intermediating content by making questions of intermediaries' statutory immunity subject to post hoc analysis. Even in cases like this one, where the content in question is noxious, Section 230 provides for no exception from its coverage, nor can the defects of the content provide any justification for denying intermediaries the discretion Section 230 immunity affords them. On the contrary, for Section 230 to provide any meaningful protection intermediaries have to be able to rely on it in the hard cases as much as the easy ones. Exceptions to this immunity cannot be borne without eviscerating it entirely. *See id.* at 1174.

But such would be the result if courts could succumb to the temptation to strip intermediaries of their immunity simply because any particular user-generated content is odious. It would be the judicial equivalent of shooting the messenger who has carried a message someone else sent based solely on the content of that message, and, worse, as in this case, simply because of the boorish behavior of society's lesser angels in response to it. If too many intermediaries find themselves facing such dire consequences for delivering others' content, soon none will be left willing to deliver any more.

Yet that result is what this Panel has risked in ignoring Section 230's protections in order to enjoin Google. The order provides a workaround to

ordinary intermediary law for any person who claims that her factual situation warrants an exception. For this reason this Court should rescind the injunction.

### B. The DMCA also precluded this injunction.

Even if Ms. Garcia did have a valid copyright in the film, the remedy ordered by the Panel to "take down all copies" and "take all reasonable steps to prevent further uploads" goes beyond what Congress permitted be compelled of Google.

Although Congress did exempt intellectual property claims from Section 230's broad immunity, § 230(e)(2), it did not want intermediaries to necessarily be liable for the copyright infringement that might be manifest in the content it hosted at the direction of others. S.Rep. No. 105-190, at 8 (1998). As with Section 230, Congress understood that if it wanted intermediaries to remain available to facilitate users' expression it needed to craft a law that aligned everyone's interests by ensuring intermediaries had sufficient protection from litigation and liability with respect to that expression. *Id.* at 20.

To meet this policy objective Congress amended the copyright statute with the DMCA. 17 U.S.C. § 512. Part of the protection it offers to intermediaries, in addition to relief from monetary damages, is a limit on injunctive exposure. § 512(c)(1) ("A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief…"). The only

injunctions courts could issue to a DMCA safe harbor-eligible intermediary were limited to (1) disabling access "to infringing material or activity *residing at a particular online site* on the provider's system or network," § 512(j)(1)(A)(i), (2) terminating specifically-identified users, § 512(j)(1)(A)(ii), or (3) "[s]uch other injunctive relief as the court may consider necessary to prevent or restrain infringement of copyrighted material specified in the order of the court *at a particular online location…*" § 512(j)(1)(A)(iii) (emphasis added). All of these limitations therefore preclude the broad injunction issued by the Panel to "take down all copies" everywhere.

Furthermore, the DMCA explicitly relieves intermediaries from having to police for infringing content. § 512(m)(1); *see also Perfect 10, Inc. v. CCBill LLC*, 488 F. 3d 1102, 1114 (9th Cir. 2007). Thus the order to "take all reasonable steps to prevent further uploads" imposes a duty on Google that goes far beyond what Congress contemplated being appropriate and at the expense of the same free speech concerns that Congress worried about in the Section 230 context. Under the DMCA an intermediary only needs to take down specific copies of content that were not "authorized by the copyright owner, its agent, or the law." § 512(c)(3)(A)(v); *see also UMG Recordings, Inc. v. Shelter Capital Partners*, 718 F. 3d 1006, 1021-22 (9th Cir. 2013). But copyright analysis is inherently contextual; the question is never as simple as whether a copy has been made, but

8

whether the specific copy has been made without entitlement, something the intermediary is least equipped to know. *Id.* Some copies may, for example, have been posted by other individuals under the principles of fair use, a particularly salient concern here given the immense public discussion this controversy has spawned. *See id.* In nevertheless ordering Google to prevent the existence of each and every possible copy, whether infringing or not, the Panel has ignored the statutory limitations imposed by the DMCA and 17 U.S.C. § 107, the portion of the Copyright Act governing fair use, in contravention of the First Amendment principles enshrined in the latter and general desire of Congress to encourage online discourse by protecting intermediaries through the former.[1]

## II. Enjoining Google frustrates Congress's intent to promote online free speech by protecting intermediaries.

### A. When intermediaries have to fear liability for user-generated content, it harms public discourse.

When intermediaries' immunity is not robust, the vibrant marketplace of ideas they enable is compromised. This harm has already been evidenced by attempts to exploit the intellectual property exception to Section 230's applicability to circumvent the immunity it otherwise provides intermediaries.

---

[1] It is worth noting that Garcia then moved to hold Google in contempt for allegedly failing to perfectly police its entire network. While the panel denied the motion (without explaining its reasoning), Google was put to the expense and uncertainty of risking a contempt finding and litigating the motion. Not all intermediaries can afford such extensive proceedings. But the panel's ruling did not state a principle of law that would only apply to Google.

The problem generally arises because Congress specifically pre-empted state law claims with Section 230. § 230(e)(3) ("No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."). The ability for Section 230 immunity to trump state claims is particularly important to furthering Section 230's language and legislative goals because the Internet inherently extends across every state jurisdiction. Were each state permitted to interfere with this immunity intermediaries would be subject to myriad and potentially conflicting legal requirements, which would undermine Congress's intent to "to promote the continued development of the Internet and other interactive computer services and other interactive media," § 230(b)(1), by letting them be "unfettered by Federal or State regulation." § 230(b)(2); *see also Delfino v. Agilent Techs., Inc.*, 52 Cal. Rptr. 3d 376, 387 (Ct. App. 2006) ("[The purpose of Section 230 is to] avoid the chilling effect upon Internet free speech that would be occasioned by the imposition of tort liability upon companies that do not create potentially harmful messages but are simply intermediaries for their delivery."); *Zeran v. America Online, Inc.*, 129 F.3d 327, 330-31 (4th Cir.1997).[2]

---

[2] Although in *Barnes v. Yahoo, Inc.,* this Circuit did find an intermediary liable under state law, *Barnes* hinged on a distinctive fact pattern. 570 F.3d 1096, 1098-99 (9th Cir. 2009). In that case the intermediary had promised to delete content and then did not. *Id.* Its liability arose under a theory of promissory estoppel connected to its own actions with respect to affirmatively adopting responsibility for the content unconnected to its role as a neutral conduit for it. *Id.* at 1106-1109.

In light of Section 230 putting user-generated content beyond the reach of court orders for deletion, plaintiffs often try to bypass its reach by recasting their state law claims, for which intermediaries would be immune from requirements to take it down, as intellectual property claims, for which intermediaries are not. § 230(e)(2). This Circuit has long held that this exception from Section 230's ordinarily-applicable immunity refers only to federal intellectual property and not any state-created quasi-intellectual property claims Ms. Garcia may legitimately have against Nakoula arising from his film. Pursuant to Section 230's language and legislative goals, Google is immune from such claims. *CCBill*, 488 F. 3d at 1118-19 ("[P]ermitting … any particular state's definition of intellectual property to dictate the contours of this federal immunity would be contrary to Congress's expressed goal of insulating the development of the Internet from the various state-law regimes.").

But because this exemption clearly applies to federal copyright claims it can be dangerously easy for people to censor content they don't like by framing their displeasure as a copyright claim, however speciously, because doing so targets the intermediary's non-Section-230-immune Achilles heel. *See*, *e.g.*, *Scott v. WorldStarHipHop, Inc.,* 102 U.S.P.Q.2d 1725 (S.D.N.Y. 2012) (involving a plaintiff claiming copyright in video in which he was shown assaulting a woman in order to force a website to delete the video). Rationally risk-adverse intermediaries

11

are therefore inclined to over-censor potentially important public discourse in order to avail themselves of the lesser, conditional protection of the DMCA and avoid the specter of being held liable for content someone else provided.

The Panel's order has exacerbated the problem by setting a dangerous precedent that disrupts the already shaky balance of the DMCA's notice and takedown system. The lesson here is that intermediaries will now need to remove any content any takedown notice demands be deleted, no matter how questionable the claim, lest they risk unexpectedly burdensome relief being awarded against them. The implications of this ruling on those who depend on intermediaries to enable their speech is thus extremely chilling.

In addition to the *WorldStarHipHop* case cited above, numerous other examples already evince how the existing notice-and-takedown system is subject to abuse by those who would use it to attempt to demand content be removed. *See, e.g., Klinger v. Conan Doyle Estate*, 761 F.3d 789, 790-91 (7th Cir. 2014) (describing how effective the mere threat to have material removed from Internet is in causing it to be removed, despite speciousness of underlying copyright claim). *See also* Center for Democracy & Technology, *Campaign Takedown Troubles: How Meritless Copyright Claims Threaten Online Political Speech* (Sept. 2010), http://www.cdt.org/files/pdfs/copyright_takedowns.pdf (describing how broadcasters sent DMCA takedown notices to remove political ads from a number

of campaigns without considering fair use and finding that such removal chilled political speech). These efforts at censorship would succeed even more often than they do were it not for intermediaries' efforts to filter out those of questionable legitimacy. *See*, *e.g.*, Paul Sieminski,[3] *Striking Back Against Censorship*, (Nov. 21, 2013) http://en.blog.wordpress.com/2013/11/21/striking-back-against-censorship/ ("We receive hundreds of DMCA notices and try our best to review, identify and push back on those we see as abusive."). Although the DMCA includes a counter-notification process, § 512(g)(3), this process is insufficient to protect speech, given the realities facing laypeople who post important political material:

> "Our users have the right to challenge a DMCA complaint too, but doing so requires them to identify themselves and fill out a legally required form saying that they submit to being sued for copyright infringement in a place that may be far away. If they don't, their content is taken down and could stay down forever. This tradeoff doesn't work for the many anonymous bloggers that we host on WordPress.com, who speak out on sensitive issues like corporate or government corruption. Given the legal landscape, it's no wonder that we've seen an increased number of improper notices."

Sieminski, *supra*.

Ultimately, online speech is only protected by intermediaries being able to rely on their DMCA protection to insulate their users' speech from undue censorship. But if filtering out abusive notices jeopardizes the intermediary's DMCA protection, miscreants will be able to further abuse the notice-and-

---

[3] General Counsel of Automattic, Inc., the company hosting the WordPress blogging platform.

takedown system to censor legitimate content, as well as interfere with the legitimate copyrights of others, because intermediaries will be even more inclined to over-censor potentially important public discourse in order to protect themselves. The price of their self-preservation will be the important public interest Congress sought to protect when it codified both Section 230 and the DMCA. In passing these laws Congress recognized that the public also has an interest in having access to online speech and the subsequent discourse it spawns, but when a copyright claim can be used as a virtual delete button the public loses out on that benefit. It is thus crucially important that courts not aid and abet these attempts at censorship, even in cases with troubling content like this one.

In fact, rather than justifying Ms. Garcia's attempt to evade Section 230's intermediary protection the facts of this case actually serve to validate its applicability. As this Court itself noted in creating the special docket page for this case there is an above average level of interest in it. Nearly every aspect is a matter of public concern, from the abuse by Nakoula, to the abuse wrought by Ms. Garcia's attackers, to the effect this case may have on future speakers, intermediaries, and speech itself. Striking from the public record all evidence of the film (to the extent the injunction against Google would actually achieve this end) won't make it cease to exist or the matter any less important. This bell cannot be un-rung, and attempting to do so by putting the squeeze on the intermediary

serves only to chill public discussion, not only with regard to this matter but any future matters involving determined plaintiffs tempted to mask their state law claims under the guise of copyright.

Resisting that attempt here is especially important given how vital video evidence in particular has become to modern public discourse, exposing crime, hypocrisy, and other important events. Yet if a person's physical appearance in footage gives her a claim of copyright in a performance sufficient to survive a motion to dismiss, then the rational response of anyone who objects to showing up in video—whether it's a politician flubbing an easy question; a police officer whose filmed encounter with a citizen ends badly; or a sports star behaving outrageously—will be to claim copyright in a deliberate "performance" and send a DMCA notice, evading Section 230's bar against these sorts of demands that would otherwise apply.[4] Indeed, a ruling allowing even worthy victims like Ms. Garcia to force intermediaries to destroy all record of their victimization actually gives future wrongdoers the tools to suppress evidence and commentary about their wrongdoing thus enabling further victimization. In light of these harms, this order should be rescinded.

---

[4] This concern is not hypothetical. *See*, *e.g.*, Alex Hern, *WordPress pulls interview with anti-gay group Straight Pride UK*, The Guardian (Aug. 13, 2013) http://www.theguardian.com/technology/2013/aug/13/wordpress-straight-pride-uk, (describing a DMCA claim based on statement voluntarily provided to journalist).

## B. The injunction against Google signals that intermediaries now need to fear liability for hosting user-generated content.

Granting Ms. Garcia the injunction against Google changed the rules governing intermediaries. In ordering a remedy beyond the bounds Congress authorized the Panel has left intermediaries as vulnerable as they would have been had there been no Section 230 or DMCA at all. Although it was an injunction and not a monetary remedy, if the laws preventing the former can be circumvented today then they can be circumvented to allow the latter tomorrow.

Such a ruling frustrates Congress's express intention to protect intermediaries by rendering this protection illusory. Protecting intermediaries in exchange for the speech they enabled was a bargain Congress consciously struck in order to prevent them from being tempted to over-censor or even outright ban substantial amounts of legitimate, valuable content, no matter how valuable or legitimate that content might actually be. This is a policy whose wisdom has been born out: by relieving intermediaries of liability connected with content that passes through their systems intermediaries have been able to develop into increasingly rich resources that might not have been able to take root had they felt it necessary to police every byte that passed through them out of the fear that if they didn't, and the wrong bit got through, crippling legal sanction could be just around the corner.

While Google may have had the finances and fortitude to fully fight Ms. Garcia's legal demands, many smaller, start-up, or non-profit intermediaries do

not. Having to defend themselves against the reach of the courts for issues arising from any of the myriad user-generated content they host can be devastating, but in opening gaps in the safe harbors of Section 230 and the DMCA the Panel has opened up intermediaries to that likelihood. The Panel's order necessarily challenges their current and future ability to facilitate the rich and diverse discourse they've heretofore been able to facilitate and must thus be reviewed in light of how it breaches Congress's purposeful promise to shield them.

## CONCLUSION

Because this order disregards the statutory protections afforded intermediaries by Section 230 and the DMCA and therefore exposes them all to heightened risk born from uncertainty, in conflict with Congress's clear intent to provide them with generous legal protection to preserve the social value of online free speech, this case should be reheard so the court can reconsider whether its order is consistent with Congress's legislative instructions.

Dated: November 25, 2014      By: _/s/ Catherine R. Gellis_
Catherine R. Gellis, Esq.
P.O. Box #2477
Sausalito, CA 94966
Telephone: 202-642-2849
Email: cathy@cgcounsel.com

*Counsel for Amici Curiae*
*Floor 64 Inc. and Organization for*
*Transformative Works*

# CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION,
## TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS
## PURSUANT TO FED. R. APP. P. 32(a)(7)(C)

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify as follows:

1.    This Brief of Amici Curiae Floor64 Inc. and Organization for Transformative Works In Support Of Defendants-Appellees complies with the word limit of this Court's November 12, 2014 order because this brief contains 3728 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010, the word processing system used to prepare the brief, in 14 point font in Times New Roman font.

Dated: November 25, 2014            By:   /s/ Catherine R. Gellis__

                                    Catherine R. Gellis

                                    *Counsel for Amici Curiae*
                                    *Floor64 Inc and Organization for*
                                    *Transformative Works*_____

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on November 25, 2014.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: November 25, 2014      By:   /s/ Catherine R. Gellis

Catherine R. Gellis

*Counsel for Amici Curiae*
*Floor64 Inc. and Organization for*
*Transformative Works*