## CASE NO. 12-57302
―――――――――――――――――――――――

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
―――――――――――――――――――――――

CINDY LEE GARCIA,
Plaintiff and Appellant,

v.

GOOGLE INC. and YOUTUBE, LLC,
Defendants and Appellees.
―――――――――――――――――――――

On Appeal from the United States District Court for the Central District of
California, CV-12-8315-MWF (VBKx)
District Judge Michael W. Fitzgerald
━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

## AMICUS CURIAE BRIEF BY NEWS ORGANIZATIONS IN SUPPORT OF DEFENDANTS AND APPELLEES
―――――――――――――――――――――

KELLI L. SAGER (State Bar No. 120162)
kellisager@dwt.com
DAN LAIDMAN (State Bar No. 274482)
danlaidman@dwt.com
BRENDAN N. CHARNEY (State Bar No. 293378)
brendancharney@dwt.com
**DAVIS WRIGHT TREMAINE LLP**
865 S. Figueroa Street, Suite 2400, Los Angeles, California 90017-2566
Telephone: (213) 633-6800; Facsimile: (213) 633-6899

Attorneys for Amici Curiae Los Angeles Times Communications LLC, The E.W.
Scripps Company, Advance Publications, Inc., The New York Times Company,
The Washington Post, the Reporters Committee for Freedom of the Press, National
Public Radio, Inc., the National Press Photographers Association, the California
Newspaper Publishers Association, and the First Amendment Coalition

## STATEMENT OF COMPLIANCE

Counsel for the parties did not author this brief. Neither the parties nor their counsel have contributed money intended to fund preparing or submitting the brief. No person – other than Amici, their members, or their counsel – contributed money that was intended to fund preparing or submitting this brief.

The interests of the individual Amici and their corporate disclosure information are attached as Appendix A.

DWT 25421183v5 0026175-000467

# TABLE OF CONTENTS

Page

I.   SUMMARY OF ARGUMENT.......................................................................1

II.  ENJOINING SPEECH UNDER COPYRIGHT LAW FOR NON-
     COPYRIGHT PURPOSES THREATENS IMPORTANT FIRST
     AMENDMENT INTERESTS. ........................................................................4

III. THIS COURT SHOULD REJECT THE IMPERMISSIBLY LOW
     BAR FOR ENJOINING THE PUBLICATION OF NEWSWORTHY
     CONTENT URGED BY APPELLANT AND ADOPTED BY THE
     PANEL MAJORITY. ..................................................................................13

IV.  THE INJUNCTION INTERFERES WITH THE ABILITY OF
     MEDIA AMICI TO COVER THE CONTROVERSY
     SURROUNDING THE "INNOCENCE OF MUSLIMS" VIDEO..............24

V.   CONCLUSION...........................................................................................27

DWT 25421183v5 0026175-000467

# TABLE OF AUTHORITIES

Page

**Cases**

1-800-Get-Thin, LLC v. Hiltzik,
  2011 U.S. Dist. LEXIS 81982 (C.D. Cal. July 25, 2011).....................................6

Abend v. MCA, Inc.,
  863 F.2d 1465 (9th Cir. 1988) ....................................................................20, 21

Arica Inst., Inc. v. Palmer,
  761 F. Supp. 1056 (S.D.N.Y. 1991) ....................................................................7

Balboa Island Village Inn, Inc. v. Lemen,
  40 Cal. 4th 1141 (2007) ........................................................................................9

Bank Julius Baer & Co. v. Wikileaks,
  535 F. Supp. 2d 980 (N.D. Cal. 2008)................................................................19

Belushi v. Woodward,
  598 F. Supp. 36 (D.D.C. 1984)...........................................................................21

Bollea v. Gawker Media, LLC,
  913 F. Supp. 2d 1325 (M. D. Fla. 2012).........................................................7, 8

Bond v. Blum,
  317 F.3d 385 (4th Cir. 2003) ...............................................................................7

Burch v. Barker,
  861 F.2d 1149 (9th Cir. 1988) ...........................................................................17

Campbell v. Acuff-Rose Music,
  510 U.S. 569 (1994)............................................................................................21

CBS, Inc. v. Davis,
  510 U.S. 1315 (1994) (Blackmun, J., in chambers) ......................................4, 16

CBS, Inc. v. District Court,
  729 F.2d 1174 (9th Cir. 1984) ...........................................................................22

iii

Condit v. Star Editorial, Inc.,
   259 F. Supp. 2d 1046 (E.D. Cal. 2003) ................................................................6

Ctr. for Bio-Ethical Reform, Inc. v. Los Angeles County Sheriff
   Department,
   533 F.3d 780 (9th Cir. 2008) ................................................................22

Desnick v. ABC, Inc.,
   44 F.3d 1345 (7th Cir. 1995) ................................................................10

eBay Inc. v. MercExchange, L.L.C.,
   547 U.S. 388 (2006)................................................................20

Effects Associates, Inc. v. Cohen,
   908 F.2d 555 (9th Cir. 1990) ................................................................10

Eldred v. Ashcroft,
   537 U.S. 186 (2003)................................................................18

Elrod v. Burns,
   427 U.S. 347 (1976)................................................................22

Flexible Lifeline Sys. v. Precision Lift, Inc.,
   654 F.3d 989 (9th Cir. 2011) ................................................................20

Four Navy Seals & Jane Doe v. AP,
   413 F. Supp. 2d 1136 (S.D. Cal. 2005) ................................................................6

Garcia v. Google, Inc.,
   743 F.3d 1258 (9th Cir. 2014), amended by 766 F.3d 929 (9th Cir.
   2014) ................................................................*passim*

Golan v. Holder,
   132 S. Ct. 873 (2012)................................................................5

Goldblum v. NBC,
   584 F.2d 904 (9th Cir. 1978) ................................................................16

Harper & Row, Publrs. v. Nation Enters.,
   471 U.S. 539 (1985)................................................................5, 26

In re Charlotte Observer,
   882 F.2d 850 (4th Cir. 1989) ................................................................19

iv

Marceaux v. Lafayette City-Parish Consol. Gov't,
   731 F.3d 488 (5th Cir. 2013) ...............................................................14

Miami Herald Publishing Co. v. Tornillo,
   418 U.S. 241 (1974) (White, J., concurring) .....................................15

Near v. Minnesota,
   283 U.S. 697 (1931)...................................................................15, 16

Nebraska Press Ass'n v. Stuart,
   427 U.S. 539 (1976).......................................................14, 15, 16, 17

New Era Publications International, ApS v. Henry Holt & Co.,
   695 F. Supp. 1493 (S.D.N.Y. 1988) ....................................................7

New York Times Co. v. United States,
   403 U.S. 713 (1971).............................................................8, 16, 17

Oakley, Inc. v. McWilliams,
   879 F. Supp. 2d 1087 (C.D. Cal. 2012) ...............................................4

Online Policy Group v. Diebold, Inc.,
   337 F. Supp. 2d 1195 (D. Cal. 2004)...................................................6

Org. for a Better Austin v. Keefe,
   402 U.S. 415 (1971)...........................................................................14

Patterson v. Colorado ex rel. Attorney General,
   205 U.S. 454 (1907)...........................................................................15

R.A.V. v. City of St. Paul,
   505 U.S. 377 (1992)....................................................................22, 23

Religious Technology Ctr. v. Lerma,
   908 F. Supp. 1362 (E.D.Va. 1995) ......................................................6

Rosemont Enterp. v. Random House, Inc.,
   366 F.2d 303 (2d Cir. 1966) ...............................................................5

Sarei v. Rio Tinto, PLC,
   671 F.3d 736 (9th Cir. 2011) (Kleinfeld, J., dissenting) .....................24

v

Sofa Entm't, Inc. v. Dodger Prods.,
709 F.3d 1273 (9th Cir. 2013) ...........................................................26

Sony Corp. of Am. v. Universal City Studios, Inc.,
464 U.S. 417 (1984) ............................................................................5

Trust Co. Bank v. Putnam Pub. Group, Inc.,
1988 U.S. Dist. LEXIS 4963 (C.D. Cal. Jan. 6, 1988) .......................21

United States v. Alvarez,
617 F.3d 1198 (9th Cir. 2010) ...........................................................23

United States v. The Progressive, Inc.,
467 F. Supp. 990 (W.D. Wis. 1979) ..................................................17

United States v. The Progressive, Inc.,
610 F.2d 819 (7th Cir. 1979) .............................................................17

United States v. Smith,
123 F. 3d 140, 154 n.16, 155 n.17 (3d Cir. 1997) .............................19

Valle Del Sol Inc. v. Whiting,
709 F.3d 808 (9th Cir. 2013) .............................................................21

Winter v. NRDC, Inc.,
555 U.S. 7 (2008) ...............................................................................20

## Constitutional Provisions

U.S. Const. amend. I .....................................................................*passim*

## Other Authorities

"Symposium: Weapons of Mass Destruction, National Security, and a
Free Press: Seminal Issues as Viewed through the Lens of the
Progressive Case," 26 Cardozo L. Rev. 1337, 1358 (2004-2005) ....................17

"Actress in riot-sparking movie says cast didn't know film was about
Muhammad," The Times of Israel (Sept. 13, 2012) (available at
http://www.timesofisrael.com/actress-in-riot-sparking-movie-
claims-cast-didnt-know-fim-was-about-muhammad/) .......................25

Adrian Chen, "'It Makes Me Sick': Actress in Muhammed Movie Says She Was Deceived, Had No Idea It Was About Islam," Gawker (Sept. 12, 2012) (available at http://gawker.com/5942748/it-makes-me-sick-actress-in-muhammed-movie-says-she-was-deceived-had-no-idea-it-was-about-islam) ...........................................................................26

Brian Todd, "Ron Paul '90s newsletters rant against blacks, gays," CNN.com, Jan. 11, 2008 (available at http://www.cnn.com/2008/POLITICS/01/10/paul.newsletters/).......................11

Colleen Curry, "'Innocence of Muslims' Actress Tells 'The View' She Forgives Filmmaker," ABC News (Sept. 26, 2012) (available at http://abcnews.go.com/Blotter/innocence-muslims-actress-tells-view-forgives-filmmaker/story?id=17330024) ..................................................26

David D. Kirkpatrick, "Anger Over a Film Fuels Anti-American Attacks in Libya and Egypt," New York Times (Sep. 11, 2012) (available at http://www.nytimes.com/2012/09/12/world/middleeast/anger-over-film-fuels-anti-american-attacks-in-libya-and-egypt.html)................................24

Eyder Peralta, "What We Know About 'Sam Bacile,' The Man Behind The Muhammad Movie," National Public Radio (Sept. 12, 2012) (available at http://www.npr.org/blogs/thetwo-way/2012/09/12/161003427/what-we-know-about-sam-bacile-the-man-behind-the-muhammad-movie) ................................................25

"'Innocence of Muslims' unrest," Los Angeles Times (available at http://timelines.latimes.com/unrest-timeline/).....................................................25

J.J. Colao, "'Innocence of Muslims' Now With 10 Million Views Worldwide," Forbes (Sept. 14, 2012) (available at http://www.forbes.com/sites/jjcolao/2012/09/14/innocence-of-muslims-now-with-10-million-views-worldwide/) ...........................................19

John Tehranian, Curbing Copyblight, 14 Vand. J. Ent. & Tech. L. 993, 999, 1005 (2012)............................................................................................6

DWT 25421183v5 0026175-000467

Lorne Manley, "Legal Debate on Using Boastful Rap Lyrics as a Smoking Gun," <u>New York Times</u>, Mar. 26, 2014 (available at http://www.nytimes.com/2014/03/27/arts/music/using-rap-lyrics-as-damning-evidence-stirs-legal-debate.html?_r=0) ........................................11

Mark A. Lemley & Eugene Volokh, "Freedom of Speech and Injunctions in Intellectual Property Cases," 48 Duke L.J. 147, 169 (1998) .................................................................................................................9

Phil Willon & Rebecca Keegan, "'Innocence of Muslims': Mystery shrouds film's California origins," <u>Los Angeles Times</u> (Sept. 12, 2012) (available at http://articles.latimes.com/2012/sep/12/world/la-fg-libya-filmmaker-20120913) ...........................................................................................25

Robert Mackey & Liam Stack, "Obscure Film Mocking Muslim Prophet Sparks Anti-U.S. Protests in Egypt and Libya," <u>New York Times</u>, (Sep. 11, 2012) (available at <u>http://thelede.blogs.nytimes.com/2012/09/11/obscure-film-mocking-muslim-prophet-sparks-anti-u-s-protests-in-egypt-and-libya/</u>) ...................................................................................................25

Robin Abcarian & Tina Susman, "Rep. Anthony Weiner admits tweeting lewd photo, and more," <u>Los Angeles Times</u>, June 6, 2011 (available at http://articles.latimes.com/2011/jun/06/nation/la-na-weiner-20110607) .......................................................................................11

Stan Wilson, "'Innocence of Muslims' actress sues filmmaker, YouTube in federal court," CNN (Sept. 27, 2012) (available at http://www.cnn.com/2012/09/27/justice/muslim-film-lawsuit/) .......................26

"Why Are All The Religious References In 'Innocence Of Muslims' Dubbed?" On The Media (Sept. 12, 2012) (available at <u>http://www.onthemedia.org/story/236861-religious-references-innocence-muslims-dubbed/</u>) ...........................................................................25

DWT 25421183v5 0026175-000467

# I.    SUMMARY OF ARGUMENT

Amici are journalists, publishers, and trade associations whose members regularly gather and disseminate news and information on matters of public interest ("Media Amici").[1]  Amici urge this Court to overturn the Panel Majority's decision, which orders a website to suppress a controversial video that has been the subject of widespread discussion over the last two years, based on the alleged copyright interest of one performer who appears in a few seconds of the film.  See Garcia v. Google, Inc., 743 F.3d 1258 (9th Cir. 2014), amended by 766 F.3d 929 (9th Cir. 2014).  Although Appellant is not unsympathetic, the Panel Majority's unprecedented and surprisingly expansive interpretation of injunctive relief under copyright law poses serious risks to news organizations, whose content often includes sensitive and controversial topics.

The en banc Court should reject the constitutionally suspect injunction at issue, and should make clear that requests for such extraordinary relief must be subject to rigorous First Amendment scrutiny, even in the context of copyright litigation.

First, the Court should decline Appellant's invitation to dramatically expand the scope of copyright injunctions in a manner that threatens vital free speech

---

[1] A description of the individual Amici and their corporate disclosure information is attached as Appendix A.

protections.  See Section II.  The availability of injunctive relief for infringing expressive works has been justified to further the purpose of copyright, namely, to incentivize creative activity.  But that rationale does not exist where the purpose of the order is to address other interests, such as alleged harms to an author's reputation, privacy, or safety.  Indeed, when plaintiffs attempt to suppress speech by asserting these kinds of interests, the First Amendment virtually always precludes injunctive relief.

Allowing the Appellant to obtain a copyright injunction by asserting damages that arise from tortious conduct, such as alleged safety concerns, would provide plaintiffs with a powerful, unprecedented tool for evading traditional First Amendment protections.  News organizations like Media Amici would be particularly susceptible to such claims by individuals aiming to silence critical reporting on important topics.

Second, assuming that alleged safety concerns can justify injunctive relief, this Court should reject the standard urged by Appellant and adopted by the panel majority.  Where, as here, an injunction would directly restrain speech on a matter of public concern, strict constitutional standards must be applied, regardless of whether the plaintiff invokes intellectual property law or tort law.  See Section III. These standards require analysis of whether the requested injunction amounts to a prior restraint, and whether it would impermissibly target speech based on a

2

particular viewpoint.  The injunction here, which aims to suppress a newsworthy video based on speculative fears about the hostile reaction of violent extremists to its anti-Islamic message, cannot survive such constitutional scrutiny.  Id.

Third, this Court should reaffirm the traditional equitable principles that courts repeatedly have invoked to deny copyright injunctions that infringe on free speech rights.  See Section III.  The weighing of interests that must precede the issuance of any injunction requires consideration of the interest in ensuring a robust, uninhibited debate on important public issues.  Id.

Finally, even if the Panel Majority's ruling was limited to this unusual case, it nonetheless has troubling implications for news organizations like Media Amici. See Section IV.  The "Innocence of Muslims" video ("the Video") has been blamed for the attack in Benghazi, Libya that killed Ambassador Christopher Stevens and others, and has been the subject of substantial public debate. Appellant's role in the Video, and the apparently fraudulent scheme to trick her and others into participating in its creation, are important aspects of the story, and news organizations cannot present the public with a complete picture without using visual images.  The injunction order against Google unnecessarily impacts the public's ability to access this information, and leaves Media Amici in an uncertain position with respect to their own coverage of the "Innocence of Muslims" controversy, and even coverage of Appellant's lawsuit.

3

For all of these reasons, Media Amici urge this Court to affirm the ruling of the District Court and hold that even in the copyright context, newsworthy speech cannot be enjoined without meeting stringent constitutional requirements in such circumstances as are presented here.

## II. ENJOINING SPEECH UNDER COPYRIGHT LAW FOR NON-COPYRIGHT PURPOSES THREATENS IMPORTANT FIRST AMENDMENT INTERESTS.

When an injunction against speech is sought as a remedy for defamation, invasion of privacy, misappropriation, infliction of emotional distress, or virtually any other tort or statutory violation, the First Amendment is a formidable – and often insurmountable – obstacle.  See Oakley, Inc. v. McWilliams, 879 F. Supp. 2d 1087, 1093 (C.D. Cal. 2012) (applying "the longstanding rule that injunctions of speech in defamation cases are impermissible under the First Amendment"); see also CBS, Inc. v. Davis, 510 U.S. 1315, 1317 (1994) (Blackmun, J., in chambers) (prior restraints on speech are "presumptively unconstitutional," and "may be considered only where the evil that would result from the reportage is both great and certain and cannot be militated by less intrusive measures.").[2]  Federal copyright law provides for injunctive relief, but with an important limitation:  any

---

[2] In Davis, Justice Blackmun stayed an order enjoining CBS from airing undercover footage shot in the plaintiff's meat packing factory, where the company brought claims for trespass, aiding and abetting a breach of the duty of loyalty, and a violation of the Uniform Trade Secrets Act.  Id. at 1315-16.

4

such injunction must further the interests that copyright law is designed to protect.

As the Supreme Court has explained:

> The monopoly privileges that Congress may authorize are neither unlimited nor primarily designed to provide a special private benefit. Rather, the limited grant is a means by which an important public purpose may be achieved. It is intended to motivate the creative activity of authors and inventors by the provision of a special reward, and to allow the public access to the products of their genius after the limited period of exclusive control has expired.

Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 429 (1984).

The Supreme Court has harmonized copyright enforcement with constitutional free speech protections by focusing on this underlying purpose: by incentivizing creative activity, copyright law complements the First Amendment by serving as "an engine of free expression." Golan v. Holder, 132 S. Ct. 873, 890 (2012) (quotation omitted). But using this uniquely severe remedy to restrain speech for any other purpose upsets this delicate balance of competing constitutional interests, and can result in the "abuse of the copyright owner's monopoly as an instrument to suppress facts." Harper & Row, Publrs. v. Nation Enters., 471 U.S. 539, 559 (1985).

Indeed, plaintiffs routinely have attempted to use copyright law as a means of restraining speech, rather than protecting commercial interests. For example, Howard Hughes sought to silence a critical biographer,[3] Diebold Election Systems

---

[3] Rosemont Enterp. v. Random House, Inc., 366 F.2d 303 (2d Cir. 1966).

5

tried to hide security flaws in touch-screen voting machines,[4] the Church of Scientology attempted to suppress an affidavit describing its teachings,[5] and Navy SEALS sought to keep photos private that depicted abuse of military prisoners,[6] all by asserting claims for copyright infringement. See also John Tehranian, Curbing Copyblight, 14 Vand. J. Ent. & Tech. L. 993, 999, 1005 (2012) ("[t]he adverse consequences of overreaching copyright claims are widespread, stymieing expressive rights and squelching legitimate social, political, and economic discourse in myriad ways"; author specifically describes threats of copyright litigation that amount to attempts "to preclude … negative publicity").[7]

As Judge Pierre Leval explained, in refusing to enjoin publication of a critical biography of Scientology founder L. Ron Hubbard in a copyright action, "[i]t is important to recognize that the justification of the copyright law is the protection of the commercial interest of the artist/author. It is not to coddle artistic

---

[4] Online Policy Group v. Diebold, Inc., 337 F. Supp. 2d 1195 (D. Cal. 2004).

[5] Religious Technology Ctr. v. Lerma, 908 F. Supp. 1362, 1366-68 (E.D.Va. 1995).

[6] Four Navy Seals & Jane Doe v. AP, 413 F. Supp. 2d 1136, 1142 (S.D. Cal. 2005).

[7] Subjects of critical news reporting also have tried to use federal trademark law to silence the press. E.g., 1-800-Get-Thin, LLC v. Hiltzik, 2011 U.S. Dist. LEXIS 81982 (C.D. Cal. July 25, 2011) (granting Los Angeles Times' motion to dismiss Lanham Act claims brought by a prominent weight loss marketing firm that was the subject of the newspaper's investigative reporting); Condit v. Star Editorial, Inc., 259 F. Supp. 2d 1046, 1054 (E.D. Cal. 2003) (dismissing Lanham Act claim arising from reporting about congressman's wife).

6

vanity or to protect secrecy, but to stimulate creation by protecting its rewards."
New Era Publications International, ApS v. Henry Holt & Co., 695 F. Supp. 1493,
1526 (S.D.N.Y. 1988) (original emphasis). See also Bond v. Blum, 317 F.3d 385,
395 (4th Cir. 2003) ("the protection of privacy is not a function of the copyright
law …. To the contrary, the copyright law offers a limited monopoly to encourage
ultimate public access to the creative work of the author. If privacy is the essence
of Bond's claim, then his action must lie in some common-law right to privacy, not
in the Copyright Act") (original emphasis); Arica Inst., Inc. v. Palmer, 761 F.
Supp. 1056, 1061 (S.D.N.Y. 1991) (rejecting request to enjoin publication of a
book as "an effort to prevent 'heresy' not copyright infringement").

More recently, the court in Bollea v. Gawker Media, LLC, 913 F. Supp. 2d
1325 (M. D. Fla. 2012), denied a celebrity's motion that sought a preliminary
injunction to force a news website to remove a "sex tape" video on copyright
infringement grounds. Id. at 1326. The plaintiff claimed that "the 'private' Video
portrays him in poor light and in an embarrassing fashion," and he tried "to quell
any distribution or publication of excerpts of the Video in an effort to protect his
mental well-being, personal relationships, and professional image." Id. at 1330.
But as the court noted, there was "no evidence that Plaintiff ever intends to release
the Video and, in fact, it is quite likely that Plaintiff seeks to recover the
copyrighted material for the sole purpose of destroying – not publishing – the

7

copyrighted material." Id. Consequently, the court concluded that the plaintiff's claim was, "in essence, nothing more than a belated attempt to bolster his previous claims based on the common-law right to privacy," and the harms that he alleged simply did "not constitute irreparable harm in the context of copyright infringement." Id. at 1329-30.

The injunction at issue in this appeal is similarly infirm. Appellant's allegations about how she was treated by the filmmaker unquestionably are troubling, and she may well have some legitimate causes of action against him. But she effectively admits that her request for an injunction is not based on any alleged harm that is within the scope of copyright protection. See, e.g., Appellant's Opening Brief ("AOB") at 10 ("the main issue in this case involves the vicious frenzy against Ms. Garcia that the Film caused among certain radical elements of the Muslim community"). She seeks an order requiring the removal of the video because of the hostile reaction by these "radical elements" to its controversial message, and not because of any risk to her commercial interest or harm to her incentive to engage in creative activity. Id. at 10-11.

Such allegations of harm are routinely deemed inadequate to justify a direct restraint on expression, particularly at a preliminary stage of the case. E.g., New York Times Co. v. United States, 403 U.S. 713 (1971) (refusing to enjoin publication of Pentagon Papers, despite claim that disclosure posed "grave and

8

immediate danger" to national security).[8]  In granting Appellant's requested

injunction in this case, however, the panel majority declined to consider the free

speech interests involved, stating simply that "the First Amendment doesn't protect

copyright infringement."  Garcia, 766 F.3d at 939.

This bypassing of well-established law threatens to provide plaintiffs with a

means of silencing critical news reporting, by using copyright claims to circumvent

traditional constitutional protections.  Of particular concern to Media Amici, the

approach that Appellant urges this Court to adopt would expand the scope of

copyright in a manner that could allow the subjects of news coverage to exercise

veto power over unflattering broadcasts or publications.  For example, if an actress

reading a script authored by someone else is deemed to be "sufficiently creative to

be protectable" (Garcia, 766 F.3d at 934), public officials similarly could argue

---

[8] Some scholars have argued that preliminary injunctions for copyright
claims should be analyzed like classic prior restraint cases involving tort claims,
particularly given the lower standards that apply to preliminary injunctions as
compared to final determinations on the merits.  See Mark A. Lemley & Eugene
Volokh, "Freedom of Speech and Injunctions in Intellectual Property Cases," 48
Duke L.J. 147, 169 (1998) ("injunctions against distributing a supposedly
infringing work are injunctions restraining speech; and preliminary injunctions
restraining speech are generally considered unconstitutional 'prior restraints.'").
See also Balboa Island Village Inn, Inc. v. Lemen, 40 Cal. 4th 1141, 1158 (2007)
(explaining that in considering an injunction to prevent defamatory statements, "it
is crucial to distinguish requests for preventive relief prior to trial and posttrial
remedies to prevent repetition of statements judicially determined to be
defamatory").

DWT 25421183v5 0026175-000467

that they "own" the copyright to their prepared remarks, or their extemporaneous responses to a videotaped interview. And if a safety concern is enough to justify injunctive relief under copyright law, then plaintiffs aiming to suppress critical news coverage surely will argue that reputational and privacy harms justify restraining speech in this manner as well.

Under Appellant's reading of copyright ownership, the implied nonexclusive license that otherwise would exist in the copyrighted work[9] may be lost if the performer claims that the performance was used in a different context than was originally represented. Garcia, 766 F.3d at 937-38. Under this theory, if a news outlet uses an interview for criticism or unflattering commentary, or if new developments cause prior statements to take on a new light, a plaintiff may claim that the use "differs … radically" from what she originally contemplated, and use the threat of a copyright lawsuit (or a DMCA takedown demand to an ISP) to censor news reports. Id.[10]

---

[9] Effects Associates, Inc. v. Cohen, 908 F.2d 555, 558-59 (9th Cir. 1990).

[10] In contrast, the subject of a news report who attempts to assert an analogous cause of action in tort because the final article or broadcast was not what he or she expected may have an insurmountable burden, absent extraordinary circumstances. See Desnick v. ABC, Inc., 44 F.3d 1345, 1354-55 (7th Cir. 1995) (rejecting fraud claim where alleged "fraud" was simply the "scheme to expose publicly any bad practices that the investigative team discovered").

Similarly, Appellant's theory could be used to suppress news reports where the "copyrightable work" is itself the story. For example, a politician might try to block reporting about controversial writings from his past. E.g., Brian Todd, "Ron Paul '90s newsletters rant against blacks, gays," CNN.com, Jan. 11, 2008 (available at http://www.cnn.com/2008/POLITICS/01/10/paul.newsletters/). A congressman whose controversial Twitter posts and "sexts" are disclosed similarly could seize on copyright law in an attempt to suppress the relevant content. E.g., Robin Abcarian & Tina Susman, "Rep. Anthony Weiner admits tweeting lewd photo, and more," Los Angeles Times, June 6, 2011 (available at http://articles.latimes.com/2011/jun/06/nation/la-na-weiner-20110607). Or a criminal defendant whose violent song lyrics are discussed in a criminal case might assert a copyright claim in an attempt to control media coverage. E.g., Lorne Manley, "Legal Debate on Using Boastful Rap Lyrics as a Smoking Gun," New York Times, Mar. 26, 2014 (available at http://www.nytimes.com/2014/03/27/arts/music/using-rap-lyrics-as-damning-evidence-stirs-legal-debate.html?_r=0).

Even an intoxicated underage actress who is filmed stumbling from a Hollywood nightclub might claim that she is "performing," and argue that the "modicum of creativity" involved entitles her to a copyright in photographs or video of her, and as a result, seek to prevent news coverage depicting her

11

"performance." Appellant effectively asks this Court to open the door to such claims by dramatically expanding the scope of copyright ownership while simultaneously permitting a copyright owner to suppress speech without any consideration of First Amendment protections.

This lays the foundation for copyright claims by countless individuals depicted in news broadcasts or photographs, no matter how fleetingly. News outlets routinely record and photograph street scenes and large crowds, including coverage of demonstrations, sporting events, and even natural disasters. Individuals whose conduct involves "a modicum of creativity" (including, for example, displaying protest signs) could use the DMCA process or direct legal claims to demand that coverage of their copyrighted works be removed, or even demand payment if their "performance" is publicly shown, with the concomitant restriction on news coverage, under the authority of the Panel decision.

News outlets, including traditional publishers like newspapers, are increasingly posting video content and source documents online, including "embedding" videos hosted by sites like YouTube, making them vulnerable to the same sorts of claims that Appellant brought against Google.[11] Public discourse benefits immeasurably when the media can use original source material, including

---

[11] Indeed, Appellant supported her recent Emergency Motion seeking to hold Google in contempt by pointing to a "Washington Post article that links to the unedited version" of the "Innocence of Muslims" video. See Dkt. # 67 at 53.

12

video, interview records, and primary documents; by doing so, the media allows the public to independently evaluate and draw conclusions from the controversial material. By ordering the removal of newsworthy content under copyright law for purposes unrelated to incentivizing creative activity (and in response to a demand from a participant in, and not necessarily the creator of, that content), the panel decision opened a Pandora's box of copyright issues that cast a shadow over indispensable reporting tools, discouraging news organizations from distributing primary materials to the public. This Court should uphold the District Court's order, and limit the powerful remedy of a copyright injunction to instances where the relief furthers the essential purpose of copyright law, and not as a means of redressing alleged tort damages.

## III.    THIS COURT SHOULD REJECT THE IMPERMISSIBLY LOW BAR FOR ENJOINING THE PUBLICATION OF NEWSWORTHY CONTENT URGED BY APPELLANT AND ADOPTED BY THE PANEL MAJORITY.

Any order that directly restrains speech should be subject to a rigorous analysis to ensure that any infringement on First Amendment rights is justified under the circumstances, and is narrowly tailored. Because the preliminary injunction at issue involves forcing a website to remove an unquestionably newsworthy video, Media Amici urge this Court to apply strict constitutional standards to the request, in addition to traditional equitable principles.

13

First, the order requested by Appellant is a direct restraint on speech on a matter of public concern, as it requires Google to remove a video from its website that has been the subject of extensive public discussion (and has even influenced international politics), and to prevent the video from being uploaded again in the future. In analogous circumstances, courts have applied the stringent "prior restraint" analysis to such orders aimed at the ongoing distribution of speech, even where they do not preclude the speech from ever reaching the public in the first place. E.g., Org. for a Better Austin v. Keefe, 402 U.S. 415, 417-18 (1971) (order enjoining continued distribution of literature was unconstitutional prior restraint); Marceaux v. Lafayette City-Parish Consol. Gov't, 731 F.3d 488, 493-94 (5th Cir. 2013) (applying prior restraint doctrine to vacate an order taking down a website in order to avoid prejudicing litigants); see also Garcia, 766 F.3d at 949 (N.R. Smith, J., dissenting) ("Google's contention, that issuing a preliminary injunction on these facts may constitute a prior restraint of speech under the First Amendment, identifies an important public interest.").

The United States Supreme Court has reminded us that "[o]ur liberty depends on the freedom of the press, and that cannot be limited without being lost." Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 548 (1976) (quoting 9 Papers of Thomas Jefferson 239 (J. Boyd ed. 1943)). Thus, "[r]egardless of how beneficent-sounding the purposes of controlling the press might be," the Court has

14

"remain[ed] intensely skeptical about those measures that would allow government to insinuate itself into the editorial rooms of this Nation's press." Id. at 560-61 (quoting Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 259 (1974) (White, J., concurring)). The Supreme Court's long-standing hostility towards direct restraints on speech is the most important manifestation of that skepticism.

When a branch of government, including the judiciary, restrains the publication of information that has been obtained lawfully by the press, it undermines the "main purpose" of the First Amendment, which is "to prevent all such previous restraints upon publications as [have] been practiced by other governments." Nebraska Press, 427 U.S. at 557 (quoting Patterson v. Colorado ex rel. Attorney General, 205 U.S. 454, 462 (1907)). "Both the history and language of the First Amendment support the view that the press must be left free to publish news, whatever the source, without censorship, injunctions, or prior restraints." Nebraska Press Ass'n, 427 U.S. at 717 (Black, J., concurring).

The circumstances where such restraints are permitted historically have been – and must be – very narrowly cabined.[12] Typically, even the risk of harm to the

---

[12] The Supreme Court's modern prior restraint jurisprudence dates back to 1931, when the Court vacated a prior restraint against a virulently anti-Semitic publication that disturbed the "public peace" and provoked "assaults and the commission of crime." Near v. Minnesota, 283 U.S. 697, 716 (1931). After discussing the Framers' abhorrence of prior restraints, Chief Justice Hughes suggested that such restraints might be granted only in "exceptional" circumstances, such as to block the threatened publication of the sailing dates of

DWT 25421183v5 0026175-000467

proponent of the restraining order has been found to be insufficient, even when serious competing interests are at issue. See, e.g., Near, 283 U.S. at 716-718 (defamatory and racist statements that allegedly disturbed the "public peace"); Nebraska Press, 427 U.S. at 556-561 (publication of defendant's confession in small-town murder case that allegedly would have jeopardized his fair trial rights); New York Times, 403 U.S. at 714 (publication of Pentagon Papers, despite claim that disclosure posed "grave and immediate danger" to national security).

A key component of the necessary constitutional analysis when a court is called upon to directly restrain speech is the requirement that the alleged harm actually be concrete and likely to occur, and not speculative. E.g., Davis, 510 U.S. at 1318 (Blackmun, J., in chambers) ("speculative predictions … based on 'factors unknown and unknowable'" cannot justify a prior restraint); Goldblum v. NBC, 584 F.2d 904, 906 (9th Cir. 1978) ("wholly speculative" possibility of future criminal prosecution insufficient for prior restraint). Consequently, courts have

---

troop transports or information about the movement of soldiers during wartime. Id. Forty years later, the Supreme Court reaffirmed the high constitutional bar against prior restraints, unanimously rejecting the government's request for an order barring two newspapers from publishing information from the "Pentagon Papers," even though the government alleged the materials were stolen and contained highly sensitive national security information. New York Times, 403 U.S. at 714. Prior restraints are "presumptively unconstitutional," id., and "may be considered only where the evil that would result from the reportage is both great and certain and cannot be militated by less intrusive measures." CBS, Inc. v. Davis, 510 U.S. 1315, 1317 (1994) (Blackmun, J., in chambers).

rejected injunctions restraining speech even where the alleged harms were

extremely serious but where the link between the relief being sought and the

danger was conjectural.  See New York Times, 403 U.S. at 726-727 (Brennan, J.,

concurring) (threat of harm to national security caused by disclosure of defense

department documents too speculative to justify prior restraint); Nebraska Press

Ass'n, 427 U.S. at 567 (concerns about defendant's fair trial rights deemed too

speculative to justify prior restraint).  See also Burch v. Barker, 861 F.2d 1149,

1155 (9th Cir. 1988) ("[p]rior restraints are permissible in only the rarest of

circumstances, such as imminent threat to national security") (emphasis added).[13]

    The panel majority did not consider this line of authority or any of these

precedents, evidently relying on the notion that a court considering a copyright

---

[13] Even in the national security context, history has shown that court-ordered restraints on speech are not just constitutionally disfavored but are often ineffective at preventing the harm being alleged.  In perhaps the most famous case in which a prior restraint was actually issued, United States v. The Progressive, Inc., 467 F. Supp. 990 (W.D. Wis. 1979), where a magazine was temporarily enjoined from publishing an article showing how a thermonuclear bomb works, the government abandoned the case while the trial court's ruling was on appeal after similar information was published elsewhere.  See United States v. The Progressive, Inc., 610 F.2d 819 (7th Cir. 1979).  As one of the Department of Justice attorneys who prosecuted the matter observed years later – in terms that are particularly relevant to this case – "whatever the challenges may have been of keeping any information truly 'secret' twenty-five years ago, the notion of keeping anything secret once it has been disclosed in any context is virtually impossible in today's internet world." "Symposium: Weapons of Mass Destruction, National Security, and a Free Press: Seminal Issues as Viewed through the Lens of the Progressive Case," 26 Cardozo L. Rev. 1337, 1358 (2004-2005) (comments of Robert E. Cattanach).

claim and injunction need not consider the First Amendment concerns as it would if the case sounded in tort. See Garcia, 766 F.3d at 939 (citing Eldred v. Ashcroft, 537 U.S. 186 (2003)). But the Supreme Court's decision in Eldred cannot be read so expansively. There, the Court held simply that the Copyright Act's idea/expression distinction and fair use provision provided built-in safeguards that sufficiently protected the particular speech interests at issue, in a broad challenge to legislation extending the duration of copyrights by 20 years. Id. at 219-21. The Court did not address injunctive relief, and it rejected the notion that copyright is a First Amendment-free zone. Id. at 221 (recognizing that another court "spoke too broadly when it declared copyrights categorically immune from challenges under the First Amendment") (quotation omitted).

Notably, the Eldred Court explained that further First Amendment scrutiny was not necessary under the circumstances because the congressional enactment at issue did not "alter[] the traditional contours of copyright protection." Id. In contrast, the injunction at issue here does alter the traditional contours of copyright, as it is based on justifications much more akin to the arguments made in prior restraint cases than in traditional copyright cases. Under these circumstances, and given the highly unusual nature of the copyright claim – in which a participant in a newsworthy video that has been widely distributed and publicly debated seeks its removal based solely on alleged safety concerns, and not based on any

18

commercial or other copyright-recognized interest – the well-established principles constraining governments from enjoining speech should not be so easily dismissed.

Moreover, consideration should also be given to cases where injunctions have been denied because a direct restraint on speech would not be an effective remedy for the particular harm claimed, such as privacy and similar disclosure cases. Here, it is undisputed that the Video had been publicly available since July 2012, even before this lawsuit was filed in September 2012, and there is no dispute that it has been the subject of widespread public discussion and debate for more than two years.[14] Courts have denied injunctive relief in analogous situations where "there is evidence in the record that 'the cat is out of the bag' and the issuance of an injunction would therefore be ineffective…." Bank Julius Baer & Co. v. Wikileaks, 535 F. Supp. 2d 980, 985 (N.D. Cal. 2008); In re Charlotte Observer, 882 F.2d 850, 854-855 (4th Cir. 1989) (prior restraint not justified when the "genie is out of the bottle"); United States v. Smith, 123 F. 3d 140, 154 n.16, 155 n.17 (3d Cir. 1997) ("under prior restraint law, orders prohibiting the media from publishing information already in its possession [and publicly known] are

---

[14] According to a report from September 14, 2012, by that time at least 320 different clips of "Innocence of Muslims" had been viewed by more than 10 million people, and generated more than 90,000 online comments. See J.J. Colao, "'Innocence of Muslims' Now With 10 Million Views Worldwide," Forbes (Sept. 14, 2012) (available at http://www.forbes.com/sites/jjcolao/2012/09/14/innocence-of-muslims-now-with-10-million-views-worldwide/).

strongly disfavored"). For all of these reasons, and because Appellant's purpose is not to prevent harm to commercial or other interests protected by copyright, this Court should apply rigorous First Amendment scrutiny when reviewing her request for a direct restraint on newsworthy speech.

Second, in addition to the constitutional considerations described above, the Supreme Court has emphasized that a "plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. NRDC, Inc., 555 U.S. 7, 20 (2008). The plaintiff must satisfy all four prongs, and even in the copyright context, a mere showing of likely – or even actual – infringement is insufficient to justify injunctive relief. See eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 392-93 (2006) ("this Court has consistently rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed."); Flexible Lifeline Sys. v. Precision Lift, Inc., 654 F.3d 989, 998 (9th Cir. 2011) (applying the injunction standard from Winter and eBay in a copyright infringement action).

These equitable factors provide independent safeguards against the issuance of injunctions that amount to governmental censorship. For example, in Abend v.

20

MCA, Inc., 863 F.2d 1465 (9th Cir. 1988), this Court held that a movie studio infringed the plaintiff's copyright in the original story on which the film "Rear Window" was based. Id. at 1478. But despite its finding of infringement, the Court declined to enjoin distribution of the film, explaining that "an injunction could cause public injury by denying the public the opportunity to view a classic film for many years to come." Id. at 1479. See also Campbell v. Acuff-Rose Music, 510 U.S. 569, 578 n.10 (1994) (noting that even where courts find copyright infringement, in cases that do not involve "simple piracy," injunctions may be inappropriate where there is "a strong public interest in the publication of the secondary work [and] the copyright owner's interest may be adequately protected by an award of damages for whatever infringement is found").[15]

In addition to the "public interest" in the content of the work itself, courts have emphasized that free speech concerns must be taken into account in weighing the "irreparable harm" and "balance of equities" factors. As this Court and the Supreme Court have noted, "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Valle Del

---

[15] See also Belushi v. Woodward, 598 F. Supp. 36, 37 (D.D.C. 1984) (refusing to enjoin publication of a biography because it included allegedly infringing photograph, emphasizing the "competing public interest" in "the promotion of free expression and robust debate"); Trust Co. Bank v. Putnam Pub. Group, Inc., 1988 U.S. Dist. LEXIS 4963, at *20 (C.D. Cal. Jan. 6, 1988) ("[t]he public interest supports the publication of books … Enjoining publication … would not serve the public interest").

21

Sol Inc. v. Whiting, 709 F.3d 808, 828 (9th Cir. 2013) (quoting Elrod v. Burns, 427

U.S. 347, 373 (1976)).  See also CBS, Inc. v. District Court, 729 F.2d 1174, 1177

(9th Cir. 1984) ("[t]he first amendment informs us that the damage resulting from a

prior restraint – even a prior restraint of the shortest duration – is extraordinarily

grave").  Ordering the removal of the Video because of the potentially hostile

reaction creates a dangerous precedent in an era where threats are so easily issued,

as it amounts to a heckler's veto in which intimidation is rewarded by silencing the

offending speech.  See Ctr. for Bio-Ethical Reform, Inc. v. Los Angeles County

Sheriff Department, 533 F.3d 780, 787 n.4 (9th Cir. 2008) (explaining that in the

First Amendment context a "heckler's veto" is used to "describe restrictions on

speech that stem from listeners' negative reactions to a particular message").  The

panel majority did not give sufficient consideration to these concerns, or to the fact

that the video has already been widely disseminated and publicly discussed,

making the effectiveness of an injunction to accomplish Appellant's goals highly

doubtful.

Finally, there is a related but independent constitutional principle that is

particularly relevant to this case, and that deserves consideration:  the prohibition

on viewpoint discrimination.  In R.A.V. v. City of St. Paul, 505 U.S. 377 (1992),

the Supreme Court held that even where "areas of speech can, consistently with the

First Amendment, be regulated because of their constitutionally proscribable

content (obscenity, defamation, etc.)," such categories of expression are nonetheless not "entirely invisible to the Constitution, so that they may be made the vehicles for content discrimination unrelated to their distinctively proscribable content." Id. at 383-84 (original emphasis). In other words, "even entirely unprotected content cannot be targeted on the basis of view-point." United States v. Alvarez, 617 F.3d 1198, 1204 n.4 (9th Cir. 2010) (emphasis added).

This core First Amendment principle carries no less force in the context of copyright infringement than in a case involving obscenity or defamation. Thus even assuming that the "Innocence of Muslims" video is infringing, its distribution still cannot be proscribed based on its viewpoint. And yet Appellant argues that the injunction is justified because the Video constitutes "hate speech" expressing a "racist belief," which has caused a "frenzy … among certain radical elements." AOB at 41. The panel majority embraced this rationale, explaining that the injunction was justified by a need to "disassociate" Appellant "from the film's anti-Islamic message." Garcia, 766 F.3d at 939.

The viewpoint of a particular work – no matter how offensive – cannot be the litmus test for awarding injunctive relief, or any other remedy. As several members of this Court explained in discussing an analogous situation – the edict issued by the Ayatollah of Iran calling for the execution of Salman Rushdie because of his novel The Satanic Verses – "Rushdie's blasphemy is

constitutionally protected in the United States …. Imposition of Iranian law on Rushdie in the United States would violate the most fundamental aspect of our sovereignty—our constitutional right to freedom of speech." Sarei v. Rio Tinto, PLC, 671 F.3d 736, 817 (9th Cir. 2011) (Kleinfeld, J., dissenting).

Media Amici urge this Court to take into account these vital constitutional and equitable principles in deciding Appellant's request for injunctive relief.

## IV.  THE INJUNCTION INTERFERES WITH THE ABILITY OF MEDIA AMICI TO COVER THE CONTROVERSY SURROUNDING THE "INNOCENCE OF MUSLIMS" VIDEO

The panel majority suggested that it was issuing a sui generis order based on the uniquely "troubling" facts of this "rare[]" case. Garcia, 766 F.3d at 932, 940. But even if the injunction at issue is limited solely to the "Innocence of Muslims" video, news coverage about the Video and this lawsuit have been and will continue to be improperly constrained.  For example, news organizations reporting on the September 11, 2012 attack on the U.S. Consulate in Benghazi, Libya initially reported conclusions from government sources that the attack might have been perpetrated by a mob infuriated by the portrayal of the Prophet Mohammed in the "Innocence of Muslims" film.[16]  News websites referenced, linked to, or embedded

---

[16] E.g., David D. Kirkpatrick, "Anger Over a Film Fuels Anti-American Attacks in Libya and Egypt," New York Times (Sep. 11, 2012) (available at http://www.nytimes.com/2012/09/12/world/middleeast/anger-over-film-fuels-anti-american-attacks-in-libya-and-egypt.html).

24

the Video to provide their audiences with context for the discussion about the role it might have played in the attack.[17]

Appellant's role is similarly newsworthy, as her claim to have been defrauded into participating sheds important light on how the video was created. The clip in which she appears is vital to illustrating this point, as it apparently shows that her performance was overdubbed with dialogue disparaging Mohammed.[18]  Furthermore, this lawsuit is itself a matter of substantial public interest, and Appellant has frequently spoken out in the media to express her views about the Video and to discuss her legal claims.  See Garcia, 766 F.3d at 947 (N.R.

---

[17] E.g., Robert Mackey & Liam Stack, "Obscure Film Mocking Muslim Prophet Sparks Anti-U.S. Protests in Egypt and Libya," New York Times, (Sep. 11, 2012) (available at http://thelede.blogs.nytimes.com/2012/09/11/obscure-film-mocking-muslim-prophet-sparks-anti-u-s-protests-in-egypt-and-libya/); "'Innocence of Muslims' unrest," Los Angeles Times (available at http://timelines.latimes.com/unrest-timeline/); Eyder Peralta, "What We Know About 'Sam Bacile,' The Man Behind The Muhammad Movie," National Public Radio (Sept. 12, 2012) (available at http://www.npr.org/blogs/thetwo-way/2012/09/12/161003427/what-we-know-about-sam-bacile-the-man-behind-the-muhammad-movie).

[18] E.g., "Actress in riot-sparking movie says cast didn't know film was about Muhammad," The Times of Israel (Sept. 13, 2012) (available at http://www.timesofisrael.com/actress-in-riot-sparking-movie-claims-cast-didnt-know-fim-was-about-muhammad/); "Why Are All The Religious References In 'Innocence Of Muslims' Dubbed?" On The Media (Sept. 12, 2012) (available at http://www.onthemedia.org/story/236861-religious-references-innocence-muslims-dubbed/); Phil Willon & Rebecca Keegan, "'Innocence of Muslims': Mystery shrouds film's California origins," Los Angeles Times (Sept. 12, 2012) (available at http://articles.latimes.com/2012/sep/12/world/la-fg-libya-filmmaker-20120913).

Smith, J., dissenting) ("Garcia admits in her affidavit that [she] 'went public and advised the world through media that [she] did not condone the film.'").[19]

In order to present a full picture of the controversy surrounding the Video, news organizations have to be able show their viewers and readers the relevant portion in which Appellant appears. Decades of First Amendment and fair use law suggest that they should be free, at the very least, to include such a brief excerpt in their coverage. E.g., Harper & Row, 471 U.S. at 563 (recognizing that publication of "briefer quotes from the memoirs are arguably necessary adequately to convey the facts" in article about book's publication); Sofa Entm't, Inc. v. Dodger Prods., 709 F.3d 1273, 1276 (9th Cir. 2013) (theatrical production's use of seven-second clip from television show "to mark a historical point" was protected fair use). By ordering removal of this clip from the Internet,[20] the panel majority has left news

---

[19] See also Colleen Curry, "'Innocence of Muslims' Actress Tells 'The View' She Forgives Filmmaker," ABC News (Sept. 26, 2012) (available at http://abcnews.go.com/Blotter/innocence-muslims-actress-tells-view-forgives-filmmaker/story?id=17330024); Adrian Chen, "'It Makes Me Sick': Actress in Muhammed Movie Says She Was Deceived, Had No Idea It Was About Islam," Gawker (Sept. 12, 2012) (available at http://gawker.com/5942748/it-makes-me-sick-actress-in-muhammed-movie-says-she-was-deceived-had-no-idea-it-was-about-islam); Stan Wilson, "'Innocence of Muslims' actress sues filmmaker, YouTube in federal court," CNN (Sept. 27, 2012) (available at http://www.cnn.com/2012/09/27/justice/muslim-film-lawsuit/).

[20] Rather than becoming the "editor" of the film, Google simply took the entire film off its site. A similar result is easy to anticipate if a news organization is ordered to omit portions of an expressive work from its news coverage.

26

organizations in an untenable – and, Media Amici believe, an unconstitutionally restricted – position, as they consider how to report about the ongoing controversy.

## V. CONCLUSION

The injunction before this Court not only directly restrains speech on a matter of public concern, but if allowed to stand, it would set a precedent that could enable disgruntled subjects of news coverage to misuse copyright law to silence reporting on controversial topics. Because this is contrary to well-established law, and could deprive the public of important information, Amici respectfully request that the Court affirm the decision of the District Court.

RESPECTFULLY SUBMITTED this 25th day of November, 2014.

DAVIS WRIGHT TREMAINE LLP
KELLI L. SAGER
DAN LAIDMAN
BRENDAN N. CHARNEY

By /s/ Kelli L. Sager
         Kelli L. Sager

Attorneys for Amici Curiae

## Appendix A

Pursuant to Federal Rules of Appellate Procedure 29(c) and 26.1, Amici Curiae provide the following:

**Los Angeles Times Communications LLC** (The Times), is the publisher of the Los Angeles Times, the largest metropolitan daily newspaper circulated in California. The Times also publishes through Times Community News, a division of the Los Angeles Times, the Daily Pilot, Coastline Pilot, Glendale News-Press, The Burbank Leader, Huntington Beach Independent, and the La Cañada Valley Sun, and maintains the website www.latimes.com, a leading source of national and international news. The Times is wholly owned by Tribune Publishing Company, which is publicly traded. Oaktree Tribune, L.P. owns 10 percent or more of Tribune Publishing Company's stock.

**Advance Publications, Inc.**, directly and through its subsidiaries, publishes more than 20 print and digital magazines with nationwide circulation, local news in print and online in 10 states, and weekly business journals in over 40 cities throughout the United States. It also owns numerous digital video channels and internet sites and has interests in cable systems serving over 2.4 million subscribers. Advance Publications, Inc. has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

DWT 25421183v5 0026175-000467

**The E.W. Scripps Company** is a publicly traded corporation. It has no parent corporation, and no publicly owned company owns 10% or more of its stock. It is a diverse, 131-year-old media enterprise with interests in television stations, newspapers, and local news and information web sites. The company's portfolio of locally focused media properties includes: 19 TV stations (10 ABC affiliates, three NBC affiliates, one independent and five Azteca Spanish language stations); daily and community newspapers in 13 markets; and the Washington, D.C.-based Scripps Media Center, home of the Scripps Howard News Service.

**WP Company LLC** (d/b/a The Washington Post) is a wholly owned subsidiary of Nash Holdings LLC. Nash Holdings LLC is privately held and does not have any outstanding securities in the hands of the public. WP Company LLC publishes The Washington Post, one of the nation's leading daily newspapers, as well as a website (www.washingtonpost.com) that reaches a monthly audience of more than 20 million readers.

**The New York Times Company** is a publicly traded company and has no affiliates or subsidiaries that are publicly owned. No publicly held company owns 10% or more of its stock. It is a leading global multimedia media news and information company, which publishes The New York Times and the International New York Times, and operates NYTimes.com and related properties.

DWT 25421183v5 0026175-000467

**National Public Radio, Inc.** (NPR) is a privately supported, not-for-profit membership organization that has no parent company and issues no stock. It produces and distributes its radio programming through, and provides trade association services to, nearly 800 public radio member stations located throughout the United States and in many U.S. territories. NPR's award-winning programs include Morning Edition, and All Things Considered, and serve a growing broadcast audience of over 23 million Americans weekly. NPR also distributes its broadcast programming online, in foreign countries, through satellite, and to U.S. Military installations via the American Forces Radio and Television Service.

**The National Press Photographers Association** is a 501(c)(6) nonprofit organization that has no parent company and issues no stock. It is dedicated to the advancement of visual journalism in its creation, editing and distribution. NPPA's approximately 7,000 members include television and still photographers, editors, students and representatives of businesses that serve the visual journalism industry. Since its founding in 1946, the NPPA has vigorously promoted and defended the rights of photographers and journalists, including freedom of the press in all its forms, especially as it relates to visual journalism.

**The California Newspaper Publishers Association** (CNPA) is a non-profit trade association representing more than 800 daily, weekly and student newspapers in California. For well over a century, CNPA has defended the First Amendment

30

rights of publishers to gather and disseminate – and the public to receive – news and information.

**The Reporters Committee for Freedom of the Press** (RCFP) is an unincorporated association of reporters and editors with no parent corporation and no stock.  RCFP works to defend the First Amendment rights and freedom of information interests of the news media.  The Reporters Committee has provided representation, guidance and research in First Amendment and Freedom of Information Act litigation since 1970.

**The First Amendment Coalition** (FAC) is a non-profit advocacy organization based in San Rafael, California, which is dedicated to freedom of speech and government transparency and accountability.  FAC's members include news media outlets, both national and California-based, traditional media and digital, together with law firms, journalists, community activists and ordinary citizens.

DWT 25421183v5 0026175-000467

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rules of Appellate Procedure 29(c) and 32(a)(7)(C), and

Circuit Rule 29-2(c), according to the word processing system used to prepare this

brief, the word count is 6,521 words, not including the caption, tables, signature

block, Statement of Compliance, Appendix A, and this certificate.

RESPECTFULLY SUBMITTED this 25th day of November, 2014.

> DAVIS WRIGHT TREMAINE LLP
> KELLI L. SAGER
> DAN LAIDMAN
> BRENDAN N. CHARNEY
>
>
> By /s/ Dan Laidman
>                Dan Laidman
>
> Attorneys for Amici Curiae

DWT 25421183v5 0026175-000467