**No. 12-57302**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

CINDY LEE GARCIA,

*Plaintiff-Appellant,*

v.

GOOGLE INC. AND YOUTUBE, LLC,

*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the Central District of California
Hon. District Judge Michael W. Fitzgerald
Case No. 2:12-cv-8315-MWF (VBK)

---

**BRIEF OF ADOBE SYSTEMS INC.; AUTOMATTIC INC.;
FACEBOOK INC.; GAWKER MEDIA, LLC, IAC/INTERACTIVECORP;
KICKSTARTER, INC.; PINTEREST INC.; TUMBLR INC.;
AND TWITTER, INC. AS AMICI CURIAE IN SUPPORT OF
GOOGLE AND YOUTUBE ON REHEARING EN BANC**

---

Andrew P. Bridges (CSB No. 122761)
abridges@fenwick.com
David L. Hayes (CSB No. 122894)
dhayes@fenwick.com
Kathryn J. Fritz (CSB No. 148200)
kfritz@fenwick.com
Todd R. Gregorian (CSB No. 236096)
tgregorian@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone: 415.875.2300

*Counsel for the Amici Curiae*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Amici Curiae Adobe, Automattic, Facebook, IAC/InterActiveCorp, Kickstarter, Pinterest, and Twitter hereby state that they have no parent corporations and there is no publicly held corporation that owns 10% or more of their stock.

Amicus Curiae Gawker Media, LLC hereby states that it is a wholly owned subsidiary of the privately held Gawker Media Group, Inc. No publicly held corporation owns 10% or more of its stock.

Amicus Curiae Tumblr hereby states that Yahoo! is its parent corporation and owns 100% of its stock.

i

# TABLE OF CONTENTS

**Page**

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ......................................i

INTEREST OF THE AMICI CURIAE ..................................................1

ARGUMENT ..................................................................6

INTRODUCTION ..............................................................6

I.    AN INJUNCTION TO PREVENT FUTURE UPLOADS OF MATERIAL IS AT ODDS WITH CONGRESSIONAL POLICY AND ESTABLISHED CASE LAW OF THE NINTH CIRCUIT AND OTHER CIRCUITS REGARDING THE DUTIES OF ONLINE SERVICES. ....................................................9

II.   THE PANEL'S ORDER TO SUPPRESS ALL APPEARANCES OF A COPYRIGHTED WORK WAS OVERBROAD BY REQUIRING THE TAKEDOWN OF BOTH INFRINGING AND NON-INFRINGING POSTINGS. ...............................................11

III.  THE OVERBREADTH CANNOT PRACTICALLY BE CURED BY TECHNOLOGY OR A MANUAL REVIEW PROCESS. ...................14

IV.  THE PANEL'S ORDER PREVENTING ALL APPEARANCES OF MATERIAL ALSO CONTRADICTS THIS COURT'S CONTRIBUTORY COPYRIGHT INFRINGEMENT STANDARD AND SUBJECTS ONLINE SERVICES TO GRAVE RISKS OF CONTEMPT. ...............................................17

V.   AN INJUNCTION LIMITED TO REMOVAL OF JUST THE COPYRIGHT HOLDER'S CONTRIBUTION IS SIMILARLY UNWORKABLE. ...............................................18

VI.  THE COURT SHOULD DISAVOW THE USE OF GAG ORDERS REGARDING COPYRIGHT LAW DECISIONS. ...................18

CONCLUSION ..............................................................20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Cariou v. Prince*,
714 F.3d 694 (2d Cir. 2013) ...............................................................12

*Corbis Corp. v. Amazon.com, Inc.*,
351 F. Supp. 2d 1090 (W.D. Wa. 2004) ..............................................11

*Eldred v. Ashcroft*,
537 U.S. 186 (2003) ............................................................................12

*Golan v. Holder*,
565 U.S. __, 132 S. Ct. 873 (2012) .....................................................12

*Lenz v. Universal Music Corp.*,
2013 U.S. Dist. LEXIS 9799 (C.D. Cal. Jan. 24, 2013) .....................13

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
545 U.S. 913 (2005) ............................................................................15

*New Era Publ'ns Int'l, ApS v. Henry Holt & Co.*,
695 F. Supp. 1493 (S.D.N.Y. 1988) ....................................................19

*Perfect 10, Inc. v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007) ............................................................17

*Perfect 10, Inc. v. CCBill LLC*,
488 F.3d 1102 (9th Cir. 2007) ............................................................10

*Salinger v. Colting*,
607 F.3d 68 (2d Cir. 2010) ..................................................................19

*UMG Recordings, Inc. v. Veoh Networks Inc.*,
665 F. Supp. 2d 1099 (C.D. Cal. 2009),
*aff'd*, 718 F.3d 1006 (9th Cir. 2013) ............................................15, 16

*UMG Recordings, Inc. v. Veoh Networks, Inc.*,
718 F.3d 1006 (9th Cir. 2013) ......................................................10, 13

iii

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Viacom Int'l, Inc. v. YouTube, Inc.*,
  676 F.3d 19 (2d Cir. 2012) ..................................................................10

*Wolk v. Kodak Imaging Network, Inc.*,
  840 F. Supp. 2d 724 (S.D.N.Y. 2012),
  *aff'd*, 569 Fed. Appx. 51 (2d Cir. June 17, 2014)..............................................11

*Zeran v. Am. Online, Inc.*,
  129 F.3d 327 (4th Cir. 1997) ..................................................................9

**STATUTES**

17 U.S.C. § 512 ..........................................................................*passim*

17 U.S.C. § 512(c)(3)(A)(i)-(vi) & (B)(i) ..........................................................9

17 U.S.C. § 512(c)(3)(A)(v) ....................................................................13

17 U.S.C. § 512(m) ........................................................................9, 10, 16

47 U.S.C. § 230(c)(1) ..........................................................................9

**RULES**

Fed. R. App. P. 29(c)(5)..........................................................................5

NINTH CIRCUIT RULE 29-2 ......................................................................5

**OTHER AUTHORITIES**

U.S. CONST. AMEND. I..........................................................................4, 7, 12, 20

SENATE REPORT NO. 105-190 (1998)..............................................................13

## INTEREST OF THE AMICI CURIAE

These Amici Curiae ("Amici") are leading online platforms and service providers in the areas of social media and networking, publishing, and e-commerce.

Adobe is a global leader in digital marketing and digital media solutions. Its tools and services allow customers to create groundbreaking digital content, deploy it across media and devices, measure and optimize it over time, and achieve greater business success. Adobe helps creative professionals, publishers, developers, and businesses create, publish, promote, and monetize their content anywhere. Its customers have a profound impact on our visual culture by continuing to reinvent design, art, the web, mobile apps, video, broadcast, and printed content.

Automattic is a small company that has a big impact on the Internet. It is a major contributor to the free software WordPress, which powers approximately 23% of the top 10 million web sites. Its WordPress.com service allows anyone to create a site, for free, in minutes. It hosts 33 million sites, ranging from large media properties to personal family blogs, which together attract nearly 400 million visitors a month. Automattic does this with a relatively small staff of fewer than 300, who work remotely from all across the world.

Facebook, Inc. is one of the world's leading providers of online networking services, and is one of the top five most-trafficked websites in the world.

1

Facebook provides a free Internet-based social media service that enables more than 1.3 billion people to connect with their friends and family, to discover what is going on in the world around them, and to share and publish the opinions, ideas, photos, and activities that matter to them and the people they care about.

Gawker Media is the publisher of some of the web's best-loved brands and communities, including the eponymous Gawker, the gadget sensation Gizmodo, and the popular sports site Deadspin. It both produces blogs and supports the interaction of uncompromisingly authentic editorial voices, exceptionally opinionated audiences, and bespoke brand advertising programs. Founded in 2002, Gawker's sites reach over 100 million readers around the world each month.

IAC/InterActiveCorp is a diversified online media company whose businesses are leaders in numerous sectors of the Internet economy. Many of these businesses, including Match.com, OkCupid, Ask.com, The Daily Beast, and Vimeo, provide users with the ability to post, search for, and view a wide variety of user-generated content.

Kickstarter is an independent company of about 100 people located in Brooklyn. Kickstarter provides a funding platform for creative projects— everything from films, games, and music to art, design, and technology. Kickstarter is full of ambitious, innovative, and imaginative projects that are brought to life through the direct support of others. Since its launch in 2009, 7.4

million people have pledged $1.4 billion, funding more than 74,000 creative projects.

Pinterest is an online platform that allows users to collect, share, and discover things they love. Pinterest users gather images and other content (each known as a "Pin") from their own collections or from across the Internet and organize them in themed collections called "boards." A board may relate to a nearly infinite variety of topics based on a given user's interests. As users browse the Internet, including the millions of boards and more than 30 billion Pins available on Pinterest, they can add the content they find to their own boards, and they can follow the Pinterest users and boards they find most interesting, useful, or inspiring. Pinterest thus provides a way for people to express themselves, connect with others who share their interests, discover new things, and engage with the people who create them. The Pinterest service is available on the web at www.pinterest.com and mobile apps for iOS and Android devices.

Tumblr is platform and website that allows its creators to share their artwork, writing, audio, video, and photography with the most adoring fans in the world. Tumblr is home to over 210 million blogs and 96 million posts, and, as such, on a daily basis it must deal with the copyright interests of both creators and consumers on its platform.

3

Twitter is a global platform for public self-expression and conversation in real time. The Twitter platform gives everyone the power to create and share ideas and information instantly, without barriers. Twitter has more than 284 million monthly active users creating approximately 500 million Tweets every day.

Many of the Amici compete with Google and YouTube, and with each other, but on the issues at stake in this appeal they unanimously urge the Court to overturn the panel's troublesome orders and opinion. Focusing specifically on the *copyright* issues this *copyright* case presents, both the balance of hardships and the public interest weigh strongly against an injunction. While these Amici are sensitive to Ms. Garcia's concerns about her being duped by a filmmaker and about threats to her safety, expansion and distortion of copyright law and remedies are not legitimate means of addressing those non-copyright concerns.

All these Amici have businesses that involve user-generated content, and together they receive and process millions of "takedown" requests each year. These Amici promote responsible conduct on the part of online services, their customers, and copyright holders in cooperative efforts to safeguard and balance copyright interests, free speech, and due process. In this brief, Amici urge respect for Congressional policies against imposing on online services the obligation to monitor their services and for the First Amendment, which copyright law protects in its fair use doctrine.

4

Amici submit this brief under Circuit Rule 29-2 and the Court's November 12, 2014 Order. (Dkt. No. 131.) All parties have consented to the filing of this brief.

Amici disclose that none of the circumstances in Rule 29(c)(5), Fed. R. App. P., exist with respect to this brief.

## ARGUMENT

## INTRODUCTION

The panel's injunction directed Google to take all reasonable steps to prevent future uploads of "Innocence of Muslims" to its YouTube service and any other platform under its control. The panel's decision and order are alarming.

First, the panel's decision and order are at odds with long established copyright jurisprudence and Congressional policy that the obligation of identifying infringements belongs to copyright holders and that service providers do not have a duty to monitor their services for all possible third-party copyright infringements. Second, the overbreadth of the order is contrary to Ninth Circuit precedent and denies the public's interest in free expression and access to information. Third, the panel's order erroneously assumes that service providers can determine whether a particular use of a copyrighted work is authorized or not, and the ruling also poses a serious threat to online service providers' businesses. Fourth, copyright remedies should focus on copyright concerns and do not deserve wild expansion to accommodate non-copyright interests. Focusing on the copyright interests in this copyright case, the balance of hardships and the public interest weigh strongly against an injunction.

The panel's decision failed to consider these points. Amici therefore urge this Court to engage in a correct examination of the balance of hardships and the

public interest in this appeal from denial of a motion for preliminary injunction. The Court should bear in mind Congress's policy decision to protect online services from burdens of monitoring or controlling all allegedly infringing activity on their services, and it should reconsider the severe burdens and risks the panel's decision has imposed on Google and other online services. In weighing the public interest, the Court should recognize that a requirement to prevent all future uploads of a challenged work may suppress important fair uses (and other permissible uses such as pursuant to license), not merely in this case but in general, and thus trample upon both fundamental copyright principles and related First Amendment interests.

Several points illustrate the improper burdens and impractical elements of the panel's decision:

- An online service cannot guarantee compliance with an order preventing all new appearances of material. Any combination of technological efforts and manual efforts would fail to distinguish between infringing and noninfringing uses and, even if they could make such distinctions, would still fall short, as Google's compliance efforts in this case show.

- Many online services, in particular smaller or newer competitors, lack resources, technology, staffing, or the appropriate architecture to attempt even partial compliance with the decision and order. Those efforts would

require significant financial, technological, and human capabilities, at

great expense, while yielding at best an uncertain outcome.

- The added threat of contempt sanctions would compel services to

  suppress lawful materials or withdraw their services, and the effect would

  be censorship of legitimate speech, improper removal of non-infringing

  material, and/or a loss of competition and choice in the online

  marketplace.

- As problematic as the single order at issue here may be, a precedent that

  would allow orders like it to become standard would be intolerable to the

  industry as a whole and to the public.

These Amici also express deep concern about the panel's use of a secret gag

order to block public knowledge about the panel's injunction. The goal of the gag

order was to keep the public in the dark about a court-ordered takedown of a film

that has been at the center of massive public and political debate and also the

subject of a newsworthy lawsuit for over a year. In this era of secret court orders,

service providers legitimately fear that government overreach may jeopardize their

public standing, harming both their businesses and the marketplace of free speech

and public inquiry. There is no place for this type of gag order in a copyright case.

Focusing their observations entirely on the panel's injunction and the

secrecy order, Amici urge the Court, acting en banc, to vacate the injunction and

disavow the gag order.  Amici also harbor concerns about the panel's copyright

infringement ruling, but they leave that to the arguments of Appellees and others.

In any event, because the balance of hardships and the public interest weigh

strongly against an injunction, for that reason alone the Court should also affirm

the District Court's denial of an injunction.

## I.    AN INJUNCTION TO PREVENT FUTURE UPLOADS OF MATERIAL IS AT ODDS WITH CONGRESSIONAL POLICY AND ESTABLISHED CASE LAW OF THE NINTH CIRCUIT AND OTHER CIRCUITS REGARDING THE DUTIES OF ONLINE SERVICES.

In enacting the Digital Millennium Copyright Act ("DMCA"), Congress

established a core principle that service providers have no obligation to monitor

their services for infringement.  17 U.S.C. § 512(m).[1]  Instead, the DMCA created

a notice-and-takedown process, requiring rightsholders to provide notice of

specific instances of claimed infringement in order to prompt a service provider

seeking DMCA protection to take down those identified instances.  17 U.S.C.

§ 512(c)(3)(A)(i)-(vi) & (B)(i).

---

[1] This policy is not unique to copyright law: in a different context, the
Communications Decency Act, 47 U.S.C. § 230(c)(1), protects online services
from the burdens of monitoring or filtering material from other sources.  "The
purpose of this statutory immunity is not difficult to discern. . . .  Section 230 was
enacted, in part, to maintain the robust nature of Internet communication . . . ."
*Zeran v. Am. Online*, *Inc.,* 129 F.3d 327, 330 (4th Cir. 1997).  "It would be
impossible for service providers to screen each of their millions of postings for
possible problems."  *Id.* at 331.  The same points apply in the copyright context.

9

In other words, a rightsholder cannot satisfy the notification requirement by merely stating that unspecified infringement is occurring in some form somewhere on a platform. Nor should a court issue an order that substitutes for a rightsholder's notifications. To shift the policing function onto online services, forcing them to search for unidentified instances of infringement without any notice from a rightsholder identifying the specific infringements, would be inconsistent with the mandate of Congress, which recognized that rightsholders— not online service providers—are in the best position to determine whether a particular use may be infringing.

Such burden shifting would also be contrary to Ninth Circuit law: "The DMCA notification procedures place the burden of policing copyright infringement—identifying the potentially infringing material and adequately documenting infringement—squarely on the owners of the copyright." *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1113 (9th Cir. 2007); *see also UMG Recordings, Inc. v. Veoh Networks, Inc.,* 718 F.3d 1006, 1029 (9th Cir. 2013) (DMCA imposes no investigative duties on service providers and places the burden of policing copyright infringement squarely on the owners of copyright).

Many other decisions are in accord. *See Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 35 (2d Cir. 2012) (Section 512(m) of the DMCA "is incompatible with a broad common law duty to monitor or otherwise seek out infringing activity

based on general awareness that infringement may be occurring"); *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 729 (S.D.N.Y. 2012) (DMCA does not require active enforcement by online services), *aff'd*, 569 Fed. Appx. 51, 52 (2d Cir. June 17, 2014) (summary order); *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1104 (W.D. Wa. 2004) (service provider does not have an affirmative duty under the DMCA to police its users).

The order here, which requires Google actively to monitor its service for infringing material, without any notice of specific infringements, thus conflicts with the structure and purpose of the DMCA, as amplified by the extensive body of law that has construed that statutory framework. In so erring, the order wrongly assesses the balance of hardships. It imposes on Google the duty to seek out infringements of Ms. Garcia's asserted copyright, notwithstanding the fact that the provisions of the DMCA and numerous decisions of this and other courts squarely place enforcement responsibilities on copyright holders.

## II. THE PANEL'S ORDER TO SUPPRESS ALL APPEARANCES OF A COPYRIGHTED WORK WAS OVERBROAD BY REQUIRING THE TAKEDOWN OF BOTH INFRINGING AND NON-INFRINGING POSTINGS.

The panel's order was also overbroad by requiring the takedown of both infringing and non-infringing postings. The order fails to recognize that, while one person's upload may be infringing, other uploads may constitute fair use, be subject to license, or otherwise be lawful. Infringement depends on many facts

11

that will not be clear on the surface of any activity, and an injunction requiring prospective blocking of all uploads, without distinguishing lawful from unlawful, is plainly overbroad.

The panel majority sidestepped this difficult issue, offering only the platitude that the First Amendment does not protect copyright infringement. But the panel failed to consider the many non-infringing uses within the injunction's scope that would not be inconsistent with the First Amendment, such as a fair use that describes the controversy over this very case.[2] Indeed, because fair use is a "built-in First Amendment accommodation[]," *see Eldred v. Ashcroft,* 537 U.S. 186, 219 (2003); *Golan v. Holder,* 565 U.S. __, 132 S. Ct. 873, 890 (2012), the panel's injunction amounts to a ruling that fair use can never apply with respect to the work.

Even enjoining a service provider from ever hosting *unlawfully* (not just all, as here) uploaded material would impose an impossible burden because only a rightsholder itself—not a third party such as an online service provider—can determine whether the rightsholder's work is being infringed in any particular instance. Given the common-sense nature of this principle, it is well-rooted in

---

[2] Courts regularly reproduce original works to explain their analysis and results. *See, e.g., Cariou v. Prince,* 714 F.3d 694, 701-703 (2d Cir. 2013). Public discussions of the legal controversies naturally often reproduce the copyrighted works at issue, even beyond the reproductions the court included. *See, e.g., http://www.artnet.com/magazineus/news/corbett/prince-wins-right-to-appeal-in-cariou-v-prince.asp.*

copyright law. *See* S. Rep. No. 105-190 (1998), at 48 (service providers "could not be expected . . . to determine whether [a work] was still protected by copyright or was in the public domain; . . . whether the use was licensed; and if the use was not licensed, whether it was permitted under the fair use doctrine"). Accordingly, this Court's precedent wisely rejected the requirement that a service provider identify all infringements, "declin[ing] to shift [that] substantial burden from the copyright owner to the provider." *Veoh*, 718 F.3d at 1022 (citation omitted). The Court should not shift that burden now.

Even where a court determines a service provider has failed to take down infringing material, the appropriate remedy is not to mandate that the service block *all* instances, infringing and lawful, of the work. The DMCA acknowledges that not all online uses are infringing, and it therefore requires rightsholders to state specifically in their notifications that the use they challenge "is not authorized by the copyright owner, its agent, *or the law*." 17 U.S.C. § 512(c)(3)(A)(v) (emphasis added). In fact, a copyright owner must make at least an initial assessment as to whether the fair use doctrine applies to a challenged use before submitting a DMCA takedown notice asserting that the use is not "authorized by law." *Lenz v. Universal Music Corp.*, 2013 U.S. Dist. LEXIS 9799, at *17-18 (C.D. Cal. Jan. 24, 2013). Ordering removal of all instances of a work takes consideration of lawful uses out of the picture and harms the public interest.

## III. THE OVERBREADTH CANNOT PRACTICALLY BE CURED BY TECHNOLOGY OR A MANUAL REVIEW PROCESS.

Even were the panel's injunction to be narrowed to require takedown of only future *infringing* postings, it would be impossible as a practical matter to comply with such an order, even with the assistance of technology or a manual review process.

This is so, first and foremost, because there is simply no human review, technology, or other mechanism that would allow for a third-party online service to determine whether a particular use of a rightsholder's work is authorized in any given situation or not. For example, an online service cannot know whether a use may be pursuant to license, may be a fair use, or otherwise may be permitted by the rightsholder or non-infringing under the law. Indeed, infringement is always context-specific. It depends on such factors as who uploaded the content, what portion was used and for what purpose, which permissions were obtained, and so on. It is impossible for an algorithm to interpret the context or manner in which a work is used. For example, there is no way to automatically distinguish between an infringing image and one used for the purposes of education, satire, or news reporting.

The inability of online services to make such infringement determinations is highlighted by the limitations of current technologies. Those technologies can make no determinations regarding whether a given use is fair, licensed, or

14

otherwise lawful; the extent of their capability is to determine, at best, whether there is likely a content match. There are significant limitations on their capability to match content. Moreover, there are countless other ways that filtering tools can be ineffective. File names, sizes, encodings, and format are just some of the trivial things that can be altered to create a "new" version of the same material that may cause it to pass through a filter. Simple modifications of the material itself could also have a similar effect, such as blurring parts of a picture or flipping a video horizontally. Given the large range of possible ways to circumvent filtering technology, the effect of requiring its use may simply be to create an ever-escalating series of burdens that may ultimately be ineffective, while at the same time indiscriminately removing non-infringing uses of material.

Courts predictably have recognized many of the limitations inherent to recognition tools. *See, e.g., UMG Recordings, Inc. v. Veoh Networks Inc.*, 665 F. Supp. 2d 1099, 1104 (C.D. Cal. 2009) (noting that the Audible Magic tool had failed to identify several hundred files on the Veoh service as infringing), *aff'd*, 718 F.3d 1006 (9th Cir. 2013). The fact remains that the most robust tools are simply too expensive for many providers, are still imperfect, and cannot properly address the dynamic nature of content or fair uses. And even if filtering technologies were effective to identify all infringing materials, a service provider has no general legal duty to redesign its service to make use of them. *See Metro-*

15

*Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 939 n.12 (2005) ("Of course, in the absence of other evidence of intent, a court would be unable to find contributory infringement liability merely based on a failure to take affirmative steps to prevent infringement, if the device otherwise was capable of substantial noninfringing uses.  Such a holding would tread too close to the *Sony* safe harbor."); *UMG Recordings*, 665 F. Supp. 2d at 1113 (requiring service providers to adopt specific filtering technology and perform regular searches would impermissibly condition the DMCA safe harbors on monitoring of their services, in contravention of Section 512(m)).

    In addition, the extraordinary cost and burden with respect to one item of material or one activity in one case would multiply if courts were to issue stay-down orders frequently.  The largest service providers would face a complex burden even attempting compliance, without guarantee of success or accuracy; but most service providers simply would not have the personnel or financial resources even to attempt compliance.

16

**IV.  THE PANEL'S ORDER PREVENTING ALL APPEARANCES OF MATERIAL ALSO CONTRADICTS THIS COURT'S CONTRIBUTORY COPYRIGHT INFRINGEMENT STANDARD AND SUBJECTS ONLINE SERVICES TO GRAVE RISKS OF CONTEMPT.**

Requiring service providers to "take all reasonable steps to prevent further uploads" also contradicts copyright law in this Circuit and threatens serious consequences, including the prospect of contempt.

In *Perfect 10, Inc. v. Amazon.com, Inc.,* 508 F.3d 1146, 1172 (9th Cir. 2007), the Court held that an online service provider may face liability for failure to take "simple measures" after it has actual knowledge that specific infringing material is on its system.  Unlike takedowns in response to DMCA notifications, proactive monitoring and filtering of online services, as the panel ordered here, are hardly "simple measures":  as detailed in the previous section, they pose formidable challenges, and even sophisticated services may stumble in compliance efforts. Google's efforts to comply with the panel's orders are telling.  Ms. Garcia sought contempt sanctions notwithstanding Google's extensive resources and efforts focused on a single work.

Put simply, the financial constraints combined with the risks involved in complying with an order like the panel's could drive some online services out of business.

17

## V.    AN INJUNCTION LIMITED TO REMOVAL OF JUST THE COPYRIGHT HOLDER'S CONTRIBUTION IS SIMILARLY UNWORKABLE.

To the extent the panel envisioned Google's editing the "Innocence of Muslims," that is not a practical alternative in general or at scale.  Imagine a service provider receiving demands from 100 actors, each claiming a copyright in his or her individual performance in a different video, that their performances be taken down from the system.  If, as is typically the case, multiple instances of each such video reside on the service provider's system, compliance with those demands could require the service provider to edit tens of thousands of instances of the videos.

Online services are not, and should not be, editors of their users' works.  They do not have the capacity or desire to edit works at scale; it is not their competence; and they do not wish to risk new legal attacks over alterations in order to comply with an injunction that allows altered material.

## VI.    THE COURT SHOULD DISAVOW THE USE OF GAG ORDERS REGARDING COPYRIGHT LAW DECISIONS.

The panel's original order required a secret takedown of material.  This created a troubling precedent, and Amici urge the Court to disavow this approach.

Online service providers have historically promoted openness regarding requests they receive to remove content on their platforms.  This has become especially important in recent years, where government secrecy—especially

18

judicial secrecy—has provoked public outcry.  Some services now issue public

reports about various requests they receive (*see, e.g.*, the Google Transparency

Report at www.google.com/transparencyreport/removals/copyright/), and some

forward requests to publications or clearinghouses for public disclosure (*see, e.g.*,

the online database at www.chillingeffects.org).  Others publicly disclose, at the

place the material previously appeared, why the material has disappeared.

Openness about responses to outside demands is important for trust between

online service providers and their users, and copyright law enforcement deserves

robust debate that public disclosure facilitates.  The panel's use of a secret

takedown order in response to a very public, long-simmering claim dressed in

copyright garb frustrates these purposes.  Without the power to disclose the reasons

for its actions, a service loses credibility:  a sudden and unexplained disappearance

of a newsworthy item will create an inference that the service provider yielded to

pressure from a private interest.

"[T]he justification of the copyright law is the protection of the commercial

interest of the []author.  It is not to . . .  protect secrecy, but to stimulate creation by

protecting its rewards."  *Salinger v. Colting*, 607 F.3d 68, 81 n.9 (2d Cir. 2010)

(quoting *New Era Publ'ns Int'l, ApS v. Henry Holt & Co.*, 695 F. Supp. 1493, 1526

(S.D.N.Y. 1988)).  The Court should not, *in the name of copyright*, issue a secret

19

order directing an online service to censor its site secretly or preventing it from explaining a disappearance of material.

## CONCLUSION

Because the panel decision conflicts with established copyright law protecting online services from monitoring burdens, is overbroad and threatens First Amendment interests, and is unworkable as a practical matter and therefore dangerous to services, and because the balance of hardships and public interest both weigh heavily against a preliminary injunction in this copyright dispute, the Court should vacate the panel's injunction and affirm the District Court's denial of the preliminary injunction.

Dated: November 25, 2014     Respectfully submitted,

By: *Andrew P. Bridges*

Andrew P. Bridges
David L. Hayes
Kathryn J. Fritz
Todd R. Gregorian
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone: (415) 875-2300

Counsel for *Amici Curiae*

## CERTIFICATE OF COMPLIANCE

I certify that the attached brief is proportionally spaced, has a typeface of 14 points or more, and contains 4,226 words (based on the word processing system used to prepare the brief).

Dated: November 25, 2014          Respectfully submitted,

By:  *Andrew P. Bridges*

Andrew P. Bridges
David L. Hayes
Kathryn J. Fritz
Todd R. Gregorian
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone: (415) 875-2300

Counsel for *Amici Curiae*

21

## CERTIFICATE OF SERVICE

I caused the electronic filing of this paper with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit through the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and therefore will be served by the appellate CM/ECF system.

Dated: Nov. 25, 2014       Respectfully submitted,

By: *Andrew P. Bridges*

     Andrew P. Bridges
     David L. Hayes
     Kathryn J. Fritz
     Todd R. Gregorian
     FENWICK & WEST LLP
     555 California Street, 12th Floor
     San Francisco, CA 94104
     Telephone: (415) 875-2300

     Counsel for *Amici Curiae*