NO. 12-57302

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

CINDY LEE GARCIA,

PLAINTIFF-APPELLANT,

v.

GOOGLE INC. AND YOUTUBE, LLC,

DEFENDANTS-APPELLEES.

On Appeal from the United States District Court
for the Central District of California
Case No. CV-12-8315-MWF (VBKx)
Honorable Michael W. Fitzgerald, District Court Judge

## BRIEF OF AMICI CURIAE PROFESSORS OF INTELLECTUAL PROPERTY LAW IN SUPPORT OF GOOGLE, INC. AND YOUTUBE, LLC

CHRISTOPHER NEWMAN
ASSISTANT PROFESSOR
GEORGE MASON UNIVERSITY
SCHOOL OF LAW
3301 Fairfax Drive
Arlington, VA 22201
(703) 993-8131
cnewman2@gmu.edu

JENNIFER S. GRANICK
STANFORD LAW SCHOOL
CENTER FOR INTERNET AND SOCIETY
559 Nathan Abbott Way
Stanford, CA 94305
(650) 736-8675
jennifer@law.stanford.edu

CHRISTOPHER JON SPRIGMAN
PROFESSOR, NEW YORK UNIVERSITY
SCHOOL OF LAW
CO-DIRECTOR, ENGELBERG CENTER
ON INNOVATION LAW AND POLICY
40 Washington Square South
New York, NY 10012
(212) 992-8162
Christopher.Sprigman@nyu.edu

*Counsel for Amici Curiae*
*Professors of Intellectual Property*
*Law*

November 25, 2014

*THIS BRIEF IS FILED ON BEHALF OF THE FOLLOWING PROFESSORS (INSTITUTIONAL AFFILIATIONS ARE LISTED FOR IDENTIFICATION PURPOSES ONLY):*

Annemarie Bridy
Alan G. Shepard Professor of Law
University of Idaho College of Law

Sarah Burstein
Associate Professor of Law
The University of Oklahoma College of Law

Sean Flynn
Associate Director, Program on Information Justice and Intellectual Property
Professorial Lecturer in Residence
American University Washington College of Law

James Grimmelmann
Professor of Law
University of Maryland, Francis King Carey School of Law

Deidre A. Keller
Associate Professor of Law
Ohio Northern University

Mark A. Lemley
William H. Neukom Professor, Stanford Law School
Director, Stanford Program in Law, Science, and Technology
Senior Fellow, Stanford Institute for Economic Policy Research

Yvette Joy Liebesman
Associate Professor of Law
Saint Louis University School of Law

Lydia Pallas Loren
Robert E. Jones Professor of Advocacy and Ethics
Lewis & Clark Law School

Mark McKenna
Associate Dean for Faculty Research and Development
Professor of Law
Notre Dame Presidential Fellow
University of Notre Dame School of Law

Joseph Scott Miller
Professor
University of Georgia School of Law

Stephen McJohn
Professor, Suffolk University Law School

Prof. Tyler T. Ochoa
High Tech Law Institute
Santa Clara University School of Law

Guy A. Rub  Assistant Professor of Law
The Ohio State University, Michael E. Moritz College of Law

Pamela Samuelson
Richard M. Sherman Distinguished Professor of Law
Berkeley Law School

Jason Schultz
Professor of Clinical Law
Director, Technology Law & Policy Clinic
Co-Director, Engelberg Center on Innovation Law and Policy
NYU School of Law

Jessica Silbey
Professor of Law
Suffolk University Law School

David E. Sorkin
Associate Professor
The John Marshall Law School, Chicago

Rebecca Tushnet
Professor of Law
Georgetown Law School

Ryan Vacca
Associate Professor of Law
Director of Faculty Research and Development
University of Akron School of Law

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned states that the amicus is not a corporation that issues stock or has a parent corporation that issues stock.

Dated: November 25, 2014                By: /s/ Jennifer S. Granick
                                        Counsel for Amici Curiae

## STATEMENT OF COMPLIANCE WITH RULE 29(C)(5)

This brief is submitted pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure with the leave of the Court. No party's counsel authored the brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person other than the amicus curiae, its members, or its counsel, contributed money that was intended to fund preparing or submitting the brief.

Dated: November 25, 2014                    By: /s/ Jennifer S. Granick
                                                                Counsel for Amici Curiae

# TABLE OF CONTENTS

Corporate Disclosure Statement ....................................................... i

INTERESTS OF AMICI ................................................................. 1

ARGUMENT .............................................................................. 2

    I.    Introduction ............................................................... 2

    II.   Copyright, Authorship, and the Problem of Collaborative
        Creativity ..................................................................... 4

    III.  Copyright's authorship rules and the risk of "fragmentation"
        of ownership ............................................................ 14

# TABLE OF AUTHORITIES

## Cases

*American Broadcasting Companies, Inc. v. Aereo*, 134 S.Ct. 2498 (2014) .............8

*Aalmuhammed v. Lee*, 202 F.3d 1227 (9th Cir. 2000).................................... passim

*Andrien v. Southern Ocean County Chamber of Commerce*,
   927 F.2d 132 (3d Cir. 1991) ......................................................... 10, 11

*Burrow-Giles Lithographic Co. v. Sarony*, 11 U.S. 52 (1884)................................12

*Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989) .............. 2, 11

*Effects Assoc., Inc. v. Cohen*, 908 F.2d 555 (9th Cir. 1990)......................................5

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991) ...........................16

*Kiss Catalog, Ltd. v. Passport Int'l Prod., Inc.*, 405 F.Supp. 2d 1169
   (C.D. Ca. 2005) .......................................................................................9

*Lindsay v. R.M.S. Titanic*, 52 U.S.P.Q.2d 1609 (S.D.N.Y. 1999)............................9

*Metro-Goldwyn-Mayor Inc. v. American Honda*, 900 F.Supp. 1287
   (C.D.Cal. 1995)......................................................................................16

*Thomson v. Larson*, 147 F.3d 195 (2d Cir. 1998)........................................... 10, 13

*U.S. v. ASCAP,* 627 F.3d 64 (2d Cir. 2010)...............................................................8

*United States v. Martignon*, 492 F.3d 140 (2d Cir. 2007) .......................................9

*United States v. Moghadam*, 175 F.3d 1269 (11th Cir. 1999)..................................9

## Constitutional Provisions

U.S. Const., art. I, §8...................................................................................2

## Statutes

17 U.S.C. §101 ............................................................................... passim

17 U.S.C. §102 .........................................................................2, 7

17 U.S.C. §107 ...........................................................................15

17 U.S.C. § 202 ...........................................................................8

17 U.S.C. §203 ..........................................................................18

## Other Authorities

Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* (2013)....................9

Copyright Office Registration Form SR, *available at*
   http://www.copyright.gov/forms/formsr.pdf ..........................................7

DeNeen L. Brown and Hamil R. Harris, *A Struggle for Rights: 'Eyes on
   the Prize' Mired in Money Battle*, Washington Post, Jan. 17, 2005,
   *available at* http://www.washingtonpost.com/wp-dyn/articles/A14801-
   2005Jan16.html......................................................................15

H.R. Rep. No. 1476, 94th Cong., 2d Sess. 53, *reprinted in*
   1976 U.S. Code Cong. & Admin. News 5659.................................6, 7

Register of Copyrights, Section 1201 Rulmaking: Fifth Triennial Proceeding to
   Determine Exemptions to the Prohibition on Circumvention 126 (Oct. 2012) ...16

## INTERESTS OF THE AMICI AND CONSENT TO FILE

Amici are law professors who teach and write about copyright law. Amici are concerned this case has serious implications for a foundational element of the copyright law: the baseline requirements for copyrightability. Further, Amici anticipate that a ruling in favor of the appellant will create significant practical difficulties for firms and individuals producing the creative works that copyright is intended to incentivize.

**ARGUMENT**

## I.    Introduction

Under Article I, Section 8 of the U.S. Constitution, Congress is given the power to grant copyrights only to "authors," and only for "their . . . writings."  U.S. Const., Art I, Sec 8.   Each of these constitutional prerequisites is crucial to the coherence of copyright as a system.  The writing requirement ensures that copyright is granted only in fully actualized works with boundaries that distinguish them both from other works and from noncopyrightable ideas.  The authorship requirement ensures both that each protected work will have a clearly identified initial owner who can authorize its use, and that this owner will be the person responsible for creating the "writing"— the fixed form that renders the work distinct and eligible for protection.  *See* Community for Creative Non-Violence v. Reid, 490 U.S. 730, 737 (1989) (the "author" of a work is the person "who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection."). These constitutional requirements are implemented in Congress's directive that copyright shall subsist only in "works of authorship" that are both "original" and "fixed in any tangible medium of expression[.]"  17 U.S.C.  §102(a).

The constitutional rule that only "authors" who create "writings" receive exclusive rights means that there will be many instances where an artist creates original and valuable expression, yet does not receive her own copyright in that

2

expression.  This may occur in two ways:  either 1) the expression is not given permanent form, and hence never comes to be protected by copyright at all; or 2) the expression *is* given permanent form, but not "by or under the authority of the author."[1]  In either event, the work is not "fixed" as that term is defined in Title 17.[2]  The reason the artist does not receive copyright in these cases is not that her expression is necessarily any less original or valuable than that to which copyright attaches.  Nor is it that her creative labor is necessarily any less worthy of recognition and reward.[3]  Rather, it is because any system of property rights must employ formal rules that translate underlying claims of creation and merit into well-defined *ownership claims* that reduce—rather than multiply—conflicts over who is entitled to control a given piece of artistic or literary expression.  The problem with an unfixed work is that we can't tell what is supposed to be owned; the problem with a work fixed outside the artist's authority is that we can't tell

---

[1] 17 U.S.C. §101 ("A work is "fixed" in a tangible medium of expression when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration.").
[2] *Id.*
[3] The same phenomenon exists in traditional regimes of tangible property as well. Even though one of the key normative underpinnings of private property rights is the idea that people deserve to benefit from the fruits of their labor, not all value-creating labor results in the laborer's acquiring a property claim in the value he creates or things he labors on.  This is especially the case where the labor in question takes place in conjunction with others and/or using resources provided by others.  In such cases the laborer may well have a quantum meruit claim to compensation, but no property interest in the improvements to which he contributed.

3

what is supposed to be owned *by her*.[4]

No one doubts that through her performance, Ms. Garcia contributed original creative expression to the film production in which she participated. The question is whether the circumstances of that contribution are such as to give her sole ownership of any separate "work of authorship" that now allows her to exercise exclusive control over all footage in which she appears. Ms. Garcia has highly unusual and sympathetic reasons for asserting this claim, as it appears that she was not only deceived as to the intended nature of the film, but subjected to serious harassment as a result of the form in which it was released. The logic of her claim, however, has implications that go far beyond this case, and that threaten to undermine copyright's ability to foster the creation and dissemination of collaborative works of authorship.

## II.    Copyright, Authorship, and the Problem of Collaborative Creativity

There are many creative endeavors—filmmaking being a prominent example—in which numerous individuals, working collaboratively with others, contribute various forms of expression toward the creation of a complex work. The types of contribution range across a huge creative gamut, as anyone who has ever sat through a motion picture's closing credits can attest.

---

[4] How, for example, is the expression claimed by Ms. Garcia to be disaggregated from that contributed by the other actors, the director, the editor, or the cinematographer? The film merges all these contributions into a single seamless "writing," no part of which embodies Ms. Garcia's performance in isolation but only as combined with the creative contributions of the others.

Some of these contributions—such as screenplays, artwork, musical scores, or the special effects footage at issue in *Effects Assoc., Inc. v. Cohen*[5]—take the form of free-standing works that are conceived and independently fixed by their contributors prior to their incorporation into the film. Each such work acquires its own copyright from the moment of its fixation, and its respective author (assuming the work does not qualify as work for hire)[6] does not lose ownership of that work by virtue of its subsequent incorporation in the film. If that use is not licensed by the owner (or allowed by law), it is infringing.

Clearly, this is not the nature of Ms. Garcia's claim in her performance. She did not arrive at the film set having already reduced to fixed form her part in the script. Instead, her performance was created on set, under the guidance of the director and in collaboration with the other actors in her scenes. This is another common form of creative collaboration, in which previously nonexisting or unfixed contributions of various people come to be fixed simultaneously in a single "writing."

When an artist contributes expression to a collaborative work in this manner, there are two possibilities, each having different consequences for ownership. The first possibility is that the artist in question exercises (sole or shared) authorial control over the "writing" in which her contribution comes to be fixed. In this

---

[5] 908 F.2d 555 (9th Cir. 1990).
[6] See 17 U.S.C. §101 (definition of "work made for hire").

5

case, the artist is the author (or a co-author) of the resulting work, and may use the copyright in that work to protect the expression she contributed to it. The second possibility is that the artist did not exercise authorial control over the "writing," in which case she is not an author or co-author of the resulting work. In this case, while her contribution will form part of the protected expression contained within the resulting work, she will not acquire a separate copyright in that expression because it was never fixed by her or "under [her] authority."[7]

A common example that illustrates the first possibility takes place when a group of recording artists and one or more producers collaborate in the studio to produce a record album. In these instances, the collaborators (often, though not always) exercise joint creative control over the recording process, and thereby become co-authors and co-owners in the copyright of the resulting work—the sound recording.[8] It is important to note that in such cases the musicians' claim to co-ownership of the sound recording does not stem merely from the fact that the sounds of their performance are captured on it. As this Court explained in *Aalmuhammad v. Lee*,[9] authorship accrues to those who "superintend[] the work by

---

[7] 17 U.S.C. §101.

[8] See H.R. Rep. No. 1476, 94th Cong., 2d Sess. 53, reprinted in 1976 U.S. Code Cong. & Admin. News 5659, 5669 ("The copyrightable elements in a sound recording will usually, though not always, involve 'authorship' both on the part of the performers whose performance is captured and on the part of the record producer responsible for setting up the recording session, capturing and electronically processing the sounds, and compiling and editing them to make the final sound recording.").

[9] 202 F.3d 1227 (9th Cir. 1999).

exercising control."[10]  To exercise creative control in the studio it is neither necessary nor sufficient to be in direct command of the mixing board, but one must do more than simply create sounds without having any say as to the form in which they come to be fixed.[11]  Recording artists commonly make or participate in creative decisions as to what will be performed and how, which takes of their performances will be used, and how they will be combined to create the final recording.  In so doing, they exercise collaborative control over the final content of the recording.[12]

It is also worth clarifying that in this scenario, the musicians whose performances are captured in the recording do not obtain copyright *in their performances*.  Rather, they obtain—along with the producer—co-authorship of *the sound recording.*   The Copyright Office recognizes performance as a possible means of making authorial contribution to a recording, not as a category of protected work.[13]  Indeed, even to refer to performance as a type of "work" is an

---

[10] Aalmuhammad at 1234.

[11] *See* H.R. Rep. No. 1476 at 5669 ("There may, however, be cases where the record producer's contribution is so minimal that the performance is the only copyrightable element in the work, and there may be cases (for example, recordings of birdcalls, sounds of racing cars, et cetera) where only the record producer's contribution is copyrightable. ").

[12] In a collaborative project the exercise of artistic control may of course be very elusive to identify.  This is why this Court, like others, has emphasized the importance of recourse to "objective manifestations of a shared intent to be coauthors," so that after-the-fact expressions of subjective intent do not "become an instrument of fraud[.]" *See Aalmuhammad,* 202 F.3d at 1234.

[13] *See* Copyright Office Registration Form SR, available at http://www.copyright.gov/forms/formsr.pdf.  *See also* 17 U.S.C. §102(a) (listing

unfortunate blurring of concepts likely to create confusion. Copyright law and terminology have long striven to distinguish between works of authorship and the particular actions through which they can be created or exploited.[14] By definition, a "performance" is not a work but an event—a series of actions that renders the contents of a work perceptible to an audience.[15] A new work (such as an improvised jazz solo or set of rap lyrics) may be composed and (if recorded by or under the authority of the author) fixed during the act of performing it, but that work and the performance of it remain two distinct things. Even where recording a performance serves as the means of fixing the performed work, it remains true that the performance is not *itself* the work, but the act by which the content of the work

---

musical works and sound recordings, but not performances, among recognized categories of copyrightable works). While the list in section 102 is not necessarily exclusive, performances are such an integral part of the world of copyright that if they were thought to constitute works one would expect them to have been listed. Properly speaking, the work Ms. Garcia claims ownership in is a derivative dramatic work that encompasses only whatever original dramatic elements she added to the script in the course of acting it.

[14] *See* 17 U.S.C. § 202 (distinguishing between work and object in which it is embodied).

[15] 17 U.S.C. §101 ("To "perform" a work means to recite, render, play, dance, or act it, either directly or by means of any device or process[.]"). The term "performance" is already under significant pressure, as technological developments have made it more difficult to identify the types of activities that should be regarded as performing. *See e.g. American Broadcasting Companies, Inc. v. Aereo*, 134 S.Ct. 2498 (2014) (considering whether internet retransmission of broadcast signals to individual subscribers constituted performance); *U.S. v. ASCAP,* 627 F.3d 64, 73 (2d Cir. 2010) (considering whether digital downloads are also performances). It would be unfortunate to add to this already challenging territory the need to distinguish between "performance" as a means of exploiting a work and "performance" as a category of protected work.

8

is communicated from the performer to the recording apparatus.[16]

For collaborators like our recording artists to become co-authors of a work, two things must be true: 1) they must each qualify as "authors"; 2) they must intend "that their contributions be merged into inseparable or interdependent parts of a unitary whole."[17] In *Aalmuhammad v. Lee*, this Court detailed what is required to satisfy the first criterion. To qualify as an "author" of a work, it is not enough to make a "substantial creative contribution" to it; one must exercise "artistic control."[18] Mr. Aalmuhammad's claim to co-authorship of the film "Malcolm X" failed, because even though he had made significant creative

---

[16] It is precisely because evanescent performances cannot qualify as "writings" that, when Congress chose to provide musical performers with protection against unauthorized recordings of their performances, it did so not as a matter of copyright but as an exercise of its powers under the Commerce Clause. *See* United States v. Moghadam, 175 F.3d 1269 (11th Cir. 1999); United States v. Martignon, 492 F.3d 140 (2d Cir. 2007); Kiss Catalog, Ltd. v. Passport Int'l Prod., Inc., 405 F.Supp. 2d 1169 (C.D. Ca. 2005). If the recent Beijing Treaty on Audiovisual Performances (adopted at Beijing on June 24, 2012) were ever to come into force, presumably it too would require implementing legislation under the Commerce Clause. *See* 1 M.B. NIMMER &D. NIMMER, NIMMER ON COPYRIGHT § 1.12[A] (2013) (International copyright agreements are non-self executing – meaning that they only become judicially cognizable through domestic legislation implementing their mandates.). In any event, the Beijing Treaty has no effect on this case, as it is not in force (Article 26 of the Treaty requires 30 ratifications to come into force; to date, there are only 6 ratifications), nor has it been ratified by the U.S. Senate.
[17] *See* 17 U.S.C. 101 ("A "joint work" is a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole."); Aalmuhammad at 1231-34.
[18] 202 F.3d. at 1233. *See also* Lindsay v. R.M.S. Titanic, 52 U.S.P.Q.2d 1609, 1614 (S.D.N.Y. 1999) (author of film was director who "retained what appeared to be exclusive authority over what was included in the footage").

contributions that were incorporated into the movie,[19] and even though he intended those contributions to be merged into it, he did not exercise the kind of artistic control over the film that could support a claim of authorship. For identical reasons, Ms. Garcia does not qualify as an "author" of the film *The Innocence of Muslims*—indeed, she makes no claim to the contrary.

Instead, Ms. Garcia claims that she owns separate copyright in the artistic expression she contributed to the film. She cannot, however—for the very same reason she is not a co-author of the film itself. To be an author, one must exercise artistic control over the fixation of one's work. *See, e.g.* Thomson v. Larson, 147 F.3d 195, 202-03 (2d Cir. 1998) (dramaturg who contributed actual language to text of play was not author, because she lacked decision making authority over what would ultimately be included in script); Andrien v. Southern Ocean County Chamber of Commerce, 927 F.2d 132 (3d Cir. 1991) (printer who created artwork and lettering for map was not author, because her work was performed under the close direction of real estate agent who commissioned map). The only way to rule in favor of Ms. Garcia is to read "under the authority of the author" as demanding no more than bare consent to someone else's act of fixation, regardless of this other person's purposes in doing so. Such a reading, however, destroys the whole

---

[19] 202 F.3d. at 1230: "Aalmuhammed submitted evidence that he directed Denzel Washington and other actors while on the set, created at least two entire scenes with new characters, translated Arabic into English for subtitles, supplied his own voice for voice-overs, selected the proper prayers and religious practices for the characters, and edited parts of the movie during post production."

purpose of requiring that exclusive rights be granted only to "authors" for "*their* writings*." It is *fixation* that gives a work of authorship definitive form and content, and the act of choosing that form and content is the very essence of authorship. *See* Community for Creative Non-Violence v. Reid, 490 U.S. 730, 737 (1989) (the "author" of a work is the person "who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection."). An author need not perform the mechanics of fixation herself, but if she does not somehow exercise artistic control over what comes to be fixed, she has ceded authorship to someone else. The difference is that between dictating a literary work to an amanuensis whose manuscript you oversee and correct,[20] and giving someone permission to write down his own impressions of what you say to him. In the former case you are an author; in the latter a documentary subject.

It follows that an actor who lacks sufficient artistic control over the film to sustain a claim of co-authorship will ordinarily also fail to acquire separate copyright in her individual performance. *See* Copyright Office letter of December 18, 2012 ("[A]n actor's or actress' performance in the making of a motion picture is an integrated part of the resulting work, the motion picture as a whole.") This is because the director and others who capture the performance on film are not acting

---

[20] See Andrien, 927 F.2d at 135 ("When one authorizes embodiment, that process must be rote or mechanical transcription that does not require intellectual modification or highly technical enhancement[.]").

under her authority with the goal of fixing her work in accordance with her artistic vision.  Rather, they are acting under their own authority and capturing her performance only instrumentally, to be used as material in order to further their own artistic vision for the film itself.   Because Ms. Garcia was not an author of the film, we cannot say to what extent the form in which elements of her performance appear reflects "facts of originality, of intellectual production, of thought, and conception" that should be attributed to her as author, rather than to the director, editor, and cinematographer who made the actual decisions as to how her contributions would be presented.[21]   Under these circumstances, she can no more claim separate copyright in her performance than Oscar Wilde could in his pose.[22]

The danger of holding otherwise is amply illustrated by the facts underlying this Court's decision in *Aalmuhammad.*  What if, instead of claiming co-authorship over the film as a whole, Mr. Aalmuhammad had, like Ms. Garcia, claimed instead sole ownership of the creative contributions he made to it?  Such a claim might have afforded him greater leverage than his claim to be co-author of the film.  Co-authors are co-owners, each of whom has the ability to authorize use of the joint work in its entirety, which means all Mr. Aalmuhuammad could get would be an accounting for some (presumably small) share of profits.  17 U.S.C. §§101, 106,

---

[21]*Burrow-Giles Lithographic Co. v. Sarony*, 11 U.S. 52, 59-60 (1884)
[22] *See Aalmuhammad* at 1232 (discussing *Burrow-Giles* and fact that Oscar Wilde was not an author of the lithograph in which he appeared though he contributed to its content).

201(a). This is of course why Ms. Garcia is uninterested in claiming co-authorship of the film—such status would not afford her the remedy she seeks of exclusive control over the footage in which she appears.

If on the other hand Mr. Aalmuhammad could have claimed separate sole ownership of the material he contributed to the film, he could have forced the studio to either come to terms with him or else somehow remove all his contributions from the film before disseminating it further. The possibility of such a claim is present in every case where someone who has contributed expressive content to a work is disappointed by the level of remuneration and/or credit she receives, or where she is disappointed with the quality of the final product and wishes to be disassociated from it.[23] The statute makes co-authors co-owners precisely to avoid the threat of holdup posed by a single co-author over a collaborative work. If Ms. Garcia succeeds in her claim here, we can be certain that every dispute over authorship in the future will include a similar claim in the alternative. Such claims have far greater social cost than disputes over co-authorship, because they threaten to make works unavailable rather than merely redistributing their proceeds.

It is tempting to regard this case as *sui generis* because of the unusual manner in which Ms. Garcia was deceived and harmed. At the end of the day however, the fraud directed at Ms. Garcia—reprehensible as it was—simply does

---

[23] *See* Thomson, 147 F.3d at 205-06 (noting but declining to decide this issue).

not go to the issues on which copyright ownership depends.   There is no dispute

that, prior to arriving on the film set, the performance she was to give had been

neither created nor fixed.  There is no dispute that she gave (and accepted payment

for) her performance with full knowledge that it had no purpose but to be merged

into a film, over which she was to exercise no directorial or editorial control.  She

was misled only as to the expressive character the finished film would exhibit.

Ms. Garcia contends that this deception was so fundamental as to vitiate her

otherwise apparent "intention that [her] contributions be merged into inseparable

or interdependent parts of a unitary whole."[24]  If so, it must necessarily also vitiate

any claim that the performance was fixed "under her authority."   Just as a

promisor who argues fraud in the inducement must rescind the entire contract and

not just the terms she dislikes, Ms. Garcia cannot claim both that she was

fundamentally deceived as to the purpose of the fixation and yet that the

filmmakers were acting "under her authority" to effectuate her artistic vision.[25]

## III.    Copyright's authorship rules and the risk of "fragmentation" of ownership

The danger of accepting Ms. Garcia's claim is that it leads to a default rule

making a separately-owned work of authorship out of every bit of expression fixed

---

[24] 17 U.S.C. 101 (definition of "joint work").

[25] The true gravamen of Ms. Garcia's injury is one of false light defamation.  The appropriate remedy would be for her to obtain an injunction against the filmmaker to require him to cease disseminating the film and to use his ownership of copyright to have it removed from YouTube.

14

as part of a larger collaborative work, provided only that the contribution meet the minimal standard of originality and that the contributor have consented to the fixation. The result will be to fragment the final work into an indeterminate number of subworks that lack distinct boundaries, not least because they lack independent fixations delineating those boundaries. Each contributor will (absent assignment) own a separate copyright in her contribution and will therefore have at least a prima facie right to block use or force redaction of the overall work. This will leave many works vulnerable to holdup or censorship in the short run, and unusable in the long run due to the cost of identifying potential claimants and their successors. Where preexisting and separately fixed works are later combined into a compilation, such fragmented ownership is the correct if occasionally unfortunate result.[26] But where creative elements are neither conceived as separate works nor ever fixed in any "writing" independent of the larger work, there is nothing to be gained—and much to be lost—from a legal rule that generates pervasive fragmentation. Such a rule would also have harmful effects on fair use, which considers the amount of the "work" used as one factor. 17 U.S.C. §107. If each performance or creative contribution to a film is a "work" of its own—whether or not all the subworks in a given work are owned by the same entity—then even

---

[26] *See e.g.* DeNeen L. Brown and Hamil R. Harris, A Struggle for Rights: 'Eyes on the Prize' Mired in Money Battle, Washington Post January 17, 2005, available at http://www.washingtonpost.com/wp-dyn/articles/A14801-2005Jan16.html (discussing how rebroadcast of civil rights documentary was impeded for years by need to reclear expired rights to footage, photos and music used in film).

short clips of minimal importance to a larger work could easily be described as substantial appropriations of a subwork, contrary to prevailing law.[27]

Given the minimal nature of the originality requirement, the implication of Ms. Garcia's claim is that virtually any sequence of actions consensually captured on film or video constitutes by default a copyrighted performance owned separately from the copyright in the film.[28] If, as Ms. Garcia contends, bare consent to the act of filming is enough to sustain separate copyright in one's performance even though the performer is deceived about the nature of the production, then virtually anyone who knows himself to be on camera at any time has a copyright and at least a prima facie entitlement to block dissemination of the footage if he later decides he dislikes the final product. Nor is the logic limited to those who appear on camera. Cinematographers,

---

[27] *See* REGISTER OF COPYRIGHTS, SECTION 1201 RULEMAKING: FIFTH TRIENNIAL PROCEEDING TO DETERMINE EXEMPTIONS TO THE PROHIBITION ON CIRCUMVENTION 126-27 (Oct. 2012) ("[S]hort excerpts of motion pictures for purposes of criticism and commentary … fall within the favored purposes referenced in the preamble of Section 107 and therefore are likely to be fair uses.") (footnote omitted).

[28] *See* Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 345 (1991) ("[T]he requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, "no matter how crude, humble or obvious" it might be.") (citations omitted). Note that because the performer is asserting a claim to her performance as an independent work, it would be this minimal *Feist* standard that would apply, and not the somewhat higher standard that applies when deciding whether a character is sufficiently developed that copying it constitutes infringement of the work in which that character appears. *See e.g.,* Metro-Goldwyn-Mayor Inc. v. American Honda, 900 F.Supp. 1287 (C.D.Cal. 1995) (applying this standard to television commercial featuring character reminiscent of James Bond).

camera operators, lighting designers, costumers, sound engineers, editors—all of these participants in the motion picture industry would presumably have litigable copyright claims, both against the copyright owner of the larger work and against any intermediary or third party making use of that work, whether by license or as a result of a legal privilege to use the larger work..

To be sure, many of these problems may be solved by appropriate use of waivers, licenses, or work for hire agreements. But while sophisticated Hollywood studios may be in a position to hire enough lawyers to protect themselves,[29] copyright law doesn't apply only to Hollywood studios; it applies to everyone who captures others on film, from professionals to amateurs who don't even "do lunch," let alone "do contracts." For copyright to fulfill its promise of democratizing the intellectual marketplace, it must provide a framework that everyone can use, which means default rules that lead to common sense results when lapses occur. It serves a useful purpose for artists to be careful about seeking permission when they make use of preexisting fixed works. As courts have recognized in the context of co-authorship disputes however, it does not serve a useful purpose to force authors to regard every offer of original collaborative expression as a potential Trojan horse

---

[29] And even in Hollywood, it is possible for significant contributors to escape the contractual net—as the facts of *Aalmuhammad* attest.

undermining ownership in the completed project.[30]  Nor does it serve a useful

purpose to encourage opportunism on the part of collaborators who may seek to

introduce expressive content into a project in order to obtain leverage.

Implied licenses may help to ameliorate some of these problems in the

short run, but only imperfectly.  First, since implied licenses are (by definition)

not written down, the contours of any particular implied license can be limned

only through litigation.   Second, if Ms. Garcia's allegation of fraud is sufficient

to invalidate what would otherwise be an implied license, it will be possible for

virtually any disgruntled collaborator to allege that he too was defrauded,

whether as to the expressive nature of the project or as to whether he would be

recognized as a co-author.  Finally, all licenses, whether express or implied, are

subject to statutory termination rights.   17 U.S.C. §203.  The threat of

fragmentation is therefore not resolved, but merely postponed until the

termination window opens 35 years after the license grant.[31]  The consequence

of allowing anyone to find their way onscreen (or even onto the set) without a

signed work-for-hire agreement will be the possibility of a non-frivolous

---

[30] *See Aalmuhammad*, 202 F.3d at 1235-36  ("Claimjumping by research assistants, editors, and former spouses, lovers and friends would endanger authors who talked with people about what they were doing, if creative copyrightable contribution were all that authorship required.").

[31] 17 U.S.C § 203(b)(1) addresses this issue for authorized derivative works, but will not solve the problem created here.   Because Garcia's performance has no fixation apart from the film, it was not a "preexisting work," nor can the film be said to have "recast, transformed, or adapted" it.  17 U.S.C. §101 (defining "derivative work").

18

copyright claim, whether now or at some point in the future. Imagine having the job of trying to clear rights to use a piece of video footage when you must not only worry about artwork and music, but must regard every person appearing onscreen (and the statutory heirs to his or her termination rights) as a potential claimant against your contemplated use. To accept Ms. Garcia's claim will create a breeding ground for the orphan works of the future.

By all appearances, Ms. Garcia was deceived and harmed. We are concerned, however, that copyright law will be harmed if stretched in this manner to provide her a remedy. Other avenues for effective relief are available to her. The preferable course would be for her to obtain a judgment directly against the filmmaker who defrauded her, and either obtain an injunction requiring him to put an end to dissemination of the film, or to foreclose on his copyright in the film so that she can do so herself. We urge the en banc Court to reject the reasoning of the panel opinion and hold that Ms. Garcia holds no copyright interest in *The Innocence of Muslims*.

November 25, 2014

Respectfully Submitted,

_____/s/_____

CHRISTOPHER JON SPRIGMAN
PROFESSOR, NEW YORK UNIVERSITY
SCHOOL OF LAW
CO-DIRECTOR, ENGELBERG CENTER ON
INNOVATION LAW AND POLICY
40 Washington Square South
New York, NY 10012
(212) 992-8162
Christopher.Sprigman@nyu.edu

19

CHRISTOPHER NEWMAN
ASSISTANT PROFESSOR
GEORGE MASON UNIVERSITY SCHOOL OF
LAW
3301 Fairfax Drive
Arlington, VA 22201
(703) 993-8131
cnewman2@gmu.edu

JENNIFER S. GRANICK
STANFORD LAW SCHOOL
CENTER FOR INTERNET AND SOCIETY
559 Nathan Abbott Way
Stanford, CA 94305
(650) 736-8675
jennifer@law.stanford.edu

*Counsel for Amici Curiae*
*Professors of Intellectual Property Law*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I certify that this brief complies with the typeface requirements of Rule 32(a)(5) and (6), because it is written in 14-pt Times New Roman font, and with the type-volume limitations of Rules 28.1(e)(2)(B) and 29(d), because it contains 5,181 words, excluding the portions excluded under Rule 32(a)(7)(A)(iii). This count is based on the word-count feature of Microsoft Word 2013.

Dated: November 25, 2014          By: <u>/s/ Jennifer S. Granick</u>

                                  Counsel for Amici Curiae

## CERTIFICATE OF SERVICE

I hereby certify that on November 25, 2014, I electronically filed the foregoing BRIEF OF AMICI CURIAE PROFESSORS OF INTELLECTUAL PROPERTY LAW IN SUPPORT OF GOOGLE, INC. AND YOUTUBE, LLC, with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: November 25, 2014                    By: /s/ Jennifer S. Granick
                                                Counsel for Amici Curiae