No. 12-57302

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

CINDY LEE GARCIA,

PLAINTIFF-APPELLANT,

v.

GOOGLE INC. AND YOUTUBE, LLC,

DEFENDANTS-APPELLEES.

**On Appeal from the United States District Court
for the Central District of California
Case No. CV-12-8315-MWF (VBKx)
Honorable Michael W. Fitzgerald, District Court Judge**

**BRIEF OF *AMICI CURIAE* SCREEN ACTORS GUILD-AMERICAN
FEDERATION OF TELEVISION AND RADIO ARTISTS; ACTORS'
EQUITY ASSOCIATION; AMERICAN FEDERATION OF MUSICIANS
OF THE UNITED STATES AND CANADA; INTERNATIONAL
FEDERATION OF ACTORS; ALLIANCE OF CANADIAN CINEMA,
TELEVISION, AND RADIO ARTISTS; EQUITY UK; MEDIA,
ENTERTAINMENT AND ARTS ALLIANCE – EQUITY DIVISION
(AUSTRALIA & NEW ZEALAND); AND SOUTH AFRICAN GUILD OF
ACTORS IN SUPPORT OF APPELLANT CINDY LEE GARCIA**

DUNCAN CRABTREE-IRELAND
DANIELLE S. VAN LIER
SAG-AFTRA
5757 Wilshire Blvd., 7th Fl.
Los Angeles, CA 90036
Telephone: (323) 549-6627
Facsimile: (323) 549-6624
Email: amicus@sagaftra.org

*Counsel of Record for Amici*

*Additional Counsel on Next Page*

*Additional Counsel:*

THOMAS R. CARPENTER
GENERAL COUNSEL
ACTORS' EQUITY ASSOCIATION
165 West 46th Street, 15th Floor
New York, NY 10036
Telephone: (212) 869-8530

JENNIFER P. GARNER
IN-HOUSE COUNSEL
AMERICAN FEDERATION OF MUSICIANS
OF THE UNITED STATES AND CANADA
1501 Broadway, Suite 600
New York, NY 10036
Telephone: (212) 869-1330

DOMINICK LUQUER
GENERAL SECRETARY
INTERNATIONAL FEDERATION OF ACTORS
Rue Joseph II 40, B/04
1000 Brussels, Belgium
Telephone: +32 (0)2 235 0865

ELICHAI SHAFFIR
COUNSEL FOR ALLIANCE OF CANADIAN CINEMA,
TELEVISION, AND RADIO ARTISTS
CAVALLUZZO SHILTON MCINTYRE CORNISH LLP
474 Bathurst Street, Suite 300
Toronto, ON M5T 2S6, Canada
Telephone: (416) 964-1115

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................. ii

CORPORATE DISCLOSURE STATEMENT ..................................... v

STATEMENT OF COMPLIANCE WITH RULE 29(c)(5) ................................ v

CONSENT OF THE PARTIES ........................................................ v

INTEREST OF THE *AMICI CURIAE* ................................................. 1

SUMMARY OF ARGUMENT ........................................................ 6

ARGUMENT ............................................................................... 8

A.    An Actor's Performance Can Be an Original Work of Authorship and Therefore Copyrightable when Fixed in a Tangible Medium .......... 9

    1.    "Original Works of Authorship" ..................................... 9

    2.    "…Fixed in a Tangible Medium of Expression" ............................. 11

    3.    A Performance Can Be Considered a Pantomime or a Dramatic Work ................................................................. 12

    3.    This Court Has Previously Acknowledged That a Performance is Copyrightable ..................................... 16

    4.    A Short Performance may be Sufficiently Original to be Protectable ........................................................ 21

B.    Acknowledging an Actor's Separate Copyright Interest, in the Rare Circumstances in which it Arises, Will Not Upset the Hollywood Apple Cart nor Place an Undue Burden on Online Content Sites ............................................................... 23

    1.    Standard Practices Protect the Audiovisual Industry ................... 23

    2.    Technology Companies are Adequately Protected Against Potential Claims ................................................ 28

CONCLUSION ............................................................................ 31

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Bleistein v. Donaldson Lithographing Co*., 188 U.S. 239 (1903) ...........................10

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991).............................9

*Fleet v. CBS, Inc.*, 50 Cal. App. 4th 1911, 58 Cal. Rptr. 2d 645 (Cal. Ct. App. 1996). ................................................................................ 18, 19

*Garcia v. Google, Inc., 766 F.3d 929, 935 (9th Cir. 2014) reh'g granted*, No. 12-57302, 2014 U.S. App. LEXIS 21508 (9th Cir., Nov. 12, 2014)...........12

*Jules Jordan Video, Inc. v. 144942 Canada Inc.*, 617 F.3d 1146 (2010)...............19

*Laws v. Sony Music Entm't*, 448 F.3d 1134 (9th Cir. 2006) ............................ 17, 18

*Lesley v. Spike TV*, 241 Fed. Appx. 357 (9th Cir. 2007) ........................................27

*No Doubt v. Activision Publishing, Inc.*, 702 F.Supp.2d 1139 (2010) ...................20

*Richlin v. Metro-Goldwyn-Mayer*, 531 F.3d 962 (9th Cir. 2007) ..........................20

**Statutes**

17 U.S.C. §101 ...................................................................... 11, 23, 24, 26

17 U.S.C. §102...................................................................... 8, 11, 12, 13

17 U.S.C. §201...............................................................................................26

17 U.S.C. §301...............................................................................................17

U.S. Const. Art. I, §8.......................................................................................8

**Other Authorities**

Chelsea White, *Inside Heath Ledger's Private Diary: Batman Star's Heartbroken Father Shares Personal Notes From Joker Journal*, MAIL ONLINE, May 31, 2013, available at http://www.dailymail.co.uk/tvshowbiz/article-2334159/Inside-Heath-Ledgers-private-diary-Batman-stars-heartbroken-father-shares-personal-notes-dark-Joker-role.html...................................................................14

Compendium II, Compendium of U.S. Copyright Office Practices (2d ed. 1984........................................................................................ passim

Emily Yahr, *'Orphan Black' and Tatiana Maslany Got Snubbed by the Emmy Awards. Here's Why That's Not Shocking*, THE WASHINGTON POST, July 10, 2014, available at

http://www.washingtonpost.com/blogs/style-blog/wp/2014/07/10/orphan-black-and-tatiana-maslany-got-snubbed-by-the-emmy-awards-heres-why-thats-not-shocking/ ............................................15

F. Jay Dougherty, *Not a Spike Lee Joint? Issues in the Authorship of Motion Pictures under U.S. Copyright Law*, 49 UCLA L. REV. 225 (2001) .................................................................................. 10, 11, 13

Glen Berry, *Screenplay Formatting*, FILM UNDERGROUND, available at http://www.filmunderground.com/185/Article/NWFS/Screenplay-Formatting.htm...................................................................................21

Google Transparency Report, available at http://www.google.com/transparencyreport/removals/copyright/?hl=en...........28

H.R.REP. No. 94-1476 (1976)........................................................ 8, 9, 17

Lesley Goldberg, *Emmy's Dark Horse: 'Orphan Black's' Tatiana Maslany*, THE HOLLYWOOD REPORTER, June 20, 2013, available at http://www.hollywoodreporter.com/news/orphan-blacks-tatiana-maslany-emmys-570175 .....................................................................15

Reed Tucker, *Stan Lee's Mighty Marvel Cameos*,. New York Post, November 4, 2013, available at http://nypost.com/2013/11/04/stan-lees-mighty-marvel-cameos/ ....................................................................22

Sam Gutelle, *YouTube's ContentID System Has Paid Out $1 Billion To Rights Holders*, TUBEFILTER, Oct. 15, 2014, available at http://www.tubefilter.com/2014/10/15/youtube-content-id-one-billion ...........29

Tracy Brown, *Meet the 'Orphan Black' Clones Face to Face*, LOS ANGELES TIMES, May 20, 2014, available at http://graphics.latimes.com/towergraphic-orphan-black-clones-guide/.............15

YouTube.com Copyright Infringement Notification Requirements, available at https://support.google.com/youtube/answer/6005900 ...................30

YouTube.com Copyright on YouTube, available at https://www.youtube.com/yt/copyright/ ..........................................................27

YouTube.com Creator Hub, available at https://www.youtube.com/yt/creators/education.html...............................27

YouTube.com Frequently Asked Questions, available at https://support.google.com/youtube/answer/2797449?hl=en..............................30

YouTube.com How Content ID Works,  available at https://support.google.com/youtube/answer/2797370?hl=en..............................29

YouTube.com Submit a Copyright Takedown Notice, available at
    https://support.google.com/youtube/answer/2807622/......................................29

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 26.1 and 29(c) of the Federal Rules of Appellate Procedure, *Amici* provide the following disclosures of corporate identity:

Screen Actors Guild-American Federation of Television and Radio Artists and the American Federation of Musicians of the United States and Canada each certifies that it is a non-profit corporation; it does not offer stock; and it has no parent corporation.

Actors' Equity Association, International Federation of Actors, Alliance of Canadian Cinema, Television, and Radio Artists, Equity UK, Media, Entertainment & Arts Alliance – Equity Section (Australia & New Zealand) and South African Guild of Actors each certifies that it is a non-profit unincorporated association; it does not offer stock; and it has no parent corporation.

## STATEMENT OF COMPLIANCE WITH RULE 29(c)(5)

Counsel for the parties did not author this brief. The parties have not contributed money intended to fund preparing or submitting the brief. No person other than amici curiae, their members, or their counsel contributed money that was intended to fund preparing or submitting the brief.

## CONSENT OF THE PARTIES

Counsel for the parties have consented to the filing of this brief.

# INTEREST OF THE *AMICI CURIAE*

*Amici* represent entertainment industry professionals, including, among others, actors, musicians, and recording artists from around the world who create performances protected under US copyright law. Those performances entertain and inform people everywhere.

Screen Actors Guild-American Federation of Television and Radio Artists ("SAG-AFTRA") is the world's largest labor union representing working media artists. SAG-AFTRA – formed through the historic merger of Screen Actors Guild ("SAG") and the American Federation of Television and Radio Artists ("AFTRA") in 2012 – represents more than 165,000 actors, announcers, broadcasters, journalists, dancers, DJs, news writers, news editors, program hosts, puppeteers, recording artists, singers, stunt performers, voiceover artists and other media professionals. SAG-AFTRA collectively bargains the wages, hours, and working conditions of its members, including in video games, and exists to secure strong protections for media artists.

SAG-AFTRA has collective bargaining agreements with all of the major motion picture and television production companies, television networks, and commercial producers. These collective bargaining agreements govern the wages, hours, and working conditions of SAG-AFTRA's members. Artists working under these collective bargaining agreements are employees and, subject to certain

1

exceptions and reservations of rights, their work is considered "made for hire." SAG-AFTRA and its predecessor organizations have long fought to preserve the rights of performers and others in their performances, including through nationwide legislative and amicus efforts.

Actors' Equity Association ("AEA"), founded in 1913, is a national labor union affiliated with the AFL-CIO, that represents more than 50,000 stage actors and stage managers in the United States. As the oldest labor organization in the United States representing actors, Equity seeks to advance, promote and foster the art of live theatre as an essential component of our society. Equity negotiates wages and working conditions for members working in live theatre, including recording of theatrical performances and developmental contracts where actors and stage managers participate in a royalty pool in exchange for their creative contributions to the creation of new works of theatre. As an advocate for its members, it is a core function of Equity's mission to protect the creative contribution of actors to collaborative artistic endeavors.

The American Federation of Musicians of the United States and Canada ("AFM") was founded in 1896 and represents approximately 80,000 professional musicians throughout North America. The AFM negotiates the wages, hours, and working conditions of musicians in the production of sound recordings, motion pictures, television, commercial announcements, live symphonic, opera and ballet

2

performances, musical theatre, and video games. As an advocate for the intellectual property rights of performers, the AFM has engaged in national and international political action, including a leadership role in backing the passage of the Digital Performance Rights Act. The protection and advancement of performers' rights in their performances is a primary interest of the AFM in the fulfillment of its mission and purpose.

The International Federation of Actors ("FIA") is an international non-governmental organization that represents 85 trade unions, guilds and associations in more than 70 countries around the world, voicing the interests of professional performers in the audiovisual sector. FIA serves as a forum to promote best practices and as an advocate of performers' social and economic rights internationally. FIA campaigns vigorously for the intellectual property rights of performers as they serve to enhance their livelihood and protect their reputation. FIA takes a particular interest in this case as it strongly believes that performers must retain their intellectual property rights in their performance(s), unless such rights are willfully and explicitly transferred to another party by contract or otherwise by operation of law.

The Alliance of Canadian Cinema, Television, and Radio Artists ("ACTRA") is the national union of professional performers working in the English-language recorded media in Canada. ACTRA represents the interests of

3

22,000 members across Canada – the foundation of Canada's highly acclaimed professional performing community.  Founded in 1943, ACTRA negotiates collective agreements covering the production of film, television, audio, and digital media production, as well as commercials and videogames. Through its Performers Rights Society (PRS) division, ACTRA collects remuneration from producers and distributors for use of product in all media.  And through its Royalty Artists Collection Society (RACS) division, ACTRA administers the statutory rights of musicians and singers in audio production, such rights provided by the Canadian Copyright Act.  One of ACTRA's principal interests is in protecting existing intellectual property rights for performers; and advocating for enhanced protection of performers' rights nationally and internationally.

Equity UK is the trade union representing more than 39,000 professional performers and creative practitioners in the UK. As a leading industry organization, Equity is known and respected nationally and internationally for the work it does with, and on behalf of, its members working across all areas of the entertainment industry. Set up in 1930 by a group of artists, Equity has brought about fair payments and fees for artists, health and safety regulation, an outstanding royalties and residuals structure, members' pension and insurance schemes, and made a difference in countless ways.

4

The Media, Entertainment and Arts Alliance – Equity Division ("MEAA") is the union and professional organization which covers all performers in the media, entertainment, sports and arts industries in Australia and New Zealand. MEAA's members include performers working in television, radio, theatre and film, entertainment venues, recreation grounds, such as actors, dancers, orchestral and opera performers. MEAA was created in 1992 through the merging of the unions covering actors, journalists and entertainment industry employees. MEAA advocates in Australia, New Zealand, and internationally for the rights of performers, including recognition of performers' rights under copyright laws.

The South African Guild of Actors ("SAGA") is the foremost organization representing actors in the film, television, stage, commercial and corporate sectors in South Africa. SAGA exists to enhance actors' working conditions, compensation and benefits and to be a powerful, unified voice on behalf of artists' rights. SAGA operates at an international level through the International Federation of Actors, the International Committee for Artistic Freedom and through agreements with sister organizations throughout the world.

*Amici* and the professionals they represent will undoubtedly be affected by the outcome of this case. Accordingly, *Amici* and their members have a significant interest in the outcome of this critically important case.

# SUMMARY OF ARGUMENT

This case presents an interesting question that has seldom been addressed by the courts – does an actor have a copyrightable interest in her performance, separate and apart from the interest anyone else holds in the motion picture as a whole? In a split decision, the panel that heard the case initially determined that she does.

The Copyright Act provides that "[c]opyright protection subsists… in original works of authorship fixed in any tangible medium of expression," specifically enumerating eight categories, such as dramatic works. 17 U.S.C. §102. The plain language of the Copyright Act, as well as this circuit's past precedent, make clear that an actor's performance is a copyrightable work.

Google and its amici have argued that recognizing an actor's copyright interest in his performance would wreak havoc of epic proportions on the audiovisual production and distribution industries, generally, and the internet as a distribution platform, specifically. But their arguments fall flat in light of this court's prior precedent recognizing that an actor's performance is a copyrightable work. Additionally, industry custom and practice is such that it is only in rare circumstances that an actor can claim a separate copyright in his work.

For the reasons discussed, the determination that an actor can, under certain circumstances, have such a copyrightable interest is correct, and that determination should be affirmed.

## **ARGUMENT**

The Constitution gives Congress the power to "promote the progress of science and useful arts, by securing for limited times to authors… the exclusive right to their… writings." U.S. Const. art. I, §8, cl. 8. In exercising that power, Congress has provided that copyright protection should vest "in original works of authorship fixed in any tangible medium of expression." 17 U.S.C. §102. Section 102 then provides a non-exclusive list of categories of works, the Congressional intent being that the section sets out "the general area of copyrightable subject matter, but with sufficient flexibility to free the courts from rigid or outmoded concepts of the scope of particular categories." H.R.REP. No. 94-1476, at 531 (1976).

The question at issue here is whether an actor's performance in a motion picture can be an original work of authorship and, if so, whether the actor can hold a copyright, separate from the copyright in the whole motion picture. For the reasons described herein, the answer to both questions is yes, although the occasions on which this arises will be extraordinarily rare and completely outside the custom and practice of the audiovisual industry of the United States and many other countries.

**A.    An Actor's Performance Can Be an Original Work of Authorship and Therefore Copyrightable when Fixed in a Tangible Medium**

### 1.    "Original Works of Authorship"

Congress intentionally left the phrase "original works of authorship" undefined, deferring to the existing common law. H.R.REP. No. 94-1476, p. 51. *See also Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 355 (1991). "Originality," for purpose of copyrightability, simply means the work originated with the author. The Supreme Court explained that "originality requires independent creation plus a modicum of creativity." *Feist*, 499 U.S. at 346 (holding that a telephone directory lacked the requisite modicum of creativity). The Copyright Office Compendium simply states that, for a work to be original, it "must owe its origin to the author." Compendium II, Compendium of U.S. Copyright Office Practices, §202.01 (2d ed. 1984) ("Compendium II"). It further states that the work "need not be 'novel,' that is, new to the world: to be original it need only be new to the author, that is, not taken from any other source." *Id.*

Originality does not require a finding that a work is novel, or that it show ingenuity or aesthetic merit.  H.R. REP. No. 94-1476, p. 51. Generally, the Copyright Office will not consider a work's quality in determining its copyrightability. *Compendium II* §202. As Justice Holmes advised over a century ago, courts, too, should refrain from considering a work's artistic merit, a concept that has come to be known as "aesthetic nondiscrimination."  F. Jay Dougherty,

9

*Not a Spike Lee Joint? Issues in the Authorship of Motion Pictures under U.S. Copyright Law*, 49 UCLA L. REV. 225, 236 (2001). Justice Holmes noted that "it would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the work of pictorial illustrations outside of the narrowest and most obvious limits." *Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 250 (1903).

The Copyright Office Compendium does not define "authorship," stating only that: "In order to be an original work of 'authorship,' the work must contain at least a certain minimum amount of original creative expression." *Compendium* II §202.02. It lists a number of factors that may impact a determination of whether a work is an original work of authorship. *Id.* at §202.02(a)-(m). Among the factors are whether a work is *de minimis* (*i.e.* lacking even a minimum amount of creativity) or whether it has been created by a human (as opposed to by a non-human, such as monkey, or an automated process, such as a security camera). However, neither of these factors has a significant bearing on the general question of whether an actor's performance can be copyrightable and whether the actor can be considered the author. The "individual whose original, minimally creative expression is embodied" in the work is generally considered the work's "author."[1]

---

[1] There are exceptions to this rule, such as works made for hire or joint works. *Id.*

Dougherty, 49 UCLA L. REV. at 238. Put another way, the author is "the person who 'translates an idea' into expression." *Id.* at 241.

### 2. "…Fixed in a Tangible Medium of Expression"

An original work of authorship is protected when it has been fixed in a "tangible medium of expression." 17 U.S.C. §102. "A work is 'fixed' in a tangible medium of expression when its embodiment in a copy or phonorecord, by *or under the authority of the author*, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration."17 U.S.C. §101 (emphasis added). The Compendium reiterates that, "[i]n order to be subject to copyright registration, a work must be fixed in a tangible medium of expression by *or under the authority* of the author." *Compendium II*, §203 (emphasis added). Neither the Copyright Act nor the Compendium require that the author be the individual who presses the proverbial button to fix the work – by the definition's plain language, it is sufficient that the author authorized fixation. There is no question that Garcia's performance was fixed in a tangible medium; the only question is whether her performance includes the requisite originality to deem her the author, whether individual or joint, of the work.

### 3. A Performance Can Be Considered a Pantomime or a Dramatic Work

An actor's performance can also be considered a pantomime or a dramatic work, protectable separate from the medium in which it is fixed (i.e. a motion picture). Section 102 of the Copyright Act includes works of pantomime and dramatic works among the specifically enumerated works of authorship that are protected. 17 U.S.C. §102(a). As the Ninth Circuit panel that originally heard the case noted, each of these works is an authorized derivative work of the original screenplay. *Garcia v. Google, Inc., 766 F.3d 929, 935 (9th Cir. 2014) reh'g granted*, No. 12-57302, 2014 U.S. App. LEXIS 21508 (9th Cir., Nov. 12, 2014).

The Copyright Office Compendium describes a dramatic work as including "plays prepared for stage presentation, as well as those prepared for cinema, radio, and television." *Compendium II* §430. It "portrays a story by means of dialog or acting and is intended to be performed [and] gives directions for performance or actually represents all or a substantial portion of the action as actually occurring, rather than merely being narrated or described." *Compendium* II §431. The compendium provides that a "drama may be embodied … on a video-recording, such as a videocassette [and the] fixation of a drama may be made simultaneously with its transmission or live performance." *Compendium II* §435. As the live performance of a drama is copyrightable when fixed, an actor's performance of a

role constitutes copyrightable subject matter as this Circuit has previously recognized. *See, infra*, Section 3.A.

Stripped of its dialog and dubbed over, as it was, Garcia's performance can also be considered a work of pantomime, one of the categories of work expressly identified in the Copyright Act. 17 U.S.C. §102. Although the Copyright Act does not define pantomime, the Compendium states: "Pantomime is the art of imitating or acting out situations, characters, or some other events with gestures and body movement." *Compendium* II §460.1. Unlike a dramatic work, "[p]antomimes need not tell a story or be presented before an audience to be protected by copyright." *Id.* The Compendium provides that "[t]o register a work as a pantomime, the movements must be described in sufficient detail… or an actual performance must be captured on some form of film or videotape." *Compendium II* §463. An actor's performance "involves movement, posture, and gesture, which are analogous to copyrightable pantomime or choreography." Dougherty, 49 UCLA L. Rᴇᴠ. at 303.

Generally speaking, each actor adds something new to the character she performs. Google and its amici argue that the actor is basically a puppet – an automaton that merely does as the director instructs, reading the words the writer writes, depicted as the cinematographer sees him or her. Supplemental Brief for Google and YouTube in Response to Suggestion of Rehearing En Banc, pp. 29-30. But this is clearly not the case. The actor imbues the character with originality.

13

Compare, for example, the various actors who have played the character Batman on the big screen – each actor brought something different to their performance of the character that, even when masked in full costume, Christian Bale's performance stands apart from Michael Keaton's, or Val Kilmer's, or George Clooney's or even Adam West's television appearances. And the recent casting of Ben Affleck to play the role sparked considerable debate among fans of the character. And Batman's nemesis, the Joker, provides an example of an actor given wide latitude to create the character. In an interview before his death, Heath Ledger discussed how he spent a month trying to "find" the Joker's character and how the film's director gave him free rein to do so. Chelsea White, MAIL ONLINE, *Inside Heath Ledger's Private Diary: Batman Star's Heartbroken Father Shares Personal Notes From Joker Journal*, May 31, 2013, available at http://www.dailymail.co.uk/tvshowbiz/article-2334159/Inside-Heath-Ledgers-private-diary-Batman-stars-heartbroken-father-shares-personal-notes-dark-Joker-role.html (last visited Dec. 5, 2014) (Ledger described that he "sat around in a hotel room in London for about a month, locked myself away, formed a little diary and experimented with voices - it was important to try to find a somewhat iconic voice and laugh.")

Another example of the originality an individual performer adds to a role can be seen in Tatiana Maslany's portrayal of no less than eight (8) on-screen

14

characters (to-date) in the television series "Orphan Black."[2] Maslany's characters are clones of each other – a 20-something grifter, a science genius, a pill-popping housewife, a transgender male, and a deranged, yet somewhat sympathetic, serial killer – each very distinct from the others. Emily Yahr, *'Orphan Black' and Tatiana Maslany Got Snubbed by the Emmy Awards. Here's Why That's Not Shocking*, THE WASHINGTON POST, July 10, 2014, available at http://www.washingtonpost.com/blogs/style-blog/wp/2014/07/10/orphan-black-and-tatiana-maslany-got-snubbed-by-the-emmy-awards-heres-why-thats-not-shocking/ (last visited Dec. 4, 2014). At times, a scene calls for Maslany to portray one character masquerading as another, requiring a further nuanced performance. Lesley Goldberg, *Emmy's Dark Horse: 'Orphan Black's' Tatiana Maslany*, THE HOLLYWOOD REPORTER, June 20, 2013, available at http://www.hollywoodreporter.com/news/orphan-blacks-tatiana-maslany-emmys-570175 (last visited Dec. 4, 2014). Each character has a different "dialect and [way of] speaking, moving, thinking… and… physicality." *Id.* While the directions provided by the writer and director, as well as distinct costumes and makeup, help

---

[2] Maslany has portrayed nearly a dozen clones, in total. *See* Tracy Brown, *Meet the 'Orphan Black' Clones Face to Face*, LOS ANGELES TIMES, May 20, 2014, available at http://graphics.latimes.com/towergraphic-orphan-black-clones-guide/ (last visited Dec. 4, 2014).

distinguish each character, it is Maslany's performance that brings each character to life, distinguishing one from another.

If an actor did not add sufficient originality to a performance, which actor a studio hired simply would not matter. The Academy Awards, Golden Globes, and Emmy acting categories and the Screen Actors Guild Awards would have no relevance. But it is indisputable that is not true; clearly actors are valued for their performance and the originality they bring to their respective roles. The actor imbues the lines with original expression that conveys emotion and brings the character to life.

The original expression added by performers can be more easily observed in the realm of live theater and with remakes of motion pictures or television shows. Reviews of either often indicate how a performer playing a role originated by a prior performer made the role his or her own. His performance may evoke memories of the actor who played it before, or the character may go in a completely different direction. While a director or cinematographer may help guide the actor's performance, particularly in connection with stage directions, it is the actor's own original expression that the audience sees.

### 3.    This Court Has Previously Acknowledged That a Performance is Copyrightable

This Court has previously recognized that a performance falls within the subject matter of copyright in cases involving preemption of state right of publicity

laws. Where a state law addresses rights that fall within the general scope of copyright in connection with works that are within the subject matter of copyright, the law will be preempted. 17 U.S.C. §301. Section 301(a) provides, specifically, that:

> "all legal and equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103… are governed exclusively by this title."

17 U.S.C. §301(a). Congress' expressed intent was "to preempt and abolish any rights under the common law or statutes of a State that are equivalent to copyright and that extend to works coming within the scope of the Federal copyright law." H.R. REP. No. 94-1476, at 130. Congress further explained that as "long as a work fits within one of the general subject matter categories of sections 102 and 103, the bill prevents the States from protecting it even if it fails to achieve Federal statutory copyright because it is too minimal or lacking in originality to qualify..." *Id.* at 131. As the following cases make clear, performances are protected works of authorship, falling within the subject matter of copyright, even if a particular performance might lack the originality or be too minimal to qualify for protection.

In *Laws v. Sony Music Entm't*, 448 F.3d 1134 (9th Cir. 2006), this court determined that a singer's recorded performance fell within the subject matter of

copyright as a sound recording. The singer alleged her common law and statutory rights of publicity were violated when a record label used samples of her recorded performance without her consent. *Id.* at 1136. In reaching its conclusion that the singer's recorded performance fell within the subject matter of copyright, the court found persuasive a California Court of Appeals case, noting "[a]s the court observed, 'it was not merely [plaintiffs'] likenesses which were captured on film--it was their dramatic performances which are . . . copyrightable.'" *Id.* at 1142, quoting *Fleet v. CBS, Inc.*, 50 Cal. App. 4th 1911, 58 Cal. Rptr. 2d 645 (Cal. Ct. App. 1996).

*Fleet*, although a California case, is particularly instructive in this matter as the facts, but not the claims, were notably similar. Unlike Garcia, Fleet alleged only a violation of his right of publicity, insisting the claim was not one for copyright infringement. *Fleet*, 50 Cal. App. 4th at 1916. Despite the lack of written contracts or evidence of an employment relationship, because the copyright issue was not before the court, it did not address whether Fleet might have been an employee or independent contractor or whether the work was on made for hire. *Id.* at 1917. In addressing the subject matter prong of the preemption analysis, the court held: "There can be no question that, once appellants' performances were put on film, they became 'dramatic work[s]' 'fixed in [a] tangible medium of expression...' [and] [a]t that point, the performances came within the scope or

18

subject matter of copyright law protection." Additionally, the *Fleet* court noted that "[a] work is fixed in a tangible *[sic]* of expression for purposes of the Act, only if recorded 'by or under the authority of the author.' Here, appellants' performances in the film were recorded with their active participation and consent." *Id.* at 1920 fn. 5 (internal citation omitted) (distinguishing *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562 (1977)).

This court had another opportunity to address the copyrightability of an actor's performance in a right of publicity case involving, in part, misappropriation of a "dramatic performance" in counterfeit adult videos. *Jules Jordan Video, Inc. v. 144942 Canada Inc.*, 617 F.3d 1146 (2010). Relying once again on *Fleet*, as well as *Laws*, the court held that the plaintiff's claim was preempted because the "rights [asserted] are works of authorship fixed in a tangible medium of expression and come within the subject matter of the Copyright Act." *Id.* at 1155. Additionally, in addressing who owned the copyright, the court noted that, because there was no written instrument, if the actor's "creative work was performed as an independent contractor, he would be considered the author." *Id.* (discussing whether the work fell within the scope of the actor's employment).

The United States District Court for the Central District of California recently found that a state right of publicity claim was not preempted where the rights asserted did not relate to the plaintiffs' performance. *No Doubt v. Activision*

19

*Publishing, Inc.*, 702 F.Supp.2d 1139 (2010). No Doubt brought suit alleging violation of its members' rights of publicity in a video game. Summarizing the precedent, the court noted that "*Laws* and *Fleet* stand for the following proposition: federal law preempts state-law right of publicity claims where the claims are based on the claimant's *copyrightable* activities that are captured in a copyrighted work." *Id.* at 1144.

The premise of the preemption cases that actors' performances are copyrightable has been expressly stated by this court in other contexts as well. For example, in *Richlin v. Metro-Goldwyn-Mayer*, 531 F.3d 962, 970 (9th Cir. 2007), this court used the Pink Panther film as examples of original expression "Peter Sellers's legendary comedic performance, Henry Mancini's memorable score, or Blake Edwards's award-winning direction," placing the actor's performance at the same level as the composer's musical work. See, *Brief of Amici Curiae Professors Shyamkrishna Balganesh, Justin Hughes, Peter Menell, and David Nimmer in Support of Neither Party at* pp. 7-8 (discussing dramatic performance as a basis for authorship).

As described herein, the prior precedent in this circuit makes clear that an actor's performance is copyrightable.

### 4. A Short Performance may be Sufficiently Original to be Protectable

Google and its supporters argue, in part, that Garcia's performance comprises approximately five (5) seconds of a larger motion picture and, therefore, is not worthy of protection. However, this ignores the fact that her entire performance was substantially longer, edited by Nakoula into what has been called a "trailer" for a larger motion picture. According to Garcia's Complaint, her performance was spread over five (5) full and one partial script pages. *First Amended Complaint*, Exhibit A. A general rule of thumb provides that each script page represents approximately one (1) minute of screen time. See, e.g., Glen Berry, *Screenplay Formatting*, FILM UNDERGROUND, available at http://www.filmunderground.com/185/Article/NWFS/Screenplay-Formatting.htm (last visited Dec. 4, 2014). Additionally, Ms. Garcia worked for three and one-half days, indicative of more than five seconds of footage. *Declaration of Cindy Lee Garcia* ¶6. Accordingly, while Nakoula may have used only a few seconds of Garcia's performance, the full performance may not have been so *de minimis* as to be unprotected.

Some of the most memorable film performances are ones that were exceptionally short. In some cases, these may be moments in a larger performance. In others, they may be brief appearances, or cameos, by a celebrity playing an often uncredited role. Consider the following examples:

21

- Clint Eastwood's oft quoted "So you gotta ask yourself this question: 'Do I feel lucky?' Well, do ya, punk?" as the titular character from Dirty Harry.

- Peter Finch's "mad as hell" monologue from his role as Howard Beale in Network, for which he won a posthumous Oscar.

- Robert Duvall, as Lt. Col. Kilgore in Apocalypse Now, waxing poetic about the smell of napalm in the morning.

While each of the iconic moments above represents a single scene in the actor's larger performance, there is little question that each of these short performances is made memorable by the actor's performance.[3] Each performance possesses more than a modicum of creativity and each originates with the performer, thereby satisfying the minimum requirements of originality and authorship and each is fixed in a tangible medium of expression. Accordingly, these short, memorable performances would qualify for copyright protection and, under appropriate (though rare) circumstances, that copyright would vest in the performer.

While one may question whether Garcia's short performance rises to the level of being separately copyrightable, there should be no question that an actor can have a copyrightable interest in his performance.

---

[3] Even the brief appearance by Stan Lee in the films based upon various Marvel Comics properties, each a unique character in itself lasting no more than a few seconds and often lacking dialog, are memorable and a topic of much fan discussion. See, e.g. Reed Tucker, *Stan Lee's Mighty Marvel Cameos*, New York Post, November 4, 2013, available at http://nypost.com/2013/11/04/stan-lees-mighty-marvel-cameos/ (last visited December 4, 2014) (describing Stan Lee's 18 cameos in the Marvel movies released through November 2013).

**B.      Acknowledging an Actor's Separate Copyright Interest, in the Rare Circumstances in which it Arises, Will Not Upset the Hollywood Apple Cart nor Place an Undue Burden on Online Content Sites**

Google and its amici argue that recognizing an actor's individual copyright interest is unprecedented and would create chaos that would wreak near-apocalyptic chaos on the content and technology industries. Not only is there precedent for it, as explained *infra*, the impact of this rare circumstance is most likely relatively minimal.

**1.      Standard Practices Protect the Audiovisual Industry**

On the copyright side, the audiovisual industry is dominated by standardized practices that consolidate rights through the work made for hire doctrine, assignment, and licensing.

The custom and practice in the US audiovisual industry is to hire individual performers as employees, not as independent contractors.[4]  Where the work is created within an employer-employee relationship, the copyright in the performer's contribution automatically vests in the employer as a work made for hire. 17 U.S.C. §101 ("A 'work made for hire' is… (1) a work prepared by an employee

---

[4] The most notable exception is when a performer is hired through a personal services (or "loan out") company that "lends" the performers services to the producer. In that circumstance, the performer is considered a joint employee of his loan out company and the producer. However, for contractual certainty, the contract between the producer and the loan out company would normally include express work made for hire and/or assignment language.

within the scope of his or her employment").[5] On those occasions where a

performer may be hired through his or her professional services (or "loan out")

company, or where she is engaged as an independent contractor, it is common

practice for the applicable contract to state that the work is being performed as a

work made for hire. *See* 17 U.S.C. §101 ("A 'work made for hire' is…(2) a work

specially ordered or commissioned for use… as a part of a motion picture or other

audiovisual work… if the parties expressly agree in a written instrument signed by

them that the work shall be considered a work made for hire.") In addition, it is

common practice for performer contracts to include a copyright safe harbor;

namely, a statement that if the work is determined not to be a work made for hire,

the performer's copyright interest is assigned to the producer.

    In the US, the major studios, large independent production companies, and

most small independent production companies are signatory to SAG-AFTRA's

collective bargaining agreements which expressly recognize an employer-

employee relationship.[6] Adherence to the terms of one of these agreements is a

prerequisite for employing performers who are members of SAG-AFTRA. SAG-

---

[5] The "work for hire" doctrine is not commonly observed outside the United States.
The non-US amici participating in this brief consider this an accurate statement of
US law but do not endorse its application outside the context of US copyright law.

[6] Additionally, foreign producers must become signatory to either a SAG-AFTRA
collective bargaining agreement or a substantially equivalent agreement with the
union having jurisdiction over the production, if any, in when hiring SAG-AFTRA
members outside of the US.

AFTRA's membership includes among it some of the most famous individuals in the world as well as tens of thousands of individuals who range from those who make a living as actors to those who are just getting started in their careers and everything in between.[7]

Even in situations where a producer has both failed to reduce his relationship with the performer to writing and an employment relationship does not exist, most audiovisual content would be deemed a joint work between the various participants. A work is a "joint work" when it is "prepared by two or more authors with the intention that their contributions be merged into inseparable or

---

[7] Google's *amici*, International Documentary Association, *et al*, argue that SAG-AFTRA's contracts do not include any transfer of interest in the members' performance, citing to inactive links on the SAG-AFTRA website. *Brief of Amicus Curiae International Documentary Association, Film Independent, Fredrik Gertten and Morgan Spurlock In Support Of Appellees Google, Inc. And YouTube, LLC on Rehearing en banc* at 23. What these *amici* fail to note is that each of these contracts incorporates by reference the applicable signatory agreement between SAG-AFTRA and the producer. As the performer is the producer's employee, per the terms of the signatory agreement, the work is a work prepared by an employee within the scope of his employment and the copyright vests in the employer. Additionally, *amici* argue that "actors receive benefits from the actor's union SAG-AFTRA, not the production company," citing to a section of SAG-AFTRA's website as the reason why Ms. Garcia, who is not a SAG-AFTRA member, did not receive benefits from Nakoula. *Id.* at 18. This is false and misleading. Member pension and health benefits are provided, not by SAG-AFTRA but, by independent multi-employer benefit plans established and managed jointly by SAG-AFTRA's predecessor unions and the applicable employers. Contributions to the plans are made by the employer and health premiums are paid by the employee.

interdependent parts of a unitary whole." 17 U.S.C. §101. If the applicable content is a joint work, each author is a co-owner and has the right to exploit it non-exclusively. 17 U.S.C. §201(a) ("The authors of a joint work are co-owners of copyright in the work"). In fact, the Copyright Office has taken the position that "an actor or actress in a motion picture is either a joint author in the entire work or, as most often is the case, is not an author at all by virtue of a work made for hire agreement."[8] *Letter to Mr. M. Cris Armenta, Counsel to Ms. Garcia, from Robert J. Kasunic, Associate Register of Copyrights and Director of Registration Policy and Practices, U.S. Copyright Office (Mar. 6, 2014)*.

We appreciate that Google and some amici may be concerned that user generated content ("UGC"), documentaries, reality shows, game shows and news programs may not consistently adhere to well-established customs and practices of the audiovisual industry. However, programming that relies heavily on unscripted interviews and similar contributions will not be impacted by acknowledging copyrights in performers' creative contributions because such contributions will typically lack the requisite "modicum" of creativity required to be considered an "original work of authorship." *See*, *e.g.*, *Lesley v. Spike TV*, 241 Fed. Appx. 357

---

[8] Amici do not take a position with regard to the Copyright Office's analysis nor with regard to whether Ms. Garcia's performance is properly considered her separately-owned copyright or a joint work. However, this question is addressed in detail by other *amici*. *See*, *Brief of Amici Curiae Professors Shyamkrishna Balganesh, Justin Hughes, Peter Menell, and David Nimmer in Support of Neither Party*.

(9th Cir. 2007) (holding that an actor's actions on an unscripted game show were "naturally associated with the theme of the show" and therefore "commonplace" and, alternatively, that even if it was copyrightable, it was a work made for hire). Similarly, UGC is a content source still relatively in its infancy and many content creators may lack the sophistication of the more established audiovisual industries, but have shown tremendous drive to innovate and grow. There are many resources available to ensure content creators are working within the law. For example, SAG-AFTRA and the other union *amici*, as well as other affiliated organizations, host programs for independent producers and offer information and presentations at film festivals and film schools that are designed to educate and inform producers about working with performers. And YouTube, itself, offers a section that answers many common questions about copyright. *See*, YouTube.com Copyright on YouTube, available at https://www.youtube.com/yt/copyright/ (last visited Dec. 6, 2014). It also offers a robust section for content creators, providing resources on building their brands and establishing audiences, which could easily incorporate lessons on how content creators could work within the bounds of established law. *See* YouTube.com Creator Hub, available at https://www.youtube.com/yt/creators/education.html (last visited Dec. 6, 2014).

**2.** **Technology Companies are Adequately Protected Against Potential Claims**

Google and other technology companies argue that acknowledging an actor's copyright interests in her performances will unduly burden them with take-down notices and even more copyright disputes. This court should reject any such argument because of the technological and commercial reality on both sides.

On the technology side, Google responds to tens of millions of copyright takedown requests on a monthly basis and has deployed a sophisticated, automated system to detect and take down infringing material from YouTube. While the number of takedown requests directed to its YouTube service is not publicly available, Google does report figures related to its other services. For example, in the past 30 days ending December 5, 2014, Google's search engine received and responded to nearly 36 million take-down notices; the company has received and responded to as many as 11 million take-down requests in one week for its search engine. Google Transparency Report, available at http://www.google.com/transparencyreport/removals/copyright/?hl=en (last visited Dec. 5, 2014).

Those numbers do not include YouTube, where, to its credit, Google has deployed "ContentID," a sophisticated technology to automatically detect and stop infringements. ContentID is used by thousands of copyright owners, giving them a choice of leaving the material on YouTube and receiving some financial benefit

28

or making the material unavailable. Sam Gutelle, *YouTube's ContentID System Has Paid Out $1 Billion To Rights Holders*, TUBEFILTER, Oct. 15, 2014, available at http://www.tubefilter.com/2014/10/15/youtube-content-id-one-billion/ (last visited Dec. 5, 2014). In YouTube's own words, "Videos uploaded to YouTube are scanned against a database of files that have been submitted to us by content owners. Copyright owners get to decide what happens when content in a video on YouTube matches a work they own." *See,* YouTube.com How Content ID Works, available at https://support.google.com/youtube/answer/2797370?hl=en (last visited Dec. 4, 2014). This automation substantially reduces any burden to YouTube.

Additionally, the notice and takedown process, by its very design, is intended to minimize the burden technology companies face in responding to takedown notices. Google's process for YouTube videos is exemplary of this. YouTube provides multiple means by which a copyright holder can report allegedly infringing videos, including via an online form, email or manually by mail or fax. *See*, YouTube.com Submit a Copyright Takedown Notice, available at https://support.google.com/youtube/answer/2807622/ (last visited Dec. 4, 2014). In each instance, the copyright owner must provide YouTube with detailed information regarding the allegedly infringing video, including the specific URL address at which it can be found, and a description of the content that is allegedly

29

being infringed. YouTube.com Copyright Infringement Notification

Requirements, available at https://support.google.com/youtube/answer/6005900

(last visited Dec. 4, 2014). Additionally, the copyright owner or her agent must

declare, under penalty of perjury, that she has a good faith belief that she has rights

in the content and that the video is unauthorized. *Id*. Google will then disable the

infringing video and notify the uploader. In most circumstances, that is the end of

the process. However, in some cases, the alleged infringer may submit a counter-

notification, arguing that there is no infringement or he is otherwise authorized to

use the content. Counter Notification Basics, YouTube.com,

https://support.google.com/youtube/answer/2807684/ (last visited Dec. 4, 2014).

Once a counter-notification has been received, YouTube's notifies the copyright

owner and will reinstate the video unless the copyright owner initiates legal

proceedings to restrain the conduct within ten days. YouTube.com Frequently

Asked Questions, available at

https://support.google.com/youtube/answer/2797449?hl=en (last visited Dec. 4,

2014). This is the process even in the most obvious and egregious examples of

infringement.[9]

---

[9] SAG-AFTRA has had direct experience with this process, including receipt of a
counter-notification relating to a clearly infringing video.

In that context, the court should be very doubtful that very rare take-down requests generated from dramatic performers could impose any significant burden on internet service providers.

## CONCLUSION

The framers of the Constitution recognized the importance of encouraging and protecting the creation of works and, for that reason, expressly provided for Copyright. Like other creators, actors bring inspiration and contributions to their performances that endow them with the unique magic that we have all experienced. Actors are not automatons robotically repeating the words of others, and legitimately create copyrightable works in the form of their performances. Actors recognize that in the vast majority of cases, their rights as creators are consolidated with the rights of others to create a single unitary work that can be effectively shared with their audience. In most cases, that creation will be embodied within a joint work, allowing any author to exploit it even over the objections of the other, or a work for hire where the performer has either given up all rights in exchange for the benefits of an employment relationship or the parties have otherwise agreed in writing that the commissioning party shall own all rights. But in some rare cases, that consolidation may not happen. In such circumstances, actors' rights as creators must be respected and recognized under the law. This case presents some

31

unique facts that the trial court should address with the understanding that an actor may have a copyright interest in her performance.

DATED: December 5, 2014                    Respectfully submitted,

                                           By: /s/ Duncan Crabtree-Ireland
                                           DUNCAN CRABTREE-IRELAND
                                           DANIELLE S. VAN LIER
                                           SAG-AFTRA
                                           5757 Wilshire Blvd., 7th Fl.
                                           Los Angeles, CA 90036
                                           Telephone.: (323) 549-6627
                                           Facsimile: (323) 549-6624
                                           Email: amicus@sagaftra.org
                                           *Counsel of Record for Amici*

*Additional Counsel*:

THOMAS R. CARPENTER
ACTORS' EQUITY ASSOCIATION

JENNIFER P. GARNER
AMERICAN FEDERATION OF MUSICIANS
OF THE UNITED STATES AND CANADA

DOMINICK LUQUER
INTERNATIONAL FEDERATION OF ACTORS

ELICHAI SHAFFIR
CAVALLUZZO SHILTON MCINTYRE CORNISH LLP
ALLIANCE OF CANADIAN CINEMA, TELEVISION AND RADIO ARTISTS

## <u>CERTIFICATE OF COMPLIANCE.</u>

I hereby certify that pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1 this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and (6), because it is written in 14-pt Times New Roman font, and with the type-volume limitations of Fed. R. App. P. 29(d) and Ninth Circuit Rule 29-2(c), because it contains 6,931 words, excluding the portions excluded under Fed. R. App. P. 32(a)(7)(B)(iii). This count is based on the word-count feature of Microsoft Word.

DATE: December 5, 2014                    By: /s/ Duncan Crabtree-Ireland____
                                         DUNCAN CRABTREE-IRELAND

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on December 5, 2014.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


/s/ Duncan Crabtree-Ireland

DUNCAN CRABTREE-IRELAND